UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                              Chapter 11 Cases

DELPHI BEHAVIORAL HEALTH                            Case No. 23-_____
GROUP, LLC, *et al.*,[1]
                                                    (Joint Administration Pending)

     Debtors.

_____/

### DECLARATION OF EDWARD A. PHILLIPS IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY FILINGS

I, Edward A. Phillips, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am a Managing Director at Getzler Henrich & Associates LLC ("GHA"). I have over 25 years of experience in the restructuring industry. GHA is a professional services firm engaged in the business of providing restructuring, financial advisory and distressed asset management services, with offices located at 295 Madison Ave., 20th Floor, New York, NY 10017, among other places. GHA provides turnaround and restructuring services to middle market companies in a wide array of industries, and GHA has extensive experience in dealing

---

[1]     The address of the Debtors is 1901 West Cypress Creek Road, Suite 500, Fort Lauderdale, FL 33309. The last four digits of the Debtors' federal tax identification numbers are: (i) Delphi Behavioral Health Group, LLC (2076), (ii) 61 Brown Street Holdings, LLC (0007), (iii) Aloft Recovery LLC (6674), (iv) Banyan Recovery Institute, LLC (6998), (v) Breakthrough Living Recovery Community, LLC (5966), (vi) California Addiction Treatment Center LLC (7655), (vii) California Vistas Addiction Treatment LLC (8272), (viii) DBHG Holding Company, LLC (6574), (ix) Defining Moment Recovery Community, LLC (3532), (x) Delphi Health BuyerCo, LLC (2325), (xi) Delphi Health Group, LLC (0570), (xii) Delphi Intermediate HealthCo, LLC (6378), (xiii) Delphi Management LLC (6474); (xiv) Desert View Recovery Community, LLC (7437), (xv) DR Parent, LLC (2700), (xvi) DR Sub, LLC (8183), (xvii) Las Olas Recovery LLC (9082), (xviii) Maryland House Detox, LLC (1626), (xix) New Perspectives, LLC (0508), (xx) Next Step Housing LLC (6975), (xxi) Ocean Breeze Detox, LLC (7019), (xxii) Ocean Breeze Recovery, LLC (9621), (xxiii) Onward Living Recovery Community, LLC (4735), (xxiv) Palm Beach Recovery, LLC (4459), (xxv) Peak Health NJ, LLC (7286), (xxvi) QBR Diagnostics, LLC (7835), (xxvii) Rogers Learning, LLC (1699), (xxviii) SBH Haverhill, LLC (0971), (xxix) SBH Union IOP LLC (4139), (xxx) Summit at Florham Park, LLC (8226), (xxxi) Summit Behavioral Health Limited Liability Company (3337), (xxxii) Summit Health BuyerCo, LLC (2762), (xxxiii) Summit IOP Limited (4567), and (xxxiv) Union Fresh Start LLC (6841).

with a full range of issues and challenges that arise in corporate restructurings and business reorganizations.

2.      Since December 23, 2022, I have served as one of GHA's advisors to DR Parent, LLC, a Delaware limited liability company ("the Company"), along with its wholly-owned and majority owned subsidiaries (collectively, the "Debtors" or the "Companies") and transitioned to the role of Interim Chief Executive Officer of the Companies ("Interim CEO"). I continue to serve as Interim CEO for the Debtors, as debtors and debtors in possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases").

3.      Since the Debtors' retention of GHA, I and other colleagues from GHA that provide services for the Debtors have become familiar with the Debtors' businesses, financial affairs, debt structure, assets, contractual arrangements, operations and strategic challenges. GHA has been assisting the Debtors with respect to managing liquidity, seeking additional capital, and analyzing potential strategic alternatives for the Debtors. Accordingly, GHA has acquired substantial background and information regarding the Debtors that will assist GHA in providing effective and efficient services to the Debtors with the many issues that may arise in the context of the Debtors' Chapter 11 Cases.

4.      On the date hereof (the "Petition Date"), each of the Debtors commenced a Chapter 11 Case by filing a voluntary petition for relief in this Court under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors are operating their business and managing their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Southern District of Florida (the "United States Trustee"). No trustee or examiner has been appointed in the Chapter 11 Cases.

2

11910565-5

5.      To minimize any adverse effects on their estates as a result of the commencement of these Chapter 11 Cases, the Debtors have filed certain motions, applications and other papers seeking various types of "first day" relief (including all attachments and exhibits thereto and any amendments, collectively, the "<u>First Day Filings</u>").[2]   The First Day Filings seek relief, among other things, to establish the foundation for the smooth and efficient entry into Chapter 11 and the administration of these Chapter 11 Cases.  The relief requested in the First Day Filings is paramount to the success of the efforts of the Debtors to preserve and to maximize the value of their estates.

6.      I submit this declaration ("<u>Declaration</u>") to provide an overview of the Debtors, their business, and the Chapter 11 Cases, as well as to support the Debtors' petitions and the First Day Filings. I have reviewed the Debtors' Chapter 11 petitions and the First Day Filings, or otherwise had the contents explained to me, and to the best of my knowledge after reasonable inquiry, believe that the relief sought in each First Day Filing: (a) is necessary to enable the Debtors to enter into, and to operate in, Chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element to the Debtors' efforts to preserve value and maximize creditor and stakeholder recoveries and to achieve a successful liquidation; and (c) best serves the Debtors' estates and creditors' and stakeholders' interests.  Further, it is my belief that the relief sought in the First Day Filings is narrowly tailored and necessary to achieve the goals of these Chapter 11 Cases.  The facts set forth in each First Day Filing are incorporated herein by reference.

---

[2]   Capitalized terms used by not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Filing(s).

11910565-5

7.      Except as otherwise indicated, I have personal knowledge of the matters set forth herein, and all statements and facts set forth herein are based upon my personal knowledge, discussions with current and former members of the Debtors' senior management and the Debtors' professional advisors, my and our team's review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' representatives, or my opinion based upon my experience with the Debtors' operations and financial condition. In making my statements based upon my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' professionals and representatives, I have relied upon those professionals and representatives accurately recording, preparing or collecting such documentation and other information.  I am authorized to submit this Declaration on behalf of the Debtors.  I am over the age of eighteen, and if called to testify as a witness in this matter, I could and would competently testify to each of the statements and facts set forth herein.

8.      This Declaration is divided into three parts.  Part I provides background information about the Debtors, including their past and current business operations, their corporate and capital structure, and the events leading up to the filing of these Chapter 11 Cases. Part II summarizes the Debtors' primary objectives in these Chapter 11 Cases.  Part III sets forth the relevant facts in support each of the First Day Filings.

<div align="center">

**PART I**
**<u>BACKGROUND</u>**

</div>

**A.      Overview of Business Operations.**

- **Historically through December 31, 2022**

9.    The Company provides a wide range of inpatient and outpatient behavioral healthcare services in the substance use disorder, addiction and mental health treatment space and is focused on delivering clinical excellence at its treatment centers by tailoring programming to each client's particular needs given the medical and/or psychological impacts of addiction presented. Headquartered in Fort Lauderdale, Florida, the Company operated 12 clinical facilities and 2 recovery residences prior to the Petition Date, throughout California, Florida, Maryland, Massachusetts and New Jersey. The levels of care provided at the clinical facilities range from inpatient (detoxification ("Detox") and Residential ("RTC")) to outpatient (partial hospitalization ("PHP"), intensive outpatient programming ("IOP") and outpatient programming ("OP")), as follows:

| Debtor | Address | Program | Services |
|---|---|---|---|
| | | | |
| **California Facilities** | | | |
| California Addiction Treatment Center, LLC, d/b/a California Highlands Addiction Treatment | 15986 S. Highland Spring Ave., Banning, CA 92220 | Inpatient | Detox and RTC (16 beds) |
| California Vistas Addiction[3] Treatment, LLC, d/b/a California Highlands Vistas | 3875 Peony Drive, Fallbrook, CA 92028 | Inpatient | Detox and RTC (6 beds) |
| California Addiction Treatment Center, LLC, d/b/a Desert View Recovery | 70115 Highway 111, Rancho Mirage, CA 92270 | Outpatient | PHP and IOP |
| Desert View Recovery Community, LLC c/o Desert View Recovery Community | 588 E. San Lorenzo Rd, Palm Springs, CA 92264 | Recovery Residence | Housing for up to 42 clients |
| | | | |
| **Florida Facilities** | | | |
| Palm Beach Recovery, LLC, d/b/a Palm Beach Institute | 1017 North Olive Ave., WPB, FL 33401 | Inpatient | Detox and RTC (31 beds) |
| Palm Beach Recovery, LLC, d/b/a Palm Beach Institute | 314 10th St., WPB, FL 33401 | Outpatient | PHP, IOP and OP |
| Palm Beach Recovery, LLC, d/b/a Family Recovery Specialists | 9350 Sunset Dr., #175, Miami, FL 33173 | Outpatient | IOP and OP |
| Breakthrough Living Recovery Community LLC d/b/a Breakthrough Living Recovery Community | 3701 S. Olive Ave., WPB, FL 33405 | Recovery Residence | Housing for up to 23 clients |
| Ocean Breeze Detox, LLC, d/b/a | 1300 Hibiscus Drive, | Inpatient | Detox and RTC |

---

[3]  The Company ceased operating this facility on October 31, 2022.

