

**ORDERED in the Southern District of Florida on February 10, 2023.**



**Peter D. Russin, Judge**
**United States Bankruptcy Court**

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 11 Cases |
| DELPHI BEHAVIORAL HEALTH GROUP, LLC, *et al.*,[1] | Case No. 23-10945-PDR |
| | (Jointly Administered) |
| Debtors. | |

_____/

**INTERIM ORDER (I) AUTHORIZING DEBTORS
TO (A) OBTAIN POSTPETITION SENIOR SECURED**

---

[1]  The address of the Debtors is 1901 West Cypress Creek Road, Suite 500, Fort Lauderdale, FL 33309.  The last four digits of the Debtors' federal tax identification numbers are: (i) Delphi Behavioral Health Group, LLC (2076), (ii) 61 Brown Street Holdings, LLC (0007), (iii) Aloft Recovery LLC (6674), (iv) Banyan Recovery Institute, LLC (6998), (v) Breakthrough Living Recovery Community, LLC (5966), (vi) California Addiction Treatment Center LLC (7655), (vii) California Vistas Addiction Treatment LLC (8272), (viii) DBHG Holding Company, LLC (6574), (ix) Defining Moment Recovery Community, LLC (3532), (x) Delphi Health BuyerCo, LLC (2325), (xi) Delphi Health Group, LLC (0570), (xii) Delphi Intermediate HealthCo, LLC (6378), (xiii) Delphi Management LLC (6474) (xiv) Desert View Recovery Community, LLC (7437), (xv) DR Parent, LLC (2700), (xvi) DR Sub, LLC (8183), (xvii) Las Olas Recovery LLC (9082), (xviii) Maryland House Detox, LLC (1626), (xix) New Perspectives, LLC (0508), (xx) Next Step Housing LLC (6975), (xxi) Ocean Breeze Detox, LLC (7019), (xxii) Ocean Breeze Recovery, LLC (9621), (xxiii) Onward Living Recovery Community, LLC (4735), (xxiv) Palm Beach Recovery, LLC (4459), (xxv) Peak Health NJ, LLC (7286), (xxvi) QBR Diagnostics, LLC (7835), (xxvii) Rogers Learning, LLC (1699), (xxviii) SBH Haverhill, LLC (0971), (xxix) SBH Union IOP LLC (4139), (xxx) Summit at Florham Park, LLC (8226), (xxxi) Summit Behavioral Health Limited Liability Company (3337), (xxxii) Summit Health BuyerCo, LLC (2762), (xxxiii) Summit IOP Limited (4567), and (xxxiv) Union Fresh Start LLC (6841).

**FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING
ADEQUATE PROTECTION TO SENIOR SECURED LENDERS,
(III) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (IV) MODIFYING
THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

**THIS MATTER** having come before the Court for a hearing on February 9, 2023, at 2:30

p.m. in Fort Lauderdale, Florida upon the *Emergency Motion (I) Authorizing the Debtors to Obtain*

*Postpetition Financing, (II) Authorizing the Debtors to Use the Cash Collateral, (III) Granting*

*Adequate Protection to Senior Secured Lenders, (IV) Granting Liens and Superpriority Claims,*

*(V) Modifying the Automatic Stay, and (VI) Scheduling a Final Hearing* [ECF No. 24]

(the "**Motion**") filed by the above-captioned debtors (the "**Debtors**") in the above-captioned case

(the "**Chapter 11 Cases**"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of

title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "**Bankruptcy**

**Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure

(as amended, the "**Bankruptcy Rules**") and Rules 4001-2, 4001-3, 9013-1(F)-(H) and 9075-1 of

the Local Rules for the United States Bankruptcy Court for the Southern District of Florida (as

amended, the "**Local Rules**"), and the *Guidelines for Motions Seeking Authority to Use Cash*

*Collateral and Motions Seeking Approval of Postpetition Financing* (as amended, the

"**Guidelines**") seeking, among other things:

A.     authorization for the Debtors to receive senior secured postpetition financing in the
form of a senior secured, super priority multiple draw term loan facility (the "**DIP
Facility**"; and the financial institutions party thereto from time to time as lenders,
the "**DIP Lenders**") in an aggregate principal amount of up to $11,000,000
(collectively, the "**DIP Commitments**"), of which $5,000,000 shall be made
available upon entry of this interim order (this "**Interim Order**"), pursuant to the
terms and conditions of this Interim Order, the Final Order (as defined below) (upon
entry) and that certain *Superpriority Secured Debtor-in-Possession Credit
Agreement* (as the same may be amended, restated, supplemented, or otherwise
modified from time to time in accordance with the terms thereof, the "**DIP Loan**

11904184-3

**Agreement**"[2] together with the schedules and exhibits attached thereto, and all agreements, documents, instruments and amendments executed and delivered in connection therewith, the "**DIP Documents**"), by and among Delphi Intermediate Healthco, LLC, a Delaware limited liability company (the "**DIP Borrower**"), the other Loan Parties party thereto from time to time (together with the DIP Borrower, the "**DIP Loan Parties**"), the DIP Lenders and Brightwood Loan Services LLC, as administrative agent (in such capacity, and together with any successor thereto, the "**DIP Agent**" and together with the DIP Lenders, the "**DIP Secured Parties**"), substantially in the form of **Exhibit A**, attached hereto;

B.    approval of the terms of, and authorization for the Debtors to execute, enter into and deliver the DIP Documents, and to perform all DIP Obligations (as defined below);

C.    the granting of adequate protection to the Senior Secured Lenders (as defined below), in their capacity as the lenders from time to time under that certain Credit Agreement, dated as of April 8, 2020 (as amended by that certain First Amendment to Credit Agreement and Forbearance Agreement, dated as of August 3, 2021, that certain Second Amendment to Credit Agreement and Forbearance Agreement, dated as of January 18, 2022, that certain Third Amendment to Credit Agreement and Forbearance Agreement, dated as of April 29, 2022, that certain Fourth Amendment to Credit Agreement and Forbearance Agreement, dated as of June 14, 2022, that certain Fifth Amendment to Credit Agreement, dated as of September 16, 2022, that certain Sixth Amendment to Credit Agreement, dated as of November 7, 2022, that certain Seventh Amendment to Credit Agreement, dated as of December 6, 2022, that certain Eighth Amendment to Credit Agreement, dated as of January 10, 2023 and as may be further amended, amended and restated, supplemented and/or otherwise modified from time to time, the "**Senior Secured Loan Agreement**" and together with the schedules and exhibits attached thereto, and all agreements, documents, instruments and amendments executed and delivered in connection therewith, the "**Senior Secured Loan Documents**"), by and among the lenders from time to time to party thereto (the "**Senior Secured Lenders**"), Brightwood Loan Services LLC, in its capacity as administrative agent for the Senior Secured Lenders (solely in such capacity, the "**Prepetition Agent**" and together with the Senior Secured Lenders, the "**Senior Secured Parties**"), the Borrower (as defined therein) and the other Loan Parties (as defined therein) from time to time thereto (together with the Borrower, the "**Senior Secured Obligors**");

D.    subject to the restrictions set forth in the DIP Documents and this Interim Order, authorization for the Debtors to use Cash Collateral (as defined below) and all other Prepetition Collateral (as defined below) in which the Senior Secured Lenders have an interest and the granting of adequate protection to the Senior Secured Lenders

---

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the DIP Loan Agreement.

with respect to, *inter alia*, such use of Cash Collateral and the other Prepetition Collateral;

E.    subject to certain challenge rights of parties in interest set forth herein, approval of certain stipulations by the Debtors with respect to the Senior Secured Loan Documents and the liens and security interests arising therefrom;

F.    the granting of superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code to the DIP Lenders as well as liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d) of the Bankruptcy Code, as further described herein, on all DIP Collateral (as defined below) and all proceeds thereof (including any Avoidance Actions/Proceeds (as defined below), upon entry of a Final Order) to the DIP Agent for the benefit of the DIP Lenders, including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code and as more specifically defined below, which liens shall be subject to the priorities set forth below;

G.    the waiver of the Debtors' right to surcharge the Prepetition Collateral and the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

H.    a finding that neither the DIP Lenders nor the Senior Secured Lenders, in their respective capacities as such, shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable;

I.    authorization and direction for the Debtors to make non-refundable, irrevocable, and final payments on account of the principal, interest, fees, expenses and other amounts payable under the DIP Documents, each as applicable, as such become due, all to the extent provided in, and in accordance with, this Interim Order, the Final Order (upon entry) and the applicable DIP Documents;

J.    authorization for the Debtors to use the proceeds of the DIP Facility and the Cash Collateral in accordance with both the Approved Budget (as defined below) and the DIP Documents;

K.    the modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order, the Final Order (upon entry) and the DIP Documents;

L.    set the date for the hearing (the "**Final Hearing**") to be held no later than twenty-five (25) calendar days after the Petition Date (as defined below) to consider on a final basis the Motion and the entry of a final order (the "**Final Order**" and together with the Interim Order, the "**DIP Orders**") authorizing and approving the transactions described in the foregoing clauses, which Final Order shall be in form and substance (including with respect to any subsequent modifications made in

4

response to any objections or comments made by this Court) acceptable to the DIP Agent (acting at the direction of the Required DIP Lenders, under and as defined in the DIP Loan Agreement (the "**Required DIP Lenders**")); and

M.     providing for the immediate effectiveness of this Interim Order and the Final Order and waiving any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

This Court having reviewed the Motion, the exhibits attached thereto, the *Declaration of Edward A. Phillips in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**"), and the evidence submitted at the interim hearing held on February 9, 2023 (the "**Interim Hearing**"); and adequate notice of the Motion and the Interim Hearing having been given under the circumstances and in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules and no further notice being necessary or required; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein and that such relief is in the best interests of the Debtors, their estates, their creditors and all parties in interest and is necessary to avoid immediate and irreparable harm to the Debtors and their estates and the for the continued operation of certain of the Debtors' businesses and the preservation of value of the Debtors' assets pending the Final Hearing; and any objections to the entry of this Interim Order having been withdrawn or overruled on the merits; and upon all of the proceedings had before this Court and after due deliberation and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.     <u>Debtor-in-Possession Operation</u>.  On February 6, 2023 (the "**Petition Date**"), the Debtors commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their business and manage their properties as

11904184-3

debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Chapter 11 Cases.

B.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334. The Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for the Chapter 11 Cases and proceeding on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      <u>Notice</u>.  Proper, timely, adequate and sufficient notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order is or shall be required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, for purposes of Bankruptcy Rule 6003.

D.      <u>Debtors' Stipulations</u>.  Without prejudice to the rights of any other party in interest and subject to the limitations thereon contained in paragraph 13 below, the Debtors, on their behalf and on behalf of their estates, admit, acknowledge, agree, and stipulate to the following, which stipulations shall be binding on the Debtors, their estates, and all parties in interest (paragraphs D(i) through D(viii) below are referred to herein, collectively, as the "**Debtors' Stipulations**"):

i.      Pursuant to the Senior Secured Loan Agreement, the Senior Secured Lenders and the Prepetition Agent provided term loans, protective advances and other financial accommodations to the Borrower, as applicable, pursuant to the Senior Secured Loan Agreement (the "**Prepetition Credit Facility**").

11904184-3

ii.       Prior to the Petition Date and under the Prepetition Credit Facility, the Senior Secured Obligors were indebted and liable to the Senior Secured Lenders in respect of the obligations under the Senior Secured Loan Documents for (a) term loans in the aggregate principal amount of $14,000,000 (the "**Term Loans**"), (b) initial protective advances in the aggregate principal amount of $7,500,000 (the "**Initial Protective Advances**"), (c) priming protective advances in the aggregate principal amount of $10,500,000 (the "**Priming Protective Advances**") and (d) super priming protective advances in the aggregate principal amount of $5,000,000 (the "**Super Priming Protective Advances**") plus, with respect to subsections (a), (b), (c) and (d) of this sentence, all accrued but unpaid interest (including interest paid in kind, accrued but unpaid interest payable in cash and interest at the default rate, as applicable), fees (including the Protective Advance PIK Fees (as defined in the Senior Secured Loan Documents)) expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith, including any "Obligations" as defined in the Senior Secured Loan Agreement (such obligations under the Senior Secured Loan Agreement and the other Senior Secured Loan Documents, including, without limitation, the Term Loans, Initial Protective Advances, Priming Protective Advances and Super Priming Protective Advances, the "**Senior Secured Loan Obligations**"), and the Debtors are unconditionally liable, without defense, counterclaim, offset or setoff of any kind, with respect to the Senior Secured Loan Obligations.

iii.      The Senior Secured Loan Obligations constitute legal, valid, binding and non-avoidable obligations of the Senior Secured Obligors, enforceable in accordance with the terms of the applicable Senior Secured Loan Documents.  No offsets, recoupments, challenges, objections, defenses to, counterclaims to, or claims or causes of action that could reduce the amount or ranking of, the Senior Secured Loan Obligations exist.  No portion of the Prepetition

11904184-3

Secured Liens (as defined below) or Senior Secured Loan Obligations (including any interest or fees owed thereunder) is subject to set-off, avoidance, impairment, disallowance, recharacterization, reduction, subordination (whether equitable, contractual, or otherwise), counterclaims, recoupment, defenses, cross-claims or any other challenges under or pursuant to the Bankruptcy Code or any other applicable domestic or foreign law or regulation by any person or entity. The Senior Secured Loan Documents are valid and enforceable by the Senior Secured Lenders against each of the Senior Secured Obligors.

iv.    To secure the Senior Secured Loan Obligations, the Senior Secured Obligors entered into various security and collateral documents pursuant to and in connection with the Senior Secured Loan Documents, pursuant to which the Senior Secured Lenders were granted the benefit of valid, binding, perfected, enforceable, first-priority liens and security interests in the Prepetition Collateral (the "**Prepetition Secured Liens**"). The Prepetition Secured Liens provide the Prepetition Agent, for and on behalf of the Senior Secured Lenders, with valid, binding, properly perfected, enforceable, first-priority liens, and security interests in all property described in the Senior Secured Loan Documents, including, without limitation, certain cash collateral as defined in section 363(a) of the Bankruptcy Code (the "**Cash Collateral**") and the "Collateral" (as defined in the Senior Secured Loan Documents) (collectively, the "**Prepetition Collateral**"). All cash of the Debtors and cash proceeds of the Prepetition Collateral, including all such cash and cash proceeds of such Prepetition Collateral held at any time and from time to time in any of the Debtors' securities accounts and banking, checking, or other deposit accounts with financial institutions (in each case, other than trust, escrow, payroll, and custodial funds held as of the Petition Date in properly established trust, escrow, payroll, and custodial accounts), are and will be Cash Collateral of the Senior Secured Lenders.

11904184-3

v.    The Prepetition Secured Liens (a) are valid, binding, properly perfected, enforceable and non-avoidable liens on and security interests in the Prepetition Collateral; (b) are not subject to, pursuant to the Bankruptcy Code or other applicable law (foreign or domestic), avoidance, disallowance, reduction, recharacterization, recovery, subordination (whether equitable, contractual, or otherwise), attachment, offset, counterclaim, defense, "claim" (as defined in the Bankruptcy Code), impairment, or any other challenge of any kind by any person or entity; (c) entitle the Senior Secured Lenders to credit bid the entirety of the Senior Secured Loan Obligations pursuant to section 363(k) of the Bankruptcy Code without further challenges from the Debtors or any other party and implemented by the Senior Secured Lenders in their absolute discretion; and (d) are subject and subordinate only to (1) the Carve-Out (as defined below), (2) the DIP Liens (as defined below) and (3) valid and enforceable liens and encumbrances in the Prepetition Collateral (if any) that were expressly permitted to be senior to the Senior Secured Lenders' liens under the applicable Senior Secured Loan Documents, that are valid, properly perfected, enforceable, and non-avoidable as of the Petition Date and that are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (foreign or domestic), and the Debtors irrevocably waive, discharge and release, for themselves and their estates, any right to challenge or contest in any way the scope, extent, perfection, priority, validity, non-avoidability, and enforceability of the Prepetition Secured Liens or the validity, enforceability, or priority of payment of the Senior Secured Loan Obligations and the Senior Secured Loan Documents.  The Prepetition Secured Liens were granted to the Senior Secured Lenders for fair consideration and reasonably equivalent value, and were granted contemporaneously with the making of loans, commitments, and/or other financial accommodations under the Senior Secured Loan Documents.

Pursuant to and as more particularly described in the Senior Secured Loan Documents, the Prepetition Secured Liens are valid, binding, properly perfected, enforceable, non-avoidable, first-priority liens and security interests in and against the Prepetition Collateral (including, without limitation, Cash Collateral), and are senior in right, priority, operation and effect to all other interests in the Prepetition Collateral (subject to the relative priorities among the Senior Secured Lenders created under the Senior Secured Loan Documents in connection with the Term Loans, Initial Protective Advances, Priming Protective Advances and Super Priming Protective Advances) and subject to the Senior Liens (as defined below), in all respects, notwithstanding any provisions of the Uniform Commercial Code or any other Federal, State or foreign law. The Senior Secured Loan Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

vi.    Prior to the Petition Date, DR Parent, LLC ("**HoldCo**"), the managing member of DR Sub, LLC, which wholly owns Delphi Intermediate Healthco, LLC, the Senior Secured Lenders and the Prepetition Agent entered into that certain credit agreement dated April 8, 2020 (as amended, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "**HoldCo Loan Agreement**"), pursuant to which HoldCo was indebted and liable to the Senior Secured Lenders in respect of the obligations under the HoldCo Loan Agreement for term loans in the aggregate amount of $12,500,000, plus all accrued but unpaid interest (including accrued but unpaid interest paid in kind, interest payable in cash and interest at the default rate, as applicable), fees, expenses, and all other obligations expressly provided for thereunder, or incurred in connection therewith, including any "Obligations" as defined in the HoldCo Loan Agreement (such obligations under the HoldCo Loan Agreement and all agreements, documents, instruments and amendments executed and delivered in connection

11904184-3

therewith (the "**HoldCo Loan Documents**"), the "**HoldCo Loan Obligations**"), and the Debtors are unconditionally liable, without defense, counterclaim, offset or setoff of any kind, with respect to the HoldCo Loan Obligations.

vii.      Events of Default (under and as defined in the Senior Secured Loan Agreement) have occurred and are continuing under the terms of the Senior Secured Loan Documents and the HoldCo Loan Documents.  The Senior Secured Lenders expressly reserve all of their respective rights, powers, privileges, and remedies under the Senior Secured Loan Documents and the HoldCo Loan Documents with respect to such existing Events of Default.

viii.      The liens granted to the DIP Lenders shall be valid, binding, properly perfected, enforceable and non-avoidable liens against the Debtors.

E.      Release.  Subject in all respects to paragraph 13 hereof, upon entry of this Interim Order, each of the Debtors and the Debtors' estates on its own behalf and on behalf of its past, present, and future predecessors, successors, heirs, subsidiaries and assigns or any person acting for and on behalf of, or claiming through them, hereby unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge the DIP Secured Parties, and the Senior Secured Parties, and each of their respective affiliates, former, current, or future officers, employees, directors, servants, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, heirs, predecessors in interest and each person acting for on behalf of any of them, each in their capacity as such (collectively, the "**Representatives**"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known,

11904184-3

unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description in each case that exist on the date hereof with respect to, relating to or arising from the DIP Obligations, the DIP Liens (as defined below), the DIP Documents, the Senior Secured Loan Documents, the Senior Secured Loan Obligations, the Prepetition Secured Liens, the HoldCo Loan Documents or the HoldCo Loan Obligations, as applicable, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses or recharacterization claims or defenses, (ii) any and all claims and causes of action arising under the Bankruptcy Code, (iii) any and all claims and causes of action regarding the validity, priority, extent, enforceability, perfection, or avoidability of the liens or claims of the DIP Lenders, DIP Agent, the Senior Secured Lenders or the Prepetition Agent and (iv) any and all claims and causes of action related to other carrying costs, penalties, legal, accounting and other professional costs, and consequential and punitive damages payable to third parties.

F.    <u>Stipulation Binding on Debtors</u>.  The Debtors' acknowledgments, stipulations, waivers, and releases shall be binding on the Debtors and their respective representatives, successors, and assigns, and on each of the Debtors' estates and all entities and persons, including any creditors of the Debtors, and each of their respective representatives, successors, and assigns, including, without limitation any trustee or other representative appointed in these Chapter 11 Cases or Successor Cases (as defined below), whether such trustee or representative is appointed under chapter 11 or chapter 7 of the Bankruptcy Code.

G.    <u>Findings Regarding the DIP Financing and Cash Collateral</u>.

11904184-3

i.        Good and sufficient cause has been shown for the entry of this Interim Order.

ii.        The Debtors have an immediate and critical need to obtain the financing contemplated under the DIP Facility (the "**DIP Financing**") and to continue to use the Prepetition Collateral (including Cash Collateral).  The Debtors' borrowings from the DIP Lenders under the DIP Facility will be used in a manner consistent with the terms and conditions of the applicable DIP Documents and this Interim Order for: (a) working capital and other general corporate purposes of the Debtors solely in accordance with the Approved Budget; (b) payment of amounts due under the DIP Facility, including interest and fees payable thereunder and any Adequate Protection Fees (as defined below) payable pursuant to this Interim Order, in accordance with the Approved Budget; (c) payment of the professional fees and expenses of administering the Chapter 11 Cases; and (d) other purposes as expressly set forth in this Interim Order, the Approved Budget, or as expressly approved by the DIP Agent.  Except with the prior written consent of the DIP Agent, at the direction of the Required DIP Lenders in their sole discretion, the Debtors shall not be permitted to use the proceeds of the DIP Facility and the proceeds of the Prepetition Collateral (including the Cash Collateral) in contravention of the provisions of the orders entered in the Chapter 11 Cases (including this Interim Order), including any restrictions or limitations on the use of proceeds contained therein.  The Debtors' access to sufficient working capital through the use of Cash Collateral and other Prepetition Collateral and the incurrence of indebtedness under the DIP Facility are necessary and vital to the preservation and maintenance of the Debtors' estates, to preserve the Debtors' businsses as a going concern and to maximize value for all parties-in-interest.  The Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' cash disbursement needs during the period of effectiveness of this Interim Order.  The Debtors and

their estates will suffer immediate and irreparable harm if immediate financing is not obtained and permission to use Cash Collateral is not granted. The terms of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration. The adequate protection provided in this Interim Order and other benefits and privileges contained herein are consistent with, and authorized by, the Bankruptcy Code.

iii.     The DIP Facility is the best source of debtor-in-possession financing available to the Debtors. Given their current financial condition, financing arrangements, capital structure, and the circumstances of these Chapter 11 Cases, the Debtors are unable to obtain financing on terms more favorable than that offered by the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors are also unable to obtain secured credit allowable solely under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the DIP Lenders, the DIP Liens and the DIP Superpriority Claims (as defined below) on the terms and conditions set forth herein and granting the Adequate Protection Obligations, in each case, under the terms and conditions set forth in this Interim Order and in the DIP Documents.

iv.     The priming of the Prepetition Secured Liens on the Prepetition Collateral under section 364(d) of the Bankruptcy Code (as required under the DIP Facility) will enable the Debtors to continue operating their businesses on a postpetition basis, to preserve the Debtors' businesses as a going conern and to maximize value for the benefit of the Debtors' estates, creditors and other constituents.  The Senior Secured Lenders have consented to the priming of the Prepetition Secured Liens and the terms of this Interim Order, which consent would not have been

11904184-3

provided absent the restructuring transactions contemplated by the terms of this Interim Order and the DIP Documents, including, without limitation, the Adequate Protection Fees, Adequate Protection 507(b) Claim (as defined below) and Adequate Protection Liens set forth below.

v.        As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Agent, the DIP Lenders, the Prepetition Agent and the Senior Secured Lenders require, and the Debtors have agreed, that proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of this Interim Order, the DIP Documents and in accordance with the Approved Budget (as the same may be modified from time to time consistent with the terms of the DIP Documents and this Interim Order).

vi.       As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and authorization to use Cash Collateral, the Debtors, the DIP Secured Parties, and the Senior Secured Parties have agreed that, as of and commencing on the date of entry of this Interim Order, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the DIP Documents.

vii.      Based on the Motion, the First Day Declaration, and the record presented to the Court at the Interim Hearing, the terms of the DIP Financing, the terms of the Adequate Protection Obligations, and the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral) pursuant to this Interim Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

viii.     The Senior Secured Lenders have consented to the use of Cash Collateral and the other Prepetition Collateral, the priming of the Prepetition Secured Liens pursuant to

11904184-3

section 364(d)(1) of the Bankruptcy Code, and the Debtors' entry into the DIP Documents in accordance with and subject to the terms of this Interim Order and the DIP Documents.

        ix.      The DIP Financing, as well as the terms of the Adequate Protection Obligations, and the use of the Prepetition Collateral (including Cash Collateral) have been negotiated in good faith and at arm's length among the Debtors, the DIP Lenders, the Senior Secured Lenders, and their respective advisors, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with, the DIP Financing and the DIP Documents, including: (a) all loans made to and guarantees issued by the Debtors pursuant to the DIP Documents (collectively, the "**DIP Loans**") and (b) any "Obligations" (as defined in the DIP Loan Agreement) of the Debtors owing to the DIP Secured Parties or any of their affiliates, in accordance with the terms of the DIP Documents, including any obligations, to the extent provided for in the DIP Documents, to indemnify the DIP Secured Parties and to pay any interest, fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the DIP Documents), amounts, charges, costs, indemnities and other obligations that are chargeable or reimbursable under this Interim Order, the Final Order or the DIP Documents (the foregoing in clauses (a) and (b) collectively, the "**DIP Obligations**"), shall be deemed to have been extended by the DIP Lenders and their respective affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Secured Parties (and the successors and assigns thereof) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.  In providing the DIP Loans and consenting to the use of Cash Collateral, the DIP Lenders, the Senior Secured Lenders and their respective

Representatives have acted in the best interests of the Debtors' estates, for the benefit of all stakeholders, to preserve and enhance the value of the Prepetition Collateral and maximize recoveries for stakeholders.  The Senior Secured Lenders and the DIP Lenders have acted in good faith regarding the DIP Financing and the Debtors' continued use of the Prepetition Collateral (including the Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of the Adequate Protection Obligations and the granting of the Adequate Protection Liens), in accordance with the terms hereof, and the Senior Secured Lenders (and their Representatives) and the DIP Lenders (and their Representatives) shall be entitled to the full protection of section 363(m) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

x.        Until the applicable Senior Secured Loan Obligations are Paid in Full[3], the Senior Secured Lenders are entitled to the adequate protection provided in this Interim Order as and to the extent set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code.  Based on the Motion and on the record presented to the Court, the terms of the proposed adequate protection arrangements and of the use of the Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Cash Collateral;

---

[3] "**Paid in Full**" or "**Payment in Full**" means the indefeasible payment in full in cash of all obligations (including, without limitation, principal, interest (payable in cash or in kind), premiums, fees, expenses and indemnities) under the applicable credit facility, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing, or cash collateralization of letters of credit, in each case, in accordance with the applicable credit facility.  No facility shall be deemed to have been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend thereunder have been terminated and (b) either the Prepetition Agent or the DIP Agent, as applicable, has received (i) a countersigned payoff letter in form and substance satisfactory to such agent and (ii) releases from the Debtors (including any liquidator acting on behalf of any of the Debtors or their estates, if applicable) in form and substance satisfactory to such agent, as applicable, each in such agent's sole discretion.

*provided*, *however*, nothing in this Interim Order or the other DIP Documents shall (a) be construed as the affirmative consent by the Senior Secured Lenders for the use of Cash Collateral, other than on the terms set forth in this Interim Order and in the context of the DIP Financing authorized by this Interim Order, (b) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior), or (c) prejudice, limit or otherwise impair the rights of the Senior Secured Lenders to seek new, different or additional adequate protection or assert the interests of any of the Senior Secured Lenders.

xi.     The Debtors have prepared and delivered to the DIP Lenders a proposed budget (such initial budget, the "**Initial DIP Budget**"), a copy of which is attached hereto as **Exhibit B**.  The Initial DIP Budget reflects the Debtors' anticipated net cash flow and anticipated disbursements for each month during the period from the Petition Date through and including May 26, 2023.  The Initial DIP Budget may be modified, amended and updated from time to time in accordance with the DIP Loan Agreement, and once approved by, and in form and substance satisfactory to, the DIP Agent (acting at the direction of the Required DIP Lenders, in their sole discretion), shall supplement and replace the Initial DIP Budget (the Initial DIP Budget, following entry of this Interim Order, and each subsequently approved budget, shall each constitute without duplication, an "**Approved Budget**").  The Initial DIP Budget is reasonable under the facts and circumstances.  The DIP Lenders are relying, in part, upon the Debtors' agreement to comply with the Approved Budget, the other DIP Documents, and this Interim Order in determining to enter into the postpetition financing arrangements provided for in this Interim Order.

xii.    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rules 4001-2 and 9075-1.  Absent

11904184-3

granting the relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the DIP Financing and the use of Prepetition Collateral, including Cash Collateral, in accordance with this Interim Order and the DIP Documents are therefore in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties.

H.    <u>Senior Secured Lenders' Good Faith</u>.  By virtue of the stipulations and findings in this Interim Order related to the Senior Secured Loan Obligations and the DIP Financing, and certain of the Senior Secured Lenders agreeing to provide the DIP Financing in their capacity as DIP Lenders, no "cause" has been shown to limit or otherwise impair the Senior Secured Lenders' right to credit bid the Senior Secured Loan Obligations pursuant to section 363(k) of the Bankruptcy Code.

I.    <u>Sections 506(c) and 552(b)</u>.  In light of, among other things, (i) the DIP Agent's and the DIP Lenders' agreement that their liens and super-priority claims shall be subject to the Carve-Out and (ii) the Senior Secured Lenders' agreement to subordinate the Prepetition Secured Liens and Senior Secured Loan Obligations to the DIP Liens, and to permit the use of the DIP Facility and Cash Collateral for payments made in accordance with the terms of this Interim Order and the other DIP Documents, including the Approved Budget, the DIP Agent, the DIP Lenders, the Prepetition Agent and the Senior Secured Lenders are entitled to a waiver of (i) the provisions of Bankruptcy Code section 506(c) (subject to entry of a Final Order), (ii) any "equities of the case" claims under Bankruptcy Code section 552(b), and (iii) the equitable doctrine of "marshaling" or any similar doctrine.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and good and sufficient cause appearing therefor,

11904184-3

**IT IS HEREBY ORDERED THAT:**

1.      <u>Interim DIP Financing Approved</u>.   The Motion is granted, entry into the DIP Facility and the DIP Documents is authorized and approved, and the use of Cash Collateral is authorized, in each case, on an interim basis and subject to the terms and conditions set forth in this Interim Order, the DIP Documents and entry of the Final Order. Unless terminated earlier pursuant to the DIP Documents and this Interim Order, the DIP Facility will terminate on a date that is twenty-five (25) calendar days after entry of this Interim Order (the "**Termination Date**") absent the Court's entry of a Final Order in form and substance satisfactory to the DIP Agent at the direction of the Required DIP Lenders.

2.      <u>Objections Overruled</u>.   Any objections, reservations of rights, or other statements with respect to entry of this Interim Order, to the extent not withdrawn, waived, settled or resolved, are overruled on the merits.  This Interim Order shall become effective immediately upon its entry, notwithstanding the possible application of Bankruptcy Rules 6004(h), 7062 and 9014.

3.      <u>Authorization of the DIP Financing and the DIP Documents</u>.

(a)      The Debtors are hereby authorized and directed to (a) execute, enter into and deliver the DIP Documents, (b) incur and to perform all obligations under the DIP Documents and this Interim Order and (c) execute, deliver and perform under all instruments, certificates, agreements, and documents that may be required or necessary for the Debtors' performance under the DIP Documents and the creation and perfection of the DIP Liens described in, and provided for by, this Interim Order and the DIP Documents. To prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby authorized upon entry of this Interim Order to borrow money pursuant to the DIP Loan Agreement in an aggregate principal or face amount not to exceed $5,000,000 under the DIP Facility, which shall be used for all purposes permitted under the DIP

11904184-3

Documents (and subject to the terms and conditions set forth herein and therein) and in accordance with the Approved Budget; *provided*, *however*, no more than $11,000,000 of new DIP Loans in the aggregate shall be made available to the Debtors pending the entry of the Final Order.

(b)     The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, the principal, interest, fees, expenses and other amounts described in the DIP Documents and all other documents comprising the DIP Facility as such become due, including, without limitation, any fees due and payable thereunder, the DIP Agent's fees, and the reasonable and documented fees and disbursements of the DIP Secured Parties' attorneys, advisors, accountants and other consultants, whether or not such fees arose before, on or after the Petition Date, whether or not the transactions contemplated hereby are consummated, and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order or the DIP Documents, as applicable; *provided, however*, that, other than in connection with the fees and expenses incurred and payable at the closing of the DIP Facility, including, without limitation, fees and expenses incurred before the Petition Date, the payment of the fees and expenses of the Professional Persons (as defined below) shall be subject to the provisions of paragraph 14 of this Interim Order. All collections, consideration and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Documents.

(c)     Each officer and director of the Debtors acting individually is hereby authorized to execute and deliver each of the DIP Documents, such execution and delivery to be conclusive evidence of such individual's respective authority to act in the name of and on behalf of the Debtors.

11904184-3

(d)      In furtherance of the foregoing subsections (a)-(c), and without further approval of this Court, the Debtors are hereby authorized and directed to perform all such acts and execute and deliver all such documents and instruments, which for the avoidance of doubt shall include:

(i)      Amendments.  The execution and delivery of, and performance under, one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case, in such form as the Debtors and the DIP Lenders may agree, it being understood that no further approval of the Court shall be required for authorizations, amendments, waivers, consents or other modifications to and under the DIP Documents that do not shorten the maturity of the extensions of credit thereunder; *provided*, *however*, that no waiver, modification or amendment of any of the provisions of the DIP Documents shall be effective unless set forth in writing, signed by or on behalf of all the Debtors and the DIP Agent (after having obtained the approval of the Required DIP Lenders) and, to the extent required herein, approved by this Court;

(ii)      Repayment.  The incurrence of, and the non-refundable payment to the DIP Lenders, of any amounts due (or that may become due) in respect of the indemnification obligations, in each case referred to in the DIP Loan Agreement and this Interim Order, and the costs and expenses as may be due from time to time, including fees and expenses of the Lender Professionals (as defined below), in each case, as provided for in the DIP Documents, shall be without the need to file retention or fee applications or

11904184-3

to provide notice to any party, other than as provided in paragraph 14 hereof; and

(iii) <u>Performance</u>. The performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection 507(b) Claim and perfection of the DIP Liens and Adequate Protection Liens as permitted herein and therein.

(e) Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid, binding and unavoidable obligations of the Debtors, enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in the Chapter 11 Cases or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing, in accordance with the terms of the DIP Documents and this Interim Order (collectively, the "**Successor Cases**"). Upon entry of this Interim Order, the DIP Obligations shall include all loans and any other indebtedness or obligations, contingent or absolute, which may now, or from time to time, be owing by any of the Debtors to the DIP Agent or any of the DIP Lenders, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses, obligations in respect of indemnity claims (contingent or otherwise) and other amounts under the DIP Documents. No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order to the DIP Secured Parties (as to the DIP Agent, for the benefit of the DIP Lenders) shall be stayed, restrained, voidable or recoverable under the Bankruptcy Code or under any applicable law (including under sections 502(d), 548 or 549 of the Bankruptcy Code, any applicable Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or other

11904184-3

similar state statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim or counterclaim. The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the Termination Date, except as provided in paragraph 10 hereof.

(f)    The DIP Agent and DIP Lenders shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent to the making of such extension of credit, amendment or renewal under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent (acting at the direction of the Required DIP Lenders) in accordance with the terms of the DIP Loan Agreement.

(g)    From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order, the Final Order (upon entry) and the DIP Documents, and in compliance with the Approved Budget and the terms and conditions in this Interim Order, the Final Order (upon entry) and the DIP Documents.

(h)    No DIP Lender or DIP Agent shall have any obligation or responsibility to monitor any DIP Loan Party's use of the DIP Facility and each DIP Lender, and the DIP Agent may rely upon each DIP Loan Party's representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Documents.

(i)    The Initial DIP Budget is approved in its entirety. The use of proceeds from the DIP Facility and use of Cash Collateral under this Interim Order shall be in accordance with the Approved Budget, subject to Permitted Variances (as defined below) and the terms and conditions set forth in the DIP Documents and this Interim Order. Not later than 5:00 PM (Eastern Standard Time) beginning on the third Wednesday following the Petition Date and on every Wednesday

following the end of each Testing Period (as defined below), the Debtors shall deliver to the DIP

Agent (along with its professionals) and the DIP Lenders, (a) an Updated Budget, in form and

substance satisfactory to the DIP Agent (acting at the direction of the Required DIP Lenders), and

such Updated Budget shall become the Approved Budget for the purposes of this Interim Order

upon approval of the DIP Agent (acting at the direction of the Required DIP Lenders); *provided*,

that until a new Approved Budget has been so approved, the most recent Approved Budget shall

govern and (b) a variance report (the "**Variance Report**") setting forth actual cash receipts and

disbursements and cash flows of the Debtors for the prior Testing Period and setting forth all

disbursement variances, on a line-item basis, from the amount set forth for such period as

compared to the applicable Approved Budget, in each case, for the applicable Testing Period (and

each such Variance Report shall include explanations for all material variances and shall be

certified by the Interim Chief Executive Officer of the Debtors).

(j)      For purposes hereof, the term "**Permitted Variances**" shall mean, for (a) the period

commencing on the Petition Date through and including the two week period ending on the second

Friday following the Petition Date and (b) each Friday thereafter (each week commencing on the

Saturday of such week) , but calculated on a rolling 3 week basis to account for timing of payment

variances, unless otherwise agreed by the DIP Agent (the applicable "**Testing Period**") (i) any

favorable disbursement variance, and (ii) any unfavorable disbursement variance (other than

disbursements for Professional Fees of the DIP Lenders, the DIP Agent, the Senior Secured

Lenders, the Prepetition Agent and the fees of the Office of the United States Trustee) of no more

than 15% for actual disbursements (on a line-item basis) as compared to the budgeted

disbursements set forth in the Approved Budget with respect to the applicable Testing Period.  The

Permitted Variances with respect to each Testing Period shall be determined and reported to the

DIP Agent and the Prepetition Agent, not later than 5:00 PM (Eastern Standard Time) on each Wednesday immediately following the end of each such Testing Period. Additional variances, if any, from the prior Approved Budget, and any proposed changes to the budget, shall be subject to the approval of the DIP Agent (acting at the direction of the Required DIP Lenders) and the Prepetition Agent.

4.    <u>DIP Superpriority Claims</u>. Upon entry of this Interim Order, subject only to the Carve-Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors in each of these Chapter 11 Cases and any Successor Cases (without the need to file any proof of claim) with priority over any and all claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims, priority and other unsecured claims against the Debtors or their estates in any of the Chapter 11 Cases and any Successor Cases, including, without limitation, administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 or 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code (including the Adequate Protection Obligations), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims (the "**DIP Superpriority Claims**") shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof (including, subject to entry of a Final Order, the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy

Code and the proceeds thereof (collectively, the "**Avoidance Actions/Proceeds**"). The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

5.    <u>DIP Liens</u>.    As security for the DIP Obligations, effective and perfected immediately upon entry of this Interim Order and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, any notation of certificates of title for a titled good, or the possession or control by the DIP Agent or DIP Lenders of, or over, any DIP Collateral, the following continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition first priority security interests and liens are hereby granted to the DIP Agent, for the benefit of the DIP Lenders (all presently owned and hereafter acquired property identified in clauses (a), (b) and (c) below being collectively referred to as the "**DIP Collateral**", and all such liens and security interests granted to the DIP Agent, for the benefit of the DIP Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP Liens**"):

(a)    <u>First Lien on Unencumbered Property</u>.    Subject only to the Carve-Out, pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all tangible and intangible pre- and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to a valid, perfected and non-avoidable lien (collectively, "**Unencumbered Property**"), including any and all unencumbered cash of the Debtors and any investment of such cash, cash equivalents, inventory, accounts receivable, other

11904184-3

rights to payment whether arising before or after the Petition Date, contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits, in each case, with respect to any and all of the foregoing, whether arising under section 552(b) of the Bankruptcy Code or otherwise, including, subject to entry of a Final Order, the Avoidance Actions/Proceeds;

(b)    <u>Priming Liens on Prepetition Collateral</u>.  Subject only to the Carve-Out and any existing liens that under applicable law, are senior to, and have not been subordinated to, the liens of the DIP Agent under the DIP Loan Documents, but only to the extent that such liens are valid, perfected, enforceable and non-avoidable liens as of the Petition Date or perfected following the Petition Date as permitted by section 546 of the Bankruptcy Code (such liens, the "**Senior Liens**"), pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all pre- and postpetition property of the Debtors (including any and all cash, cash equivalents and Cash Collateral and any investment of such cash, cash equivalents and Cash Collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date (including post-petition intercompany claims against any Debtor), contracts, properties, plants, fixtures, machinery, equipment, general intangibles, documents, instruments, securities, chattel paper, interests in leaseholds, real properties, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, capital stock of subsidiaries, wherever located, and the proceeds, products, rents and profits of any and all of the foregoing), whether now existing or hereafter acquired, that is subject to the Prepetition Secured

Liens, which lien shall be senior in all respects to such Prepetition Secured Liens. Such security interests and liens shall be senior in all respects to the interests in such property of the Senior Secured Lenders arising from current and future liens of the Senior Secured Lenders (including the Adequate Protection Liens granted hereunder);

(c)     <u>DIP Liens Junior to Certain Other Liens</u>. Subject only to the Carve-Out, pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all tangible and intangible pre- and postpetition property of the Debtors subject to Senior Liens; and

(d)     <u>DIP Liens Senior to Certain Other Liens</u>. The DIP Liens shall not be (i) subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (b) unless otherwise provided for in the DIP Documents or in this Interim Order, any liens or security interests arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, (c) any intercompany or affiliate liens of the Debtors, or (d) any orders of attachment or judicial liens; or (ii) subordinated to or made *pari passu* with any other lien or security interest under section 363 or 364 of the Bankruptcy Code heretofore or hereinafter granted in these Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code.

6.     <u>Use of Cash Collateral</u>. The Debtors are hereby authorized, subject to the terms and conditions of this Interim Order, the DIP Facility and the other DIP Documents and in

accordance with the Approved Budget, to use all Cash Collateral; *provided,* that (a) the Senior Secured Lenders are granted the adequate protection as hereinafter set forth and (b) except on the terms and conditions of this Interim Order, the Debtors shall be enjoined and prohibited from at any times using the Cash Collateral absent further order of the Court.

7.    <u>Adequate Protection of Senior Secured Lenders</u>.  The Senior Secured Lenders are entitled, pursuant to sections 361, 362, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in the value, if any, of the Senior Secured Lenders' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, for any reason provided for under the Bankruptcy Code, including any such diminution resulting from the depreciation, sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral (including Cash Collateral), the priming of the Senior Secured Lenders' security interests and liens on the Prepetition Collateral (including Cash Collateral) by the DIP Lenders pursuant to the DIP Documents and this Interim Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the "**Adequate Protection Claim**").   In consideration of the foregoing, the Senior Secured Lenders, as applicable, shall receive the following (collectively, the "**Adequate Protection Obligations**"):

(a)    <u>Adequate Protection Liens</u>.  The Senior Secured Lenders are hereby granted (effective and perfected and without the necessity of the execution of any mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of the Adequate Protection Claim, a valid, binding, enforceable, non-avoidable and automatically and properly perfected replacement security interest in and lien upon all of the DIP Collateral including all Unencumbered Property upon the date of this Interim Order and, upon entry of a Final Order,

including the Avoidance Actions/Proceeds, in each case subject and subordinate only to (i) the DIP Liens and any liens to which the DIP Liens are junior, including the Senior Liens, if any, and (ii) the Carve-Out (the "**Adequate Protection Liens**"). Except as provided herein, the Adequate Protection Liens shall not be made subject to, or *pari passu* with, any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The Adequate Protection Liens shall not be subject to sections 510, 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Adequate Protection Liens.

(b)      Adequate Protection Section 507(b) Claim.  The Senior Secured Lenders are hereby granted, subject to the DIP Superpriority Claims and the Carve-Out, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases as provided for in section 507(b) of the Bankruptcy Code in the amount of the Adequate Protection Claim with, except as set forth in this Interim Order, priority in payment over any and all administrative expenses of the kind specified or ordered pursuant to any provision of the Bankruptcy Code (other than the DIP Superpriority Claims) (the "**Adequate Protection 507(b) Claim**"), which Adequate Protection 507(b) Claim shall have recourse to and be payable from all of the DIP Collateral in accordance with the priorities set forth herein, including, upon entry of a Final Order, the Avoidance Actions/Proceeds.  Except to the extent expressly set forth in this Interim Order or the DIP Documents, the Senior Secured Lenders shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection 507(b) Claim unless and until the DIP Obligations (other than contingent indemnification obligations as to which no claim has been

asserted) and any claims having a priority superior to or *pari passu* with the DIP Superpriority Claims, including claims that benefit from the Carve-Out, have been indefeasibly paid in full and all DIP Commitments have been terminated.

(c)     <u>Adequate Protection Payments</u>.  As further adequate protection, the Debtors are authorized and directed to pay, in accordance with the terms of paragraph 14 of this Interim Order, all reasonable and documented out-of-pocket fees and expenses (the "**Adequate Protection Fees**"), whether incurred before or after the Petition Date, including all reasonable and documented out-of-pocket fees and expenses of the Senior Secured Parties and for the counsel and other professionals retained as provided for in the Senior Secured Loan Documents and this Interim Order; *provided*, that, immediately upon entry of this Interim Order, the Debtors are authorized and directed to pay all such Adequate Protection Fees incurred prior to and including the Petition Date that remain outstanding upon entry of this Interim Order to the Prepetition Agent and/or the Senior Secured Lenders, as applicable.  None of the Adequate Protection Fees shall be subject to separate approval by this Court or the U.S. Trustee Guidelines, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto or otherwise seek the Court's approval of any such payments.

(d)     <u>Adequate Protection Reservation</u>. Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Senior Secured Lenders is insufficient to compensate for any diminution in value of their respective interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  The receipt by the Senior Secured Lenders of the adequate protection provided for herein shall not be deemed an admission that the interests of the Senior Secured Lenders are adequately protected.  Further, this Interim Order shall not prejudice or limit the rights of the Senior

11904184-3

Secured Lenders to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection in a manner consistent with the Senior Secured Loan Documents.

8.  _Application of Proceeds of Collateral_.  As a condition to entry into the DIP Loan Agreement, the extension of funds under the DIP Facility and authorization to use Cash Collateral, the Debtors, the DIP Lenders, and the Senior Secured Lenders, in their respective capacities, have agreed that as of and commencing on the date of entry of this Interim Order (and the date of entry of the Final Order, if entered), and to the extent set forth herein and therein, the Debtors shall apply the proceeds of DIP Collateral and Prepetition Collateral solely in accordance with this Interim Order (and the Final Order, if entered), the DIP Documents, the Senior Secured Loan Documents, and the Approved Budget.

9.  _Milestones_.  As a condition to the use of the DIP Facility and Cash Collateral, and as further adequate protection to the Senior Secured Lenders, the DIP Lenders and Senior Secured Lenders are hereby entitled to performance of the following milestones by the dates set forth below (or such later date as may be agreed by the DIP Agent (acting at the direction of the Required DIP Lenders) and the Prepetition Agent, in their respective capacities) (the "**Milestones**"), and for the avoidance of doubt, absent the consent of the DIP Lenders, the failure of the Debtors to comply with any of the Milestones shall constitute an immediate Event of Default under the DIP Loan Agreement and this Interim Order and permit the DIP Agent (at the direction of the Required DIP Lenders) and the Prepetition Agent  to exercise their respective rights and remedies provided for in this Interim Order and the DIP Documents:

     a.  No later than five (5) business days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order;

     b.  No later than ten (10) business days after the Petition Date, the Debtors shall have filed a disclosure statement and corresponding liquidating plan (the "Liquidating Plan");

11904184-3

c.      No later than twenty-eight (28) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

d.      The Debtors shall establish a date that is no later than forty-five (45) calendar days after the Petition Date as the deadline for the submission of binding bids with respect to the assets and operations related to the Sellers under the subject Asset Purchase Agreement ((i)-(v) collectively, the "Acquired Assets");

e.      No later than fifty (50) calendar days after the Petition Date, the Debtors shall commence an auction for the Acquired Assets, in accordance with the Bid Procedures; provided that if there is no higher or better offer submitted in comparison to the stalking horse bid(s), no auction shall be held;

f.      No later than fifty-five (57) calendar days after the Petition Date, Bankruptcy Court shall have entered an order approving the disclosure statement;

g.      No later than fifty-seven (57) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order (which shall be in form and substance acceptable to Required DIP Lenders) approving the winning bid resulting from the sale of the Acquired Assets;

h.      Consummation of the sale of the Acquired Assers, shall occur no later than the date that is seventy-two (72) calendar days after the Petition Date;

i.      No later than ninety-five (95) days after the Petition Date, the Bankruptcy Court shall have entered an order confirming the Liquidating Plan; and

j.      No later than one-hundred (100) days after the Petition Date, the Liquidating Plan Effective Date shall have occurred.

10.      Events of Default.  With respect to (a) the DIP Lenders and the DIP Facility or (b) the Senior Secured Lenders and the Debtors' use of Cash Collateral, for purposes of this Interim Order, an "**Event of Default**" means an "Event of Default" as defined in the DIP Loan Agreement and as expressly provided for in this Interim Order.  Notwithstanding anything in this Interim Order, following an Event of Default, the Senior Secured Lenders shall be stayed from enforcing any rights and remedies under this Interim Order unless and until the DIP Agent has delivered a Trigger Notice (as defined below) and has complied with its obligations in connection with the issuance thereof or consents to such enforcement.

11.    <u>Remedies Upon Event of Default</u>.  The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit the DIP Agent (acting at the direction of the Required DIP Lenders) and the Prepetition Agent (as applicable) to enforce all of their respective rights under the DIP Documents and the Senior Secured Loan Documents, as applicable, and (a) immediately upon the occurrence of an Event of Default, declare (i) the termination, reduction or restriction of Cash Collateral and any further DIP Commitments to the extent any such DIP Commitment remains in effect, (ii) all DIP Obligations to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are expressly waived by the Debtors, (iii) the termination of the DIP Facility and the DIP Documents as to any future liability or obligations of the DIP Agent and DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations and (iv) that the application of the Carve-Out has occurred following delivery of the Trigger Notice to the Debtors in accordance with paragraph 15 herein and (b) upon the occurrence of an Event of Default and the giving of five (5) Business Days' prior written notice (the "**Remedies Notice Period**") (which shall run concurrently with any notice required to be provided under the DIP Documents or Senior Secured Loan Documents) via email to counsel to the Debtors, counsel to the official committee of unsecured creditors (the "**Committee**") (if any), and the U.S. Trustee to (i) immediately terminate consent to the Debtors' continued use of Cash Collateral and/or the DIP Facility and (ii) exercise all other rights and remedies provided for in the DIP Documents, Senior Secured Loan Documents, and under applicable law; *provided that* nothing in the preceeding sentence shall prejudice the Debtors from seeking a determination by the Bankruptcy Court that an Event of Default has not occurred. Notwithstanding anything in this Interim Order, during the Remedies Notice Period, the Debtors may only use Cash Collateral with the express written consent of the DIP Lenders and the Senior

11904184-3

Secured Lenders in their respective capacities. For the avoidance of doubt, interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents upon the occurrence and during the continuation of an Event of Default. In any hearing regarding any exercise of rights or remedies under the Senior Secured Loan Documents or the DIP Documents, the only issues that may be raised by the Debtors and any other parties in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors and any other parties in interest hereby waive their right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the DIP Lenders or the Senior Secured Lenders set forth in this Interim Order, the DIP Documents, or the Senior Secured Loan Documents.  For clarity, notwithstanding anything to the contrary in this paragraph or Order, prior to the DIP Lenders' enforcement of remedies, the Debtors shall have the right within the Remedies Notice Period to challenge the existence or occurrence of an Event of Default (and no other matters) by seeking emergency relief from the Bankruptcy Court. If the Bankruptcy Court finds that an Event of Default has occurred, the DIP Lenders' right to enforce the remedies provided in the Interim DIP Order and in the DIP Lenders' Credit Agreement is subject to the DIP Lenders satisfying their obligations occasioned by the issuance of a Trigger Notice, namely, to fund the Trigger Notice Cap in the amount of $250,000 for Allowed Professional Fees of Debtor Professionals and $50,000 for Allowed Professional Fees of Committee Professionals. No rights, protections or remedies of the DIP Secured Parties and the Senior Secured Parties granted by the provisions of this Interim Order, the DIP Documents, or Senior Secured Loan Documents shall be limited, modified or impaired in any way by: (a) any actual or purported withdrawal of the consent of any party to the Debtors' authority to continue to use Cash Collateral; (b) any actual or purported termination of

the Debtors' authority to continue to use Cash Collateral; or (c) except as provided herein or in the Final Order, the terms of any other order or stipulation related to the Debtors' continued use of Cash Collateral or the provision of adequate protection to any party.

12.     <u>No Marshaling</u>.  Neither the DIP Lenders nor the Senior Secured Lenders shall be subject to (a) the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or Prepetition Collateral, as applicable, or (b) the "equities of the case" exception in section 552(b) of the Bankruptcy Code.

13.     <u>Effect of Stipulations on Third Parties</u>.  The Debtors' stipulations, admissions, releases, and agreements contained in this Interim Order, including in paragraphs D and E of this Interim Order, shall be binding upon the Debtors and any successor thereto (including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtors) in all circumstances and for all purposes.  The Debtors' stipulations, admissions, releases, and agreements contained in this Interim Order, including in paragraphs D and E of this Interim Order, shall be binding upon all other parties in interest, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any Successor Cases (including the Committee, if any) and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtors, in all circumstances and for all purposes unless, and only to the extent that:  (a) such committee, or any other party in interest, with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so), has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, among others, in this paragraph 13) by the earlier of (i) (x) with respect to parties in interest with requisite standing other than the Committee (if any), sixty (60) calendar days after entry of this Interim Order and (y) with

respect to the Committee, sixty (60) calendar days after the appointment of the Committee, if any and (ii) two (2) Business Days prior to any sale hearing approving the sale of the Debtors' assets pursuant to the bidding procedures to be approved by the Court (the time period established by the foregoing clauses (i) and (ii), the "**Challenge Period**"), (A) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of any of the Senior Secured Loan Obligations or the Prepetition Secured Liens, or (B) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Challenges**") against either the Senior Secured Lenders or their respective Representatives in connection with matters related to the Senior Secured Loan Documents, the Senior Secured Loan Obligations, the Prepetition Secured Liens and the Prepetition Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; *provided*, *however*, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such Challenge or claim and any Challenges or claims not so specified before the expiration of the Challenge Period shall be deemed forever, waived, released and barred; *provided*, *further*, that the timely filing of a motion seeking standing to file a Challenge before the expiration of the Challenge Period, which attaches a draft complaint setting forth the legal and factual bases of the proposed Challenge, shall toll the Challenge Period only as to the party that timely filed such standing motion until such motion is resolved or adjudicated by the Court.  If (a) no such Challenge is timely and properly filed during the Challenge Period, or (b) the Court does not rule in favor of the plaintiff in any such proceeding then, for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases): (i) the Debtors' stipulations,

admissions, releases, and agreements contained in this Interim Order, including those contained in paragraphs D and E of this Interim Order, shall be binding on all parties in interest, including the Committee (if any); (ii) the obligations of the Debtors under the Senior Secured Loan Documents, including the Senior Secured Loan Obligations, shall constitute allowed claims (without the need to file a proof of claim) not subject to defense, claim, counterclaim, recharacterization, subordination, offset or avoidance, for all purposes in the Chapter 11 Cases and any Successor Cases; (iii) the Prepetition Secured Liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding, properly perfected, security interests and liens on the Prepetition Collateral, not subject to recharacterization, subordination, avoidance or other defense; and (iv) the Senior Secured Loan Obligations and the Prepetition Secured Liens on the Prepetition Collateral shall not be subject to any other or further claim or challenge by the Committee (if any), any non-statutory committees appointed or formed in the Chapter 11 Cases or any Successor Cases or any other party in interest acting or seeking to act on behalf of the Debtors' estates, including any successor thereto (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for the Debtor) and any defenses, claims, causes of action, counterclaims and offsets by the Committee (if any), any non-statutory committees appointed or formed in the Chapter 11 Cases or any Successor Cases, or any other party acting or seeking to act on behalf of the Debtors' estates, including any successor thereto (including any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for the Debtor), whether arising under the Bankruptcy Code or otherwise, against the Senior Secured Lenders and their Representatives arising out of or relating to any of the Senior Secured Loan Documents shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, releases, and agreements contained in this Interim Order, including

11904184-3

those contained in paragraphs D and E of this Interim Order, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases or any Successor Cases, including the Committee (if any), and on any other person or entity, except to the extent that such stipulations, admissions, releases, and agreements were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction. The Challenge Period may be extended only (i) with respect to the Prepetition Credit Facility, with the consent of the Prepetition Agent or (ii) by order of the Court for good cause shown.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Committee (if any) or any non-statutory committees appointed or formed in the Chapter 11 Cases or any Successor Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including Challenges with respect to the Senior Secured Loan Documents, the Senior Secured Loan Obligations, or the Prepetition Secured Liens. The failure of any party in interest, including the Committee (if any), to obtain an order of this Court prior to the termination of the Challenge Period granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the termination of the Challenge Period as required under this paragraph 13 or to require or permit an extension of the Challenge Period. For the avoidance of doubt, the investigation and Challenge rights afforded to the Committee (if any) and any other party-in-interest hereunder shall not be deemed a recognition, consent or agreement not to object to such Committee's or party-in-interest's, as applicable, standing to assert any such claim or cause of action.

14.    <u>Fees & Expenses</u>.  The Debtors are authorized and directed, without any further order of this Court, to pay any and all reasonable and documented fees and expenses of the DIP

Lenders, the DIP Agent, the Senior Secured Lenders and the Prepetition Agent in connection with the DIP Financing, the Chapter 11 Cases and the Adequate Protection Obligations, as applicable, including the fees and expenses of attorneys, advisors, accountants and other consultants and professionals (the "**Lender Professionals**"), whether incurred before, on or after the Petition Date and whether or not the transactions contemplated hereby are consummated, including, but not limited to fees and expenses incurred in connection with (a) the preparation, negotiation and execution of the DIP Orders, the DIP Documents, and the Adequate Protection Obligations; (b) the creation, perfection or protection of the DIP Liens, the Prepetition Secured Liens and the Adequate Protection Liens (including all search, filing and recording fees); (c) the on-going administration of the DIP Documents (including the preparation, negotiation and execution of any amendments, consents, waivers, assignments, restatements or supplements thereto) and the Chapter 11 Cases and any Successor Cases (including the filing of any proofs of claim); (d) the enforcement of the DIP Documents, the DIP Orders, the Senior Secured Loan Documents or the Adequate Protection Obligations; and (e) any legal proceeding relating to or arising out of the DIP Facilities or the other transactions contemplated by the DIP Documents and the DIP Orders, including the Chapter 11 Cases and credit bid of the DIP Obligations and/or the Senior Secured Loan Documents and the Senior Secured Loan Obligations. The Lender Professionals shall not be required to comply with the United States Trustee fee guidelines or submit invoices to this Court, the Committee (if any) or any other party in interest. Solely with respect to any fees and expenses of the Lender Professionals incurred on or subsequent to the Petition Date, the Lender Professionals, if requested, shall forward copies of summary invoices submitted to the Debtors to the U.S. Trustee, counsel for the Committee (if any) and such other parties as this Court may direct. The summary invoices shall be sufficiently detailed to enable a determination as to the

41

reasonableness of such fees and expenses; *provided*, *however*, that such summary invoices shall not be required to contain time entries and may be redacted to the extent necessary to protect any information subject to the attorney-client privilege or of any benefits of the attorney work product doctrine or other applicable privilege. If the Debtors, U.S. Trustee or the Committee (if any) objects to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within ten (10) Business Days of receipt of such invoices (the "**Review Period**"), then the Debtors, United States Trustee, or the Committee (if any), as the case may be, shall file with this Court and serve on such Lender Professional an objection (the "**Fee Objection**"), and any failure by any such party to file a Fee Objection within the Review Period shall constitute a waiver of any right of such party to object to the applicable invoice. Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of a Lender Professional shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.  If no written objection is received by 12:00 PM (Eastern Standard Time), on the end date of the Review Period, the Debtors shall pay such invoices promptly and in no event later than one (1) Business Day thereafter.  If an objection to a Lender Professional's invoice is received within the Review Period, the Debtors shall promptly pay the undisputed amount of the invoice, and in no event later than two (2) Business Days of such request, and the Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Such reasonable and documented fees and expenses paid by the Debtors in accordance with this paragraph 14 shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

15. <u>Carve-out</u>.

(a)    For purposes hereof, the "**Carve-Out**" is an amount equal to the sum of (i) all fees required to be paid to the clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) all reasonable fees and expenses incurred by a chapter 7 trustee, if any, under section 726(b) of the Bankruptcy Code in an amount not to exceed $25,000; (iii) all accrued and unpaid fees and expenses or otherwise of persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "**Debtor Professionals**") to the extent allowed at any time (collectively, the "**Allowed Debtor Professional Fees**"); (iv) all accrued and unpaid hourly fees and expenses to the extent allowed at any time (collectively, the "**Allowed Committee Professional Fees**" and together with the Allowed Debtor Professional Fees, each of which shall be strictly subject to the Approved Budget and the line items applicable to such Professional Persons (as defined below) and not subject to the Permitted Variances unless consented to by the DIP Agent (acting at the direction of the Required DIP Lenders) and the Pre-Petition Agent, the "**Allowed Professional Fees**") of persons or firms retained by the Committee (if any) in the Chapter 11 Cases or any Successor Cases pursuant to section 1103 of the Bankruptcy Code (the "**Committee Professionals**, together with the Debtor Professionals, the "**Professional Persons**"), incurred at any time on or before the Debtors' receipt of the Trigger Notice (as defined below); and (v) Allowed Professional Fees incurred after the Debtors' receipt of the Trigger Notice in an amount not to exceed $250,000 (the "**Debtor Trigger Notice Cap**") with respect to the Debtor Professionals and $50,000 with respect to the Committee and Committee Professionals (if any) ("**Committee Trigger Notice Cap**", together with the Debtor Trigger Notice Cap, the "**Trigger Notice Cap**") (collectively, (i)-(v), the "**Carve-Out Cap**"), in each case subject to the limits imposed by this Interim Order, the Final Order (if and

11904184-3

when entered), the Approved Budget, or otherwise, on Allowed Professional Fees permitted to be incurred, including in connection with any permitted investigation of the claims, liens, and defenses against the Senior Secured Lenders; *provided*, *however*, nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described in clauses (i), (ii), (iii), (iv) and (v) above on any other grounds.  "**Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent (acting at the direction of the Required DIP Lenders) or the Prepetition Agent, as applicable, to the Debtors, their restructuring counsel, the U.S. Trustee, and counsel to the Committee (if any), which notice shall be delivered following (i) the occurrence and during the continuation of an Event of Default and (ii) acceleration of the DIP Obligations under the DIP Facility, stating that the Carve-Out Cap has been invoked and that the Debtors' ability to pay the Allowed Professional Fees is subject to and limited by the Carve-Out.

(b)    On a weekly basis, the Debtors shall fund from borrowings under the DIP Facility into segregated trust account(s) at Debtors' counsel's law firm, Berger Singerman, LLP, for the benefit of the Professional Persons, an amount equal to the sum of the total weekly fees of Professional Persons for  such week subject to the Approved Budget (the "**Funded Reserve Account**").  For the avoidance of doubt, the DIP Lenders shall have no obligation to fund aggregate fees and expenses in excess of (i) the amounts set forth in the Approved Budget or (ii) the DIP Commitments.  The Debtors shall use funds held in the Funded Reserve Account exclusively to pay Allowed Professional Fees as they become allowed and payable pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules, and any interim or final orders of the Bankruptcy Court; *provided that* no Allowed Professional Fees shall be paid from the Funded Reserve Account in excess of the applicable line items in the Approved Budget unless

11904184-3

consented to by the DIP Agent (acting at the direction of the Required DIP Lenders) and the Pre-Petition Agent.  Notwithstanding anything to the contrary herein, funds transferred to the Funded Reserve Account shall remain DIP Collateral until paid to the applicable Professional Person in accordance with this paragraph 15.

(c)     Upon the day on which a Trigger Notice is delivered by the DIP Lenders to the Debtors, the Trigger Notice shall (i) be deemed a request by the Debtors for, and the DIP Lenders shall fund, DIP Loans under the DIP Facility, in an amount equal to the Carve-Out Cap (less any amounts already funded into the Funded Reserve Account) (any such amounts actually advanced shall constitute DIP Loans); and (ii) constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Carve-Out Cap (less any amounts already funded into the Funded Reserve Account). The Debtors shall deposit and hold such amounts in the Funded Reserve Account to pay such then unpaid Allowed Professional Fees benefiting from the Carve-Out Cap prior to any and all other claims and none of the funds deposited in the Funded Reserve Account shall be subject to claims of (i) the Debtors, (ii) creditors of the Debtors, or (iii) any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estates of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtor; *provided, however,* that funds in the Funded Reserve Account shall remain DIP Collateral until paid to the applicable Professional Person in accordance with this paragraph 15.

(d)     Notwithstanding any restriction on the Debtors' use of Cash Collateral, unless consented to by the DIP Agent (at the direction of the Required DIP Lenders), all funds in the Funded Reserve Account, other than any amounts on account of the Trigger Notice Cap, shall be

11904184-3

used first to pay the obligations set forth in clauses (i) through (iv) of the definition of Carve-Out set forth above (the "**Pre-Carve-Out Amounts**") until paid in full, and then, to the extent such Pre-Carve-Out Amounts have not been reduced to zero, to pay the DIP Lenders, unless the DIP Obligations have been Paid in Full and all DIP Commitments have been terminated, in which case any such excess Pre-Carve-Out Amounts shall be paid to the Senior Secured Lenders. Notwithstanding any restriction on the Debtors' use of Cash Collateral, unless consented to by the DIP Agent (at the direction of the Required DIP Lenders), following the delivery of a Trigger Notice, all funds in the Funded Reserve Account on account of the Trigger Notice Cap shall be used first to pay the obligations set forth in clause (v) of the definition of Carve-Out set forth above (the "**Post-Carve-Out Amounts**"), and then, to the extent the such Post-Carve-Out Amounts have not been reduced to zero, to pay the DIP Lenders, unless the DIP Obligations have been Paid in Full and all DIP Commitments have been terminated, in which case any such excess Post-Carve-Out Amounts shall be paid to the Senior Secured Lenders. Notwithstanding anything to the contrary in the DIP Documents or this Interim Order, if there are not enough funds in the Funded Reserve Account to pay the Post-Carve-Out Amounts in full following the delivery of a Trigger Notice, then any excess funds following the payment of the Pre-Carve-Out Amounts shall be used to satisfy the Post-Carve Out Amounts prior to making any payments to the DIP Lenders or the Senior Secured Lenders, as applicable. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Funded Reserve Account shall not constitute DIP Loans or increase or reduce the DIP Obligations, (ii) the failure of the Funded Reserve Account to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve-Out, and (iii) under no circumstances shall the DIP Lenders have any obligation to extend DIP Loans in excess of the amounts authorized under this Interim Order or the DIP Commitments.

11904184-3

For the avoidance of doubt and notwithstanding anything to the contrary in this Interim Order, the DIP Facility, or the Prepetition Credit Facility, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, the DIP Superpriority Claims, and the Adequate Protection 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the DIP Obligations, the Adequate Protection Obligations or the Senior Secured Loan Obligations.

(e)    Notwithstanding the foregoing, the Carve-Out shall not include, apply to, or be available for, any fees or expenses incurred by any party in connection with (i) the investigation (other than as permitted under paragraph 13 of this Interim Order), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the DIP Lenders and the Senior Secured Lenders, each in such capacity, and their respective agents, attorneys, advisors or representatives, including challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the obligations and the liens and security interests granted under the DIP Documents or the Senior Secured Loan Documents, including the Senior Secured Loan Obligations (whether in such capacity or otherwise), including, in each case, for lender liability or pursuant to section 105, 506(c), 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise, (ii) the modification of any of the rights granted to the DIP Lenders or the Senior Secured Lenders hereunder or under the applicable DIP Documents or Senior Secured Loan Documents, (iii) preventing, hindering, or otherwise delaying any of the DIP Lenders' assertion, enforcement or realization upon any DIP Collateral or Prepetition Collateral in accordance with the DIP Documents, this Interim Order or the Final Order, or (iv) paying any amount on account of any claims arising before the Petition

Date unless such payments are approved by an order of the Court and permitted under the DIP Documents, including the Approved Budget.

16. <u>Protection of DIP Lenders' Rights</u>.

(a) To the extent the Senior Secured Parties have possession of any Prepetition Collateral or DIP Collateral or have control with respect to any Prepetition Collateral or DIP Collateral, or have been noted as a secured party on any certificate of title for a titled good constituting Prepetition Collateral or DIP Collateral, then the Prepetition Agent and/or the Senior Secured Lenders, as applicable, shall be deemed to maintain such possession or notation or exercise such control as a gratuitous bailee or gratuitous agent for perfection for the benefit of the DIP Agent and the DIP Lenders, and shall comply with the instructions of the DIP Agent (acting on behalf of the Required DIP Lenders) with respect to the exercise of such control.

(b) Other than as expressly consented to in writing by the DIP Agent (acting at the direction of the Required DIP Lenders), any proceeds of Prepetition Collateral received by the Senior Secured Lenders in connection with the exercise of any right or remedy (including setoff) relating to the Prepetition Collateral or otherwise received by the Senior Secured Lenders (other than on account of the Adequate Protection Obligations) shall be segregated and held in trust for the benefit of and forthwith paid over to the DIP Lenders in the same form as received, with any necessary endorsements, or as a court of competent jurisdiction may otherwise direct.

17. <u>Access to DIP Collateral</u>. Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent, exercisable on behalf of the DIP Lenders, subject to the terms of the DIP Documents, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing, the DIP Agent may (or shall at the direction of the Required DIP Lenders), subject to the applicable notice provisions

in this Interim Order, enter upon any leased premises of the Debtors or any other party for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtors' rights and privileges as lessee under such lease without interference from the landlord thereunder; *provided*, that the DIP Agent shall be obligated only to pay rent of the Debtors that first accrues after the written notice referenced above is delivered and that is payable during the period of such occupancy by the DIP Agent, calculated on a daily per diem basis.  Upon the Payment in Full of the DIP Obligations, the Prepetition Agent shall inure to all rights provided under this paragraph 17.  Nothing contained herein shall require the DIP Agent or any other DIP Party to assume any lease as a condition to the rights afforded in this paragraph 17.

18.    <u>Limitation on Charging Expenses Against Collateral</u>.    No costs or expenses of administration of the Chapter 11 Cases or any Successor Cases, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral (including Cash Collateral) or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lenders or the Senior Secured Lenders, in their respective capacities, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lenders or the Senior Secured Lenders and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Lenders or the Senior Secured Lenders to any charge, lien, assessment or claim against the DIP Collateral under section 506(c) of the Bankruptcy Code or otherwise; *provided*, *however* that such limitation for the benefit of the Senior Secured Lenders shall be subject to entry of a Final Order.

19.    <u>Payments Free and Clear</u>.  Any and all payments or proceeds remitted to the DIP Agent or DIP Lenders or the Prepetition Agent or Senior Secured Lenders pursuant to the

provisions of this Interim Order, the Final Order (if and when entered) or the DIP Documents shall be irrevocable and received free and clear of any claim, charge, assessment or other liability, whether asserted or assessed by, through or on behalf of the Debtors.

20.    _Rights of Senior Secured Lenders Adequately Protected_.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable to protect the interests of the Senior Secured Lenders.

21.    _Consent to Adequate Protection; Right to Seek Additional Adequate Protection; No Admission_.  The Senior Secured Lenders are deemed to have consented to the Adequate Protection Obligations, the priming of the Prepetition Secured Liens by the DIP Liens, and the use of Cash Collateral provided for herein; _provided_, _however_, that such consent is expressly conditioned upon the entry of this Interim Order, and such consent shall not be deemed to extend to any other Cash Collateral usage or other replacement financing or debtor-in-possession financing other than the DIP Facility provided under the DIP Documents; _provided_, _further_, that such consent shall be of no force and effect in the event this Interim Order is reversed, modified, stayed, or amended (unless such reversal, modification, stay, or amendment is acceptable to the Prepetition Agent) or the DIP Documents and DIP Facility as set forth herein are not approved.  The Adequate Protection Obligations provided to the Senior Secured Lenders hereunder adequately protects the Senior Secured Lenders as of the date hereof; _provided_, _however_, this Interim Order: (a) is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Senior Secured Lenders to request additional or alternative forms of adequate protection from the Debtors; and (b) shall not be deemed an admission, acknowledgement, or stipulation by the Senior Secured

11904184-3

Lenders that the Senior Secured Lenders are in fact adequately protected by the terms and conditions of this Interim Order or otherwise following the date of this Interim Order.

22.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.

(a)    This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection and priority of all liens granted herein, including the DIP Liens and the Adequate Protection Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit control agreement) to validate or perfect (in accordance with applicable non-bankrutcy law) the DIP Liens and the Adequate Protection Liens or to entitle the DIP Agent, the DIP Lenders and the Prepetition Secured Parties to the priorities granted herein.

(b)    The DIP Agent, DIP Lenders, Prepetition Agent and Senior Secured Lenders are hereby authorized, but not required, to file or record (and to execute in the name of the Debtors, as their true and lawful attorneys, with full power of substitution, to the maximum extent permitted by law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, deposit account control agreements or to take possession of or control over cash or securities, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder, including, without limitation, with respect to the DIP Liens and the Adequate Protection Liens.  Whether or not the DIP Lenders or the Senior Secured Lenders shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, deposit account control agreements or take possession of or control over any cash or securities, or otherwise confirm

11904184-3

perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, properly perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, at the time and on the date of entry of this Interim Order, without the necessity of filing or recording any financing statement, trademark filing, copyright filing, mortgage, notice of lien, deposit account control agreement or similar perfection document in any jurisdiction.  Notwithstanding the foregoing, upon the request of the DIP Agent (at the direction of the Required DIP Lenders) or the Prepetition Agent, the Debtors, without any further consent of any party, are authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Lenders and Senior Secured Lenders to further validate, perfect, preserve and enforce the DIP Liens and Adequate Protection Liens, as applicable.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(c)      A certified copy of this Interim Order may, in the discretion of the DIP Lenders and the Senior Secured Lenders, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Interim Order for filing and/or recording, as applicable.  The automatic stay of section 362(a) of the Bankruptcy Code is hereby modified to the extent necessary to permit the DIP Agent, DIP Lenders, Prepetition Agent and Senior Secured Lenders to take all actions, as applicable, referenced in this subparagraph (b) and the immediately preceding subparagraph (a).

(d)      Notwithstanding anything to the contrary in the Motion, the DIP Documents or this Interim Order, for purposes of this Interim Order, in no event shall the DIP Collateral include, or the DIP Liens or Adequate Protection Liens attach to, any lease, license, contract or agreement or

other property right to which the Debtors are a party, or any such relevant Debtors' rights or interests thereunder, if and for so long as the grant of such security interest would constitute or result in:  (i) the abandonment, invalidation, unenforceability or other impairment of any right, title or interest of the Debtors therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease, license, contract or agreement or other property right pursuant to any provision thereof, unless, in the case of each of clauses (i) and (ii), the applicable provision is rendered ineffective by applicable non-bankruptcy law or the Bankruptcy Code (such leases, licenses, contracts or agreements or other property rights are collectively referred to as the "**Specified Contracts**"); *provided*, *however*, the DIP Liens, Adequate Protection Liens, DIP Superpriority Claims and Adequate Protection 507(b) Claim shall in all events attach to and have recourse from all proceeds, products, offspring or profits from any and all Specified Contracts (including from the sale, transfer, disposition or monetization thereof).

23.    <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner, any responsible officer or any other estate representative subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents at any time before the Payment in Full of (a) all DIP Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, and (b) all Senior Secured Loan Obligations, including subsequent to the confirmation of any plan with respect to the Debtors and the Debtors' estates, and such financing is secured by any DIP Collateral or Prepetition Collateral, then all of the cash proceeds derived from such credit or debt shall immediately be turned over first to the DIP Agent, to be applied as set forth the DIP Documents, and second to the Prepetition Agent to be applied as

set forth in the Senior Secured Loan Documents, except as provided under such confirmed plan (if applicable).

24.    <u>Disposition of DIP Collateral; Rights of DIP Lenders</u>.

(a)    The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any DIP Collateral or Prepetition Collateral other than in the ordinary course of business without the prior written consent of the DIP Agent (acting at the direction of the Required DIP Lenders)  and the Prepetition Agent (and no such consent shall be implied, from any other action, inaction or acquiescence), except as expressly permitted in the DIP Documents, Senior Secured Loan Documents, this Interim Order and the Final Order (if and when entered), including budgets attached thereto, as applicable.

(b)    The Debtors will (i) maintain books, records and accounts to the extent, and as required by, the DIP Documents, (ii) cooperate with, consult with, and provide to the DIP Agent, the DIP Lenders, the Prepetition Agent and the Senior Secured Lenders, all such information and documents that any or all of the Debtors are obligated to provide under the DIP Documents or the provisions of this Interim Order or as otherwise requested by the DIP Agent (acting at the direction of the Required DIP Lenders) or the Prepetition Agent, (iii) permit consultants, advisors and other representatives (including third party representatives) of the DIP Agent, the DIP Lenders, the Prepetition Agent or the Senior Secured Lenders (as applicable), to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations and accounts with their respective officers, employees, independent public accountants and other professional advisors as, and to the extent required by, the DIP Documents or the Senior

Secured Loan Documents, (iv) permit the DIP Agent, the DIP Lenders, the Prepetition Agent, the Senior Secured Lenders and their respective consultants, advisors and other representatives, to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets, and (v) permit the DIP Agent and the Prepetition Agent to conduct, at their reasonable direction and at the Debtors' sole cost and expense, field audits, collateral examinations, liquidation valuations and inventory appraisals in respect of any or all of the DIP Collateral and the Prepetition Collateral, in each case, in accordance with the applicable DIP Documents and the Senior Secured Loan Documents.

(c)      No Debtor shall object to the DIP Agent (acting at the direction of the Required DIP Lenders) or the Prepetition Agent submitting a credit bid with respect to any sale of the Debtors' assets in accordance with paragraph 31 hereunder.

25.      <u>Maintenance of DIP Collateral</u>. Until all DIP Obligations and Senior Secured Loan Obligations are Paid in Full and all Adequate Protection Obligations are indefeasibly paid in full and the termination of the DIP Lenders' obligations to extend credit under the DIP Facility, the Debtors shall (a) insure the DIP Collateral as required under the DIP Documents and the Senior Secured Loan Documents, as applicable; and (b) maintain the cash management system consistent with the terms and conditions of the Cash Management Order (as defined below), or as otherwise required by the DIP Documents.

26.      <u>Preservation of Rights Granted Under This Interim Order</u>.

(a)      Other than the Carve-Out and other claims and liens expressly granted or permitted by this Interim Order and the DIP Documents, no claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the DIP Lenders or the Senior Secured Lenders shall be permitted while any of the DIP Obligations, Adequate Protection Obligations or Senior

Secured Loan Obligations remain outstanding.  No lien or security interest shall be granted to any other party in any of the Specified Contracts without first granting such lien or security interest to the DIP Lenders or the Senior Secured Lenders, as applicable. It shall be an Event of Default under this Interim Order if, in any of these Chapter 11 Cases or any Successor Cases, any order is entered granting any claim or lien in contravention of this paragraph 26(a).

(b)        Notwithstanding any order that may be entered dismissing the Chapter 11 Cases or any Successor Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered: (i) the DIP Superpriority Claims, the Adequate Protection 507(b) Claim, the DIP Liens, and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations are Paid in Full and Adequate Protection Obligations shall have been indefeasibly paid in full (and that such DIP Superpriority Claims, Adequate Protection 507(b) Claim, DIP Liens and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest); (ii) the other rights granted by this Interim Order shall not be affected; and (iii) this Court shall, to the extent permitted by applicable law, retain exclusive jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)        If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect: (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred before the actual receipt of written notice by the DIP Lenders or the Senior Secured Lenders, as applicable, of the effective date of such reversal, modification, vacation or stay; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding any

11904184-3

such reversal, modification, vacation or stay of any use of Cash Collateral, any DIP Obligations, DIP Liens, Adequate Protection Obligations or Adequate Protection Liens incurred or granted by the Debtors to or for the benefit of the DIP Agent, the DIP Lenders, the Prepetition Agent or the Senior Secured Lenders, as the case may be, before the actual receipt of written notice by the DIP Agent, the DIP Lenders, the Prepetition Agent or the Senior Secured Lenders, as applicable, of the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lenders and the Senior Secured Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)     Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Secured Parties and the Senior Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by: (i) the entry of an order converting the Chapter 11 Cases to a case under chapter 7, dismissing the Chapter 11 Cases or any Successor Cases, or by any other act or omission; (ii) the entry of an order approving the sale of any DIP Collateral or Prepetition Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents); or (iii) the entry of an order confirming a chapter 11 plan in the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in these Chapter 11 Cases, in any Successor Cases or following dismissal of the Chapter 11 Cases

11904184-3

or any Successor Cases, as applicable, and the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Obligations and all other rights and remedies of the DIP Lenders and the Senior Secured Lenders granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until the entry of the Final Order or the DIP Obligations are Paid in Full and Adequate Protection Obligations are indefeasibly paid in full, as set forth herein and in the DIP Documents, and the DIP Commitments have been terminated.

(e)    The entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the right of any party (including, but not limited to, the DIP Secured Parties and the Senior Secured Parties) to object to the allowance of any professional fees or expenses of any Professional Person, which rights are expressly preserved, (b) the DIP Secured Parties' and Senior Secured Parties' right to seek any other or supplemental relief in respect of the Debtors; (c) any of the rights of any of the DIP Secured Parties and the Senior Secured Parties under the Bankruptcy Code or under applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans; or (d) any other rights, claims or privileges (whether legal, equitable or otherwise) of any of the DIP Secured Parties or Senior Secured Parties.

27.    <u>Cash Management</u>.  Unless otherwise agreed by the DIP Lenders and the Senior Secured Lenders, in their respective capacities, the Debtors shall maintain their cash management arrangements in all material respects in a manner consistent with that described in the applicable

11904184-3

"first-day" order and the related motion seeking authorization to continue the Debtors' cash management arrangements (the "**Cash Management Order**"). Subject to this Interim Order, the Debtors and the financial institutions where the Debtors maintain deposit accounts (as identified in the Cash Management Order), are authorized and directed to remit, without offset or deduction, funds in such deposit accounts upon receipt of any direction to that effect from the DIP Agent (acting at the direction of the Required DIP Lenders) in accordance with the DIP Documents.

28.     <u>Limitation on Use of DIP Loans and DIP Collateral</u>.  Notwithstanding any other provision of this Interim Order or any other order entered by the Court, no DIP Loans, DIP Collateral, Prepetition Collateral or any portion of the Carve-Out, may be used directly or indirectly by the Debtors, the Committee (if any), or any trustee appointed in the Chapter 11 Cases or any Successor Cases, or any other person, party or entity (a) in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation (i) against the DIP Lenders or the Senior Secured Lenders or their respective Representatives, or any action purporting to do the foregoing in respect of the Senior Secured Loan Obligations, liens on the Prepetition Collateral, DIP Obligations, DIP Liens on the DIP Collateral, DIP Superpriority Claims, or the Adequate Protection Obligations, Adequate Protection Liens and Adequate Protection 507(b) Claim granted to the Senior Secured Lenders, as applicable, under the Interim Order or the Final Order, as applicable, or (ii) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset with respect to, the Senior Secured Loan Obligations, the Adequate Protection Obligations, the DIP Obligations, or the liens, claims, rights, or security interests granted under this Interim Order, the Final Order and the DIP Documents, including, in each case for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or

11904184-3

otherwise; *provided*, *however*, advisors to any Committee may investigate any potential challenges with respect to the Senior Secured Loan Documents, the Senior Secured Loan Obligations, or Prepetition Secured Liens during the Challenge Period at an aggregate expense for such investigation, but not litigation, prosecution, objection or challenge thereto, not to exceed $25,000 in the aggregate; (b) to prevent, hinder, or otherwise delay the Senior Secured Lenders or the DIP Lenders, as applicable, in the enforcement or realization on the Senior Secured Loan Obligations, Adequate Protection Obligations, Prepetition Collateral, DIP Obligations, DIP Collateral, and the liens, claims, and rights granted to such parties under the Interim Order or the Final Order, each in accordance with the DIP Documents, the Senior Secured Loan Documents, this Interim Order, or the Final Order (if and when entered), other than, and subject to the notice period set forth in paragraph 11 hereof, to seek a determination that an Event of Default has not occurred or is not continuing; (c) to seek to modify any of the rights and remedies granted to the Senior Secured Parties or the DIP Secured Parties under this Interim Order, the Senior Secured Loan Documents or the DIP Documents, as applicable; (d) to apply to the Court for authority to approve superpriority claims or grant liens or security interests in the DIP Collateral or any portion thereof that are senior to, or on parity with, the Carve-Out or the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection 507(b) Claim granted to the Senior Secured Lenders and the DIP Lenders unless all DIP Obligations, Adequate Protection Obligations and claims granted to the DIP Lenders or Senior Secured Lenders under this Interim Order, have been refinanced or Paid in Full or otherwise agreed to in writing by the DIP Lenders and the Senior Secured Lenders; or (e) to seek to pay any amount on account of any claims arising before the Petition Date unless such payments are agreed to in writing by the DIP Lenders or are otherwise included in the Approved Budget.

11904184-3

29.    <u>Exculpation; Loss or Damage to Collateral</u>.  Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Senior Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts.  The DIP Secured Parties and the Senior Secured Parties shall not, in any way or manner, be liable or responsible for (a) the safekeeping of the DIP Collateral or the Prepetition Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof, or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral and the Prepetition Collateral shall be borne by the Debtors.

30.    <u>Indemnification</u>. The Debtors shall indemnify and hold harmless the DIP Secured Parties and the Senior Secured Parties in accordance with the terms and conditions of the DIP Documents and the Senior Secured Loan Documents, as applicable.

31.    <u>Credit Bidding</u>.  Upon Entry of this interim Order, (a) the DIP Agent (at the direction of the Required DIP Lenders) shall have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral and (b) the Prepetition Agent shall have the right to credit bid up to the full amount of the Adequate Protection Obligations and the Senior Secured Loan Obligations in the sale of any Prepetition Collateral whether (with respect to both (a) and (b) above) pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for the Debtors under section 725 of the Bankruptcy Code and each of the DIP Agent and Prepetition Agent, in their respective

capacities as such, shall be deemed a qualified bidder (or such analogous term or capacity) in connection with any such sale.

32.    <u>Application of Sale Proceeds</u>.  Notwithstanding anything herein: (a) the right of the DIP Lenders to consent to the sale of any portion of the DIP Collateral, on terms and conditions acceptable to the DIP Lenders, are hereby expressly reserved and not modified, waived or impaired and (b) unless otherwise ordered by the Court, including without limitation pursuant to the Sale Order, all cash proceeds generated from the sale of any assets secured by Prepetition Secured Liens or DIP Liens shall be paid to the DIP Lenders and Senior Secured Lenders upon the closing of such sale for permanent application against the obligations owing by the Debtors under the DIP Documents in accordance with the terms and conditions of the DIP Orders and the DIP Documents and the Senior Secured Loan Documents, as applicable, until such time as all DIP Obligations, and Senior Secured Loan Obligations have been Paid in Full and all Adequate Protection Obligations have been indefeasibly paid in full.

33.    <u>Modification of Automatic Stay</u>. The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate the terms and provisions of this Interim Order, including, without limitation, to (a) permit the Debtors to grant the DIP Liens, the Adequate Protection Liens, the DIP Superpriority Claims and the Adequate Protection 507(b) Claim; (b) permit the Debtors to perform such acts as the DIP Agent and the Prepetition Agent may request to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the DIP Secured Parties and the Senior Secured Parties under the DIP Documents, the DIP Facility and this Interim Order; and (d) authorize the Debtors to pay, and the DIP Secured Parties and the Senior Secured Parties to retain

and apply, payments made in accordance with the terms of this Interim Order, the DIP Documents and the Approved Budget.

34.    <u>Interim Order Governs</u>.  In the event of any inconsistency between the provisions of this Interim Order, on the one hand, and the DIP Documents, the Senior Secured Loan Documents or any other order entered by this Court (other than the Final Order), on the other hand, the provisions of this Interim Order shall govern.  Notwithstanding anything to the contrary in any other order entered by this Court, any payment made pursuant to and any authorization contained in any other order entered by this Court shall be consistent with and subject to the requirements set forth in this Interim Order, the Final Order upon its entry and the DIP Documents, including the Approved Budget.

35.    <u>No Modification of Interim Order</u>. Until and unless the DIP Obligations, and Senior Secured Loan Obligations have been Paid in Full and the Adequate Protection Obligations have been indefeasibly paid in full, and all commitments to extend credit under the DIP Facility have been terminated, the Debtors shall not seek or consent to, directly or indirectly, without the prior written consent of (A) the DIP Agent (acting at the direction of the Required DIP Lenders) and (B) with respect to any provisions that impact the legal or economic rights of the Senior Secured Parties, the Prepetition Agent, any material modification, stay, vacatur or amendment to this Interim Order.

36.    <u>Binding Effect; Successors and Assigns</u>.  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Cases and any Successor Cases, including the Debtors, the DIP Secured Parties, the Senior Secured Parties, the Committee (if any), any non-statutory committees appointed or formed in the Chapter 11 Cases, the Debtors, and their respective successors and assigns (including

any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estates of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of the Debtors or with respect to the property of the estates of the Debtor) and shall inure to the benefit of the DIP Lenders, the Senior Secured Lenders, and the Debtors and their respective successors and assigns; *provided*, *however*, the DIP Lenders and the Senior Secured Lenders shall have no obligation to permit the use of the DIP Collateral or Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estates of the Debtors.

37.    <u>No Liability to Third Parties</u>.  Except as explicitly provided for herein or in any of the DIP Documents, the Debtors stipulate and the Court finds that the DIP Lenders and the Senior Secured Lenders, in their respective capacities as such, shall not (a) be deemed to have liability to any third party or be deemed to be in control of the operation of any of the Debtors or to be acting as a "controlling person," "responsible person," "owner or operator," or "participant" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any other federal, state, or applicable international statute or regulation) as a result of its consent to the use of Cash Collateral hereunder or (b) owe any fiduciary duty to any of the Debtors, their creditors or estates, or shall constitute or be deemed to constitute a joint venture or partnership with any of the Debtors as a result of their extension of credit under the DIP Documents or the Senior Secured Loan Documents.

38.    <u>No Standing Granted</u>.  Nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code), including any committee appointed in the Chapter 11 Cases or any Successor Cases (including the Committee), if any, standing or authority to pursue any

challenge or other cause of action belonging to the Debtors or their estates with respect to the Senior Secured Loan Documents or the Senior Secured Loan Obligations.

39.    <u>No Waiver</u>.  No delay or failure by the Prepetition Agent, Senior Secured Lenders, DIP Agent or DIP Lenders in the exercise of their respective rights and remedies under the DIP Documents, the Senior Secured Loan Documents or this Interim Order, as applicable, shall constitute a waiver, in whole or in part, of any of such party's rights hereunder or otherwise.

40.    <u>Proofs of Claim</u>.  Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, neither the Senior Secured Lenders, the DIP Lenders, nor the lenders under the HoldCo Loan Agreement shall  be required to file proofs of claim in the Chapter 11 Cases or any Successor Cases to assert claims on behalf of themselves for payment of the Senior Secured Loan Obligations, the DIP Obligations or the HoldCo Loan Obligations, including any principal, unpaid interest (including default interest therein), fees, expenses, and other amounts under the Senior Secured Loan Documents, the DIP Loan Documents or the HoldCo Loan Documents, as applicable.  The statements of claim in respect of the Senior Secured Loan Obligations, the DIP Obligations or the HoldCo Loan Obligations, as set forth in this Interim Order, together with any evidence accompanying the Motion and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such debt and such secured status. The Debtors' Stipulations shall be deemed to constitute a timely filed proof of claim for the Senior Secured Lenders in respect of all of the Senior Secured Loan Obligations, for the DIP Lenders in respect of all of the DIP Loan Obligations and for the lenders under the HoldCo Loan Agreement in respect of the HoldCo Loan Obligations.  In addition, the Senior Secured Lenders and the DIP Lenders shall not be required to file any request for allowance or payment of any administrative expenses,

11904184-3

and this Interim Order shall be deemed to constitute a timely filed request for allowance or payment of any Senior Secured Loan Obligation or DIP Obligation constituting administrative expenses, as applicable.

41.     Insurance.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, to the extent that the Senior Secured Lenders and/or the Prepetition Agent are listed as loss payee(s) under the Debtors' insurance policies that in any way relate to the DIP Collateral, the DIP Lenders and/or DIP Agent, as appropriate, are also deemed to be the loss payee(s) under such insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies in the order of priorities set forth herein.

42.     Joint and Several Liability. Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates; *provided*, *however*, that the Debtors shall be jointly and severally liable for the obligations hereunder and all DIP Obligations and Adequate Protection Obligations in accordance with the terms hereof and the DIP Documents.

43.     Effectiveness.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable as of the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

44.     Headings.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

45.     Payments Held in Trust.  Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity receives any payment on account of a

security interest in DIP Collateral, receives any DIP Collateral or any proceeds of DIP Collateral or receives any other payment with respect thereto from any other source before Payment in Full of all DIP Obligations and Adequate Protection Obligations under the DIP Documents and termination of the DIP Commitments in accordance with the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Lenders and Senior Secured Lenders and shall immediately turn over such proceeds to the DIP Lenders and/or Senior Secured Lenders, as applicable, or as otherwise instructed by this Court, for application in accordance with the DIP Documents and this Interim Order.

46. <u>Bankruptcy Rules</u>.  The requirements of Local Rules 4001-2, 9013-1(F)-(H) and 9075-1, the Guidelines, and Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

47. <u>Necessary Action</u>.  The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

48. <u>Assignment of DIP Obligations</u>.  The DIP Lenders may assign any or all of their rights or obligations under the DIP Loan Agreement (a) at any time, to any affiliate of the DIP Lenders, (b) prior to the occurrence of an Event of Default, to any person with the prior written consent of the DIP Borrower, and (c) during an Event of Default, to any other person without the consent of any DIP Loan Party.

49. <u>Retention of Jurisdiction</u>.  The Court shall retain exclusive jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

11904184-3

50.    <u>Final Hearing</u>.  The Final Hearing to consider entry of the Final Order and approval of the DIP Facility and continued use of Cash Collateral is scheduled for **March 6,  2023 at 11:00 am** (Prevailing Eastern Time) before this Court at the U.S. Courthouse, 299 East Broward Boulevard, Courtroom 301, Fort Lauderdale, FL 33301. Information on requirements and procedures for remote attendance at the hearing may be found on the Honorable Peter D. Russin's webpage on the Court's website: www.flsb.uscourts.gov.

51.    <u>Objections</u>.  Objections, if any, to the relief sought at the Final Hearing  must: (a) be in writing; (b) state the basis of such objection with specificity; (c) comply with the Bankruptcy Rules and the Local Rules; (d) be filed with the Bankruptcy Court on or before **4:00 pm (Eastern Standard Time) on February 27, 2023** (the "**Objection Deadline**"); and (e) be served, so as to be received the same day as the objection is filed with the Bankruptcy Court, but in no event later than the Objection Deadline, upon:  (a) the Debtors, c/o (i) Interim Chief Executive Officer, c/o Getzler Henrich & Associates, 295 Madison Avenue, 20th Floor, New York, New York 10017 (Attn: Edward Phillips, ephillips@getzlerhenrich.com)  and (ii) bankruptcy counsel for the Debtors, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com), and Robin J. Rubens, Esq. (rrubens@bergersingerman.com) and delphi@bergersingerman.com; (b) counsel for (i) the Administrative Agent for the Prepetition Lenders and (ii) the Administrative Agent for the DIP Lenders, King & Spalding LLP, 1185 Avenue of the Americas, 34th Floor, New York, New York 10036 (Attn: Roger Schwartz, Esq. (rschwartz@kslaw.com), Pete Montori, Esq. (PMontoni@kslaw.com), and Robert Nussbaum, Esq. (rnussbaum@kslaw.com)); (c) the Office of the United States Trustee, 51 SW First Avenue, Room 1204, Miami, Florida 33130; and (d) counsel to any statutory committee appointed in the Debtors' bankruptcy cases.

52.    The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing), to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court, and to the Committee (if any) after the same has been appointed, or such Committee's counsel, if the same shall have been appointed.

# # #

<u>Submitted by</u>:
Paul Steven Singerman, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Ste. 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340
Email:  singerman@bergersingerman.com

*(Attorney Singerman is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

11904184-3

**<u>Exhibit A</u>**

**DIP Loan Agreement**

*Execution Version*

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**DATED February 6, 2023 and**

**BY AND AMONG**

**DR SUB, LLC,**
**as Holdings,**

**DELPHI INTERMEDIATE HEALTHCO, LLC,**
**as Borrower,**

**THE OTHER LOAN PARTIES WHICH ARE PARTY HERETO,**

**THE LENDERS WHICH ARE PARTY HERETO**

**AND**

**BRIGHTWOOD LOAN SERVICES LLC,**
**as Administrative Agent**

35954104

# TABLE OF CONTENTS

**Page**

## ARTICLE I
### DEFINITIONS AND OTHER TERMS

1.1  UCC Terms .................................................................................................................. 2
1.2  Defined Terms ............................................................................................................. 2
1.3  Other Interpretive Provisions .................................................................................... 24
1.4  Accounting Terms; Payment Dates ........................................................................... 25
1.5  References to Agreements, Laws, Etc. ...................................................................... 25
1.6  Times of Day .............................................................................................................. 25
1.7  Divisions .................................................................................................................... 25

## ARTICLE II
### THE ADVANCES

2.1  The Advances ............................................................................................................. 25
2.2  Register ...................................................................................................................... 28
2.3  Payments .................................................................................................................... 29
2.4  Setoff; etc .................................................................................................................. 29
2.5  Sharing ....................................................................................................................... 29
2.6  Fees ............................................................................................................................ 30
2.7  Lending Branch .......................................................................................................... 30
2.8  Application of Payments and Collections .................................................................. 30
2.9  Making the Loans ....................................................................................................... 31
2.10 Defaulting Lenders .................................................................................................... 31
2.11 No Discharge; Survival of Claims ............................................................................ 33
2.12 Super Priority Nature of Obligations and Lenders' DIP Liens ................................. 33
2.13 Release ....................................................................................................................... 33
2.14 Waiver of Certain Rights .......................................................................................... 34
2.15 Grant of Security; Security for Obligations; Debtors Remain Liable ....................... 34

## ARTICLE III
### CONDITIONS PRECEDENT

3.1  Conditions Precedent to the Closing Date ................................................................. 36
3.2  Conditions Precedent to Extensions of Loans ........................................................... 38

## ARTICLE IV
### REPRESENTATIONS AND WARRANTIES

4.1  Organization; etc ....................................................................................................... 40
4.2  Due Authorization ...................................................................................................... 40
4.3  Subsidiaries ................................................................................................................ 40
4.4  Validity of the Agreement ......................................................................................... 41
4.5  Financial Statements; Budget .................................................................................... 41
4.6  Litigation; etc ............................................................................................................ 41
4.7  Compliance with Law ................................................................................................ 41
4.8  ERISA Compliance .................................................................................................... 41

4.9     Title to Assets .................................................................................................... 42
4.10    Use of Proceeds ................................................................................................ 43
4.11    Governmental Regulation .................................................................................. 43
4.12    Margin Stock ..................................................................................................... 43
4.13    Investment Company Act ................................................................................... 43
4.14    Accuracy of Information .................................................................................... 43
4.15    Tax Returns; Audits .......................................................................................... 43
4.16    Environmental and Safety Regulations .............................................................. 44
4.17    Payment of Wages; Labor Matters ..................................................................... 44
4.18    Intellectual Property .......................................................................................... 44
4.19    [Reserved] ......................................................................................................... 44
4.20    Chapter 11 Cases .............................................................................................. 44
4.21    No Material Adverse Occurrence ....................................................................... 45
4.22    DIP Orders ........................................................................................................ 45
4.23    Deposit Accounts .............................................................................................. 45
4.24    [Reserved] ......................................................................................................... 45
4.25    Material Contracts ............................................................................................. 45
4.26    Valid Liens ........................................................................................................ 45
4.27    Foreign Assets Control Regulations and Anti-Money Laundering ....................... 45
4.28    Patriot Act ........................................................................................................ 46
4.29    Insurance. ......................................................................................................... 46
4.30    [Reserved] ......................................................................................................... 46
4.31    Healthcare Laws ............................................................................................... 46
4.32    HIPAA and Part 2 Compliance .......................................................................... 46
4.33    Other Agreements/Program Eligibility .............................................................. 47
4.34    Reimbursement from Third-Party Payors ........................................................... 47
4.35    Fraud and Abuse ............................................................................................... 47

## ARTICLE V
CERTAIN AFFIRMATIVE COVENANTS

5.1     Financial Information; etc.................................................................................. 48
5.2     Maintenance of Existence; etc ........................................................................... 49
5.3     Maintenance of Properties ................................................................................. 49
5.4     Payment of Liabilities ....................................................................................... 50
5.5     Compliance with Laws ...................................................................................... 50
5.6     Books and Records; Inspection Rights; etc......................................................... 50
5.7     Insurance ........................................................................................................... 51
5.8     ERISA ............................................................................................................... 51
5.9     [Reserved] ......................................................................................................... 52
5.10    [Reserved] ......................................................................................................... 52
5.11    Cash Management Systems ................................................................................. 52
5.12    Further Assurances............................................................................................. 52
5.13    [Reserved] ......................................................................................................... 52
5.14    OFAC; Patriot Act ............................................................................................. 52
5.15    Compliance with Certain Healthcare Laws ......................................................... 52
5.16    Assignment of Licenses and Certificates ............................................................ 53
5.17    Post-Closing ...................................................................................................... 53

## ARTICLE VI
### FINANCIAL COVENANTS AND NEGATIVE COVENANTS

6.1    [Reserved].................................................................................................54
6.2    Limitations on Indebtedness..................................................................54
6.3    Liens.......................................................................................................55
6.4    Sales of Assets.......................................................................................55
6.5    Liquidations, Mergers and Consolidations............................................55
6.6    Investments............................................................................................55
6.7    Transactions with Affiliates...................................................................55
6.8    [Reserved].............................................................................................56
6.9    Amendment and Waiver.........................................................................56
6.10   Restricted Payments...............................................................................56
6.11   Payments in Respect of Certain Indebtedness.......................................56
6.12   Change in Business.................................................................................56
6.13   Changes in Accounting, Name and Jurisdiction of Organization...........57
6.14   [Reserved].............................................................................................57
6.15   Holding Company Status........................................................................57
6.16   Use of Proceeds.....................................................................................57
6.17   Plans......................................................................................................58

## ARTICLE VII
### EVENTS OF DEFAULT

7.1    Events of Default ...................................................................................58
7.2    Action If Event of Default .....................................................................62
7.3    Remedies................................................................................................62

## ARTICLE VIII
### THE ADMINISTRATIVE AGENT

8.1    Appointment and Authorization .............................................................63
8.2    Power .....................................................................................................63
8.3    Interest Holders......................................................................................64
8.4    Employment of Counsel; etc .................................................................64
8.5    Reliance .................................................................................................64
8.6    General Immunity...................................................................................64
8.7    Lenders' Representations and Warranties...............................................65
8.8    Administrative Agent and Affiliates......................................................67
8.9    Indemnification.......................................................................................67
8.10   Security Documents................................................................................67
8.11   Collateral Matters; Credit Bid................................................................67
8.12   Action by the Administrative Agent .......................................................69
8.13   Successor Administrative Agent.............................................................70
8.14   Legal Representation of Administrative Agent .......................................70

## ARTICLE IX
### MISCELLANEOUS

9.1    Waivers, Amendments; etc .....................................................................70
9.2    Payment Dates .......................................................................................71

9.3     Notices ........................................................................................................... 71
9.4     Costs and Expenses ........................................................................................ 71
9.5     Indemnification .............................................................................................. 72
9.6     Severability .................................................................................................... 73
9.7     Headings ........................................................................................................ 73
9.8     Governing Law ............................................................................................... 73
9.9     Successors and Assigns .................................................................................. 73
9.10    Execution in Counterparts .............................................................................. 76
9.11    Several Liability ............................................................................................. 76
9.12    Financial Information ...................................................................................... 76
9.13    Entire Agreement ............................................................................................ 76
9.14    Other Relationships ........................................................................................ 76
9.15    Consent to Jurisdiction ................................................................................... 77
9.16    Waiver of Jury Trial ....................................................................................... 77
9.17    USA Patriot Act .............................................................................................. 77
9.18    Confidentiality ............................................................................................... 78
9.19    Replacement of Lenders .................................................................................. 78
9.20    [Reserved] ...................................................................................................... 79
9.21    Electronic Execution of Assignments and Certain Other Documents ............ 79
9.22    [Reserved] ...................................................................................................... 79
9.23    Acknowledgement and Consent to Bail-In of EEA Financial Institutions ...... 79
9.24    Conflict; Control ............................................................................................ 80

**ARTICLE X**
TAXES, YIELD PROTECTION AND ILLEGALITY

10.1    Taxes .............................................................................................................. 80
10.2    Illegality ........................................................................................................ 84
10.3    Inability to Determine Rates ........................................................................... 85
10.4    Increased Costs ............................................................................................... 85
10.5    Funding Losses ............................................................................................... 86
10.6    Mitigation Obligations; Replacement of Lenders ........................................... 86
10.7    Survival .......................................................................................................... 87

SCHEDULE I        -     Lenders/Commitments
SCHEDULE 4.6      -     Litigation
SCHEDULE 4.7      -     Compliance with Law
SCHEDULE 4.8      -     ERISA
SCHEDULE 4.17     -     Labor Matters
SCHEDULE 4.23     -     Deposit Accounts
SCHEDULE 4.31(c) -     Healthcare Inspections, Investigations, Inquiries and Audits
SCHEDULE 4.33     -     Other Agreements / Program Eligibility
SCHEDULE 5.3      -     Maintenance of Properties
SCHEDULE 6.1      -     Permitted Indebtedness
SCHEDULE 6.3      -     Permitted Prior Liens
SCHEDULE 6.6      -     Permitted Investments
SCHEDULE 6.7      -     Affiliate Transactions
SCHEDULE 9.3      -     Administrative Agent's Office; Certain Addresses for Notices

EXHIBIT A         -     Initial Budget

## CREDIT AGREEMENT

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT effective as of February 6, 2023, by and among **DR SUB, LLC** ("Holdings"), **DELPHI INTERMEDIATE HEALTHCO, LLC** ("Borrower"), the other Loan Parties party hereto, the Lenders now or hereafter parties hereto, and **BRIGHTWOOD LOAN SERVICES LLC**, in its capacity as Administrative Agent for the Lenders.

**WHEREAS**, on February 6, 2023 (the "**Petition Date**"), the Borrower and the other Loan Parties (collectively, the "**Debtors**" and, each individually, a "**Debtor**") each commenced a chapter 11 case, which are being jointly administered under Case No. 23-10945-PDR (each a "**Chapter 11 Case**" and collectively, the "**Chapter 11 Cases**"), by filing separate voluntary petitions for reorganization under Chapter 11 of Title 11 of the U.S. Code, 11 U.S.C. 101 *et seq*. (the "**Bankruptcy Code**"), with the United States Bankruptcy Court for the Southern District of Florida (together with any other court having jurisdiction over the Chapter 11 Cases or any proceeding therein from time to time, the "**Bankruptcy Court**"); and each Debtor continues to operate its businesses and manage its properties as a debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, prior to the Petition Date, certain of the Lenders and/or certain of their affiliates or controlled funds provided financing to the Borrower pursuant to that certain Credit Agreement, dated as of April 8, 2020, among the Borrower, the guarantors from time to time party thereto, the lenders party thereto from time to time, and the Administrative Agent (as amended by that certain First Amendment to Credit Agreement and Forbearance Agreement, dated as of August 3, 2021, that certain Second Amendment to Credit Agreement and Forbearance Agreement, dated as of January 18, 2022, that certain Third Amendment to Credit Agreement and Forbearance Agreement, dated as of April 29, 2022, that certain Fourth Amendment to Credit Agreement and Forbearance Agreement, dated as of June 14, 2022, that certain Fifth Amendment to Credit Agreement and Forbearance Agreement, dated as of September 16, 2022, that certain Sixth Amendment to Credit Agreement, dated as of November 7, 2022, that certain Seventh Amendment to the Credit Agreement, dated as of December 6, 2022, that certain Eighth Amendment to the Credit Agreement, dated as of January 10, 2023 and as further amended, restated, amended and restated, supplemented or otherwise modified through the Petition Date, the "**Prepetition Credit Agreement**");

**WHEREAS**, the Borrower has requested that the Lenders provide a senior secured, superpriority debtor-in-possession term loan facility available in multiple draws as set forth herein to the Borrower in the maximum aggregate principal amount of $11,000,000 (the "**DIP Facility**") as further set forth herein, including, without limitation, to fund the costs of the Chapter 11 Cases and other purposes set forth in Section 6.16;

**WHEREAS**, the Guarantors will guaranty all of the Obligations under the Loan Documents;

**WHEREAS**, in order to secure the Obligations of the Borrower and the other Guarantors under the Loan Documents, the Borrower and the Guarantors will grant to the Administrative Agent, for the benefit of Administrative Agent and all other Secured Parties, subject to the Carve-Out, a security interest in and a DIP Lien upon substantially all of the now existing and hereafter acquired personal of the Borrower and the Guarantors;

**WHEREAS**, the relative priority of the DIP Liens and security interests granted to secure the Obligations in relation to the Liens and security interests securing the Prepetition Obligations and certain other obligations will be set forth in the DIP Orders;

1

**WHEREAS**, the Borrower and the other Loan Parties will provide to the prepetition lenders and other prepetition secured parties under the Prepetition Credit Agreement and the other Prepetition Loan Documents, adequate protection in accordance with the DIP Orders; and

**WHEREAS**, the Lenders are willing to extend such credit to the Borrower and the other Loan Parties on the terms and subject to the conditions set forth herein and the DIP Orders, as applicable.

**NOW, THEREFORE**, in consideration of the terms and conditions contained herein, and of any loans or extensions of credit heretofore, now or hereafter made to or for the benefit of the Borrower by the Lenders and the Administrative Agent, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND OTHER TERMS

**1.1    <u>UCC Terms</u>**. The following terms shall have the respective meanings provided for in the Uniform Commercial Code as in effect from time to time in the State of New York: "Accounts", "Account Debtor", "Cash Proceeds", "Certificate of Title", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Commodity Contracts", "Deposit Account", "Documents", "Electronic Chattel Paper", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter-of-Credit Rights", "Noncash Proceeds", "Payment Intangibles", "Proceeds", "Promissory Notes", "Record", "Securities Account", "Software", "Supporting Obligations" and "Tangible Chattel Paper".

**1.2    <u>Defined Terms</u>.**  The following terms when used in this Agreement shall, except where the context otherwise requires, have the following meanings:

"<u>Administrative Agent</u>" means Brightwood Loan Services LLC, as Administrative Agent for the Lenders, or any successor Administrative Agent hereunder.

"<u>Administrative Questionnaire</u>" means an administrative questionnaire to be completed and provided to the Administrative Agent in form and substance as provided by the Administrative Agent.

"<u>Advance</u>" means one or more advances made by the Lenders under this Agreement.

"<u>Affiliate</u>" shall include, with respect to any Person, any other Person which directly or indirectly controls, is controlled by, or is under common control with such Person; <u>provided</u> that, for purposes of <u>Sections 4.28</u> and <u>6.7</u>, the Lenders as of the Closing Date (and any of their transferees that are otherwise not Affiliates of the Borrower) shall not be Affiliates of the Loan Parties.  For purposes of this definition, a Person shall be deemed to control another Person if the controlling Person owns or controls directly or indirectly ten percent (10%) or more of the shares of stock, other Equity Interests or Equity Interests Equivalents or voting powers of the controlled Person.

"<u>Aggregate Commitments</u>" means the Commitments of all Lenders.

"<u>Agreement</u>" means this Superpriority Secured Debtor-in-Possession Credit Agreement as originally executed and as amended, modified or supplemented from time to time.

"<u>Applicable Loan Percentage</u>" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the outstanding principal amount of the Loans of a Lender divided by the outstanding principal amount of the Loans owed to all Lenders at such time.  The initial Applicable Loan Percentage of each Lender is set forth opposite the name of such Lender on <u>Schedule I</u> or in the

Assignment and Assumption Agreement pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Margin" means 7.0% per annum.

"Approved Fund" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Assignment and Assumption Agreement" shall have the meaning set forth in Section 9.9(b).

"Automatic Stay" shall mean the automatic stay imposed under Section 362 of the Bankruptcy Code.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 1.8.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time that is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" has the meaning assigned to such term in the recitals hereto.

"Bankruptcy Court" has the meaning assigned to such term in the recitals hereto.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Internal Revenue Code) the assets of any such "employee benefit plan" or "plan".

"Blocked Account Agreement" means with respect to an account established by a Loan Party (other than Excluded Accounts), an agreement, in form and substance reasonably satisfactory to the Administrative Agent, establishing control (as defined in the UCC) of such account by the Administrative Agent and whereby the Blocked Account Bank agrees, upon the occurrence and during the continuance of an Event of Default, to comply only with the instructions originated by the Administrative Agent without the further consent of any Loan Party.

"Blocked Account Bank" means each bank with whom Deposit Accounts are maintained and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Borrower" has the meaning provided in the introductory paragraph hereto.

"Brightwood" means Brightwood Loan Services LLC and any Affiliate thereof.

"Budget" means the Initial Budget, as amended and supplemented by any Budget Update delivered in accordance with Section 5.1(a) and approved by the Administrative Agent at the direction of the Required Lenders in accordance with Section 5.1(a).

"Budget Update" has the meaning set forth in Section 5.22.

"Business Day" means any day on which commercial banks and foreign exchange markets are open for business in New York, New York.

"Capital Lease" means, with respect to any Person, a lease of (or other agreement conveying the right to use) real and/or personal property, which obligation is, or in accordance with GAAP (including Statement of Financial Accounting Standards No. 13 of the Financial Accounting Standards Board) is required to be, classified and accounted for as a capital lease on a balance sheet of such Person.

"Capital Lease Obligations" means, for any period for which the amount thereof is to be determined, any obligation of such Person to pay rent or other amounts under a Capital Lease that is required to be capitalized in accordance with GAAP.

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act, as amended.

"Carve-Out" has the meaning set forth in the then applicable DIP Order.

"Casualty Event" means any event that gives rise to the receipt by any Loan Party of any insurance proceeds (including business interruption insurance proceeds) or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"Change in Law" means the occurrence, after the Closing Date, of any of the following:  (a) the adoption or taking effect of any law, order, policy, rule, regulation or treaty, (b) any change in any law, order, policy, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, regulations or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, regulations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means the occurrence of any of the following: (a) Holdings ceases to own and control, beneficially and of record, directly or indirectly, all Equity Interests in the Borrower or any other Loan Party, (b) the Permitted Holders collectively cease to directly or indirectly (x) own and control, beneficially and of record, at least 50.1% of the Equity Interests of Holdings, or (y) possess the right to elect (through contract, ownership of voting securities or otherwise) at all times a majority of the board of directors (or similar governing body) of Holdings or to direct the management policies and decisions of Holdings, (c) the Permitted Holders collectively cease to directly or indirectly own and control, beneficially and of record, Equity Interests of Holdings representing at least 50% of the voting power and 50% of the

economic interest represented by the Equity Interests of Holdings held by the Permitted Holders on the Closing Date, or (d) any "change of control" (or similar term) under any Subordinated Indebtedness, while outstanding, shall have occurred.

"Chapter 11 Cases" has the meaning assigned to such term in the recitals to this Agreement.

"Closing Date" means the date on which all the conditions precedent in Section 3.1 are satisfied or waived in accordance with Section 9.1.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all present and future assets and properties of the Borrower and the Guarantors, whether real or personal, tangible or intangible, in which Liens are granted or purported to be granted pursuant to the Security Documents; provided that Collateral shall not include any Excluded Assets.

"Commitment" means, for each Lender, the aggregate amount of such Lender's commitment to fund Loans as set forth on Schedule I, as such amount may be modified from time to time pursuant to the terms hereof.

"Commitment Letter" means the commitment letter, dated as of January 30, 2023, among Brightwood, Borrower, Holdings, the other lenders party thereto and the other debtor parties party thereto.

"Committees" shall mean collectively, the official committee of unsecured creditors and any other official committee appointed or approved in any Chapter 11 Case and each of such committees shall be referred to herein as a "Committee".

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" means a certificate in form and substance reasonably acceptable to the Administrative Agent, completed and signed by a Responsible Officer of the Borrower.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Corresponding Tenor" with respect to any Available Tenor means, as applicable, either a tenor (including overnight) or an interest payment period having approximately the same length (disregarding business day adjustment) as such Available Tenor.

"control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "controlled" has the meaning correlative thereto.

"Controlled Investment Affiliate" means, as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Debtor Relief Laws" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States of America or other applicable jurisdictions from time to time in effect.

"Debtors" has the meaning set forth in the recitals hereto.

"Default" means any Event of Default and any event which with the giving of notice or lapse of time, or both, would become an Event of Default.

"Default Interest" shall have the meaning set forth in Section 2.1(i)(3).

"Default Rate" means a simple interest rate per annum equal to the sum of the otherwise then applicable interest rate plus two percent (2%).

"Defaulting Lender" means, subject to Section 2.10(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States of America or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.10(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower and each Lender promptly following such determination.

"Deposit Account" means each checking, savings or other demand deposit account maintained by any of the Loan Parties. All funds in each Deposit Account shall be conclusively presumed to be DIP

Collateral and proceeds of DIP Collateral and the Administrative Agent and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in any Deposit Account.

"DIP Collateral" has the meaning provided in Section 2.15(a).

"DIP Credit Facility Super-Priority Claims" has the meaning set forth in the then applicable DIP Order.

"DIP Facility" has the meaning assigned to such term in the recitals to this Agreement.

"DIP Liens" shall have the meaning assigned to such term in the then applicable DIP Order.

"DIP Loan Funding Date" has the meaning provided in Section 3.2.

"DIP Order" means the Interim DIP Order or the Final DIP Order, as applicable, or each of them as the context may require.

"DIP Proceeds" shall mean the proceeds received by the Borrower from the Loans.

"DIP Termination Date" shall mean the date that all Obligations will be due and payable in full in cash unless otherwise agreed to by the Required Lenders on the earliest of (i) the Maturity Date, (ii) if the Final DIP Order has not been entered, twenty-five (25) calendar days after the Petition Date, (iii) the acceleration of the Loans and the termination of the Commitments hereunder, (iv) the effective date of any plan of reorganization, (v) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (vi) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (vii) any Event of Default (as defined in the DIP Orders) and (viii) the date an order is entered in any Bankruptcy Case appointing a Chapter 11 trustee or examiner with enlarged powers.

"Disposition" means any sale, transfer, lease, exclusive license or other disposition of any property by any Person.  "Dispose" has the meaning correlative thereto.

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any Equity Interests or Equity Interests Equivalent into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition,

(a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments),

(b) provides for the scheduled payments of dividends in cash,

(c) is or becomes redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests of the applicable Person and except as permitted by clause (a) above), in whole or in part, or

(d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests or Equity Interests Equivalents that would constitute Disqualified Equity Interests, in the case of each of clauses (a), (b), (c) and (d) hereof, prior to the date that is one hundred eighty (180) days after the Maturity Date at the time of issuance;

provided that if such Equity Interests or Equity Interests Equivalents are issued pursuant to a plan for the benefit of future, current or former employees, directors, or officers of Holdings, the Borrower or its Subsidiaries or by any such plan to such employees, directors or officers, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by Holdings, the Borrower or any Subsidiary in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's, director's or officer's termination, death or disability.

"Disqualified Lender" means,

(a)     any competitor of Holdings and/or its Subsidiaries that is reasonably identifiable as a competitor of Holdings and its subsidiaries according to the written list of competitors that has been provided to the Administrative Agent by the Borrower from time to time on or prior to the Closing Date, or after the Closing Date (which list, together with any updates thereto, shall be made available by the Administrative Agent to all Lenders),

(b)     those particular financial institutions and other institutional lenders identified by name in writing by the Borrower to the Administrative Agent prior to the Closing Date, and

(c)     any Affiliate of the entities described in the preceding clauses (a) (other than any such Affiliates that are banks, financial institutions, bona fide debt funds or investment vehicles that are engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course) or (b), in each case, that are either reasonably identifiable as such on the basis of their name or are identified as such by name in writing by the Borrower to the Administrative Agent on or prior to the Closing Date, or after the Closing Date from time to time,

provided that any Person that is a Lender and subsequently becomes a Disqualified Lender (but was not a Disqualified Lender on the Closing Date or at the time it became a Lender) shall be deemed to not be a Disqualified Lender hereunder.  The list of Disqualified Lenders shall be made available to all Lenders.  Notwithstanding the foregoing, each Loan Party and the Lenders acknowledge and agree that the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender, participant or potential Lender or participant is a Disqualified Lender and the Administrative Agent shall have no liability with respect to any assignment or participation made to a Disqualified Lender.

"Dollars" or "$" means the basic unit of the lawful currency of the United States of America.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States of America.

"ECP Rules" means the final rules issued jointly by the Commodity Futures Trading Commission and the Securities and Exchange Commission as published in 77 FR 30596 (May 23, 2012), as may be amended, modified or replaced from time to time.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country that is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country that is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country that is a subsidiary of an institution described in clause (a) or clause (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any other Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means (i) any Lender, any Affiliate of a Lender or any Approved Fund and (ii) any other Person for which the consents required under Section 9.9(b) have been obtained; provided that no Defaulting Lender, Disqualified Lender or natural person shall be an Eligible Assignee.

"Equipment" means all equipment, furniture and fixtures held or maintained at the Real Property or otherwise used in the business of the Loan Parties, together with all additions and accessions thereto and replacements therefor.

"Equity Interests" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Equity Interests Equivalents" means all securities convertible into or exchangeable for Equity Interests and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Equity Interests, whether or not presently convertible, exchangeable or exercisable.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, together with the regulations promulgated and rulings issued thereunder and under the Code, in each case as in effect from time to time. References to sections of ERISA shall be construed to also refer to any successor sections.

"ERISA Affiliate" means any Person, including Affiliates or Subsidiaries of the Loan Parties, that is a member of any group of organizations or a controlled group of trades or businesses, as described in Sections 414(b), 414(c), 414(m) or 414(o) of the Code or Section 4001 of ERISA, of which any of the Loan Parties or any of their respective Subsidiaries is a member.

"ERISA Event" means any of (a) a Reportable Event with respect to a Pension Plan, (b) a withdrawal of a Loan Party or ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA, (c) a complete or partial withdrawal by any Loan Party or ERISA Affiliate from a Multiemployer Plan, or the receipt by any Loan Party or any ERISA Affiliate of any notice that a Multiemployer Plan is in endangered or critical status under Section 305 of ERISA, (d) the filing of a notice of intent to terminate any Pension Plan, if such termination would require material additional contributions in order to be considered a standard termination within the meaning of Section 4041(b) of ERISA; the filing under Section 4041(c) of ERISA of a notice of intent to terminate any Pension Plan; or the termination of any Plan under Section 4041(c) of ERISA; or the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA, (e) the determination that any Pension Plan or Multiemployer Plan is, or is expected to be, considered an at-risk plan or a plan in critical or endangered status under the Code or ERISA, (f) the institution of proceedings, or the occurrence of an event or condition which would reasonably be expected to constitute grounds for the institution of proceedings, by the PBGC under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan, (g) the incurrence of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or ERISA Affiliate, (h) the failure by any Loan Party or ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules in respect of a Pension Plan, whether or not waived, or to make a required contribution to a Multiemployer Plan; or (i)

engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person).

"Event of Default" means any Event of Default described in Article VII.

"Excluded Account", with respect to any Loan Party, any deposit account used solely for (i) payroll and accrued payroll expenses, (ii) tax payments and/or (iii) employee benefit accounts.

"Excluded Assets" means any assets held by the Debtors in trust for a third party and Excluded Accounts.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 9.19), or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 10.1(a)(ii), (a)(iii) or (c), amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 10.1(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Extraordinary Receipts" means any cash received by or paid to or for the account of any Loan Party or any of their Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in any of clause (4), (5) or (6) of Section 2.1(l)), including without limitation tax refunds, insurance proceeds, indemnification payments (other than such indemnification payments to the extent that the amounts so received are applied by a Loan Party or its Subsidiary, as applicable, or are reimbursement or payment on behalf of a Loan Party or its Subsidiary, as applicable, for costs incurred for the purpose of replacing, repairing or restoring any assets or properties of a Loan Party or its Subsidiary or reimbursement for settlement costs, thereby satisfying the condition giving rise to the claim for indemnification, or reimbursement or indemnification for costs, or otherwise covering losses arising as a result of the circumstances giving rise to the underlying claims, or any out-of-pocket expenses incurred by any Loan Party or any of their Subsidiaries in obtaining such payments or the payment of taxes arising thereunder).

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code, and any intergovernmental agreement and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of such sections of the Code.

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such

rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing reasonably selected by it.

"Final DIP Loan Commitment" means, with respect to each Lender holding a Final DIP Loan Commitment, the commitment of such Lender to make Final DIP Loans, which commitment is in the amount set forth opposite such Lender's name on Schedule I under the caption "Final DIP Loan Commitment". The aggregate amount of the Final DIP Loan Commitments shall be the lesser of (a) the DIP Facility in excess of the Interim DIP Loans and (b) such amount as approved by the Bankruptcy Court for funding pursuant to the Final DIP Order.

"Final DIP Loans" means the term loans to be made from time to time on and after the Final DIP Closing Date and until the DIP Termination Date, in one or more drawings (but not to exceed one draw in any two-week period (unless the Required Lenders consent to more frequent draws) in an aggregate principal amount not to exceed such Lender's Final DIP Loan Commitment.

"Final DIP Order" means an order entered by the Bankruptcy Court in the Chapter 11 Cases substantially in the form of the Interim DIP Order (with only such modifications thereto as are necessary to convert the Interim DIP Order to a final order and other modifications as are satisfactory in form and substance to the Administrative Agent (with respect to matters relevant to or affecting the Administrative Agent) and the Required Lenders in their sole discretion).

"Final DIP Closing Date" means the date on which the conditions under Section 3.2 are satisfied or waived as determined by the Administrative Agent and the Required Lenders.

"Flood Insurance Laws" collectively, (i) National Flood Insurance Reform Act of 1994 (which comprehensively revised the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973) as now or hereafter in effect or any successor statute thereto, (ii) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (iii) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Floor" means 1.00%.

"Foreign Lender" means, with respect to any Borrower (a) if such Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Plan" means any employee benefit plan or arrangement (a) maintained or contributed to by any Loan Party or Subsidiary that is not subject to the laws of the United States, or (b) mandated by a government other than the United States for employees of any Loan Party or Subsidiary.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means generally accepted accounting principles in the United States, as in effect from time to time; provided that no change in the accounting principles used in the preparation of any financial statement hereafter adopted by the Borrower or any other Loan Party shall be given effect for purposes of measuring compliance with any provision of this Agreement unless the Borrower, Administrative Agent

11

and the Required Lenders agree to modify such provisions to reflect such changes in GAAP and, unless such provisions are modified, all financial statements, Compliance Certificates and similar documents provided hereunder shall be provided together with a reconciliation between the calculations and amounts set forth therein before and after giving effect to such change in GAAP; provided, further that no effect shall be given to any change in GAAP that would require leases of the type classified as operating leases under GAAP as in effect on the Closing Date to be classified or reclassified as capitalized leases.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee(s)" means all direct and indirect guarantees, sales with recourse, endorsements (other than for collection or deposit in the ordinary course of business) and other obligations (contingent or otherwise, including interest that would accrue during the pendency of any proceeding under Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) by any Person to pay, purchase, repurchase or otherwise acquire or become liable upon or in respect of any Indebtedness of any other Person, and, without limiting the generality of the foregoing, all obligations (contingent or otherwise) by any Person to purchase products, supplies or other property or services for any Person under agreements requiring payment therefor regardless of the non-delivery or non-furnishing thereof, or to make investments in any other Person, or to maintain the capital, working capital, solvency or general financial conditions of any other Person, or to indemnify any other Person against and hold him harmless from damages, losses and liabilities, all under circumstances intended to enable such other Person or Persons to discharge any Indebtedness or to comply with agreements relating to such Indebtedness or otherwise to assure or protect creditors against loss in respect of such Indebtedness. The amount of any Guarantee shall be deemed to be the amount of the Indebtedness of, or damages, losses or liabilities of, the other Person or Persons in connection with which the Guarantee is made or to which it is related unless the obligations under the Guarantee are limited to a determinable amount, in which case the amount of such Guarantee shall be deemed to be such determinable amount. The term "Guarantee" as a verb has a corresponding meaning. For the avoidance of doubt, the keepwell provided by Borrower, any Affiliate of Borrower or any Guarantor in Section 9.20 shall constitute a Guarantee.

"Guarantor(s)" means, collectively, (i) Holdings, (ii) any Domestic Subsidiary that becomes a Guarantor in accordance with Section 5.9, and (iii) any other Person who executes and delivers a guaranty of the Obligations.

"Healthcare Laws" means, collectively, any and all federal, state or local laws, rules, regulations and administrative manuals, orders, guidelines and requirements governing the licensure of or regulating healthcare providers, professionals, facilities or payors, or otherwise governing or regulating the provision of, or payment for, medical services.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, and any and all rules or regulations promulgated from time to time thereunder.

"HIPAA and Part 2 Compliance Date" means that term as defined in Section 4.32 hereof.

"HIPAA and Part 2 Compliance Plan" means that term as defined in Section 4.32 hereof.

"HIPAA and Part 2 Compliant" means that term as defined in Section 4.32 hereof.

"Impacted Loans" has the meaning set forth in Section 10.3(b).

"Improvements" means the buildings, and other facilities, amenities and improvements to be erected on the Real Property.

"Indebtedness" means, as to any Person at a particular time, without duplication, the following: (a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments; (b) the maximum amount (after giving effect to any prior drawings or reductions that may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person; (c) [reserved]; (d) all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts and accrued expenses incurred and paid in the ordinary course, subject to extension of terms consistent with prudent financial management and dispute resolution procedures taken in good faith, (ii) [reserved], and (iii) accruals for payroll and other liabilities accrued in the ordinary course of business); (e) indebtedness in respect of the foregoing (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse; (f) all Capital Lease Obligations; (g) all obligations of such Person in respect of Disqualified Equity Interests; (h) the principal balance of synthetic leases or other off-balance sheet financing arrangements; and (i) all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of consolidated Indebtedness. The amount of Indebtedness of any Person for purposes of clause (e) (to the extent that such Indebtedness is non recourse to such Person for amounts in excess of the value of the property securing such Indebtedness) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value (as determined by such Person in good faith) of the property encumbered thereby as determined by such Person in good faith. For avoidance of doubt, leases classified as operating leases under GAAP as in effect on December 1, 2018 shall not be required to be classified or reclassified as capitalized leases notwithstanding ASC 842 or any other change in GAAP.

"Indemnified Parties" has the meaning specified in Section 9.5.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower or Guarantor under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Initial Budget" shall mean a 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning the week prior to the Petition Date, broken down by week, including the line item details for and anticipated weekly uses of the DIP Proceeds for such period (and draws under this Agreement), which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses and total expenses, fees and expenses relating to this Agreement, fees and expenses related to the Chapter 11 Cases (including professional fees), and working capital and other general corporate needs, which forecast shall be in form and substance satisfactory to the Administrative Agent at the direction of the Required Lenders. Such Initial Budget shall be in the form set forth in Exhibit A hereto and also attached as an exhibit to the Interim DIP Order. Until

13

supplemented pursuant to Section 5.22 and approved by the Administrative Agent at the direction of the Required Lenders in accordance hereof, the Initial Budget shall constitute the Budget.

"Intellectual Property" shall mean:

(a) any copyright rights to any published or unpublished works of authorship or other copyrightable subject matter owned by any Loan Party, including in computer programs and software (whether in object code or source code), computer data bases, drawings and writings, and all copyright registrations and applications for registration that have been or may hereafter be issued or applied for thereon in the United States and any state thereof;

(b) all patents and patent applications and rights and interests in patents and patent applications owned or held by a Loan Party and all re-issues, divisions, continuations, renewals, extensions and continuations-in-part thereof and all issued patents and applications for issuance of patents that have been or may hereafter be issued or applied for thereon in the United States;

(c) all trademarks, service marks, designs, logos, indicia of origin, trade names, trade dress, corporate names, company names, business names, fictitious business names, trade styles and/or other source and/or business identifiers and applications pertaining thereto, owned by a Loan Party, or hereafter adopted and used, in its business, including all goodwill therein or arising therefrom, all trademark registrations and applications for trademark registration that have been or may hereafter be issued or applied for thereon in the United States or any state thereof;

(d) all trade secrets, trade secret rights, know-how, customer lists, processes of production, ideas, confidential business information, techniques, processes, formulas, and all other proprietary information, and all other intellectual property and similar rights;

(e) all rights to sue at law or in equity for any past, present, and future infringement, dilution, misappropriation, or other violation or impairment of any of the foregoing, including, without limitation, license fees, royalties, income, payments, claims, damages and proceeds of suit, now or hereafter due and/or payable with respect thereto and all agreements related to the license, ownership, development, use or disclosure of any of the foregoing; and

(f) all proceeds of any of the foregoing.

"Interest Payment Date" the first Business day of each month after such Loan was made.

"Interest Period" means the period commencing on the date the relevant Loan is made and ending on the date which is one (1) month thereafter and each subsequent one (1) month period thereafter. For purposes of determining an Interest Period, a month means a period starting on one day in a calendar month and ending on a numerically corresponding date in the next calendar month. Notwithstanding the foregoing, however, (i) any applicable Interest Period which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any applicable Interest Period which begins on a day for which there is no numerically corresponding day in the calendar month during which such Interest Period is to end shall (subject to clause (i) above) end on the last day of such calendar month, and (iii) no Interest Period shall extend beyond the Maturity Date, as applicable, or such earlier date as would interfere with the Borrower's repayment obligations hereunder.

"Interim DIP Loan Commitment" shall mean, with respect to each Lender holding an Interim DIP Loan Commitment, the commitment of such Lender to make an Interim DIP Loan, which commitment is

in the amount set forth opposite such Lender's name on <u>Schedule I</u> under the caption "Interim DIP Loan Commitment." The aggregate amount of the Interim DIP Loan Commitments on the Closing Date shall be the lesser of (a) $11,000,000 and (b) such amount as approved by the Bankruptcy Court pursuant to the Interim DIP Order.

"<u>Interim DIP Loans</u>" means the term loans to be made on the Closing Date and prior to entry of the Final DIP Order, in an aggregate amount not to exceed the Interim DIP Loan Commitments.

"<u>Interim DIP Order</u>" shall mean the interim order entered by the Bankruptcy Court in the Chapter 11 Cases (as the same may be amended, supplemented, or modified form time to time after entry thereof in a manner satisfactory to the Required Lenders in their sole discretion) authorizing and approving, among other things, the DIP Facility and the Transactions, which interim order is in form and substance satisfactory to the Administrative Agent (with respect to matters relevant to or affecting the Administrative Agent) and the Required Lenders in their sole discretion.

"<u>Investment</u>" means, with respect to any Person, any loan, advance or extension of credit (other than to customers in the ordinary course of business) by such Person to, or any Guarantee or other contingent liability with respect to the capital stock, Indebtedness or other obligations of, or any contributions to the capital of, any other Person, or any ownership, purchase or other acquisition by such Person of any interest in any capital stock, limited partnership interest, general partnership interest, or other securities of any such other Person; and "<u>Invest</u>," "<u>Investing</u>" or "<u>Invested</u>" means the making of an Investment.

"<u>K&S</u>" means King & Spalding LLP.

"<u>Knowledge</u>" of the Loan Parties means the actual knowledge of any Responsible Officer of any Loan Party.

"<u>Known Event</u>" means the commencement and continuation of the Chapter 11 Cases, the events leading up to the Chapter 11 Cases, the effect of the bankruptcy, the conditions in which the Borrower operates as existing on the Closing Date and/or the consummation of transactions contemplated by the Debtors' "first day" pleadings reviewed by the Administrative Agent or Required Lenders, or as disclosed to the Administrative Agent and the Lenders prior to the Petition Date.

"<u>Laws</u>" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"<u>Lending Office</u>" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"<u>Lien</u>" means, with respect to any interest in Property (whether real, personal or mixed and whether tangible or intangible) (a) any interest or right which secures the payment of Indebtedness or an obligation owed to, or a claim by, a Person other than the owner of such Property, whether such interest is based on common law, statute or contract, and whether or not choate, vested or perfected, including any such interest or right arising from a mortgage, charge, pledge, negative pledge or other agreement not to lien or pledge, assignments, security interest, conditional sale, levy, execution, seizure, attachment, garnishment,

conditional sale, Capital Lease or trust receipt, or arising from a lease, consignment or bailment given for security purposes, and (b) any exception to or defect in the title to or ownership interest in such Property, including reservations, rights of entry, possibilities of reverter, encroachments, easements, rights of way, restrictive covenants, leases and licenses.  For purposes of this Agreement, the Borrower or any Subsidiary shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, Capital Lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes.

"<u>Loan</u>" means the Interim DIP Loans and the Final DIP Loans.

"<u>Loan Document(s)</u>" means, individually or collectively, as the case may be, this Agreement, any Notes, if any and each other Security Document, and all other documents, agreements and certificates executed or delivered in connection with or contemplated by this Agreement or any other document evidencing or securing a Loan, each as may be amended, modified or supplemented from time to time.

"<u>Loan Party</u>" means the Borrower and the Guarantors.

"<u>Material Adverse Occurrence</u>" means the effect of any event or circumstance that, taken alone or in conjunction with other events or circumstances, (a) has or could be reasonably expected to have a material adverse effect on the business, operations, Properties, or condition (financial or otherwise) of any Debtor and their subsidiaries as of the Petition Date, on the value of any material Collateral, on the legality, validity or enforceability of any Loan Documents or the DIP Orders, or on the legality, validity, enforceability or priority of the DIP Liens in favor of the Administrative Agent for the benefit of the Secured Parties on any Collateral, (b) impairs the ability of a Loan Party to perform its obligations under the Loan Documents or the DIP Orders, including repayment of any Obligations, (c) otherwise impairs the ability of the Administrative Agent or any Lender to enforce or collect any Obligations or to realize upon any other material Collateral or (d) has or could be reasonably expected to have a material adverse effect on the rights and remedies of the Administrative Agent and the Lenders under the Loan Documents or the DIP Orders taken as a whole; except, in each case, those events, circumstances or conditions relating to the commencement and continuation of the Chapter 11 Cases.

"<u>Material Contract</u>" means, as to each Loan Party, (a) any acquisition supply, construction/development, franchise, purchase, service, employment, management, tax, indemnity, shareholder, lease of Real Property or other agreement or contract the termination of which, other than in accordance with its terms, would reasonably be expected to result in a Material Adverse Occurrence.

"<u>Maturity Date</u>" means the date that is 120 days after the Petition Date.

"<u>Milestone</u>" has the meaning assigned to such term in the then applicable DIP Order.

"<u>Moody's</u>" means Moody's Investors Service, Inc., or any successor to the rating agency business thereof.

"<u>Multiemployer Plan</u>" means any multiemployer plan as defined in Sections 3(37) or 4001(a)(3) of ERISA, to which a Loan Party or ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"<u>Net Cash Proceeds</u>" means with respect to any Disposition by the Borrower or any Subsidiary or any Casualty Event, the excess, if any, of (i) the sum of cash and cash equivalents received in connection with such Disposition or Casualty Event (including any cash or cash equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when

16

so received) over (ii) the sum of (A) if applicable, the principal amount of any Indebtedness that is secured by the applicable asset by a Lien permitted hereunder which is senior to the Administrative Agent's Lien on such asset and that is required to be repaid (or to establish an escrow for the future repayment thereof) in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents), (B) taxes paid or payable by such Loan Party in connection with such Disposition or Casualty Event, and (C) the reasonable and customary out-of-pocket expenses incurred by such Loan Party in connection with such Disposition or Casualty Event (including, without limitation, appraisals, and brokerage, legal, agents and title expenses and commissions) paid by any Loan Party to third parties (other than Affiliates) to the extent in accordance with the Budget.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 9.1 and (b) has been approved by the Required Lenders.

"Non-Defaulting Lender" means, at any time, each Lender that is not a Defaulting Lender at such time.

"Note(s)" means, individually or collectively, as the case may be, (a) the Term Notes (in form and substance reasonably acceptable to the Administrative Agent), and (b) such other promissory notes accepted by the Lenders in exchange for or in substitution of any such Notes.

"Notice of Borrowing" means a notice in form and substance reasonably acceptable to the Administrative Agent to be delivered to the Administrative Agent pursuant to Section 2.1 or such other form as may be reasonably approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be reasonably approved by the Administrative Agent), substantially completed and signed by a Responsible Officer of the Borrower.

"Obligations" means (i) all Loans, Advances, debts, liabilities, payment and performance obligations, covenants and duties of every kind, nature and description owing by the Borrower or the Guarantors to the Administrative Agent, the Lenders or any Lender of any kind or nature, present or future, arising under this Agreement or any other Loan Document, whether direct or indirect (including those acquired by permitted assignment or participation), absolute or contingent, liquidated or unliquidated, due or to become due, now existing or hereafter arising and however acquired, (ii) [reserved] and (iii) all obligations of the Borrower or any Guarantor under any Related Treasury Management Arrangement.  The term includes all principal, interest, fees, charges, expenses, reasonable attorneys' fees, and any other sum chargeable (including interest that would accrue during the pendency of any proceeding under Debtor Relief Laws, regardless of whether allowed or allowable in such proceeding) to the Borrower or the Guarantors under this Agreement or any other Loan Document or in connection with any Related Treasury Management Arrangement.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising solely from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with

17

respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 10.6).

"Part 2" means the Confidentiality of Alcohol and Drug Abuse Patient regulations found at 42 C.F.R. Part 2 and any and all rules or regulations promulgated from time to time thereunder.

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Pension Funding Rules" means the Code and ERISA rules regarding minimum required contributions (including installment payments) to Pension Plans set forth in Sections 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (as defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA, and is sponsored or maintained by any Loan Party or ERISA Affiliate or to which the Loan Party or ERISA Affiliate contributes or has an obligation to contribute, or has during the preceding five plan years made or been obligated to make contributions.

"Permitted Holders" means the holders of Holdings' Equity Interests as of the Closing Date and their respective Controlled Investment Affiliates.

"Permitted Indebtedness" has the meaning set forth in Section 6.2.

"Permitted Investment" means any of the following Investments made by the Borrower or any of its Subsidiaries in any Person: (i) Investments that exist on the Closing Date in cash and cash equivalents; (ii) advances made in connection with purchases of goods and services in the ordinary course of business and in accordance with the Budget; (iii) Investments that exist on the date hereof, set forth on Schedule 6.6 hereto, but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof; (iv) Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business; (v) advances in the form of a prepayment of expense to vendors, suppliers and trade creditors consistent with their past practices, so long as such expenses were incurred in the ordinary course of business and in accordance with the Budget; (vi) purchases of assets in the ordinary course of business, consistent with past practices and in accordance with the Budget; (vii) Permitted Intercompany Advances; and (viii) deposits made in the ordinary course of business to secure the performance of leases or other obligations pursuant to Section 6.3.

"Permitted Intercompany Advances" means Investments made by a Loan Party into another Loan Party.

"Permitted Lien" shall mean:

(a) the Permitted Prior Liens;

(b) Liens arising by operation of law on the Real Property for real estate taxes and Liens securing Taxes, assessments or governmental charges or levies or the claims or demands of contractors, materialmen, mechanics, carriers, warehousemen, landlords and other like Persons (other than Liens imposed under ERISA); provided the payment thereof is not required to be made pursuant to Section 5.4 hereof;

(c)     Liens incurred or deposits made in the ordinary course of business (1) in connection with workmen's compensation, unemployment insurance, social security and other like laws or (2) to secure the performance of letters of credit, bids, tenders, sales contracts, leases, statutory obligations, surety, appeal and performance bonds and other similar obligations not incurred in connection with the borrowing of money, the obtaining of advances or the payment of the deferred purchase price of the Real Property or Equipment and, in the case of this clause (2) only, not in excess of $500,000 in the aggregate outstanding at any one time;

(d)     attachments, judgment and other similar Liens arising in connection with court proceedings, provided the execution or other enforcement of such Liens is stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings in such manner as not to have the Real Property or Equipment subject to such Liens forfeitable in accordance with Section 5.4;

(e)     easements, rights-of-ways, reservations, exceptions, minor encroachments, rights of entry, restrictive covenants, licenses, restrictions and similar charges created or incurred in the ordinary course of business and not in connection with Indebtedness, and which in the aggregate do not materially detract from the value of any Real Property or materially impair or interfere with its use in the business operations of the Borrower and its Subsidiaries; including any such items included as exceptions in the title policy obtained by Administrative Agent related to the Real Property;

(f)     Liens in favor of the Borrower or any Guarantor;

(g)     Liens in favor of the Administrative Agent for the benefit of the Secured Parties or otherwise to secure the Obligations;

(h)     Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any of its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and its Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any of its Subsidiaries in the ordinary course of business;

(i)     Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(j)     precautionary Uniform Commercial Code and similar filings;

(k)     Liens solely on any cash earnest money deposits made in connection with any letter of intent or purchase agreement permitted hereunder;

(l)     Liens (i) of a collection bank arising under Section 4-208 or 4-210 of the Uniform Commercial Code on the items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business and not for speculative purposes and (iii) in favor of a banking or other financial institution arising as a matter of law encumbering deposits or other funds maintained with a financial institution (including the right of setoff) and that are within the general parameters customary in the banking industry;

(m)     Liens arising from judgments or orders for the payment of money not constituting an Event of Default under Section 7.1(h);

(n)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of its Subsidiaries in the ordinary course of business and not securing Indebtedness prohibited by this Agreement; and

(o)      the modification, replacement, renewal or extension of any Lien permitted by this Section 6.3; provided that (i) such Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien and (B) proceeds and products thereof and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens is permitted by Section 6.2.

"Permitted Prior Lien" shall mean any of those existing Liens set forth on Schedule 6.3 that under applicable law, are senior to, and have not been subordinated to, the DIP Liens granted in favor of the Administrative Agent under the Loan Documents and the DIP Orders, but only to the extent that such Liens are valid, perfected, enforceable and non-avoidable Liens as of the Petition Date as permitted by section 546 of the Bankruptcy Code.

"Permitted Variance" shall mean, for (x) the period beginning on the Petition Date through and including the second Friday following the Petition Date and (y) each Friday thereafter (each week commencing on the Saturday of such week) but calculated on a rolling 3 week basis to account for timing of payment variances, unless otherwise agreed to by the DIP Agent (the applicable "Testing Period"): (a) any favorable disbursement variance, and (b) any unfavorable disbursement variance (other than disbursements for professional fees of the Lenders and Administrative Agent and fees of the Office of the United States Trustee) of no more than 15% for actual disbursements (on a line-item basis) as compared to the budgeted disbursements set forth in the Budget with respect to the applicable Testing Period. The Permitted Variances with respect to each Testing Period shall be determined and reported to the Administrative Agent and the Required Lenders, not later than 5:00 p.m. Eastern Time on each Wednesday immediately following the end of each such Testing Period. Additional variances, if any, from the Budget, and any proposed changes to the Budget, shall be subject to the approval of the Administrative Agent (acting at the direction of the Required Lenders).

"Person" means any natural person, corporation, firm, joint venture, partnership, limited partnership, limited liability company, association, trust or other entity or organization, whether acting in an individual, fiduciary or other capacity, or any government or political subdivision thereof or any agency, department or instrumentality thereof.

"Petition Date" has the meaning assigned to such term in the recitals to this Agreement.

"Plan" means each employee benefit plan (as defined in Section 3(3) of ERISA) whether now in existence or hereafter instituted, of, or contributed to by, any Loan Party or any of its Subsidiaries or any of their respective ERISA Affiliates.

"Prepayment Event" means:

(a) any Disposition of DIP Collateral other than Dispositions permitted by Section 6.4;

(b) the receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts;

(c) the receipt of (i) any cash or cash equivalents cash collateralizing any letter of credit that are returned to a Loan Party for its own account and (ii) any cash or cash equivalents returned to a Loan Party from rent reserves or security deposits returned to a Loan Party upon the assignment of a lease or otherwise;

(d) any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any DIP Collateral of Borrower or any of its Subsidiary; or

(e) the incurrence by Borrower or any of its Subsidiary of any Indebtedness (other than Permitted Indebtedness) or the receipt of Net Proceeds from the issuance of Equity Interests.

"Prepetition Agent" means the "Administrative Agent" as such term is defined in the Prepetition Credit Agreement.

"Prepetition Collateral" means the "Collateral" as such term is defined in the Prepetition Credit Agreement.

"Prepetition Credit Agreement" shall have the meaning assigned to such term in the recitals to this Agreement.

"Prepetition Lenders" shall mean the "Lenders" as defined in the Prepetition Credit Agreement as of the Closing Date.

"Prepetition Liens" shall have the meaning assigned to such term in Section 6.16.

"Prepetition Loan Documents" shall mean the "Loan Documents" as defined in the Prepetition Credit Agreement as of the Closing Date.

"Prepetition Obligations" shall mean the "Obligations" as defined in the Prepetition Credit Agreement as of the Closing Date.

"Prepetition Secured Parties" has the meaning set forth in Section 2.14(b).

"Prime Rate" means the rate of interest quoted in *The Wall Street Journal* (or another national publication reasonably selected by the Administrative Agent) as the U.S. "Prime Rate."

"Private Payor" means any insurance company, health maintenance organization, professional provider organization or similar entity that is obligated to make payments for goods or services provided to a patient, other than a governmental entity.

"Private Payor Arrangement" means an agreement or arrangement with a Private Payor pursuant to which the Private Payor pays all or a portion of the charges of a Loan Party for providing goods and services to a patient.

"Proceeding" has the meaning ascribed to it in Section 9.5.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, and any right in respect of any of the foregoing.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Qualified ECP Guarantor" means, at any time, each Borrower, Affiliate of Borrower or Guarantor with total assets exceeding $10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another Person to qualify as an "eligible contract participant" at such time under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Qualified Equity Interests" means any Equity Interests or Equity Interests Equivalents that are not Disqualified Equity Interests.

"Real Property" means all real property or interests therein wherever situated now, heretofore or hereafter owned or ground (or space) leased by the Borrower pledged to Administrative Agent for the benefit of the Secured Parties as Collateral under any of the Security Documents.

"Recipient" means the Administrative Agent or any Lender or any other recipient of any payment to be made by or on account of any obligation of any Borrower or Guarantor hereunder.

"Register" has the meaning ascribed to it in Section 9.9(d).

"Regulation D," "Regulation T," "Regulation U" and "Regulation X" means  Regulation D, Regulation T, Regulation U and Regulation X, respectively, of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Related Indemnified Party" has the meaning ascribed to it in Section 9.5.

"Related Treasury Management Arrangement" means all arrangements for the delivery of cash management services, including treasury, depository, overdraft, credit or debit card, electronic funds transfer and other cash management arrangements, to or for the benefit of any Borrower, Guarantor or any of their Affiliates which are now or hereafter entered into or maintained with a Lender, the Administrative Agent or an Affiliate of a Lender or the Administrative Agent.

"Release Price" means the amount reasonably determined by the Administrative Agent which is payable by Borrower as a condition precedent to the release of any Collateral.  The Administrative Agent's reasonable determination of the Release Price for shall be final absent manifest error.

"Relevant Governmental Body" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"Reportable Event" any event set forth in Section 4043(c) of ERISA, other than an event as to which the PBGC has waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043 the requirement of Section 4043(a) of ERISA that it be notified of such event.

"Required Lenders" means Lenders holding more than fifty percent (50%) of the aggregate outstanding principal amount of the Loans; provided that if there are at least two non-affiliated Lenders (treating Lenders that are Affiliates of one another as a single Lender for the purposes of this proviso), "Required Lenders" must include at least two non-affiliated Lenders.  The Commitments and Loans of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Resignation Effective Date" has the meaning specified in Section 8.13(a).

"Responsible Officer" means the chief executive officer, president, senior vice president, senior vice president (finance), vice president, chief financial officer, treasurer, manager of treasury activities or assistant treasurer or other similar officer or Person performing similar functions of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party.  To the extent requested by the Administrative Agent, each "Responsible Officer" will provide an incumbency certificate and to the extent requested by the Administrative Agent, appropriate authorization

documentation, in form and substance reasonably satisfactory to the Administrative Agent. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party. Unless otherwise specified, all references herein to a "Responsible Officer" shall refer to a Responsible Officer of the Borrower.

"S&P" means S&P Global Ratings or any successor thereto.

"SDN List" has the meaning set forth in Section 4.27.

"Secured Parties" means, collectively, the Administrative Agent, the Lenders and each Indemnified Party, and their respective successors and assigns.

"Security Documents" means the DIP Order and each other assignment, pledge or security agreement, instrument, certificate, financing statements, filings or document pursuant to which the Borrower, any Guarantor or any other Person shall grant or convey to the Administrative Agent or the Lenders a DIP Lien in Collateral as security for all or any portion of the Obligations, whether now or hereafter in existence, as said agreements or documents may be amended, modified, restated or replaced from time to time, each in form and substance reasonably satisfactory to the Administrative Agent.

"Specified Loan Party" means any Borrower, Affiliate of Borrower or Guarantor that is not then an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to Section 9.20).

"Subsidiary" of any Person means (i) any corporation of which more than 50% of the outstanding Equity Interests and Equity Interests Equivalents of any class or classes having ordinary voting power for the election of directors (irrespective of whether or not at the time Equity Interests or Equity Interests Equivalents of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is now or hereafter owned directly or indirectly by such Person, by such Person and one or more of its Subsidiaries, or by one or more of such Person's other Subsidiaries, (ii) any partnership, association, limited liability company, joint venture or other entity in which such Person, such Person and one or more of its Subsidiaries, or one or more of its Subsidiaries, is either a general partner or has an equity or voting interest of more than 50% at the time, and (iii) any other entity which is directly or indirectly controlled by such Person or one or more Subsidiaries of such Person or both; provided that, unless otherwise specified, any reference to "Subsidiary" means a Subsidiary of the Borrower.

"Tax Distributions" means, in the event the income of Borrower or any of its Subsidiaries is required to be included in any income tax return filed by Holdings or any direct or indirect parent corporation of Holdings (including any such income tax return filed on a consolidated, combined, unitary or similar basis), distributions from the Loan Parties (other than Holdings) to Holdings (or to such parent corporation) to permit Holdings or such parent corporation to pay federal, state and local income taxes (including estimated taxes) then due and payable, provided that the amount of such distributions shall not be greater than the amount of such taxes as are attributable to the income of Holdings and its Subsidiaries.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Note" has the meaning set forth in Section 2.1(a).

"Testing Period" has the meaning set forth in the definition of "Permitted Variances".

"Transactions" means, collectively, (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party, (b) the commencement and filing of the Chapter 11 Cases and (c) the payment fees and expenses in connection with the consummation of the Transactions.

"United States" and "U.S." mean the United States of America.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned thereto in Section 10.1(e)(ii)(B)(3).

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**1.3    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    All undefined terms contained in any of the Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Uniform Commercial Code to the extent the same are used or defined therein; in the event that any term is defined differently in different Articles or Divisions of the Uniform Commercial Code, the definition contained in Article or Division 9 shall control.

(c)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(i)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)    References in this Agreement to an Exhibit, Schedule, Article, Section, clause or sub-clause refer (A) to the appropriate Exhibit or Schedule to, or Article, Section, clause or sub-clause in this Agreement or (B) to the extent such references are not present in this Agreement, to the Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not a limitation.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(d)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(e)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

1.4    **Accounting Terms; Payment Dates**.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, except as otherwise specifically prescribed herein.  Unless the context indicates otherwise, any reference to a "fiscal year" or a "fiscal quarter" shall refer to a fiscal year ending December 31 or fiscal quarter ending March 31, June 30, September 30 or December 31 of the Borrower.

1.5    **References to Agreements, Laws, Etc.**  Unless otherwise expressly provided herein, (a) any definition of or reference to any agreement, instrument or other document herein or in any Loan Document shall be construed as referring to such agreement, instrument or other document as may be from time to time amended, restated, amended and restated, supplemented or otherwise modified, extended, refinanced or replaced (subject to any restrictions or qualifications on such amendments, restatements, amendment and restatements, supplements or modifications, extensions, refinancings or replacements set forth herein or in any Loan Document) and (b) any reference to any law in any Loan Document shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

1.6    **Times of Day**.  Unless otherwise specified, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

1.7    **Divisions**.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Equity Interests at such time.

## ARTICLE II
## THE ADVANCES

2.1    **The Advances**.

(a)    Interim DIP Loan.  Subject to the terms and conditions of this Agreement, and pursuant to and solely in accordance with the Budget, on the Closing Date, each Lender, agrees to severally, and not jointly or jointly and severally, to make an Interim DIP Loan to and for the account of the Borrower as provided herein, in the aggregate amount of such Lender's Interim DIP Loan Commitment (subject to any limitations contained within the Interim DIP Order). The Interim DIP Loans shall be made in one draw on the Closing Date, and the Interim DIP Loan Commitments

shall be immediately terminated after the funding of the Interim DIP Loans. Once repaid, no part of the Interim DIP Loans may be reborrowed.

(b)    <u>Final DIP Loans</u>.  Subject to the terms and conditions set forth herein, and pursuant to and solely in accordance with the Budget, each Lender, agrees to severally, and not jointly or jointly and severally, from time to time on and after the Final DIP Closing Date and until the DIP Termination Date, to make the Final DIP Loans to and for the account of the Borrower as provide herein, in the aggregate amount of such Lender's Final DIP Loan Commitment (subject to any limitations contained within the Final DIP Order). The Final DIP Loan Commitment of each Lender shall be reduced by the amount of any funding hereunder and shall be terminated on the DIP Termination Date. Once paid or prepaid, no part of the Final DIP Loans may be reborrowed.

(c)    The Borrower's obligation to pay the principal of, and interest on, the Loans shall be evidenced by the records of the Administrative Agent and each Lender and, if requested by a Lender in accordance with <u>Section 2.1(g)</u> below, by a term loan promissory note(s) in form and substance reasonably acceptable to the Administrative Agent (the "<u>Term Note</u>").  The entries made in the Register shall (absent manifest error) be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; <u>provided</u> that the failure or delay of the Administrative Agent or Lender in maintaining or making entries into any such record or on such schedule or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans (both principal and unpaid accrued interest) in accordance with the terms of this Agreement.

(d)    <u>Disbursement of Loans</u>. Pending use in accordance with the Budget and subject to Section 6.16, all DIP Proceeds (including any intra-company transfers of such DIP Proceeds) shall be deposited into a Blocked Account (or in any case subject to the DIP Liens pursuant to the DIP Order) and invested at all times by the applicable Loan Party in accordance with the Debtors' "first day" pleadings governing cash management. Any such DIP Proceeds may only be used by the Borrower in accordance with the Budget.

(e)    [Reserved].

(f)    [Reserved].

(g)    <u>Notes</u>.  If requested by any Lender, the Advances made by such Lender shall be evidenced by, and be payable in accordance with the terms of the Term Note issued to such Lender, as applicable, made by the Borrower payable to such Lender in a principal amount equal to the Commitment of such Lender; <u>subject</u>, <u>however</u>, to the provisions of such Note to the effect that the principal amount payable thereunder at any time shall not exceed the then unpaid principal amount of the Advances made by such Lender.  The Borrower hereby irrevocably authorizes each Lender to make or cause to be made, at or about the time of each Advance made by such Lender, an appropriate notation on the records of such Lender, reflecting the principal amount of such Advance, and such Lender shall make or cause to be made, on or about the time of receipt of payment of any principal of any Advance, an appropriate notation on its records reflecting such payment and such Lender will, prior to any transfer of any of such Note, endorse on the reverse side thereof the outstanding principal amount of the Advances evidenced thereby.  Failure to make any such notation shall not affect the Borrower's obligations in respect of such Advances.  The aggregate amount of all Advances set forth on the Register shall be conclusive evidence of the principal amount owing and unpaid on such Lender's Note, absent manifest error.

(h)    Promise to Pay.  The Borrower hereby promises to pay in full to the Administrative Agent for the benefit of the Lenders the amount of all Obligations, including the principal amount of all Loans, together with accrued interest, fees and other amounts due thereon, all in accordance with the terms of this Agreement.  All outstanding Obligations, including the outstanding principal amount of all Loans, together with unpaid accrued interest, fees and other amounts due thereon, shall be due and payable in full on the DIP Termination Date.  The Borrower shall repay to the Administrative Agent, for the account of the Lenders on the DIP Termination Date the aggregate outstanding principal amount of the Loans, together with all accrued but unpaid interest thereon.

(i)    Interest on Advances.  The Borrower agrees to pay interest on the aggregate outstanding principal amount of the Advances until paid in full as follows:

(1)    Loan.  The Loan shall bear interest at the Prime Rate plus the Applicable Margin.

(2)    [Reserved].

(3)    Default Interest.  While any Event of Default exists and is continuing or after acceleration, automatically and without notice from the Administrative Agent, the Loans and any other Obligations shall bear interest at the Default Rate ("Default Interest") with respect to all Loans and with respect to all other Obligations that are then due and unpaid; provided that Default Interest shall accrue from the date of such Default or Event of Default.  All Default Interest shall be payable on demand or at the DIP Termination Date.

(4)    Payment Dates. Interest accrued on each Loan shall be payable in cash, without duplication:

(A)    on the DIP Termination Date;

(B)    in respect of any Loan, on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan, on the principal amount so paid or prepaid; and

(C)    on each Interest Payment Date.

The Administrative Agent shall determine each interest rate applicable to the Loan in accordance with the terms hereof and, upon any rate change, shall promptly notify the Borrower of such rate in writing (or by telephone, promptly confirmed in writing).  Any such determination shall be conclusive and binding for all purposes, absent manifest error.

(j)    Calculation of Interest.  All computations of interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid, provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.3, bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(k)    [Reserved.]

(l)      Prepayment. Prepayments of the Loans shall be (or in the case of Section 2.1(l)(1), may be) made as set forth below:

(1)      The Borrower shall have the right, by giving written notice to the Administrative Agent (which such written notice shall be in a form approved by the Administrative Agent (including any form on an electronic platform or electronic transmission system as shall be reasonably approved by the Administrative Agent), substantially completed and signed by a Responsible Officer) by not later than 1:00 p.m. on the fifth (5th) day preceding the date of such prepayment, to prepay all or any portion of the aggregate principal amount of any Loan, without premium or penalty. Borrower shall reimburse the Lenders and the Administrative Agent on demand for any amounts set forth in, and to the extent required by Section 10.5.

(2)      [Reserved].

(3)      [Reserved].

(4)      Concurrently with the receipt by Holdings or any of its Subsidiaries of Net Cash Proceeds from any Prepayment Event, the Borrower shall make a mandatory prepayment of the Loans in an amount equal to 100.0% of such Net Cash Proceeds.

(5)      Application of Prepayment. In connection with any voluntary prepayments by any Borrower pursuant to Section 2.01(l)(1) and any mandatory prepayments by any Borrower of the Loans pursuant to Section 2.01(l)(4), such prepayments shall be applied on a pro rata basis to the then outstanding Loans.

(m)      Administrative Agent may, on behalf of Lenders, disburse funds to the Borrower for Loans requested.  Each Lender shall reimburse Administrative Agent on demand for all funds disbursed on its behalf by Administrative Agent, or if Administrative Agent so requests, each Lender will remit to Administrative Agent its Commitment percentage of any Loan before Administrative Agent disburses same to the Borrower.  If Administrative Agent elects to require that each Lender make funds available to Administrative Agent prior to disbursement by Administrative Agent to the Borrower, Administrative Agent shall advise each Lender by telephone or fax of the amount of such Lender's Commitment percentage of the Loan requested by the Borrower no later than the Business Day prior to the scheduled Borrowing date applicable thereto, and each such Lender shall pay Administrative Agent such Lender's Commitment percentage of such requested Loan, in same day funds, by wire transfer to Administrative Agent's account, as designated in writing by the Administrative Agent to Borrower from time to time, no later than 1:00 p.m. on such scheduled Borrowing date.  Nothing in this Section 2.1(m) or elsewhere in this Agreement or the other Loan Documents, including the remaining provisions of Section 2.1, shall be deemed to require Administrative Agent to advance funds on behalf of any Lender or to relieve any Lender from its obligation to fulfill its Commitments hereunder or to prejudice any rights that Administrative Agent, any Lender or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

**2.2      Register**.  The Borrower hereby irrevocably authorizes the Administrative Agent to make, or cause to be made, an appropriate notation on the Register, reflecting the date and original principal amount of each Advance made by any Lender, the dates for each period, the interest rate for each such period and the dates of principal and interest payments on such Advance.  The Register shall be conclusive evidence of the status of such Lender's Advances, absent manifest error.  Failure to make any such notation shall not affect the Borrower's obligations in respect of such Advances.

**2.3**    __Payments__.  Any other provision of this Agreement to the contrary notwithstanding, the Borrower shall make each payment of interest on and principal of the Notes, and fees and other payments due under this Agreement (except as otherwise expressly provided herein), in immediately available funds to the Administrative Agent at its office referred to in Section 9.3 not later than 2:00 p.m. on the date when due.  Subject to Section 10.1 (Taxes) hereof, payments by the Borrower under this Agreement shall be made without offset, counterclaim or other deduction and in such amounts as may be necessary in order that all such payments shall not be less than the amounts otherwise specified to be paid under this Agreement and the Notes.  The Administrative Agent will promptly thereafter distribute like funds ratably to each Lender (unless such amount is not to be shared ratably in accordance with the terms hereof).

**2.4**    __Setoff; etc__.  Upon the occurrence and during the continuance of an Event of Default, each Lender and the Administrative Agent are hereby authorized at any time and from time to time, subject to the terms of the Interim DIP Order and Final DIP Order, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or Administrative Agent to or for the credit or the account of the Borrower or any of its Subsidiaries, including specifically any amounts held in any account maintained at such Lender or Administrative Agent, against any and all amounts then due to the Administrative Agent or the Lenders, or any of them, from the Borrower, in connection with this Agreement or any Loan Document; provided that no Lender shall exercise any such right without the prior written consent of the Administrative Agent (at the direction of the Required Lenders).  The rights of the Lenders and the Administrative Agent under this Section 2.4 are in addition to other rights and remedies (including other rights of set-off) which the Lenders and the Administrative Agent may have under applicable law.  Each Lender and the Administrative Agent agrees, severally and not jointly, to use reasonable efforts to notify the Borrower of any exercise of its rights pursuant to this Section 2.4, provided, however, that failure to provide such notice shall not affect any Lender's or the Administrative Agent's rights under this Section 2.4 or the effectiveness of any action taken pursuant hereto; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.10 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

**2.5**    __Sharing__.  If any Lender shall obtain any payment (whether voluntary, involuntary, by application of offset or otherwise) on account of the Loans made by it in excess of such Lender's ratable share of payments on account of the Loans obtained by all the Lenders, such Lender shall purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided that, (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and (ii) the provisions of this Section 2.5 shall not be construed to apply to (x) any payment made by or on behalf of the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than an assignment to any Borrower or any Guarantor or any Affiliate thereof (as to which the provisions of this Section 2.5 shall apply).  The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 2.5 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right to setoff) with respect to such

participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

**2.6**    **Fees**.  The Borrower shall pay to the Administrative Agent for its own account fees in the amounts and at the times specified in the Commitment Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

**2.7**    **Lending Branch**.  Subject to the provisions of Section 10.6(a), each Lender may, at its option, elect to make, fund or maintain its Loans hereunder at the branch or office specified on the signature pages hereto or such other of its branches or offices as such Lender may from time to time elect.

**2.8**    **Application of Payments and Collections**.

(a)    Order of Application of Payments.    Subject to the provisions of subsection (b) below, all payments and prepayments and any other amounts received by the Administrative Agent from or for the benefit of the Borrower shall be applied, first to pay principal of and interest on any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower, second ratably to pay all other Obligations in respect of fees, expenses, reimbursements or indemnities then due and payable, third ratably to pay interest then due in respect of the Loans, and fourth to pay the principal of the Loans then due and payable.

(b)    Application of Payments After an Event of Default.  After the occurrence of an Event of Default and while the same is continuing, the Administrative Agent shall, unless the Administrative Agent and the Lenders shall agree otherwise, apply all payments and prepayments in respect of any Obligations (including collections from and proceeds of the Collateral) in the following order:

(1)    to pay interest on and then principal of any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower;

(2)    to pay Obligations in respect of any fees, expense reimbursements or indemnities then due to the Administrative Agent;

(3)    ratably to pay Obligations in respect of any fees, expenses, reimbursements or indemnities (other than principal and interest) payable to the Lenders; and

(4)    (A) first, to the payment of interest on all Loans and any amounts due pursuant to Sections 10.4 and 10.5, to be allocated among the Lenders pro rata based on the respective aggregate amounts of such accrued interest and amounts owed to them, and (B) second, to the payment of the outstanding principal amounts of all Loans and Obligations under Related Treasury Management Arrangements to be allocated among the Lenders, pro rata based on the respective outstanding principal amounts described in this clause (B) payable to them;

(c)    Each of the Lenders hereby irrevocably designates the Administrative Agent its attorney in fact for the purpose of receiving any and all payments to be made to such Lender in respect of Obligations held by it, and hereby directs each payor of any such payment to make such payment to the Administrative Agent.  Each of the Lenders hereby further agrees that

if, notwithstanding the foregoing, it should receive any such payment (including by set-off), it shall hold such payment in trust for, and promptly deliver such payment to, the Administrative Agent.

(d)     The Administrative Agent shall promptly distribute to each Lender at its primary address set forth on the appropriate signature page hereof or at such other address as a Lender may notify the Administrative Agent in writing, such funds as such Lender may be entitled to receive.

**2.9     Making the Loans**.

(a)     A Responsible Officer on behalf of the Borrower shall (I) give the Administrative Agent a Notice of Borrowing, not later than 1:00 PM (New York City time) on the date which is (i) one (1) Business Day prior the applicable DIP Loan Funding Date with respect to the Borrowing of any Interim DIP Loans and (ii) three (3) Business Days prior to the applicable DIP Loan Funding Date with respect to the Borrowing of any Final DIP Loans. The Notice of Borrowing shall be irrevocable and shall specify (i) the principal amount of the proposed Loan (which shall be denominated in Dollars), (ii) the Borrower's wiring instructions, (iii) confirmation that the Notice of Borrowing complies with the then applicable Budget and (iv) the proposed borrowing date, which must be an applicable Business Day. The Administrative Agent and the Lenders may act without liability upon the basis of written, telecopied or telephonic notice believed by the Administrative Agent in good faith to be from any Responsible Officer of Borrower designated in writing to the Administrative Agent. Each Borrower hereby waives the right to dispute the Administrative Agent's record of the terms of any such telephonic Notice of Borrowing. The Administrative Agent and each Lender shall be entitled to rely conclusively on any Responsible Officer's authority to request a Loan on behalf of the Borrower until the Administrative Agent receives written notice to the contrary. The Administrative Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on the written Notice of Borrowing.

(b)     The Notice of Borrowing pursuant to this Section 2.9 shall be irrevocable and the Borrower shall be bound to make a Borrowing in accordance therewith.

(c)     Except as otherwise provided in this Section 2.9(c), all Loans under this Agreement shall be made by the applicable Lenders simultaneously and proportionately to their pro rata shares of the Commitment of each such Lender, as the case may be, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to make a Loan requested hereunder, nor shall the Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make a Loan requested hereunder, and each Lender shall be obligated to make the Loans required to be made by it by the terms of this Agreement regardless of the failure by any other Lender.

**2.10     Defaulting Lenders**.

(a)     Adjustments.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(1)     Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and Section 9.1.

(2)      Defaulting Lender Waterfall.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 2.4 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise as may be required under the Loan Documents in connection with any Lien conferred thereunder or directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 3.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments hereunder.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(3)      Certain Fees.  No Defaulting Lender shall be entitled to receive any fee payable under Section 2.6 for any period during which that Lender is a Defaulting Lender and the Borrower shall not be required to pay any such fee that otherwise would have been required to have been paid to that Defaulting Lender.

(b)      [Reserved].

(c)      Defaulting Lender Cure.  If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Loan Percentages, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

**2.11**    **No Discharge; Survival of Claims**.   Until indefeasible payment in full (other than contingent obligations not yet due and payable) in cash of the Loans and all other Obligations, each of the Borrower and the Guarantors agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case (and each of the Borrower and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the DIP Credit Facility Super-Priority Claims and the DIP Liens granted to the Administrative Agent pursuant to the DIP Orders and described in Section 2.12 shall not be affected in any manner by the entry of an order confirming a plan of reorganization or liquidation in any Chapter 11 Case, and such claims and Liens shall be paid in full in cash by any such plan in each case, unless otherwise agreed by DIP Agent, including with respect to the assumption of the underlying Obligations by any purchaser of the Debtors' assets.

**2.12**    **Super Priority Nature of Obligations and Lenders' DIP Liens**.

(a)    The priority of the Secured Parties' DIP Liens on the DIP Collateral owned by the Loan Parties shall be set forth in the DIP Orders.

(b)    All Obligations shall constitute DIP Credit Facility Super-Priority Claims.

(c)    Upon entry of the Interim DIP Order, the DIP Liens granted to the Administrative Agent for the benefit of the Lenders on the DIP Collateral shall be valid and automatically perfected and with the priority as set forth in the DIP Orders.

(d)    Except as set forth herein or the DIP Orders, the Debtors shall not seek approval of any other claim having a priority superior or pari passu to that granted to the Administrative Agent and Lenders by the DIP Orders while any Obligations remain outstanding.

**2.13**    **Release**.  The Borrower and each of the Guarantors hereby acknowledges effective upon entry of the Interim DIP Order, and subject to the terms thereof and of the Final DIP Order, that the Borrower, the Guarantors and any of their Subsidiaries have no defense, counterclaim, offset, recoupment, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all of any part of the Borrower's, the Guarantors' or any Subsidiaries' liability to repay the Administrative Agent or any Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the Administrative Agent or any Lender in their respective capacities as such. Upon entry of the Interim DIP Order, the Borrower and the Guarantors, each in their own right and on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, hereby fully, finally and forever release and discharge the Administrative Agent and the Lenders in their respective capacities as such and all of the Administrative Agent's and the Lenders' respective officers, directors, servants, agents, advisors, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them of and from any and all actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, in each case, existing at the time of entry of the Interim DIP Order, whether in law, equity or otherwise (including, without limitation, any so-called "lender liability" or equitable subordination or recharacterization claims or defenses and those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional costs, and incidental, consequential and punitive damages payable to third parties), directly or indirectly arising out of, connected with or relating to this Agreement, the DIP Orders and the transactions (including, for avoidance of doubt, the Transactions) contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing. Notwithstanding anything herein to the contrary, the Borrower and

33

Guarantors shall not have any obligation to indemnify or hold harmless any Administrative Agent or any Lender hereunder with respect to liabilities to the extent they result from gross negligence or willful misconduct of such Administrative Agent or Lender, as applicable, as finally determined by a court of competent jurisdiction.

**2.14    Waiver of Certain Rights**.

(a)    On and after the Closing Date, and on behalf of themselves and their estates, and for so long as any Obligations shall be outstanding, the Borrower and the other Loan Parties hereby irrevocably waive any right, pursuant to sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the DIP Liens securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

(b)    The DIP Orders shall provide that in no event shall the Administrative Agent, the Lenders, the Prepetition Agent or the Prepetition Lenders under the Prepetition Credit Agreement (the "***Prepetition Secured Parties***") be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds thereof shall be received and applied pursuant to the DIP Orders, the Loan Documents and the Prepetition Loan Documents, as applicable, notwithstanding any other agreement or provision to the contrary.

(c)    Upon entry of the Final DIP Order, subject to the Carve-Out, the Debtors (on behalf of themselves and their estates) shall irrevocably waive, and shall be prohibited from asserting in the Chapter 11 Cases or any successor chapter 7 case, (i) any surcharge claim under sections 105(a) or 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Administrative Agent, the Lenders, or the Prepetition Secured Parties upon the DIP Collateral or the Prepetition Collateral, and (ii) the Administrative Agent, the Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Administrative Agent, the Lenders, and the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral.

**2.15    Grant of Security; Security for Obligations; Debtors Remain Liable**.

(a)    Pursuant to the DIP Orders, each Debtor hereby grants to the Administrative Agent, for the benefit of the Secured Parties, a security interest in all of such Debtor's right, title and interest in and to all of the following real and personal property, in each case whether now owned or existing or hereafter acquired, possessed or arising, whether tangible or intangible, wherever located, including any such property in which a security interest is granted to the Administrative Agent pursuant to, as applicable, the Loan Documents, the DIP Orders, or any other order of the Bankruptcy Court to secure the Obligations (all of which collectively shall hereinafter be referred to as the "DIP Collateral"):

(i)    all Accounts;

(ii)    all Chattel Paper;

(iii)    all Money and all Deposit Accounts, together with all amounts on deposit from time to time in such Deposit Accounts;

(iv)    all Documents;

(v)    all General Intangibles, including Payment Intangibles and all Intellectual Property;

(vi)    all Goods, including Inventory, Equipment and Fixtures;

(vii)    all Instruments;

(viii)    all Intellectual Property;

(ix)    all Investment Property;

(x)    all Letter-of-Credit Rights and other Supporting Obligations;

(xi)    all Records;

(xii)    all Commercial Tort Claims;

(xiii)    all books and records relating to any of the foregoing;

(xiv)    all leasehold interests in real property;

(xv)    rights, claims or causes of action that the Loan Parties may have with respect to DIP Collateral;

(xvi)    all present and future claims, rights, interests, assets and properties recovered by or on behalf of the Loan Parties or any trustee of any Loan Party (whether in the Chapter 11 Cases or any subsequent case to which any Chapter 11 Case is converted), including, without limitation, all such property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to, inter alia, Sections 542, 544, 545, 547, 548, 549, 550, 552 and 553 of the Bankruptcy Code, and the proceeds thereof, subject to the terms of the DIP Orders; and

(xvii)    all Proceeds and Accessions with respect to any of the foregoing DIP Collateral.

Each category of DIP Collateral set forth above shall have the meaning set forth in the UCC (to the extent such term is defined in the UCC), it being the intention of Debtors that the description of the DIP Collateral set forth above be construed to include the broadest possible range of assets, in all instances as more fully set forth in the DIP Orders.

(b)    Notwithstanding anything herein to the contrary, and subject to the terms of the DIP Orders, in no event shall the DIP Collateral include (nor shall any defined term used therein include), and no Debtor shall be deemed to have granted a security interest in, any of such Debtor's rights or interests in any Excluded Assets.

(c)    The DIP Orders grant DIP Liens with respect to the DIP Collateral, and the DIP Collateral is collateral security for, the prompt payment in full when due and owing, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, of all Obligations. It is the intention of the parties that if the Administrative Agent shall fail to have a perfected Lien in any particular property or assets of any Loan Party for any reason whatsoever,

35

the provisions of this Agreement and/or the other Loan Documents, together with the DIP Orders, all financing statements and other public financing relating to Liens filed or recorded by the Administrative Agent against the Loan Parties and, with respect to all Loan Parties, the DIP Orders and any other order entered by the Bankruptcy Court to secure the Obligations, would be sufficient to create a perfected first priority DIP Lien in any property or assets that such Loan Party may receive upon the sale, lease, license, exchange, transfer or disposition of such particular property or assets, then all such "proceeds" of such particular property or assets shall be included in the DIP Collateral.

(d)    Anything contained herein to the contrary notwithstanding, (a) each Debtor shall remain liable under any contracts and agreements included in the DIP Collateral, to the extent set forth therein, to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Administrative Agent of any of its rights hereunder or under any other Loan Document shall not release any Debtor from any of its duties or obligations under the contracts and agreements included in the DIP Collateral unless the Administrative Agent has expressly in writing assumed such duties and obligations and released the Debtors from such duties and obligations, and (c) the Administrative Agent shall not have any obligation or liability under any contracts, licenses, and agreements included in the DIP Collateral by reason of this Agreement, nor shall the Administrative Agent be obligated to perform any of the obligations or duties of any Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder unless the Administrative Agent has expressly in writing assumed such duties and obligations and released the Debtors from such duties and obligations.

## ARTICLE III
## CONDITIONS PRECEDENT

**3.1    Conditions Precedent to the Closing Date**.  The effectiveness of this Agreement and the obligation of the Lenders to make any Advance hereunder, is subject to the following conditions precedent:

(a)    The Administrative Agent shall have received copies (in sufficient number for each of the Lenders to receive a copy) of all of the following, each dated the Closing Date or such earlier date as approved by the Administrative Agent and each in form and substance reasonably satisfactory to the Administrative Agent in all respects:

(1)    This Agreement appropriately completed and duly executed by the parties hereto;

(2)    The Term Notes, to the extent requested, appropriately completed and duly executed by the Borrower;

(3)    [Reserved]; and

(4)    A certificate executed by a Responsible Officer or member of each Loan Party, certifying in the name of and on behalf of such Loan Party that (A) a true, correct and complete copy of its charter document, with all amendments thereto (as certified by the Secretary of State or similar state official) as of January 24, 2023 (the "Prior Certificate Date"), along with any charter documents that have been amended since the Prior Certificate Date is attached to the certificate, (B) a true, correct and complete copy of its operating agreement or bylaws, with all amendments thereto, as of the Prior Certificate Date, along with any operating agreements of the Loan Parties that have been amended since the Prior Certificate Date is attached to the certificate, (C) a correct and complete copy of the resolutions of its members or shareholders authorizing the

execution, delivery and performance of the Loan Documents to which it is a party as of the Prior Certificate Date are attached to the certificate, and such resolutions have not been subsequently modified or repealed as of the Prior Certificate Date and (D) signature and incumbency certificates of a Responsible Officer executing any of the Loan Documents, all certified by its secretary or an assistant secretary (or similar officer) as being in full force and effect without modification as of the Prior Certificate Date;

(b)    [Reserved];

(c)    The representations and warranties set forth in <u>Article IV</u> and in each of the other Loan Documents shall be true and correct in all material respects as of the Closing Date, except any representation and warranty that expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date);

(d)    Since the Petition Date, other than the Known Events, there has been no event or circumstance, either individually or in the aggregate, that has resulted, or could reasonably be expected to result, in a Material Adverse Occurrence;

(e)    **[Reserved]**.

(f)    All reasonable out-of-pocket fees, costs, disbursements and expenses, accrued and unpaid as of the Closing Date, of the Administrative Agent and the Lenders (limited, in the case of counsel, to all reasonable out-of-pocket fees, costs, disbursements and expenses of, the Administrative Agent's and Lender's outside counsel, K&S and any successor counsel, and any firm of local counsel engaged by the Administrative Agent in connection with the Chapter 11 Cases), to the extent invoices for any such accrued and unpaid amounts are provided to the Debtors no later than one (1) Business Days prior to the Closing Date;

(g)    The Commitment Fee (as defined in the Commitment Letter) and the Agent Fee (as defined in the Commitment Letter) shall have been paid in full in cash, from the first proceeds of the DIP Loan;

(h)    Other than the DIP Orders, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the DIP Facility or the exercise by the Administrative Agent its rights as a secured party with respect to the DIP Collateral;

(i)    The Bankruptcy Court shall have entered the Interim DIP Order within five (5) Business Days following the Petition Date, which Interim DIP Order shall include, without limitation, copies of the DIP Facility and the Initial Budget as exhibits thereto, entered on notice to such parties as may be satisfactory to the Administrative Agent at the direction of the Required Lenders, (i) authorizing and approving the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the superpriority claim status, security interests and priming liens, and the payment of all fees, referred to herein and therein; (ii) authorizing the lifting or modification of the Automatic Stay to permit the Borrowers and the Guarantors to perform their obligations, and the Lenders to exercise their rights and remedies, with respect to the DIP Facility; (iii) authorizing the use of cash collateral and providing for adequate protection in favor of the Prepetition Secured Parties, as and to the extent provided herein and therein; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the Administrative Agent and the Debtors, in their respective discretion in each case, which Interim DIP Order shall be in full force

and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent;

(j)     **[Reserved]**.

(k)     Other than as a result of or in connection with the Chapter 11 Cases, all governmental and third party consents and approvals reasonably necessary to be obtained by the Borrower in connection with the DIP Facility, if any, shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Administrative Agent) or permitted pursuant to the DIP Order, as applicable, and shall remain in effect;

(l)     The Administrative Agent and Lenders shall have received the Initial Budget in form and substance satisfactory to the Administrative Agent;

(m)     All first day motions, including those related to the DIP Facility and any motion to sell any of the Debtors' assets pursuant to Section 363 of the Bankruptcy Code (the "Sale Motion"), filed by the Debtors and related orders entered by the Bankruptcy Court in the Chapter 11 Cases, including, without limitation, with respect to the approval the DIP Facility, on an interim and final basis, and the bid procedures (the "Bid Procedures") accompanying the Sale Motion shall be in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders;

(n)     Other than the Chapter 11 Cases, as stayed upon the commencement of the Chapter 11 Cases, or as otherwise disclosed to the Administrative Agent prior to the Petition Date, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or governmental authority that (i) would reasonably be expected to result in a Material Adverse Occurrence or (ii) restrains, prevents or purports to affect materially adversely the legality, validity or enforceability of the DIP Facility or the consummation of the transactions contemplated thereby; and

(o)     Subject to entry of the Interim DIP Order, the Administrative Agent, for the benefit of the Lenders, shall have a valid and perfected DIP Lien on and security interest in the DIP Collateral of the Debtors on the basis and with the priority set forth herein; and

(p)     The Debtors shall have entered into one or more stalking horse purchase agreements (each an "Asset Purchase Agreement") for the sale of the Purchased Assets (under and as defined in the Asset Purchase Agreement); each Asset Purchase Agreement shall be acceptable in all respects to the Administrative Agent and the Required Lenders.

The making of the Advance hereunder shall not constitute a waiver by the Administrative Agent or any Lender of any right which the Administrative Agent or such Lender may have in the event that any certificate, agreement, financial statement or other document delivered pursuant to this Section 3.1 or otherwise in connection with the transactions contemplated by this Agreement shall prove to have been false or misleading in any respect.

**3.2**     **Conditions Precedent to Extensions of Loans**.  The obligation of the Lenders to make any Advance hereunder shall be further subject to the satisfaction of each of the following conditions immediately prior to or contemporaneously with each such Advance, unless waived in writing by the Administrative Agent:

(a)     A Notice of Borrowing relating to the Interim DIP Loans or the Final DIP Loans, as applicable, in accordance with Section 2.9(a), which shall be in accordance with the Initial Budget or then applicable Budget Update, as applicable;

(b)     the representations and warranties set forth in Article IV and in each of the other Loan Documents are true and correct in all material respects on the date of and after giving effect to the making of the Advance, (except, in the case of any representation and warranty which expressly relates to a given date or period, such representation and warranty shall be true and correct in all material respects as of the respective date or period, as the case may be) and any representation and warranty that is qualified by references to materiality or Material Adverse Occurrence or similar term or qualification, shall be true and correct in all respects;

(c)     At the time of and immediately after giving effect to the Interim DIP Loans or the Final DIP Loans, no Default or Event of Default shall then have occurred and be continuing;

(d)     With respect to the Final DIP Loans, the Bankruptcy Court shall have entered the Final DIP Order within twenty-five (25) calendar days following the Petition Date (subject to the availability of the Bankruptcy Court to conduct the final hearing on the DIP Facility), in form and substance satisfactory to the Administrative Agent at the direction of the Required Lenders, which Final DIP Order shall include, a Budget Update, as necessary, as an exhibit thereto, entered on notice to such parties as may be satisfactory to the Administrative Agent acting at the direction of the Required Lenders and otherwise as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of the Bankruptcy Court, (i) authorizing and approving, on a final basis, the DIP Facility and the transactions contemplated hereby, including, without limitation, the granting of the superpriority claim status, security interests and priming liens, and the payment of all fees, referred to herein; (ii) authorizing, on a final basis, the lifting or modification of the automatic stay to permit the Borrower and the Guarantors to perform their obligations, and the Lenders to exercise their rights and remedies, with respect to the DIP Facility as provided in the Final DIP Order; (iii) authorizing, on a final basis, the use of cash collateral and providing for adequate protection in favor of the Prepetition Secured Parties as provided in the Final DIP Order; and (iv) reflecting such other terms and conditions that are mutually satisfactory to the Administrative Agent (at the direction of the Required Lenders) and the Debtors, in their respective discretion, in each case, which Final DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent (at the direction of the Required Lenders);

(e)     The making of the Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently;

(f)     The making of the Loans shall be authorized pursuant to the then applicable DIP Order;

(g)     Other than the DIP Orders, there shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the DIP Facility or the exercise by the Administrative Agent at the direction of the Lenders of its rights as a secured party with respect to the DIP Collateral;

(h)     Other than the Known Events, since the Petition Date there shall not have occurred Material Adverse Occurrences;

(i)      Other than the Chapter 11 Cases, as stayed upon the commencement of the Chapter 11 Cases, or as otherwise disclosed to the Administrative Agent prior to the Petition Date, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or governmental authority that (i) would reasonably be expected to result in a Material Adverse Occurrence or (ii) restrains, prevents or purports to affect materially adversely the legality, validity or enforceability of the DIP Facility or the consummation of the transactions contemplated thereby; and

(j)      The Loan Parties shall be in compliance with (i) the applicable DIP Order, and (ii) the Budget (subject to Permitted Variances).

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and each of the Lenders that as of the Closing Date (both before and after giving effect to the conditions subsequent in Section 3.3) and as of the date of each Advance:

**4.1      Organization; etc**.  Each Loan Party is a limited liability company or corporation, as the case may be, validly organized and existing and in good standing under the laws of the state of its organization, subject to entry by the Bankruptcy Court of the applicable DIP Orders, has full power and authority to own its property and conduct its business as conducted by it and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected, in the aggregate, to result in a Material Adverse Occurrence.  Subject to entry by the Bankruptcy Court of the applicable DIP Orders, each Loan Party has full power and authority to enter into and to perform its obligations under the Loan Documents to which it is a party and, in the case of the Borrower only, to request Advances under this Agreement. Each Loan Party has all licenses, permits and rights necessary to carry on its business as now being and hereafter proposed to be conducted and to own and operate its Property, except for permits, licenses, and rights the failure of which to have or obtain would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Occurrence.

**4.2      Due Authorization**.  Subject to entry by the Bankruptcy Court of the applicable DIP Orders, the execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party (a) have been duly authorized by all necessary corporate or limited liability company action, as the case may be, (b) do not and will not conflict with, result in any violation of or constitute any default under, (i) any provision of the organizational, constitutive or governing documents (including, as applicable, articles of organization and operating agreements) of such Loan Party, (ii) any other material agreement binding on or applicable to such Loan Party, or (iii) any of their respective Property, or any law or governmental regulation or court decree or order binding upon or applicable to such Loan Party, or any of the Property and (c) will not result in the creation or imposition of any Lien on any of such Loan Party's Property pursuant to the provisions of any agreement binding on or applicable to such Loan Party, or any Property, except any such Liens created pursuant to the Security Documents in favor of the Administrative Agent, for the benefit of the Secured Parties and Permitted Liens.

**4.3      Subsidiaries**.  As of the Closing Date, no Loan Party has any Subsidiaries except those previously disclosed to the Administrative Agent and Lenders prior to the date hereof.  Each Loan Party and its Subsidiaries has good and marketable title to all of the Equity Interests or Equity Interests Equivalents it owns in each of its Subsidiaries, free and clear of any Lien (other than any Liens in favor of the Administrative Agent for the benefit of the Secured Parties and inchoate Permitted Liens) and all such shares have been duly issued and are fully paid and non-assessable.  Each Loan Party has been duly

organized and is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and is duly licensed or qualified and in good standing in each other jurisdiction where such qualification is necessary, except where the failure to be so qualified or in good standing would not reasonably be expected, in the aggregate, to result in a Material Adverse Occurrence. Each Loan Party has full power and authority to own and operate its properties (including, without limitation, the DIP Collateral), to carry on its business as now conducted and to enter into and perform the Loan Documents to which it is a party. Each Loan Party has all licenses, permits, and rights necessary to carry on its business as now being and hereafter proposed to be conducted and to own and operate its properties, except for permits, licenses, and rights the failure of which to have or obtain, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence.

4.4     **Validity of the Agreement**.  Subject to entry by the Bankruptcy Court of the applicable DIP Orders, each Loan Document is the legal, valid and binding obligation of each Loan Party and is enforceable in accordance with its terms except that, as to enforcement of remedies, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' and secured parties' rights generally or by equitable principles relating to enforceability, regardless of whether considered in equity or at law.

4.5     **Financial Statements; Budget**.

(a)     To the best of Borrower's Knowledge, the most recent financial statements furnished to the Lenders and the Administrative Agent (i) were prepared in accordance with GAAP (if applicable) consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein.

(b)     The Borrower has heretofore furnished to the Administrative Agent the Initial Budget. The Initial Budget and each Budget delivered thereafter are based on good faith estimates and assumptions believed by management of the Borrower to be reasonable and fair in light of current conditions and facts known to the Borrower at the time delivered.

4.6     **Litigation; etc**.  To the best of Borrower's Knowledge and except for Known Events and as set forth on Schedule 4.6, there is no action, suit, claim, demand, disputes, cause of action, proceeding, arbitration or investigation at law or equity, or before or by any federal, state, local or other governmental department, commission, court, tribunal, board, bureau, agency or instrumentality, domestic or foreign, pending against or affecting any Loan Party or any of its Properties, which if determined adversely would reasonably be expected to result in a Material Adverse Occurrence or that would relate to the transactions contemplated by the Loan Documents.

4.7     **Compliance with Law**.  To the best of Borrower's Knowledge and except for Known Events and as set forth on Schedule 4.7 and subject to entry by the Bankruptcy Court of the applicable DIP Orders, no Loan Party is (a) in default or breach with respect to any judgment, order, writ, injunction, rule, regulation or decree of any court, governmental authority, department, commission, agency or arbitration board or tribunal or (b) in violation of any law, rule, regulation, ordinance or order relating to its or their respective businesses, in each case of (a) and (b) above, the breach, default or violation of which would reasonably be expected to result in a Material Adverse Occurrence.

4.8     **ERISA Compliance**.  To the best of Borrower's Knowledge and except as set forth on Schedule 4.8:

(a)      Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code, and all other federal and state laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS with respect thereto, or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS with respect thereto, and, to the Knowledge of the Loan Parties, nothing has occurred which would adversely affect such determination (or, in the case of a Plan with no determination, nothing has occurred that would materially adversely affect the issuance of a favorable determination letter or otherwise materially adversely affect such qualification). Each Loan Party and ERISA Affiliate has made all material contributions to or under each Pension Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, the terms of such Pension Plan or Multiemployer Plan, respectively, and any contracts or agreements requiring contributions to a Pension Plan or Multiemployer Plan.

(b)      There are no pending or, to the Knowledge of the Loan Parties, threatened disputes, arbitrations, claims, grievances or lawsuits, or actions or audits by any Governmental Authority, against or involving any Plan (other than routine claims for benefits payable under any such Plan) that would reasonably be expected (individually or in the aggregate) to result in a Material Adverse Occurrence.

(c)      (i) No ERISA Event has occurred or is reasonably expected to occur, (ii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is at least 80%, and no Loan Party or ERISA Affiliate knows of any reason that such percentage could reasonably be expected to drop below 80%, (iii) no Loan Party or ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, (iv) no Loan Party or ERISA Affiliate has ceased operations at a facility so as to become subject to the provisions of Section 4068(a) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions to any Pension Plan subject to Section 4064(a) of ERISA to which it made contributions, and (v) no lien imposed under the Code or ERISA on the assets of any Loan Party or any ERISA Affiliate exists or is likely to arise on account of any Plan.

(d)      With respect to any Foreign Plan, (i) all employer and employee contributions required by law or by the terms of the Foreign Plan have been timely made, or, if applicable, accrued in accordance with normal accounting practices, (ii) the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for any Foreign Plan funded through insurance, or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations (whether or not vested) with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles, (iii) such Foreign Plan has been registered as required and has been maintained in good standing with applicable regulatory authorities, and (iv) no Loan Party or Subsidiary has incurred any obligation in connection with the termination of, or withdrawal from, any Foreign Plan.

**4.9      Title to Assets**.  To the best of Borrower's Knowledge, (a) each Loan Party holds or will hold title to the Collateral, including any owned Real Property in fee simple and good, legal and marketable title to any Equipment, in each case and used in its business and pledged as Collateral for the Obligations, free and clear of all Liens except for Permitted Liens and other encumbrances permitted pursuant to Section 6.3 and (b) except for Uniform Commercial Code financing statements evidencing Permitted Liens, or Uniform Commercial Code financing statements for which terminations will be tendered to the Administrative Agent prior to or contemporaneously with the first Advance, no financing statement under

the Uniform Commercial Code as in effect in any jurisdiction and no other filing which names any Loan Party as debtor or which covers or purports to cover any of the Collateral, including Real Property or Equipment pledged as Collateral for the Obligations, will be effective and on file in any state or other jurisdiction, and no Loan Party will sign or authorize any such financing statement or filing or any security agreement authorizing any secured party thereunder to file any such financing statement or filing other than in favor of Administrative Agent.

**4.10    Use of Proceeds**.  The proceeds of the Loans shall be used strictly in accordance with the Budget and subject to the terms and conditions of this Agreement and the DIP Orders.

**4.11    Governmental Regulation**.  To the best of Borrower's Knowledge, no Loan Party is required to obtain any material consent, approval, authorization, permit or license which has not already been obtained from, or effect any material filing or registration (other than the filing of the Uniform Commercial Code financing statements) which has not already been effected with, any federal, state or local regulatory authority in connection with the execution and delivery of this Agreement or the performance, in accordance with their respective terms, of this Agreement or any other Loan Document, or the consummation of the Transactions.

**4.12    Margin Stock**.  No part of any Advance shall be used at any time by any Loan Party to purchase or carry margin stock (within the meaning of Regulations T, U and X) or to extend credit to others for the purpose of purchasing or carrying any margin stock.  No Loan Party is engaged principally, or as one of its important activities, in the business of extending credit for the purposes of purchasing or carrying any such margin stock.  No part of the proceeds of any Advance will be used by any Loan Party for any purpose which violates, or which is inconsistent with, any regulations promulgated by the Board of Governors of the Federal Reserve System.

**4.13    Investment Company Act**.  No Loan Party is registered or required to be registered as an "investment company," or an "affiliated person" of, or a "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended. The making of the Advances, the application of the proceeds and repayment thereof by the Borrower and the performance by each Loan Party of the transactions contemplated by this Agreement will not violate any provision of said Act, or any rule, regulation or order issued by the Securities and Exchange Commission thereunder.

**4.14    Accuracy of Information**.  To the best of Borrower's Knowledge and subject to the Known Events, all written information heretofore furnished by or on behalf of any Loan Party to the Administrative Agent or the Lenders for purposes of or in connection with this Agreement or any transaction contemplated by this Agreement and the DIP Orders is, and all other such information furnished by or on behalf of such Loan Party to the Administrative Agent is, when considered as a whole, complete and correct in all material respects and did not, when delivered, contain any untrue statement of material fact or omit to state a fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements have been made (after giving effect to all supplements thereto).

**4.15    Tax Returns; Audits**.  To the best of Borrower's Knowledge, (a) each Loan Party has filed all federal, state and local income tax returns and all other material tax returns which are required to be filed by it, and has paid all taxes shown as due on such tax returns and all material Taxes otherwise due and payable (except for any Taxes which are being contested in good faith by appropriate proceedings that will prevent a forfeiture or sale of any property and for which an adequate reserve has been provided on the books of such Loan Party in accordance with GAAP); and (b) as of the Closing Date, no material tax return

is under audit or examination by any Governmental Authority and no Loan Party is aware of any proposed assessment against it or any of its Subsidiaries with respect to any material amount of Taxes.

**4.16    Environmental and Safety Regulations**.  To the best of Borrower's Knowledge, (a) each Loan Party is in compliance with all requirements of applicable federal, state and local environmental, pollution control, health and safety statutes, laws and regulations except for any noncompliance which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence and is not, to the knowledge of each Loan Party, the subject of any federal or state investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment; (b) the Real Property and its intended use complies with all applicable laws, governmental regulations and the terms of any enforcement action by any federal, state, regional or local governmental agency regarding all applicable federal, state and local laws pertaining to air and water quality, hazardous waste, waste disposal and other environmental matters (including, but not limited to, the Clean Water, Clean Air, Federal Water Pollution Control, Solid Waste Disposal, Resource Conservation and Recovery and Comprehensive Environmental Response, Compensation, and Liability Acts, as said acts may be amended), and the rules, regulations and ordinances of all applicable federal, state and local agencies and bureaus under such laws, except in each case for any noncompliance which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence; and (c) no written notice, demand, request for information, citation, summons or order has been issued, no complaint has been filed, no penalty has been assessed and, to the knowledge of each Loan Party, no investigation or review is pending or threatened by any governmental or other entity with respect to any alleged failure by such Loan Party to comply in any respect with any of such environmental laws (each of the foregoing, an "Environmental Action").

**4.17    Payment of Wages; Labor Matters**.  To the best of Borrower's Knowledge, (a) each Loan Party is in compliance with the Fair Labor Standards Act, as amended, in all material respects, and each Loan Party has paid all minimum and overtime wages required by law to be paid to their respective employees; there are no strikes, work stoppages, slowdowns or lockouts existing, pending or, to the Knowledge of the Loan Parties, threatened against or involving any Loan Party or any Subsidiary of any Loan Party, except for Known Events and those that would reasonably be expected to result in a Material Adverse Occurrence and (c) except as set forth on Schedule 4.17, (a) there is no collective bargaining or similar agreement with any union, labor organization, works council or similar representative covering any employee of any Loan Party or any Subsidiary of any Loan Party, (b) no petition for certification or election of any such representative is existing or pending with respect to any employee of any Loan Party or any Subsidiary of any Loan Party and (c) to the knowledge of any Loan Party, no such representative has sought certification or recognition with respect to any employee of any Loan Party or any Subsidiary of any Loan Party.

**4.18    Intellectual Property**.  To the best of Borrower's Knowledge, (a) each Loan Party owns, possesses or has the right to use all material licenses and rights to all patents, trademarks, trademark rights, trade names, trade name rights, trade dress, service marks, domain marks and copyrights necessary to conduct their business in all material respects as now being and hereafter proposed to be conducted, without conflict with any patent, trademark, trade name, service mark, license or copyright of any other Person; and (b) all such material licenses and rights with respect to patents, trademarks, trademark rights, trade names, trade name rights, service marks and copyrights are in full force and effect in all material respects.

**4.19    [Reserved]**.

**4.20    Chapter 11 Cases**.  The Chapter 11 Cases were commenced on the Petition Date in accordance with the applicable law and proper notice has been or will be given of (i) the motion seeking

approval of the Loan Documents and the DIP Orders, and (ii) the hearing for the entry of the Final DIP Order.

**4.21    No Material Adverse Occurrence**.  Since the Petition Date, subject to the Known Events, there has occurred no event which would reasonably be expected to result in a Material Adverse Occurrence.

**4.22    DIP Orders**.  As of the date of each Borrowing, the Loan Parties are in compliance in all material respects with the terms and conditions of the DIP Orders. Each of the Interim DIP Order (with respect to the period prior to the entry of the Final DIP Order) or the Final DIP Order (from and after the date the Final DIP Order is entered), as applicable, is in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent acting at the direction of the Required Lenders.

**4.23    Deposit Accounts**.  To the best of Borrower's Knowledge, (a) Schedule 4.23 lists all banks and other financial institutions at which any Loan Party maintains deposit or other accounts as of the Closing Date, and such Schedule correctly identifies the name, address and any other relevant contact information reasonably requested by the Administrative Agent with respect to each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number therefor; and (b) the DIP Orders grant the Administrative Agent "control" (as such term is used in the UCC) over such Deposit Accounts for the benefit of the Secured Parties.

**4.24    [Reserved]**.

**4.25    Material Contracts**.  To the best of Borrower's Knowledge, (a) all of the Material Contracts are in full force and effect and no Loan Party is in default under any Material Contract; and (b) no other Person that is a party thereto is in material default under any of the Material Contracts.

**4.26    Valid Liens**.  This Agreement, the DIP Orders and the Security Documents, subject to entry of the DIP Orders, are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties legal, valid, and enforceable first-priority Liens on, and security interests in, the DIP Collateral pledged hereunder or thereunder, in each case, with respect to priority, subject to no Liens other than the Carve-Out and Permitted Liens with the relative priorities granted pursuant to the terms of the DIP Orders. Pursuant to the terms of the DIP Orders, no filing or other action will be necessary to perfect or protect such DIP Liens and security interests. Pursuant to and to the extent provided in the DIP Orders, the Indebtedness of the Debtors under this Agreement will constitute part of the DIP Credit Facility Super-Priority Claims.

**4.27    Foreign Assets Control Regulations and Anti-Money Laundering**.  To the best of Borrower's Knowledge, (a) each Loan Party is in compliance in all material respects with all U.S. economic sanctions laws, Executive Orders and implementing regulations as promulgated by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), and all applicable anti-money laundering and counter-terrorism financing provisions of the Bank Secrecy Act and all regulations issued pursuant to it; and (b) each Loan Party (i) is not a Person designated by the U.S. government on the list of the Specially Designated Nationals and Blocked Persons (the "SDN List") with which a U.S. Person cannot deal with or otherwise engage in business transactions, (ii) is not a Person who is otherwise the target of U.S. economic sanctions laws such that a U.S. Person cannot deal or otherwise engage in business transactions with such Person or (iii) is not controlled by (including by virtue of such person being a director or owning voting shares or interests), or acts, directly or indirectly, for or on behalf of, any person or entity on the SDN List or a foreign government that is the target of U.S. economic sanctions prohibitions such that the entry into, or performance under, this Agreement or any other Loan Document would be prohibited under U.S. law.

**4.28**    **Patriot Act**.  To the best of Borrower's Knowledge, (a) the Loan Parties, each of their Subsidiaries and, to their knowledge, each of their Affiliates, are in compliance in all material respects with (i) the Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department and any other enabling legislation or executive order relating thereto, (ii) the Patriot Act and (iii) other federal or state laws relating to "know your customer" and anti-money laundering rules and regulations; and (b) no part of the proceeds of any Loan will be used directly or indirectly for any payments to any government official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

**4.29**    **Insurance**.  To the best of Borrower's Knowledge, the Borrower and its Subsidiaries maintain insurance policies with respect to their respective properties and business, in each case in compliance with Section 5.7.

**4.30**    **[Reserved]**.

**4.31**    **Healthcare Laws**.  To the best of Borrower's Knowledge:

(a)    Without limiting any other representation or warranty made herein, each Loan Party, each property owned or managed by such Loan Party, and each Loan Party's licensed employees and contractors (other than contracted agencies), in the exercise of their respective duties on behalf of such Loan Party, is in material compliance with all applicable Healthcare Laws.

(b)    [reserved].

(c)    Except as set forth on Schedule 4.31(c), no Loan Party, and no property owned or managed by any Loan Party, is currently, or has in the past been, subject to any federal, state, local governmental or private payor civil or criminal inspections, investigations, inquiries or audits involving or related to such Loan Party, such Loan Party's activities or such Loan Party's compliance with Healthcare Laws, except for such inspections, investigations, inquiries or audits which, individually and in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence.

(d)    No Loan Party (i) has had a civil monetary penalty assessed against it pursuant to 42 U.S.C. §1320a 7a, (ii) has been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. §1320a 7b), (iii) has been convicted (as that term is defined in 42 C.F.R. §1001.2) of any of those offenses described in 42 U.S.C. §1320a 7b or 18 U.S.C. §§669, 1035, 1347, 1518, or (iv) has been involved or named in a United States Attorney complaint made, or any other action taken pursuant to the False Claims Act under 31 U.S.C. §§3729 3731 or qui tam action brought pursuant to 31 U.S.C. §3729 *et seq*.

(e)    Each Loan Party, and the owners of the facilities and other businesses managed by each Loan Party have such Licenses and other notices, approvals, or authorizations of Governmental Authorities, as are necessary under applicable law to own its respective properties and to conduct its respective business (including, without limitation, such permits as are required under Healthcare Laws), except for such notices, approvals, or authorizations by Governmental Authorities with respect to which the failure to make or obtain, in the ordinary course of business, could not reasonably be expected to result in a Material Adverse Occurrence.

**4.32**    **HIPAA and Part 2 Compliance**.  To the best of Borrower's Knowledge, to the extent that, and for so long as, any Loan Party is a "covered entity" within the meaning of HIPAA or offers

substance abuse treatment "programs" as defined by 42 C.F.R. § 2.11 that are "federally assisted" as defined by 42 C.F.R. § 2.12(b), such Loan Party (a) has undertaken or will promptly undertake all necessary surveys, audits, inventories, reviews, analyses and assessments (including any necessary risk assessments) of all areas of its business and operations required by HIPAA or Part 2, or that could be adversely affected by the failure of such Loan Party to be HIPAA and Part 2 Compliant (as defined below), (b) has developed, or will promptly develop, a detailed plan and time line for becoming HIPAA and Part 2 Compliant (a "HIPAA and Part 2 Compliance Plan"), and (c) has implemented, or will implement, those provisions of such HIPAA and Part 2 Compliance Plan necessary to ensure that such Loan Party is or becomes HIPAA and Part 2 Compliant, except in each case as would not reasonably be expected to result in a Material Adverse Occurrence. For purposes hereof, "HIPAA and Part 2 Compliant" means that each Loan Party (i) is or will be in compliance with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA and the requirements of Part 2 on and as of each date that any part thereof, or any final rule or regulation thereunder, becomes effective in accordance with its or their terms, as the case may be (each such date, a "HIPAA and Part 2 Compliance Date"), and (ii) is not and could not reasonably be expected to become, as of any date following any such HIPAA and Part 2 Compliance Date, the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could be adverse to such Loan Party.

      4.33    **Other Agreements/Program Eligibility**.  To the best of Borrower's Knowledge and except for Known Events and as set forth on Schedule 4.33 (a) no Loan Party is in default in the performance, observance or fulfillment of any obligation, covenant or condition contained in or applicable with respect to any agreement or instrument to which such Loan Party is a party with a third-party payor, or any other third-party payor program in which such Loan Party participates, which default, if not remedied within any applicable grace period, reasonably would be expected to (i) in the case of any third-party payor agreement other than a national third-party payor agreement results in the revocation, termination, cancellation, suspension or non-renewal of certification of a material third party not involved in a national third-party payor agreement, if any, an agreement with a third-party payor which is not party to a national third-party payor program with such Loan Party, or eligibility to participate, directly or indirectly, in material third-party payor programs which are not national third-party payor programs of such Loan Party, or (ii) in the case of any material national third-party payor agreement, results in the revocation, termination, cancellation, suspension or non-renewal of certification of a material national third-party payor contract or agreement or material national agreement with a third-party payor, or eligibility to participate, directly or indirectly, in material national third-party payor programs; and (b) no Loan Party or any of its Subsidiaries participates in any third party payor program with a Governmental Authority.

      4.34    **Reimbursement from Third-Party Payors**.  To the best of Borrower's Knowledge and except for the Known Events, (a) the accounts receivable of the Loan Parties have been and will continue to be adjusted reasonably to reflect reimbursement experiences with, and policies of, third-party payors such as private insurance companies, health maintenance organizations, preferred provider organizations, alternative delivery systems, managed care systems, government contracting agencies and other third-party payors; and (b) in particular, accounts receivable relating to such third-party payors do not, and shall not, exceed amounts in any material respect any obligee is entitled to receive under any capitation arrangement, fee schedule, discount formula, cost-based reimbursement or other adjustment or limitation to its usual charges.

      4.35    **Fraud and Abuse**.  To the best of Borrower's Knowledge, no Loan Party, nor any stockholder, officer or director, acting on behalf of any Loan Party, has engaged in any knowing or willful violation of the federal and state anti-kick-back or fraud and abuse laws, or the regulations promulgated thereunder.

# ARTICLE V
## CERTAIN AFFIRMATIVE COVENANTS

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Loan shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

**5.1** **Financial Information; etc**. The Borrower will furnish to the Administrative Agent copies of the following financial statements, reports and information:

(a) Following delivery of the Budget on the Petition Date, by not later than 5:00 p.m. Eastern Time on the third Wednesday following the Petition Date and by not later than 5:00 p.m. Eastern Time on each Wednesday following the end of each Testing Period, a Budget Update, in each case, in form and substance reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders for the subsequent 13 week period consistent with the form of the Budget, and such Budget Update shall become the "Budget" for the purposes of the DIP Facility upon the Administrative Agent's acknowledgement at the direction of the Required Lenders that the proposed Budget Update is substantially in the form of the Budget and in substance satisfactory to the Administrative Agent at the direction of the Required Lenders (provided, that, until a new Budget has been approved by the Administrative Agent at the direction of the Required Lenders, the most recently approved Budget shall govern); and beginning on the third Wednesday following the Petition Date (by not later than 5:00 p.m. Eastern Time), and on every Wednesday following the end of each Testing Period (by not later than 5:00 p.m. Eastern Time), a variance report (the "Variance Report") setting forth actual cash receipts and disbursements and cash flows of the Debtors for the prior Testing Period and setting forth the disbursement variance, on a line-item basis, from the amount set forth for such period as compared to the applicable approved Budget delivered by the Debtors, in each case, on a cumulative basis, as applicable (and each such Variance Report shall include explanations for all material variances and shall be certified by the Chief Financial Officer of the Debtors);

(b) to the extent monthly operating reports are not timely filed with the Bankruptcy Court, as soon as available and in any event within thirty (30) days after the end of each fiscal quarterly period of each fiscal year of the Borrower (or, for with respect to the last such quarterly period ending in any fiscal year, forty five (45) days after the end of such quarterly period), consolidated and combined statements of operations and cash flows of the Borrower and its Subsidiaries for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year, accompanied by a certificate of a Responsible Officer of the Borrower which shall state, in the name and on behalf of the Borrower, that said financial statements (which are neither audited nor reviewed by an outside CPA firm) are complete and correct on a best efforts basis in all material respects and fairly present the financial condition and results of operations of the Borrower and its Subsidiaries in accordance with GAAP for such period, (subject to year-end adjustments and the lack of GAAP footnotes), and a written management's discussion and analysis of the financial condition and results of operations for such fiscal quarter and the then elapsed portion of the fiscal year since the Petition Date;

(c) to the extent monthly operating reports are not timely filed with the Bankruptcy Court, as soon as available and in any event within thirty (30) days after the end of each of the first two fiscal months of each fiscal quarter of the Borrower, consolidated and combined statements of operations and cash flows of the Borrower and its Subsidiaries for such

period and for the period from the beginning of the respective fiscal year to the end of such period, and the related balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year;

(d)    to the extent monthly operating reports are not timely filed with the Bankruptcy Court, with each financial statement required by Section 5.1(b) and Section 5.1(c) to be delivered to the Administrative Agent, a Compliance Certificate signed by a Responsible Officer of the Borrower;

(e)    promptly after the Borrower knows or has reason to know that any Default has occurred and is continuing or Material Adverse Occurrence has occurred, but in any event not later than two (2) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice of such Default or Material Adverse Occurrence describing the same in reasonable detail and a description of the action that the Borrower has taken and proposes to take with respect thereto;

(f)    promptly following the commencement of any litigation, suit, administrative proceeding or arbitration relating to the Borrower or any of its Properties which if adversely determined would reasonably be expected to result in a Material Adverse Occurrence or otherwise relating in any way to the transactions contemplated by this Agreement, but in any event not later than two (2) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice thereof describing the allegations of such litigation, suit, administrative proceeding or arbitration and the Borrower's response thereto;

(g)    promptly following the commencement of any Environmental Action, but in any event not later than two (2) Business Days after any Responsible Officer of the Borrower becomes aware thereof, a notice describing the allegations of such Environmental Action;

(h)    promptly and in any event not later than two (2) Business Days after any Loan Party knows or has reason to know of: (i) the occurrence of any ERISA Event, a certificate of a Responsible Officer of the Borrower describing such ERISA Event and the action, if any, proposed to be taken with respect to such ERISA Event and a copy of any notice filed with the PBGC or the IRS pertaining to such ERISA Event and any notices received by any Loan Party or any ERISA Affiliate from the PBGC or any other governmental agency with respect thereto; and/or (ii) the adoption of or the commencement of contributions to any Pension Plan, Multiemployer Plan or Foreign Plan by any Loan Party or any ERISA Affiliate or the adoption of any amendment to any Pension Plan, Multiemployer Plan or Foreign Plan which results in a material increase in contribution obligations of any Loan Party or any ERISA Affiliate, a detailed written description thereof from a Responsible Officer of the Borrower; and

(i)    such other information with respect to the financial condition and operations of the Borrower as the Administrative Agent or any Lender may reasonably request.

**5.2    Maintenance of Existence; etc**. Except for Known Events, each Loan Party shall maintain and preserve its existence, and qualification and good standing in all states in which such qualification and good standing are required in order to conduct its business and own its property as conducted and owned in such states, except where the failure to do so would not reasonably be expected to result in a Material Adverse Occurrence or as approved by the Administrative Agent in its sole discretion.

**5.3    Maintenance of Properties**. Each Loan Party will maintain or cause to be maintained in the ordinary course of business in good repair, working order and condition (reasonable wear and tear

excepted) all Properties set forth on Schedule 5.3 (whether owned or held under lease), and from time to time make or cause to be made all necessary repairs, renewals, replacements, additions, betterments and improvements thereto, except to the extent the failure to maintain such Properties would not reasonably be expected to result in a Material Adverse Occurrence or as approved by the Administrative Agent in its sole discretion.

5.4    **Payment of Liabilities**.  Subject to the Budget, each Loan Party shall pay and discharge as the same may become due and payable, all material taxes, assessments and other governmental charges or levies against or on any of its Property, as well as all other lawful claims of any kind which, if unpaid, might become a Lien upon any of its Property; provided, however, that the foregoing shall not require such Loan Party to pay any such tax, assessment, charge, levy or claim so long as the validity thereof shall be contested diligently in good faith by appropriate proceedings that will prevent a forfeiture or sale of any Property and an adequate book reserve in accordance with GAAP shall have been set aside with respect thereto, but (with respect to claims that are not Taxes, assessments and other governmental charges or levies) only so long as such claim does not become a Lien on any assets of such Loan Party.

5.5    **Compliance with Laws**.  Each Loan Party shall carry on its business activities in substantial compliance with all applicable federal or state laws and all applicable rules (including the DIP Orders), regulations and orders of all governmental bodies and offices having power to regulate or supervise its business activities, including all applicable environmental, pollution control, health and safety statutes, laws and regulations, except in each case where the failures to so comply would not reasonably be expected to result in a Material Adverse Occurrence.  Each Loan Party shall maintain all material rights, liens, permits, certificates of compliance or grants of authority necessary for the conduct of its business, except where the failure to maintain would not reasonably be expected to result in a Material Adverse Occurrence or as approved by the Administrative Agent in its sole discretion.  Each Loan Party agrees that the Real Property and its intended use will comply at all times with all applicable laws, governmental regulations and the terms of any enforcement action now or hereafter commenced by any federal, state, regional or local governmental agency, including all applicable federal, state and local laws pertaining to air and water quality, hazardous waste, waste disposal and other environmental matters (including, but not limited to, the Clean Water, Clean Air, Federal Water Pollution Control, Solid Waste Disposal, Resource Conservation and Recovery and Comprehensive Environmental Response, Compensation, and Liability Acts, as said acts may be amended from time to time), and the rules, regulations and ordinances of all applicable federal, state and local agencies and bureaus, except where the failures to so comply would not reasonably be expected to result in a Material Adverse Occurrence.

5.6    **Books and Records; Inspection Rights; etc**. Each Loan Party shall keep (a) a system of accounting administered in accordance with GAAP and (b) books and records reflecting all of its business affairs and transactions in accordance with GAAP.  Each Loan Party shall permit the Administrative Agent (accompanied by any Lender) or any representative thereof, at reasonable times and intervals, during normal business hours and upon reasonable notice to the Borrower, to visit the offices of such Loan Party, discuss financial matters with Responsible Officers of such Loan Party and with its independent public accountants (and by this provision each Loan Party authorizes its independent public accountants to participate in such discussions) and examine any of the such Loan Party's books and other company records in a non-disruptive manner.  Notwithstanding anything to the contrary in this Section 5.6, no Loan Party will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter, or provide information, that (i) constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure is prohibited by Law, (iii) is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) the disclosure of which is restricted by binding agreements with a third party that is not a controlled Affiliate of any Loan Party.

**5.7**    **Insurance**.  Each Loan Party will:

(a)    Maintain insurance including, but not limited to, business interruption coverage, public liability coverage insurance and directors and officers insurance coverage from responsible companies in such amounts and against such risks to such Loan Party as is prudent and reasonably satisfactory to the Administrative Agent; provided that the Administrative Agent acknowledges that the insurance maintained by the Loan Parties as of the Closing Date is satisfactory;

(b)    Keep its assets insured by responsible companies against loss or damage by fire, theft, burglary, pilferage, loss in transit, explosions and hazards in amounts which are prudent for the healthcare industry, in accordance with industry standards, all premiums thereon to be paid by the Loan Parties;

(c)    With respect to each Real Property, if at any time the area in which any Improvements located on such unit is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), (i) obtain flood insurance providing $5,000,000 of coverage, and otherwise comply with the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent, including a copy of the flood insurance policy and a declaration page relating to the insurance policies required by this Section 5.7 which shall (a) identify the addresses of each property located in a special flood hazard area, (b) indicate the applicable flood zone designation, the flood insurance coverage and the deductible relating thereto and (c) provide that the insurer will give the Administrative Agent thirty (30) days written notice of cancellation or non-renewal and shall include evidence of annual renewals of such insurance and (iii) shall be otherwise in form and substance satisfactory to the Administrative Agent;

(d)    Require that each insurance policy for the Collateral provide for at least thirty (30) days' prior written notice to the Administrative Agent of any termination of or proposed cancellation or non-renewal of such policy, or material reduction in coverage, and name the Administrative Agent for the Secured Parties as additional named loss payee or additional named insured, as applicable.

**5.8**    **ERISA**.  Each Loan Party agrees that all assumptions and methods used to determine the actuarial valuation of employee benefits, both vested and unvested, under any Plan, and each such Plan, will comply in all material respects with ERISA and other applicable laws.

(a)    No Loan Party will at any time permit any Plan to:

(1)    engage in any "prohibited transaction" for which an exemption is not available as such term is defined in Section 4975 of the Code or in Section 406 of ERISA;

(2)    fail to satisfy the minimum funding standard as such term is defined in Section 302 of ERISA, whether or not waived;

(3)    be terminated under circumstances which are likely to result in the imposition of a lien on the property of any Loan Party or any of their respective Subsidiaries pursuant to Section 4068 of ERISA, if and to the extent such termination is within the control of a Loan Party; or

(4)    be operated or administered in a manner which is not in compliance with ERISA or any applicable provisions of the Code;

if the event or condition described in (1), (2), (3) or (4) above would reasonably be expected (individually or in the aggregate) to subject any Loan Party or any of their respective Subsidiaries to a Material Adverse Occurrence.

(b)    Upon the request of the Administrative Agent or any Lender, the Borrower will furnish a copy of the annual report of each Plan (Form 5500) required to be filed with the Internal Revenue Service.  Copies of such annual reports shall be delivered no later than thirty (30) days after the date the copy is requested.

**5.9    [Reserved]**.

**5.10    [Reserved]**.

**5.11    Cash Management Systems**.  Maintain a cash management system as in effect on the Petition Date and as required by the DIP Orders and as authorized by the Bankruptcy Court pursuant to orders approving the first day motions filed by the Debtors and otherwise in compliance with the Prepetition Credit Agreement. Upon the request of the Administrative Agent (at the direction of the Required Lenders), cause bank statements and/or other reports to be delivered to the Administrative Agent not less often than monthly, accurately setting forth all amounts deposited in each Blocked Account to ensure the proper transfer of funds as set forth above.

**5.12    Further Assurances**.  Promptly upon reasonable request by the Administrative Agent, the Borrower shall (and, subject to the limitations hereinafter set forth, shall cause the other Loan Parties to) take such additional actions and execute such documents as the Administrative Agent may reasonably request from time to time in order (i) to carry out the purposes of this Agreement, the DIP Orders or any other Loan Documents, (ii) to subject to the Liens in the Collateral granted by any of the Security Documents any of the Collateral and (iii) to perfect and maintain the validity, effectiveness and priority of the Liens granted by any of the Security Documents and the Liens intended to be created thereby.

**5.13    [Reserved]**.

**5.14    OFAC; Patriot Act**.  The Loan Parties shall, and shall cause their Subsidiaries to, comply with the laws, regulations and executive orders referred to in Section 4.27 and Section 4.28 (subject to any materiality qualifiers set forth in such Section 4.27 and Section 4.28).

**5.15    Compliance with Certain Healthcare Laws**.

(a)    Each Loan Party shall comply with all material applicable requirements of Law, contractual obligations and permits (including Healthcare Laws). Each Loan Party will file all material applicable Private Payor Arrangement cost reports in a timely and complete manner.

(b)    Each Loan Party will (except as otherwise approved by the Administrative Agent in its sole discretion) maintain all certificates of need, provider numbers, supplier numbers, and other Licenses necessary to conduct its business as currently conducted in all material respects, and take all commercially reasonable steps required to comply with any such new or additional requirements that may be imposed on providers of the types of services such Loan Party provides

(c)       Each Loan Party shall maintain on its behalf, and shall allow the Administrative Agent and consultants of the Administrative Agent to review, upon reasonable request, (i) a corporate healthcare regulatory compliance program ("CCP") designed to ensure compliance with applicable federal and state law, and (ii) a program that complies with the privacy standards pertaining to health information, as set forth at 45 C.F.R. part 164, subparts A and E, and an effective program that complies with the security standards pertaining to health information, as set forth at 45 C.F.R. part 164, subpart C.

5.16    **Assignment of Licenses and Certificates**.  No Loan Party shall transfer or assign any Licenses under state or federal law required for such Loan Party to operate the properties of such Loan Party, other than to another Loan Party in compliance with applicable law or as approved by the Administrative Agent in its sole discretion. In addition, each Loan Party shall cause its Licenses for such Loan Party's facilities to be issued in the current corporate name of such Loan Party (or such other entity as approved by the Administrative Agent in writing).

5.17    **[Reserved]**.

5.18    **[Reserved]**.

5.19    **Milestones**.  Each of the Borrower and the Guarantors covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses or amounts payable under any Loan Document have been paid in full in cash (other than contingent obligations not yet due and payable), each of the Borrower and the Guarantors shall and shall cause each of the Subsidiaries to ensure that each of the Milestones set forth in the DIP Orders is achieved in accordance with the applicable timing referred to therein (or such later dates as may be approved in writing by the Required Lenders in their sole discretion).

5.20    **Bankruptcy Covenants**.  Notwithstanding anything in the Loan Documents to the contrary, the Debtors shall comply with all material covenants, terms and conditions and otherwise perform all obligations set forth in the DIP Orders in all material respects.

5.21    **Chapter 11 Cases**.

(a)       Each Debtor shall deliver or cause to be delivered for review and comment, as soon as commercially reasonable and in any event at least three (3) Business Days (or as soon thereafter as is reasonably practicable under the circumstance) prior to filing, all material pleadings, motions and other documents (provided that any of the foregoing relating to the DIP Facility shall be deemed material) to be filed on behalf of the Debtors with the Bankruptcy Court to K&S and shall consult in good faith with such counsel regarding the form and substance of any such proposed filing.  If not otherwise provided by the Bankruptcy Court's electronic docketing system, the Borrower shall provide copies to the Administrative Agent and the Lenders of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtors with the Bankruptcy Court, distributed by or on behalf of the Debtors to any Committee, filed with respect to the Chapter 11 Cases or filed with respect to any Loan Document.  In connection with the Chapter 11 Cases, the Debtors shall give the proper notice for (x) the motions seeking approval of the Loan Documents and the DIP Orders and (y) the hearings for the approval of the Final DIP Order.

(b)       Each Loan Party shall deliver or cause to be delivered to the Administrative Agent and the Lenders, in accordance with the Bid Procedures, copies of any term

sheets, proposals, presentations, amendments to any asset purchase agreement(s) or other documents, from any party, related to (i) the restructuring of the Debtors, or (ii) the sale of assets of one or more of the Debtors.

(c)      Except to the extent permitted (or required) hereunder, under the DIP Orders, under the Budget or as approved by an order of the Bankruptcy Court, no Loan Party shall, without the express prior written consent of the Required Lenders or pursuant to an order of the Bankruptcy Court after notice and a hearing, use the DIP Proceeds or cash DIP Collateral to make any critical vendor payment with respect to any prepetition amount, unless such payments are approved by an order of the Bankruptcy Court and permitted pursuant to any approved Budget.

**5.22    Budget Matters**.  The Borrower hereby acknowledges and agrees that any updated Budget (each such updated Budget, a "Budget Update") provided to the Administrative Agent and the Lenders shall not amend and supplement the applicable approved Budget until the Administrative Agent (at the direction of the Required Lenders) delivers a notice (which may be delivered by electronic mail) to the Borrower stating that the Required Lenders have approved of such Budget Update in accordance with Section 5.1(a); provided, that if the Administrative Agent does not deliver a notice of approval to the Borrower, then the existing approved Budget shall continue to constitute the applicable approved Budget until such time as the subject Budget Update is agreed to among the Borrower and the Required Lenders in accordance with Section 5.1(a).  Once such Budget Update is so approved in writing by the Administrative Agent and the Required Lenders, it shall supplement or replace the prior approved Budget, and shall thereafter constitute the approved Budget.

## ARTICLE VI
## FINANCIAL COVENANTS AND NEGATIVE COVENANTS

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Advance shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

**6.1    [Reserved]**.

**6.2    Limitations on Indebtedness**.  The Loan Parties shall not, and shall not permit any of their Subsidiaries to, create, assume, incur, issue, guarantee or otherwise become or remain obligated in respect of, or permit to be outstanding, any Indebtedness, except the following (the "Permitted Indebtedness"):

(a)      any Indebtedness owing to the Administrative Agent or any Lender under this Agreement and the other Loan Documents or the Prepetition Credit Agreement; and

(b)      contingent liabilities under surety bonds or similar instruments incurred in the ordinary course of business and in accordance with the Budget;

(c)      Indebtedness arising from the honoring by any bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within five (5) Business Days of its incurrence;

(d)      Indebtedness owed to any Person providing property, casualty, liability or other insurance to any Loan Party, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for

the period in which such Indebtedness is incurred and such Indebtedness is outstanding only for a period not exceeding twelve months;

(e)     Indebtedness representing deferred compensation or similar obligation to employees of Loan Parties incurred in the ordinary course of business and in accordance with the Budget;

(f)     Indebtedness of any Loan Party in respect of letters of credit, bank guarantees, supporting obligations bankers' acceptances, performance bonds, surety bonds, statutory bonds, appeal bonds, warehouse receipts or similar instruments issued or created in the ordinary course of business, including with respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; provided that any reimbursement obligations in respect thereof are reimbursed within 30 days following the due date thereof;

(g)     Other Indebtedness in respect of employee credit card programs and other cash management and similar arrangements in the ordinary course of business and any Guarantees thereof; and

(h)     any other Indebtedness listed on Schedule 6.1 on the Closing Date.

**6.3**     **Liens**.  The Loan Parties shall not, and will cause their Subsidiaries not to, create, incur, assume or permit to exist or to be created or assumed any Lien on Real Property or Equipment pledged as Collateral, whether now owned or hereafter acquired, except for Permitted Liens.

**6.4**     **Sales of Assets**.  The Loan Parties shall not, and will cause their Subsidiaries not to, make any Dispositions, other than (a) in the ordinary course of business and consistent with past practice or (b) as may be authorized by the Bankruptcy Court after notice and a hearing and with the consent of the Administrative Agent.

**6.5**     **Liquidations, Mergers and Consolidations**.  Except as permitted pursuant to Sections 6.6 or with the approval of the Administrative Agent and except for the merger, consolidation or amalgamation of any Loan Party or any Subsidiary of any Loan Party into any other Loan Party, the Loan Parties shall not, and will cause their Subsidiaries not to, liquidate or dissolve itself (or suffer any liquidation or dissolution) or otherwise wind up, or consolidate with or merge into any other Person; provided that any Subsidiary of the Borrower may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries and is not materially disadvantageous to the Lenders so long as the surviving Person or the Person who receives the assets of such dissolving or liquidated Subsidiary that is Loan Party shall be a Loan Party.

**6.6**     **Investments**.  The Loan Parties shall not, and will cause their Subsidiaries not to, permit to exist any Investment, except that, so long as no Event of Default then exists or is caused thereby, the Borrower and its Subsidiaries may make Permitted Investments.

**6.7**     **Transactions with Affiliates**.  The Loan Parties shall not, and will cause their Subsidiaries not to, enter into any material transaction (including the purchase, sale or exchange of Property, the rendering of any service, the making of any Investment in an Affiliate or the repayment of any Indebtedness owed to an Affiliate) with an Affiliate (other than any such transactions among the Loan Parties), except for (i) subject to the Budget, any agreement, instrument or arrangement as in effect as of the Closing Date and set forth on Schedule 6.7, and (ii) subject to the Budget, any material transaction in the ordinary course

of business and pursuant to the reasonable requirements of the Loan Parties and their Subsidiaries business, upon terms which are fair and reasonable to the Loan Parties and their Subsidiaries and which are not less favorable to the Loan Parties and their Subsidiaries than would be obtained in a comparable transaction with a Person not an Affiliate.

**6.8**     **[Reserved]**.

**6.9**     **Amendment and Waiver**.  The Loan Parties shall not, and will cause their Subsidiaries not to, except in connection with a transaction otherwise permitted hereunder, enter into any material amendment of, or agree to or accept or consent to any material waiver of any of the material provisions of its articles of organization or operating agreement.

**6.10**     **Restricted Payments**.  The Loan Parties shall not, and will cause their Subsidiaries not to, declare, pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Equity Interests or Equity Interests Equivalents of any Loan Party or any direct or indirect parent thereof, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Loan Parties or any of their Subsidiaries (collectively, "Restricted Payments"), except that the Loan Parties and their Subsidiaries may, in each case subject to the Budget:

(a)     [reserved];

(b)     to the extent constituting Restricted Payments, make payments permitted by Section 6.7;

(c)     make Tax Distributions; and

(d)     to the extent constituting Restricted Payments, any Loan Party and their Subsidiaries may enter into and consummate transactions expressly permitted by Section 6.6.

**6.11**     **Payments in Respect of Certain Indebtedness**.  The Loan Parties shall not, and will cause their Subsidiaries not to, (i) pay interest on any Indebtedness that (x) is subordinated in right of payment to the Obligations, or (y) secured by Liens on the Collateral on a junior basis to the Liens on the Collateral securing the Obligations (collectively, "Subordinated Indebtedness") or (ii) prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner, or make any payment in violation of any subordination terms of, any Subordinated Indebtedness, except:

(a)     [reserved];

(b)     [reserved];

(c)     payments of or in respect of such Indebtedness made solely with Qualified Equity Interests in Holdings or the Borrower or the conversion of such Indebtedness into Qualified Equity Interests of Holdings or the Borrower; and

(d)     [reserved].

**6.12**     **Change in Business**.  The Loan Parties shall not, and will cause their Subsidiaries not to, engage in any line of business that is substantially different from those lines of business carried on by it on

the Closing Date (or any reasonable extension thereof) or are ancillary, corollary, complimentary or related thereto.

**6.13    Changes in Accounting, Name and Jurisdiction of Organization**.  The Loan Parties shall not, and will cause their Subsidiaries not to, (i) change their fiscal year, (ii) change its name as it appears in official filings in its jurisdiction of organization or (iii) change its jurisdiction or form of organization.

**6.14    [Reserved]**.

**6.15    Holding Company Status**.  Notwithstanding anything contained in this Agreement or the other Loan Documents to the contrary, each of (i) Holdings, (ii) Borrower, (iii) Delphi Health BuyerCo, LLC, (iv) Summit Health BuyerCo, LLC, (v) DBHG Holding Company, LLC, and (vi) Delphi Behavioral Health Group, LLC shall not (a) own or acquire any assets other than the Equity Interests and Equity Interests Equivalents of its Subsidiaries that are Loan Parties or become Loan Parties in accordance with the terms hereof and its own Equity Interests or Equity Interests Equivalents, and, to the extent cash is temporarily transferred through Holdings to effectuate a transaction expressly permitted by this Agreement or the DIP Orders, such cash during such transfer, (b) incur any liabilities other than (i) minimal liabilities necessary to maintain its separate organizational existence and to pay reasonable overhead expenses of Loan Parties and their Subsidiaries and (ii) those incurred under or permitted by this Agreement, the DIP Orders and the other Loan Documents to which it is a party, (c) incur any Indebtedness other than the Obligations and Guarantees of the other Loan Parties' obligations permitted by this Agreement or the DIP Orders, (d) engage in any trade, business or operations (other than acting as a holding company for the equity of its Subsidiaries) and any administrative activities incidental or reasonably related thereto, (e) merge, amalgamate or consolidate with any other Person, (f) sell or otherwise transfer any of its assets, (g) permit or suffer to exist any Lien on any of its assets other than Permitted Liens, or (h) accept or receive any Loans or Collateral (other than distributions that are expressly permitted by Section 6.12); provided that nothing herein shall prevent Holdings from incurring liabilities with respect to Taxes as required by Law.

**6.16    Use of Proceeds**.  The proceeds of the Loans shall be used to provide working capital, for general corporate purposes and to fund the Chapter 11 Cases, subject to the Budget (including Permitted Variances) and the terms and conditions of this Agreement and the DIP Orders, including, without limitation, to (i) provide working capital and for other general corporate purposes of the Debtors; (ii) fund the costs of the administration of the Chapter 11 Cases (including professional fees and expenses); and (iii) fund interest, fees, and other payments contemplated in respect of the DIP Facility.

Without in any way limiting the foregoing, and otherwise in accordance with the DIP Orders, no DIP Collateral, DIP Proceeds or any portion of the Carve-Out may be used directly or indirectly by any of the Debtors, the Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Cases (or any successor chapter 7 case) or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to seek authorization to obtain liens or security interests that are senior to or *pari passu* with the DIP Liens or the Liens in existence on the Petition Date securing the Prepetition Obligations (the "Prepetition Liens") (except to the extent expressly set forth herein); or (b) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, any of the Administrative Agent, the Lenders, or the Prepetition Secured Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (all in their capacities as such) (collectively, the "Released Parties"), with respect to any

transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any claims or causes of action arising under chapter 5 of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the Obligations, the DIP Credit Facility Super-Priority Claims, the DIP Liens, the Loan Documents, the Prepetition Liens, the Prepetition Loan Documents, or the Prepetition Obligations; (iv) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the Obligations or the Prepetition Obligations; (v) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either (A) the Administrative Agent or the Lenders hereunder or under any of the Loan Documents, or (B) the Prepetition Agent or the Prepetition Lenders under any of the Prepetition Loan Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the Administrative Agent's or the Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable Loan Documents and the DIP Orders); or (vi) objecting to, contesting, or interfering with, in any way, the Administrative Agent's and the Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; provided, however, that no more than $25,000 in the aggregate of the DIP Collateral, DIP Proceeds or any portion of the Carve-Out may be used by the Committee, if any, to investigate claims and/or liens of the Prepetition Agents and Prepetition Lenders under the Prepetition Credit Agreement.

**6.17    Plans**.  No Loan Party shall, nor shall it permit any of its Subsidiaries to, become party to (or commence contributions to) any Multiemployer Plan or Foreign Plan, other than any Multiemployer Plan or Foreign Plan to which it is a party (or is already making contributions to) on the Closing Date.

**6.18    Employees Payments**.  No Loan Party shall make any cash bonus payment to any executive officers or employees of the Borrower or any of its Subsidiaries unless in accordance with the Budget, or otherwise acceptable to the Required Lenders.

## ARTICLE VII
## EVENTS OF DEFAULT

**7.1    Events of Default**.  The term "Event of Default" means any of the following events occurring for whatever reason, whether voluntary or involuntary, effected by operation of law, judgment, order or otherwise:

(a)    A failure to pay when and as due any principal amount of the Loans;

(b)    A default in the payment when and as due of any interest on the Loans or of fees or other amounts payable to the Lenders pursuant to this Agreement;

(c)    [reserved];

(d)    A default (other than those defaults specifically described in other subsections of this Section 7.1) by any Loan Party in the due performance and observance of any of the covenants contained in this Agreement or any other Loan Document and such failure continues for a period of ten (10) days;

(e)    Subject to the Budget, the Borrower or any Subsidiary thereof (i) fails to make any payment beyond the applicable grace period, if any, in respect of its Indebtedness (other than the Obligations) having an aggregate outstanding principal amount (individually or in the aggregate with all other such Indebtedness as to which such a failure shall exist) in excess of

$1,000,000 or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; provided that such failure is unremedied and is not waived by the holders of such Indebtedness prior to the termination of the Commitments and acceleration of the Loans pursuant to Section 7.2;

(f)        Other than with respect to the Chapter 11 Cases, an involuntary case under any applicable federal or state bankruptcy, insolvency or similar laws shall be commenced against any Loan Party; the entry of a decree or order by a court having jurisdiction in the premises in respect of any Loan Party under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law; or the entry of a decree or order by a court having jurisdiction in the premises appointing a receiver, liquidator, assignee, trustee, sequestrator or other similar official of the any Loan Party or of any substantial part of the property of any Loan Party, or ordering the winding up or liquidation of its affairs, which, in any case, is not dismissed within sixty (60) days;

(g)        Other than with respect to the Chapter 11 Cases, the commencement by any Loan Party of or consent to, a voluntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law or the request or consent by it to the appointment of a receiver, liquidator, assignee, trustee, sequestrator or other similar official of either of any Loan Party or of any substantial part of the property of any Loan Party, or the making by it of a general assignment for the benefit of creditors, or the failure by the Borrower to pay its debts generally as they become due, or the taking of any action by the Borrower in furtherance thereof;

(h)        One or more judgments (i) for the payment of money in an aggregate amount in excess of $1,000,000 (other than any such judgment covered by insurance (other than under a self-insurance program) to the extent a claim therefor has been made in writing and liability therefor has not been denied by the insurer), shall be rendered against any Loan Party, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of a Loan Party to enforce any such judgment or (ii) in the case of non-monetary judgments, which would reasonably be expected to result in a Material Adverse Occurrence, and which, in any case, remains undischarged, unvacated, unbonded or unstayed for a period of forty-five (45) days;

(i)        Any Loan Document or any material provision of any Loan Document shall at any time and for any reason cease to be valid and binding on or enforceable against any Loan Party party thereto or any Loan Party shall so state in writing or bring an action to limit its obligations or liabilities thereunder; or any security interest and DIP Lien on the DIP Collateral purported to be granted to the Administrative Agent for the benefit of the Secured Parties by any Security Document shall for any reason (other than as expressly permitted hereunder or pursuant to the terms thereof) cease to be in full force and effect or create a valid security interest in any material portion of the Collateral or such security interest shall for any reason (other than the failure of the Administrative Agent to take any action within its control) cease to be a perfected security interest with the priority stated in the Security Documents, except (in each case) (x) to the extent that any such grant, perfection or priority is not required pursuant to the terms hereof or the Security Documents and (y) to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage;

(j)      The occurrence of a Change of Control;

(k)      Any representation or warranty made or deemed made by any Loan Party in this Agreement or any other Loan Document shall be untrue, incorrect or misleading in any material respect when made or deemed made;

(l)      Any of the following shall occur:  (i) an ERISA Event occurs that has resulted or could reasonably be expected to result in liability of a Loan Party or ERISA Affiliate, or (ii) any event similar to the foregoing occurs or exists with respect to a Foreign Plan;

(m)      Other than a Known Event, there occurs a Material Adverse Occurrence;

(n)      The occurrence of any of the following in any Chapter 11 Case:

(1)      termination of any Asset Purchase Agreement due to a breach thereunder by any Debtor;

(2)      filing of a plan of liquidation under Chapter 11 of the Bankruptcy Code by the Debtors that has not been consented to by the Required Lenders;

(3)      filing of a plan of reorganization by the Debtors that does not propose to indefeasibly pay the Obligations in full in cash, unless otherwise consented to by the Administrative Agent and the Required Lenders;

(4)      any of the Debtors shall file a pleading seeking to vacate or modify any of the DIP Orders over the objection of the Administrative Agent or the Administrative Agent at the direction of the Required Lenders;

(5)      entry of an order without the prior written consent of the Required Lenders amending, supplementing or otherwise modifying the DIP Orders;

(6)      reversal, vacatur or stay of the effectiveness of the DIP Orders except to the extent stayed or reversed within five (5) Business Days;

(7)      a failure by the Loan Parties to comply with any material provision of the DIP Orders (except where such failure would not materially and adversely affect the Lenders or the Administrative Agent);

(8)      dismissal of the Chapter 11 Case of a Debtor with material assets or conversion of the Chapter 11 Case of a Debtor with material assets to a case under Chapter 7 of the Bankruptcy Code;

(9)      appointment of a Chapter 11 trustee or examiner with enlarged powers relating to the operation of the business of the Borrower or any other Loan Party or any Debtor shall file a motion or other pleading seeking such appointment;

(10)      any sale of all or substantially all assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, unless such sale is conducted in accordance with the Bid Procedures and consented to by the Required Lenders;

(11)     failure to meet a Milestone, unless extended or waived pursuant by the prior written consent of the Administrative Agent at the direction of the Required Lenders;

(12)     granting of relief from the Automatic Stay by the Bankruptcy Court after notice and hearing in the Chapter 11 Cases to permit foreclosure or enforcement on assets of the Borrower or any other Loan Party, in each case, with a fair market value in excess of $50,000;

(13)     the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or pari passu with the Lenders' claims under the DIP Facility;

(14)     an order shall be entered in any of the Chapter 11 Cases, without the prior written consent of the Administrative Agent and the Required Lenders (i) to permit any administrative expense or any claim (now existing or hereafter arising of any kind or nature whatsoever) to have administrative priority equal or superior to the DIP Credit Facility Super-Priority Claims or (ii) granting or permitted grant of a lien that is equal in priority or senior to the DIP Liens;

(15)     the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan, without the prior written consent of the Required Lenders;

(16)     the Debtors shall seek, or shall support any other person's motion seeking (in any such case, verbally in any court of competent jurisdiction or by way of any motion or pleading with the Bankruptcy Court, or any other writing to another party in interest by Debtors) to challenge the validity or enforceability of any of the DIP Lien or obligations of the parties under the Prepetition Loan Documents;

(17)     the Debtors shall assert in any pleading filed in any court that the guarantee contained in the Loan Documents is not valid and binding, for any reason, to be in full force and effect, other than pursuant to the terms hereof;

(18)     payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or in the DIP Orders or consented to by the Administrative Agent at the direction of the Required Lenders;

(19)     expiration or termination of the period provided by section 1121 of the Bankruptcy Code for the exclusive right to file a plan, with respect to a Debtor with material assets unless such expiration or termination was sought by the Prepetition Secured Parties or the Secured Parties;

(20)     the Bankruptcy Court's determination of the cessation of the DIP Liens or the DIP Credit Facility Super-Priority Claims to be valid, perfected and enforceable in all respects;

(21)     Permitted Variances under the Budget are exceeded for any period of time without consent of or waiver by the Administrative Agent at the direction of the Required Lenders;

(22) any uninsured judgments are entered with respect to any post-petition non-ordinary course claims against any of the Debtors or any of their respective affiliates in a combined aggregate amount in excess of $250,000 unless stayed;

(23) other than in the ordinary course and consistent with past practice, any Debtor asserting any right of subrogation or contribution against any other Debtor until all borrowings under the DIP Facility are paid in full in cash and the commitments are terminated;

(24) subject to entry of the Final DIP Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against any Lender;

(25) the commencement of a suit or action against any Lender and, as to any suit or action brought by any person other than any Debtor or an officer or employee of any Debtor, the continuation thereof without dismissal for thirty (30) days after service thereof on the Lenders, that asserts or seeks by or on behalf of the Debtors, any Committee or any other party in interest in any of the Chapter 11 Cases (unless the Bankruptcy Court has granted such party derivative standing to bring such a claim or action after notice and a hearing), a claim or any legal or equitable remedy that would (i) have the effect of subordinating any or all of the Obligations or DIP Liens of the Lenders under the Loan Documents to any other claim, or (ii) have a material adverse effect on the rights and remedies of the Administrative Agent and/or the Lenders under any Loan Document or the collectability of all or any portion of the Obligations in each case, unless consistent with any DIP Order;

(26) the entry of an order in any Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(27) an order shall have been entered by the Bankruptcy Court prohibiting, limiting or restricting the right of the Administrative Agent (on behalf of the Lenders) to credit bid for any or all of the Debtors' assets; and

(28) the payment of any prepetition claim other than (i) as consented to by the Required Lenders, (ii) as authorized by the Budget, (iii) permitted under the terms of this Agreement or (iv) as authorized by the Bankruptcy Court or the DIP Orders and reflected in the Budget.

**7.2     Action If Event of Default**.  If an Event of Default shall occur, to the extent permitted by law and the DIP Orders, the full unpaid principal amount of and interest on the Loans and all other amounts due and owing and Obligations hereunder shall automatically be due and payable without any declaration, notice, presentment, protest or demand of any kind (all of which are hereby waived) and the obligation of the Lenders to make additional Advances shall automatically terminate.

**7.3     Remedies**.

(a) Upon acceleration of the Loans, as provided in Section 7.2, the Administrative Agent shall, at the request of the Required Lenders and in accordance with and subject to the DIP Orders, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents and the DIP Orders and/or under applicable law.

(b)      The Administrative Agent, personally or by attorney, shall, at the request of the Required Lenders, proceed to protect and enforce its rights and the rights of the Lenders by pursuing any available remedy, including a suit or suits in equity or at law, whether for damages or for the specific performance of any obligation, covenant or agreement contained in this Agreement, the DIP Orders or in the Notes, or in aid of the execution of any power herein or therein granted, or for the enforcement of any other appropriate legal or equitable remedy, as the Administrative Agent shall deem most effectual to collect the payments then due and thereafter to become due on the Notes or under this Agreement, to enforce performance and observance of any obligation, agreement or covenant of the Borrower hereunder or under the Notes or to protect and enforce any of the Administrative Agent's or any Lender's rights or duties hereunder.

(c)      No remedy herein conferred upon or reserved to the Administrative Agent or any Lender is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder or under any other Loan Document or the DIP Orders now or hereafter existing at law, in equity or by statute.

(d)      Each Lender agrees that it will not take any action, nor institute any actions or proceedings, against the Borrower hereunder or under any Loan Document or the DIP Orders, without the prior written consent of the Required Lenders or, as may be provided in this Agreement, the DIP Orders or the other Loan Documents, at the direction of the Administrative Agent with the consent of the Required Lenders.

## ARTICLE VIII
## THE ADMINISTRATIVE AGENT

**8.1      Appointment and Authorization**.    Each Lender hereby irrevocably appoints the Administrative Agent as the Administrative Agent of such Lender and authorizes the Administrative Agent to act on such Lender's behalf to the extent provided herein or under any of the other Loan Documents, and to take such other action and exercise such other powers as may be reasonably incidental thereto.  Each Lender hereby agrees that it will require any transferee of any of such Lender's interests in its Loans to irrevocably appoint and authorize the Administrative Agent as such transferee's Administrative Agent in accordance with the terms hereof.  Notwithstanding the use of the term "agent," it is expressly understood and agreed that the Administrative Agent shall not have any fiduciary responsibilities to any Lender by reason of this Agreement and that the Administrative Agent is merely acting as the representative of the Lenders with only those duties as are expressly set forth in this Agreement and the other Loan Documents. In its capacity as the Lenders' contractual representative, the Administrative Agent (i) does not hereby assume any fiduciary duties to the Loan Parties, any of the Lenders or any other Person (and no such fiduciary duties shall be implied) and (ii) is acting as an independent contractor, the rights and duties of which are limited to those expressly set forth in this Agreement and the other Loan Documents.  The Borrower, on behalf of the Loan Parties, and each of the Lenders hereby agrees to assert no claim against the Administrative Agent on any agency theory or any other theory of liability for breach of fiduciary duty, all of which claims the Borrower and each Lender hereby waives.

**8.2      Power**.  The Administrative Agent shall have and may exercise such powers under this Agreement and any other Loan Documents as are specifically delegated to the Administrative Agent by the terms hereof or thereof, together with such powers as are reasonably incidental thereto.  As to any matters not expressly provided for by the Loan Documents (including enforcement or collection of the Notes), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions shall be binding upon all Lenders and

all holders of the Notes; provided, however, that the Administrative Agent shall not be required to take any action which exposes the Administrative Agent to personal liability or which is contrary to any Loan Document or applicable law. The Administrative Agent shall not have any implied duties or any obligation to take any action under this Agreement or any other Loan Document except such action as is specifically provided by this Agreement or any other Loan Document to be taken by the Administrative Agent.

8.3 **Interest Holders**. The Administrative Agent may treat each Lender, or the Person designated in the last notice filed with the Administrative Agent, whether under Section 9.3 or 9.9, or otherwise hereunder, as the holder of all of the interests of such Lender in its Loans until written notice of transfer, signed by such Lender (or the Person designated in the last notice filed with the Administrative Agent) and by the Person designated in such written notice of transfer, in form and substance satisfactory to the Administrative Agent, shall have been filed with the Administrative Agent.

8.4 **Employment of Counsel; etc**. The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document, and any instrument, agreement or document executed, issued or delivered pursuant or in connection herewith or therewith, by or through employees, agents and attorneys-in-fact and shall not be answerable for the default or misconduct of any such employee, agent or attorney-in-fact selected by it with reasonable care (other than employees, officers and directors of the Administrative Agent, when acting on behalf of the Administrative Agent). The Administrative Agent shall be entitled to rely on advice of counsel (including counsel who are the employees of the Administrative Agent) selected by the Administrative Agent concerning all matters pertaining to the agency hereby created and its duties under any of the Loan Documents.

8.5 **Reliance**. The Administrative Agent shall be entitled to rely upon and shall not be under a duty to examine or pass upon the validity, effectiveness, genuineness of this Agreement, any other Loan Document or any notice, consent, waiver, amendment, certificate, affidavit, letter, telegram, statement, paper, document or writing furnished pursuant to this Agreement or any other Loan Document, and the Administrative Agent shall be entitled to assume (absent actual knowledge to the contrary) that the same are valid, effective and genuine, have been signed or sent by the proper Person(s) and are what they purport to be. The Administrative Agent shall be entitled to assume that no Default has occurred and is continuing unless it has actual knowledge, or has been notified in writing by the Borrower, of such fact, or has been notified by a Lender in writing that such Lender considers that a Default has occurred and is continuing, and such Lender shall specify in detail the nature thereof in writing. The Administrative Agent shall not be liable hereunder for any action taken or omitted to be taken except for its own gross negligence or willful misconduct. The Administrative Agent shall provide promptly each Lender with copies of such documents received from the Borrower pursuant to the terms of this Agreement or any other Loan Document as such Lender may reasonably request.

8.6 **General Immunity**. Neither the Administrative Agent nor any of the Administrative Agent's directors, officers, agents, attorneys or employees shall be liable or responsible in any manner to the Borrower, any Lender or any other Person for any action taken or omitted to be taken by it or them under the Loan Documents or in connection therewith except for any liability imposed by law for its own willful misconduct or gross negligence. Without limitation on the generality of the foregoing, the Administrative Agent: (a) shall not be responsible to any Lender for any recitals, statements, warranties, representations, or failure or delay of performance under the Loan Documents or any agreement or document related thereto or for the financial condition of the Borrower; (b) shall not be responsible for the authenticity, accuracy, completeness, value, validity, effectiveness, due execution, legality, genuineness, enforceability or sufficiency of any of the Loan Documents, any provisions thereof or any document contemplated thereby; (c) shall not be responsible for the validity, genuineness, creation, perfection or priority of any of the DIP Liens created or reaffirmed by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any DIP Collateral or other security; (d) shall

not be bound to ascertain or inquire as to the performance or observance of any of the terms, covenants or conditions of any of the Loan Documents on the part of the Borrower or of any of the terms of any such agreement by any party thereto and shall have no duty to inspect the property (including the books and records) of the Borrower; (e) shall incur no liability under or in respect of any of the Loan Documents or any other document or DIP Collateral by acting upon any notice, consent, certificate or other instrument or writing (which may be by telegram, cable or telex) furnished pursuant to this Agreement or any other Loan Document; (f) shall incur no liability to the Borrower or any other Person as a consequence of any failure or delay in performance by or any breach by, any Lender or Lenders of any of its or their obligations under this Agreement; and (g) may consult with legal counsel (including counsel for the Borrower), independent public accountants and other experts selected by the Administrative Agent.

**8.7**    **Lenders' Representations and Warranties**.

(a)    Each Lender has made, and shall continue to make, its own independent investigation or evaluation of the operations, business, property and condition, financial and otherwise, of the Borrower in connection with the making of its commitments hereunder and has made, and will continue to make, its own independent appraisal of the creditworthiness of the Borrower. Without limiting the generality of the foregoing, each Lender acknowledges that prior to the execution of this Agreement, it had this Agreement and all other Loan Documents and such other documents or matters as it deemed appropriate relating thereto reviewed by its own legal counsel as it deemed appropriate, and it is satisfied with the form and substance of this Agreement and all other Loan Documents. Each Lender agrees and acknowledges that neither the Administrative Agent nor any of its directors, officers, attorneys or employees makes any representation or warranties about the creditworthiness of the Borrower or with respect to the due execution, legality, validity, genuineness, effectiveness, sufficiency or enforceability of this Agreement or any other Loan Documents, or the validity, genuineness, execution, perfection or priority of DIP Liens created or reaffirmed by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any DIP Collateral or other security. Each of the Lenders shall use its commercially reasonable efforts to provide the other Lenders with any credit or other material information which comes into the possession of such Lender on or before a Default or Event of Default or at any time thereafter with respect to the operations, business, property, condition or creditworthiness of the Borrower but no Lender shall have any liability to any other Lender for its inadvertent failure to do so. Each Lender, upon the request of another Lender, shall deliver to such other Lender any financial statement, report, certificate or other document required to be delivered to the Lenders pursuant to <u>Section 5.1</u> which the requesting Lender did not receive. Except as explicitly provided herein, neither the Administrative Agent nor any Lender has any duty or responsibility, either initially or on a continuing basis, to provide any other Lender with any credit or other information with respect to such operations, business, property, condition or creditworthiness, whether such information comes into its possession on or before a Default or an Event of Default or at any time thereafter.

(b)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(1)    such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement;

(2)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement;

(3)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement; or

(4)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(c)    In addition, unless either (1) the immediately preceding clause (b)(1) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with the immediately preceding clause (b)(4), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(1)    none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto); and

(2)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50,000,000, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E);

(3)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations);

66

(4)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Commitments and this Agreement, and is responsible for exercising independent judgment in evaluating the transactions hereunder; and

(5)     no fee or other compensation is being paid directly to the Administrative Agent or any of its affiliates for investment advice (as opposed to other services) in connection with the Loans, the Commitments or this Agreement.

**8.8     Administrative Agent and Affiliates**.  With respect to the Loans made by it and the Notes issued to it, the Administrative Agent, in its individual capacity, shall have the same rights and powers under the Loan Documents as any other Lender and may exercise the same as though it were not an Administrative Agent; and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, include the Administrative Agent in its individual capacity.  The Administrative Agent, in its individual capacity, and its Affiliates may accept deposits from, lend money to, act as trustee under indentures of, and generally engage in any kind of business with, the Borrower, and any Person who may do business with or own securities of the Borrower, all as if it were not an Administrative Agent and without any duty to account therefor to the Lenders.

**8.9     Indemnification**.  The Lenders jointly and severally agree to indemnify and hold harmless the Administrative Agent and its officers, directors, employees and agents (to the extent not reimbursed by the Borrower), ratably according to their respective Commitments, from and against any and all claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Administrative Agent or any of its officers, directors, employees or agents, in any way relating to or arising out of any investigation, litigation or proceeding concerning or relating to the transaction contemplated by this Agreement or any of the other Loan Documents, or any of them, or any action taken or omitted by the Administrative Agent or any of its officers, directors, employees or agents, under any of the Loan Documents; provided, however, that no Lender shall be liable for any portion of such claims, liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the gross negligence or willful misconduct of the Administrative Agent or any of its officers, directors, employees or agents.  Without limitation of the foregoing, each Lender agrees to reimburse the Administrative Agent promptly upon demand for such Lender's proportionate share of any out-of-pocket expenses (including counsel fees) incurred by the Administrative Agent or its officers, directors, employees or agents in connection with the preparation, execution, administration, or enforcement of, or legal advice in respect of rights or responsibilities under any of, the Loan Documents, to the extent that the Administrative Agent is not reimbursed for such expenses by the Borrower.

**8.10     Security Documents**.  The Administrative Agent, as collateral agent hereunder and under the Security Documents, is hereby authorized to act on behalf of the Secured Parties, in its own capacity and through other agents and sub-agents appointed by it in good faith, under the Security Documents, provided that the Administrative Agent shall not agree to the release of any DIP Collateral, or any property encumbered by any mortgage, pledge or security interests except in compliance with Section 8.11.  In connection with its role as secured party with respect to the DIP Collateral hereunder, the Administrative Agent shall act as collateral agent, for itself and for the ratable benefit of the Lenders, and such role as Administrative Agent shall be disclosed on all appropriate accounts, filings, mortgages, and other DIP Collateral documentation.

**8.11     Collateral Matters; Credit Bid**.  The Administrative Agent is authorized on behalf of all the Lenders without the necessity of any notice to or further consent from the Lenders, from time to time

to take any action with respect to the Security Documents or any DIP Collateral thereunder which may be necessary to perfect and maintain perfected the security interest in and DIP Liens upon the DIP Collateral granted pursuant to the Security Documents.  The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any DIP Lien granted to or held by the Administrative Agent upon any DIP Collateral (i) upon termination of the Commitments and payment in full of all Loans and all other Obligations of the Borrower known to the Administrative Agent and payable under this Agreement or any other Loan Document; (ii) constituting Property sold or to be sold or disposed of to a Person that is not a Loan Party as part of or in connection with any Disposition permitted hereunder; (iii) consisting of an instrument evidencing Indebtedness or other debt instrument, if the Indebtedness evidenced thereby has been paid in full; or (iv) if approved, authorized or ratified in writing by all the Lenders.  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Administrative Agent's authority to release particular types or items of DIP Collateral pursuant to this Section 8.11, provided that the absence of any such confirmation for whatever reason shall not affect the Administrative Agent's rights under this Section 8.11.

The Lenders hereby irrevocably authorize the Administrative Agent, based upon the instruction of the Required Lenders, to (a) consent to, credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the DIP Collateral at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code and any similar laws in any other jurisdictions in which a Loan Party is subject, (b) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the DIP Collateral at any sale or other disposition thereof conducted under the provisions of the Uniform Commercial Code, including pursuant to Sections 9-610 or 9-620 of the Uniform Commercial Code, or (c) credit bid or purchase (either directly or indirectly through one or more entities) all or any portion of the DIP Collateral at any other sale or foreclosure conducted or consented to by the Administrative Agent (at the direction of the Required Lenders) in accordance with applicable law in any judicial action or proceeding or by the exercise of any legal or equitable remedy. In connection with any such credit bid or purchase, (i) the Obligations owed to the Lenders shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims being estimated for such purpose if the fixing or liquidation thereof would not impair or unduly delay the ability of the Administrative Agent to credit bid or purchase at such sale or other disposition of the DIP Collateral and, if such contingent or unliquidated claims cannot be estimated without impairing or unduly delaying the ability of the Administrative Agent to credit bid at such sale or other disposition, then such claims shall be disregarded, not credit bid, and not entitled to any interest in the DIP Collateral that is the subject of such credit bid or purchase) and the Lenders whose Obligations are credit bid shall be entitled to receive interests (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) in the DIP Collateral that is the subject of such credit bid or purchase (or in the Equity Interests of the any entities that are used to consummate such credit bid or purchase), and (ii) the Administrative Agent, based upon the instruction of the Required Lenders, may accept non-cash consideration, including debt and equity securities issued by any entities used to consummate such credit bid or purchase and in connection therewith the Administrative Agent may reduce the Obligations owed to the Lenders (ratably based upon the proportion of their Obligations credit bid in relation to the aggregate amount of Obligations so credit bid) based upon the value of such non-cash consideration. Except as provided above, the Administrative Agent will not execute and deliver a release of any DIP Lien on any DIP Collateral without the prior written authorization of (y) if the release is of all or substantially all of the DIP Collateral, all of the Lenders, or (z) otherwise, the Required Lenders. Upon request by the Administrative Agent or the Borrower at any time, the Lenders will confirm in writing the Administrative Agent's authority to release any such DIP Liens on particular types or items of DIP Collateral pursuant to this Section 8.11; provided, that (1) anything to the contrary contained in any of the Loan Documents notwithstanding, the Administrative Agent shall not be required to execute any document or take any action necessary to evidence such release on terms that, in the Administrative Agent's reasonable opinion, could expose Administrative Agent to liability or create any obligation or entail any

consequence other than the release of such DIP Lien without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any DIP Liens (other than those expressly released) upon (or obligations of the Borrower in respect of) any and all interests retained by the Borrower, including, the proceeds of any sale, all of which shall continue to constitute part of the DIP Collateral.

**8.12    Action by the Administrative Agent.**

(a)    The Administrative Agent shall be entitled to use its discretion with respect to exercising or refraining from exercising any rights with which it may be vested and with respect to taking or refraining from taking any action or actions which it may be able to take under or in respect of, this Agreement, unless the Administrative Agent shall have been instructed by the Required Lenders to exercise or refrain from exercising such rights or to take or refrain from taking such action; provided that the Administrative Agent shall not exercise any rights under Section 7.3 of this Agreement except upon the request of the Required Lenders or of all the Lenders, where expressly required by this Agreement.  The Administrative Agent shall incur no liability under or in respect of this Agreement with respect to anything which it may do or refrain from doing in the exercise of its judgment or which may seem to it to be necessary or desirable in the circumstances, except for its gross negligence or willful misconduct as determined by a final, non-appealable order of a court having jurisdiction over the subject matter.

(b)    The Administrative Agent shall not be liable to the Lenders or to any Lender in acting or refraining from acting under this Agreement or any other Loan Document in accordance with the instructions of the Required Lenders or of all the Lenders, where expressly required by this Agreement, and any action taken or failure to act pursuant to such instructions shall be binding on all Lenders.

(c)    Notice of Default or Event of Default.  In the event that the Administrative Agent or any Lender shall acquire actual knowledge, or shall have been notified in writing, of any Default (other than through a notice by one party hereto to all other parties), such Lender shall promptly notify the Administrative Agent and the Administrative Agent shall promptly notify the Lenders, and the Administrative Agent shall take such action and assert such rights under this Agreement and the other Loan Documents as the Required Lenders (or all the Lenders, where expressly required by this Agreement) shall request in writing, and the Administrative Agent shall not be subject to any liability by reason of its acting pursuant to any such request.  If the Required Lenders shall fail to request the Administrative Agent to take action or to assert rights under this Agreement in respect of any Default within ten (10) days after their receipt of the notice of any Default from the Administrative Agent or any Lender, or shall request inconsistent action with respect to such Default, the Administrative Agent may, but shall not be required to, take such action and assert such rights as it deems in its discretion to be advisable for the protection of the Lenders, except that, if the Required Lenders have instructed the Administrative Agent not to take such action or assert such right, in no event shall the Administrative Agent act contrary to such instructions.

(d)    Force Majeure. The Administrative Agent shall not be responsible or liable for any failure or delay in the performance of the Administrative Agent's obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond the Administrative Agent's control, including, without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents;

labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

**8.13**    **Successor Administrative Agent**.

(a)    Reorganization.  The Administrative Agent may resign at any time as Administrative Agent under the Loan Documents by giving thirty (30) days' prior written notice thereof to the Lenders and the Borrower.  Upon any such resignation, the Required Lenders shall, with (so long as no Event of Default exists) the consent of the Borrower (which shall not be unreasonably withheld or delayed), have the right to appoint a successor Administrative Agent hereunder that is organized under the laws of the United States of America or a political subdivision thereof.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, with (so long as no Event of Default exists) the consent of the Borrower (which shall not be unreasonably withheld or delayed), appoint a successor Administrative Agent, which shall be a commercial bank organized under the laws of the United States or of any state thereof and having a combined capital and surplus of at least $250,000,000.  Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.  Upon the acceptance of any appointment as Administrative Agent under the Loan Documents by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.  After any retiring Administrative Agent's resignation as Administrative Agent under the Loan Documents, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Administrative Agent under the Loan Documents.

**8.14**    **Legal Representation of Administrative Agent**.  In connection with the negotiation, preparation and execution of this Agreement and the other Loan Documents, and in connection with future legal representation relating to loan administration, amendments, modifications, waivers or enforcement of remedies in connection herewith, King & Spalding LLP has represented only and shall represent only Brightwood Loan Services LLC, in its capacity as Administrative Agent. The Borrower and each other Lender hereby acknowledges that King & Spalding LLP does not represent it in connection with any such matters.

**ARTICLE IX**
**MISCELLANEOUS**

**9.1**    **Waivers, Amendments; etc**.  The provisions of this Agreement, including the closing conditions set forth herein, may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Required Lenders; provided that no amendment, waiver or consent shall:  (a) increase the Commitment of any Lender or subject a Lender to any additional obligations, without the written consent of such Lender, (b) reduce the principal of, or interest on, the Notes or any fees or other amounts payable to any Lender hereunder without the written consent of such Lender, (c) postpone any date fixed for any payment of principal of, or interest on, the Notes or any fees or other amounts payable to any Lender hereunder without the written consent of such Lender, (d) change the number of Lenders which shall be required for the Lenders or any of them to take any action hereunder, unless in writing and signed by all the Lenders, (e) discharge the Borrower from its obligations under the Loan Documents, unless in writing and signed by all the Lenders, (f) amend Section

2.8, this Section 9.1 or the last sentence of Section 2.3, unless in writing and signed by all Lenders or (g) except as specifically permitted hereby or thereby, release or impair the security interest in any of the DIP Collateral granted to the Administrative Agent, for the benefit of the Secured Parties, under the Security Documents or discharge any Guarantor, unless in writing and signed by all the Lenders; provided, further, that no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above to take such action, affect the rights or duties of the Administrative Agent under this Agreement or any Note.

No failure or delay on the part of the Administrative Agent, any Lender or the holder of any Note in exercising any power or right under this Agreement or any Note shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right. No notice to or demand on the Borrower in any case shall entitle it to any notice or demand in similar or other circumstances.

Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

9.2     **Payment Dates**.  Except as expressly provided in this Agreement, whenever any payment to be made hereunder by or to the Lenders or to the holder of any Note shall otherwise be due on a day which is not a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall be included in computing the fees or interest payable on such next succeeding Business Day.

9.3     **Notices**.  All communications and notices provided under this Agreement shall be in writing by in writing (including email or facsimile transmission), telecopy or personal delivery and if to the Borrower addressed or delivered to the Borrower at its address shown on the signature page hereof or if to the Administrative Agent delivered to it at the address shown on Schedule 9.3 attached hereto, or to any party at such other address as may be designated by such party in a notice to the other parties. Any notice shall be deemed given when transmitted by email, telecopier or, when personally delivered, if mailed properly addressed, shall be deemed given upon the third Business Day after the placing thereof in the United States mail, postage prepaid.

9.4     **Costs and Expenses**.  The Borrower agrees to pay, or reimburse, the Administrative Agent for all expenses reasonably incurred for the preparation of this Agreement, including exhibits, and the Loan Documents, the DIP Orders and any amendments hereto or thereto or consents or waivers hereunder or thereunder as may from time to time hereafter be required thereby or by the transactions contemplated hereby, including, but not limited to, the fees and out-of-pocket expenses of the Administrative Agent, charges and disbursements of special counsel to the Administrative Agent from time to time incurred in connection with the preparation and execution of this Agreement, the DIP Orders and any document relevant to this Agreement and the DIP Orders, including the Loan Documents, any amendments hereto or thereto, or consents or waivers hereunder or thereunder, and the consideration of legal questions relevant hereto and thereto. The Borrower agrees to pay, or reimburse, the Administrative Agent and each Lender upon demand for all costs and expenses (including attorneys', auditors' and accountants' fees and expenses) reasonably incurred and arising out of the transactions contemplated by this Agreement and the Loan Documents, in connection with any work-out or restructuring of the transactions contemplated hereby, the

DIP Orders and by the Loan Documents and any collection or enforcement of the obligations of the Borrower hereunder or thereunder, whether or not suit is commenced, including attorneys' fees and legal expenses (limited to one (1) primary counsel for the Administrative Agent and, if deemed appropriate by the Administrative Agent, one (1) counsel in each relevant jurisdiction and any special counsel (except in the case of actual or perceived conflict, in which case one (1) additional counsel for each Lender similarly situated in respect of such conflict)) in connection with any appeal of a lower court's order or judgment. The obligations of the Borrower under this <u>Section 9.4</u> shall survive any termination of this Agreement.

       **9.5**    <u>**Indemnification**</u>.  In consideration of the execution and delivery of this Agreement by the Administrative Agent and the Lenders, the Borrower agrees to indemnify and hold harmless the Administrative Agent, each Lender and their respective Affiliates, officers, directors, employees, shareholders, agents, successors and assigns (the "<u>Indemnified Parties</u>") from and against any and all losses, claims, damages, liabilities and expenses (other than the expenses to be paid or reimbursed pursuant to <u>Section 9.4</u> above), joint or several, to which any such Indemnified Party may become subject arising out of or in connection with this Agreement, the DIP Orders and the other transactions contemplated hereby or the DIP Orders, the Advances and the use of proceeds thereof in connection with any claim, litigation, investigation or proceeding (any of the foregoing, a "<u>Proceeding</u>") relating to any of the foregoing, regardless of whether any such Indemnified Party is a party hereto or whether a Proceeding is brought by a third party or by you any Loan Party or Affiliate of a Loan Party, and to reimburse each such Indemnified Party within ten (10) days of receipt of an invoice for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing; it being understood and agreed that no Loan Party shall be required to reimburse legal fees or expenses of more than one counsel to all Indemnified Parties, taken as a whole and in the case of a conflict of interest where such Indemnified Parties affected by such conflict inform the Borrower of such actual or potential conflict as determined in their sole discretion, one additional counsel to each group of affected Indemnified Parties similarly situated taken as a whole (and, if reasonably necessary as determined by the Administrative Agent, a single local counsel for all Indemnified Parties taken as a whole in each relevant jurisdiction and, in the case of a conflict of interest where such Indemnified Parties affected by such conflict inform the Borrower of such actual or potential conflict as determined in their sole discretion, one additional counsel in each relevant jurisdiction to each group of affected Indemnified Parties similarly situated taken as a whole); <u>provided</u> that the foregoing indemnity will not, as to any Indemnified Party, apply to losses, claims, damages, liabilities or related expenses to the extent (x) they have been determined in a final judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of such Indemnified Party or any Related Indemnified Party (as defined below), (y) they have been determined in a final judgment of a court of competent jurisdiction to have resulted from a material breach of the material obligations of any Indemnified Party or any of its Related Indemnified Parties under this Agreement or any of the Loan Documents at a time when no Loan Party has breached its obligations hereunder in any material respect, or (z) they relate to any dispute solely among Indemnified Parties at a time when no Loan Party has breached its obligations hereunder or any other Loan Document in any material respect (other than any claims against the Administrative Agent in its capacity or in fulfilling its role as Administrative Agent, but not any other person or entity party to any such Proceeding).

       Notwithstanding any other provision of this Agreement or any Loan Document, (i) no Indemnified Party or Related Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems, except to the extent such damages have been determined in a final judgment of a court of competent jurisdiction to have resulted from the willful misconduct, bad faith or gross negligence of any Indemnified Party and (ii) none Loan Parties, any of their Affiliates or any Indemnified Party or Related Indemnified Party shall be liable for any indirect, special, punitive or consequential damages incurred in connection with this Agreement or the transactions contemplated herein (<u>provided</u> that this provision shall not limit the Loan Parties' indemnification obligations set forth above).  For purposes hereof,

a "Related Indemnified Party" of an Indemnified Party means (1) any controlling person or controlled affiliate of such Indemnified Party, (2) the respective directors, trustees, officers, or employees of such Indemnified Party or any of its controlling persons or controlled Affiliates and (3) the respective agents or advisors of such Indemnified Party or any of its controlling persons or controlled Affiliates, in the case of this clause (3), acting at the instructions of such Indemnified Party, controlling person or such controlled Affiliate; provided that each reference to a controlled Affiliate or controlling person in this paragraph pertains to a controlled Affiliate or controlling person involved in the negotiation of this Agreement and the other Loan Documents.

No Loan Party shall be liable for any settlement of any Proceedings effected without the Borrower's consent (which consent shall not be unreasonably conditioned, withheld or delayed), but if settled with the Borrower's written consent or if there is a final judgment for the plaintiff in any such Proceedings, the Borrower agrees to indemnify and hold harmless each Indemnified Party from and against any and all losses, claims, damages, liabilities and expenses by reason of such settlement or judgment in accordance with this Section 9.5. No Loan Party shall, without the prior written consent of an Indemnified Party, effect any settlement or consent to the entry of any judgment of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Indemnified Party, unless (i) such settlement includes an unconditional release of such Indemnified Party in form and substance reasonably satisfactory to such Indemnified Party from all liability on claims that are the subject matter of such Proceedings, and (ii) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of such Indemnified Party.

The provisions of this Section 9.5 shall survive termination of this Agreement and payment in full of the Notes. This Section 9.5 shall not apply with respect to Taxes, other than Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

**9.6** **Severability**. Any provision of this Agreement, the Notes or any other Loan Document executed pursuant hereto which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement, the Notes or any other Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

**9.7** **Headings**. The various headings of this Agreement are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provisions hereof.

**9.8** **Governing Law**. This Agreement and the Notes shall each be deemed to be a contract made under, governed by and interpreted pursuant to the internal laws (and not the law of conflicts) of the State of New York.

**9.9** **Successors and Assigns**.

(a)    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns except that: (i) the Borrower may not assign or transfer its rights hereunder without the prior written consent of all of the Lenders and the Administrative Agent; and (ii) any assignment by a Lender must be made in compliance with subsection (b) below and any participation by a Lender must be made in compliance with subsection (c) below. Notwithstanding clause (ii) of this subsection (a), any Lender may at any time, without the consent of Borrower or the Administrative Agent, assign all or any portion of its rights under this Agreement and its Notes to a Federal Reserve Bank. Except to the extent otherwise required by its context, the word "Lender" where used in this Agreement means and includes any

such assignee and such assignee shall be bound by and have the benefits of this Agreement the same as if such holder had been a signatory hereto.

(b)      Any Lender may, in the ordinary course of its business and in accordance with applicable law, at any time assign to one or more banks or other entities that are Eligible Assignees all or a portion of its Commitments, Advances owing to it, and its rights and obligations under this Agreement in respect thereof in accordance with the provisions of this subsection (b). Each assignment shall be of a constant, and not a varying, ratable percentage of the assigning Lender's rights and obligations under this Agreement and each Eligible Assignee shall assume a pro rata share of the assigning Lender's obligations determined by the percentage of the Commitments assigned for the period from the effective date of the assignment through the Date. Such assignment shall be in form and substance reasonably acceptable to the Administrative Agent (the "Assignment and Assumption Agreement") and shall not be permitted hereunder unless (i) such assignment is for all of such Lender's Commitment and the rights and obligations under this Agreement related thereto, (ii) the amount of the Commitment assigned by the assigning Lender pursuant to each assignment shall be at least $1,000,000, or (iii) such assignment is to another Lender or an Affiliate of a Lender, in which case no minimum amount shall apply.  The consent of the Administrative Agent shall be required prior to an assignment becoming effective with respect to a transferee which is not a Lender, an Affiliate of a Lender, or an Approved Fund. Upon (i) delivery to the Administrative Agent of an executed Assignment and Assumption Agreement, together with any required consents and (ii) payment of a $3,500 fee to the Administrative Agent for processing such assignment, such assignment shall become effective on the effective date specified in such Assignment and Assumption Agreement; provided that (a) if an assignment by a Lender is made to an Affiliate or an Approved Fund of such assigning Lender, then no assignment fee shall be due in connection with such assignment and (b) if an assignment by a Lender is made to an assignee that is not an Affiliate or Approved Fund of such assignor Lender, and concurrently to one or more Affiliates or Approved Funds of such assignee, then only one assignment fee of $3,500 shall be due in connection with such assignment (unless waived or reduced by the Administrative Agent).  On and after the effective date of such assignment, such transferee, if not already a Lender, shall for all purposes be a Lender party to this Agreement and any other Loan Documents executed by the Lenders and shall have all the rights and obligations of a Lender under the Loan Documents, to the same extent as if it were an original party hereto, and no further consent or action by the Borrower, the Lenders or the Administrative Agent shall be required to release the transferor Lender with respect to the percentage of the  Commitment and Advances assigned to such transferee Lender.   To the extent requested by the applicable Lenders, upon the consummation of any assignment pursuant to this Section 9.9, the Administrative Agent and the Borrower shall make appropriate arrangements so that replacement Notes are issued to such transferor Lender and new Notes or, as appropriate, replacement Notes, are issued to such transferee Lender, in each case in principal amounts reflecting their Commitment, as adjusted pursuant to such assignment.

(c)      Each Lender may, without the consent of the Borrower, sell participations to one or more banks or other entities that are Eligible Assignees in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment, the Loans owing to it, hereunder); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other entities shall be entitled to the benefit of, and obligations under, Section 10.1 and of the cost protection provisions contained in Section 10.4, as well as Sections 9.19 and 10.6 to the extent of the Lender selling such participation and the Borrower's aggregate obligations with respect to Section 10.1 and Section 10.4 shall not be increased by reason of such participation, provided that such participant

74

shall not be entitled to the benefits of Sections 10.1 and 10.4 unless such participant complies with Section 10.1(e) as (and to the extent) applicable, as if such participant were a Lender (it being understood that the documentation required under Section 10.1(e) shall be delivered to the participating Lender) (iv) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right (and shall not limit its rights) to enforce the obligations of the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers with respect to any fees payable hereunder (to the extent such participants are entitled to such fees) or the amount of principal of or the rate at which interest is payable on the Loans, or the dates fixed for payments of principal of or interest on the Loans). Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any person except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement.

(d)     The Administrative Agent shall maintain a copy of each Assignment and Assumption Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and the principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement and the other Loan Documents, notwithstanding notice to the contrary. It is the intent of the parties that the Obligations shall be treated as issued in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. Upon the Administrative Agent's receipt of a duly completed Assignment and Assumption Agreement executed by an assigning Lender, an assignee Lender that is an Eligible Assignee and, to the extent required hereunder, the Borrower, such Eligible Assignee's completed Administrative Questionnaire (unless the assignee is already a Lender), the fee referred to in Section 9.9(b) above, and any written consent to such assignment required by such subsection, the Administrative Agent shall accept such Assignment and Assumption Agreement and record the information contained therein in the Register. No assignment shall be effected for purposes of this Agreement unless it has been recorded in the Register as provided in this subsection.

(e)     Notwithstanding anything to the contrary contained in this Section 9.9, a Lender that is a fund that invests in bank loans may pledge all or a portion of its rights in connection with this Agreement to the trustee or other agent for holders of obligations owed, or securities issued, by such fund as security for such obligations or securities, provided that any foreclosure or other exercise of remedies by such trustee shall be subject, in all respects, to the provisions of this Section 9.9 regarding assignments. No pledge described in the immediately preceding sentence shall release any such Lender from its obligations hereunder.

(f)     Except as specifically set forth in this Section 9.9, nothing in this Agreement, expressed or implied, is intended to or shall confer on any Person other than the respective parties hereto and thereto and their successors and assignees permitted hereunder and

thereunder any benefit or any legal or equitable right, remedy or other claim under this Agreement or any Notes.

(g)     The provisions of this Section 9.9 shall not apply to any purchase of participations among the Lenders pursuant to Section 2.5.

(h)     In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Loan Percentage.  Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(i)     To the extent that any assignment is purported to be made to a Disqualified Lender, such Disqualified Lender shall be required immediately (and in any event within five (5) Business Days) to assign all Loans and Commitments then owned by such Disqualified Lender to another Lender (other than a Defaulting Lender) or Eligible Assignee (and the Borrower shall be entitled to seek specific performance in any applicable court of law or equity to enforce this sentence).

**9.10**     **Execution in Counterparts**.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**9.11**     **Several Liability**.  The Obligations of the Administrative Agent and each of the Lenders hereunder are several, not joint.

**9.12**     **Financial Information**.  The Borrower assumes responsibility for keeping itself informed of its own financial condition and the financial condition of any and all endorsers and/or other guarantors of all or any part of the Obligations, and of all other circumstances bearing upon the risk of nonpayment of the Obligations, or any part thereof, that diligent inquiry would reveal, and the Borrower agrees that the Administrative Agent and the Lenders shall have no duty to advise the Borrower of information known to them regarding such condition or any such circumstances.

**9.13**     **Entire Agreement**.  Except as otherwise expressly provided herein, this Agreement and the other documents described or contemplated herein embody the entire agreement and understanding among the parties hereto and thereto and supersede all prior agreements and understandings relating to the subject matter hereof and thereof.

**9.14**     **Other Relationships**.  No relationship created hereunder or under any other Loan Document shall in any way affect the ability of the Administrative Agent or its Affiliates and each Lender

or their respective Affiliates to enter into or maintain business relationships with the Borrower beyond the relationships specifically contemplated by this Agreement and the other Loan Documents.

9.15    **Consent to Jurisdiction**.  BORROWER HEREBY IRREVOCABLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF FLORIDA, AND IF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF FLORIDA DOES NOT HAVE, OR ABSTAINS FROM EXERCISING JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY AND OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF (EXCEPT TO THE EXTENT THAT THE PROVISIONS OF THE BANKRUPTCY CODE ARE APPLICABLE AND SPECIFICALLY CONFLICT WITH THE FOREGOING), OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE NOTES OR ANY OTHER LOAN DOCUMENT AND HEREBY IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF FLORIDA OR SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  BORROWER HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT IT MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING.    EACH PARTY IRREVOCABLY CONSENTS TO THE SERVICE OF COPIES OF THE SUMMONS AND COMPLAINT AND ANY OTHER PROCESS WHICH MAY BE SERVED IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING BY UNITED STATES CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OF COPIES OF SUCH PROCESS TO BORROWER'S ADDRESS REFERENCED IN SECTION 9.3.  EACH PARTY AGREES THAT A JUDGMENT, FINAL BY APPEAL OR EXPIRATION OF TIME TO APPEAL WITHOUT AN APPEAL BEING TAKEN, IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.    NOTHING IN THIS SECTION SHALL AFFECT THE RIGHT OF ANY PARTY TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT THE RIGHT OF THE ADMINISTRATIVE AGENT, ANY LENDER TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION. NOTWITHSTANDING ANY OTHER PROVISION OF THIS SECTION 9.15, THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY ACTION OR DISPUTE INVOLVING, RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS.

9.16    **Waiver of Jury Trial**.  THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY NOTE, OR ANY OTHER INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

9.17    **USA Patriot Act**.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the Act. The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to

comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**9.18** **Confidentiality**.

(a)    Each of the Administrative Agent, each Lender agree to maintain the confidentiality of information obtained by it pursuant to any Loan Document, except that such information may be disclosed (i) with the Borrower's written consent, (ii) in any legal, judicial, administrative proceeding or compulsory process or otherwise as required by applicable law or regulations (in which case such Person agrees to promptly notify the Borrower to the extent practicable and permitted by applicable law); (iii) upon the request or demand of any Governmental Authority having jurisdiction over the Administrative Agent, such Lender or their respective Affiliates (in which case such Person agrees to, except with respect to any audit or examination conducted by bank accountants, any governmental bank or insurance regulatory authority exercising examination or regulatory authority, or any regulatory requests made by the National Association of Insurance Commissioners, promptly notify the Borrower to the extent lawfully permitted to do so); (iv) to officers, directors, trustees, agents, members, partners, equity holders, approved and managed funds, employees, attorneys, accountants and advisors of the Administrative Agent or any Lender who are informed of the confidential nature of such information and are or have been advised of their obligation to keep such information confidential solely on a need-to-know basis in connection with the transactions contemplated by this Agreement; (v) to any Affiliates of the Administrative Agent or any Lender (provided that any such Affiliate is advised of its obligation to retain such information as confidential) on a need-to-know basis in connection with the transactions contemplated by this Agreement; (vi) to the extent any such information becomes publicly available other than by reason of disclosure in breach of this Agreement; and (vii) in connection with the exercise or enforcement of any right or remedy under any Loan Document.

**9.19** **Replacement of Lenders**.  If the Borrower is entitled to replace a Lender pursuant to the provisions of Section 10.6, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.9), all of its interests, rights (other than its existing rights to payments pursuant to Sections 10.1 and 10.4 with respect to payments made prior to such assignment) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)    the Borrower shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 9.9(b);

(b)    such Lender shall have received payment of an amount equal to 100% of the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 10.5) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 10.4 or payments required to be made pursuant to Section 10.1, such assignment will result in a reduction in such compensation or payments thereafter;

(d)        such assignment does not conflict with applicable Laws; and

(e)        in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**9.20**    **[Reserved]**.

**9.21**    **Electronic Execution of Assignments and Certain Other Documents**.  The words "delivery," "execute," "execution," "signed," "signature," and words of like import in any Loan Document or any other document executed in connection herewith shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act; provided that notwithstanding anything contained herein to the contrary neither the Administrative Agent nor any Lender is under any obligation to agree to accept electronic signatures in any form or in any format unless expressly agreed to by the Administrative Agent or such Lender pursuant to procedures approved by it and provided further without limiting the foregoing, upon the request of any party, any electronic signature shall be promptly followed by such manually executed counterpart.

**9.22**    **[Reserved]**.

**9.23**    **Acknowledgement and Consent to Bail-In of EEA Financial Institutions**.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)        the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)        the effects of any Bail-In Action on any such liability, including, if applicable:

(1)        a reduction in full or in part or cancellation of any such liability;

(2)        a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(3)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

9.24    **Conflict; Control**.  In the event of any inconsistency between the terms and conditions of the Loan Documents, the Interim DIP Order or Final DIP Order, the provisions of the Interim DIP Order or Final DIP Order, as the case may be, shall govern and control.

9.25    **Bankruptcy Matters**.  This Agreement, the other Loan Documents, and all Liens and DIP Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Debtor, the estate of each Debtor, and any trustee, other estate representative or any successor in interest of any Debtor in any Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of each Administrative Agent and the Lenders and their respective assigns, transferees and endorsees.  The DIP Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case or any other bankruptcy case of any Debtor to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any Chapter 11 Case or the release of any DIP Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent file financing statements or otherwise perfect its DIP Liens under applicable law.  No Loan Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of the Administrative Agent and the Lenders.  Any such purported assignment, transfer, hypothecation or other conveyance by any Loan Party without the prior express written consent of the Administrative Agent and the Lenders shall be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Loan Party, the Administrative Agent and the Lenders with respect to the transactions contemplated hereby and no Person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

The Administrative Agent is hereby authorized and directed by the Lenders to execute and deliver this Agreement and any additional Loan Documents entered into in connection with the subject matter of this Agreement, in its capacity as Administrative Agent, and, by its execution below, each of the undersigned Lenders agrees to be bound by the terms and conditions of this Agreement and such other Loan Documents. The Administrative Agent shall have all of the benefits, indemnities, powers, privileges, protections and rights contained in this Agreement (including, for the avoidance of any doubt, Article IX) in connection with acting in its capacity as Administrative Agent hereunder.

**ARTICLE X**
**TAXES, YIELD PROTECTION AND ILLEGALITY**

10.1    **Taxes**.

(a)    Payments Free of Taxes; Obligation to Withhold; Payments on Account of Taxes.

(i)    Any and all payments by or on account of any obligation of any Borrower or Guarantor under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Laws.  If any applicable Laws (as determined in the good faith discretion of the applicable withholding agent) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or a Borrower or Guarantor, then the Administrative Agent or such Borrower or Guarantor shall be entitled to make such deduction or

withholding, upon the basis of the information and documentation to be delivered pursuant to subsection (e) below.

(ii)     If any Borrower or Guarantor or the Administrative Agent shall be required by the Code to withhold or deduct any Taxes, including both United States federal backup withholding and withholding taxes, from any payment on account of any obligation of the Borrower or Guarantor under any Loan Document, then (A) the Administrative Agent shall withhold or make such deductions as are determined by the Administrative Agent to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) the Administrative Agent shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with the Code and provide evidence of such payment to the Borrower, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower or Guarantor shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 10.1) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(iii)     If any Borrower or Guarantor or the Administrative Agent shall be required by any applicable Laws other than the Code to withhold or deduct any Taxes from any payment on account of any obligation of the Borrower or Guarantor under any Loan Document, then (A) such Borrower or Guarantor or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to subsection (e) below, (B) such Borrower or Guarantor or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and, if paid by the Administrative Agent, the Administrative Agent shall provide evidence of such payment to the Borrower, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the applicable Borrower or Guarantor shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 10.1) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(b)     Payment of Other Taxes by Borrower and/or Guarantor.  Without limiting the provisions of subsection (a) above, Borrower and/or Guarantor shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     Tax Indemnifications.

(i)     Each Borrower and Guarantor shall, and does hereby, jointly and severally indemnify each Recipient, and shall make payment in respect thereof within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 10.1) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(ii)     Each Lender shall, and does hereby, severally indemnify and shall make payment in respect thereof within ten (10) days after demand therefor, the Administrative Agent against (A) any Indemnified Taxes attributable to such Lender (but only to the extent that any Borrower or Guarantor has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Borrower and/or Guarantor to do so), (B) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.9(c) relating to the maintenance of a Participant Register, and (C) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document or otherwise payable by the Administrative Agent, Borrower or Guarantor from any other source against any amount due to the Administrative Agent under this clause (ii).

(d)     Evidence of Payments.  As soon as practicable after any payment of Taxes by any Borrower or Guarantor to a Governmental Authority, as provided in this Section 10.1, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Status of Lenders; Tax Documentation.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 10.1(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that the Borrower is a U.S. Person,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender o under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)    executed originals of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable); or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or W-8BEN, as applicable), a U.S. Tax Compliance Certificate, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate satisfactory to the Administrative Agent on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies (or originals, as required) of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made;

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply

with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement; and

(E)    the Administrative Agent shall deliver to the Borrower on or prior to the date on which the Administrative Agent becomes the Administrative Agent under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower), executed copies of IRS Form W-9 certifying that the Administrative Agent is a U.S. Person exempt from U.S. federal backup withholding tax.

(iii)    Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 10.1 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(f)    Treatment of Certain Refunds. Unless required by applicable Laws, at no time shall the Administrative Agent have any obligation to file for or otherwise pursue on behalf of a Lender, or have any obligation to pay to any Lender, any refund of Taxes withheld or deducted from funds paid for the account of such Lender. If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes ("Refund") as to which it has been indemnified by any Borrower or Guarantor or with respect to which any Borrower or Guarantor has paid additional amounts pursuant to this Section 10.1, it shall pay to such Borrower or Guarantor an amount equal to such Refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower or Guarantor under this Section 10.1 with respect to the Taxes giving rise to such Refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such Refund), provided that each Borrower or Guarantor, upon the request of the Recipient, agrees to repay the amount paid over to such Borrower or Guarantor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such Refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to such Borrower or Guarantor pursuant to this subsection the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such Refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Borrower or Guarantor or any other Person.

(g)    Survival. Each party's obligations under this Section 10.1 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

**10.2**    **Illegality**. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its Lending Office to make, maintain or fund Loans whose interest is determined by reference to the Prime Rate, or to determine or charge interest rates based upon the Prime Rate, or any Governmental Authority has imposed material restrictions on the authority of such Lender to purchase or sell, or to take deposits of, Dollars in the Prime Rate market, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any

obligation of such Lender to make or continue Prime Rate Loans shall be suspended. Upon receipt of such notice, the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Loans of such Lender to interest benchmark to be reasonably agreed between the Borrower and the Required Lenders, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Prime Rate Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Prime Rate Loans. Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.

**10.3** **Inability to Determine Rates**.

(a)      If in connection with any request for a Prime Rate Loan or a continuation thereof, (i) the Administrative Agent determines that adequate and reasonable means do not exist for determining the Prime Rate for any requested Interest Period with respect to a proposed Prime Rate Loan (such a loan, an "<u>Impacted Loans</u>") or (ii) the Administrative Agent or the Required Lenders determine that for any reason Prime Rate for any requested Interest Period with respect to a proposed Prime Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender. Thereafter, the obligation of the Lenders to make or maintain Prime Rate Loans shall be suspended (to the extent of the affected Prime Rate Loans or Interest Periods) until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, the Borrower may revoke any pending request for an Advance of or continuation of Prime Rate Loans (to the extent of the affected Prime Rate Loans or Interest Periods).

**10.4** **Increased Costs**.

(a)      <u>Increased Costs Generally</u>. If any Change in Law shall:

(i)      impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement contemplated by <u>Section 10.4(e)</u>);

(ii)      subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes) and (C) Connection Income Taxes on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)      impose on any Lender any other condition, cost or expense affecting this Agreement.

(b)      <u>Capital Requirements</u>. If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender, or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's for any such reduction suffered.

(c)      Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or such Lender's holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)      Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 10.4 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs or reductions suffered more than nine (9) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period referred to above shall be extended to include the period of retroactive effect thereof).

**10.5      Funding Losses**.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, which demand shall set forth in reasonable detail the basis for requesting such amount, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost, liability or expense (excluding loss of anticipated profits or margin) actually incurred by it as a result of:

(a)      any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)      any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower; or

(c)      any assignment of a Prime Rate Loan on a day other than the last day of the Interest Period therefor as a result of a request by the Borrower pursuant to Section 9.19; including any loss or expense (excluding loss of anticipated profits or margin) actually incurred by reason of the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.  The Borrower shall also pay any customary administrative fees charged by such Lender in connection with the foregoing.

**10.6      Mitigation Obligations; Replacement of Lenders**.

(a)      Designation of a Different Lending Office.  If any Lender requests compensation under Section 10.4, or requires the Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 10.1, or if any Lender gives a notice pursuant to Section 10.2, then at the request of the Borrower, such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 10.1 or 10.4, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 10.2, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees

to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 10.4</u>, or if the Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 10.1</u> and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with <u>Section 10.6(a)</u> that eliminates the need to pay additional amounts for Indemnified Taxes under <u>Section 10.1</u> or compensation under <u>Section 10.4</u>, the Borrower may replace such Lender in accordance with <u>Section 9.19</u>.

**10.7    Survival**.  All of the Borrower's obligations under <u>Sections 10.4</u> and <u>10.5</u> shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent.

[Signature pages follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

**HOLDINGS**

**DR SUB, LLC**, a Delaware limited liability company

By: 

Name: Harvey Tepner
Title: Authorized Signatory

**BORROWER**

**DELPHI INTERMEDIATE HEALTHCO, LLC**, a Delaware limited liability company

By: 

Name: Harvey Tepner
Title: Authorized Signatory

**DELPHI HEALTH BUYERCO, LLC**, a Delaware limited liability company

By: 

Name: Harvey Tepner
Title: Authorized Signatory

**SUMMIT HEALTH BUYERCO, LLC**, a Delaware limited liability company

By: 

Name: Harvey Tepner
Title: Authorized Signatory

**DBHG HOLDING COMPANY, LLC**, a Delaware limited liability company

By: 

Name: Harvey Tepner
Title: Authorized Signatory

**DELPHI BEHAVIORAL HEALTH GROUP, LLC**, a Delaware limited liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**OCEAN BREEZE RECOVERY, LLC**, a Florida limited liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**DELPHI HEALTH GROUP, LLC**, a Delaware limited liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**LAS OLAS RECOVERY LLC**, a Florida limited liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**OCEAN BREEZE DETOX, LLC**, a Florida limited liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**NEXT STEP HOUSING LLC**, a Florida limited liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**PALM BEACH RECOVERY, LLC**, a Florida limited liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**ROGERS LEARNING, LLC**, a Florida limited liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**BANYAN RECOVERY INSTITUTE, LLC**, a Florida limited liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**CALIFORNIA ADDICTION TREATMENT CENTER LLC**, a Delaware limited liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**ALOFT RECOVERY LLC (formerly known as Elevate Recovery, LLC)**, a Delaware limited liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**MARYLAND HOUSE DETOX, LLC**, a Delaware limited liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

*[DIP Credit Agreement Signature Page]*

**CALIFORNIA VISTAS ADDICTION TREATMENT LLC**, a Delaware limited liability company

By: _____

Name: Harvey Tepner

Title: Authorized Signatory

**BREAKTHROUGH LIVING RECOVERY COMMUNITY, LLC**, a Delaware limited liability company

By: _____

Name: Harvey Tepner

Title: Authorized Signatory

**DEFINING MOMENT RECOVERY COMMUNITY, LLC**, a Delaware limited liability company

By: _____

Name: Harvey Tepner

Title: Authorized Signatory

**NEW PERSPECTIVES, LLC**, a Delaware limited liability company

By: _____

Name: Harvey Tepner

Title: Authorized Signatory

**ONWARD LIVING RECOVERY COMMUNITY, LLC**, a Delaware limited liability company

By: _____

Name: Harvey Tepner

Title: Authorized Signatory

**DESERT VIEW RECOVERY COMMUNITY, LLC**,
a Delaware limited liability company



By: _____
Name: Harvey Tepner
Title: Authorized Signatory

**SUMMIT BEHAVIORAL HEALTH LIMITED
LIABILITY COMPANY**, a New Jersey limited
liability company



By: _____
Name: Harvey Tepner
Title: Authorized Signatory

**SUMMIT IOP LIMITED**, a Pennsylvania limited
liability company



By: _____
Name: Harvey Tepner
Title: Authorized Signatory

**QBR DIAGNOSTICS, LLC**, a New Jersey limited
liability company

By: _____
Name: Harvey Tepner
Title: Authorized Signatory

**SBH HAVERHILL, LLC**, a Massachusetts limited
liability company

By: _____
Name: Harvey Tepner
Title: Authorized Signatory

*[DIP Credit Agreement Signature Page]*

**PEAK HEALTH NJ, LLC**, a New Jersey limited
liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**SBH UNION IOP LLC**, a New Jersey limited liability
company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**UNION FRESH START LLC**, a New Jersey limited
liability company

By: 
Name: Harvey Tepner
Title: Authorized Signatory

**SUMMIT AT FLORHAM PARK, LLC**, a New Jersey
limited liability company

By:
Name: Harvey Tepner
Title: Authorized Signatory

**61 BROWN STREET HOLDINGS, LLC**, a
Massachusetts limited liability company

By:
Name: Harvey Tepner
Title: Authorized Signatory

**THE AGENT**

**BRIGHTWOOD LOAN SERVICES LLC**, in its capacity as Agent

By: _____
Name: Sengal Selassie
Title: Managing Member

By: _____
Name: Jennifer Patrickakos
Title: Head of Loan Operations

*[DIP Credit Agreement Signature Page]*

**"LENDERS"**

**BCOF CAPITAL, LP**, as a Lender

By: BCOF Capital Managers, LLC, its General Partner

By: _____
     Name:    Sengal Selassie
     Title:     Managing Member

By: _____
     Name:    Jennifer Patrickakos
     Title:     Head of Loan Operations

**BRIGHTWOOD CAPITAL CO-INVEST FUND, LP**, as a Lender

By: Brightwood Capital Fund Managers IV, LLC, its General Partner

By: _____
     Name:    Sengal Selassie
     Title:     Managing Member

By: _____
     Name:    Jennifer Patrickakos
     Title:     Head of Loan Operations

**BRIGHTWOOD CAPITAL FUND III-U, LP**, as a Lender

By: Brightwood Capital Fund Managers III, LLC, its General Partner

By: _____
    Name:    Sengal Selassie
    Title:    Managing Member

By: _____
    Name:    Jennifer Patrickakos
    Title:    Head of Loan Operations

**BRIGHTWOOD CAPITAL FUND III HOLDINGS, LP**, as a Lender

By: Brightwood Capital Fund Managers IV, LLC, its Manager

By: _____
Name:    Sengal Selassie
Title:    Managing Member

By: _____
Name:    Jennifer Patrickakos
Title:    Head of Loan Operations

**BRIGHTWOOD CAPITAL FUND IV, LP**, as a Lender

By: Brightwood Capital Fund Managers IV, LLC, its General Partner

By: _____
    Name:    Sengal Selassie
    Title:    Managing Member

By: _____
    Name:    Jennifer Patrickakos
    Title:    Head of Loan Operations

**BRIGHTWOOD CAPITAL FUND IV-U, LP**, as a Lender

By: Brightwood Capital Fund Managers IV, LLC, its General Partner

By: _____
    Name:    Sengal Selassie
    Title:    Managing Member

By: _____
    Name:    Jennifer Patrickakos
    Title:    Head of Loan Operations

*[DIP Credit Agreement Signature Page]*

**BRIGHTWOOD CAPITAL OFFSHORE FUND IV, LP**, as a Lender

By: Brightwood Capital Fund Managers IV, LLC, its General Partner

By: _____
    Name:    Sengal Selassie
    Title:    Managing Member

By: _____
    Name:    Jennifer Patrickakos
    Title:    Head of Loan Operations

**BRIGHTWOOD CAPITAL OFFSHORE FUND IV-U, LP**, as a Lender

By: Brightwood Capital Fund Managers IV, LLC, its General Partner

By: _____
    Name:    Sengal Selassie
    Title:    Managing Member

By: _____
    Name:    Jennifer Patrickakos
    Title:    Head of Loan Operations

**DEERPATH CAPITAL ADVANTAGE V-B HOLDINGS, LP**, as a Lender

By: Deerpath Capital GenPar V, LLC, its General Partner

By: _____
      Name:    Anish Bahl
      Title:     Vice President, Secretary and Chief Financial Officer

**DEERPATH CAPITAL HOLDINGS, SLP**, represented by its managing general partner, Deerpath Capital GP S.á.r.l., as a Lender

By: _____
      Name:    Anish Bahl
      Title:     Vice President, Secretary and Chief Financial Officer

**DEERPATH FUNDING ADVANTAGE IV, LP**, as a Lender

By: Deerpath Capital Management, LP, its Investment Manager

By: _____
      Name:    Anish Bahl
      Title:     Vice President, Secretary and Chief Financial Officer

**DEERPATH PARTNERS HOLDINGS, LTD.**, as a Lender

By: Deerpath Capital Advantage IV (Cayman), LP, its sole shareholder

By: Deerpath Capital GenPar IV, LLC, its General Partner

By: _____

      Name:    Anish Bahl
      Title:     Vice President, Secretary and Chief Financial Officer


**DEERPATH PARTNERS, LLC**, as a Lender

By: _____

      Name:    Anish Bahl
      Title:     Vice President, Secretary and Chief Financial Officer

*[DIP Credit Agreement Signature Page]*

## Schedule I

Lenders/Commitments

| Commitment Party | New Money DIP Facility Commitment Percentage | New Money DIP Loan Amount |
|---|---|---|
| Deerpath Capital Advantage V-B Holdings, LP | 0.544203% | $59,862.32 |
| Deerpath Capital Holdings, SLP | 3.526212% | $387,883.30 |
| Deerpath Funding Advantage IV, LP | 7.16347% | $787,981.70 |
| Deerpath Partners Holdings, Ltd | 3.729197% | $410,211.60 |
| Deerpath Partners, LLC | 3.520119% | $387,213.10 |
| BCOF Capital, LP | 19.389092% | $2,132,800.14 |
| Brightwood Capital Co-Invest Fund, LP | 0.165529% | $18,208.17 |
| Brightwood Capital Fund III Holdings, LP | 25.347458% | $2,788,220.33 |
| Brightwood Capital Fund III-U, LP | 1.173810% | $129,119.05 |
| Brightwood Capital Fund IV, LP | 22.244771% | $2,446,924.77 |
| Brightwood Capital Fund IV-U LP | 0.056630% | $6,229.30 |
| Brightwood Capital Fund IV-U, LP | 0.599622% | $65,958.45 |
| Brightwood Capital Offshore Fund IV, LP | 10.413552% | $1,145,490.76 |
| Brightwood Capital Offshore Fund IV-U, LP | 2.126336% | $233,897.01 |
| Total: | 100% | $11,000,000.00 |

## Schedule 4.6

### Litigation

| Cases | Counsel | Notes |
|---|---|---|
| **3030 Harbor LLC v. Defining Moment Recovery Community**<br>Case No. CACE22014533 (Broward)<br>Count I – Breach Lease Agreement<br>Count II – LL Lien & Distress for Rent | **Gail A. McQuilkin (Counsel for Plaintiff 3030 Harbor LLC)**<br>Jeffrey J. Leavitt<br>KOZYAK TROPIN & THROCKMORTON LLP<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, Florida 33134<br>O: (305) 372-1800<br>gam@kttlaw.com<br>jleavit@kttlaw.com | Pending. Plaintiff has propounded initial written discovery. Responses to interrogatory requests for production due 2/7/23. |
| AdTaxi | **Robert B. Hollis**<br>Szabo Associates, Inc.<br>3355 Lenox Road NE, Suite 945<br>Atlanta, GA 30326<br>O: (404) 266-2464 ext. 1412 | $22,500 owed; could settle for less. |
| Allbritton, Stephen (Boys Ranch Road) | **Barry G. Roderman (Counsel for Plaintiff)**<br>Barry G. Roderman & Associates, P.A.<br>633 SE 3rd Avenue, Suite 4R<br>Fort Lauderdale, FL 33301<br>O: (954) 761-8810<br>bgr@barryroderman.com | Loss date: 07/23/19<br>Lawsuit pending with an amended complaint dated 12/1/22 naming the landlord (18307 Boys Ranch Rd Owner, LLC) as a defendant; notice of claim filed with our insurer (Allied World); coverage was denied under the general liability policy and under the D&O policy; no Borrower entity has been named as a defendant and the landlord seeks a defense and indemnification (as an additional insured) from the Borrower entity. |
| Alli King | | Claims wrongful termination-no formal<br>pre-suit activity yet |
| Baltimore Detox Center v. DR Parent, LLC | **Eric S. Mueller (Counsel for Delphi)**<br>500 E. Pratt Street, Suite 600<br>Baltimore, MD 21202<br>O: (410) 962-5265<br>Eric.mueller@wilsonelser.com<br><br>**Robert Gaumont (Counsel for Plaintiff)**<br>**Gordon Feinblatt LLC**<br>233 East Redwood Street<br>Baltimore, MD 21202<br>O: (410) 576-4003<br>rgaumont@gfrlaw.com | Loss date: 07/18/19<br>Defamation/tortious<br>03/25/20 Settlement (we have a copy of the<br>signed settlement agreement but not fully executed) |
| LD v. United Healthcare Ins. Co., et al | **David M. Lilienstein (counsel for Plaintiff and the Putative Class)** | Pending, see docket sheet; non-party. |

| | | |
|---|---|---|
| Case No. 4:20-cv-02254-YGR (Northern District of California) | Katie J. Spielman<br>DL Law Group<br>345 Franklin St.<br>San Francisco, CA 94102<br>O: (415) 678-5050<br>david@dllawgroup.com<br>katie@dllawgroup.com<br><br>Matthew M. Lavin (pro hac vice)<br>Aaron R. Modiano<br>Arnall Golden Gregory LLP<br>1775 Pennsylvania Ave., NW, Suite 1000<br>Washington, DC 20006<br>Matt.lavin@agg.com<br>Aaron.modiano@agg.com | |
| RJ, et al. v. Chlic, et al.<br>Case No. 5:20-cv-02255-EJD (Northern District of California) | **William P. Donovan, Jr. (Counsel for Cigna Health and Life Insurance Company)**<br>2049 Century Park East, Suite 3200<br>Los Angeles, CA 90067-3206<br>O: (310) 277-4110<br>wdonovan@mwe.com<br><br>Joshua B. Simon (pro hac vice)<br>Warren Haskel<br>Dmitriy Tishyevich<br>Caroline Incledon<br>Chelsea Cosillos<br>McDermott Will & Emery LLP<br>One Vanderbilt Avenue<br>New York, NY 10017<br>jsimon@mwe.com<br>whaskel@mwe.com<br>dtishyevich@mwe.com<br>cincledon@mwe.com<br>ccosillos@mwe.com | Pending, see docket sheet; as a non-party, we provided the declaration of Michael Borkowski instead of a 30(b)(6) deposition |
| Campbellton-Graceville Hospital<br>Case No. 17-40185-KKS (Northern District of Florida – Tallahassee) | **Michael G. Austin (Counsel for Delphi)**<br>McDermott Will & Emery<br>333 SE 2nd Avenue, Suite 4500<br>Miami, FL 33131-4336<br>O: (305) 347-6517<br>maustin@mwe.com | Loss date: 03/22/19<br>3rd Party in Bankruptcy Case |
| Joelle Chalet | **Sheri Gipson**<br>**Claims Specialist**<br>Management Liability Claims<br>Ironshore<br>28 Liberty Street, 5th Floor<br>O: (212) 208-8890 | Loss date: 05/22/19<br>-Appears to be a patient complaint of<br>improper sexual contact by a Serenity New Jersey employee<br>-No case seems to have been filed; no counsel assigned.<br>-Carrier (Ironshore) put on notice |
| Charles, Lisa Marie v. DR Parent, LLC | **Becky Greenfield (Counsel for Delphi)**<br>**O: (786) 409-0803** | Loss: 09/16/20<br>Discrimination<br>03/31/21 Case closed by EEOC |

| | | |
|---|---|---|
| | | with no findings |
| Cigna | | Demand letter of 9/30/2022<br>Post-payment review<br>Audited damages total refund sought: **$5,926,980.28** |
| Cynthia Curtis v. Maryland House Detox, LLC, et al. (Arunde County, MD)<br>Case No. C-02-cv-20-000674<br>**Count I Breach of K** – MHD<br>**Count II Violation MD Wage Payment and Collection Law – MHD and Delphi**<br>seeks joint and several- unpaid wages<br>joint and several treble damages<br>joint and several fees costs expenses<br>**Count III Breach of K – DCX and Stup**<br>Breach DCX Operating Agreement<br>Compel dissolution of DCX and distribute 250k DHH class B units to her | **Yoora Pak (Counsel for Defendants MHD and Delphi)**<br>Christina M. Heischmidt (pro hac vice)<br>8444 Westpark Drive, Suite 510<br>McLean, VA 22102<br>O: (703) 245-9300<br>Yoora.pak@wilsonelser.com<br>Christina.heischmidt@wilsonelser.com<br><br>**Marc J. Smith (Counsel for Plaintiff)**<br>Law Office of Marc J. Smith, LLC<br>401 North Washington Street<br>Suite 500<br>Rockville, Maryland 20850<br><br>Jeffrey D. Goldstein<br>Law Office of Jeffrey D. Goldstein, LLC<br>9211 Corporate Boulevard, Suite 350<br>Rockville, Maryland 20850<br><br>Steven M. Pavsner<br>Joseph, Greenwald & Laake, P.A<br>6404 Ivy Lane, Suite 400<br>Greenbelt, Maryland 20770<br><br>**Steven A. Allen (Counsel for Defendant DCX Group, LLC and David Stup)**<br>Pessin Katz Law P.A.<br>901 Dulaney Valley Road, Suite 500<br>Towson, Maryland 21204 | Loss date: 11/30/18<br>Set for bench trial March 22-24<br>Discovery cut off Jan. 31<br>Insurance providing a defense-ROR<br>exclusions for wage/breach of contract claims<br>Plaintiff was deposed on January 27, 2023<br>Michael Borkowski was deposed on January 31, 2023, in his individual capacity, as representative of Maryland House Detox, LLC, and as representative of Delphi Behavioral Health Group, LLC. |
| Cyber Incident/policy claim | See Schedule 4.21. | Key Bank<br>$536,031.60 recovered. |
| Danchuk v. DR Parent, LLC | | Loss date: 09/30/18<br>Wages<br>07/01/20 Settled |
| DelVacchio, Paul v. DR Parent, LLC | | Loss date: 12/28/18<br>-Former director/owner of CA facilities |
| Joseph Dello Russo v. SBH Haverhill, LLC d/b/a Serenity At Summit<br>Case No. 2177CV1256-B<br>Commonwealth of Massachusetts | **Scott J. Tucker (Counsel for Plaintiff)**<br>Matthew S. Prunk<br>Tucker, Dyer & O'Connell, LLP<br>199 Wells Avenue<br>Newton, MA 02459<br>O: (617) 986-4219<br>tucker@tdolaw.com<br>prunk@tdolaw.com<br><br>**Matthew J. Holmes (Counsel for Defendant)**<br>Noel B. Dumas | Negligence claim pending in MA<br>Claim is that SBH Haverhill, LLC d/b/a Serenity At Summit cost employee his job |

| | | |
|---|---|---|
| | MORRISON MAHONEY LLP<br>250 Summer Street<br>Boston, MA 02210-1181<br>O: (617) 439-7500<br>mholmes@morrisonmahoney.com<br>ndunas@morrisonmahoney.com | |
| Gerson, David v. DR Parent, LLC | | Loss date 08/03/18<br>-09/18/18 email from Robert Dominguez, Engage PEO (rdominguez@engagepeo.com) mediation in Encino, CA.  -Aloft's share $3,750 |
| Palm Beach Recovery, LLC v. Harmony Hills Behavioral Health | **Gail McQuilken (Counsel for Defendant)**<br>Kozyak Tropin & Throckmorton<br>2525 Ponce de Leon Blvd, 9th Floor<br>Miami, FL 33134<br>O:  (305) 377-0656<br>GAM@kttlaw.com | Complaint filed in Lake County, FL on 1/9/23 for breach of contract under promissory note and sublease. Defendant response to complaint due February 6, 2023. |
| Haverhill Flood | **Michael J. Brandt (Counsel for Former Landlord)**<br>Wallace, Jordan, Ratliff & Brandt, LLC<br>800 Shades Creek Parkway, Suite 400<br>Birmingham, AL 35209<br>O:  (205) 874-0308<br>mbrandt@wallacejordan.com | SBH Haverhill, LLC (tenant) v. TST<br>Haverhill MOB, LLC; NWI US MOB<br>REIT LLC; NWI US Hospital REIT LLC &<br>NWI Haverhill Hospital LP (f/k/a NWI<br>Serenity Behavioral Hospital LP) (jointly, Landlord)<br>-Landlord at time of incident (property was subsequently sold) proposed settlement for tenant to receive $189,391.92, but current landlord would not sign release thereby leaving tenant (which completed the subject repairs) exposed to liability should an additional or similar flood occur again; settlement not authorized by client |
| Ijioma, Merci v. DR Parent, LLC | **Yoora Pak (Counsel for Delphi)**<br>O: (703) 852-7861<br>8444 Westpark Drive, Suite 510<br>McLean, VA 22102<br>O: (703) 245-9300<br>Yoora.pak@wilsonelser.com | Loss date: 11/13/18<br>Wrongful termination<br>12/20/21 settled |
| Iorio, Jamie (Flexer)<br>Wrongful death case – status pending | **Jami Gursky (Counsel for Delphi)**<br>Cole, Scott & Kissane, P.A.<br>110 S.E. 6th Street, Suite 2700<br>Fort Lauderdale, FL 33301<br>O: (954)703-3756<br>Jami.gursky@csklegal.com<br><br>Percy Martinez, Esq. opposing counsel | Court extended stay until 3/6/2023; mediation scheduled 3/3/23; Defendants' response to the Complaint is due on 3/17/2023;<br>-Broward-patient suicide/hanging |
| Koahou, Brendan v. DR Parent, LLC | | Loss date: 04/10/20<br>Settled: 07/21/20 |

| | | |
|---|---|---|
| Lee, Jane v. DR Parent, LLC | | Loss date: 09/17/19<br>12/17/19 Settled |
| McKevitt-Cano, Tammy (presuit) | **Matthew J. Troy (Counsel for Delphi)**<br>Conroy Simberg<br>2 South Orange Avenue, Suite 300<br>Orlando, FL 32801<br>O: (407) 481-5514<br><br>**Jonathan I. Rotstein (Counsel for Tammy McKevitt-Cano)**<br>Law Office of Rotstein & Shiffman, LLP | Loss date: 09/15/20<br>-WC claim and wrongful termination<br>-HH employee prior to purchase<br>-Ironshore did not extend coverage<br>-Status: settled |
| Miller, Esther v. DR Parent, LLC | **Nicholas Haynes**<br>**O: (305) 562-9771** | Loss date: 10/01/18<br>Discrimination (pregnancy)<br>03/05/19 $3,500 settlement |
| Mormeneo, Carlos v. Onward Living Recovery Community, LLC; Delphi Behavioral Health Group, LLC<br>Case No. 20-11087-CA-01 (Miami-Dade) | **Patrick C. McCardle (Counsel for Defendants Onward Living Recovery Community, LLC and Delphi Behavioral Health Group, LLC)**<br>Cole, Scott & Kissane, P.A.<br>110 S.E. 6th Street, Suite 2700<br>Fort Lauderdale, FL 33301<br>O: (954) 703-3756<br>Patrick.mccardle@csklegal.com<br>Kristi.carroll@csklegal.com<br>Annette.habersham@csklegal.com<br><br>**Janpaul Portal (Counsel for Plaintiff)**<br>The Ferraro Firm<br>600 Brickell Avenue, 38th Floor<br>Miami, Florida 33131<br>O: (305) 375-0111<br>jpp@ferrarolaw.com<br><br>Andrew L. Ellenberg<br>Needle & Ellenberg, P.A.<br>1401 Brickell Avenue, Suite 900<br>Miami, Florida 33131<br>O: (305)530-0000<br>aellenberg@needleellenberg.com<br>ccannon@needleellenberg.com | Negligence claim<br>Divorced parents<br>Trial period commencing 04/10/23<br>Calendar Call 03/23/23 @ 3:00 pm |
| 3500 Quakerbridge, LLC v. Peak Health NJ, LLC | | Default under NJ lease; mitigation issue as to landlord possibly re-renting the premises |
| Phelps, Brian | **Lorne Adam Kaiser (Counsel for Brian Phelps)**<br>Kaiser Romanello, P.A.<br>11555 Heron Bay Boulevard, Suite 200<br>Parkland, FL 33076<br>O: (954) 603-0100<br>lkaiser@kaiserromanello.com<br><br>**Manny Comras (Counsel for Delphi)**<br>mrc@bclmr.com | -Wrongful death<br>-Brought by spouse and parents (Crenshaw)<br>-Van driven by Delphi employee<br>-*No damage to van*<br>-Yet, surgeries to neck and back claimed<br>-Relapse due to pain med<br>-OD/died |
| Quest Diagnostic | **Craig P. Bronstein (Counsel for Quest)**<br>Lanak & Hanna | -Settlement finalized 1/5/23;<br>Pathway to Hope paid $12,950.59 |

| | 625 The City Drive S., Ste. 190<br>Orange, CA 92868<br>O:  (714) 620-2350 x308<br>cpbronstein@lanak-hanna.com | |
|---|---|---|
| Ramos, Nicole v. DR Parent, LLC<br>Eleventh Circuit Court of Appeals<br>Case No. 21-11218 | **Nicole Wall (Counsel for Delphi)**<br>Cole, Scott & Kissane, P.A.<br>222 Lakeview Avenue, Suite 120<br>West Palm Beach, FL 33401<br>O: (561) 383-9236<br>Nicole.wall@csklegal.com<br><br>**Romin No. Currier (Counsel for Plaintiff)**<br>Pincus & Currier LLP<br>1555 Palm Beach Lakes Blvd., Suite 320<br>West Palm Beach, FL 33401<br>rcurrier@pincusandcurrier.com | Loss date: 07/22/19<br>Discrimination<br>Reopened-Appeal<br>11th Circuit Court of Appeals |
| Sevilla, Arminda v. DR Parent, LLC | | Loss date: 07/06/20<br>Termination<br>09/18/20 Settled |
| SL Monroe Sr. v. DR Parent, LLC (Southern District of Florida)<br>Case No. 9:20-cv-80954 | **Tamesha W. Blye (Counsel for Plaintiff)**<br>Saenz & Anderson, PLLC<br>20900 NE 30th Avenue, Suite 800<br>Aventura, FL 33180<br>O: (305) 503-5131<br><br>**Doug Wolfe (Counsel for Delphi)**<br>WOLFE PINCAVAGE<br>2937 SW 27th Avenue<br>Suite 302<br>Miami, FL 33313<br>O: (786) 409-0800<br>doug@wolfepincavage.com | Loss date: 06/17/20<br>Wage & retaliation<br>01/27/21 Settled |
| Taylor, Danielle | **Jami Gursky (Counsel for Delphi)**<br>Cole, Scott & Kissane, P.A.<br>110 S.E. 6th Street, Suite 2700<br>Fort Lauderdale, FL 33301<br>O: (954)703-3756<br>Jami.gursky@csklegal.com | -Negligence/violating privacy rights<br>**-No demand**<br>-Cyber policy put on notice |
| Vistas-CA | **Fred S. Pardes (Counsel for Landlord/Rabuchin)**<br>Law Offices of Fred S. Pardes<br>A Professional Corporation<br>34145 Pacific Coast Highway, Suite 520<br>Dana Point, CA 92629<br>O:  (949) 443-3400<br>C:  (949) 293-4506<br>fred@fredpardes.com | -Nancy Rabuchin v. California Vistas<br>Treatment Center<br>-Default under lease<br>-2 months left on term<br>-$34k security deposit<br>- Landlord threatening property damages claim of approximately $200,000<br>- Landlord's insurer has denied the claim |
| Vogel, David v. DR Parent, LLC | **Alicen Wong (Counsel for Delphi)**<br>Stream Kim Hicks Wrage & Alfaro, PC<br>3403 Tenth Street, Suite 700<br>Riverside, CA 92501 | Loss date 2/19/2019<br>-No lawsuit filed<br>-County zoning case requiring property |

| | | |
|---|---|---|
| | **Christopher B. Queally**<br>Gordon Rees Scully Mansukhani<br>2211 Michelson Drive, Suite 400<br>Irvine, CA 92612<br>O: (949) 255-6975<br>cqueally@grsm.com | to obtain CUP<br>-Approved by Riverside County Plan<br>Commission on May 19, 2021<br>-CHAT neighbor claiming nuisance<br><br>-Neighbor has since moved and issue<br>is moot<br>-Related county zoning case requirin<br>property to obtain CUP<br>-Approved by Riverside County Plan<br>Commission on May 19, 2021 |
| Westover, Carrie v. California Addition Treatment Center, LLC, Paul Del Vacchio (Superior Court of California) Case No. RIC 1819657 | **Donald Potter (Counsel for Plaintiff)**<br>Don Potter Law Corporation<br>690 East Green Street, Suite 102<br>Pasadena, CA 91101<br>O: (626) 744-1555<br>dp@donpotterlaw.com<br><br>**Lonnie Giamela (Counsel for Delphi)**<br>O: (213) 330-4454 | Loss date: 10/01/18<br>Wages<br>04/15/19 Settlement |
| Dominic Sirianni v. Delphi Health Group, LLC | | Potential severance claim |
| Matt John Feehery v. DR Sub, LLC | | Complaint received 1/18/23, served 1/12/23, for payment of severance, which includes a salary of $400,000. |
| 18307 Boys Ranch Road Owner LLC v. Palm Beach Recovery LLC, DR Parent LLC, DR Sub LLC, Delphi Behavioral Group LLC, and Delphi Intermediate HealthCo LLC | | Letter received from landlord on 1/23/23 providing formal notice of defaults and demanding payment and fees. |
| 588 E San Lorenzo Owner LLC v. Delphi Health Group, LLC, Delphi Health Holdings, LLC, DR Parent LLC, DR Sub LLC, and Delphi Intermediate HealthCo LLC | | Letter received from landlord on 1/23/23 providing formal notice of defaults and demanding payment and fees. |

**Schedule 4.7**

Compliance with Law

1. California Addiction Treatment Center, LLC dba Desert View Recovery: State of California Health and Human Services Agency, Department of Healthcare Services, Certification Report dated 11/1/22 noting deficiencies found during the compliance review performed onsite on 10/19/22 and requiring a plan of correction. A corrective action plan was submitted to DHCS, Licensing and Certification Division on 11/29/22. No further action is required.

2. California Addiction Treatment Center, LLC dba California Highlands Addiction Treatment: State of California Health and Human Services Agency, Department of Healthcare Services, Certification and Deficiency Report dated 11/1/22 noting Class B and Class C deficiencies found during the compliance review performed onsite on 10/18/22-10/19/22 and requiring a plan of correction. A corrective action plan was submitted to DHCS, Licensing and Certification Division on 11/29/22. No further action is required.

**Schedule 4.8**

ERISA Compliance

None.

**<u>Schedule 4.17</u>**

Payment of Wages; Labor Matters

Union Fresh Start LLC (also known as Serenity at Summit) received an NLRB petition for labor union election by email from a representative of the Alliance Frontline Workers Union, which was formed on August 30, 2022. A vote was held in January 2023 and the results have not yet been released due to a claim that was submitted. Union Fresh Start LLC is actively working with a consultant, Jim Monica from American Labor Group, on the matter.

**Schedule 4.23**

Deposit Accounts

| Secured Party | Name of Bank | Type of Account | Old Account Numbers | New Account Numbers |
|---|---|---|---|---|
| Delphi Behavioral Health Group, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ███ 7273 | ███ 6912 |
| Las Olas Recovery, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ███ 7562 | ███ 6920 |
| Ocean Breeze Detox, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ███ 7661 | ███ 6938 |
| Ocean Breeze Detox, LLC dba Pathway to Hope | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ███ 5486 | ███ 7092 |
| Palm Beach Recovery, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ███ 7874 | ███ 6961 |
| Palm Beach Recovery, LLC dba Family Recovery Specialists | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ███ 7715 | ███ 7084 |
| California Addiction Treatment Center, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ███ 7679 | ███ 6979 |
| California Addiction Treatment Center, LLC dba Desert View Recovery | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ███ 3260 | ███ 7076 |
| Maryland House Detox, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ███ 7737 | ███ 6953 |
| California Vistas Addiction Treatment, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ███ 7725 | ███ 6946 |

11911638-6

| | | | | |
|---|---|---|---|---|
| Breakthrough Living Recovery Community, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ████ 2118 | ████ 6987 |
| Defining Moment Recovery Community, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ████ 2142 | ████ 6995 |
| Summit Behavioral Health Limited Liability Company | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ████ 1713 | ████ 7050 |
| SBH Haverhill, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ████ 1697 | ████ 7035 |
| Peak Health NJ, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ████ 1614 | ████ 7001 |
| Summit at Florham Park, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ████ 1705 | ████ 7043 |
| SBH Union IOP, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ████ 1663 | ████ 7027 |
| Union Fresh Start, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ████ 1655 | ████ 7019 |
| Desert View Recovery Community, LLC | Key Bank PO Box 93885 Cleveland, OH 44101-5885 | Operating | ████ 3252 | ████ 7068 |

- All accounts are open and active.

## **Schedule 4.31(c)**

Healthcare Inspections, Investigations, Inquiries and Audits

1. Ocean Breeze Detox, LLC d/b/a Arete Recovery: Overpayment determination and current proactive suspension of payment for services from Cigna dated 9/30/22 based on audit of 40 random patient records in 2020, subsequent extrapolation. Cigna is seeking $5,926,980.28. Status is pending.

2. California Addiction Treatment Center, LLC dba Desert View Recovery: State of California Health and Human Services Agency, Department of Healthcare Services, Certification Report dated 11/1/22 noting deficiencies found during the compliance review performed onsite on 10/19/22 and requiring a plan of correction. A corrective action plan was submitted to DHCS, Licensing and Certification Division on 11/29/22. No further action is required.

3. California Addiction Treatment Center, LLC dba California Highlands Addiction Treatment: State of California Health and Human Services Agency, Department of Healthcare Services, Certification and Deficiency Report dated 11/1/22 noting Class B and Class C deficiencies found during the compliance review performed onsite on 10/18/22-10/19/22 and requiring a plan of correction. A corrective action plan was submitted to DHCS, Licensing and Certification Division on 11/29/22. No further action is required.

4. Serenity at Summit New Jersey: Horizon Blue Cross Blue Shield of New Jersey patient chart audit and determination of Level 2 Sanction issued 10/13/22 related to patient care/injury issue on 5/18/22 and requiring a corrective action plan. A corrective action plan was submitted to Horizon on 12/1/22 and was accepted on 1/4/23. This matter is now closed.

5. Serenity at Summit New Jersey: Investigation by NJ Department of Human Services, Division of Mental Health and Addiction Services related to complaint by

    a. Detox patient's family on billed charges, representation of services offered, and customer service interaction with the patient's family. Patient services were provided in February 2022, and DMHAS first contacted Serenity in May 2022. Initial response submitted on 12/14/22 followed by a request to submit an Incident Report for Alleged Neglect – No injury/Alleged Operational Staff Shortage. Incident Report was submitted on 12/23/22.

    b. Detox and IOP patient on misrepresentation of insurance coverage, disorganization of facility, and quality of care, and customer service interaction. Patient services were provided in February 2022 and DMHAS first contacted Serenity in March 2022. Initial response submitted on 12/14/22. No further action requested at this time.

6. Florida Association of Recovery Residences ("FARR") audit of Breakthrough Living Recovery Community, LLC resulted in deficiencies and was due on 4/21/22. A 30 day notice of the certifications was issued on 6/2/22. Breakthrough Living Recovery Community, LLC is contacting FARR to resolve any outstanding items or deficiencies. A corrective action plan was submitted on 12/21/22. No further action requested at this time.

**Schedule 4.33**

Other Agreements/Program Eligibility

Serenity at Summit New Jersey: Horizon Blue Cross Blue Shield of New Jersey patient chart audit and determination of Level 2 Sanction issued 10/13/22 related to patient care/injury issue on 5/18/22 and requiring a Corrective Action Plan. A corrective action plan was submitted to Horizon on 12/1/22 and was accepted on 1/4/23. This matter is now closed.

## Schedule 5.3

Maintenance of Properties

Summit Behavioral Health, LLC, 4065 Quakerbridge Road, Suite 102 & Suite 103, Princeton, NJ 08550.

Union Fresh Start, LLC, 1000 Galloping Hill Road, Union Township, NJ 07083.

SBH Haverhill, LLC, 61 Brown Street, Haverhill, MA 01830.

## Schedule 6.1

Indebtedness

| Loan Party | Existing Indebtedness |
|---|---|
| Delphi Behavioral Health Group, LLC | American Express Corporate Card. This card typically carries a balance of $75,000 - $125,000 and is paid off monthly.<br><br>WEX Fuel Credit Card - average monthly balance of $6,300, paid off monthly |
| Ocean Breeze Detox, LLC | American Express Corporate Card.  This card typically carries a balance of $5,000-$6,000 and is paid off monthly. |
| Palm Beach Recovery, LLC | American Express Corporate Card.  This card typically carries a balance of $5,000-$6,000 and is paid off monthly. |
| California Addiction Treatment Center LLC | American Express Corporate Card.  This card typically carries a balance of $10,000 and is paid off monthly. |
| Maryland House Detox, LLC | American Express Corporate Card.  This card typically carries a balance of $2,500 and is paid off monthly. |
| Union Fresh Start LLC | American Express Corporate Card.  This card typically carries a balance of $20,000-$25,000 and is paid off monthly. |

- All debt secured by liens set forth in Schedule 6.3
- See attached tax liabilities in the amount of $971,738.21.

| **Debtor** | **Creditor** | **Address** | **Type of Tax** | **Estimated Amount of Tax Owed** |
|---|---|---|---|---|
| Breakthrough Living Recovery Community, LLC | City of West Palm Beach Bus Tax | City of West Palm Beach PO Box 3147 West Palm Beach FL 33402 | Business Tax | $27,320.15 |
| Breakthrough Living Recovery Community, LLC | Tax Collector, PBC | Tax Collector, PBC Anne M. Gannon, Const Tax Collector, PBC PO Box 3353 West Palm Beach FL 33402-3353 | Property Tax | $28,805.58 |
| California Addiction Treatment Center, LLC | Riverside County Treasurer-Tax Collector - | Riverside County Treasurer-Tax Collector PO Box 12005 Riverside CA 92502-2205 | Personal Property Tax | $9,386.37 |
| Defining Moment Recovery Community, LLC | Broward County Tax Collector | Broward County Tax Collector 115 S. Andrews Ave. Rm A-100 Fort Lauderdale FL 33301 | Property Tax | $117,362.72 |
| Desert View Recovery | Riverside County Treasurer-Tax Collector - | Riverside County Treasurer-Tax Collector PO Box 12005 Riverside CA 92502-2205 | Personal Property Tax | $33,161.88 |
| Ocean Breeze Detox, LLC | City of Pembroke Pines Bus Tax | City of Pembroke Pines 601 City Center Way 4th Flr LBTR Div. Pembroke Pines FL 33025 | Business Tax | $250.00 |
| Breakthrough Living Recovery Community, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $4,348.12 |
| California Addiction Treatment Center, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $34,644.20 |

| California Vistas Addiction Treatment, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $13,068.63 |
|---|---|---|---|---|
| Delphi Behavorial Health Group, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $290,351.60 |
| Defining Moment Recovery Community, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $5,932.78 |
| Desert View Recovery Community, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $8,067.40 |
| Maryland House Detox, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $41,871.43 |
| Ocean Breeze Detox, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $61,020.85 |
| Palm Beach Recovery, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $75,858.69 |

| | | | | |
|---|---|---|---|---|
| Summit Behavioral Health, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $14,698.00 |
| SBH Haverhill, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $92,364.99 |
| SBH Union IOP, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $14,324.46 |
| Summit at Florham Park, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $7,930.00 |
| Union Fresh Start, LLC | United States Treasury | United States Treasury Social Security Tax - CARES Act Section 2302 Dept. of the Treasury Internal Revenue Service Ogden, UT 84201 | 2020 Deferred Tax (CARES Act) | $90,970.36 |
| **TOTAL** | | | | $971,738.21 |

**<u>Schedule 6.3</u>**

Permitted Prior Liens

| <u>Loan Party</u> | <u>Existing Liens</u> |
|---|---|
| Delphi Behavioral Health Group, LLC | **Secured Party:** ASD Specialty Healthcare, LLC dba Besse Medical<br>**Lien Type:** All Assets<br>**File Date:** 1/28/2020<br>**File No.:** 2020 0671133 |
| Delphi Health Group, LLC | **Secured Party:** Marlin Business Bank<br>**Lien Type:**  Equipment<br>**File Date:** 9/21/2018<br>**File No.:** 2018 6531228 |

## Schedule 6.6

Permitted Investments

| **Loan Party** | **Investment** |
| --- | --- |
| DR Sub, LLC | 100% ownership of Delphi Intermediate HeathCo, LLC |
| Delphi Intermediate HealthCo, LLC | 100% ownership of Delphi Health BuyerCo, LLC |
| | 100% ownership of Summit Health BuyerCo, LLC |
| Delphi Health BuyerCo, LLC | 100% ownership of DBHG Holding Company, LLC |
| Summit Health BuyerCo, LLC | 100% ownership of Summit Behavioral Health Limited Liability Company |
| | 100% ownership of Summit IOP Limited |
| | 100% ownership of QBR Diagnostics, LLC |
| | 100% ownership of SBH Haverhill, LLC |
| | 100% ownership of Peak Health NJ, LLC |
| | 100% ownership of Summit of Florham Park, LLC |
| | 100% ownership of SBH Union IOP LLC |
| | 100% ownership of Union Fresh Start LLC |
| | 100% ownership of 61 Brown Street Holdings, LLC |
| DBHG Holding Company, LLC | 100% ownership of Delphi Behavioral Health Group, LLC |
| Delphi Behavioral Health Group, LLC | 100% ownership of Ocean Breeze Recovery, LLC |
| | 100% ownership of Las Olas Recovery LLC |
| | 100% ownership of Delphi Health Group, LLC |
| | 100% ownership of Ocean Breeze Detox, LLC |
| | 100% ownership of Next Step Housing LLC |
| | 100% ownership of Palm Beach Recovery, LLC |

|  | 100% ownership of Rogers Learning, LLC |
|---|---|
|  | 100% ownership of Breakthrough Living Recovery Community, LLC |
|  | 100% ownership of Defining Moment Recovery Community, LLC |
|  | 100% ownership of Onward Living Recovery Community, LLC |
|  | 100% ownership of New Perspectives, LLC |
| Delphi Health Group, LLC | 85% ownership of Banyan Recovery Institute, LLC |
|  | 100% ownership of California Addiction Treatment Center LLC |
|  | 100% ownership of Aloft Recovery LLC |
|  | 100% ownership of Maryland House Detox, LLC |
|  | 100% ownership of Desert View Recovery Community, LLC |
| California Addiction Treatment Center LLC | 100% ownership of California Vistas Addiction Treatment LLC |

**Schedule 6.7**

Transactions with Affiliates

1. Asset Purchase Agreement, dated as of October 1, 2019, by and among Palm Beach Recovery, LLC, Harmony Hills, LLC ("HH"), the equity holders of HH (the "HH Owners"), and Eduardo R. Lacasa, as the representative of the HH Owners, and Asset Purchase Agreement, dated as of June 11, 2020, by and between  Palm Beach Recovery, LLC and Harmony Hills Behavioral Health, LLC and agreements for lease and sublease (and related upstream guarantees) for property located at 18121 Boys Ranch Rd, Altoona, FL 32702, including the  Sublease Agreement, dated September 14, 2020, by and between Delphi Health Holdings LLC and Harmony Hills Behavioral Health LLC.

2. Lease Agreement, dated March 1, 2018, by and between EMD Realty Group, LLC and Defining Moment Recovery Community, LLC, for property located at 3030 Harbor Drive, Fort Lauderdale, FL 33316, including lease payments following abandonment of the premises.

3. Lease Agreement, dated February 22, 2018, by and between Onward Living Recovery Community, LLC and 2100 NE 33rd Avenue, for property located at 2100 NE 33rd Avenue Fort Lauderdale, FL 33305, including lease termination payments of 18 months' rent.

4. Lease Agreement, dated March 1, 2018, by and between EMD Realty Group, LLC and Breakthrough Living Recovery Community, LLC for property located at 3701 S Olive Avenue, West Palm Beach, FL, 33405, including lease extension and upstream guaranty supporting a sale of the property, by agreements dated March 26, 2021.

5. Lease Agreement, dated September 1, 2021, by and between Bolive, LLC and Palm Beach Recovery, LLC, guaranteed by Delphi Behavioral Health Group, LLC, supporting the sale of property located at 1017-1021 North Olive Avenue, West Palm Beach, FL 33401.

6. Billing Services Agreement, dated May 13, 2016, by and between Infinity Behavioral Health Services, LLC and Delphi Behavioral Health Group, LLC, as amended from time to time.

7. Lease Agreement, dated February 28, 2017, by and between Banning Real Estate, LLC and California Addiction Treatment Center LLC for the property located at 15986 Highland Springs Avenue, Banning, California 92220.

8. Administrative and Marketing Services Agreement, dated September 1, 2016, by and between Delphi Behavioral Health Group, LLC and Ocean Breeze Detox, LLC.

9. Administrative and Marketing Services Agreement, dated June 8, 2016, by and between Delphi Health Group, LLC and Banyan Recovery Institute, LLC.

10. Administrative and Marketing Services Agreement, dated June 8, 2016, by and between Delphi Health Group, LLC and California Addiction Treatment Center LLC.

11. Administrative and Marketing Services Agreement, dated June 8, 2016, by and between Delphi Health Group, LLC and Aloft Recovery LLC (formerly known as Elevate Recovery, LLC).

12. Trade Name License and Services Agreement, dated March 12, 2014, by and between Peak Health NJ, LLC and Union Fresh Start LLC.

13. Trade Name License and Services Agreement, dated July 11, 2014, by and between Peak Health NJ, LLC and SBH Haverhill, LLC.

14. Trade Name License and Services Agreement, dated May 28, 2014, by and between Peak Health NJ, LLC and QBR Diagnostics, LLC.

15. Trade Name License and Services Agreement, dated March 12, 2014, by and between Peak Health NJ, LLC and SBH Union IOP LLC.

16. Trade Name License and Services Agreement, dated March 12, 2014, by and between Peak Health NJ, LLC and Summit at Florham Park, LLC (formerly known as FP Dynamic Treatment, LLC).

17. Trade Name License and Services Agreement, dated March 12, 2014, by and between Peak Health NJ, LLC and Summit IOP Limited.

18. Agreement, dated May 20, 2015, by and among Thomas J. Allen, Jr., Destiny Oaks Holdings, LLC, Summit at Newton, LLC, Summit at Florham Park, LLC, SBH Oceanfront Rehabilitation, LLC, Union Fresh Start LLC, SBH Union IOP LLC, QBR Diagnostics, LLC, SBH Haverhill, LLC, Peak Health, NJ, LLC, Behavhealth TreatDyn, LLC, Ocean and Ocean, LLC, SBH Hidden River, LLC, Summit IOP Limited, and Summit Behavioral Health Limited Liability Company.

19. Trade Name License and Services Agreement, dated March 12, 2014, by and between Peak Health NJ, LLC and Summit Behavioral Health Limited Liability Company.

## **Schedule 9.3**

Notices

<u>Administrative Agent:</u>

Brightwood Loan Services LLC
810 Seventh Avenue, 26th Floor
New York, NY 10019
Attn: Loan Operations
Telephone: 646-368-8265
Facsimile: 646-537-2648
E-mail: finance@brightwoodlp.com

<u>Borrower:</u>

Delphi Intermediate HealthCo
1901 West Cypress Creek Road
Suite 500
Fort Lauderdale, FL 33309
Attn: Edward Phillips
Email: ephillips@getzlerhenrich.com

**<u>Exhibit B</u>**

**Initial DIP Budget**

**Delphi Behavioral Health Group**
Weekly DIP Forecast

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH FLOW** | FCAST | FCAST | FCAST | FCAST | FCAST | FCAST | FCAST | FCAST | FCAST | FCAST | FCAST | FCAST | FCAST | FCAST | FCAST | FCAST | **TOTAL** |
| Date (Week Ending) | 2/10/2023 | 2/17/2023 | 2/24/2023 | 3/3/2023 | 3/10/2023 | 3/17/2023 | 3/24/2023 | 3/31/2023 | 4/7/2023 | 4/14/2023 | 4/21/2023 | 4/28/2023 | 5/5/2023 | 5/12/2023 | 5/19/2023 | 5/26/2023 | |
| **INPATIENT ADC** | 65.0 | 67.0 | 69.0 | 71.0 | 73.0 | 75.0 | 77.0 | 79.0 | 81.0 | 83.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 46.1 |
| **NET CHARGES** | 522,747 | 532,015 | 547,687 | 563,360 | 579,032 | 594,704 | 610,377 | 626,049 | 641,721 | 657,393 | - | - | - | - | - | - | 5,875,084 |
| **RECEIPTS** | | | | | | | | | | | | | | | | | |
| OldCo Receipts | 725,316 | 651,015 | 539,527 | 176,458 | 233,825 | 264,279 | 218,121 | 25,718 | - | - | - | - | - | - | - | - | 2,834,659 |
| NewCo Receipts | 9,119 | 8,302 | 8,915 | 230,157 | 296,666 | 281,987 | 307,083 | 459,689 | 488,842 | 510,428 | - | - | - | - | - | - | 2,599,588 |
| Total Customer Receipts | 734,435 | 659,318 | 548,441 | 406,615 | 530,491 | 546,266 | 525,604 | 483,807 | 488,842 | 510,428 | - | - | - | - | - | - | 5,434,247 |
| Other Receipts | 66,476 | | | | 66,476 | | | | | | | | | | | | 132,952 |
| **TOTAL RECEIPTS** | 800,911 | 659,318 | 548,441 | 406,615 | 596,968 | 546,266 | 525,604 | 483,807 | 488,842 | 510,428 | - | - | - | - | - | - | 5,567,199 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | | | |
| *Operating Disbursements* | | | | | | | | | | | | | | | | | |
| Client Program Costs - Food Services | 29,009 | 24,551 | 168,433 | 22,859 | 29,667 | 32,325 | 32,325 | 32,066 | 34,219 | 35,730 | - | - | - | - | - | - | 356,473 |
| Client Program Costs - Other | | | 22,733 | | | | 34,272 | | | | 26,659 | | 88,282 | | | 4,226 | 297,432 |
| *General & Administrative* | | | | | | | | | | | | | | | | | |
| Advertising & Marketing | 1,125,000 | | | 1,125,000 | | | | | 1,125,000 | | | | | | | | 3,375,000 |
| G&A Non-Rate / Amex | | | | 243,000 | | 378,998 | 166,000 | 355,002 | 303,750 | 355,002 | 25,279 | 26,659 | 88,282 | 1,929 | | | 546,750 |
| Google | 28,773 | 38,365 | 27,596 | 180,000 | | | 43,250 | | 180,000 | | 2,022 | | 154 | | | | 275,503 |
| Advertising & Marketing (Credit to OldCo) | | | | (883,296) | | | | | (483,750) | | 414 | 494,910 | | | | | (11,247,046) |
| Amex (Other OldCo) | 5,893 | 15,527 | 5,652 | 27,000 | 26,678 | 30,313 | 16,788 | 28,400 | 11,484 | 28,400 | 122,716 | | | | | | 60,750 |
| Billing Collections (RCM) | 30,522 | 34,500 | | | 5,464 | 12,268 | 3,438 | 11,494 | 2,352 | 11,494 | | | | | | | 362,644 |
| Systems | | 16,000 | 20,000 | | | | | | 7,991 | | 22,433 | | 90,365 | | | | 56,000 |
| Workers Comp Insurance | | | | 186,387 | | | 20,000 | | 149,283 | | | | | | | | 33,556 |
| Commercial Insurance Premium | | | | 20,000 | | | | 4,226 | 313,820 | | 4,226 | | | | | 4,226 | 629,795 |
| Rentals & Leases | | | | 12,887 | 325,000 | | | | | | | | | | | | 715,933 |
| | | | | 155,151 | | | | | | | | | | | | | |
| | | | | 313,820 | | | | | | | | | | | | | |
| **Subtotal** | 1,154,009 | 40,551 | 397,554 | 1,216,782 | 354,607 | 32,325 | 242,312 | 174,116 | 1,664,064 | 35,730 | 26,659 | 89,282 | 88,282 | 4,226 | - | 4,226 | 5,431,277 |
| Net Payroll | (785,464) | 50,810 | 456,624 | (258,282) | 375,321 | 378,998 | 166,600 | 355,002 | 143,551 | 355,002 | (150,432) | 521,569 | (90,365) | - | - | (4,226) | 3,481,479 |
| Bonus | (88.1%) | 7.7% | (47.1%) | (47.1%) | | 16.9% | 43,250 | 10.1% | (27.2%) | 15.6% | | | | | | | 43,250 |
| Withholding & Taxes | | | | | | | | | | | | | | | | | 275,503 |
| Benefits | | | | | | | | | | | | | | | | | 88,780 |
| Severance/ PTO | | | | | | | | | | | | | | | | | 187,738 |
| Social Security Taxes | | | | | | | | | | | | | | | | | 494,910 |
| **Total Operating Disbursements** | 608,507 | 50,810 | 806,733 | 1,724,719 | 762,730 | 453,813 | 471,388 | 569,012 | 1,821,451 | 430,626 | 150,432 | 521,569 | 90,365 | - | - | 4,226 | 10,002,938 |
| **Operating Cash Flow** | (785,464) | 50,810 | (258,282) | (1,318,104) | (165,762) | 92,453 | 53,215 | (85,206) | (1,332,609) | 79,802 | (150,432) | (521,569) | (90,365) | - | - | (4,226) | (4,435,739) |
| margin % | (88.1%) | 7.7% | (47.1%) | (124.2%) | (27.8%) | 16.9% | 10.1% | (17.6%) | (272.6%) | 15.6% | | | | | | (79.7%) | (79.7%) |
| *Non-Operating Disbursements* | | | | | | | | | | | | | | | | | |
| CapEx | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 136,523 | | | | | | | | 350,000 |
| Other | | | | 189,695 | | | | | 325,000 | | | | | | | | 276,218 |
| Management Fees | | | | | | | | | | | | | | | | | 325,000 |
| **Total Non-Operating Disbursements** | 50,000 | 50,000 | 50,000 | 189,695 | 50,000 | 50,000 | 50,000 | 50,000 | 461,523 | - | - | - | - | - | - | - | 951,218 |
| *Closing Costs* | | | | | | | | | | | | | | | | | |
| Disposal Costs | | 6,000 | | | | | | | | | | 10,000 | | | | | 6,000 |
| Additional out-of-pocket costs (Furniture/Ret) | | | | | | | | | | | | | | 2,000 | | | 10,000 |
| **Total Closing Disbursements** | - | 6,000 | - | - | - | - | - | - | - | - | - | 10,000 | - | - | - | - | 16,000 |
| *Non-Recurring Costs* | | | | | | | | | | | | | | | | | |
| Legal | 125,000 | 125,000 | 125,000 | 125,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 100,000 | 75,000 | 75,000 | 75,000 | 50,000 | 1,500,000 |
| Interim CEO | 85,000 | 90,250 | 90,250 | 90,250 | 90,250 | 76,750 | 76,750 | 76,750 | 76,750 | 76,750 | 76,750 | 76,750 | | | | 25,000 | 108,250 |
| Secured Creditor Counsel | | | | | 375,000 | 375,000 | | | | 375,000 | | | | | | | 750,000 |
| US Trustee | | | 370,000 | | | | 90,000 | | | | | | | | 60,000 | | 150,000 |
| Filing Fees / DIP Financing Fees | 100,000 | | | | | | | | | 36,000 | | | | | | | 370,000 |
| Board Members | | 6,000 | | | 35,000 | | | | | | | 7,500 | | | | | 76,000 |
| Professionals to Creditors Committee | | | 7,500 | | | 50,000 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | | | | | | 150,000 |
| Patient care ombudsman | | | 80,000 | | 7,500 | | 120,000 | | | | | 90,000 | | | | | 75,000 |
| Epiq | | | | | | | | | | | | 10,000 | | | | | 330,000 |
| Aetus | | 10,000 | | | | | 10,000 | | | | | 10,000 | | | 40,000 | | 40,000 |
| Compliance | | 10,000 | | | | | | 4,000 | | | | 5,000 | | | 10,000 | | 21,000 |
| Other Professionals | | | | 60,000 | | | | | 90,000 | | | 75,000 | | | | | 225,000 |
| **Total Disbursements** | 210,000 | 315,250 | 246,750 | 732,750 | 197,750 | 644,250 | 188,250 | 494,250 | 184,250 | 594,250 | 184,250 | 364,250 | 75,000 | 77,000 | 75,000 | 185,000 | 6,770,250 |
| DIP Interest | | | | 61,458 | | | | | 108,167 | | | 135,208 | | | | | 304,833 |
| **TOTAL DISBURSEMENTS** | 1,796,376 | 973,757 | 1,111,473 | 2,708,622 | 1,010,489 | 1,148,063 | 710,638 | 1,113,262 | 2,575,391 | 1,024,876 | 334,682 | 895,819 | 300,573 | 300,573 | 175,000 | 189,226 | 16,045,239 |
| **NET CASH FLOW** | (995,466) | (314,440) | (563,032) | (2,302,007) | (413,521) | (601,797) | (185,035) | (629,456) | (2,086,549) | (514,448) | (334,682) | (895,819) | (300,573) | (300,573) | (175,000) | (189,226) | (10,478,040) |
| margin % | (124.3%) | (47.7%) | (102.7%) | | (69.3%) | (110.2%) | (35.2%) | (130.1%) | | (100.8%) | | | | | | | |
| **CUMULATIVE NET CASH FLOW** | (995,466) | (1,309,905) | (1,872,937) | (4,174,944) | (4,588,466) | (5,190,264) | (5,375,288) | (6,004,744) | (8,091,293) | (8,605,740) | (8,940,422) | (9,836,241) | (10,136,814) | (10,283,814) | (10,378,814) | (10,478,040) | (10,478,040) |
| **LIQUIDITY** | | | | | | | | | | | | | | | | | |
| Beginning Book Ledger Balance | 207,087 | 4,211,622 | 3,897,182 | 3,334,150 | 1,032,143 | 4,118,631 | 3,516,834 | 5,831,799 | 5,202,343 | 3,115,794 | 2,601,347 | 2,266,665 | 1,370,846 | 1,070,273 | 993,273 | 918,273 | 207,087 |
| Net Cash Flow | (995,466) | (314,440) | (563,032) | (2,302,007) | (413,521) | (601,797) | (185,035) | (629,456) | (2,086,549) | (514,448) | (334,682) | (895,819) | (300,573) | (77,000) | (75,000) | (189,226) | (10,478,040) |
| DIP Advances / (Pay Down) | 5,000,000 | | | | 3,500,000 | | 2,500,000 | | | | | | | | | | 11,000,000 |
| **Ending Book Ledger Balance** | 4,211,622 | 3,897,182 | 3,334,150 | 1,032,143 | 4,118,631 | 3,516,834 | 5,831,799 | 5,202,343 | 3,115,794 | 2,601,347 | 2,266,665 | 1,370,846 | 1,070,273 | 993,273 | 918,273 | 729,047 | 729,047 |