| | | | |
|---|---|---|---|
| Arete Recovery | Pembroke Pines, FL 33025 | | (26 beds) |
| Ocean Breeze Detox, LLC, d/b/a Vista Pines Health | 1301 Poinciana Dr., Pembroke Pines, FL 33025 8455 S. Palm Dr., Pembroke Pines, FL 33025 | Inpatient | Mental Health RTC services (40 beds) |
| | | | |
| **Maryland Facility** | | | |
| Maryland House Detox, LLC, d/b/a Maryland House Detox | 817 Camp Meade Rd., Linthicum, MD 21090 | Inpatient | Detox (16 beds) |
| | | | |
| **Massachusetts Facility** | | | |
| SBH Haverhill LLC, d/b/a Serenity at Summit New England | 61 Brown St., Haverhill, MA 01830 | Inpatient | Detox and RTC (61 beds) |
| | | | |
| **New Jersey Facilities** | | | |
| Union Fresh Start, LLC, d/b/a Serenity at Summit | 1000 Galloping Hill Road, Union, NJ 07083 | Inpatient | Detox and RTC (72 beds) |
| Summit at Florham Park, LLC, d/b/a Summit Behavioral Health | 83 Hanover Rd., Suite 160, Florham Park, NJ 07932 | Outpatient | PHP, IOP and OP |
| SBH Union IOP, LLC, d/b/a Summit Behavioral Health | 2780 Morris Ave., Union, NJ 07083 | Outpatient | PHP, IOP and OP |
| Summit Behavioral Health Limited Liability Company, d/b/a Summit Behavioral Health Princeton Junction | 4065 Quakerbridge Rd., Princeton Junction, NJ 08550 | Outpatient | PHP, IOP and OP |
| | | | |
| **Corporate Headquarters** | | | |
| Delphi Behavioral Health Group, LLC | 1901 W. Cypress Road, Suite 500, Fort Lauderdale, FL 33309 | Corporate Headquarters | Performs administrative functions for all Facilities and Debtors |

10.    The Company prides itself on providing individualized treatment for all levels of addiction by crafting a personalized plan of medical intervention and therapy, including individual and group sessions and activities, with the goal of giving clients the tools to maintain abstinence from drugs and/or alcohol. Depending on a client's particular needs, a client will start programming at the appropriate level of care and slowly earn more privileges and freedoms as he or she "steps down" within the continuum of care offered. The Company's approach to patient care is distinct from other treatment programs, in that it provides ongoing, post-residential monitoring and care. That process allows for long-term client engagement, which increases the chances that clients can avoid relapse and remain on the path to recovery.

6

11.     The most intensive treatment at the top of the full continuum of care offered by the Company is medical detox, during which the client receives medical care from an attending physician designed to ease withdrawal symptoms. Once the client is medically stable, he or she steps down to inpatient rehabilitation, also known as residential care, which entails 24 hour supervised care for 7 to 25 days. After completing residential care, the client steps down to outpatient programming, starting with PHP, which encompasses individual and group programming typically for 3 to 5 days a week for at least 6 hours a day, followed by IOP spanning approximately 3 days a week for 3 hours a day, and concluding with OP once a week or once every other week for 1 hour.

12.     After completing the full continuum of care, the Company continues to support its clients with aftercare by way of an alumni group that fosters a community among past clients who can continue to support one another through their journey in recovery and that hosts periodic meetings and maintenance programming for alumni. The Company also assists past clients with finding job opportunities and offers structured, sober living environments for former clients in exchange for rent, so that they may progressively acclimate back to more conventional living arrangements.

13.     As more specifically addressed below, the Company expanded its business when it acquired six treatment facilities known as the "Summit" facilities in Massachusetts, New Jersey and Pennsylvania[4] in April of 2018.

- **Changes in Operations during January 2023 Through Present**

14.     For the reasons more fully described below, a wind down of the Company's patient care operations in Florida, California and Maryland was completed on or about January

---

[4]     The Summit Pennsylvania facility was closed in 2019.

11910565-5

31, 2023, with all patients successfully discharged or transferred to other programming. The Company's operations involving one facility in Massachusetts and two facilities in New Jersey will be the subject of a proposed section 363 sale during these cases and the remaining operations in New Jersey will be wound down by, on or about February 28, 2023.

15.    The chart below sets forth the information regarding the winddown of the Company's operations preceding the commencement of these Chapter 11 Cases:

| Debtor | Client Remaining | Staff Remaining | Status |
|---|---|---|---|
| California Addiction Treatment Center, LLC, d/b/a California Highlands Addiction Treatment | 0: Transfers of all clients completed on 1/10/23 | 0: Last of staff completed work on 1/13/23 | Vacated |
| California Addiction Treatment Center, LLC, d/b/a Desert View Recovery | 0: Transfers of all clients completed on 1/18/23 | 0: Last of staff completed work on 1/31/23 | Vacated |
| Desert View Recovery Community, LLC c/o Desert View Recovery Community | 0: Transfers of all clients completed on 1/18/23 | Recovery Residence: 0 | Vacated |
| Palm Beach Recovery, LLC, d/b/a Palm Beach Institute | 0: Transfers of all clients completed on 1/20/23 | 0: Last of staff completed work on 1/31/23 | Vacated |
| Palm Beach Recovery, LLC, d/b/a Palm Beach Institute | 0: Transfers of all clients completed on 1/20/23 | 0: Last of staff completed work on 1/31/23 | Vacated |
| Palm Beach Recovery, LLC, d/b/a Family Recovery Specialists | 0: Transfers of all clients completed on 1/20/23 | 0: Last of staff completed work on 1/31/23 | Vacated |
| Breakthrough Living Recovery Community LLC, d/b/a Breakthrough Living Recovery Community | 0: Transfers of all clients completed on 1/20/23 | Recovery Residence: 0 | Vacated |
| Ocean Breeze Detox, LLC, d/b/a Arete Recovery | 0: Transfers of all clients completed on 1/20/23 | 0: Last of staff completed work on 1/31/23 | Vacated |
| Ocean Breeze Detox, LLC, d/b/a Vista Pines Health | 0: Transfers of all clients completed on 1/20/23 | 0: Last of staff completed work on 1/31/23 | Vacated |
| Maryland House Detox, LLC, d/b/a Maryland House Detox | 0: Transfers of all clients completed on 1/11/23 | 0: Last of staff completed work on 1/31/23 | Vacated |
| SBH Haverhill LLC, d/b/a Serenity at Summit New England | 32 clients | Employees: 98 62 full time 34 part time 2 independent contractors | Subject of a 363 sale |

| Union Fresh Start, LLC, d/b/a Serenity at Summit | 30 clients | Employees: 89<br>58 full time<br>30 part time<br>1 independent contractors | Subject of a 363 sale |
|---|---|---|---|
| Summit at Florham Park, LLC, d/b/a Summit Behavioral Health | 20 clients | Employees: 8<br>5 full time<br>3 part time | Wind down by 2/28/23 |
| SBH Union IOP, LLC, d/b/a Summit Behavioral Health | 36 clients | Employees: 9<br>8 full time<br>1 part time | Wind down by 2/28/23 |
| Summit Behavioral Health Limited Liability Company, d/b/a Summit Behavioral Health Princeton Junction | 76 clients | Employees: 8<br>7 full time<br>1 part time | Subject of 363 sale |
| Delphi Behavioral Health Group, LLC | Corporate Office | Employees: 101<br>89 full time<br>1 part time<br>11 independent contractors | Continue operations for 90 to 120 days |

## B.     The Corporate Structure and Governance of the Debtors.

16.     An organizational chart (the "Org Chart") reflecting the Debtors' corporate structure is attached hereto as Exhibit A.  The Debtors are part of a corporate structure whose ultimate parent is DR Parent, LLC, a Delaware limited liability company. DR Parent, LLC, which is owned 100% by funds managed by, or affiliates of, the Debtors' prepetition senior secured lenders, and serves as the Managing Member of DR Sub, LLC, a Delaware limited liability company. DR Parent LLC and other funds managed by, or affiliates of, certain of the Debtors' prepetition senior secured lenders, hold 68.5299% and 31.4701% of the membership interests in DR Sub, LLC, respectively. The events leading up to the ownership interests by the Debtors' senior secured lenders in DR Parent, LLC and DR Sub, LLC are more fully described below. Pursuant to DR Parent, LLC's Limited Liability Company Agreement, as amended ("LLC Agreement"), the Board of Managers for DR Parent, LLC consists of up to eight positions. As of the Petition Date, three board positions are filled by representatives of the Debtors' prepetition secured lenders ("Lender Managers"), one of whom serves as the Chairperson, and two board positions are filled by independent mangers, one of whom has voting

rights and is the sole member of a Special Committee to which all restructuring matters are delegated.

17.     DR Sub LLC holds 100% of the membership interests in Delphi Intermediate Healthco, LLC, a Delaware limited liability company. Delphi Intermediate Healthco, LLC holds 100% of the membership interests in Delphi Health BuyerCo, LLC and Summit Health BuyerCo, LLC, both of which are Delaware limited liability companies.

18.     Delphi Health BuyerCo, LLC holds 100% of the membership interests in DBGC Holding Company, a Delaware limited liability company, which holds 100% of the membership interests in Delphi Behavioral Health Group, LLC, a Delaware limited liability company. Summit Health BuyerCo, LLC holds 100% of the membership interests in the following limited liability companies: (i) Summit Behavioral Health Limited Liability Company, a New Jersey limited liability company; (ii) Summit IOP Limited, a Pennsylvania limited liability company; (iii) QBR Diagnostics, LLC, a New Jersey limited liability company; (iv) SBH Haverhill, LLC, a Massachusetts limited liability company; (v) Peak Health NJ, LLC, a New Jersey limited liability company; (vi) Summit at Florham Park, LLC, a New Jersey limited liability company; (vii) SBH Union IOP, LLC, a New Jersey limited liability company; (viii) Union Fresh, LLC, a New Jersey limited liability company; and (ix) 61 Brown Street Holdings, LLC, a Massachusetts limited liability company.

19.     Delphi Behavioral Health Group, LLC holds 100% of the membership interests in the following limited liability companies: (i) Breakthrough Living Recovery Community, LLC, a Delaware limited liability company; (ii) Defining Moment Recovery Community, LLC, a Delaware limited liability company; (iii) Onward Living Recovery Community, LLC, a Delaware limited liability company; (iv) New Perspectives, LLC, a Delaware limited liability

10

company; (v) Ocean Breeze Recovery, LLC, a Florida limited liability company; (vi) Las Olas Recovery, LLC, a Florida limited liability company; (vii) Delphi Health Group, LLC, a Delaware limited liability company; (viii) Ocean Breeze Detox, LLC, a Florida limited liability company; (ix) NextStep Housing, LLC, a Florida limited liability company; (x) Palm Beach Recovery, LLC, a Florida limited liability company; and (xi) Rogers Learning, LLC, a Florida limited liability company.

20.     Delphi Health Group, LLC holds (a) 85% of the membership interests in Banyan Recovery Institute, LLC, a Florida limited liability company;[5] and (b) 100% of the membership interests in the following Delaware limited liability companies: (i) California Addiction Treatment Center, LLC; (ii) Aloft Recovery, LLC; (iii) Maryland House Detox, LLC; and (iv) Desert View Recovery Community, LLC.

21.     California Addiction Treatment Center, LLC holds 100% of the membership interests in California Vistas Addiction Treatment, LLC, a Delaware limited liability company.

22.     Historically, the overall operations of the Company have been managed from the Company's corporate headquarters in Fort Lauderdale, Florida. Since GHA's engagement by the Company, members of the GHA team, including myself as Interim CEO, have been assisting in the management of the Company on a day-to-day basis from the Company's Fort Lauderdale corporate headquarters.[6]

**C.     The Prepetition Capital Structure of the Debtors.**

23.     In October of 2017, The Halifax Group, LLC, a private equity firm ("Halifax"), became the equity sponsor of, and provided management consulting services for, "legacy

---

[5] The remaining membership interests in Banyan Recovery Institute, LLC are owned by Joseph Halpern (5%), Maria de Lourdes Cocchiarella (5%) and Thomas Sibilia (5%).

[6] On January 5, 2023, the Company's Chief Executive Officer delivered a notice of resignation to the Company that became effective on February 4, 2023.

Delphi," meaning, in substantive part, the Company's business operations prior to its acquisition of operations known as the "Summit" entities in April of 2018.[7]  At the same time, Brightwood Loan Services, LLC ("Brightwood"), as administrative agent on behalf of a consortium of onshore and offshore lenders (collectively, the "Secured Lenders"), made loans under a credit agreement dated October 3, 2017 ("2017 Credit Agreement") to borrower Delphi Intermediate Healthco, LLC and Delphi Health Holdings, LLC ("old Holdco") to facilitate the leveraged buyout of legacy Delphi by Halifax. The equity and debt transactions described in this paragraph are referred to herein as the "Leveraged Buyout."

24.     In April of 2018, Halifax sought to finance the expansion of the Company's footprint into Massachusetts, New Jersey and Pennsylvania and made an additional equity investment, along with the Secured Lenders lending additional funds, for the Company's acquisition of the Summit entities ("Summit Acquisition").[8]

25.     Following defaults under the 2017 Credit Agreement, however, and as part of a comprehensive restructuring of the Company's balance sheet, Halifax surrendered its equity interests in the Company to the Secured Lenders in April 2020 pursuant to a Restructuring Agreement (the "2020 Restructuring"). At that point, the outstanding amounts owed to the Secured Lenders had grown to over $110 million. In conjunction with the 2020 Restructuring, the Secured Lenders consummated a debt/equity swap by contributing debt in the amount of $90 million that was due and payable under the 2017 Credit Agreement in exchange for 100% of the

---

[7] The Summit entities, which include the Debtors that continue to operate postpetition and will be the subject of a sale process in these cases (SBH Haverhill, LLC, d/b/a Serenity at Summit New England in Massachusetts and Union Fresh Start LLC, d/b/a Serenity at Summit and Summit Behavioral Health Limited Liability Company, d/b/a Summit Behavioral Health Princeton Junction in New Jersey), are owned 100% by Summit Health BuyerCo, LLC. See Exhibit "A."

[8] See second sentence of ¶17 herein for the list of Summit entities acquired in connection with the Summit Acquisition.

direct and indirect membership interests of the Company. The remaining balance of the debt due to the Secured Lenders in the amount of $26.5 million was allocated over two credit agreements. The first credit agreement dated April 8, 2020, was between Brightwood, as Administrative Agent, and borrower DR Parent, LLC for term loans in the aggregate principal amount of $12.5 million (the "Holdco Prepetition Credit Agreement"). The second credit agreement dated April 8, 2020, was between Brightwood, as Administrative Agent, and borrower DR Sub, LLC, which borrower obligations were assumed by Delphi Intermediate Healthco, LLC, for term loans in the aggregate principal amount of $14 million[9] ("Senior Prepetition Credit Agreement"). DR Sub, LLC and the 31 Debtor subsidiaries are guarantors under the Senior Prepetition Credit Agreement and, other than certain excluded assets, the obligations of the Secured Lenders under the Senior Prepetition Credit Agreement are secured by liens on all present and future assets and properties of the Debtor borrower and guarantors, whether real or personal or tangible or intangible.

26.      In or about August 2021, the Company notified Brightwood of an immediate need for funding to support continued operations. Since then, the parties have entered into eight (8) amendments to the Senior Prepetition Credit Agreement (each an "Amendment"), pursuant to which Brightwood, in its capacity as administrative agent, made Protective Advances (under, and as defined in the Senior Prepetition Credit Agreement) to the Company, which were participated out to certain Senior Secured Lenders (based on *pro rata* holdings of term loans), to fund continued operations and to assist the Company while it explored strategic restructuring alternatives, including a sale of the Company's assets as described below. Specifically, Brightwood and the Senior Secured Lenders made a total of $23 million in Protective Advances

---

[9] $14 million is comprised of an initial term loan in the amount of $12.5 million and a post-closing term loan in the amount of $1.5 million.

as follows: (i) Initial Protective Advances (under, and as defined in the Senior Prepetition Credit Agreement) in the aggregate principal amount of $7,500,000, pursuant to Amendments one through three; (ii) Priming Protective Advances (under, and as defined in, the Senior Prepetition Credit Agreement) in the aggregate principal amount of $10,500,000, pursuant to Amendments four through seven; and (iii) Super Priming Advances (under, and as defined in the Senior Prepetition Credit Agreement) in the aggregate principal amount of $5,000,000, pursuant to the eighth Amendment, each of (i)-(iii) exclusive of interest, fees and other charges for which the Debtors are liable under the Senior Prepetition Credit Agreement. On the Petition Date, the aggregate outstanding principal amount of obligations due by the Debtors to Brightwood, for the benefit of the Senior Secured Lenders, under the Holdco Prepetition Credit Agreement and the Senior Prepetition Credit Agreement totals $49.5 million, not including interest, fees and costs.[10]

27.     As of the Petition Date, the Debtors owe approximately $1 million in taxes and $3.1 million in general unsecured debt to creditors, comprised of (i) $465,000 owed to non-insider landlords, (ii) $1 million which may be claimed by landlords owned by one or more former insiders, and (iii) approximately  $1.8 million owed to trade creditors (excluding $12.5 million due from DR Parent, LLC to Brightwood in connection with the Holdco Prepetition Credit Agreement referenced in paragraph 25 above, which comprises a part of the $49.5 million referred to in paragraph 26 above).

**D.     Events Leading to the Filing of the Chapter 11 Cases.**

28.     Following the Leveraged Buyout, the Company began experiencing financial difficulties, as net income after payment of expenses and debt service was modest. That delicate

---

[10] The consortium of lenders participating in the Senior Prepetition Credit Agreement possess an equal right of repayment; however they are contractually subordinated in repayment to the Super Priming Protective Advances, Prior Priming Protective Advances and Prior Protective Advances described above.

balance was deeply disturbed when payors began reducing reimbursements rates starting on January 1, 2018, for inpatient and outpatient services rendered by out of network providers like the Company ("Rate Compression"), particularly at the Florida facilities. While the Summit Acquisition increased cash flow and improved liquidity, it was not enough to offset the negative impact that Rate Compression had on the revenue stream. The Company was overleveraged and unable to service the Secured Lenders' debt.

29.     In an effort to combat lower payments by insurance companies for out of network services to clients, the Company sought to convert to more of an in network-based model. While it was able to secure more favorable in network contracts with major payors, the Company was unsuccessful in increasing client admissions and the number of days clients remained in treatment in order to offset the differential between out of network reimbursements and in network reimbursements. In 2020, the Company ceased operations of a laboratory it had purchased as part of the Summit Entities acquisition (QBR Diagnostics, LLC) because reimbursements for testing declined and payors were increasingly demanding that providers use payors' preferred laboratories.

30.     The onset of COVID also exacerbated the Company's financial difficulties, particularly for its California and Florida facilities, which historically had higher client populations due to their appeal to clients as destination treatment programs. Since the California and Florida facilities were much more dependent on clients traveling from out of state to attend programming, the census at those facilities significantly decreased when COVID prompted the cessation of travel and complicated the consistency and degree of in person treatment.

31.     Additionally, the Company struggled to recruit and retain skilled employees at the corporate level (admissions and business development employees) and at the clinical level

15

(nurses) due to fierce competition in the industry. The Company was simply unable to match bonuses and salaries offered by its competitors to corporate and clinical employees due to losses in revenue equating to hundreds of thousands of dollars each month, notwithstanding the additional advances made available under the Senior Prepetition Credit Agreement.

32.     For the past couple of years, certain of the Secured Lenders, including Brightwood, have continued to fund losses through a succession of three Chief Executive Officers, the last of who resigned in January, effective on February 4, 2023. The Company's net income for 2020 totaled $71.7 million, net income for 2021 was negative $4.5 million and net income for 2022 (through November 2022)[11] was approximately negative $18.5 million. Currently, the Companies employ 423 employees, of which 327 are full-time, 27 are part time, and 69 work on a per diem basis. Of the 423 employees, 288 are hourly employees and 135 are salaried employees.

## PART II
## DEBTORS' OBJECTIVES IN THESE CHAPTER 11 CASES

33.     The primary goal of these Chapter 11 Cases is to consummate a sale of the assets and facilities of the Debtors whose businesses are going to be operated post-sale, including ((i) SBH Haverhill, LLC, d/b/a Serenity at Summit New England; (ii) Union Fresh Start, LLC, d/b/a Serenity at Summit; and (iii) Summit Behavioral Health Limited Liability Company, d/b/a/ Summit Behavioral Health Princeton Junction (collectively, the "Selling Debtors")), which will maximize the value of the Debtors' estates for the benefit of their constituents and preserve a viable business that will continue to employ individuals, maintain contracts with vendors and service providers, and provide services and continued care to clients and patients. In order to facilitate a sale process and the orderly administration of these Chapter 11 Cases, a subset of the

---

[11] As of the Petition Date, the Company is reviewing and finalizing the financial data for December 2022.

11910565-5

Senior Secured Lenders (collectively, the "DIP Lenders") have agreed to provide debtor-in-possession financing (as more fully described below) and Brightwood, in its capacity as Administrative Agent under the Senior Prepetition Credit Agreement, intends to submit a stalking horse credit bid for the purchase of the assets of the Selling Debtors, subject to higher and better bids pursuant to a section 363 sale process and bidding procedures to be approved by the Court. Thereafter, as will be set forth in the Debtors' plan of liquidation, a liquidating trust will be established, and a liquidating trustee will be appointed, to administer any remaining assets of the Debtors. Absent Brightwood's agreement to serve as the stalking-horse bidder, and the DIP Lenders' agreement to provide debtor-in-possession financing in conjunction with the Senior Secured Lenders' consent to use cash collateral to fund the sale process and working capital needs pending a sale, the Debtors would have been forced to cease all operations, lay off their remaining employees, and terminate all of their operations and employees. Without the relief requested in the First Day Filings, and later, in the bidding procedures and the sale motions, immediate liquidation likely remains the Debtors only viable option. The bid procedures motion that the Debtors are filing concurrently herewith seeks the approval of the Court to set a bid deadline for interested parties to submit bids to purchase any of the other remaining assets of the Debtors that are not Purchased Assets included in the Stalking Horse Bid Agreement.

34.     The First Day Filings will permit the Debtors to preserve and maximize some of their enterprise value during the proposed sale process for the benefit of their employees, clients, patients, secured creditors, vendors, and other creditors and parties in interest. The Debtors' immediate objective is to stabilize their operations, preserve liquidity, and to minimize any adverse effects that these Chapter 11 Cases might otherwise have on their estates by obtaining

17

the relief requested in the First Day Filings and to work with interested parties to obtain a sale of their business for the highest and best offer for the benefit of the above-mentioned stakeholders.

35.     For these reasons, and the additional reasons discussed in the First Day Filings which are incorporated herein by reference, I respectfully submit that the various relief requested in the First Day Filings is in the best interest of the Debtors and their estates and should be approved by this Court

<div align="center">

**PART III**

**FIRST-DAY FILINGS**

</div>

36.     Concurrently with the filing of these Chapter 11 Cases, the Debtors are filing certain First Day Filings.  The Debtors respectfully request that the Court conduct a hearing as soon as practicable after the commencement of the Chapter 11 Cases (the "First Day Hearing") to consider the First Day Filings.

37.     I have reviewed each of the First Day Filings (including the exhibits and schedules attached thereto) and, to the best of my knowledge, I believe that the facts set forth therein are true and correct.  Moreover, I believe that the relief sought in each of the First Day Filings : (a) is essential to enable the Debtors to enter into, and to operate in, Chapter 11 with minimal disruption or loss of productivity or value; (b) constitutes a critical element to the Debtors' efforts to preserve value and maximize creditor and stakeholder recoveries; and (c) best serves the Debtors' estates and creditors' and stakeholders' interests.  Further, it is my belief that the relief sought in the First Day Filings is narrowly tailored and necessary to achieve the goals of these Chapter 11 Cases, including the ability of the Debtors to preserve and to maximize value of, as well as to avoid immediate and irreparable harm to, the Debtors' estates.

**A.     Debtors' *Ex Parte* Motion for Joint Administration (the "Joint Administration Motion").**

<div align="center">18</div>

38.     The Debtors believe that it would be more efficient for the administration of these cases if joint administration were authorized.  The Debtors anticipate that a significant portion of the activity during these cases and most hearings will be substantially identical for all of the Debtors resulting in duplicative filings repeatedly being filed should joint administration be denied. Consequently, joint administration would reduce costs and facilitate the economical, efficient and convenient administration of the Debtors' estates.

39.     The Debtors submit that the rights of the creditors and other stakeholders of each of the Debtors will not be adversely affected by joint administration of these cases.  The Debtors filed the Joint Administration Motion on an *ex parte* basis as contemplated by Local Rule 1015-1.

40.     For the reasons set forth in the Joint Administration Motion and herein, I believe that entry of an Order approving joint administration of the Debtors' Chapter 11 Cases will be in the best interests of the Debtors, their estates and creditors.

**B.      Debtors' Application for Entry of an Order Authorizing Debtors to Employ and Retain Epiq Corporate Restructuring LLC as Notice, Claims and Solicitation Agent, Effective as of the Petition Date (the "Epiq Application").**

41.     The Debtors seek approval of their agreement with Epiq Corporate Restructuring LLC ("Epiq") and to have Epiq appointed as notice, claims and solicitation agent of the Court.  I am informed that Epiq is one of the country's leading Chapter 11 administrators, with experience in noticing, claims administration, balloting, solicitation, and facilitating other administrative aspects of Chapter 11 cases, including in healthcare-related matters.  I am further informed that Epiq has substantial experience in cases of this size and complexity, and has acted as the official notice, claims, and solicitation agent in many large bankruptcy cases pending in various districts nationwide.  As explained in the Epiq Application, the approval of the Debtors' agreement with

Epiq and Epiq's appointment as claims, noticing, and solicitation agent of the Court will facilitate the orderly and efficient management of these Chapter 11 Cases.

42.     For the reasons set forth in the Epiq Application and herein, I believe that entry of an Order approving Epiq's retention will be in the best interests of the Debtors, their estates and creditors.

**C.     Debtors' Application, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, for Approval of Agreement with Getzler Henrich & Associates LLC to Provide the Services of (I) Edward Phillips as Interim Chief Executive Officer; and (II) Certain Support Personnel Effective as of the Petition Date (the "<u>Interim CEO Application</u>").**

43.     The Debtors seek approval of an agreement with Getzler Henrich & Associates, LLC ("<u>GHA</u>") to provide (i) myself, Edward A. Phillips, as the Interim CEO of the Debtors; and (ii) the services of certain support personnel, as required.

44.     The Debtors understand that GHA, its professionals and employees and I have a wealth of experience in providing interim management services to distressed organizations, including those operating as chapter 11 debtors-in-possession. The Debtors further understand that GHA and I have an excellent reputation for providing such services throughout the United States in restructuring matters, and that GHA and I are well-qualified to provide services to the Debtors in these Chapter 11 Cases. The Debtors believe that it is in their best interests, and those of their creditors and other stakeholders, that GHA be retained and that it provide my services as Interim CEO, and to provide support staff, to the Debtors in their Chapter 11 Cases. The Debtors need to retain a Chief Executive Officer for regulatory compliance purposes, as well.

45.     Prior to the Petition Date, the Debtors retained GHA in connection with their financial and operational restructuring and GHA agreed to provide the services of certain support personnel, and also to provide my services as Interim CEO, pursuant to an engagement letter

20

dated December 22, 2022, which was amended and restated on January 25, 2023. GHA's retention was approved by the Company's Board of Managers on January 3, 2023 and approved by the Special Committee of the Board on February 1, 2023. Since GHA's original engagement on December 22, 2022, GHA has become familiar with the Debtors' businesses, financial affairs, debt structure, assets, contractual arrangements, operations and strategic challenges. GHA has been assisting the Debtors with respect to managing liquidity, seeking additional capital, and analyzing potential strategic alternatives for the Debtors. Accordingly, GHA has acquired the necessary background and experience regarding the Debtors that will assist GHA in providing effective and efficient services to the Debtors with the many issues that may arise in the context of the Debtors' Chapter 11 cases.

46.     As a result of my prior service as interim management in other restructuring matters, and the prepetition work done for the Debtors by GHA, I believe that the Debtors will suffer immediate and significant harm if they are unable to obtain my services and the services of GHA in these Chapter 11 Cases. It is, therefore, my belief that only with the granting of an order approving GHA's and my employment will such immediate and irreparable injury be avoided.

47.     For the reasons set forth in the Interim CEO Application and herein, I believe that entry of an Order approving the Interim CEO Application is in the best interests of the Debtors, their estates and creditors.

**D.      Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Continue to (I) Maintain Their Cash Management System, (II) Honor Certain Prepetition and Postpetition Obligations Related Thereto, (III) Use Existing Forms, and (IV) Perform Intercompany Transactions, and (B) Granting Related Relief (the "Cash Management Motion").**

48.     I understand from counsel that the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter

21

11 cases. These guidelines require Chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation "debtor-in-possession," the bankruptcy case number, and the type of account. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims. In the Cash Management Motion, the Debtors seek a waiver of these requirements so that its operations are not further disrupted by the need to alter the cash management system.

49. Prior to the commencement of these Chapter 11 Cases, and in the ordinary course of their business, the Debtors used a cash management system which permits the efficient collection, transfer, and disbursement of funds generated on a daily basis from their operations (the "Cash Management System") comprised of thirty-seven (37) bank accounts (each a "Bank Account" and collectively, the "Bank Accounts"). The Debtors maintain each Bank Account at KeyBank, N.A., an authorized depository.

50. Other than two (2) Concentration Accounts in the name of Delphi Behavioral Health Group, LLC, every other Bank Account is a Zero Balance Account (ZBA), the contents of which get swept daily into the Concentration Accounts. Funds on hand in the Concentration Accounts are used to (a) pay accounts payables owed to third parties by Delphi Behavioral Health Group, LLC, and (b) funds amounts necessary for each of the other Debtor account holders to pay accounts payables they owe to third parties and/or employee compensation. Central to the Cash Management System is financing provided by Brightwood that is utilized by

22

the Debtors to fund their business operations. A list of the Debtors' Bank Accounts and the amount on deposit in each such Bank Account as of the February 3, 2023, the last business day preceding the Petition Date, is set forth in the chart comprising paragraph 12 of the Cash Management Motion.

51.     Because the non-Concentration Accounts are swept daily, only the Concentration Accounts have balances at the close of each day.

52.     The Bank Accounts are part of a carefully constructed and highly automated Cash Management System that ensures the Debtors' ability to efficiently monitor and control their cash position.

53.     The Cash Management System used by the Debtors constitute ordinary, usual, and essential business practices. These systems allow the Debtors to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, and (c) reduce administrative expenses. The Debtors' existing Bank Accounts function smoothly and permit the efficient collections and disbursements of cash for the benefit of the Debtors and all parties in interest. The Debtors' transition into Chapter 11 will be significantly less disruptive if the Bank Accounts are maintained following the commencement of these cases with the same account numbers. The Debtors further request authority to deposit funds in each of the Bank Accounts, sweep funds daily into the two (2) Concentration Accounts and use funds therein to pay obligations owed to third parties and employees postpetition, subject to the same access rights and limitations existing prior to the Petition Date, including, but not limited to, check, wire, transfers, ACH, electronic funds transfers and other debits and to treat the Bank Accounts for all purposes as debtors in possession accounts.

11910565-5

54.     The Debtors' operations require the Cash Management System to continue during the pendency of the Chapter 11 Cases.  If the Debtors were required to create and implement a new cash management system, their operations would be severely disrupted, which would have an adverse impact on the Debtors' ability to undertake the proposed sales process.  Further, the establishment of new cash accounts and a new collection and disbursement system would result in substantial additional costs to the Debtors' bankruptcy estates.  Accordingly, the Debtors submit that the maintenance of the existing Cash Management System is essential and in the best interests of all creditors and other parties in interest.

55.     The Debtors seek a waiver of certain operating Guidelines established by the U.S. Trustee.  For example, the Debtors seek a waiver of the requirements that they: (i) close all existing bank accounts; (ii) open new debtor in possession bank accounts; (iii) establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes); (iv) maintain a separate DIP account for cash collateral; (v) obtain checks for all DIP accounts that bear the designation, "debtor in possession," the bankruptcy case number, and the type of account; and (vi) open a new set of books and records as of the Petition Date.  Closing and opening new bank accounts and books and records would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay. With the use of computer technology, it is now easy to differentiate between pre- and post-petition transactions by date.  The Debtors, in the ordinary course of their businesses, use many checks, invoices, stationery, and other business forms.  By virtue of the nature and scope of the businesses in which the Debtors are engaged and the numerous other parties with whom the Debtors deal, the Debtors need to use their existing bank accounts and business forms without alteration or change.  A substantial amount of time and expense would be required in order to

24

close and open new bank accounts and print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations. Accordingly, the Debtors request that they be authorized to continue to use their existing bank accounts and business forms and to maintain their existing business records.

56.     I further understand that section 345 of the Bankruptcy Code and the U.S. Trustee Guidelines established certain requirements with respect to all deposits accounts and investments of money of the estate. The Debtors understand that KeyBank, N.A., where each of the Debtors' Bank Accounts is located, is FDIC insured and an authorized depository pursuant to 11 U.S.C. § 345(b). Additionally, as explained above, the Debtors' Bank Accounts comprise an established and integrated Cash Management System that the Debtors need to maintain in order to ensure that collections and disbursements from the Bank Accounts are not disrupted. The Debtors will note, in their respective records, the date and times the Chapter 11 petitions were filed, and the records will reflect each post-petition receipt and disbursement. Therefore, a waiver of the section 345 deposit guidelines would not pose a risk to the Debtors' estates nor their creditors.

57.     The Debtors request further relief from the Guidelines to the extent that they require the Debtors to make all disbursements by check. In particular, the Guidelines require that all receipts and all disbursements of estate funds be by check with a notation representing the reason for the disbursement. Considering the complexity of the Debtors' operations, the Debtors must conduct transactions by debit, wire, or ACH payments and other similar methods, as discussed above. In addition, the Debtors' receive a portion of their customer receipts through wire transfers. To deny the Debtors the opportunity to conduct transactions by debit, wire or ACH payments or other similar methods would interfere with the Debtors' performance of their

contracts and unnecessarily disrupt the Debtors' business operations, as well as create additional costs to the Debtors. Therefore, the Debtors request a waiver of this requirement.

58. The Debtors also request authority to engage in Intercompany Transactions (as defined in paragraph 18 of the Cash Management Motion) postpetition. If the Court grants this relief, the Debtors will continue recording all such Transactions in their books and records consistent with past practice prior to the Petition Date.

59. Further, the Debtors request authority to pay Bank Fees in the ordinary course as such Fees accrue, including Fees owed to KeyBank, N.A. as of the Petition Date which the Debtors estimate total approximately $24,000. The Debtors understand these Bank Fees will be due and payable within the first ten days of their Chapter 11 Cases.

60. The Debtors seek authority to satisfy Bank Account Claims (as defined in paragraph 14 of the Cash Management Motion) that arise in the ordinary course pre- and postpetition, if any.

61. The Debtors and I have been advised by counsel that the similar relief as the relief requested in the Cash Management Motion has been granted in this and other Districts.

62. For the reasons set forth in the Cash Management Motion and herein, I believe that entry of an Order approving the Cash Management Motion will be in the best interests of the Debtors, their estates and creditors.

**E.  Debtors' Emergency Motion for Order (I) Authorizing Debtors to Pay (A) Certain Prepetition Employee Obligations and (B) Prepetition Withholding Obligations; (II) Authorizing the Debtors to Maintain Employee Benefit Programs and Other Practices, and (III) Directing Banks to Honor Related Prepetition Transfers (the "Employee Motion").**

63. The Debtors seek the relief requested in the Employee Motion because any delay in paying employee compensation, deductions, or benefits will fundamentally harm the Debtors'

relationships with their employees and irreparably impair employee morale at the very time when the dedication, confidence, and cooperation of these employees are most critical. The Debtors face imminent risk that their operations may be severely impaired if the Debtors are not immediately granted authority to make the payments described in the Employee Motion. Employee support for the Debtors' sale and liquidation efforts is crucial to the success of those efforts, particularly given the unique knowledge of the employees regarding the Debtors' operations. At this critical early stage of these Chapter 11 Cases, the Debtors simply cannot risk the substantial disruption to their business operations that would inevitably attend any decline in work force morale attributable to the Debtors' failure to pay employee compensation, deductions, and benefits in the ordinary course. Finally, to remain in a position to maintain necessary operational integrity, oversight, and quality control, the Debtors must continue their corporate policies of permitting certain employees to incur business-related expenses and thereafter to seek reimbursement by submitting appropriate invoices or vouchers evidencing such out-of-pocket disbursements if and when incurred.

64. As the stability of the Debtors' workforce is essential to a successful sale and wind down process, it is critical that they be permitted to continue the ordinary course personnel policies, programs and procedures that were in effect prior to the Petition Date. The Debtors believe that the requested relief will enable them to maintain their current operations without interruption during the sale process, thereby preserving the value of the business, and, at the same time, maintaining employee morale. Without the relief requested, the Debtors' ability to preserve the assets of the estates for the benefit of all creditors and stakeholders will be dramatically impaired and, rather, the granting of that relief will be in the best interests of the Debtors, their estates and creditors.

11910565-5

65. As of the Petition Date and as reflected on Exhibit "A" to the Employee Motion, none of the Employees and none of the Independent Contractors or persons who work on a per diem basis whom the Employer Debtor seeks authority to pay exceeds the Wage Cap.

66. For the reasons set forth in the Employee Motion and herein, I believe that entry of an Order approving the Employee Motion will be in the best interests of the Debtors, their estates and creditors.

**F. Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File (A) A Consolidated Creditor Matrix and (B) A Consolidated List of the Top Thirty Unsecured Creditors; and (II) Authorizing the Debtors to Redact Certain Personally Identifiable Information for Individual Creditors and Parties in Interest (the "<u>Administrative Matters Motion</u>").**

67. The Debtors seek entry of an order authorizing, but not requiring the Debtors to (i) file and maintain a consolidated creditor list and mailing matrix (the "<u>Consolidated Creditor Matrix</u>"), in lieu of a separate creditor list and mailing matrix for each Debtor, (ii) a consolidated list of the Debtors' top thirty (30) unsecured creditors (the "<u>Consolidated Top 30 List</u>"), in lieu of filing a separate list of the top twenty (20) unsecured creditors for each Debtor; and (iii) redact certain personal identifiable information for the Debtors' individual creditors and parties in interest.

68. Authorizing the Debtors to file a Consolidated Creditor Matrix, in lieu of a separate creditor list and mailing matrix for each Debtor is warranted. The Debtors operate as an integrated business and share cash management and operational systems. Because the Debtors have thousands of creditors and other parties-in-interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an unnecessarily burdensome and time-consuming task and would greatly increase the risk of error with respect to information already on computer systems maintained by the Debtors and their agents. Moreover,

28

with respect to the top unsecured creditor lists, the Debtors submit that filing separate top 20 unsecured creditor lists for each Debtor—instead of one consolidated list of the Debtors' top 30 unsecured creditors—would be of limited utility and potentially duplicative to an extent, especially in comparison to the time and expense it would cost to compile separate lists when the Debtors' management are trying to facilitate a smooth transition into chapter 11.

69.    Instead, the Debtors, in consultation with Epiq Corporate Restructuring, LLC, their proposed claims, noticing and solicitation agent, have prepared a single, consolidated list of the Debtors' creditors in electronic format.  The Debtors are prepared to make the Creditor Matrix available in electronic form to any party-in-interest who requests (or in non-electronic form at such requesting party's sole cost and expense) in lieu of submitting a mailing matrix to the clerk of the Bankruptcy Court.  I am advised by counsel that courts in this and other Districts have approved similar relief.

70.    I am also advised by counsel that Bankruptcy Rule 1007(d) provides that a debtor shall file "a list containing the name, address, and claim of the creditors that hold the 20 largest unsecured claims, excluding insiders."  Because certain of the Debtors share creditors and the Debtors operate as a single business enterprise, the Debtors request authority to file a single, Consolidated Top 30 List of their 30 largest general unsecured creditors, in lieu of a separate list of the top 20 unsecured creditors of each Debtor.

71.    Further, the Debtors believe a single, consolidated list of the Debtors' 30 largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors.  Filing a single consolidated list of the 30 largest unsecured creditors in these chapter 11 cases is therefore appropriate. I am advised by counsel that courts in this and other Districts have approved similar relief.

29

11910565-5

72.     I am further advised by counsel that Section 107(c) of the Bankruptcy Code provides that the Court "for cause, may protect an individual, with respect to the following types of information to the extent the court finds that disclosure of such information would create undue risk of identity theft or other unlawful injury to the individual[:]….[a]ny means of identification…contained in a paper filed, or to be filed in a case under" the Bankruptcy Code. 11 U.S.C. § 107(c)(1)(A).

73.     The Debtors respectfully submit that it is appropriate to authorize the Debtors to redact from any pleading or paper filed or to be filed with the Court in these Chapter 11 Cases the home addresses of the Debtors' individual creditors and parties in interest because such information could be used, among other things, to perpetrate identify theft or locate survivors of domestic violence or stalk those who have otherwise taken steps to conceal their whereabouts. The Debtors propose to provide an unredacted version of the Consolidated Creditor Matrix and any other applicable filings to the Court, the U.S. Trustee, counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases (if any), and other parties in interest upon reasonable request, subject to entry into a confidentiality agreement acceptable to the Debtors and their counsel. I am advised by counsel that courts in this and other Districts have approved similar relief.

74.     For the reasons set forth in the Administrative Matters Motion and herein, I believe that entry of an Order approving the Administrative Matters Motion will be in the best interests of the Debtors, their estates and creditors.

**G.** **Debtors' Emergency Motion For Entry of an Order Authorizing Implementation of Procedures to Maintain and Protect Confidential Client Information (the "Confidentiality Motion").**

75. Through the Confidentiality Motion, the Debtors seek an order that will ensure that personal client information is maintained in strict confidence as counsel advises is required by federal law, including the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191, and any amendments thereto ("HIPPA"), as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, Public Law 111-5 ("HITECH"), and their implementing regulations set forth at 45 C.F.R. Parts 160 and Part 164, and the federal regulations governing the Federal Confidentiality of Alcohol and Drug Abuse Patient Records, 42 C.F.R. Part 2 (particularly 42 C.F.R. §§ 2.1 through 2.3, 2.61, and 2.64) ("Part 2 Regulations").

76. The Debtors are in the business of owning and operating facilities that provide substance treatment rehabilitation services to individuals struggling with drug addiction, alcohol addiction, and co-occurring mental/behavioral health issues (the "Clients"). In the ordinary course of their business, the Debtors have access to and receive "protected health information" and data relating to the Clients, which counsel advises the Debtors are required to confidentially maintain pursuant not only to HIPAA, but also Part 2 Regulations, which imposes even stricter guidelines for substance abuse treatment facilities and the release or disclosure of patient information. The Debtors' obligations to maintain in strict confidence "protected health information" and data relating to the Clients is set forth in detail in one or more Employee Handbooks governing employees. Some of these Clients may hold actual or contingent claims against the Debtors' estates, and as such, I am advised by counsel that under section 521(a) of the Bankruptcy Code, 11 U.S.C. § 521, the Debtors have a duty to list all such creditors on the Debtors' mailing matrices and bankruptcy schedules.

31

77.     In an effort to comply with these federal statutes and regulations, the Debtors propose certain procedures outlined in paragraph 9 of the Confidentiality Motion to maintain client confidentiality during the pendency of the Debtors' Chapter 11 Cases (the "Privacy Procedures").

78.     I am also advised by counsel that HIPAA, HITECH, and their corresponding regulations impose stringent standards on health care providers and establish significant penalties for any health care provider that uses or discloses patient information. *See, e.g.,* 42 U.S.C. § 1302d-6 and 45 C.F.R. § 164.502. I am further advised by counsel that Part 2 imposes additional and more stringent standards for health care providers of substance abuse treatment. *See, e.g.*, 42 C.F.R. §§ 2.11, 2.51.

79.     Counsel also informs that the Debtors could be subjected to significant monetary and criminal penalties for the unauthorized disclosure of individually identifiable health information or patient identifying information. 45 C.F.R. § 160.402; 42 C.F.R. § 2.3; 42 U.S.C. § 290dd-2(f). Counsel additionally advises that such penalties can be imposed, for example, even if a person "did not know and, by exercising reasonable diligence, would not have known" that a violation occurred. 45 C.F.R. § 160.404(b)(2)(i).

80.     The Debtors believe that the requirements to maintain patient confidentiality under HIPAA Rules and Part 2 Regulations conflict with the requirements, relayed to me by counsel, to disclose information under the Bankruptcy Code, including the duty to file a list of all creditors under section 521(a)(1)(A) of the Bankruptcy Code and the duty to file schedules of all assets and liabilities under section 521(a)(1)(B)(i) of the Bankruptcy Code. I am advised by counsel that the relief requested in the Confidentiality Motion can be authorized pursuant to sections

105(a) and 107(c) of the Bankruptcy Code, and Rule 9018 of the Federal Rules of Bankruptcy Procedure.

81.    I believe that it is critical that the Clients' personally identifiable health information be protected, that the Debtors maintain compliance with their obligations under federal law to protect such information, and that the Privacy Procedures proposed are appropriate to facilitate that compliance.

82.    For the reasons set forth in the Confidentiality Motion and herein, I believe that entry of an Order approving the Confidentiality Motion will be in the best interests of the Debtors, their estates and creditors.

## H.    Debtors' Emergency Motion For Authorization to (I) Continue to Administer Insurance Policies and Related Agreements and (II) Honor Certain Obligations in Respect Thereto (the "Insurance Motion").

83.    Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors to continue administering the insurance policies described in the Insurance Motion (the "Insurance Policies") and agreements relating thereto, specifically including the *Commercial Insurance Premium Finance and Security Agreement* with BankDirect Capital Finance entered into on or about October 25, 2022, and subject to an addendum entered into on November 17, 2022, and the payment of certain claims, deductibles and/or premiums, in the Debtors' discretion to the extent they become due and payable during the pendency of their Chapter 11 Cases.

84.    The Debtors' Insurance Policies are essential to the preservation of the value of the Debtors' business, properties, and assets during the sale process.  I am advised by counsel that, in many cases, the insurance coverage provided by the Insurance Policies is required by diverse regulations, laws, and contracts, as well as the Office of the United States Trustee.

Therefore, I believe that it is essential for the Debtors to maintain the Insurance Policies, which provide a comprehensive range of coverage for the Debtors.  Moreover, if the Insurance Policies are allowed to lapse, the Debtors could be exposed to substantial liability for any damages resulting to persons or property of the Debtors and others, and the Debtors would have to bear the costs and expenses of defense litigation.

85.     The Debtors' continued operations, combined with the Debtors' efforts to undertake an orderly sales process, require that the Insurance Policies be maintained on an ongoing and uninterrupted basis.  In maintaining those obligations, it is crucial that the administrative fees paid to providers and the premiums paid for the Insurance Policies are continued and maintained by the Debtors.  For example, the risk that eligible claimants will not receive payments with respect to employment-related injuries may have a devastating effect on the financial well-being and morale of the employees, and their willingness to remain in the Debtors' employ.  Departures by employees at this critical time may result in a severe disruption of the Debtors' business to the detriment of all parties in interest.

86.     To the extent that the Insurance Policies and related agreements may be deemed executory contracts, the Debtors do not at this time seek authority to assume these contracts. Rather, the Debtors request only authorization to continue the programs, pay certain claims in accordance with the programs, and pay such premiums and administrative expenses as may be necessary to keep the Insurance Policies in force, including payments due under the *Commercial Insurance Premium Finance and Security Agreement* and the addendum thereto entered into on November 17, 2022, with BankDirect Capital Finance.

87.     I believe that the relief requested in the Insurance Motion will enable the Debtors to continue to operate their businesses in Chapter 11 without disruption.

88.     For the reasons set forth in the Insurance Motion and herein, I believe that entry of an Order approving the Insurance Motion will be in the best interests of the Debtors, their estates and creditors.

I.      **Debtors' Emergency Omnibus Motion to Reject Executory Contracts and Unexpired Non-Residential Real Property Leases, Effective as of the Petition Date (the "Rejection Motion").**

89.     I am advised by counsel that a chapter 11 debtor can, pursuant to Section 365(a) of the Bankruptcy Code, in the exercise of its business judgment, reject executory contracts and unexpired leases if doing so will benefit the bankruptcy estate; that is, eliminate or reduce unnecessary administrative expenses. Certain of the Debtors are lessees of non-residential real estate (collectively, the "Leasing Debtors"), who have ceased operations at the subject premises and are no longer occupying and deriving any benefit from the use of such premises (collectively, the "Leases"). The Leases which the Debtors wish to reject are identified in Exhibit "A" to the Rejection Motion.

90.     Rejection of the Leases will benefit the Leasing Debtors' estates by eliminating or reducing administrative expenses.

91.     I submit that the decision to reject the Leases is one made well within the scope of the Leasing Debtors' business judgment which will benefit their estates and all parties in interest.

92.     The Debtors are also parties to executory contracts as listed in the exhibit to the Rejection Motion, under which the counterparties provide services to one or more of the Debtors (collectively, the "Contracting Debtors"), where mutual and continuing obligations exist (collectively, the "Executory Contracts").

93.     Rejection of the Executory Contracts will benefit the Contracting Debtors' estates by eliminating or reducing administrative expenses, whether by avoiding paying for services that

35

are no longer needed or where replacement providers have been obtained on more favorable terms.

94. I submit that the decision to reject the Executory Contracts is one made well within the scope of the Contracting Debtor's business judgment which will benefit their estates.

95. For the reasons set forth in the Rejection Motion and herein, I believe that entry of an Order approving the Rejection Motion will be in the best interests of the Debtors, their estates and creditors.

**J.** **Debtors' Emergency Motion for Entry of Order Authorizing the Retention and Employment of Professionals Utilized in the Ordinary Course of Business, Effective as of the Petition Date (the "OCP Motion").**

96. Through the OCP Motion, the Debtors seek authority to continue to retain certain professional persons that customarily provided services to the Debtors. The list of Ordinary Course Professionals is attached to the OCP Motion as Exhibit "A." Ordinary Course Professionals are distinct from those professionals who are tasked specifically with assisting the Debtors with their Chapter 11 bankruptcy cases (for whom the Debtors will seek authority to employ through separate application to this Court). Examples of Ordinary Court Professionals are lawyers who serve as insurance or defense counsel who will have no input or involvement in the day-to-day administration of the Debtors' chapter 11 cases.

97. The uninterrupted service of the Ordinary Course Professionals is critical to the Debtors' ability to continue operations and restructure their financial affairs. The Debtors desire to continue to employ and retain Ordinary Course Professionals to render services to their estates that are similar to those rendered prior to the commencement of these Chapter 11 cases. Although the Debtors anticipate that Ordinary Course Professionals will wish to continue to represent the Debtors on an ongoing basis, Ordinary Course Professionals may not be in a

11910565-5

position to do so if the Debtors cannot pay them on a regular basis. The Debtors' estates and their creditors are best served by avoiding any disruption in the services that are required for the day-to-day operations of the Debtors. The Debtors submit that it would be impractical, inefficient and costly for the Debtors and their counsel to prepare and submit individual applications and proposed retention orders for each Ordinary Course Professional.

98.     Although some of the Ordinary Course Professionals may hold unsecured claims against the Debtors in connection with services rendered to the Debtors pre-petition, the Debtors do not believe that any Ordinary Course Professional has an interest materially adverse to the Debtors, their creditors or other parties in interest. The Ordinary Course Professionals will assist with the Debtors' ongoing professional matters and will not be involved with the administration of the Chapter 11 cases. Thus, I am advised by counsel that the Ordinary Course Professionals do not constitute "professional persons" within the meaning of section 327 of the Bankruptcy Code and caselaw construing that phrase. Nonetheless, out of an abundance of caution, the Debtors move this Court for an order authorizing the retention of the Ordinary Course Professionals.

99.     I believe that the procedures for the continued retention of and compensation for Ordinary Course Professionals set forth in paragraph 13 of the OCP Motion is appropriate.

100.     I am advised by counsel that the relief sought in the OCP Motion is authorized by Sections 105(a), 363(c) and/or 1107(a) of the Bankruptcy Code, and that courts in this and other Districts have granted the type of relief sought therein.

101.     For the reasons set forth in the OCP Motion and herein, I believe that entry of an Order approving the OCP Motion will be in the best interests of the Debtors, their estates and creditors.

11910565-5

**K.**     **Debtors' *Ex Parte* Motion for Authorization to File Consolidated Chapter 11 Case Management Summary (the "<u>Consolidated Case Management Motion</u>").**

102.     I am advised that in accordance with Local Rule 2081-1(B), the debtor in possession in a Chapter 11 case is directed to file with the Court and serve all parties of record, within the earlier of three business days after relief is entered, or one business day prior to the date of the first scheduled hearing, a completed local form *Chapter 11 Case Management Summary* (the "<u>Case Management Summary</u>") providing certain information regarding the assets, liabilities and financial affairs of Chapter 11 debtors.

103.     Contemporaneously herewith, the Debtors have each filed in their respective Chapter 11 Cases, *ex parte* motions seeking joint administration of these Chapter 11 Cases. Through the Consolidated Case Management Motion, I am advised that the Debtors will request that the Court authorize them to file a consolidated Case Management Summary, reflecting the assets, liabilities and financial information of each of the Debtors.  I believe that the Debtors' request for authority to file a consolidated Case Management Summary is justified, as the filing of a separate Case Management Summary for each of the thirty-four (34) Debtors would be, in significant part, duplicative.  In brief, the filing of a consolidated Case Management Summary is more efficient and will provide the Court and parties-in-interest with adequate disclosures regarding the assets and liabilities of each Debtor.

104.     I am advised by counsel that the United States Trustee does not usually oppose the relief requested by this motion.

105.     For the reasons set forth in the Consolidated Case Management and herein, I believe that entry of an Order approving the Consolidated Case Management Motion will be in the best interests of the Debtors, their estates and creditors.

11910565-5

**L.** **Debtors' Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry into the Agreement with the Stalking Horse Bidder, Subject to the Bidding Procedures and the Sale Hearing, (II) Approving Bidding Procedures, (III) Scheduling the Bid Deadlines and the Auction, (IV) Scheduling a Hearing to Consider the Transaction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Procedures, and (VII) Granting Related Relief (the "Bidding Procedures Motion").**

106.    The Bidding Procedures Motion seeks approval of, among other things, the Bidding Procedures, the Assumption and Assignment Procedures, the Stalking Horse Bid Agreement as the Stalking Horse Bid, subject to the Bidding Procedures and the Sale Hearing, and Lender AcquisitionCo LLC as the Stalking Horse Bidder. The Bidding Procedures provide for, among other things, the requirements for Competing Qualified Bidders to submit Competing Qualified Bids and participate in an Auction. The Assumption and Assignment Procedures provide for, among other things, the deadlines and requirements for the Debtors to assume and assign executory contracts and unexpired leases.

107.    Pursuant to the terms of the Stalking Horse Bid Agreement, the Stalking Horse Bidder has agreed to purchase the Purchased Assets in exchange for the sum of the following consideration: (i) a credit bid equal to the aggregate outstanding amount of the Protective Advances, in order of priority starting with the Super Priming Protective Advances, up to Five Million Dollars ($5,000,000) (the "Credit Bid Amount"); plus (ii) the assumption by Buyer of funded Debt obligations in an aggregate principal amount equal to Eleven Million Dollars ($11,000,000), inclusive of the DIP Facility (collectively, the "Assumed Debt"); plus (iii) the assumption by Buyer of the other Assumed Liabilities. The portion of the Purchase Price payable under clause (i) shall be paid by means of a credit against the total amounts due and owing under the Loan Documents (the Delphi Intermediate Healthco Credit Agreement) as of the Closing Date. In no event shall the Credit Bid Amount be payable by Buyer in cash.

11910565-5

108.    Pursuant to the relief requested in the Bidding Procedures Motion, the Sale closing shall take place on or before the date that is not greater than seventy-two (72) days after the Petition Date. Upon Court approval, the Purchased Assets will be transferred to the Stalking Horse Bidder or the person or entity which submits a higher or otherwise better bid and prevails at the Auction free and clear of all Liens (except for Permitted Liens).

109.    The Debtors, in the exercise of their reasonable business judgment, have determined after a thorough prepetition strategic review and marketing process, that the most effective way to maximize the value of the Debtors' estates for the benefit of their constituents is to seek bankruptcy protection and to sell the Purchased Assets through the Sale pursuant to section 363 of the Bankruptcy Code.  In order to satisfy the requirements of the DIP Facility (as further described below) and to maintain the support of the DIP Lenders, clients and vendors, and to retain the Debtors' employee base, the Debtors have determined that it is in the best interests of the Debtors and their estates to move expeditiously with a sale process, as described in the Bidding Procedures Motion.

110.    In the Debtors' reasonable business judgment, the Debtors have decided to move forward with the Sale transaction proposed in the Stalking Horse Bid Agreement, subject to the Bidding Procedures, including the submission of higher or better offers, the Sale Hearing and the approval of this Court, as the most effective way to maximize the value of the Debtors' estates for the benefit of their stakeholders.

111.    During the Debtors' cases, Mr. Harvey Tepner, an Independent Manager of DR Parent, LLC Board of Managers, who is also the sole member of the Special Committee established by the Board of Managers to oversee all restructuring efforts, will lead (with the assistance of the Debtors and their professionals) additional marketing of the Debtors' assets

40

during the postpetition period with the goal of obtaining competing bids by the Bid Deadline that will occur during the latter part of March, 2023. As a part of the postpetition marketing process, the Debtors will also consult with any official committee of creditors appointed in these bankruptcy cases and will reach out to any additional parties interested in submitting bids for the Purchased Assets that such committee suggests should be contacted.

112. I believe that the marketing period, which will have spanned more than seven months covering the period both before the commencement of, and during, these bankruptcy cases by the time any proposed Auction is held during late March, 2023, represents a reasonable and sufficient period during which to solicit bids on the Purchased Assets, and that such marketing efforts will be sufficient to ensure the highest or otherwise best offer.

113. I also believe that the Bidding Procedures negotiated with the Stalking Horse Bidder will result in the highest or otherwise best offer for the Purchased Assets and I am advised by counsel that similar Bidding Procedures have been approved by courts in this and other Districts.

114. For the reasons set forth in the Bidding Procedures Motion and herein, I believe that entry of an Order approving the Bidding Procedures Motion will be in the best interests of the Debtors, their estates and creditors.

**M. Emergency Motion (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Adequate Protection to Senior Secured Lenders, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing (the "DIP Financing Motion").**

115. The Debtors are in need of an immediate infusion of liquidity to ensure sufficient working capital to operate their business and administer their estates during the Chapter 11 Cases while the Debtors pursue an orderly sale and wind down process for the remainder of their

41

11910565-5

assets.  During the past several weeks, GHA, together with the Debtors' other advisors, have undertaken an analysis of the Debtors' operations and funding needs.  From this review and analysis, it became clear that the Debtors would require an infusion of capital to allow the Debtors to operate in Chapter 11 as they work with their advisors and key stakeholders to achieve their goal of pursuing a sale of their remaining operating businesses. Specifically, the Debtors' advisors have determined that debtor in possession financing is necessary to ensure (a) sufficient working capital to operate their business and to administer their estates; (b) the timely payment of administrative expenses to be incurred; and (c) a positive message to the market that these Chapter 11 cases are sufficiently funded, which is critical to address the concerns raised by the Debtors' clients, employees, vendors and other creditors.

116.    Given the Debtors' desire to avoid the cost and uncertainty of a postpetition DIP facility that would attempt to non-consensually prime their prepetition secured lenders, the Debtors concluded that, under the circumstances, acceptable third-party financing was not reasonably obtainable.  Moreover, the Debtors' prepetition secured lenders informed the Debtors that they would not consent to the priming of their liens by a third-party lender.  Nevertheless, the Debtors' management approached various parties with the goal of determining whether the Debtors would be able to obtain third-party financing. Recognizing their need for immediate liquidity, the Debtors' management began an arm's-length process and evaluation of available alternatives.

117.    Notwithstanding the foregoing outreach, no third-party has come forward with any proposal for a facility on a junior or unsecured basis to meet the Debtors' liquidity needs. Specifically, no party was willing to provide (i) senior secured financing absent the prepetition secured lenders' explicit consent to the priming of their liens (which they will not consent to),

42

(ii) secured financing junior to the prepetition secured lenders' liens, or (iii) financing on an unsecured basis. Given the Debtors' challenging liquidity situation and the fact that no third-party lender was willing to provide financing on a junior basis to the existing secured facility, or to refinance in full the existing secured debt as well as provide incremental capital to fund the Debtors' chapter 11 cases, the Debtors determined that the DIP Facility provides the best path forward for the Debtors to maximize the value of their estates in these Chapter 11 Cases. Accordingly, the Debtors, with the help of their professionals, negotiated the DIP Documents with the DIP Lenders in good faith and with the assistance of GHA and their counsel, and the Debtors believe that they have obtained financing on the best terms reasonably available.

118.     Given the financial challenges and the anticipated funding needs of the Debtors during the sale process, the Debtors concluded that proceeding with the DIP Facility is the most efficient and cost-effective way to proceed. In my role as the Debtors' Interim Chief Executive Officer, I was actively involved in the solicitation of proposals to procure debtor in possession financing, as well as in the negotiation process, including engaging in good faith discussions with the potential lenders. The proposed DIP Facility, including the pricing, is fair and reasonable under the circumstances, is in the best interest of the Debtors' estates, will provide the Debtors with the financing required for these Chapter 11 Cases, and will add liquidity to fund the Debtors' bankruptcy cases through an orderly sales process and a plan of liquidation. Accordingly, I believe the DIP Facility and its terms are both fair and reasonable and in the best interests of the Debtors' and their estates.

119.     The continued and viable operation of the Debtors' business will not be possible absent the Court's entry of the Interim Order. Approval of the Interim Order will ensure the uninterrupted operation of the Debtors' business, the maintenance of ordinary course

11910565-5

relationships with vendors, clients and employees, the satisfaction of working capital needs in the ordinary course, and the consummation of the sale process.

120.     For the reasons set forth in the DIP Financing Motion and herein, I believe that entry of an Order granting the DIP Financing Motion is in the best interests of the Debtors, their estates, and creditors.

*N.*     **Debtors' Motion for Entry of an Order Authorizing and Approving a Key Employee Retention Plan (the "<u>KERP Motion</u>").**

121.     The Debtors filed the KERP Motion seeking authorization to establish and implement a KERP for eight (8) non-officer, non-insider employees employed by Delphi Behavioral Health Group, LLC ("<u>DBHG</u>"). Each of the KERP Participants works out of the corporate headquarters in Fort Lauderdale, and undertakes accounting functions for all of the Debtors.   The KERP Motion is supported by a separate Declaration I submitted contemporaneously with submission of the KERP Motion.

122.     The KERP Motion proposes to pay the KERP Participants a total of $65,350 to stay with DBHG through the Effective Date of confirmation of a Chapter 11 plan, which would subsume the sale process. The KERP Payments are payable in three (3) lump sums, range from approximately $5,750 to $17,850 per KERP Participant, and average approximately $8,168.75 per KERP Participant.

123.      In the event a KERP Participant's employment is terminated by DBHG without cause or due to the KERP Participant's death/disability, then the KERP Participant shall be entitled to a pro-rata portion of his/her respective KERP Payment based on the number of days worked from the prior KERP Retention Date.

44

124. In the event a KERP Participant voluntarily resigns from employment or is terminated by DBHG for cause, then the KERP Participant shall not be eligible for any portion of such unpaid KERP Payment, and DBGH shall maintain the right to recoup and claw back the Initial KERP Payment made upon entry of the Order from such KERP Participant. Any unused funds allocated towards a KERP Participant who has voluntarily resigned or is terminated for cause by DBHG may be allocated towards another KERP Participant absent further relief and in DBHG''s sole discretion, provided *that*, in no event shall the aggregate cost of the KERP exceed $65,350.

125. The KERP Participants have developed valuable institutional knowledge regarding the Debtors' ongoing business operations. Several have longstanding relationships with the Debtors' vendors and customers that would be difficult and expensive to replace. Preserving this institutional knowledge and these relationships is crucial to the successful administration of the Debtors' operations over the coming months, the preservation of the value of the Debtors' estates, and, ultimately, the efficient administration of the Chapter 11 Cases.

126. No KERP Participant is an "insider" as such term is defined in section 101(31) of the Bankruptcy Code.

127. I am advised by counsel that the relief sought in the KERP Motion is authorized under Section 503(c)(3) of the Bankruptcy Code.

128. Based on my experience in the restructuring industry, I believe that the proposed KERP is modest in scope, that is justified because of the importance of the accounting functions performed by each of the KERP Participants, and it will benefit the estates. The KERP is further warranted because it provides that each of the KERP Participants will continue their employment

45

through the contemplated sale and confirmation processes. Accordingly, I believe that it is appropriate for the Court to approve of the KERP.

## PART IV
## CONCLUSION

129.     This Declaration explains the circumstances that have led to the commencement of the Chapter 11 Cases and the need for the relief requested in the First Day Filings.  For the reasons described herein and in the First Day Filings which are incorporated herein by reference, I believe that the prospect for achieving the objectives for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Filings.

## 28 U.S.C.  § 1746 Declaration

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed this 5 day of February, 2023 in Miami, FL.

_____
Edward A. Phillips
Interim Chief Executive Officer

46

**EXHIBIT "A"**



Prepetition Lenders
100%
DR Parent, LLC
Managing Member of DR Sub, LLC
Certain Prepetition Lenders
68.5299%
31.4701%
DR Sub, LLC
Delphi Management LLC
100%
100%
Delphi Intermediate Healthco, LLC
100%
Delphi Health BuyerCo, LLC
100%
Summit Health BuyerCo, LLC
All 100%
Summit Behavioral Health Limited Liability Company
Summit IOP Limited
QBR Diagnostics, LLC
SBH Haverhill, LLC
Peak Health NJ, LLC
Summit at Florham Park, LLC
SBH Union IOP LLC
Union Fresh Start LLC
61 Brown Street Holdings, LLC
100%
DBHG Holding Company, LLC
100%
Delphi Behavioral Health Group, LLC
100%
Breakthrough Living Recovery Community, LLC
100%
Defining Moment Recovery Community, LLC
100%
Onward Living Recovery Community, LLC
100%
New Perspectives, LLC
100%
Ocean Breeze Recovery, LLC
100%
Las Olas Recovery LLC
100%
Delphi Health Group, LLC
100%
Ocean Breeze Detox, LLC
100%
Next Step Housing LLC
100%
Palm Beach Recovery, LLC
100%
Rogers Learning, LLC
85%
Banyan Recovery Institute, LLC
100%
California Addiction Treatment Center LLC
100%
Aloft Recovery LLC
100%
Maryland House Detox, LLC
100%
Desert View Recovery Community, LLC
100%
California Vistas Addiction Treatment LLC

11872874-6