UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                    Chapter 11 Cases

DELPHI BEHAVIORAL HEALTH                                  Case No. 23-10945-PDR
GROUP, LLC, *et al.*,[1]

                                                          (Jointly Administered)

         Debtors.

_____/

## DEBTORS' NOTICE OF FILING (I) REVISED STALKING HORSE BID AGREEMENT AND (II) SELLERS' DISCLOSURE SCHEDULES

The above-captioned, affiliated, debtors and debtors-in-possession (collectively, the

"Debtors"), by and through their undersigned proposed counsel, hereby file a revised, executed,

clean version of the *Asset Purchase Agreement*, dated February 19, 2023 (the "Stalking Horse

Bid Agreement"), which is attached hereto as **Exhibit "A"**, in connection with the (i) *Debtors'*

*Expedited Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry into*

*the Stalking Horse Bid Agreement with the Stalking Horse Bidder, Subject to the Bidding*

*Procedures and the Sale Hearing, (II) Approving Bidding Procedures, (III) Scheduling the Bid*

*Deadlines and the Auction, (IV) Scheduling a Hearing to Consider the Transaction, (V)*

---

[1]   The address of the Debtors is 1901 West Cypress Creek Road, Suite 500, Fort Lauderdale, FL 33309.  The last four digits of the Debtors' federal tax identification numbers are: (i) Delphi Behavioral Health Group, LLC (2076), (ii) 61 Brown Street Holdings, LLC (0007), (iii) Aloft Recovery LLC (6674), (iv) Banyan Recovery Institute, LLC (6998), (v) Breakthrough Living Recovery Community, LLC (5966), (vi) California Addiction Treatment Center LLC (7655), (vii) California Vistas Addiction Treatment LLC (8272), (viii) DBHG Holding Company, LLC (6574), (ix) Defining Moment Recovery Community, LLC (3532), (x) Delphi Health BuyerCo, LLC (2325), (xi) Delphi Health Group, LLC (0570), (xii) Delphi Intermediate HealthCo, LLC (6378), (xiii) Delphi Management LLC (6474), (xiv) Desert View Recovery Community, LLC (7437), (xv) DR Parent, LLC (2700), (xvi) DR Sub, LLC (8183), (xvii) Las Olas Recovery LLC (9082), (xviii) Maryland House Detox, LLC (1626), (xix) New Perspectives, LLC (0508), (xx) Next Step Housing LLC (6975), (xxi) Ocean Breeze Detox, LLC (7019), (xxii) Ocean Breeze Recovery, LLC (9621), (xxiii) Onward Living Recovery Community, LLC (4735), (xxiv) Palm Beach Recovery, LLC (4459), (xxv) Peak Health NJ, LLC (7286), (xxvi) QBR Diagnostics, LLC (7835), (xxvii) Rogers Learning, LLC (1699), (xxviii) SBH Haverhill, LLC (0971), (xxix) SBH Union IOP LLC (4139), (xxx) Summit at Florham Park, LLC (8226), (xxxi) Summit Behavioral Health Limited Liability Company (3337), (xxxii) Summit Health BuyerCo, LLC (2762), (xxxiii) Summit IOP Limited (4567), and (xxxiv) Union Fresh Start LLC (6841).

11934644-3

*Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Procedures, and (VII) Approving a Deadline for Interested Parties to Submit Bids to Purchase Any of the Debtors' Remaining Assets Which Are Not Purchased Assets Subject to the Stalking Horse Bid Agreement, and (VIII) Granting Related Relief* [ECF No. 21] (the "<u>Bidding Procedures Motion</u>"), and (ii) *Debtors' Motion for Entry of an Order (I) Approving Stalking Horse Bid Agreement and Authorizing the Sale of Certain Assets of the Debtors Outside the Ordinary Course of Business, (II) Authorizing the Sale of Assets Free and Clear of all Claims and Liens Except for Permitted Liens, Encumbrances and Assumed Liabilities, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [ECF No. 23] (the "<u>Sale Motion</u>").  Included as exhibits to the Stalking Horse Bid Agreement are the proposed (i) Bidding Procedures[2] (Exhibit A) and Bidding Procedures Order (Exhibit B), each of which was previously filed with the Court on February 6, 2023, as attachments to the Bidding Procedures Motion [ECF No. 21, Exh. A], and (ii) the Form of Bill of Sale, Assignment and Assumption Agreement (Exhibit C).

Attached hereto as **<u>Exhibit "B"</u>** is a redline reflecting revisions made to the original *Asset Purchase Agreement* which is attached as Exhibit "A" to the Sale Motion filed with the Court on February 6, 2023 (the "<u>Original Stalking Horse Bid Agreement</u>").  The redline attached hereto as **<u>Exhibit "B"</u>** does not include redlines of the Bidding Procedures, the Bidding Procedures Order, and the Form of Bill of Sale, Assignment and Assumption Agreement, as they were not previously attached to the Original Stalking Horse Bid Agreement.

Attached hereto as **<u>Exhibit "C"</u>** are the redacted versions of the Sellers' Disclosure Schedules associated with the Stalking Horse Bid Agreement.  Concurrently with the filing of

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Stalking Horse Bid Agreement.

this notice, the Debtors are filing the *Expedited Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to File Under Seal Certain Schedules to the Proposed Stalking Horse Bid Agreement, and (II) Directing Parties to Redact Confidential Information* (the "Motion to Seal").  The Motion to Seal requests the Court's authorization to file under seal the unredacted versions of the Sellers' Disclosure Schedules.

Dated: February 20, 2023

Respectfully submitted,

BERGER SINGERMAN LLP
*Proposed Counsel for the Debtors and Debtors-in-Possession*
1450 Brickell Avenue, Suite 1900
Miami, FL  33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By:  */s/  Christopher Andrew Jarvinen*
Paul Steven Singerman
Florida Bar No. 378860
singerman@bergersingerman.com
Christopher Andrew Jarvinen
Florida Bar No. 021745
cjarvinen@bergersingerman.com

## EXHIBIT "A"

**STALKING HORSE BID AGREEMENT**
(CLEAN VERSION)

11934644-3

**ASSET PURCHASE AGREEMENT**

by and among

DELPHI LENDER ACQUISITIONCO LLC,

as Buyer,

THE SELLERS PARTY HERETO,

solely for the purposes of Sections 3.1(b) and 6.15 hereto,

DR PARENT, LLC,

as Parent

and

solely for the purposes stated expressly herein,

BRIGHTWOOD LOAN SERVICES LLC,

as Administrative Agent


Dated as of February 19, 2023

11875751-23

# TABLE OF CONTENTS

## ARTICLE I

### DEFINITIONS

1.1    Defined Terms ..................................................................................................2
1.2    Other Definitional Provisions ........................................................................15

## ARTICLE II

2.1    Purchased Assets ............................................................................................16
2.2    Excluded Assets .............................................................................................18
2.3    Assumed Liabilities ........................................................................................18
2.4    Excluded Liabilities .......................................................................................19
2.5    Assumption and Assignment of Assumed Contracts .....................................21

## ARTICLE III

### CLOSING AND PURCHASE PRICE

3.1    Closing; Transfer of Possession; Certain Deliveries .....................................22
3.2    Purchase Price; Related Matters .....................................................................24
3.3    Allocation of Purchase Price ..........................................................................24
3.4    Withholding ....................................................................................................24

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES OF SELLERS

4.1    Organization and Good Standing ....................................................................25
4.2    Power and Authority ......................................................................................25
4.3    Litigation ........................................................................................................25
4.4    No Contravention ...........................................................................................25
4.5    Consents and Approvals .................................................................................25
4.6    Title to Purchased Assets; Sufficiency ..........................................................26
4.7    Assumed Contracts ........................................................................................26
4.8    Intellectual Property .......................................................................................26
4.9    Employee Benefits .........................................................................................27
4.10   Labor Matters .................................................................................................28
4.11   Conduct of Business ......................................................................................29
4.12   Compliance with Laws; Permits ....................................................................29
4.13   Reserved .........................................................................................................30
4.14   Financial Advisors .........................................................................................30
4.15   Reserved .........................................................................................................30
4.16   Tax Matters ....................................................................................................30
4.17   Real Property ..................................................................................................30

i

4.18    Tangible Personal Property.................................................................31
4.19    Insurance............................................................................................31
4.20    Environmental Matters......................................................................31
4.21    Condition and Suitability of Purchased Assets.................................32
4.22    Anti-Corruption.................................................................................32
4.23    Related Party Transactions................................................................32
4.24    Disclaimer of Other Representations and Warranties.......................33

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

5.1    Organization and Good Standing.......................................................33
5.2    Power and Authority..........................................................................33
5.3    No Contravention...............................................................................33
5.4    Consents and Approvals.....................................................................33
5.5    Litigation...........................................................................................34
5.6    Financial Advisors.............................................................................34
5.7    Sufficient Funds; Adequate Assurances............................................34
5.8    Acknowledgements; "As Is" "Where Is" Transaction.....................34

## ARTICLE VI

## COVENANTS OF THE PARTIES

6.1    Conduct of Business Pending the Closing.........................................35
6.2    Negative Covenants...........................................................................35
6.3    Access................................................................................................37
6.4    Confidentiality...................................................................................38
6.5    Public Announcements......................................................................38
6.6    Employment Matters.........................................................................38
6.7    Reasonable Efforts; Approvals.........................................................40
6.8    Corporate Name Change....................................................................40
6.9    Assignment of Contracts and Rights.................................................40
6.10   Tax Matters.......................................................................................41
6.11   Available Contracts List....................................................................42
6.12   Business Records...............................................................................42
6.13   Personally Identifiable Information...................................................43
6.14   Acquired Bank Accounts...................................................................43
6.15   Additional Assets..............................................................................43
6.16   Supplement to Sellers' Disclosure Schedules...................................43

## ARTICLE VII

## BANKRUPTCY PROVISIONS

7.1    Expense Reimbursement....................................................................44

ii

7.2    Bankruptcy Court Orders and Related Matters .................................................44
7.3    Bankruptcy Milestones ....................................................................................45

## ARTICLE VIII

## CONDITIONS TO OBLIGATIONS OF THE PARTIES

8.1    Conditions Precedent to Obligations of Buyer ................................................46
8.2    Conditions Precedent to the Obligations of the Sellers ...................................47
8.3    Conditions Precedent to Obligations of Buyer and the Sellers ........................47
8.4    Frustration of Closing Conditions ....................................................................48

## ARTICLE IX

## TERMINATION

9.1    Termination of Agreement ................................................................................48
9.2    Consequences of Termination ..........................................................................49

## ARTICLE X

## MISCELLANEOUS

10.1    Expenses ..........................................................................................................50
10.2    Assignment ......................................................................................................50
10.3    Parties in Interest .............................................................................................50
10.4    Matters Related to the Administrative Agent ...................................................50
10.5    Risk of Loss .....................................................................................................51
10.6    Notices .............................................................................................................51
10.7    Entire Agreement; Amendments and Waivers .................................................52
10.8    Counterparts .....................................................................................................53
10.9    Invalidity .........................................................................................................53
10.10    Governing Law ................................................................................................53
10.11    Dispute Resolution; Consent to Jurisdiction ...................................................53
10.12    WAIVER OF RIGHT TO TRIAL BY JURY ...................................................54
10.13    Specific Performance .......................................................................................54
10.14    Third Party Beneficiaries .................................................................................54
10.15    Counting ..........................................................................................................54
10.16    Survival ...........................................................................................................54
10.17    Non-Recourse ..................................................................................................54
10.18    Preparation of this Agreement ..........................................................................55
10.19    Releases ............................................................................................................55

**Exhibits**

Exhibit A    Bidding Procedures
Exhibit B    Bidding Procedures Order
Exhibit C    Form of Bill of Sale, Assignment and Assumption Agreement

11875751-23

# ASSET PURCHASE AGREEMENT[1]

This ASSET PURCHASE AGREEMENT (the "Agreement"), dated as of February 19, 2023 (the "Agreement Date"), is made and entered into by and among Delphi Lender AcquisitionCo LLC, a Delaware limited liability company (together with its designee, "Buyer"), Union Fresh Start LLC d/b/a Serenity at Summit, a New Jersey limited liability company, Summit Behavioral Health Limited Liability Company d/b/a Summit Behavioral Health, a New Jersey limited liability company, SBH Haverhill, LLC d/b/a Serenity at Summit (each a "Seller," and collectively, the "Sellers"), DR Parent, LLC, a Delaware limited liability company, solely with respect to Sections 3.1(b) and 6.15 of this Agreement ("Parent") and Brightwood Loan Services LLC, a Delaware limited liability company, solely in its capacity as administrative agent for the lenders under the Prepetition Credit Agreement (defined below) and signing solely with respect to Section 3.2, Section 10.4, and Sections 10.7 to 10.19 of this Agreement (the "Administrative Agent"). The Administrative Agent, Buyer, Parent (solely with respect to Sections 3.1(b) and 6.15 of this Agreement) and Sellers collectively are referred to herein as the "Parties" and each, a "Party."

RECITALS:

A.     The Sellers are engaged in the business of owning, managing, and operating inpatient and outpatient substance use disorder ("SUD") treatment facilities in Massachusetts and New Jersey (the "Business").

B.     Reference is made to that certain Credit Agreement, dated as of April 8, 2020 (as amended by that certain First Amendment to Credit Agreement and Forbearance Agreement, dated as of August 3, 2021, that certain Second Amendment to Credit Agreement and Forbearance Agreement, dated as of January 18, 2022, that certain Third Amendment to Credit Agreement and Forbearance Agreement, dated as of April 29, 2022, that certain Fourth Amendment to Credit Agreement and Forbearance Agreement, dated as of June 14, 2022, that certain Fifth Amendment to Credit Agreement, dated as of September 16, 2022, that certain Sixth Amendment to Credit Agreement, dated as of November 7, 2022, that certain Seventh Amendment to Credit Agreement, dated as of December 6, 2022, that certain Eighth Amendment to Credit Agreement, dated as of January 10, 2023 and as further amended, restated, supplemented and/or otherwise modified from time to time, the "Prepetition Credit Agreement"), by and among Delphi Intermediate Healthco, LLC, as borrower (the "Borrower"), the other loan parties party thereto from time to time, the lenders party thereto from time to time (the "Prepetition Lenders") and the Administrative Agent. The obligations under the Prepetition Credit Agreement and the other Loan Documents (as defined below) are secured by valid and duly perfected liens, mortgages and other encumbrances in and upon all property and assets of, among other parties, the Sellers.

C.     Buyer is an entity organized for the purpose of effecting the rights and interests of the Prepetition Lenders in accordance with the terms and conditions of the Loan Documents and that certain Credit Bid Direction Letter, dated as of January 30, 2023, executed by the Prepetition Lenders.

---

[1] NTD: Any schedule not attached hereto will be filed hereafter subject to notice of filing.

D.     Prior to the execution of this Agreement, on February 6, 2023, each of the Sellers filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (as amended, the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the Southern District of Florida (the "<u>Bankruptcy Court</u>") (such cases, the "<u>Cases</u>").

E.     Upon the terms and subject to the conditions set forth in this Agreement, and as authorized under sections 363 and 365 of the Bankruptcy Code as relates to the Sellers, the Sellers propose to sell, transfer and assign to Buyer, and Buyer proposes to purchase, acquire and assume from the Sellers, respectively, the Purchased Assets and Assumed Liabilities.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and upon the terms and subject to the conditions hereof, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     <u>Defined Terms</u>. As used herein, the terms below shall have the following respective meanings:

"<u>Accrued Wages</u>" shall mean, with respect to each Hired Employee, the amount of accrued and unpaid wages payable by any of the Sellers immediately prior to the Closing Date with respect to the pay period in which the Closing occurs and that are not yet due and payable by the Sellers, and the amount of accrued and unpaid payroll and other withholding taxes in respect thereof.

"<u>Acquired Bank Accounts</u>" shall have the meaning set forth in <u>Section 6.14</u>.

"<u>Acquired Intellectual Property</u>" shall mean, collectively, all Owned Intellectual Property, all Licensed Intellectual Property and, to the extent not sold to one or more Persons other than Buyer pursuant to the Sale Order, all Delphi Subsidiary Intellectual Property.

"<u>Administrative Agent</u>" shall have the meaning set forth in the Preamble.

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" shall have the meaning set forth in the Preamble.

"<u>Agreement Date</u>" shall have the meaning set forth in the Preamble.

"<u>Allocation Schedule</u>" has the meaning set forth in <u>Section 3.3</u>.

"Alternate Transaction" shall mean a transaction or transactions pursuant to which any of the Sellers or any of its Affiliates, in one or a series of transactions, sells, transfers, exchanges, leases or otherwise disposes of, directly or indirectly, all or any of the Purchased Assets, including any transaction pursuant to one or more Competing Qualified Bids or through any other asset sale, stock sale, share exchange, debt-for-equity swap, joint venture, credit bid, financing, merger, amalgamation, business combination, reorganization, restructuring or recapitalization, a plan of reorganization, a plan of arrangement or any similar transaction, in each case that would not involve a sale or disposition of any or all of the Purchased Assets or the Business to Buyer; provided that disposition of Purchased Assets that are expressly permitted by Section 6.2 of this Agreement shall not be deemed an Alternate Transaction.

"Anti-Corruption Laws" shall mean the FCPA and all other applicable Laws concerning or relating to bribery or corruption in any jurisdiction in which any Seller or any of its Affiliates is located or is doing business.

"Anti-Money Laundering Laws" shall mean the U.S. Patriot Act, as amended, and all other applicable Laws in any jurisdiction in which any Seller or any of its Affiliates is located or is doing business, which Laws relate to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Assumed Contracts" shall have the meaning set forth in Section 2.5(a).

"Assumed Debt" shall have the meaning set forth in Section 3.2(a).

"Assumed Environmental Liabilities" shall have the meaning set forth in Section 2.3(c).

"Assumed Liabilities" shall have the meaning set forth in Section 2.3.

"Assumption Notice" shall have the meaning set forth in Section 2.5(e).

"Auction" shall mean the auction for the Purchased Assets to be conducted on the Auction Date in the event of the submission of one or more "Competing Qualified Bids" in accordance with the terms and provisions of the Bidding Procedures Order and as expressly defined in the Bidding Procedures.

"Auction Date" shall mean the date of the Auction scheduled by the Bankruptcy Court and set forth in the Bidding Procedures Order or such later date as shall be announced by the Sellers and agreed upon by the Sellers and Buyer.

"Audited Financial Statements" shall have the meaning set forth in Section 4.13.

"Available Contracts" shall mean the executory Contracts to which one or more Sellers is a party.

"Avoidance Actions" shall mean those actual and/or potential claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code.

3

"<u>Balance Sheets</u>" shall have the meaning set forth in <u>Section 4.13</u>.

"<u>Bank Accounts</u>" shall have the meaning set forth in <u>Section 6.14</u>.

"<u>Bankruptcy Code</u>" shall have the meaning set forth in the Recitals.

"<u>Bankruptcy Court</u>" shall have the meaning set forth in the Recitals.

"<u>Bankruptcy Milestones</u>" shall have the meaning set forth in <u>Section 7.3</u>.

"<u>Bankruptcy Rules</u>" shall mean the Federal Rules of Bankruptcy Procedure originally promulgated pursuant to 28 U.S.C. § 2075.

"<u>Benefit Plan</u>" shall mean any "employee benefit plan" (within the meaning of Section 3(3) of ERISA, including multiemployer plans within the meaning of Section 3(37) of ERISA that (i) provides benefits or compensation to, or which has any application to, any present or former employee, director, independent contractor or other individual service provider of any Seller, or (ii) is adopted, maintained, sponsored, contributed to, or required to be contributed to by any Seller.

"<u>Bidding Procedures</u>" shall mean the Bidding Procedures filed with the Bankruptcy Court in the form attached hereto as <u>Exhibit A</u> or otherwise in form and substance reasonably acceptable to Buyer.

"<u>Bid</u>" shall have the meaning ascribed to such term in the Bidding Procedures.

"<u>Bidding Procedures Motion</u>" shall mean the motion filed in the Cases, which motion shall be in form and substance satisfactory to Buyer (together with all exhibits thereto), (i) seeking approval of (A) this Agreement and the Transactions and (B) the Bidding Procedures and scheduling certain dates, deadlines and forms of notice in connection therewith, (ii) authorizing the payment of the Expense Reimbursement to Buyer, and (iii) granting other related relief, in each case, in form and substance acceptable to Buyer.

"<u>Bidding Procedures Order</u>" shall mean the order entered by the Bankruptcy Court approving the Bidding Procedures Motion, the Bidding Procedures and granting the relief requested therein in the form set forth in <u>Exhibit B</u> or otherwise in form and substance acceptable to Buyer.

"<u>Bill of Sale and Assignment and Assumption Agreement</u>" shall have the meaning set forth in <u>Section 3.1(b)(i)</u>.

"<u>Borrower</u>" shall have the meaning set forth in the Recitals.

"<u>Budget</u>" shall have the meaning ascribed thereto in the DIP Documents.

"<u>Business</u>" shall have the meaning set forth in the Recitals.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in New York City, New York are authorized or obligated by Law or executive order to close.

"Buyer" shall have the meaning set forth in the Preamble.

"Carve Out" shall have the meaning set forth in the Final DIP Order.

"Cases" shall have the meaning set forth in the Recitals.

"Claims" shall have the meaning as defined in the Bankruptcy Code.

"Closing" shall mean the consummation of the Transactions.

"Closing Date" shall have the meaning set forth in Section 3.1.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Competing Qualified Bid" shall mean a Bid that, in accordance with the Bidding Procedures Order, (i) is submitted by the bid deadline established by the Bankruptcy Court, (ii) includes cash consideration of not less than the $15,000,000 Purchase Price (including the amount of the Assumed Debt as of the Closing Date) *plus* (A) all amounts outstanding under the DIP Documents in excess of $10,000,000, *plus* (B) the Expense Reimbursement and (C) an initial cash overbid of $500,000 and (iii) assumes the Assumed Liabilities (other than the Assumed Debt).

"Confidential Information" shall mean all information in any form or medium that relates to the Business, the Purchased Assets or the Assumed Liabilities, including financial information, projections, pricing structures, technical data, trade secrets, know-how, ideas, inventions, designs, research, development plans, identities of, and arrangements with, customers and suppliers, software and databases, but shall not include any information that (i) at the time of disclosure thereof is generally available to the public (other than as a result of disclosure in violation of this Agreement), or (ii) is independently developed by the receiving party following the Closing Date without reliance on or use of any Confidential Information.

"Contract" shall mean any lease, sublease, license, sublicense, agreement, contract, contract right, obligation, trust, purchase order, sale order, instrument and other similar arrangements, whether or not in written form, that is binding upon a Person or its property (including any commitment to enter into any of the foregoing).

"Contracting Parties" shall have the meaning set forth in Section 10.17.

"Copyrights" shall have the meaning set forth in the definition of Intellectual Property.

"Credit Bid Amount" shall have the meaning set forth in Section 3.2(a).

"Credit Documents" shall mean, collectively, the Loan Documents and the DIP Documents.

5

"<u>Cure Amounts</u>" shall mean all amounts payable that must be paid or otherwise satisfied to cure all of the Sellers' monetary defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Buyer pursuant to section 365 of the Bankruptcy Code.

"<u>Debt</u>" shall mean, without duplication, (i) indebtedness or other obligations for borrowed money or in respect of loans or advances or issued in substitution for or exchange of indebtedness for borrowed money or loans or advances, whether short-term or long-term, secured or unsecured, (ii) any indebtedness or other obligations evidenced by any note, bond, debenture or other debt security or instrument, (iii) all obligations to pay the deferred purchase price of property or services, contingent or otherwise (including all "earn-out" obligations), (iv) all obligations under interest rate and currency hedging agreements, including swap breakage or associated fees, (v) all obligations arising from bankers' acceptances, letters of credit (to the extent drawn) and cash/book overdrafts or similar facilities, (vi) all obligations for the payment of which a Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including guarantees of such obligations, (vii) any obligations under leases that have been or are required to be, in accordance with GAAP, recorded as capital leases, (viii) any indebtedness or other obligations secured by a Lien on any Seller's interest in any assets, and (ix) all accrued interest, premiums, penalties (including any prepayment penalties or premiums) and other obligations related to any of the foregoing.

"<u>Debtors</u>" shall mean the Sellers and their affiliated debtors and debtors in possession that filed the Cases.

"<u>Delphi Subsidiaries</u>" shall mean all direct and indirect subsidiaries of Parent other than the Sellers.

"<u>Delphi Subsidiary Intellectual Property</u>" shall mean all Marks and internet domain names set forth on <u>Schedule 4.8(a)</u> that are owned by Delphi Subsidiaries.

"<u>Designation Notice</u>" shall have the meaning set forth in <u>Section 2.5(a)</u>.

"<u>Determination Date</u>" shall have the meaning set forth in <u>Section 2.5(a)</u>.

"<u>DIP Documents</u>" shall mean that certain Superpriority Secured Debtor-in-Possession Credit Agreement between Delphi Intermediate HealthCo, LLC, the Borrower, the other loan parties party thereto, the DIP Lenders and the Administrative Agent, together with the schedules and exhibits attached thereto and all agreements, documents, orders, instruments and/or amendments executed, delivered or entered in connection therewith.

"<u>DIP Facility</u>" shall mean the debtor-in-possession term loan facility pursuant to which the DIP Lenders agreed to provide up to $11,000,000 in debtor-in-possession financing commitments on the terms set forth in the DIP Documents.

"<u>DIP Lenders</u>" shall mean the lenders providing the DIP Facility.

"<u>Environmental Law</u>" shall mean any Law concerning pollution, protection of the environment or natural resources or human health or safety, including any Law governing the

labelling, use, transportation, manufacture, processing, generation, distribution, treatment, storage, discharge, release, disposal, clean-up or handling of Hazardous Material.

"Environmental Permits" shall have the meaning set forth in Section 4.20(a).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" shall mean, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the Code.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Contracts" shall have the meaning set forth in Section 2.2(a).

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Expense Reimbursement" shall mean all reasonable and documented out-of-pocket fees and expenses which shall not exceed $375,000, subject to the right of Buyer to request approval of up to $500,000, which shall include all professional fees and expenses and travel expenses incurred by Buyer or the Administrative Agent, in each case, without duplication and to the extent not otherwise payable to, and received by, the Administrative Agent pursuant to the DIP Documents or the Loan Documents, and subject to the additional terms as set forth in the Bidding Procedures Motion and reflected in the Bidding Procedures Order.

"Express Representations" shall have the meaning set forth in Section 5.8(b).

"Extended Contract Period" shall have the meaning set forth in Section 2.5(a).

"FCPA" shall mean the Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§78dd-1, et seq.

"Final DIP Order" shall mean an Order of the Bankruptcy Court acceptable to the Administrative Agent in its sole discretion, authorizing and approving on a final basis, among other things, the DIP Documents and the DIP Facility on a final basis (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of Administrative Agent, in its sole discretion) as to which no stay has been entered.

"Final Order" shall mean an Order of the Bankruptcy Court or other applicable court (a) that is not the subject of a pending appeal, petition for certiorari, motion for reconsideration or leave to appeal or other proceeding for review, rehearing or reargument, (b) that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect, and (c) with respect to which the time to appeal, to petition for certiorari, to move for reconsideration or to seek review, rehearing or reargument shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure or other applicable Laws, as applicable.

"GAAP" shall mean United States generally accepted accounting principles.

"Government Official" shall mean any officer or employee of a Governmental Entity or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such Governmental Entity or department, agency, or instrumentality, or for or on behalf of any such public international organization, or any political party, party official, or candidate thereof, excluding officials related to the government of the United States.

"Governmental Entity" shall mean any (i) federal, state, provincial, local, municipal, foreign or other government, (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court, arbitrator or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Haverhill Flood Claim" shall mean the claim by SBH Haverhill, LLC against the Haverhill facility landlord for reimbursement of $380,000 in flood damage paid by SBH Haverhill, LLC.

"Hazardous Material" shall mean any material, substance or waste defined, classified or otherwise characterized as "hazardous," "radioactive," "deleterious," "toxic," "caustic," "dangerous," a "contaminant," a "pollutant," a "dangerous good," a "waste," a "special waste," a "source of contamination" or a "source of a pollutant" or words of similar meaning or regulatory effect under an Environmental Law and any substances or materials the presence or concentration of which in soil, sediment, ground water or surface water regulated under any Environmental Law, including, asbestos, asbestos-containing materials, lead or lead-based paint, polychlorinated biphenyls, mold, mildew or fungi, oil, waste oil, petroleum, petroleum productions, lead-containing paint or plumbing, polychlorinated biphenyls, radioactive materials or radon, or urea formaldehyde foam insulation; and any other material or substance which may pose a threat to the environment or to human health or safety, including poly- and perfluoroalkyl substances.

"Hired Employees" shall mean, collectively, the employees of the Sellers who accept an offer of employment by Buyer at or prior to the Closing and actually commence employment with Buyer upon the Closing.

"Insider Avoidance Actions" shall mean any actual and/or potential Avoidance Actions or other Claim by the Sellers against the individuals listed on Schedule 1.1(a) as of the Petition Date.

"Intellectual Property" shall mean all intellectual property and industrial property, whether protected, created or arising under the Laws of the United States or any other jurisdiction, including all: (i) patents and patent applications, all continuations, divisionals, and continuations-in-part of any of the foregoing, all patents issuing on any of the foregoing, and all reissues, renewals, substitutions, reexaminations and extensions of any of the foregoing (collectively, "Patents"); (ii) trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, corporate names, trade styles, logos and other source or business identifiers and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all

8

applications, registrations, renewals and extensions of any of the foregoing (collectively, "Marks"); (iii) internet domain names; (iv) copyrights, works of authorship, and all mask work, database and design rights, whether or not registered or published, all applications, registrations, reversions, extensions and renewals of any of the foregoing, and all moral rights, however denominated (collectively, "Copyrights"); (v) trade secrets and other confidential or proprietary information (collectively, "Trade Secrets"); (vi) rights of publicity, persona rights or other rights to use indicia of any Person's personality; and (vii) Technology and other intellectual property or industrial property rights arising from or relating to any Technology.

"Interim DIP Order" shall mean an Order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof), in form and substance acceptable to the Administrative Agent in its sole discretion, authorizing on an interim basis, among other things, the DIP Documents and the DIP Facility.

"Knowledge of the Sellers" shall mean, as to a particular matter, the actual knowledge of any executive officer of a Seller.

"Labor Laws" shall mean, collectively, to the extent applicable to any Seller, any federal, national, state, and foreign Laws governing labor and/or employment and employment-related matters, including all such Laws relating to wages, employee classification, other compensation and benefits (including but not limited to any applicable federal, state or local laws concerning COVID-19 related paid sick leave or other benefits), family and medical leave and other leaves of absence, the provision of meal and rest periods/breaks, hours, vacation, severance, restrictive covenants, background checks and screening, immigration, WARN Act and any similar federal, state, provincial or local "mass layoff" or "plant closing" Law, collective bargaining, discrimination, harassment, retaliation, civil rights, safety and health (including but not limited to the federal Occupational Safety and Health Act and any applicable state or local laws concerning COVID-19-related health and safety issues), and workers' compensation.

"Law" shall mean any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, order, treaty, administrative interpretation, guideline, principle of common law or equity, judgment enacted, promulgated, issued, enforced or entered by any Governmental Entity, or other requirement or rule of law.

"Leased Real Property" shall mean each parcel of real property leased by a Seller and used in or necessary for the conduct of the Business as currently conducted, together with all rights, title and interest of each such Seller in and to leasehold improvements relating thereto.

"Leases" shall mean all leases, subleases, licenses, concessions and other agreements pursuant to which a Seller holds any Leased Real Property.

"Lenders" shall mean the Prepetition Lenders and the DIP Lenders, as appliable.

"Liabilities" shall mean, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct, indirect, asserted or unasserted, absolute or contingent, of such Person, whether accrued, vested or otherwise, whether known or unknown, and whether or not actually reflected, or required to be

11875751-23

reflected, in such Person's balance sheets or other books and records, including any liability for Taxes.

"Licensed Intellectual Property" shall mean all Intellectual Property (other than Owned Intellectual Property) used, held for use or practiced in connection with the Business.

"Lien" shall mean any claim, pledge, option, charge, hypothecation, easement, security interest, license, right-of-way, encroachment, mortgage, statutory or deemed trust, and deed of trust or other encumbrance.

"Loan Debt" shall have the meaning provided in the Final DIP Order.

"Loan Documents" shall mean the Prepetition Credit Agreement, together with the Loan Documents (as defined therein) related thereto, including each Security Document and all other documents, agreements and certificates executed or delivered in connection with or contemplated by the Prepetition Credit Agreement.

"Marks" shall have the meaning set forth in the definition of Intellectual Property.

"Material Adverse Effect" shall mean any event, change, occurrence, circumstance, development, condition, fact or effect, which, when considered either individually or in the aggregate together with other events, changes, conditions or effects, is or would reasonably be expected to be materially adverse to (i) the Business or the properties, assets, condition (financial or otherwise), results or operations of the Business or the Purchased Assets, or (ii) any Seller's ability to consummate the Transactions, other than with respect to clause (i) hereof any event, change, occurrence, circumstance, development, condition or change of fact, arising out of, resulting from or attributable to (A) general economic conditions affecting the United States or those countries within which any of the Sellers operate, (B) a change in GAAP or regulatory accounting principles or interpretations thereof after the date hereof, or a change in applicable Law by any Governmental Entity after the date hereof, (C) any act of war or terrorism (or, in each case, escalation thereof) or declaration of a national emergency, (D) any pandemic or epidemic, or (E) any natural disaster, except in each case covered by clauses (A) through (E) to the extent such event, change, occurrence, circumstance, development, condition or change of fact disproportionately and adversely affects any Seller as compared to other companies in a business similarly situated to that of the Business.

"Nonparty Affiliates" shall have the meaning set forth in Section 10.17.

"Notices" shall have the meaning set forth in Section 10.6.

"Order" shall mean any judgment, order, injunction, writ, ruling, verdict, decree, stipulation, award or other binding obligation, pronouncement or determination of any Governmental Entity or arbitration tribunal.

"Ordinary Course of Business" shall mean the conduct and operation of the Business in the ordinary course, consistent with past practice, and in accordance with applicable Law.

"Outside Date" shall have the meaning set forth in Section 9.1(b)(ii).

"Owned Intellectual Property" shall mean all Intellectual Property owned or purported to be owned by any Seller.

"Parent" shall have the meaning set forth in the Preamble.

"Party" or "Parties" shall have the meaning set forth in the Preamble.

"Permits" shall mean all licenses, certificates, consents, permits, registrations, quotas, Environmental Permits, and other authorizations of any Governmental Entity relating to the Purchased Assets or used by the Sellers in connection with the Business, and all pending applications therefor.

"Permitted Liens" shall mean (i) Liens for Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and sufficiency reserved for on the appropriate balance sheet in accordance with GAAP, (ii) zoning, entitlement and other land use and environmental regulations by any Governmental Entity having jurisdiction over any Leased Real Property which are not violated by the current use, occupancy or operation of any Leased Real Property, (iii) lessor liens or other liens which arise by operation of law or in the Ordinary Course of Business, and (iv) such other defects, exceptions, restrictions, imperfections in title, charges, easements, restrictions and encumbrances (other than in connection with the Loan Debt) which would not, individually or in the aggregate, reasonably be expected to materially detract from the property and/or the use of the property for its intended purpose in the Ordinary Course of Business; provided that Liens described in the foregoing clause (v) shall only be deemed Permitted Liens if they rank junior to the Liens securing the obligations under the Credit Documents.

"Person" shall mean an individual, partnership, joint venture, corporation, business trust, limited liability company, trust, unincorporated organization, association, joint stock company, estate, Governmental Entity or other entity.

"Personal Information" shall mean, in addition to any definition for any similar term (e.g., "personal data" or "personally identifiable information" or "PII") provided by applicable Law or by the Sellers in any of their privacy policies, notices or contracts, all information that identifies, could be used to identify or is otherwise associated with an individual person or device, whether or not such information is associated with an identified individual. Personal Information may relate to any individual, including a current, prospective, or former customer, end user or employee of any Person, and includes information in any form or media, whether paper, electronic, or otherwise.

"Personal Property Leases" shall have the meaning set forth in Section 4.18.

"Petition Date" shall mean February 6, 2023.

"Plan" shall mean a plan of reorganization or liquidation for the Debtors pursuant to sections 1125, 1126 and 1145 of the Bankruptcy Code (as applicable), to be implemented in the Cases.

"Post-Closing Tax Period" shall mean all taxable years or other taxable periods that begin after the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period beginning after the Closing Date.

"Pre-Closing Tax Period" shall mean all taxable years or other taxable periods that end on or before the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period ending on and including the Closing Date.

"Pre-Closing Taxes" shall have the meaning set forth in Section 6.10(b).

"Prepetition Credit Agreement" shall have the meaning set forth in the Recitals.

"Prepetition Lenders" shall have the meaning set forth in the Recitals.

"Privacy Laws" shall mean any and all applicable Laws, legal requirements and self-regulatory guidelines (including of any applicable foreign jurisdiction) relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (technical, physical or administrative), disposal, destruction, disclosure or transfer (including cross-border) of any Personal Information, including the Federal Trade Commission Act, Health Insurance Portability and Accountability Act (HIPAA), California Consumer Privacy Act (CCPA), Payment Card Industry Data Security Standard (PCI-DSS), and any and all applicable Laws relating to breach notification or marketing in connection with any Personal Information.

"Proceeding" shall mean any action, arbitration, audit, hearing, investigation, order, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Entity or arbitrator.

"Purchase Price" shall have the meaning set forth in Section 3.2.

"Purchased Assets" shall mean all right, title and interest of each of the Sellers in, to and under all of the assets, properties, interests, rights and claims of the Sellers (whether owned, leased, licensed, used or held for use by the Sellers), wherever situated and of whatever kind and nature, real or personal, tangible or intangible, and whether or not reflected on the books and records of the Sellers, including the assets, properties, rights and claims described in Section 2.1, other than the Excluded Assets.

"Records" shall have the meaning set forth in Section 6.12.

"Related Party" shall have the meaning set forth in Section 4.23(a).

"Related Party Transactions" shall have the meaning set forth in Section 4.23(a).

"Representative" shall mean, with respect to any Person, such Person's officers, managers, directors, employees, agents and representatives (including any investment banker, financial

advisor, accountant, legal counsel or expert retained by or acting on behalf of such Person or its Affiliates).

"Retained Cash" shall mean cash drawn down under the DIP Documents immediately prior to the Closing to fund the liquidation of the Sellers pursuant to the Plan, in an amount to be agreed between the Sellers, on the one hand, and Administrative Agent, on the other hand, in accordance with and subject to the terms of the DIP Documents.

"Sale Order" shall mean, collectively, the Order or Orders which shall be in a form and substance reasonably acceptable to Buyer and Sellers and which shall, among other things: (i) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code (A) the execution, delivery and performance by the Sellers of this Agreement, including each and every term and condition hereof, and the other instruments and agreements contemplated hereby, (B) the sale of the applicable Purchased Assets of the Sellers to Buyer free and clear of all Liens and Liabilities (other than Permitted Liens), on the terms set forth herein, (C) the assumption of the Assumed Liabilities of the Sellers by Buyer on the terms set forth herein and (D) effective as of the Closing, the release of Sellers from amounts due and owing under the Loan Documents up to an amount equal to the Credit Bid Amount; (ii) authorize the Sellers to assume and assign to Buyer the Assumed Contracts; (iii) find that Buyer has provided adequate assurance of future performance with respect to the Assumed Contracts to which any Seller is a party; (iv) find that Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code entitled to all the protections of Section 363(m) and that the sale was not controlled by any agreements among potential bidders in violation of Section 363(n) of the Bankruptcy Code; (v) provide that neither Buyer nor any of its Affiliates or equityholders will have any derivative, successor, transferee or vicarious liability of any kind or character, whether fixed or contingent, for Liabilities of the Sellers (whether under federal or state Law or otherwise), including on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Business prior to the Closing; (vi) waive in all necessary jurisdictions, (A) the so-called "bulk sales," "bulk transfer" and similar Laws, including those related to Taxes and (B) the imposition of any Taxes incurred in connection with the Transactions and the Sale Order; (vii) enjoin all Persons from commencing any proceeding or taking any action against Buyer or any of its Affiliates to recover any claim that such Person has solely against the Sellers or their Affiliates; (viii) provide that the obligations of the Sellers relating to Taxes, whether arising under Law, by this Agreement, or otherwise, shall be fulfilled by the Sellers; and (ix) approves the releases granted pursuant to Section 10.19 hereof.

"Schedule Supplement" shall have the meaning set forth in Section 6.16.

"Seller Registered Intellectual Property" shall mean all issued Patents, pending Patent applications, Mark registrations, applications for Mark registration, Copyright registrations, applications for Copyright registration and internet domain names, in each case, included in the Owned Intellectual Property.

"Sellers" shall have the meaning set forth in the Preamble.

"Sellers' Disclosure Schedules" shall have the meaning ascribed to such term in the opening paragraph of Article IV.

13

11875751-23

"Software" shall mean, collectively, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"Tax" or "Taxes" shall mean (i) all U.S. federal, state, local, foreign and other taxes, assessments, duties or charges of any kind whatsoever, including, income, profits, gains, net worth, sales and use, *ad valorem,* gross receipts, sales, use, business and occupation, license, premium, minimum, alternative or add-on minimum, environmental, estimated, stamp, customs duties, occupation, property (real or personal), franchise, capital stock, license, excise, value added, payroll, employment, social security (or similar), escheat, unclaimed property, unemployment, transfer, severance, registration, lease, service, recording, documentary, permit or authorization, intangibles or other tax (whether payable directly or by withholding), together with any penalty, fine, addition to tax or interest on the foregoing; (ii) any liability in respect of any items described in clause (i) payable by reason of contract, assumption, transferee or successor liability, operation of Law, Treasury Regulations Section 1.1502-6(a) or any analogous or similar provision of Law (or any predecessor or successor thereof) or otherwise; and (iii) any Liability in respect of any items described in clause (i) as a result of being a "transferee" of the taxpayer or entity or a number of a related, non-arm's length, affiliated or combined group.

"Tax Return" shall mean any return, declaration, report, claim for refund, or information return or statement (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates) relating to Taxes, including any schedule or attachment thereto, and including any amendment or supplement thereof.

"Technology" shall mean all technology, formulae, algorithms, procedures, processes, methods, techniques, ideas, know-how, creations, inventions (whether patentable or unpatentable and whether or not reduced to practice), discoveries, improvements, product, servicing, business, financial and supplier information and materials, specifications, designs, models, devices, prototypes, schematics and development tools, Software, websites, recordings, graphs, drawings, reports, analyses and other writings and other tangible embodiments of any of the foregoing, in any form or media whether or not specifically listed in this definition.

"Third Party Consents" shall have the meaning set forth in Section 6.7(b).

"Trade Secrets" shall have the meaning set forth in the definition of Intellectual Property.

"Transaction Dispute" shall have the meaning set forth in Section 10.10.

"Transactions" shall mean the sale of the Purchased Assets pursuant to this Agreement and the other transactions contemplated by this Agreement.

"Transfer Tax" or "Transfer Taxes" shall mean any stamp, sales, use, transfer, conveyance, recording, registration, filing or other similar non-income Tax, fee, duty or charge imposed upon

14

the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto.

"Transition Services Agreement" shall mean a transition services agreement between Buyer and Sellers to be mutually agreed to by Buyer and Sellers prior to Closing.

"Treasury Regulations" shall mean the regulations promulgated under the Code, as such regulations may be amended from time to time.

"U.S. Patriot Act" shall mean Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001).

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any successor Law, and the rules and regulations thereunder and under any successor Law, and any comparable Law under the Laws of any state.

1.2     Other Definitional Provisions.

(a)     The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(b)     The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(c)     Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(d)     Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)     A reference to any Person shall include such Person's successors and permitted assigns.

(f)     Unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if".

(g)     References herein to any Law shall be deemed to refer to such Law as amended, modified, codified, reenacted, replaced, supplemented or superseded in whole or in part and in effect from time to time, including any successor legislation thereto, and also to all rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, reenactment, replacement or supplement of such section or other provision.

(h)     All references to "$" and dollars shall be deemed to refer to the currency of the United States of America.

(i)     The provision of a table of contents, the division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. References to the terms "Article," "Section," "clause," "Schedule" and "Exhibit" are references to the Articles, Sections, clauses, Schedules and Exhibits to this Agreement unless otherwise specified.

(j)     References to "days" means calendar days unless Business Days are expressly specified.

(k)     References to "written" or "in writing" include in electronic form (including by e-mail transmission or electronic communication by portable document format (.pdf)).

## ARTICLE II

### TRANSFER OF ASSETS AND LIABILITIES

2.1     <u>Purchased Assets</u>. At the Closing, and upon the terms and subject to the conditions set forth herein and, with respect to the Sellers, subject to the approval of the Bankruptcy Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Sellers shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from the Sellers, all of the right, title and interest of each of the Sellers, free and clear of all Liens (other than Permitted Liens), in, to and under, all of the Purchased Assets. The Purchased Assets shall include each of the following of the Sellers:

(a)     other than the Retained Cash, (i) all cash, money orders, third-party checks, wire transfers and any other funds of the Sellers, commercial paper, marketable securities, demand deposits, reserves for taxes, certificates of deposit and other bank deposits, deposits of any Seller with any third-party (including any vendor, manufacturer, customer, utility or landlord or other cash deposits for rent, electricity, telephone or otherwise), treasury bills, and other cash equivalents and liquid investments and (ii) the Acquired Bank Accounts;

(b)     all deposits, credits, and prepaid charges and expenses from whatever source paid;

(c)     all accounts receivable;

(d)     all Avoidance Actions (other than Insider Avoidance Actions) with respect to the Purchased Assets;

(e)     the Haverhill Flood Claim;

(f)     all royalties, advances, prepaid assets, and other current assets;

(g)     all furniture, fixtures, furnishings, equipment, and other tangible personal property owned or used or held for use by the Sellers in the conduct of the Business, including all

artwork, desks, chairs, tables, copiers, telephone lines and numbers, facsimile machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies;

(h)     all rights of any Seller under or pursuant to all warranties, representations and guarantees, including those made by suppliers, manufacturers and contractors or any other third party to and for the benefit of any Seller;

(i)     Reserved;

(j)     all Assumed Contracts;

(k)     copies or originals of all books, records, files or papers, whether in hard copy or electronic format, relating to the Purchased Assets or to the Business, including emails, advertising and marketing materials, sales and promotional literature, manuals and data, correspondence (including sales and purchase correspondence), vendor lists, mailing lists, other distribution lists, catalogues, research material, know-how, specifications, designs, drawings, processes and quality control data, if any, or any other intangible property and applications for the same, engineering information, test results, plans, personnel and employment records, technical information, diagrams, maintenance schedules, operating records, safety and environmental reports, data, studies and documents, fixed asset ledgers, accounting information, copies of Tax Returns, including any exemption or abatement agreements or certifications and supporting documentation for such Tax Returns;

(l)     all Acquired Intellectual Property and all of Sellers' (or, with respect to Delphi Subsidiary Intellectual Property, the applicable Delphi Subsidiary's) rights to institute and pursue Proceedings against third parties for past, present and future infringement, misappropriation or dilution of any of the foregoing, or other conflict therewith, and all of the Sellers' (or, with respect to Delphi Subsidiary Intellectual Property, the applicable Delphi Subsidiary's) rights to recover damages or lost profits in connection with any of the foregoing;

(m)     all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and agents of any Seller or with third parties (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreement entered into in connection with the Auction);

(n)     any interest in any internet websites, URLs or internet domain names, and any applications and registrations pertaining thereto;

(o)     any loans owed to any Seller by any current or former employee, officer or director of any Seller;

(p)     all other assets or rights of every kind and description of Sellers related to the Business, wherever located, whether real, personal or mixed, tangible or intangible;

(q)     all health Benefit Plans currently in effect; and

(r)     all goodwill related to the foregoing.

17

2.2     Excluded Assets. Notwithstanding anything herein contained to the contrary, from and after the Closing, each Seller shall retain, and Buyer shall not purchase, such Seller's right, title and interest in and to (and the Purchased Assets shall not include any of) the following assets and properties of the Sellers (collectively, the "Excluded Assets"), all of which shall remain the exclusive property of the Sellers:

(a)     any Contract other than any Assumed Contract or any Contract otherwise included as a Purchased Asset under Section 2.1(h) or Section 2.1(m) (the "Excluded Contracts");

(b)     any Contract or arrangement (including any loan or similar arrangement) with or binding upon any of the Sellers and any Related Party;

(c)     any intercompany accounts receivable owed between or among the Sellers;

(d)     all Claims which the Sellers may have against any Person (other than Avoidance Actions with respect to the Purchased Assets provided for in Section 2.1(d) and the Haverhill Flood Claim), including Insider Avoidance Actions;

(e)     all rights of the Sellers under this Agreement and the agreements and instruments delivered to the Sellers by Buyer pursuant to this Agreement;

(f)     the company seal, minute books, charter documents, stock or equity record books and such other books and records solely as pertain to the organization, existence or capitalization of the Sellers;

(g)     the Sellers' directors and officers liability insurance policies and general liability policies, malpractice policies, professional policies, and employment policies, if any;

(h)     all membership interests of the Sellers, including any options, warrants or other securities exchangeable or convertible into membership interests of the Sellers;

(i)     all Permits;

(j)     custodianship of all active and inactive patient records of the Sellers, other than records after December 31, 2020;

(k)     all assets owned or used by the Sellers that are specifically identified in Schedule 2.2(k);

(l)     the Retained Cash (including the Carve Out); and

(m)     all Tax assets (including duty and Tax refunds and prepayments) of Sellers for any Pre-Closing Tax Periods, including Claims for refunds of Pre-Closing Taxes.

2.3     Assumed Liabilities. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, and subject to the exclusions set forth in Section 2.4 (and in the event of any conflict between the exclusions set forth in Section 2.4 and the provisions of this Section 2.3, the exclusions set forth in Section 2.4 shall prevail), as partial consideration for the

18

Purchased Assets, Buyer shall, on and after the Closing, assume and thereafter timely pay and perform only the following Liabilities of the Sellers (the "Assumed Liabilities"):

(a)     all Liabilities arising under the Assumed Contracts solely to the extent that any such Liabilities under such Assumed Contracts: (i) arise from facts, circumstances, events or obligations to be performed on or after the Closing; (ii) do not arise from a breach, violation or default of such Assumed Contract by any Seller prior to the Closing; and (iii) are not required to be performed prior to the Closing;

(b)     all Liabilities relating to Buyer's ownership or operation of the Purchased Assets to the extent arising from events, facts or circumstances that first occur on or after the Closing;

(c)     all Liabilities under Environmental Laws solely to the extent arising from events, facts or circumstances that first occur on or after the Closing (the "Assumed Environmental Liabilities");

(d)     all Accrued Wages;

(e)     all obligations under the retention agreements listed on Schedule 2.3(e) solely with respect to Hired Employees; and

(f)     the Assumed Debt.

2.4     Excluded Liabilities. Notwithstanding anything to the contrary set forth herein, Buyer shall not assume, and shall not be deemed to have assumed, and the Sellers shall be solely and exclusively liable with respect to, all Liabilities of any Seller or any of its Affiliates or any of their respective predecessors other than the Assumed Liabilities (collectively, the "Excluded Liabilities"). For the avoidance of doubt, and without limiting the foregoing, Buyer shall not be obligated to assume, nor assumes, and Buyer hereby disclaims, all of the Excluded Liabilities, including all of the following Liabilities of any Seller or any of its Affiliates (or any of their respective predecessors) (each of which shall constitute an Excluded Liability hereunder):

(a)     any Liability for (i) Taxes of any Seller for any taxable period and (ii) Pre-Closing Taxes, including, for the avoidance of doubt, any employment Taxes the payment of which was deferred under the Coronavirus Aid, Relief, and Economic Security (CARES) Act;

(b)     any Claim in connection with or arising from or relating to any Excluded Asset, including any Taxes associated therewith;

(c)     any of the Debt other than the Assumed Debt;

(d)     all Cure Amounts;

(e)     any fees, costs and expenses (including legal fees and accounting fees) incurred by any Seller in connection with the Cases or the Transactions, including all fees, costs and expenses incurred in connection with or by virtue of (i) the negotiation, preparation and review of this Agreement and all agreements ancillary or related hereto, (ii) the preparation and

19

submission of any filing or notice required to be made or given in connection with the Transactions, and the obtaining of any consent required to be obtained in connection with the Transactions, (iii) the negotiation, preparing and review of the DIP Documents and (iv) any Alternate Transaction;

        (f)     any Liabilities arising under or pursuant to Environmental Laws, other than the Assumed Environmental Liabilities;

        (g)     any Liabilities arising under or pursuant to Labor Laws, other than the Accrued Wages to the extent expressly assumed pursuant to Section 2.3(d);

        (h)     any Liabilities relating to the Hired Employees and their dependents and beneficiaries (and any alternate payees in respect thereof) arising during or in connection with periods on or prior to the Closing Date, other than those Liabilities expressly assumed pursuant to Section 2.3(d) and Section 2.3(e), and any Liabilities relating to all other current or former employees, directors, consultants and other individual service providers of the Sellers or their Affiliates and their dependents and beneficiaries (and any alternate payees in respect thereof) arising at any time, in each case, including any severance, termination or payment in lieu of notice Liability, and any other Liability arising under or out of any Law or Contract in connection with such Person's employment, service or Contract with, or the termination of such Person's employment, service or Contract with, any Seller or its Affiliates;

        (i)     any Liabilities of the Sellers and their respective ERISA Affiliates with respect to any Benefit Plan or other compensation or benefit plan, program, policy, agreement or arrangement of the Sellers, including any health, welfare, retirement, pension or profit sharing Liability, deferred compensation Liability, equity or equity-based incentive compensation Liability, any Liability under any employment agreements or offer letters, or any penalties, fines or other expenses resulting from any compliance issue with any Benefit Plan or Law, other than those Liabilities expressly assumed pursuant to Section 2.3(d) and Section 2.3(e);

        (j)     other than Liabilities expressly assumed pursuant to Section 2.3(e), any success, retention, stay, change of control or similar bonuses and any other payments or benefits owing to current or former employees, independent contractors or consultants of the Sellers or their Affiliates in connection with the consummation of the Transactions, including any employer portion of any payroll, social security or similar Taxes in respect thereof;

        (k)     any Liability of any Seller arising out of this Agreement or any agreement ancillary or related hereto;

        (l)     any Liabilities arising out of or relating to the Business, the Purchased Assets or the ownership, operation or conduct thereof prior to the Closing;

        (m)     any Liabilities for accrued expenses and accounts payable of the Business, other than expressly assumed hereunder;

        (n)     any Liabilities arising as a result of any Proceeding, whether initiated prior to or following the Closing, to the extent related to the Business or the Purchased Assets, including any actions for breach of contract, violations of or non-compliance with Law (including Sanctions, Anti-Corruption Laws, and Anti-Money Laundering Laws), Product Liability or any tort actions;

(o)     any Liabilities arising as a result of any Contract or arrangement (including any loan or similar arrangement) with or binding upon any of the Sellers and any Related Party (other than with respect to post-Closing liabilities under Assumed Contracts) and all intercompany payables owed from one Seller to the other Seller; and

(p)     any Liabilities (i) existing prior to the filing of the Cases that are subject to compromise under the Bankruptcy Code or other applicable Law and (ii) to the extent not otherwise expressly assumed herein, incurred subsequent to the filing of the Cases and prior to the Closing.

2.5     <u>Assumption and Assignment of Assumed Contracts</u>.

(a)     By March 3, 2023 (such date, the "<u>Determination Date</u>"), Buyer shall designate in writing (each such writing, a "<u>Designation Notice</u>") which Available Contracts that Buyer wishes to assume at the Closing (the "<u>Assumed Contracts</u>"). All Available Contracts which Buyer does not designate in writing for assumption shall not constitute Assumed Contracts or Purchased Assets and shall automatically be deemed Excluded Assets; provided, however, that if an Available Contract is subject to a cure dispute or other dispute as to the assumption or assignment of such Available Contract that has not been resolved to the mutual satisfaction of Buyer and the Sellers prior to the Determination Date, then the Determination Date shall be extended (but only with respect to such Available Contract) to no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of Buyer and the Sellers, (B) the date on which such Available Contract is deemed rejected by operation of section 365 of the Bankruptcy Code and (C) the date upon which such dispute is finally determined by the Bankruptcy Court (the "<u>Extended Contract Period</u>"). If a Designation Notice with respect to such Available Contract is not delivered by Buyer in writing by the date which is three (3) Business Days following the expiration of such Extended Contract Period, such Available Contract shall be automatically deemed an Excluded Asset. For the avoidance of doubt, except as set forth in <u>Section 2.3</u>, Buyer shall not assume or otherwise have any Liability with respect to any Excluded Asset. At Buyer's reasonable request, the Sellers shall make reasonably available to Buyer the appropriate employees of the Sellers necessary to discuss the outstanding Available Contracts.

(b)     The Sellers shall use commercially reasonable efforts to take all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(c)     At the Closing, the Sellers shall, pursuant to the Sale Order and the Bill of Sale and Assignment and Assumption Agreement, assume and assign, or cause to be assigned, to Buyer, each of the Assumed Contracts that is capable of being assumed and assigned as of such date.

(d)     Buyer will cooperate with the Sellers in communicating with third parties to Available Contracts as may be reasonably necessary to assist the Sellers in establishing that Buyer has satisfied the requirement of adequate assurance of future performance contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the applicable Available Contracts.

11875751-23

(e)     As soon as practicable after the Agreement Date (and in no event later than three (3) Business Days after entry of the Bidding Procedures Order), the Sellers shall file a list of the Available Contracts (the "<u>Assumption Notice</u>") with the Bankruptcy Court and shall serve such Assumption Notice via first class mail on each counterparty to an Available Contract listed thereon. The Assumption Notice shall identify all Available Contracts and set forth a good faith estimate of the amount of the Cure Amounts applicable to each such Contract.

(f)     Not later than one (1) Business Day following the Determination Date, Seller shall file with the Bankruptcy Court an amended and restated Assumption Notice, which notice shall set forth only the Assumed Contracts (and exclude all other Available Contracts).

(g)     On the Closing Date, with respect to Cure Amounts not disputed as of the Closing Date, the Sellers shall pay all Cure Amounts in accordance with the Budget to the applicable counterparty and Buyer shall have no Liability therefor. With respect to Cure Amounts that are disputed as of the Closing Date, the Parties shall cooperate and diligently pursue resolution of such disputes. Upon the resolution of any disputed Cure Amount following the Closing, the Sellers shall pay such Cure Amount promptly, and in no event later than two (2) Business Days following such resolution.

(h)     Upon payment by the Sellers of the aforesaid Cure Amounts, all defaults under the Assumed Contracts (monetary or otherwise) and all actual or pecuniary losses that have or may have resulted from such defaults shall be deemed cured, including any Tax, rental obligation, common area maintenance, percentage rent, base rent or utility payments, whether or not such obligation became due, or accrued, after the effective date of the assignment of such Assumed Contracts, as the case may be.

(i)     Except for any Contracts listed in <u>Schedule 2.5(i)</u>, notwithstanding anything in this Agreement to the contrary, from and after the date hereof through the Closing, the Sellers will not reject or take any action (or fail to take any action that would result in rejection by operation of Law) to reject, repudiate or disclaim any Contract without the prior written consent of Buyer.

## ARTICLE III

## CLOSING AND PURCHASE PRICE

3.1     <u>Closing; Transfer of Possession; Certain Deliveries</u>.

(a)     Unless this Agreement shall have been terminated and the Transactions shall have been abandoned pursuant to <u>Article IX</u>, the Closing shall take place at 10:00 a.m. (prevailing Eastern Time) on the date (the "<u>Closing Date</u>") that is two (2) Business Days after all the conditions set forth in <u>Article VIII</u> shall have been satisfied or waived (excluding, but subject to the satisfaction or waiver of, conditions that, by their nature, are to be satisfied at the Closing), or such other time or date as agreed to in writing by the Parties. The Closing shall take place by telephone or video conference and electronic exchange of documents, unless otherwise mutually agreed to by the Parties. The Closing shall be effective as of 12:01 a.m. (prevailing Eastern Time) on the Closing Date.

(b)     At the Closing, the Sellers or Parent (as applicable) shall deliver, or shall cause to be delivered, to Buyer the following:

(i)     a counterpart to the Bill of Sale and Assignment and Assumption Agreement in substantially the form attached hereto as <u>Exhibit C</u> (the "<u>Bill of Sale and Assignment and Assumption Agreement</u>"), duly executed by each Seller and the applicable Delphi Subsidiaries;

(ii)     a counterpart to the Transition Services Agreement, duly executed by each Seller;

(iii)     one (1) or more assignments of the Owned Intellectual Property and Delphi Subsidiary Intellectual Property, in a form reasonably acceptable to Buyer and the Sellers, duly executed by the applicable Seller(s) and Delphi Subsidiaries;

(iv)     a certificate of a duly authorized officer of each Seller dated the Closing Date certifying as to the matters set forth in <u>Section 8.1(b)</u>, <u>Section 8.1(c)</u> and <u>Section 8.1(f)</u>;

(v)     assignments of the Leases, and/or other documents, in each case, as reasonably requested by Buyer with respect to the Leased Real Property;

(vi)     a certification of non-foreign status from each of the Sellers, duly completed and executed in compliance with Treasury Regulation Section 1.1445-2(b); and

(vii)     such other closing instruments and certificates as may be reasonably requested by Buyer, in each case in form and substance reasonably acceptable to Buyer and Sellers.

(c)     At the Closing, Buyer shall deliver, or shall cause to be delivered to the Sellers, the following:

(i)     a counterpart to the Bill of Sale and Assignment and Assumption Agreement, duly executed by Buyer;

(ii)     a counterpart to the Transition Services Agreement, duly executed by Buyer;

(iii)     a certificate of a duly authorized officer of Buyer dated the Closing Date, certifying as to the matters set forth in <u>Section 8.2(a)</u> and <u>Section 8.2(b)</u>; and

(iv)     such other closing instruments and certificates as may be reasonably requested by the Sellers, in each case, in form and substance reasonably acceptable to the Sellers and Buyer.

23

3.2    <u>Purchase Price; Related Matters</u>.

(a)    <u>Purchase Price</u>. The "<u>Purchase Price</u>" for the Purchased Assets is: (i) a credit bid equal to the aggregate outstanding amount of the Protective Advances, in order of priority starting with the Super Priming Protective Advances, up to Five Million Dollars ($5,000,000) (the "<u>Credit Bid Amount</u>"); *plus* (ii) the assumption by Buyer of funded Debt obligations in an aggregate principal amount equal to Ten Million Dollars ($10,000,000), inclusive of not more than $10,000,000 of the DIP Facility (collectively, the "<u>Assumed Debt</u>"); *plus* (iii) the assumption by Buyer of the other Assumed Liabilities. The portion of the Purchase Price payable under clause (i) shall be paid by means of a credit against the total amounts due and owing under the Loan Documents as of the Closing Date. In no event shall the Credit Bid Amount be payable by Buyer in cash.

(b)    <u>Bulk Sales Laws</u>. Buyer hereby waives compliance by the Sellers with the requirements and provisions of any "bulk-transfer" Laws that may apply to the sale and transfer of the Purchased Assets to Buyer. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets of the Sellers shall be free and clear of all Liens, other than Permitted Liens, in each case pursuant to the Bankruptcy Code, whether arising prior to or subsequent to the Petition Date, including any liens or claims arising out of the "bulk-transfer" Laws.

3.3    <u>Allocation of Purchase Price</u>. Sellers and Buyer agree to allocate the Purchase Price among the Purchased Assets for all purposes (including tax and financial accounting) in accordance with the allocation methodology set forth in <u>Schedule 3.3</u> attached hereto. Within ninety (90) days following the Closing Date, Buyer will provide to Sellers an allocation schedule prepared in accordance with such allocation methodology (the "<u>Allocation Schedule</u>"). Buyer and Sellers shall file all applicable Tax Returns (including Form 8594, any amended Tax Returns, and any claims for refund) consistent with the Allocation Schedule and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings) absent a contrary "determination" (within the meaning of Section 1313(a) of the Code).

3.4    <u>Withholding</u>. Buyer or any other paying agent (as applicable) shall be entitled to deduct and withhold from the amounts payable under this Agreement such amounts as may be required to be deducted and withheld under the Code and any other applicable Tax Laws. Any such withheld amount shall be treated as though it had been paid to the Person in respect of which such withholding was required.

<div align="center">

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF SELLERS**

</div>

Except as set forth in the Sellers' Disclosure Schedules delivered to Buyer concurrently herewith (the "<u>Sellers' Disclosure Schedules</u>"), the Sellers hereby jointly and severally make the following representations and warranties to Buyer with respect to itself and each other Seller as of the Agreement Date and as of the Closing, as applicable:

4.1     <u>Organization and Good Standing</u>. Each Seller (a) is a limited liability company, duly formed, validly existing and in good standing under the Laws of its jurisdiction of formation, and (b) has full organizational power and authority to own, lease and operate its properties, to perform all of its obligations under the Available Contracts, and carry on the Business as it is now being conducted. The Sellers have delivered to Buyer true, complete and correct copies of each Seller's certificate of formation and limited liability company agreement or comparable organizational documents as in effect on the date hereof.

4.2     <u>Power and Authority</u>. Subject to entry and effectiveness of the Sale Order in respect of the Sellers, each Seller has the requisite organizational power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement by each Seller and, subject to the approval of this Agreement by the Bankruptcy Court, the consummation by each Seller of the Transactions and the performance of each Seller's obligations hereunder have been duly authorized by all requisite organizational action on the part of each Seller. This Agreement has been duly executed and delivered by each Seller and (assuming the due and valid authorization, execution and delivery thereof by Buyer), following the approval of this Agreement and the Transactions by the Bankruptcy Court pursuant to the Sale Order, will constitute the legal, valid and binding obligation of each Seller, enforceable against each Seller in accordance with its terms. Each Seller has the requisite organizational power to operate its business with respect to the Purchased Assets that it owns as now conducted and is duly qualified as a foreign entity to do business, and to the extent legally applicable, is in good standing, with respect to the Business, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing has not had a Material Adverse Effect.

4.3     <u>Litigation</u>. To the Knowledge of the Sellers, except as set forth on <u>Schedule 4.3</u>, there are no outstanding Orders or Proceedings pending, or, to the Knowledge of the Sellers, threatened against any Seller relating to the ownership or use of the Purchased Assets or conduct of the Business by the Sellers or otherwise affecting the Purchased Assets or the Business.

4.4     <u>No Contravention</u>. Subject to the entry and effectiveness of the Sale Order by the Bankruptcy Court, and except as set forth on <u>Schedule 4.5</u>, neither the execution and delivery of this Agreement and compliance by the Sellers with any provisions hereof, nor the consummation of the Transactions, will (a) violate or conflict with any provision of any Seller's organizational documents, (b) with or without the giving of notice or the lapse of time or both violate, or result in a breach of, or constitute a default under, or conflict with, or accelerate the performance required by, any of the terms of any Available Contract or Lease, (c) violate or conflict with any Order, or any Law or Permit that is required to be discharged prior to Closing applicable to the Sellers, or (d) result in the creation of any Lien upon any of the Purchased Assets (other than a Permitted Lien).

4.5     <u>Consents and Approvals</u>. Except (a) to the extent excused or made unenforceable as a result of the filing of the Cases, (b) for the entry and effectiveness of the Sale Order in respect of the Sellers, or (c) as set forth in <u>Schedule 4.5</u>, to the Knowledge of the Sellers, the execution, delivery and performance by each Seller of this Agreement and the Transactions, and the legality, validity, binding effect or enforceability of this Agreement and any agreements contemplated hereby, do not require any consents, waivers, authorizations or approvals of, or filings with, any

(i) Governmental Entities or (ii) other third Persons, except with respect to clause (ii) as would not reasonably be expected to have a Material Adverse Effect.

4.6    Title to Purchased Assets; Sufficiency.

(a)    Sellers have, and subject to the entry and effectiveness of the Sale Order in respect of the Purchased Assets of the Sellers, at the Closing, Buyer will have, good and valid title to each of the Purchased Assets (except for those Purchased Assets that are leased or licensed to any Seller, as to which any Seller has, and at the Closing, Buyer will have, valid licensed or leasehold interests), free and clear of all Liens, other than (i) Permitted Liens and (ii) Liens encumbering Buyer's assets, if any, securing any loan made directly to Buyer or expressly assumed by Buyer as of the Closing Date.

(b)    To the Knowledge of the Sellers, other than the Excluded Assets, the Purchased Assets constitute all of the assets used in or held for use in the Business and are sufficient for Buyer to conduct the Business from and after the Closing Date without interruption and in the Ordinary Course of Business as it has been conducted by the Sellers prior to the Closing Date, in each case, except as would not be material to the Business taken as a whole.

4.7    Assumed Contracts. Except to the extent excused or made unenforceable as a result of the filing of the Cases, and except as set forth on Schedule 4.7, to the Knowledge of the Sellers, (i) each Assumed Contract is a legal, valid and binding obligation of the Seller that is a party to such Assumed Contract, is enforceable against such Seller in accordance with its terms, is a legal, valid and binding obligation of each other party to such Assumed Contract and is enforceable against such other party thereto in accordance with its terms, subject to bankruptcy laws and general equitable principles, (ii) no Seller that is a party to any Assumed Contract or, to the Knowledge of the Sellers, any other party to an Assumed Contract is in default or breach of an Assumed Contract, (iii) no Seller that is a party to any Assumed Contract has received any written notice of termination or cancellation with respect to any Assumed Contract and (iv) with respect to the Assumed Contracts, upon entry of the Sale Order and payment of the Cure Amounts, each Seller will not be in breach or default of its obligations thereunder.

4.8    Intellectual Property.

(a)    Schedule 4.8(a) sets forth a correct and complete list of all Owned Intellectual Property and all Delphi Subsidiary Intellectual Property. To the Knowledge of the Sellers, all renewal, maintenance and other necessary filings and fees due and payable to any relevant Governmental Entity or domain name registrar to maintain all Owned Registered Intellectual Property in full force and effect have been timely submitted or paid in full.

(b)    To the Knowledge of the Sellers, a Seller is the sole and exclusive owner of all right, title and interest in and to all Owned Intellectual Property, free and clear of all Liens (other than Permitted Liens) and all Licensed Intellectual Property is validly licensed to the applicable Seller, free and clear of all Liens (other than Permitted Liens). To the Knowledge of the Sellers, the Acquired Intellectual Property constitutes all of the Intellectual Property used in, and necessary and sufficient for, the conduct and operation of the Business in all material respects.

26

(c)     To the Knowledge of the Sellers, none of the Sellers has received any notice, and there are no claims or Proceedings pending or threatened against any Seller, (i) alleging any infringement, misappropriation, dilution or other violation of any Intellectual Property, (ii) challenging the ownership, validity or enforceability of any Owned Intellectual Property or (iii) challenging the use by any Seller of any Acquired Intellectual Property, and, in the case of clauses (i), (ii) and (iii), to the Knowledge of the Sellers, there are no facts or circumstances that would form the basis for any such claim, Proceeding or challenge.

(d)     To the Knowledge of the Sellers, the Sellers and any Person acting for or on the Sellers' behalf have at all times materially complied with (i) all applicable Privacy Laws, (ii) all of the Sellers' policies and notices regarding Personal Information, and (iii) all of the Sellers' contractual obligations with respect to Personal Information. Each Seller has implemented and maintains and, to the Knowledge of the Sellers, has at all times maintained reasonable safeguards to protect Personal Information and other confidential data in its possession or under its control against loss, theft, misuse or unauthorized access, use, modification, alteration, destruction or disclosure. Except as set forth in Schedule 4.8(d), to the Knowledge of the Sellers, there have been no material breaches, security incidents, misuse of or unauthorized access to or disclosure of any Personal Information in the possession or control of the Sellers or collected, used or processed by or on behalf of the Sellers. To the Knowledge of the Sellers, no Seller has received any written notice of any claims (including written notice from third parties acting on its behalf) of or investigations or inquires related to, or been charged with, the violation of any Privacy Laws, applicable privacy policies, or contractual commitments with respect to Personal Information.

4.9     Employee Benefits.

(a)     Schedule 4.9(a) lists all Benefit Plans.

(b)     True, correct and complete copies of the following documents, with respect to each of the Benefit Plans, have been made available to Buyer: (i) any plan documents and all material amendments thereto, (ii) the most recent Form 5500, if applicable, and (iii) the most recent summary plan descriptions (including letters or other documents updating such descriptions).

(c)     To the Knowledge of the Sellers, each of the Benefit Plans sponsored by any Seller that is intended to qualify under Section 401 of the Code has received a favorable determination letter from the Internal Revenue Service that such plan is so qualified, and, to the Knowledge of the Sellers, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(d)     To the Knowledge of the Sellers, since December 31, 2022, each of the Benefit Plans has been maintained, in all material respects, in accordance with its terms and all provisions of applicable Law. To the Knowledge of the Sellers, none of the Sellers has incurred, and no event has occurred and no condition or circumstance exists that could result, directly or indirectly, in, any unsatisfied Liability (including, any indirect, contingent or secondary Liability) of any Seller under Title IV of ERISA or Section 412 or 430 of the Code or Section 302 or 303 of ERISA or other similar Law.

(e)     Other than as required under Section 4980B of the Code or other similar applicable Law or for which the covered person pays the full cost of coverage for such person and his or her beneficiaries and dependents, to the Knowledge of the Sellers, neither the Sellers nor any ERISA Affiliate has or could reasonably be expected to have any Liability for providing post-termination or retiree medical, life insurance or other welfare benefits.

(f)     To the Knowledge of the Sellers, neither the execution and delivery of this Agreement nor the consummation of the Transactions, either alone or in connection with any other event, will (i) give rise to any payments or benefits that would be nondeductible to the Sellers under Section 280G of the Code or that could result in an excise Tax on any recipient under Section 4999 of the Code, (ii) result in any payment or benefit becoming due to any current or former employee, independent contractor or consultant of the Sellers, (iii) increase the amount or value of any compensation or benefits payable under any Benefit Plan, result in any acceleration of the time of payment or vesting of any compensation or benefits or provide any additional compensatory rights or benefits (including funding of compensation or benefits through a trust or otherwise) to any current or former employee, independent contractor or consultant of the Sellers, or (iv) limit or restrict the ability of Buyer, its Affiliates, or the Sellers to merge, amend or terminate any Benefit Plan.

4.10     Labor Matters.

(a)     To the Knowledge of the Sellers, Schedule 4.10(a) sets forth a complete list of all employees of the Sellers, and based on the Sellers' records as of the Agreement Date, correctly reflects, with respect to each individual, as applicable: (i) date of hire; (ii) job title and department; (iii) rate of pay or salary; (iv) employee versus independent contractor status; (v) exempt versus non-exempt status; (vi) accrued PTO; (vii) to the extent known, leave of absence status; and (viii) status of participation in any health or welfare Benefit Plans.

(b)     To the Knowledge of the Sellers and except as disclosed to Buyer in writing, none of the Sellers is a party to any labor or collective bargaining agreement and, to the Knowledge of the Sellers, there are no labor or collective bargaining agreements which pertain to employees of any Seller and no such agreements are being negotiated as of the date of this Agreement. To the Knowledge of the Sellers, no employees of Sellers are represented by a labor or trade union, works council, employee association or other employee representative.  Except as set forth in Schedule 4.10(b), no labor organization or group of employees of any Seller has made a pending demand for recognition, and there are no representation proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of the Sellers, threatened to be brought or filed, with the U.S. National Labor Relations Board.

(c)     To the Knowledge of the Sellers and except as disclosed to Buyer in writing, there is (i) no unfair labor practice complaint pending or threatened against any Seller before the U.S. National Labor Relations Board, and (ii) no strike, labor dispute, slowdown or stoppage pending or threatened against any Seller.

(d)     To the Knowledge of the Sellers, (i) each of the Sellers is in material compliance with all Labor Laws, (ii) other than as set forth on Schedule 4.10(d), no equal employment opportunity charges or other claims of employment discrimination are pending or, to

28

the Knowledge of the Sellers, threatened against them, nor have there been any such charges or claims since December 31, 2022, and (iii) no wage and hour department investigation has been made or, to the Knowledge of the Sellers, threatened against any Seller since December 31, 2022, whether internally or by any Governmental Entity, in connection with the employment, engagement, compensation, or service of any current or former employee, consultant or contractor.

(e)     All Liabilities in respect of employees of each Seller, to the Knowledge of the Sellers, since December 31, 2022, have or shall have been properly and correctly paid on or prior to the Closing Date, including withholdings, premium contributions, remittance and assessments for unemployment insurance, employer health tax, Governmental Entity-required pension plans, income tax, workers' compensation and any other employment related legislation, accrued wages, Taxes, salaries, commissions and any Benefit Plan payments.

(f)     Since December 31, 2022, to the Knowledge of the Sellers, all individuals of the Sellers who have provided or are providing services of any kind to the Sellers are correctly classified as an employee or an independent contractor and if classified as an employee are correctly classified as exempt or nonexempt from overtime under applicable Laws.

(g)     To the Knowledge of the Sellers, neither the Sellers, nor any of their respective officers or directors in their individual capacities have settled any material claims, actions, complaints, or other grievances relating to sexual harassment involving or relating to one or more current or former employees, independent contractors, or any other service providers. There are no such claims, actions, complaints or other grievances relating to sexual harassment currently pending or, to the Knowledge of the Sellers, threatened.

4.11     Conduct of Business. Except as set forth on Schedule 4.11, since January 31, 2023, (a) the Business has been conducted in the Ordinary Course of Business and the Sellers have not entered into any transaction related to the Purchased Assets (including any transfer or sale of assets) out of the Ordinary Course of Business, (b) the Sellers have owned and operated the Purchased Assets in the Ordinary Course of Business, and (c) there has been no Material Adverse Effect.

4.12     Compliance with Laws; Permits.

(a)     To the Knowledge of the Sellers, the Sellers are conducting, and have conducted since December 31, 2022, the Business and Purchased Assets in compliance, in all material respects, with all applicable Laws and Orders. Except as disclosed on Schedule 4.12, since December 31, 2022, none of the Sellers has received any written notice or other communication that alleges that the Business is not in compliance in any material respect with any Law, Order or Permit applicable to the Business or the Purchased Assets.

(b)     The Sellers have all material Permits which are required for the lawful operation of the Business as presently conducted and the ownership and operation of the Purchased Assets, and to the Knowledge of the Sellers, each such Permit is valid, binding and in full force and effect, in each case except as would not reasonably be expected to have a Material Adverse Effect. To the Knowledge of the Sellers, none of the Sellers is in material default or violation of any term, condition or provision of any material Permit to which it is a party.

4.13   <u>Reserved</u>.

4.14   <u>Financial Advisors</u>. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for any in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

4.15   <u>Reserved</u>.

4.16   <u>Tax Matters</u>.

(a)   To the Knowledge of the Sellers, the Sellers have timely filed (taking into account any valid extensions of time to file) all Tax Returns which are required to be filed by the Sellers, all such Tax Returns are true, correct and complete in all material respects, and all Taxes due and payable by the Sellers prior to the date hereof have been timely and fully paid.

(b)   To the Knowledge of the Sellers, there are no Liens for Taxes upon the Purchased Assets other than for Permitted Liens.

(c)   Reserved.

(d)   The Sellers have not received any written notice from any taxing authority or Governmental Entity asserting that any Seller may be subject to Tax in any jurisdiction in which any Seller does not file Tax Returns.

(e)   To the Knowledge of the Sellers, no action, suit, proceeding or audit is pending against or with respect to the Sellers regarding Taxes of any Seller.

(f)   To the Knowledge of the Sellers, the Sellers have not waived any statute of limitations in respect of the collection or assessment of any Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency of any Seller, other than any waiver or extension which has expired.

(g)   None of the Purchased Assets is an interest (other than indebtedness within the meaning of Section 163 of the Code) in an entity taxable as a corporation, partnership, trust or real estate mortgage investment conduit for U.S. federal income tax purposes.

4.17   <u>Real Property</u>.

(a)   To the Knowledge of the Sellers, no Seller owns any real property. <u>Schedule 4.17(a)</u> sets forth a complete list of the Leased Real Property. Except for Leased Real Property contained in <u>Schedule 4.17(a)</u>, the Sellers do not lease or otherwise occupy any other real property or have any other place of business.

(b)   To the Knowledge of the Sellers, each Seller has good and valid leasehold title to the Leased Real Property, in each case free and clear of all Liens except for Permitted Liens.

(c)   To the Knowledge of the Sellers, the Sellers have not leased any portion of the Leased Real Property to any Person other than pursuant to the Leases.

(d)   To the Knowledge of the Sellers, (i) the Leases are in full force and effect, (ii) no Seller has delivered or received notice from the other party to any Lease of the termination or surrender thereof, (iii) the Sellers have delivered to Buyer true and complete copies of the Leases referenced in <u>Schedule 4.17(a)</u>, including all amendments notices or memoranda of lease thereto, and all estoppel certificates, or subordination, non-disturbance and attornment agreements, if any, relating to the Leased Real Property, and (iv) no Person that is not a Seller has any right to possess, use or occupy the Leased Real Property.

4.18   <u>Tangible Personal Property</u>. All leases relating to personal property used, or held for use, by the Sellers in the conduct of the Business ("<u>Personal Property Leases</u>") are set forth in <u>Schedule 4.18</u>. To the Knowledge of the Sellers, no Seller has received any written notice of any default or event that with notice or lapse of time or both would constitute a default by any Seller under any of the Personal Property Leases.

4.19   <u>Insurance</u>. The Sellers have insurance policies in full force and effect for such amounts as are, to the Knowledge of the Sellers, sufficient for all requirements of Law applicable to the Business and the Purchased Assets. Set forth in <u>Schedule 4.19</u> is a list of all insurance policies and all fidelity bonds held by or applicable to any Seller setting forth, in respect of each such policy, the policy name, policy number, carrier, term, type of coverage and annual premium. Excluding insurance policies that have expired and been replaced in the Ordinary Course of Business, to the Knowledge of the Sellers, no insurance policy has been cancelled within the last year and, to the Knowledge of the Sellers, no threat has been made to cancel any insurance policy of any Seller during such period. Except as noted in each insurance policy or on <u>Schedule 4.19</u>, all such insurance will remain in full force and effect, all premiums due to date thereunder have been paid in full, and neither Sellers nor any of Sellers' Affiliates is in material default with respect to any obligations thereunder.

4.20   <u>Environmental Matters</u>.

(a)   To the Knowledge of the Sellers, (i) the Sellers are and have been in material compliance with Environmental Laws with respect to the Business and Purchased Assets, which compliance includes obtaining, maintaining and complying with all Permits required under Environmental Laws ("<u>Environmental Permits</u>"), (ii) no Proceeding is pending or, to the Knowledge of the Sellers, threatened, to revoke, modify or terminate any such Environmental Permit, and to the Knowledge of the Sellers, no facts, circumstances or conditions currently exist that could adversely affect such continued compliance with Environmental Laws and Environmental Permits or require currently unbudgeted capital expenditures to achieve or maintain such continued compliance with Environmental Laws and Environmental Permits.

(b)   There are no Proceedings or Orders pending or, to the Knowledge of the Sellers, threatened, alleging non-compliance with or Liabilities under Environmental Law with respect to the Business or the Purchased Assets.

(c)   To the Knowledge of the Sellers, no facts, circumstances or conditions exist with respect to the Business or the Purchased Assets or real property to which the Sellers with respect to the Business or Purchased Assets arranged for the disposal or treatment of Hazardous

31

Materials that could result in any Seller, with respect to the Business or the Purchased Assets, incurring material Liability or obligations under Environmental Laws.

4.21    <u>Condition and Suitability of Purchased Assets</u>. To the Knowledge of the Sellers, (a) there has been no condemnation, seizure, damage, destruction or other casualty loss (whether or not covered by insurance) affecting any of the Purchased Assets or the Business in any material respect which has not subsequently been completely repaired, replaced, or restored, and (b) there are no pending or, to the Knowledge of the Sellers, threatened or contemplated condemnation proceedings affecting the Business, any of the Purchased Assets (or any portion thereof), or of any sale or other disposition of the Business or any of the Purchased Assets (or any portion thereof) in lieu of condemnation except as would not reasonably be expected to have a Material Adverse Effect.

4.22    <u>Anti-Corruption</u>.

(a)    None of the Sellers, or any of their respective officers, directors, employees, agents, representatives, consultants, members, equityholders, or any other Person associated with or acting for or on behalf of the Sellers, since December 31, 2022, has, to the Knowledge of the Sellers, directly or indirectly, in connection with the Business:

(i)    made, offered or promised to make or offer any payment, loan or transfer of anything of value, including any reward, advantage or benefit of any kind, to or for the benefit of any Government Official, candidate for public office, political party or political campaign, for the purpose of (A) influencing any act or decision of such Government Official, candidate, party or campaign, (B) inducing such Government Official, candidate, party or campaign to do or omit to do any act in violation of a lawful duty, (C) obtaining or retaining business for or with any Person, (D) expediting or securing the performance of official acts of a routine nature, or (E) otherwise securing any improper advantage;

(ii)    paid, offered or promised to make or offer any bribe, payoff, influence payment, kickback, unlawful rebate, or other similar unlawful payment of any nature;

(iii)    made, offered or promised to make or offer any unlawful contributions, gifts, entertainment or other unlawful expenditures;

(iv)    established or maintained any unlawful fund of corporate monies or other properties;

(v)    created or caused the creation of any false or inaccurate books and records of the Sellers related to any of the foregoing; or

(vi)    otherwise violated any provision of any Anti-Corruption Laws.

4.23    <u>Related Party Transactions</u>.

(a)    To the Knowledge of the Sellers, no Seller, executive officer, director, member, manager, equityholder or Affiliate of a Seller nor any individual who is a lineal descendant, sibling, parent or spouse of any such Person (each, a "<u>Related Party</u>") is a party to any

Contract or arrangement (including any loan or similar arrangement) with or binding upon any of the Sellers or the Purchased Assets or has any interest in any asset (each, a "Related Party Transaction") other than as set forth on Schedule 4.23(a). Except as set forth on Schedule 4.23(a), no Seller has made any payments to or on behalf of any Related Party (including by exercise of set-off rights, cancellation of intercompany indebtedness, or otherwise).

(b)    To the Knowledge of the Sellers, no Related Party will, immediately following the Closing, hold any asset (tangible or intangible), property, right, claim, cause of action (including any counterclaim) or defense used in or related to the Business.

4.24    Disclaimer of Other Representations and Warranties. Except as expressly set forth in this Article IV, no Seller makes any representation and warranty, express or implied, in respect of such Seller, the Purchased Assets, the Business or the Assumed Liabilities, and any such other representations or warranties, express or implied, are hereby expressly disclaimed.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to the Sellers as follows:

5.1    Organization and Good Standing. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation, and has full power and authority to own, lease and operate its properties and carry on its business as it is now being conducted.

5.2    Power and Authority. Buyer has the requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement and the consummation of the Transactions and the performance of Buyer's obligations hereunder have been duly authorized by all requisite company action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and constitutes (assuming the due and valid authorization, execution and delivery thereof by the other parties thereto and the entry of approval of this Agreement and the Transactions by the Bankruptcy Court pursuant to the Sale Order) the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

5.3    No Contravention. Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) violate or conflict with any provision of Buyer's organizational documents, or (b) violate or conflict with any Order, Governmental Entity or arbitrator, or any Law applicable to Buyer.

5.4    Consents and Approvals. Except for (a) entry of the Sale Order, and (b) any consents or approvals as are reflected on Schedule 5.4, the execution, delivery and performance by Buyer of this Agreement and the Transactions, and the legality, validity, binding effect or enforceability of this Agreement and any agreements contemplated hereby, do not require any consents, waivers, authorizations or approvals of, or filings with, any third Persons or Governmental Entities.

33

5.5     Litigation. There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would reasonably be expected to adversely affect the ability of Buyer to consummate the Transactions in any material respect.

5.6     Financial Advisors. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

5.7     Sufficient Funds; Adequate Assurances. Buyer has or will have as of the Closing, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby. As of the Closing, Buyer shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts and the related Assumed Liabilities.

5.8     Acknowledgements; "As Is" "Where Is" Transaction.

(a)     BUYER ACKNOWLEDGES THAT IT HAS RECEIVED FROM SELLERS CERTAIN PROJECTIONS, FORECASTS, AND PROSPECTIVE OR THIRD-PARTY INFORMATION RELATING TO SELLERS, THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES. BUYER ACKNOWLEDGES THAT (I) THERE ARE UNCERTAINTIES INHERENT IN ATTEMPTING TO MAKE SUCH PROJECTIONS AND FORECASTS AND IN SUCH INFORMATION; (II) BUYER IS FAMILIAR WITH SUCH UNCERTAINTIES AND IS TAKING RESPONSIBILITY FOR MAKING ITS OWN EVALUATION OF THE ADEQUACY AND ACCURACY OF SUCH PROJECTIONS, FORECASTS, AND INFORMATION SO FURNISHED; AND (III) NONE OF THE SELLERS NOR ANY OTHER PERSON MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO SUCH PROJECTIONS AND FORECASTS.

(b)     BUYER FURTHER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY SELLERS TO BUYER IN ARTICLE IV (AS QUALIFIED BY THE DISCLOSURE SCHEDULES) OR IN THE DOCUMENTS DELIVERED BY SELLERS TO BUYER IN ACCORDANCE WITH SECTION 3.1(b) AT THE CLOSING (COLLECTIVELY, THE "EXPRESS REPRESENTATIONS") ARE THE SOLE AND EXCLUSIVE REPRESENTATIONS, WARRANTIES AND STATEMENTS OF ANY KIND MADE TO BUYER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND THAT ALL OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE EXPRESSED OR IMPLIED, WHETHER IN WRITTEN, ELECTRONIC OR ORAL FORM, ARE EXPRESSLY DISCLAIMED, INCLUDING WITH RESPECT TO (I) ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS, AND (II) WITH RESPECT TO THE BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, AND PROSPECTS OF SELLERS OR THE BUSINESS OF THE SELLERS, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF.

34

(c)     UPON THE CLOSING DATE, SUBJECT TO THE EXPRESS REPRESENTATIONS AND THE PROVISIONS OF <u>SECTION 10.5</u>, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE VI

## COVENANTS OF THE PARTIES

6.1     <u>Conduct of Business Pending the Closing</u>. During the period from the Agreement Date and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing, the Sellers shall carry on the Business in the Ordinary Course of Business subject to the requirements of the Bankruptcy Code and Bankruptcy Court and use commercially reasonable efforts to (a) preserve in all material respects the operations, organization and goodwill of the Business intact (including by maintaining and renewing its Permits) and (b), preserve in all material respects relationships with Governmental Entities, suppliers, partners, lessors, licensors, licensees, vendors, contractors, distributors, agents, officers and employees and others having business dealings with the Business. The Sellers shall notify Buyer in writing of any event, occurrence, fact, condition or change in the Business, assets, operations or prospects of the Sellers that results in, or could reasonably be expected to result in, a Material Adverse Effect, promptly upon the occurrence of any such event, occurrence, fact, condition or change.

6.2     <u>Negative Covenants</u>. Except as otherwise expressly provided by this Agreement or consented to in writing by Buyer, or as may be required by order of the Bankruptcy Court, the Sellers shall not take any of the following actions:

(a)     incur or commit to incur any capital expenditures other than as expressly contemplated under the Budget;

(b)     acquire or agree to acquire (by merging or consolidating with, or by purchasing any portion of the stock of, or other ownership interests in, or substantial portion of assets of, or by any other manner), any business or division or any corporation, partnership, association, limited liability company or other entity;

(c)     sublease, pledge, transfer, license, or terminate or surrender any Leased Real Property or grant any Lien on or otherwise encumber or dispose of (or consent to the disposition of) any of the Purchased Assets (including any Available Contract), including the capital stock or equity interests of any of the Sellers, other than a Permitted Lien in the Ordinary Course of Business;

(d)     sell, assign, transfer, license, sublicense, covenant not to sue with respect to, abandon, cancel, terminate, permit to lapse or expire, or otherwise dispose of any Acquired Intellectual Property;

(e)     adjust, split, combine, redeem, repurchase or reclassify any capital stock or equity interests or issue or propose or authorize the issuance of any other securities (including Debt securities, options, profits interests, warrants or any similar security exercisable for, or convertible into, such other security);

35

(f)　　incur or assume any Debt (other than in connection with the DIP Documents);

(g)　　guarantee any Debt of any Person or enter into any "keep well" or other agreement to maintain any financial condition of another Person or enter into any arrangement having the economic effect of any of the foregoing (other than pursuant to the DIP Documents);

(h)　　enter into, amend, restate, supplement, modify, waive or terminate any Available Contract;

(i)　　adopt or propose any amendments to the certificate of incorporation, bylaws or other organizational documents of any Seller;

(j)　　initiate, compromise, settle or agree to settle any Claim, complaint, or Proceeding, other than compromises or settlements in the Ordinary Course of Business that (i) involve only the payment of money damages not in excess of Ten Thousand Dollars ($10,000) individually or Twenty Five Thousand Dollars ($25,000) in the aggregate, (ii) do not impose ongoing limits on the conduct of the Business, and (iii) result in a full release of all Sellers with regard to the Claims or complaint giving rise to such Proceeding;

(k)　　make, change or revoke any material Tax election (including entity classification elections), change any financial or Tax accounting method, except insofar as may have been required by applicable Law or a change in GAAP, consent to an extension or waiver of the limitation period applicable to any Tax claim or assessment, or surrender any right to claim a refund of a material amount of Taxes;

(l)　　enter into, amend, negotiate or terminate any collective bargaining agreement or similar agreement with any labor union or labor organization representing any employees;

(m)　　(i) increase the compensation payable to or to become payable to, or the benefits provided to, pay any bonus to, or grant any equity or equity-based award to, any current or former employee, director, independent contractor or other individual service provider of the Sellers; (ii) grant, increase, pay, provide or modify any severance, retention, change in control or termination payment or benefit to, or loan or advance or accelerate any amount to, any current or former employee, director, independent contractor or other individual service provider of the Sellers; (iii) accelerate the vesting or payment, or fund or in any other way secure the payment, of any compensation or benefit for any current or former employee, director, independent contractor or other individual service provider of the Sellers; (iv) approve, establish, adopt, enter into, amend or terminate any Benefit Plan, except as required by Law; (v) grant or forgive any loans to any current or former employee, director, independent contractor or other individual service provider of the Sellers; or (vi) hire or promote, or terminate or demote (other than for cause) any current or former employee, independent contractor or other individual service provider of the Sellers with annual target cash compensation greater than One Hundred Thousand Dollars ($100,000);

(n)　　implement any employee layoffs that would result in an obligation to give notice at or before Closing Date under the WARN Act or other similar Law;

11875751-23

(o)      (i) enter into any Contract or arrangement (including any loan or similar arrangement) with a Related Party or that would be a Related Party Transaction if it existed on the Agreement Date, or (ii) make payments to or on behalf of any Related Party (including by exercise of set-off rights or otherwise), other than in accordance with the terms of an existing, disclosed Related Party Transaction;

(p)      take any action inconsistent with, or omit to take any action required by, this Agreement;

(q)      receive, collect, compile, use, store, process, share, safeguard, secure (technically, physically and administratively), dispose of, destroy, disclose, or transfer (including cross-border) Personal Information (or fail to do any of the foregoing, as applicable) in violation of any (i) applicable Privacy Laws, (ii) privacy policies or notices of the Sellers, or (iii) the Sellers' contractual obligations with respect to Personal Information; or

(r)      authorize, commit or agree to take any of the foregoing actions or any other action which would reasonably be expected to prevent, or materially delay or impede, the satisfaction of any of the conditions set forth in Article VIII.

6.3      Access.

(a)      Subject to applicable Law, until the Closing Date, the Sellers (i) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, assets, contracts, properties, officers, employees, accountants, auditors, financial advisors, counsel (other than counsel to the Sellers in connection with the Cases) and other representatives, books and records, of the Sellers and their Affiliates, (ii) shall furnish to Buyer and its Representatives such financial, operating and property related data and other information as such Persons reasonably request, (iii) shall instruct the employees, accountants, counsel and financial advisors of the Sellers and their Affiliates to cooperate reasonably with Buyer in its investigation of the Business; and (iv) shall, upon reasonable request of Buyer, use commercially reasonable efforts to provide Buyer with access to their customers, suppliers, vendors, distributors, manufacturers and other Persons with whom the Business has had material dealings. No investigation by Buyer prior to or after the date of this Agreement shall diminish or obviate any of the representations, warranties, covenants or agreements of the Sellers contained in this Agreement. For the avoidance of doubt, nothing in this Section 6.3(a) shall require Sellers to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege or (ii) such action could reasonably be expected to result in violation of applicable Law or Order.

(b)      From and after the Closing Date until the conclusion of the Cases, Buyer shall give the Sellers and the Sellers' Representatives reasonable access during normal business hours to the books and records pertaining to the Purchased Assets and Assumed Liabilities, and shall make available to the Sellers and the Sellers' Representatives the employees of Buyer or its Affiliates whose assistance Buyer reasonably determines is necessary to assist the Sellers or the Sellers' Representatives in connection with the Sellers' or such Representatives' inquiries for the purposes referred to in this Section 6.3(b), for the purposes of (i) the preparation or amendment of Tax Returns, (ii) the determination of any matter relating to the rights or obligations of the Sellers under this Agreement, or (iii) as is necessary to administer, or satisfy their obligations in connection

37

with, the Cases. Buyer shall, and shall cause each of its controlled Affiliates to, cooperate with the Sellers as may reasonably be requested by the Sellers for such purposes. For the avoidance of doubt, nothing in this <u>Section 6.3(b)</u> shall require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable Law or Order, or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations.

6.4     <u>Confidentiality</u>. From and after the Closing Date:

(a)     the Sellers will treat and hold as confidential all of the Confidential Information, and will not, directly or indirectly, without the prior written consent of Buyer, disclose or use any Confidential Information. The Sellers' obligation not to disclose Confidential Information shall not apply to Confidential Information that it shall be required to disclose by Law; <u>provided</u>, <u>however</u>, that, prior to making such disclosure, the Sellers shall notify Buyer promptly to the extent not prohibited by Law so that Buyer may seek confidential treatment or protection of such Confidential Information at Buyer's sole cost and expense.

(b)     in the event that the Sellers are required in any Proceeding to disclose any Confidential Information, the Sellers will notify Buyer promptly of the requirement to the extent not prohibited by Law so that Buyer may seek an appropriate protective order at Buyer's sole cost and expense or waive compliance with the provisions of this <u>Section 6.4</u>.

6.5     <u>Public Announcements</u>. From the Agreement Date, Buyer and the Sellers will consult with each other before issuing, and provide each other the reasonable opportunity to review and comment upon, any press release, any court filing or pleading filed with the Bankruptcy Court relating primarily to this Agreement or the Transactions, or other public statements with respect to the Transactions, and neither Buyer nor the Sellers shall issue any such press release or make any such public statement without the prior written approval of the other Party, in each case except as may be required by Law, or by obligations pursuant to any listing agreement with any national securities exchange. Sellers shall use their respective commercially reasonable efforts to cause their respective Affiliates, employees, officers and directors to comply with this <u>Section 6.5</u>.

6.6     <u>Employment Matters</u>Prior to Closing, Buyer may in its sole discretion (following consultation with the executive management of the Sellers) provide offers of employment to individuals employed by the Sellers as of the Closing Date, which offer shall provide at least the same base salary or hourly wage rate and target incentive cash bonus opportunities and such other terms and conditions determined by Buyer in its sole discretion.

(b)     Buyer shall provide credit to Hired Employees under Buyer's paid time off plans for all accrued but unused paid time off days as of the Closing, except to the extent that Hired Employees receive payment for such vacation days in connection with the Closing.

(c)     Following the Closing, Buyer shall give each Hired Employee full credit for prior service with the Sellers for purposes of (i) eligibility and vesting under any health or welfare plans of Buyer (for the avoidance of doubt, excluding defined benefit pension accruals, deferred compensation, or equity or equity-based incentive plans, or any plan under which such crediting would be prohibited), and (ii) determination of benefit levels under any employee benefit plans of

38

Buyer relating to paid time off, in each case, for which the Hired Employee is otherwise eligible and in which the Hired Employee is offered participation, except where such credit would result in a duplication of benefits. Buyer shall use commercially reasonable efforts to waive, or cause to be waived, any limitations on benefits relating to pre-existing conditions to the same extent such limitations are waived under any comparable plan of the Sellers and use commercially reasonable efforts to recognize for purposes of annual deductible and out-of-pocket limits under its medical and dental plans, deductible and out-of-pocket expenses paid by Hired Employees in the calendar year in which the Closing Date occurs.

(d)     Without limiting the generality of Section 2.4, each Seller shall retain responsibility for, and satisfy all Liabilities with respect to, all payments and benefits of the employees (and their spouses, dependents and beneficiaries, and all former employees, agents and representatives) under Benefit Plans accrued up to the Closing Date or which relate to events prior to the Closing Date in accordance with the terms thereof and applicable Laws.

(e)     Without limiting the generality of Article II, each Seller shall be responsible for the following claims or benefit payments of all employees (and their spouses, dependents and beneficiaries, and all former employees, agents and representatives) accrued up to the Closing Date or which relate to events prior to the Closing Date regardless of whether such claims are filed before or after the Closing Date:

(i)     with respect to death or dismemberment claims, those in respect of which the event occurred prior to the Closing Date;

(ii)     with respect to health claims, those in respect of which the services were provided or the supplies were purchased prior to the Closing Date; and

(iii)     with respect to short term and/or long term disability claims and workers' compensation claims, for those claims resulting from events that occurred prior to the Closing Date, including, to the extent covered under the Benefit Plans, for recurring illnesses which first originated with events occurring prior to the Closing Date, whether or not such claims continue after the Closing Date.

(f)     This Section 6.6 shall operate exclusively for the benefit of the Sellers and Buyer and not for the benefit of any other Person, including any current or former employees of the Sellers or the Hired Employees, which Persons shall have no rights to enforce this Section 6.6. Nothing in this Section 6.6 shall: (i) entitle any Hired Employee to employment with Buyer; (ii) change such Hired Employee's status as an employee-at-will or restrict the ability of Buyer to terminate the service of any Hired Employee at any time or for any reason; (iii) create any third party rights in any current or former service provider of the Sellers (including any beneficiary or dependent thereof); or (iv) be treated as an amendment of any Benefit Plan or other employee benefit plan or arrangement or restrict the ability of Buyer, the Sellers or any of their respective Affiliates to amend, modify, discontinue or terminate any Benefit Plan or other employee benefit plan or arrangement.

11875751-23

6.7    <u>Reasonable Efforts; Approvals</u>.

(a)    Buyer and the Sellers will use reasonable best efforts to take, or cause to be taken, all actions and use reasonable best efforts to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things which are necessary, proper or advisable to consummate and make effective the Transactions including: (i) the obtaining or taking of all other necessary actions, non-actions or waivers from Governmental Entities and the making of all other necessary registrations and filings with Governmental Entities, and (ii) the execution and delivery of any additional certificates, agreements, instruments, reports, schedules, statements, consents, documents and information necessary to consummate the Transactions. For greater certainty, nothing in this <u>Section 6.7(a)</u> shall diminish, reduce or impact the closing condition set forth in <u>Section 8.1(d)</u>.

(b)    In furtherance of the foregoing, Buyer and each Seller shall use its commercially reasonable efforts to obtain any consents and approvals from any third party other than a Governmental Entity that may be required in connection with the Transactions (the "<u>Third Party Consents</u>"). Without limiting the generality of the foregoing sentence, the Sellers shall not be required to compensate any applicable third party, commence or participate in any Proceeding or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to indemnify, remain primarily, secondarily or contingently liable for any Assumed Liability) to any applicable third party in connection with the Sellers' obligations under this <u>Section 6.7(b)</u>; <u>provided</u>, that the Sellers shall obtain the written consent of Buyer prior to any Seller paying any such compensation, commencing or participating in any Proceeding, or offering or granting any such accommodation. The covenants in this Section shall survive the Closing.

6.8    <u>Corporate Name Change</u>. Upon termination of the Transition Services Agreement, (a) each Seller shall deliver to Buyer a duly executed and acknowledged certificate of amendment to such Seller's certificate of formation or other organizational document which is required to change such Seller's entity name to a new name that is, in Buyer's reasonable judgment, sufficiently dissimilar to such Seller's present name and, in all cases, does not include the name "Delphi" so as to avoid confusion and to make each Seller's present name available to Buyer, and (b)    each Seller shall deliver to Buyer appropriate documents, duly executed and acknowledged, which is required to change such Seller's name to such new name in any jurisdiction in which such Seller is qualified to do business, in forms reasonably satisfactory to Buyer. Buyer and any Affiliate of Buyer are hereby authorized (but not obligated) to file such certificates or other documents (at Buyer's expense) with the applicable Governmental Entities in order to effectuate such change of name at or after the termination of the Transition Services Agreement as Buyer may elect.

6.9    <u>Assignment of Contracts and Rights</u>. To the maximum extent permitted by the Bankruptcy Code, the Purchased Assets of the Sellers shall be assumed and assigned to Buyer pursuant to section 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if, after giving effect to the Sale Order, an attempted assignment without the consent of a third party (including any Governmental Entity) would constitute a breach or in any way adversely affect the rights of Buyer following the Closing. If, as of the Closing Date,

40

such consent is not obtained or such assignment is not attainable pursuant to sections 105, 363 or 365 of the Bankruptcy Code other than as a result of the failure by the Sellers to pay or otherwise satisfy all Cure Amounts, then the Sellers and Buyer will cooperate pursuant to the Transition Services Agreement, to the extent feasible, under which Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which the Sellers would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming all of the Sellers' obligations (to the extent constituting Assumed Liabilities hereunder), and any and all rights of the Sellers thereunder.

6.10    Tax Matters.

(a)    All Transfer Taxes arising out of the transfer of the Purchased Assets and any Transfer Taxes required to effect any recording or filing with respect thereto shall be borne by the Sellers. The Transfer Taxes shall be calculated assuming that no exemption from Transfer Taxes is available, unless otherwise indicated in the Sale Order or, at Closing, the Sellers or Buyer, as appropriate, provide an appropriate resale exemption certificate or other evidence acceptable to Buyer or the Sellers, as appropriate, of exemption from such Transfer Taxes. The Sellers and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. The Sellers shall file all necessary documentation and returns with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to Buyer. Each Party shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Business as is reasonably necessary for filing of all Tax Returns, including any claim for exemption or exclusion from the application or imposition of any Taxes or making of any election related to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.

(b)    Other than Transfer Taxes, all liability for Taxes with respect to the Purchased Assets attributable to the Pre-Closing Tax Period (the "Pre-Closing Taxes") shall be borne by the Sellers, and all liability for Taxes with respect to the Purchased Assets attributable to the Post-Closing Tax Period shall be borne by Buyer. For purposes of this Agreement, with respect to Taxes attributable to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of any such Taxes that are treated as Pre-Closing Taxes shall be: (i) in the case of Taxes based upon, or related to income, receipts, profits, or wages or imposed in connection with the sale, transfer or assignment of property, or required to be withheld, deemed equal to the amount which would be payable if such taxable year or other taxable period ended on the Closing Date, and (ii) in the case of other Taxes deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period.

(c)    The Parties agree that the transfer of the Purchased Assets to the Buyer is intended to be treated as a taxable acquisition of assets and the Parties shall prepare and file all relevant U.S. federal income Tax Returns consistent with such intended treatment and Section 3.3,

41

respectively, absent a contrary "determination" (within the meaning of Section 1313(a) of the Code).

(d)    The obligations set forth in this <u>Section 6.10</u> with respect to Taxes shall survive the Closing until the date that is thirty (30) days following the expiration of the applicable statute of limitations.

(e)    In order to prepare Tax Returns and defend any Tax audit or examination, Buyer shall, for a period of seven (7) years after the Closing:

(i)    Retain the books and records (including personnel files) of the Business included in the Purchased Assets, as applicable, relating to the periods prior to Closing in a manner reasonably consistent with the prior practices of the Sellers; and

(ii)    upon reasonable notice, afford the Representatives of any requesting Party or the Representatives of any Affiliate of a Party reasonable access (including the right to make photocopies), during normal business hours, to such books and records.

(iii)    Buyer shall not be obligated to provide any Person with access to any books or records (including personnel files) pursuant to this <u>Section 6.10(e)</u> where such access would violate any Law.

6.11    <u>Available Contracts List</u>. Sellers shall use commercially reasonable efforts to provide Buyer with a true and correct list of all Available Contracts (and copies thereof) promptly following the date hereof and in no event later than February 28, 2023.

6.12    <u>Business Records</u>. In partial consideration for turning over the medical/treatment records of patients treated by Sellers in the Business ("<u>Records</u>"), as of the Closing Date, Buyer agrees to assume control, custody and possession of the Records for patients seen and/or treated after December 31, 2020.  Buyer shall retain such Records in accordance with applicable New Jersey or Massachusetts Law, as well as federal Law.  Buyer recognizes that the Records are confidential under applicable New Jersey, Massachusetts and/or federal Law and may not be released to any third party except as provided by Law. Buyer agrees to honor lawful requests for release of medical records or information contained in the Records in accordance with applicable New Jersey or Massachusetts Law, and may, at Buyer's discretion, charge a reasonable fee in accordance with the current rules of the applicable state licensing board to cover the costs of reproduction, unless such fees are deemed waived by other applicable Law. Buyer shall permit Sellers, during normal business hours, to have reasonable access to, and examine and make copies of, medical records of patients treated by the Sellers which relate to events occurring prior to the Closing or events required to audit or maintain or defend positions in connection with any Medicare claims (or other claims related to any other governmental insurance program), in connection with any investigation or proceeding, in connection with an audit by a third party payor, or to conduct the defense of any potential professional liability claim, or to conduct the defense of any potential complaint or proceeding before the applicable state licensing board. The covenants in this Section shall survive the Closing.

6.13    <u>Personally Identifiable Information</u>. Notwithstanding the definition of and provisions related to Personal Information in this Agreement, Buyer agrees that with respect to Personally Identifiable Information, as that term is defined in Section 101(41A) of the Bankruptcy Code (11 U.S.C. §101(41A)) to do the following: (a) adhere to the applicable Seller's relevant privacy policy or a policy at least as comprehensive and inclusive, and (b) use such Personally Identifiable Information only in accordance with the applicable Seller's relevant privacy policy or a policy at least as comprehensive and inclusive.

6.14    <u>Acquired Bank Accounts</u>. To facilitate the transition of the Business, the Sellers agree that Buyer shall be and hereby is authorized and entitled to utilize, for the benefit of Buyer (as opposed to any Seller) the bank accounts identified on <u>Schedule 6.14</u> (the "<u>Acquired Bank Accounts</u>") in connection with the operation of the Business and/or the provision of business, administrative and other services to or for the benefit of the Business, including (a) to deposit cash and checks and receive direct payments, and (b) administer and pay payroll and other expenses, in each case as determined by Buyer in its sole discretion.  Buyer shall be and hereby is authorized to sign checks, drafts, bank notes or other instruments in the name of the applicable Seller from such Acquired Bank Accounts and to deposit such into the Acquired Bank Accounts.  The Sellers agree that amounts deposited in the Acquired Bank Accounts after the Closing in respect of goods or services rendered as of or after the Closing shall be the sole property of Buyer and not any Seller.  The Sellers (i) hereby appoint Buyer as their true and lawful agent and attorney-in-fact to enable Buyer to take the actions described in this <u>Section 6.14</u>, (ii) shall grant Buyer signature card authority with respect to the Acquired Bank Accounts, (iii) shall not deposit or withdraw any funds from the Acquired Bank Accounts until the end of the term of the Transition Services Agreement and (iv) shall cooperate with all reasonable requests of Buyer to effectuate the purposes of this <u>Section 6.14</u>.

6.15    <u>Additional Assets</u>. During the pendency of the Cases and no longer than a period of ninety (90) days following the Closing Date, if Buyer identifies any asset (including any Intellectual Property) that is necessary for the Business as conducted by the Sellers prior to Closing or that Buyer otherwise desires to use in the Business that was not sold, assigned, transferred, conveyed and delivered to Buyer pursuant to this Agreement, then Parent shall, or shall cause its applicable subsidiary(ies) to, at no cost to Buyer, promptly transfer such asset to Buyer.

6.16    <u>Supplement to Sellers' Disclosure Schedules</u>. From time to time prior to the Closing, the Sellers shall have the right (but not the obligation) to supplement or amend the Sellers' Disclosure Schedules with respect to any matter hereafter arising or of which Sellers become aware after the date hereof, which, if existing, occurring or known at the date of this Agreement, would have been required to be set forth or described in the Sellers' Disclosure Schedules (each a "<u>Schedule Supplement</u>"). Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of the termination rights contained in this Agreement or of determining whether or not the conditions set forth in <u>Section 8.1(b)</u> have been satisfied.

43

**ARTICLE VII**

**BANKRUPTCY PROVISIONS**

7.1     Expense Reimbursement. In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of the Sellers, if this Agreement is terminated for any reason other than Section 9.1(c)(i), the Sellers shall pay Buyer, in accordance with the terms of this Agreement (including Section 9.2) and the Bidding Procedures Order an aggregate amount equal to the Expense Reimbursement; provided however, if the Agreement is terminated pursuant to Section 9.1(b)(vi), Section 9.1(b)(vii) or Section 9.1(c)(ii), any such Expense Reimbursement shall only be due and payable upon consummation of an Alternate Transaction from the proceeds of such Alternate Transaction. Each of the Parties acknowledges and agrees that the agreements contained in this Section 7.1 are an integral part of the Transactions and this Agreement and that the Expense Reimbursement is not a penalty, but rather is liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Expense Reimbursement is payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing the Transactions and this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision. In accordance with Section 7.3, Sellers shall file with and seek the entry by the Bankruptcy Court of the Bidding Procedures Order approving the payment of the Expense Reimbursement. The claim of Buyer in respect of the Expense Reimbursement shall become and constitute an allowed administrative expense claim against each of the Sellers under sections 503(b) and 507(a)(2) of the Bankruptcy Code in the Cases (without the need to file a proof of claim). The Expense Reimbursement shall be payable on a joint and several basis by the Sellers.

7.2     Bankruptcy Court Orders and Related Matters.

(a)     The Sellers and Buyer acknowledge that this Agreement and the Transactions are subject to entry of, as applicable, the Bidding Procedures Order and the Sale Order. In the event of any discrepancy between this Agreement and the Bidding Procedures Order and the Sale Order, the Bidding Procedures Order and the Sale Order shall govern.

(b)     The Sellers shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures Motion to all creditors and parties in interest entitled to notice thereof pursuant to the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court, and any other applicable orders of the Bankruptcy Court, including all Persons that have asserted Liens on any Seller's assets, and all non-debtor parties to the Available Contracts of the Sellers and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other Proceedings in the Bankruptcy Court relating to this Agreement, the Transactions and the Bidding Procedures Motion.

(c)     The Sellers shall provide draft copies of all orders, motions, pleading, applications and other material documents they intend to file with the Bankruptcy Court in

connection with the sale of the Purchased Assets or the Transactions not less than three (3) Business Days prior to the date when the Sellers plan to file such document (provided, that if the delivery of such drafts at least three (3) Business Days is not reasonably practicable, such drafts shall be delivered to Buyer as soon as reasonable practicable prior to filing). The form and substance of any such document hereunder shall be acceptable to Buyer.

(d)     Subject to the Sellers exercising their rights pursuant to this Section 7.2, the Sellers shall not, and shall cause their Affiliates not to, take any action that is intended to result in, or fail to take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or, if applicable, if Buyer is the prevailing bidder at the Auction, the Sale Order. The Sellers shall, and shall cause their Affiliates to, comply with the Bidding Procedures Order and the Sale Order.

7.3     Bankruptcy Milestones. The Sellers shall achieve the following milestones by the dates set forth below (or such later date as may be agreed by Buyer) (collectively, the "Bankruptcy Milestones"):

(a)     On the Petition Date, the Debtors shall file a motion with the Bankruptcy Court seeking approval of the DIP Facility.

(b)     On or before the date that is one (1) day after the Petition Date, the Debtors shall have filed the Bidding Procedures Motion in the Bankruptcy Court.

(c)     On or before the date that is  five (5) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.

(d)     On or before ten (10) Business Days after the Petition Date, the Debtors have filed a Plan in the Cases, in form and substance acceptable to the Buyer.

(e)     On or before the date that is no later than fourteen (14) days after the Petition Date, each of the Debtors shall have filed schedules and statements of financial affairs pursuant to rule 1007 of the Federal Rule of Bankruptcy Procedure.

(f)     On or before the date that is twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order and the Final DIP Order.

(g)     On or before the date that is forty-five (45) days after the Petition Date, the Bid Deadline (as defined in the Bidding Procedures Order) shall have occurred.

(h)     On or before the date that is fifty (50) days after the Petition Date, the Debtors shall have commenced the Auction, if necessary.

(i)     On or before the date that is fifty-seven (57) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order.

(j)     On or before the date that is seventy-two (72) days after the Petition Date, the Closing shall have occurred.

# ARTICLE VIII

## CONDITIONS TO OBLIGATIONS OF THE PARTIES

8.1     <u>Conditions Precedent to Obligations of Buyer</u>. The obligation of Buyer to consummate the Transactions is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) on or prior to the Closing Date of each of the following conditions:

(a)     <u>Debt Purchase</u>. Concurrently with the Closing, the Administrative Agent shall have assigned or otherwise transferred, or caused the assignment or transfer of, the Lenders' interest in an amount outstanding under the DIP Facility and, if applicable, the Loan Debt equal to, in the aggregate, the Credit Bid Amount and related security documents to Buyer pursuant to agreements, in form and substance satisfactory to Buyer and the Administrative Agent.

(b)     <u>Accuracy of Representations and Warranties</u>. The representations and warranties of the Sellers contained in <u>Section 4.1</u> (Organization and Good Standing), <u>Section 4.2</u> (Power and Authority), <u>Section 4.4</u> (No Contravention), <u>Section 4.14</u> (Financial Advisors), <u>Section 4.16</u> (Tax Matters), <u>Section 4.22</u> (Anti-Corruption), and <u>Section 4.23</u> (Related Party Transactions) shall be true and correct on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date). The representations and warranties of the Sellers contained in <u>Section 4.6</u> (Title to Purchased Assets) shall be true and correct in all material respects on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date). All other representations and warranties of the Sellers contained in <u>Article IV</u> shall be true and correct on the date hereof and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date), except where the failure of any such representations or warranties to be true and correct, either individually or in the aggregate, has resulted in or would reasonably be expected to result in a Material Adverse Effect.

(c)     <u>Performance of Obligations</u>. Each of the Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(d)     <u>Reserved</u>.

(e)     <u>DIP Financing</u>. The DIP Documents shall have each been approved by the Bankruptcy Court pursuant to the Final DIP Order, which shall be in form and substance acceptable to Buyer.

(f)     <u>No Material Adverse Effect</u>. There shall have been no Material Adverse Effect from the Agreement Date through the Closing Date.

(g)     <u>No Challenges to Credit Bid</u>. There shall be no pending challenge or contest to the validity, amount, perfection or priority of the DIP Documents, the Loan Documents or other Claims of Buyer or Administrative Agent (as applicable) thereunder that would prevent or

otherwise limit Buyer's ability to credit bid the Credit Bid Amount or assume the Assumed Debt, unless any such challenge or contest shall have been resolved to the reasonable satisfaction of Buyer in its sole discretion;

(h)     Deliverables. The Sellers shall have delivered, or caused to be delivered, to Buyer each deliverable required pursuant to Section 3.1(b).

(i)     Bidding Procedures Order. The Bankruptcy Court shall have entered the Bidding Procedures Order, which Order shall have become a Final Order.

(j)     Sale Order. The Bankruptcy Court shall have entered the Sale Order, which Order shall have become a Final Order.

8.2     Conditions Precedent to the Obligations of the Sellers. The obligation of the Sellers to consummate the Transactions is subject to the satisfaction (or waiver by the Sellers) at or prior to the Closing Date of each of the following conditions:

(a)     Accuracy of Representations and Warranties. The representations of Buyer contained in Section 5.1 (Organization and Good Standing), Section 5.2 (Power and Authority), Section 5.3 (No Contravention) and Section 5.6 (Financial Advisors) shall be true and correct on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date). All other representations and warranties contained in Article V shall be true and correct on the date hereof and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date), except where the failure of any such representations or warranties to be true and correct (without giving effect to any limitations to "material" or similar qualifier), either individually or in the aggregate, has resulted in or would reasonably be expected to have an adverse effect on Buyer's ability to perform its obligations under this Agreement in any material respect.

(b)     Performance of Obligations. Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or on the Closing Date.

(c)     Deliverables. Buyer shall have delivered to the Sellers each deliverable required pursuant to Section 3.1(c).

(d)     Bidding Procedures Order. The Bankruptcy Court shall have entered the Bidding Procedures Order, which Order shall not be subject to a stay or otherwise been vacated.

(e)     Sale Order. The Bankruptcy Court shall have entered the Sale Order, which Order shall not be subject to a stay or otherwise been vacated.

8.3     Conditions Precedent to Obligations of Buyer and the Sellers. The respective obligations of Buyer and the Sellers to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of the condition (which may be waived by the Parties in whole or in part to the extent permitted by applicable Law) that no provision of any applicable Law or Order

enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that prevents, renders illegal or otherwise prohibits the sale and purchase of the Purchased Assets or any of the other Transactions.

8.4    <u>Frustration of Closing Conditions</u>. Neither the Sellers nor Buyer may rely on the failure of any condition to their respective obligations to consummate the Transactions set forth in <u>Section 8.1</u>, <u>Section 8.2</u> or <u>Section 8.3</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to comply with or breach of any provision of this Agreement.

<div align="center">

**ARTICLE IX**

**TERMINATION**

</div>

9.1    <u>Termination of Agreement</u>. This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(a)    by written agreement of the Sellers and Buyer.

(b)    by Buyer, if:

(i)    any Bankruptcy Milestone is not timely satisfied in accordance with <u>Section 7.3</u>;

(ii)    there shall have been a breach by the Sellers of any of their representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Section 8.1</u>, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured by the earlier of (A) May 1, 2023 (or such later date as the Parties may agree upon in writing, the "<u>Outside Date</u>") or (B) five (5) Business Days after written notice thereof shall have been received by the Sellers;

(iii)    the Cases are (A) converted to cases under chapter 7 of the Bankruptcy Code or (B) dismissed prior to the Closing;

(iv)    a trustee or examiner is appointed under section 1104 of the Bankruptcy Code;

(v)    there is a breach or event of default under the DIP Documents;

(vi)    Buyer is not the winning bidder at the Auction; or

(vii)    any Seller enters into a definitive agreement with respect to an Alternate Transaction or an Order of the Bankruptcy Court or other court of competent jurisdiction is entered approving an Alternate Transaction;

(c)    by the Sellers, if:

<div align="center">48</div>

(i)     there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 8.2, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within the earlier of (A) Outside Date or (B) five (5) Business Days after written notice thereof shall have been received by Buyer; or

(ii)     any Seller enters into a definitive agreement with respect to an Alternate Transaction that is a Competing Qualified Bid, or an Order of the Bankruptcy Court or other court of competent jurisdiction is entered approving an Alternate Transaction that is a Competing Qualified Bid.

(d)     by either Buyer or the Sellers:

(i)     if any Governmental Entity shall have enacted or issued a Law or Order or taken other action permanently restraining, prohibiting or enjoining any of the Parties from consummating the Transactions; or

(ii)     if the Closing shall not have occurred by the Outside Date (except that a Party seeking to terminate this Agreement pursuant to this Section 9.1(d)(ii) shall not have the right to do so if such Party is then in material breach of its obligations under this Agreement).

9.2     Consequences of Termination.

(a)     If either Buyer, on the one hand, or Sellers, on the other hand, desire to terminate this Agreement pursuant to Section 9.1, such Party (or Parties, as applicable) shall give written notice of such termination to the other Parties. Upon delivery of such notice of termination, this Agreement will become void and have no further force and effect and all further obligations of the Parties to each other under this Agreement will terminate without further obligation or liability of the Parties.

(b)     Notwithstanding anything to the contrary in this Agreement, if the Agreement is terminated pursuant to Section 9.1(b)(vi), Section 9.1(b)(vii) or Section 9.1(c)(ii), then Buyer shall be entitled to payment of the Expense Reimbursement, if approved by the Bankruptcy Court, upon consummation of an Alternate Transaction from the proceeds of such Alternate Transaction.

(c)     Notwithstanding anything to the contrary in this Agreement, if this Agreement is terminated for any reason other than pursuant to Section 9.1(b)(vi), Section 9.1(b)(vii) or Section 9.1(c), then Buyer shall be entitled to payment of the Expense Reimbursement no later than two (2) Business Days following such termination.

(d)     Notwithstanding the foregoing set forth in this Section 9.2, Section 1.1 (Defined Terms), Section 6.5 (Public Announcements), Section 7.1 (Expense Reimbursement), this Section 9.2 (Consequences of Termination) and Article X (Miscellaneous) shall survive any termination of this Agreement.

49

(e)     Nothing in this <u>Section 9.2</u> shall relieve Buyer or the Sellers of any liability for a breach of this Agreement prior to the date of termination.

## ARTICLE X

## MISCELLANEOUS

10.1     <u>Expenses</u>. Except as set forth in this Agreement or the Credit Documents and whether or not the Transactions are consummated, each Party shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the Transactions.

10.2     <u>Assignment</u>. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers without the prior written consent of Buyer, or by Buyer without the prior written consent of Sellers; <u>provided</u>, <u>however</u>, that Buyer may assign any or all of its rights and/or liabilities hereunder (or any document delivered by Buyer pursuant hereto) to one or more Affiliates of Buyer, or to any party which has received a contribution of the outstanding balance of Loan Debt equal to the Credit Bid Amount, in the aggregate, which assignment shall not relieve Buyer of its obligations hereunder. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

10.3     <u>Parties in Interest</u>. This Agreement shall be binding upon and inure solely to the benefit of the Sellers and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein. Without limiting the foregoing, no direct or indirect holder of any equity interests or securities of either the Sellers or Buyer (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of either the Sellers or Buyer, nor any Representative, or controlling Person of each of the Parties and their respective Affiliates, shall have any liability or obligation arising under this Agreement or the Transactions.

10.4     <u>Matters Related to the Administrative Agent</u>.

(a)     The Administrative Agent shall use commercial reasonable efforts to assign or transfer or otherwise deliver to Buyer an amount outstanding under the Loan Debt equal in the aggregate to the Credit Bid Amount and corresponding security documents, pursuant to agreements, in form and substance satisfactory to Buyer and Administrative Agent.

(b)     Each of the Parties acknowledges and agrees that none of the Sellers' title to, control of or possession of any of the Purchased Assets, or any of the Sellers' obligations in respect of any of the Assumed Liabilities, shall be transferred to or assumed by the Administrative Agent. Each Seller and Buyer, on behalf of itself and its respective Affiliates, acknowledges and agrees that neither the Administrative Agent nor any of its Affiliates (other than Buyer) shall have any Liability in the event of any breach by Buyer or any Seller of any of its representations, warranties, covenants, obligations or other agreements under this Agreement, including its obligations to consummate the Transactions in accordance with the terms of any document contemplated by this Agreement, other than as a result of or arising out of the Administrative

50

Agent's intentional fraud or willful misconduct. Each Seller and Buyer, on behalf of itself and its respective Affiliates, further acknowledges and agrees that neither the Administrative Agent nor any of its Affiliates (other than Buyer) shall in any way be deemed to be attributed or otherwise responsible for any of the representations, warranties, covenants, obligations or other agreements of Buyer or the Sellers under any document contemplated by this Agreement, including any obligation of Buyer or the Sellers hereunder to make payments of any kind, provide written approvals or make deliveries. Each Seller and Buyer, on behalf of itself and its respective Affiliates, further acknowledges and agrees that neither the Administrative Agent nor any of its Affiliates shall have any Liability or other obligation in respect of any action taken or not taken by the Administrative Agent in connection with any document contemplated by this Agreement, other than as a result of or arising out of the Administrative Agent's intentional fraud or willful misconduct. Each Seller and Buyer, on behalf of itself and its respective Affiliates, further acknowledges and agrees that Buyer, and not the Administrative Agent, has negotiated the terms of the purchase set forth herein, including the assets being purchased, the Liabilities being assumed, the Purchase Price and all the terms of this Agreement relating to the purchase by Buyer, and the Administrative Agent shall bear no responsibility and incur no Liability whatsoever to any Person solely by virtue of being a Party.

10.5    <u>Risk of Loss</u>. The Sellers will bear all risk of loss occurring to or upon any portion of the Purchased Assets prior to the Closing Date. In the event that any material portion of any Purchased Assets is damaged or destroyed prior to Closing Date, then, with respect to such Purchased Assets, Buyer may, at Buyer's option, either (i) proceed to close notwithstanding the damage or destruction of such Purchased Assets or (ii) exclude such Purchased Assets, in which event Buyer shall have no obligation to close if as a consequence of the exclusion of such Purchased Assets any condition to Closing in <u>Section 8.1</u> would not be satisfied. If Buyer closes notwithstanding an unrepaired or unrestored loss to a Purchased Asset, the Sellers will deliver and/or assign to Buyer any insurance proceeds with respect to such damage or destruction, and all claims against third parties relating thereto, and the adjustment to the Purchase Price shall be limited to the amount of any deductible or self-insured retention under the applicable policies of insurance.

10.6    <u>Notices</u>. All notices, demands, requests, waivers, consents, approvals or other communications (collectively, "<u>Notices</u>") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery or electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice. Notice shall be deemed given on the date of service or transmission if personally served or transmitted by electronic mail with confirmation of receipt (excluding "out of office" or similar automated replies); <u>provided</u>, <u>however</u>, that, if delivered or transmitted on a day other than a Business Day, notice shall be deemed given on the next Business Day. Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

If to the Sellers or Parent:        1901 W. Cypress Creek Road
                                    Suite 500
                                    Fort Lauderdale, FL 33309

|  | Attention: Harvey L. Tepner |
|  | Email: htepner@delphihealthgroup.com |

With a copy to:        Berger Singerman LLP
                       1450 Brickell Avenue
                       Suite 1900
                       Miami, Florida 33131
                       Attention: Paul Steven Singerman, Esq.
                                  Christopher Andrew Jarvinen, Esq.
                       Email:     singerman@bergersingerman.com
                                  cjarvinen@bergersingerman.com

If to Buyer or
Administrative Agent:  Brightwood Loan Administrative Services LLC
                       810 Seventh Avenue, 26th Floor
                       New York, NY 10019
                       Attention: Mia Ellis
                       Email: ellis@brightwoodlp.com

With a copy to:        King & Spalding LLP
                       1185 Avenue of the Americas, 34th Floor
                       New York, NY 10036
                       Attention: Roger Schwartz
                                  Timothy M. Fesenmyer
                                  Robert Nussbaum
                       Email:     rschwartz@kslaw.com
                                  tfesenmyer@kslaw.com
                                  rnussbaum@kslaw.com

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

10.7    Entire Agreement; Amendments and Waivers. This Agreement and all agreements entered into pursuant hereto and thereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement between the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties; provided, that nothing herein shall modify or alter the terms, rights or obligations of the Administrative Agent, the Lenders or Sellers under the Loan Documents or the DIP Documents prior to Closing. This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the Party waiving compliance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise

52

of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.8    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Counterparts to this Agreement may be delivered via electronic delivery, "pdf" or facsimile. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

10.9    Invalidity. If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, the Parties shall negotiate in good faith to modify this Agreement, to ensure that this Agreement shall reflect as closely as practicable the intent of the Parties on the date hereof. If the final judgment of a court of competent jurisdiction or other Governmental Entity declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

10.10    Governing Law. This Agreement, and any Proceeding that may be based upon, arise out of or relate or be incidental to the Transactions, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "Transaction Dispute"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Florida, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Florida to be applied, except to the extent that such Laws are superseded by the Bankruptcy Code.

10.11    Dispute Resolution; Consent to Jurisdiction.

(a)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6; provided, however, upon the closing of the Cases (except for any matter(s) with respect to the Sellers and/or the Cases in which the Bankruptcy Court retains jurisdiction with respect to such matter with respect to Sellers and/or the Cases), then, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S. District Court for the Southern District of New York sitting in New York County or the Commercial Division of the Courts of the State of New York sitting in the County of New York and any appellate court from any thereof, for the resolution of any such Transaction Dispute. In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally: (i) submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any

judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts; (ii) agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and (iii) agrees that Notice demand in accordance with <u>Section 10.6</u>, will be effective service of process; <u>provided</u>, <u>however</u>, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of New York.

(b)    The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of New York for any purpose except with respect to any Transaction Dispute.

10.12   <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>. EACH PARTY HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING IN CONNECTION WITH A TRANSACTION DISPUTE.

10.13   <u>Specific Performance</u>. Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event that a Party does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Buyer or the Sellers may have under law or equity, each Party shall be entitled to injunctive relief to prevent any breaches of the provisions of this Agreement by the other Parties and to enforce specifically this Agreement and the terms and provisions hereof.

10.14   <u>Third Party Beneficiaries</u>. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement, except as expressly provided herein, including <u>Section 10.17</u>.

10.15   <u>Counting</u>. If the due date for any action to be taken under this Agreement (including the delivery of Notices) is not a Business Day, then such action shall be considered timely taken if performed on or prior to the next Business Day following such due date.

10.16   <u>Survival</u>. Except as expressly set forth in this Agreement to the contrary, all representations and warranties and covenants of Buyer and the Sellers, respectively, contained in this Agreement or in any document delivered pursuant hereto shall not survive the Closing Date and thereafter shall be of no further force and effect, and in no event whatsoever shall any of the Sellers be liable or responsible for damages, indemnity, or other monetary remedy after Closing. Notwithstanding the foregoing, all covenants and agreements set forth in this Agreement, which by their terms would require performance after the Closing Date, shall survive until fully performed or until such covenant or agreement expires by its terms; provided that no Seller shall be liable in monetary damages thereunder.

10.17   <u>Non-Recourse</u>. All claims, Liabilities, Proceedings, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to a Transaction Dispute, may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their permitted

assignees (collectively, the "Contracting Parties"). No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, equityholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any Contracting Party (other than the Persons listed on Schedule 10.17(a)), or any director, officer, employee, incorporator, member, partner, manager, equityholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any of the foregoing (collectively, the "Nonparty Affiliates"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, Liabilities, or causes of action, arising under, out of, in connection with, or related in any manner to a Transaction Dispute; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such claims, Liabilities, and causes of action, against any such Nonparty Affiliates.

10.18   Preparation of this Agreement. Buyer and the Sellers hereby acknowledge that (a) Buyer and the Sellers jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (b) Buyer and the Sellers have been adequately represented and advised by legal counsel with respect to this Agreement and the Transactions, and (c) no presumption shall be made that any provision of this Agreement shall be construed against either Party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

10.19   Releases. Effective as of the Closing, each of the Sellers on their own behalf and on behalf of their past, present, and future predecessors, successors and assigns hereby unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge the Buyer, Administrative Agent and the Lenders, and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such, of and from any and all Claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to this Agreement, the Sellers, the Debtors, the Cases, the Transaction, the DIP Documents, and the Loan Documents in each case, in connection with any event, conduct or circumstance occurring on or prior to the Closing.

*[Remainder of Page Intentionally Left Blank]*

55

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the Sellers, Buyer and the Administrative Agent as of the date first above written.

**BUYER:**

**Delphi Lender AcquisitionCo LLC**

By: _____
Name:  Sengal Selassie
Title:    Authorized Signatory

**SELLERS:**

**Union Fresh Start LLC d/b/a Serenity at Summit**

By: *Harvey Tepner*
Name: Harvey Tepner
Title:   Authorized Signatory

**Summit Behavioral Health Limited Liability Company d/b/a Summit Behavioral Health**

By: *Harvey Tepner*
Name: Harvey Tepner
Title:   Authorized Signatory

**SBH Haverhill, LLC d/b/a Serenity at Summit**

By: *Harvey Tepner*
Name: Harvey Tepner
Title:   Authorized Signatory

**PARENT:**

**DR Parent, LLC**, solely for purposes of <u>Section 3.1(b)</u> and <u>Section 6.15</u>

By: _____
Name: Harvey Tepner
Title: Authorized Signatory

[*Signature Page to Asset Purchase Agreement*]

**ADMINISTRATIVE AGENT:**

**Brightwood Loan Services LLC**, solely for purposes of <u>Section 3.2</u>, <u>Section 10.4</u>, and <u>Section 10.7</u> to <u>10.19</u>

By: _____
Name:  Sengal Selassie
Title:   Authorized Signatory

## <u>EXHIBIT A</u>

## Bidding Procedures

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                              Chapter 11 Cases

DELPHI BEHAVIORAL HEALTH                            Case No. 23-_____
GROUP, LLC, *et al.*,[1]
                                                    (Jointly Administered)

      Debtors.

_____/

## BIDDING PROCEDURES[2]

On February ____, 2023 (the "Petition Date"), each of the above-captioned, affiliated, debtors and debtors-in-possession (collectively, the "Debtors") filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").

On February ____, 2023, the Debtors filed the *Debtors' Expedited Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry into the Stalking Horse Bid Agreement with the Stalking Horse Bidder, Subject to the Bidding Procedures and the Sale Hearing, (II) Approving Bidding Procedures, (III) Scheduling the Bid Deadlines and the Auction, (IV) Scheduling a Hearing to Consider the Transaction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Procedures, and (VII) Approving a Deadline for Interested Parties to Submit Bids to Purchase Any of the Debtors' Remaining Assets Which Are Not*

---

[1]    The address of the Debtors is 1901 West Cypress Creek Road, Suite 500, Fort Lauderdale, FL 33309. The last four digits of the Debtors' federal tax identification numbers are: (i) Delphi Behavioral Health Group, LLC (2076), (ii) 61 Brown Street Holdings, LLC (0007), (iii) Aloft Recovery, LLC (6674), (iv) Banyan Recovery Institute, LLC (6998), (v) Breakthrough Living Recovery Community, LLC (5966), (vi) California Addiction Treatment Center, LLC (7655), (vii) California Vistas Addiction Treatment, LLC (8272), (viii) DBHG Holding Company, LLC (6574), (ix) Defining Moment Recovery Community, LLC (3532), (x) Delphi Health BuyerCo, LLC (2325), (xi) Delphi Health Group, LLC (0570), (xii) Delphi Intermediate HealthCo, LLC (6378), (xiii) Delphi Management LLC (6474), (xiv) Desert View Recovery Community, LLC (7437), (xv) DR Parent, LLC (2700), (xvi) DR Sub, LLC (8183), (xvii) Las Olas Recovery, LLC (9082), (xviii) Maryland House Detox, LLC (1626), (xix) New Perspectives, LLC (0508), (xx) Next Step Housing, LLC (6975), (xxi) Ocean Breeze Detox, LLC (7019), (xxii) Ocean Breeze Recovery, LLC (9621), (xxiii) Onward Living Recovery Community, LLC (4735), (xxiv) Palm Beach Recovery, LLC (4459), (xxv) Peak Health NJ, LLC (7286), (xxvi) QBR Diagnostics, LLC (7835), (xxvii) Rogers Learning, LLC (1699), (xxviii) SBH Haverhill, LLC (0971), (xxix) SBH Undion IOP, LLC (4139), (xxx) Summit at Florham Park, LLC (8226), (xxxi) Summit Behavioral Health, LLC (3337), (xxxii) Summit Health BuyerCo, LLC (2762), (xxxiii) Summit IOP Limited (4567), and (xxxiv) Union Fresh Start, LLC (6841).

[2]    Any capitalized term not explicitly defined herein shall have the meaning ascribed to it in, as applicable, the Stalking Horse Bid Agreement, the Bidding Procedures Motion or the Bidding Procedures Order (as each is defined herein).

11843540-13

*Purchased Assets Subject to the Stalking Horse Bid Agreement, and (VIII) Granting Related Relief*
[ECF No. __] (the "Bidding Procedures Motion").

The Bidding Procedures Motion sought approval of, among other things, the procedures through which the Debtors, in the reasonable exercise of their business judgment, will determine the highest or otherwise best bid for the sale (the "Sale") of three of the Debtors' inpatient and outpatient substance use disorder treatment facilities (each, a "SUD", and collectively, the "SUDs") located in Massachusetts and New Jersey, identified on **Schedule 1** annexed hereto, and all related assets (collectively, the assets subject to the Sale are the "Purchased Assets", as such term is defined in the Stalking Horse Bid Agreement (defined herein)).

On February ____, 2023, three of the Debtors (each, a "Seller" and collectively, the "Sellers")[3] entered into that certain *Asset Purchase Agreement* (the "Stalking Horse Bid Agreement"), a copy of which is attached as Exhibit "A" to the Sale Motion (such bid, the "Stalking Horse Bid"), by and among Lender AcquisitionCo LLC, as purchaser (together with each of its permitted successors, assigns and designees, collectively, the "Stalking Horse Bidder") and Brightwood Loan Services LLC, solely for the purposes stated expressly in the Stalking Horse Bid Agreement, the "Administrative Agent").

On February ___, 2023, the Bankruptcy Court entered an order approving the Bidding Procedures Motion [ECF No. __] (the "Bidding Procedures Order" and the procedures set forth herein, the "Bidding Procedures"), which, among other things, authorizes the Debtors to determine the highest or otherwise best bid for the Purchased Assets through the process and the procedures set forth in these Bidding Procedures, and authorized the Debtors' entry into the Stalking Horse Bid Agreement, pursuant to which the Stalking Horse Bidder has committed to (a) purchase, acquire, and take assignment and delivery of the Purchased Assets, free and clear of all liens, claims, encumbrances, and other interests (except as otherwise expressly provided in the Stalking Horse Bid Agreement), and (b) assume certain liabilities associated with the Debtors' operations involving the Purchased Assets as set forth in the Stalking Horse Bid Agreement, in the form of a credit bid.

Unless expressly indicated, the following Bidding Procedures apply to all bidders regardless of the phase of the Auction in which the bidder intends to participate.

## Key Dates

| Event | Date |
|-------|------|
| Hearing on the Motion for Bidding Procedures | February __, 2023 at ___ a.m./p.m. (prevailing Eastern Time) |
| Service of (i) Bidding Procedures Order, and (ii) Assumption Notice | Within three (3) business days after the Bankruptcy Court's entry of the Bidding Procedures Order. |

---

[3]    The Sellers are the following Debtors: Debtors: (i) Union Fresh Start LLC (d/b/a Serenity at Summit); (ii) Summit Behavioral Health Limited Liability Company (d/b/a Summit Behavioral Health Princeton Junction); and (iii) SBH Haverhill, LLC (d/b/a Serenity at Summit New England).

2

| Contract Objection Deadline | March __, 2023 at 4:00 p.m. (prevailing Eastern Time) |
|---|---|
| Sale Objection Deadline | March __, 2023 at 4:00 p.m. (prevailing Eastern Time) |
| Bid Deadline | March __, 2023 at 5:00 p.m. (prevailing Eastern Time) |
| Notice of No Auction to be Held (if applicable) | March __, 2023 at 3:00 p.m. (prevailing Eastern Time) |
| Notification of Auction Baseline Bid to all Competing Qualified Bidders | March __, 2023 at 5:00 p.m. (prevailing Eastern Time) |
| Auction | March __, 2023 at 10:00 a.m. (prevailing Eastern Time), subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Auction to a later date.  If an Auction is to be held, it shall take place at the offices of the Debtors' counsel, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131), and/or by electronic means (e.g., Zoom). |
| Debtors File Notice Identifying the Successful Bidder and any Backup Bidders | Within one (1) business days following the conclusion of the Auction. |
| Sale Hearing | March __, 2023 at ___ a.m./p.m. (prevailing Eastern Time), subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Sale Hearing to a later date, subject to the availability of the Court. |
| Adequate Assurance Objection (in the event the Stalking Horse Bidder is not the Successful Bidder) | At or before the Sale Hearing. |
| Deadline to Close the Sale | April __, 2023, subject to the right of the Debtors, in the reasonable exercise of their business judgment and the consent of the Stalking Horse Bidder, to agree to a later date. |

## <u>Access to Diligence Materials</u>.

To participate in the bidding process and to receive access to due diligence information, including access to the electronic data room being maintained by Berger Singerman LLP (the Debtors' counsel), and to additional non-public information regarding the Debtors and their business (collectively, the "<u>Diligence Materials</u>"), a party must deliver to the Debtors: (i) an executed confidentiality agreement in the form and substance satisfactory in the sole discretion of the Debtors (the "<u>Confidentiality Agreement</u>"); (ii) written evidence demonstrating such party's financial capability to close a transaction involving the Purchased Assets (an "<u>Alternate Transaction</u>"), as determined by the Debtors, in consultation with the Consultation Parties; and (iii) any other evidence that the Debtors, in consultation with the Consultation Parties, may reasonably request (any such party that satisfies the foregoing, a "<u>Preliminary Interested Investor</u>").

Only a Preliminary Interested Investor may proceed to conduct due diligence.  Only a Preliminary Interested Investor may submit a Bid (as defined below).

3

All due diligence requests must be directed to the Debtors to the attention of Mr. Harvey Tepner (htepner@delphihealthgroup.com). To the extent reasonably practicable, Mr. Tepner will also facilitate meetings between any interested Preliminary Interested Investor and the Debtors' management team, which meetings will proceed in a manner determined by the Debtors, in their sole discretion. The Debtors shall promptly provide the Stalking Horse Bidder with any information provided to a prospective bidder or Competing Qualified Bidder that has not already been provided to the Stalking Horse Bidder.

The due diligence period will end on the Bid Deadline (as defined below), and, subsequent to the Bid Deadline, the Debtors and their representatives, including but not limited to the Debtors' Advisors (as defined below), will have no obligation to furnish any due diligence information to any party. For the avoidance of doubt, no due diligence will continue after the Bid Deadline.

Neither the Debtors nor any of their respective representatives, including the Debtors' Advisors, will be obligated to furnish any information relating to the Purchased Assets other than to Preliminary Interested Investors. The Debtors and the Debtors' Advisors make no representations or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in any definitive agreement entered into with a Successful Bidder.

The Debtors and the Debtors' Advisors will coordinate all reasonable requests from Preliminary Interested Investors for additional information and due diligence access; provided that the Debtors may decline to provide such information to Preliminary Interested Investors who, at such time and in the Debtors' reasonable exercise of their business judgment, have not established, or who have raised doubt, that such Preliminary Interested Investor intends in good faith to, or has the capacity to, consummate an Alternate Transaction.

**For any Preliminary Interested Investor or Competing Qualified Bidder who, in the Debtors' determination, is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold, or to delay providing, in their sole discretion, and subject to any requirements under applicable law, <u>any</u> Diligence Materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such Preliminary Interested Investor or Competing Qualified Bidder, at any such time.**

**<u>All parties, Preliminary Interested Investors, and Competing Qualified Bidders are prohibited from communicating with any of the Debtors' employees, directors, officers, landlords, vendors, suppliers, agents, existing lender(s), interest or equity holders, or with any other potential bidder, Preliminary Interested Investor, or Competing Qualified Bidder with respect to any Bid or Alternate Transaction absent the prior written consent (email shall suffice) of the Debtors; provided that if such consent is given a representative of the Debtors shall be present for, or party to, any such communications (unless otherwise waived in writing (email shall suffice) by the Debtors in their sole discretion).</u>**

Each Preliminary Interested Investor and Competing Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or the Debtors' Advisors regarding such Preliminary Interested Investor or Competing Qualified Bidder.

Notwithstanding anything to the contrary herein, the Stalking Horse Bidder shall be qualified as a Preliminary Interested Investor and a Competing Qualified Bidder.

<div align="center">

**Bid Qualification Process**

</div>

**I.     Bid Deadline**.

A Preliminary Interested Investor that desires to make a proposal, solicitation, or offer for all or substantially all of the Purchased Assets (each, a "Bid") shall transmit such proposal, solicitation, or offer via email (in pdf or similar format) so as to be actually received by the following parties on or before **March __, 2023, at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"):

   a.   *Bankruptcy Counsel to the Debtors*:  Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com),  Christopher  Andrew  Jarvinen,  Esq. (cjarvinen@bergersingerman.com),  and  Robin  J.  Rubens (rrubens@bergersingerman.com); and

   b.   *The Interim Chief Executive Officer for the Debtors:* c/o Getzler Henrich & Associates LLC, 295 Madison Avenue, 20th Floor, New York, New York 10017 (Attn: Edward A. Phillips, ephillips@getzlerhenrich.com) (and together with Berger Singerman LLP, collectively, the "Debtors' Advisors").

**II.    Bid Requirements**.

To be eligible to participate in the Auction (defined below), other than with respect to the Stalking Horse Bid, each Bid by a Preliminary Interested Investor (a "Bidder") must be submitted in writing and satisfy each of the following requirements (collectively, the "Bid Requirements"):

   a.   Same or Better Terms.  The Bid must be on terms that are substantially the same or better than the terms of the Stalking Horse Bid Agreement, as determined by the Debtors in their sole discretion (in consultation with the Consultation Parties) and the Bid must identify which assets the Bidder intends to purchase and include executed transaction documents (as defined herein, an Alternate Transaction).  A Bid shall include both a clean version (in MS-Word) and a blackline against the Stalking Horse Bid Agreement marked to show all changes requested by the Bidder. A Bid will not be considered qualified for the Auction if: (i) such Bid contains additional material representations and warranties, covenants, closing conditions (including, but not limited to, any contingency involving the need to obtain any license in any way related to the operations of the Purchased Assets), termination rights, financing, or due diligence contingencies other than as may be included in the Stalking Horse Bid Agreement (it being agreed and understood that such Bid shall modify the Stalking Horse Bid Agreement as needed to comply in all respects with the Bidding Procedures Order (including removing any termination rights in conflict with the Bidding Procedures Order) and will remove provisions that apply only to the Stalking Horse Bidder, as the stalking horse bidder, such as the Expense

Reimbursement); (ii) such Bid is not received by each of the Debtors' Advisors in writing on or prior to the Bid Deadline; (iii) such Bid does not provide for payment of the Expense Reimbursement in cash upon closing; and (iv) such Bid does not contain evidence that the Bidder(s) has/have received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby, including proof that the Earnest Money Deposit (defined below) has been made.

b.  <u>Amount of Bid</u>.  Each Bid must be for all of the Purchased Assets and shall clearly show the amount of the purchase price.  In addition, a Bid must include (i) cash consideration of not less than the sum of (a) the Purchase Price (including the Credit Bid Amount and the amount of the Assumed Debt, as each term is defined in the Stalking Horse Bid Agreement), *plus* (b) all additional amounts outstanding under the DIP Facility not included in the Assumed Debt, *plus* (c) the Expense Reimbursement in the amount of $375,000.00, *plus* (d) an initial cash overbid of $500,000.00, and (ii) assumption of the Assumed Liabilities (other than the Assumed Debt).

c.  <u>Earnest Money Deposit</u>.  Each Bid, must be accompanied by a cash deposit in the amount equal to ten (10%) percent of the aggregate value of the cash and non-cash consideration of the Bid (the "<u>Earnest Money Deposit</u>") to be deposited with an escrow agent selected by the Debtors (the "<u>Escrow Agent</u>"), *provided that, for the avoidance of doubt,* the Stalking Horse Bidder will not be required to provide an Earnest Money Deposit.

d.  <u>Proof of Financial Ability to Perform</u>.  The Bid must include written evidence that the Debtors conclude in their sole discretion demonstrates that the Bidder has the necessary financial ability to close the Alternate Transaction and to provide adequate assurance of future performance under all executory contracts and unexpired leases to be assumed and assigned in such Alternate Transaction (i.e., the Assumed Contracts).

e.  <u>Identity</u>.  Each Bid must fully disclose the identity of each person and entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder, including if such Bidder is an entity formed for the purpose of consummating the proposed Alternate Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors' Advisors should contact regarding such Bid.  Nothing herein shall preclude multiple Preliminary Interested Investors from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein.  Each Bid must also fully disclose any past or present agreements with or connections to the Debtors or their non-debtor affiliates, the Stalking Horse Bidder, any other known prospective bidder or Competing

6

Qualified Bidder, any of the owners of the Debtors or their non-debtor affiliates, and/or any officer or director of the foregoing.

f.    <u>Authorization</u>. Each Bid must contain written evidence acceptable to the Debtors in their sole discretion that the Bidder has obtained appropriate authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its Bid and the consummation of the Alternate Transaction contemplated in such Bid.

g.    <u>Contingencies</u>. A Bid will not be considered qualified for the Auction if it (i) contains any of the contingencies set forth above in sub-paragraph "a", or (ii) is conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties set forth in any definitive agreement entered into by the Debtors with a Successful Bidder at the Closing.

h.    <u>Irrevocable</u>. A Bid must be irrevocable through the Auction, <u>provided</u>, <u>however</u>, that if such Bid is accepted as the Successful Bid or a Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of these Bidding Procedures.

i.    <u>Adequate Assurance of Future Performance</u>. To the extent applicable, each Bid must contain evidence that the Bidder has the ability to comply with the requirements of adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code (the "<u>Adequate Assurance Information</u>") with respect to the Assumed Contracts. Such Adequate Assurance Information may include: (i) information about the Bidder's financial condition, such as federal tax returns for two (2) years, a current financial statement, or bank account statements; (ii) information demonstrating (as determined by the Debtors in the reasonable exercise of their business judgment (in consultation with the Consultation Parties)) that the Bidder has the financial capacity to consummate the proposed Alternate Transaction; (iii) evidence that the Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid; (iv) the identity and exact name of the Bidder (including any equity holder or other financial backer if the Bidder is an entity formed for the purpose of consummating the proposed Alternate Transaction; (v) such additional information regarding the Bidder as the Bidder may elect to include; and (vi) such other documentation that the Debtors may request. By submitting a Bid, the Bidder(s) agree that the Debtors may disseminate their Adequate Assurance Information to affected landlords and contract counterparties in the event that the Debtors determine such Bid to be a Qualified Bid.

j.    <u>As-Is, Where-Is</u>. Each Bid must include a written acknowledgement and representation that the Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the assets prior to making its Bid; (2) has relied solely upon its own independent review, investigation, and/or inspection of any documents

and/or the asset(s) in making its Bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's mark-up of the Stalking Horse Bid Agreement.

k.   <u>Affirmative Statement</u>.  Each Bid shall be accompanied by an affirmative statement in which the Bidder explicitly agrees that: (i) it has and will continue to comply with these Bidding Procedures; (ii) the Bid it submits does not entitle such Bidder (and if it becomes a Competing Qualified Bidder) to any breakup fee, expense reimbursement, termination payment, or similar type of payment or reimbursement; and (iii) it waives any substantial contribution administrative expense claims under Bankruptcy Code section 503(b) related to bidding for the Purchased Assets.

l.   <u>Time Frame for Closing</u>. A Bid must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors after consultation with the Consultation Parties, which time frame shall include a closing by no later than **April __, 2023**.

m.   <u>Adherence to Bid Procedures</u>. By submitting a Bid, each Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of these Bidding Procedures and after the conclusion of the Auction, if any, agrees not to submit a Bid, or seek to reopen the Auction.

n.   <u>Non-License Government Approvals</u>. Each Bid must include a description of all governmental, regulatory, or other approvals or consents that are required to close the proposed Alternate Transaction (other than any license related in any way to the operations of the Purchased Assets), together with evidence satisfactory to the Debtors, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals; provided, however, as set forth above in sub-paragraphs "a" and "g", a Bid will not be considered qualified for the Auction if, among other things, it contains any contingency described therein, including but not limited to, the need to obtain any license in any way related to the operations of the Purchased Assets.

o.   <u>Non-License Government Approvals Timeframe</u>. Each Bid must set forth an estimated timeframe for obtaining any required, governmental, regulatory or other approvals or consents for consummating any proposed Sale; provided, however, as set forth above in sub-paragraphs "a" and "g", a Bid will not be considered qualified for the Auction if, among other things, it contains any contingency described therein, including but not limited to, the need to obtain any license in any way related to the operations of the Purchased Assets.

p.   Consent to Jurisdiction. By submitting a Bid, each Bidder agrees and shall be deemed to have agreed, to submit to the jurisdiction of the Bankruptcy Court and waives any right to a jury trial in connection with any disputes relating to the Debtors' qualification of bids, the Auction, if any, the construction and enforcement of these Bidding Procedures, the Alternate Transaction documents, and the Closing, as applicable

q.   Credit Bid.  If a Bid, other than the Stalking Horse Bid Agreement, consists in whole or in part of a credit bid pursuant to section 363(k) of the Bankruptcy Code (a "Credit Bid"): (i) it contains evidence sufficient to the Debtors, after consultation with the Consultation Parties, to demonstrate that the secured claims subject to such Credit Bid are secured by unavoidable, properly perfected liens on the Purchased Assets subject to such Credit Bid; and (ii) it includes a cash purchase price sufficient to pay in full the sum of the following, (a) all amounts being paid in full in cash as part of the Purchase Price under the Stalking Horse Bid Agreement (excluding, for the avoidance of doubt, any Assumed Liabilities to be assumed by the Stalking Horse Bidder pursuant to the Stalking Horse Bid Agreement), plus (b) all obligations under the DIP Facility, plus (c) all obligations secured by senior or pari passu liens on the Purchased Assets (e.g., the Loan Debt) to be purchased pursuant to such Credit Bid, plus (d) the Expense Reimbursement (in addition to the requirements set forth in (b) above).  The Stalking Horse Bid Agreement is, in part, a Credit Bid, notwithstanding any earlier Bids.  Further, any Credit Bid, including the Stalking Horse Bid, shall be permitted to increase its Credit Bid up to the full amount of its applicable outstanding secured obligations.

r.   Transition Services. Each bid must state or otherwise estimate the types of transition services, if any, the prospective bidder would require of and/or provide to the Debtors, including an estimate of the time any such transition services would be required of and/or provided to the Debtors, if the prospective bidder's bid were selected as the Successful Bid for the applicable Purchased Assets.

By submitting its Bid, each Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bidding Procedures, including but not limited to, refraining from, after the conclusion of the Auction, either submitting a Bid or seeking to reopen the Auction. **The submission of a Bid shall constitute a binding and irrevocable offer to acquire the Purchased Assets (or assets) as reflected in such Bid**.

## III.   **Designation of Competing Qualified Bidders**.

The Debtors will review each Bid received from a Bidder.  A Bid will be considered a "Competing Qualified Bid," and each Bidder that submits a Competing Qualified Bid will be considered a "Competing Qualified Bidder," if the Debtors determine, in their sole discretion and in the reasonable exercise of their business judgment (in consultation with the Consultation Parties), that such Bid was received before the Bid Deadline and satisfies each of the Bid Requirements set forth above.

9

Notwithstanding anything herein to the contrary, the Stalking Horse Bid Agreement submitted by the Stalking Horse Bidder shall be deemed a Competing Qualified Bid, and the Stalking Horse Bidder is a Competing Qualified Bidder for each phase of the Auction.

No later than three (3) business days after the receipt of a Bid, the Debtors will notify the relevant Bidder whether or not its Bid has been designated as a Competing Qualified Bid.

Upon the receipt of any competing Bid(s), the Debtors shall immediately provide counsel for the Stalking Horse Bidder copies of any blackline of the Stalking Horse Bid Agreement received by the Debtors from such Bidder(s).

If any Bid is determined by the Debtors not to be a Competing Qualified Bid, the Escrow Agent will refund such Bidder's Earnest Money Deposit on the date that is three (3) business days after the Debtors inform the Bidder that its Bid is not a Competing Qualified Bid, or as soon as is reasonably practicable thereafter.

Between the date that the Debtors notify a Bidder that it is a Competing Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Competing Qualified Bid from a Competing Qualified Bidder.  Without the prior written consent of the Debtors, a Competing Qualified Bidder may not modify, amend, or withdraw its Competing Qualified Bid, except for proposed amendments to increase the purchase price, or otherwise improve the terms of, the Competing Qualified Bid, during the period that such Competing Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Competing Qualified Bid may be improved at the Auction as set forth herein.  Any improved Competing Qualified Bid must continue to comply with the requirements for Competing Qualified Bids set forth in these Bidding Procedures.

## IV.   **Right to Credit Bid**.

Subject to the other requirements in these Bidding Procedures, and in connection with the Sale of the Purchased Assets, secured credit parties, which hold perfected security interests in the Purchased Assets, may seek to submit Credit Bids for such Purchased Assets.  The Stalking Horse Bid Agreement is, in part, a Credit Bid.  Subject to a Bid and Competing Qualified Bid satisfying the requirements of these Bidding Procedures, the Debtors shall treat comparable Credit Bids and cash bids as equivalent and no Credit Bids shall be considered inferior to a cash bid merely because it is a Credit Bid.

Notwithstanding anything to the contrary contained herein, but subject in all respects to the challenge period as set forth in any Interim DIP Order or Final DIP Order, the Administrative Agent for the Prepetition Lenders and/or the Administrative Agent for the DIP Lenders shall have the right to Credit Bid all or any portion of the aggregate amount of their respective applicable outstanding secured obligations to the maximum extent permitted by section 363(k) of the Bankruptcy Code, notwithstanding any earlier or lower Credit Bid of any portion of their respective applicable outstanding secured obligations.

## V.    **The Auction**.

If one or more Competing Qualified Bids (other than the Stalking Horse Bid Agreement submitted by the Stalking Horse Bidder) are received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the highest or otherwise best Competing Qualified Bid. If no Competing Qualified Bid (other than the Stalking Horse Bid Agreement) is received by the Bid Deadline, no Auction shall be conducted and the Stalking Horse Bid Agreement shall be deemed to be the Successful Bid and the Stalking Horse Bidder shall be deemed to be the Successful Bidder.  Only Competing Qualified Bidders (including, but not limited to the Stalking Horse Bid) may participate in the Auction.

No later than **March __, 2023 at 5:00 p.m. (prevailing Eastern Time)**, the Debtors will notify all Competing Qualified Bidders of the highest or otherwise best pre-Auction, Competing Qualified Bid, as determined by the Debtors in the reasonable exercise of their business judgment, in consultation with the Consultation Parties (the "Auction Baseline Bid"), and will provide copies of the documents supporting the Auction Baseline Bid to all Competing Qualified Bidders.

The determination of which Competing Qualified Bid constitutes the Auction Baseline Bid and which Competing Qualified Bid constitutes the Successful Bid (defined herein) shall take into account any factors that the Debtors deem in their sole discretion to be relevant to the value of the Competing Qualified Bid to the Debtors' estates, including, among other things: (a) the type and amount of Purchased Assets (or assets) sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Competing Qualified Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Auction Baseline Bid; (e) the tax consequences of such Competing Qualified Bid; (f) the assumption of obligations, including contracts and leases; (g) the cure amounts to be paid; (h) the impact on employees, including the number of employees proposed to be transferred and employee-related obligations to be assumed, including the assumption of collective bargaining agreements; and (i) regulatory authorizations from any relevant government agency and all other applicable governmental entities relating to the services and products provided by or on behalf of the Debtors, including approvals, authorizations, certificates, registrations, licenses, exemptions, permits, clearances, and consents (collectively, the "Bid Assessment Criteria").

The Auction (if any) shall take place on **March __, 2023 at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, or such other date and time and/or place or by electronic means (e.g., Zoom) as selected by the Debtors (in consultation with the Consultation Parties), and the Debtors shall notify all Competing Qualified Bidders, including the Stalking Horse Bidder, counsel for the Stalking Horse Bidder, and other invitees of the time and place of the Auction in accordance with these Bidding Procedures, and for the avoidance of any doubt, the Auction is subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Auction to a later date.

The Auction shall be conducted according to the following procedures:

11843540-13

a.    The Debtors Shall Conduct the Auction.

The Debtors and their professionals, including but not limited to the Debtors' Advisors, shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall announce which Competing Qualified Bid is deemed to be the Auction Baseline Bid.

Only (i) the Debtors, (ii) the Stalking Horse Bidder, (iii) other Competing Qualified Bidders, (iv) the Consultation Parties, and (v) with respect to (i) through (iv), each of their respective representatives and legal and financial advisors, shall be entitled to attend the Auction, and the Competing Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives.

b.    No Collusion; Good-Faith *Bona Fide* Offer.

Each Competing Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding or sale of the Purchased Assets, and (ii) its Competing Qualified Bid is a good-faith bona fide offer and it intends to consummate the proposed transaction for the Purchased Assets if selected as the Successful Bidder.

c.    Terms of Overbids.

An "Overbid" means any bid made at the Auction by a Competing Qualified Bidder subsequent to the Debtors' announcement of the Auction Baseline Bid.  To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(i)    Minimum Overbid Increment.  Any Overbid following the Auction Baseline Bid shall be no less than the value of the $500,000.00, as determined by the Debtors in the reasonable exercise of their business judgment.  Additional consideration in excess of the amount set forth in an Auction Baseline Bid, including each Overbid, may include cash, credit bids and/or other noncash consideration, or any combination of the foregoing, as determined by the Debtors in the reasonable exercise of their business judgment.  For purposes of the Overbid, the Stalking Horse Bidder shall be entitled to a dollar for dollar credit in the amount of the Expense Reimbursement.

(ii)   Remaining terms are the same as for Competing Qualified Bids.  Except as modified herein, an Overbid must comply with the conditions for a Competing Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid must remain open and binding on the Bidder until and unless the Debtors accept a higher Overbid or have a Backup Bidder (as defined below).  An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Competing Qualified Bid or Overbid, as determined by the Debtors in the reasonable exercise of their

12

business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

     d.    <u>Consideration of Overbids</u>.

The Debtors reserve the right, in the reasonable exercise of their business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times, to, among other things, to (i) facilitate discussions between the Debtors and the Competing Qualified Bidders, (ii) allow Competing Qualified Bidders to consider how they wish to proceed, and (iii) provide Competing Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in the reasonable exercise of their business judgment, may require, that the relevant Competing Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed purchase of the Purchased Assets at the prevailing Overbid amount.

Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (as the Debtors may, in the reasonable exercise of their business judgment, extend from time to time, the "<u>Overbid Round Deadline</u>") by which time any Overbids must be submitted to the Debtors.

Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified, (a) in the initial Overbid round, an Overbid as being higher or otherwise better than the Auction Baseline Bid, or, (b) in subsequent rounds, an Overbid as being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>").  The Debtors shall describe to all Competing Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

     e.    <u>Backup Bidder</u>.

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Competing Qualified Bid at the Auction, as determined by the Debtors, in the reasonable exercise of their business judgment (in consultation with the Consultation Parties), will be designated as the backup bidder (the "<u>Backup Bidder</u>").  The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "<u>Backup Bid</u>") open and irrevocable until the earlier of 4:00 p.m. (prevailing Eastern Time) on the date that is the earlier of sixty (60) days after the conclusion of the Auction (the "<u>Outside Backup Date</u>") or the closing of the Alternate Transaction with the Successful Bidder.  For the avoidance of doubt, the Debtors may not designate the Stalking Horse Bidder as a Backup Bidder without its express written consent.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction, the Debtors may designate (in consultation with the Consultation Parties) the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction, with the Backup Bidder.  A hearing to authorize a sale to the Backup

Bidder will be held by the Bankruptcy Court on no less than three (3) days' notice, with supplemental objections due at least two (2) days prior to such hearing (the "Backup Sale Hearing"). For the avoidance of doubt, only parties who timely filed an objection to the Sale by the Sale Objection Deadline may supplement their original objection with respect to the Backup Bidder and all such issues shall be limited to issues relating to the identity of the Backup Bidder. In such case, the defaulting Successful Bidder's Earnest Money Deposit shall be forfeited to the Debtors. The Debtors also specifically reserve the right to seek all available damages from the defaulting Successful Bidder. The Earnest Money Deposit of the Backup Bidder shall be held by the Debtors until the earlier of one (1) business day after (i) the closing of the transaction with the Successful Bidder and (ii) the Outside Backup Date.

       f.      <u>Additional and Modified Procedures</u>.

The Debtors (in consultation with the Consultation Parties and the Stalking Horse Bidder) may announce at the Auction additional or modified rules and procedures that are reasonable under the circumstances (e.g., limitations on the amount of time to make subsequent Overbids, changes in minimum Overbid increments, etc.) for conducting the Auction so long as such rules are not inconsistent with the Bidding Procedures or the Stalking Horse Bid Agreement.

       g.      <u>Consent to Jurisdiction as Condition to Bidding</u>.

The Stalking Horse Bidder and all Competing Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection any disputes relating to these Bidding Procedures, the Auction, or the construction and enforcement of any documents relating to an Alternate Transaction.

       h.      <u>Closing the Auction</u>.

The Auction shall continue until the Debtors determine, in the reasonable exercise of their business judgment (in consultation with the Consultation Parties), that there is a highest or otherwise best Competing Qualified Bid or Competing Qualified Bids at the Auction for all or substantially all of the Purchased Assets (each a "<u>Successful Bid</u>" and each Bidder submitting such Successful Bid, a "<u>Successful Bidder</u>"). The Auction shall not close unless and until all Bidders who have submitted Competing Qualified Bids have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbids and the Successful Bidder has submitted fully executed sale and transaction documents memorializing the terms of the Successful Bid. Within one (1) business day following the conclusion of the Auction, the Debtors shall file a notice on the Bankruptcy Court's docket in the lead case for the Debtors identifying the Successful Bidder for the Purchased Assets and any applicable Backup Bidders. The Debtors shall not consider any Bids submitted after the conclusion of the Auction and any and all such Bids shall be deemed untimely and shall under no circumstances constitute a Competing Qualified Bid.

Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

<div align="center">14</div>

The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Auction Baseline Bid, all Overbids, all Prevailing Highest Bids, the Successful Bid and any Backup Bid.

## VI.   **Expense Reimbursement**.

The Stalking Horse Bidder is entitled to payment of the Expense Reimbursement pursuant to the terms of the Stalking Horse Bid Agreement; provided, however that the amount of the Expense Reimbursement that a Preliminary Interested Investor shall use solely for the purpose of the amount of the "Expense Reimbursement" referenced in the "Amount of Bid" set forth in paragraph II.b of these Bidding Procedures is set at $375,000.00; provided further, the Stalking Horse Bidder shall provide the Debtors and the U.S. Trustee with documentation supporting the payment of the Expense Reimbursement up to $500,000.00 five business days prior to the Sale Hearing; provided further, that the U.S. Trustee may only seek to challenge on the grounds of amounts sought for reimbursement over $375,000.00; provided further, that the Stalking Horse Bidder may only seek reimbursement of fees incurred in connection to the Stalking Horse Bid Agreement and the Sale Hearing. Nothing herein precludes the right of the Stalking Horse Bidder to seek reimbursement in excess of $500,000.00 in establishing the reasonableness of the Expense Reimbursement (to the extent applicable), however it shall only be entitled to actual payment and reimbursement up to $500,000.00.

The Debtors recognize the value and benefits that the Stalking Horse Bidder has provided to the Debtors' estates by entering into the Stalking Horse Bid Agreement, as well as the Stalking Horse Bidder's expenditure of time, energy and resources. Therefore, subject to the terms of the Stalking Horse Bid Agreement, the Debtors shall pay the Expense Reimbursement on the terms set forth in the Stalking Horse Bid Agreement and shall be paid to the Stalking Horse Bidder prior to the payment of the proceeds of such sale to any third party asserting a lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Expense Reimbursement.)

The Expense Reimbursement shall constitute an allowed administrative expense claim against the each of the Debtors pursuant to section 503(b) and 507 of the Bankruptcy Code (without the need to file a proof of claim).

Except for the Stalking Horse Bidder, no other party submitting an offer or Bid for the Purchased Assets or a Competing Qualifying Bid shall be entitled to any expense reimbursement, breakup fee, termination or similar fee or payment.

In the event no Competing Qualified Bid, other than the Stalking Horse Bid, is received, the Debtors reserve the right to request (in consultation with the Consultation Parties) that the Bankruptcy Court advance the date of the Sale Hearing and provide notice of such new date to those parties in interest entitled to notice thereof.

The Sale Hearing may be adjourned or rescheduled from time to time.

15

## VII.    Sale Hearing.

Objections, if any, to the Sale and/or the sale of the Purchased Assets to the Successful Bidder and the transaction contemplated by the Stalking Horse Bid Agreement must be: (a) be in writing; (b) state the basis of such objection with specificity; (c) comply with the Bankruptcy Procedure and the Local Rules; (d) be filed with the Court on or before **4:00 p.m. (prevailing Eastern Time) on March __, 2023** (the "Sale Objection Deadline"); and (e) be served, so as to be received the same day as the objection is filed, upon: (1) *the Debtors*, c/o (i) Interim Chief Executive Officer, c/o Getzler Henrich & Associates LLC, 295 Madison Avenue, 20th Floor, New York, New York 10017 (Attn: Edward A. Phillips, ephillips@getzlerhenrich.com) and (ii) *bankruptcy counsel for the Debtors*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com), Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com), and Robin J. Rubens, Esq. (rrubens@bergersingerman.com)); (2) *counsel for (i) the Administrative Agent for the Prepetition Lenders, (ii) the Administrative Agent for the DIP Lenders, and (iii) the Stalking Horse Bidder*, King & Spalding LLP, 1185 Avenue of the Americas, 34th Floor, New York, New York 10036 (Attn: Roger Schwartz, Esq. (rschwartz@kslaw.com), Timothy M. Fesenmyer, Esq. (tfesenmyer@kslaw.com), and Robert Nussbaum, Esq. (rnussbaum@kslaw.com)); (3) *the Office of the United States Trustee*, 51 SW First Avenue, Room 1204, Miami, Florida 33130; and (4) *counsel to any statutory committee appointed in the Debtors' bankruptcy cases*.

If no Auction is to be held, the Debtors will file a notice **no later than 3:00 p.m. (prevailing Eastern Time) on March ___, 2023** with the Court in the lead case for the Debtors stating that there will be no Auction (the notice will be posted at the Court's website https://ecf.flsb.uscourts.gov/ which requires a court-issued login and passcode to access the notice).

The Debtors will seek a hearing (the "Sale Hearing") on **March __, 2023 at _____ a.m./p.m. (prevailing Eastern Time)**, at which the Debtors will seek approval of the transactions contemplated by the Stalking Horse Bid Agreement (or Alternate Transaction) with the Successful Bidder, and for the avoidance of any doubt, the Sale Hearing is subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Sale Hearing to a later date, subject to the availability of the Court.

**The Sale Hearing may be continued to a later date by the Debtors by either filing a notice with the Bankruptcy Court prior to, or making an announcement in open court at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party.**

The approved Sale shall close not later than **April __, 2023**, unless the Debtors, with the consent of the Stalking Horse Bidder, agree to a later date.

## VIII.    Return of Earnest Money Deposit.

The Earnest Money Deposit for each Competing Qualified Bidder (i) shall be held by the Escrow Agent in one or more interest-bearing escrow accounts on terms acceptable to the Debtors

in their sole discretion, (ii) shall not become property of the Debtors' estates absent further order of the Bankruptcy Court, and (iii) shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) by the Escrow Agent on the date that is three (3) business days after the Sale Hearing, or as soon as is reasonably practicable thereafter.

The Earnest Money Deposits of any Competing Qualified Bidder shall be forfeited if any such Competing Qualified Bidder attempts to withdraw its Qualified Bid, except as may be permitted by these Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bidding Procedures and the Debtors are not in violation of these Bidding Procedures. The Debtors and their estates shall be entitled to retain the Competing Qualified Bidder's Earnest Money Deposit as partial compensation for the damages caused to the Debtors and their estates as a result of the Competing Qualified Bidder's failure to adhere to the terms of these Bidding Procedures and/or the relevant Qualified Bid. In the event that a Competing Qualified Bidder's Earnest Money Deposit is deemed forfeited, such Competing Qualified Bidder's Earnest Money Deposit shall be released by the Escrow Agent by wire transfer of immediately available funds to an account designated by the Debtors within two (2) business days after receipt of written notice to the Escrow Agent by an authorized office of the Debtors stating that the applicable Competing Qualified Bidder has breached or otherwise failed to satisfy its obligations in accordance with these Bidding Procedures and the applicable Qualified Bid.

The Earnest Money Deposit of the Backup Bidder shall be returned to the Backup Bidder by the Escrow Agent on the date that is the earlier of one (1) business day after (i) the closing of the transaction with the Successful Bidder and (ii) the Outside Backup Date. If the Successful Bidder timely closes its winning transaction, its Earnest Money Deposit shall be credited towards its purchase price.

Upon the return of the Earnest Money Deposit, the applicable Competing Qualified Bidders shall receive any and all interest that will have accrued thereon.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors and the Escrow Agent will not have any obligation to return the Earnest Money Deposit deposited by such Successful Bidder, which may be retained by the Debtors' estates as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed Alternate Transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court.

## IX.    **Consultation Parties**.

Each reference in these Bidding Procedures to "consultation" (or similar phrase) with the Consultation Parties shall mean consultation in good faith. The term "Consultation Parties" as used in these Bidding Procedures shall mean (a) the Administrative Agent for the DIP Lenders (and its advisors), (b) the Administrative Agent for the Prepetition Lenders (and its advisors), and (c) any statutory committee of unsecured creditors (and its advisors). During any period in which a Consultation Party or an affiliate thereof (i) has submitted a Qualified Bid and has become a Qualified Bidder hereunder, or (ii) submits (or indicates its intent to submit) a credit bid, such

17

Consultation Party shall no longer be considered a Consultation Party for purposes of these Bidding Procedures unless and until such party unequivocally revokes its Bid and waives its right to continue in the Auction process.

## X. __Free and Clear Sale__.

Except as otherwise provided in the Stalking Horse Bid Agreement, the applicable purchase agreement of a different Successful Bidder, or the Sale Order, all of the Debtors' rights, title, and interests in the Purchased Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "__Encumbrances__") in accordance with section 363 of the Bankruptcy Code and any definitive agreement entered into by the Debtors with the Successful Bidder with respect to a Sale, with such Encumbrances to attach to the net proceeds (if any) of the sale of the Purchased Assets.

## XI. __Fiduciary Duties__.

Notwithstanding anything to the contrary contained herein, nothing in the Bidding Procedures will prevent the Debtors from exercising their respective fiduciary duties under applicable law.

## XII. __Reservation of Rights__.

Except as otherwise provided in Stalking Horse Bid Agreement, or the Bidding Procedures Order, the Debtors further reserve the right as they may reasonably determine at any time, whether before, during or after the Auction, in the exercise of the Debtors' business judgment (in consultation with the Consultation Parties) to: (a) determine which Bidders are Competing Qualified Bidders; (b) determine which Bids are Competing Qualified Bids and reject any or all Bids or Competing Qualified Bids; (c) determine which Competing Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and their estates; (e) impose additional terms and conditions with respect to all potential bidders other than the Stalking Horse Bidder; (f) modify these Bidding Procedures and/or implement additional procedural rules that the Debtors determine will better promote the goals of the bidding process, including but not limited to adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (g) extend the deadlines set forth in these Bidding Procedures; and (h) adjourn or cancel the Auction at the Auction and/or the Sale Hearing in open court without further notice or by filing a notice on the docket (in consultation with the Stalking Horse Bidder and the Consultation Parties).

**Schedule 1**

**SUDs in the Stalking Horse Bid**

| # | Debtor | Doing Business As (d/b/a) | Inpatient or Outpatient | Street Address | City | State | Zip Code |
|---|--------|--------------------------|-------------------------|----------------|------|-------|----------|
| 1 | Union Fresh Start, LLC | Serenity at Summit | Inpatient | 1000 Galloping Hill Road | Union | NJ | 07083 |
| 2 | Summit Behavioral Health Limited Liability Company | Summit Behavioral Health Princeton Junction | Outpatient | 4065 Quakerbridge Road Suite 102 | Princeton Junction | NJ | 08550 |
| 3 | SBH Haverhill, LLC | Serenity at Summit New England | Inpatient | 61 Brown Street | Haverhill | MA | 01830 |

19

11843540-13

## EXHIBIT B

**Bidding Procedures Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                          Chapter 11 Cases

DELPHI BEHAVIORAL HEALTH               Case No. 23-_____
GROUP, LLC, *et al.*,[1]
                                                (Jointly Administered)

      Debtors.

_____/

**ORDER GRANTING
DEBTORS' EXPEDITED MOTION FOR ENTRY OF AN ORDER**

---

[1]    The address of the Debtors is 1901 West Cypress Creek Road, Suite 500, Fort Lauderdale, FL 33309. The last four digits of the Debtors' federal tax identification numbers are: (i) Delphi Behavioral Health Group, LLC (2076), (ii) 61 Brown Street Holdings, LLC (0007), (iii) Aloft Recovery, LLC (6674), (iv) Banyan Recovery Institute, LLC (6998), (v) Breakthrough Living Recovery Community, LLC (5966), (vi) California Addiction Treatment Center, LLC (7655), (vii) California Vistas Addiction Treatment, LLC (8272), (viii) DBHG Holding Company, LLC (6574), (ix) Defining Moment Recovery Community, LLC (3532), (x) Delphi Health BuyerCo, LLC (2325), (xi) Delphi Health Group, LLC (0570), (xii) Delphi Intermediate HealthCo, LLC (6378), (xiii) Delphi Management LLC (6474), (xiv) Desert View Recovery Community, LLC (7437), (xv) DR Parent, LLC (2700), (xvi) DR Sub, LLC (8183), (xvii) Las Olas Recovery, LLC (9082), (xviii) Maryland House Detox, LLC (1626), (xix) New Perspectives, LLC (0508), (xx) Next Step Housing, LLC (6975), (xxi) Ocean Breeze Detox, LLC (7019), (xxii) Ocean Breeze Recovery, LLC (9621), (xxiii) Onward Living Recovery Community, LLC (4735), (xxiv) Palm Beach Recovery, LLC (4459), (xxv) Peak Health NJ, LLC (7286), (xxvi) QBR Diagnostics, LLC (7835), (xxvii) Rogers Learning, LLC (1699), (xxviii) SBH Haverhill, LLC (0971), (xxix) SBH Undion IOP, LLC (4139), (xxx) Summit at Florham Park, LLC (8226), (xxxi) Summit Behavioral Health, LLC (3337), (xxxii) Summit Health BuyerCo, LLC (2762), (xxxiii) Summit IOP Limited (4567), and (xxxiv) Union Fresh Start, LLC (6841).

11844825-13

**(I) AUTHORIZING AND APPROVING THE DEBTORS' ENTRY INTO
THE STALKING HORSE BID AGREEMENT WITH THE STALKING HORSE
BIDDER, SUBJECT TO THE BIDDING PROCEDURES AND THE SALE
HEARING, (II) APPROVING BIDDING PROCEDURES, (III) SCHEDULING
THE BID DEADLINES AND THE AUCTION, (IV) SCHEDULING A HEARING
TO CONSIDER THE TRANSACTION, (V) APPROVING THE FORM AND
MANNER OF NOTICE THEREOF, (VI) APPROVING CONTRACT PROCEDURES,
(VII) APPROVING A DEADLINE FOR INTERESTED PARTIES
TO SUBMIT BIDS TO PURCHASE ANY OF THE DEBTORS' REMAINING
ASSETS WHICH ARE NOT PURCHASED ASSETS SUBJECT TO THE
<u>STALKING HORSE BID AGREEMENT, AND (VIII) GRANTING RELATED RELIEF</u>**

**THIS MATTER** came before the Court on February __, 2023 at _____ a.m./p.m. (the "<u>Hearing</u>") upon the *Debtors' Expedited Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry into the Stalking Horse Bid Agreement with the Stalking Horse Bidder, Subject to the Bidding Procedures and the Sale Hearing, (II) Approving Bidding Procedures, (III) Scheduling the Bid Deadlines and the Auction, (IV) Scheduling a Hearing to Consider the Transaction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Procedures, and (VII) Approving a Deadline for Interested Parties to Submit Bids to Purchase Any of the Debtors' Remaining Assets Which Are Not Purchased Assets Subject to the Stalking Horse Bid Agreement, and (VIII) Granting Related Relief* [ECF No. __] (the "<u>Motion</u>")[2] filed by the above-captioned, affiliated, debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), by the authority granted to the Debtors by chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Motion requests the entry of an order: (a) authorizing and approving the Debtors' entry into the Stalking Horse Bid Agreement, subject to the Bidding Procedures attached hereto as **Exhibit "1"** (the "<u>Bidding Procedures</u>") and the Sale Hearing; (b) approving the Bidding Procedures in connection with the solicitation and acceptance of higher or

---

[2]   Any capitalized term not explicitly defined herein shall have the meaning ascribed to it, as applicable, in (i) the Motion, (ii) the Bidding Procedures attached hereto as **Exhibit "1"**, or (iii) the Stalking Horse Bid Agreement (as such term is defined in the Motion).

otherwise better bids, with respect to the Sale of the Purchased Assets; (c) approving the Expense Reimbursement; (d) scheduling on shortened notice the bid deadlines and the Auction; (e) scheduling the Sale Hearing to approve the Sale, and setting objection deadlines with respect to the Sale; (f) approving the form and manner of notice of the Sale Notice and related Auction for the Purchased Assets; (g) establishing the Assumption and Assignment Procedures of the Assumed Contracts; and (h) approving the Other Assets Bid Deadline for interested parties to submit bids to purchase any of the Other Assets; and (i) granting related relief, all as more fully set forth in the Motion; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having considered the First Day Declaration of Edward A. Phillips [ECF No. __] and the Supplemental Declaration of Harvey Tepner [ECF No. __], each in support of the relief sought by the Debtors in the Motion, and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a Hearing before this Court; and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing established just cause for the relief granted herein; and upon all of the proceedings had before this Court and at the Hearing; and after due deliberation and sufficient cause appearing therefor, does for the reasons stated in the Motion and on the record of the Hearing, all of which are incorporated herein:

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To

the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.     This Court has jurisdiction over the Motion and the transactions contemplated by the Stalking Horse Bid Agreement pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory bases for the relief requested in the Motion are: (i) sections 105, 363, 365, 503 and 507 of the Bankruptcy Code; (ii) Bankruptcy Rules 2002, 6003, 6004, 6006, 9006, 9007 and 9014; and (iii) rules 2002-1(C)(2) and 6004-1 of the Local Bankruptcy Rules for the Southern District of Florida (the "Local Rules").

D.     Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and no other or further notice is required except as set forth herein with respect to the hearing to be conducted to approve the transactions contemplated by the Stalking Horse Bid Agreement (the "Sale Hearing").  A reasonable and fair opportunity to object or be heard regarding the Motion and the relief provided in this Order have been afforded to parties in interest under the circumstances.

E.     The Debtors' proposed notice of the Bidding Procedures, the Auction and the Sale Hearing is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the Debtors' assets subject to the Stalking Horse Bid Agreement (the "Purchased Assets"), the auction for all of the Purchased Assets (the "Auction"), and the Bidding Procedures to be employed in connection therewith, and the Sale Hearing.

11844825-13

F.      The form and manner of service of the Sale Notice as proposed in the Motion, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Sale, the Bidding Procedures, and the Assumption and Assignment Procedures to be employed in connection therewith, including, without limitation: (i) the date, time and place of the Auction (if one is held); (ii) the Bidding Procedures and the dates and deadlines related thereto; (iii) the objection deadline for the Sale and the date, time and place of the Sale Hearings; (iv) reasonably specific identification of the Purchased Assets, including the sale of certain of the Debtors' or their estates' causes of actions and (v) the representations describing the Sale as being free and clear of liens, claims, interests and other encumbrances, with all such liens, claims and encumbrances attaching with the same validity and priority to the proceeds of the Sale; and no other or further notice of the Sale shall be required.

G.      The Assumption Notice (as defined below) is appropriate and reasonably calculated to provide each non-debtor party to any Available Contracts (such parties, collectively, the "Non-Debtor Counterparties") with proper notice of the potential assumption and assignment of the applicable Available Contract, the proposed Cure Amount (as defined in the Motion), and the Assumption and Assignment Procedures.  The inclusion of any particular contract or lease on an Assumption Notice shall not be deemed to be an admission that such contract or lease is an executory contract or unexpired lease of property or require or guarantee that such contract or lease will be assumed and/or assigned, and all rights of the Debtors with respect to the foregoing are reserved.

H.      The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation: (i) approval of the Bidding Procedures; (ii) setting the Sale Hearing and approving the manner of notice of the

5

11844825-13

Motion and the Sale Hearing; (iii) approval of the Sale Notice and the Assumption Notice; (iv) approving the Assumption and Assignment Procedures set forth herein and in the Stalking Horse Bid Agreement, including the procedures set forth in the Stalking Horse Bid Agreement with respect to the Stalking Horse Bidder's rights to designate or change the character of such Assumed Contracts by the Determination Date; (v) approving the payment of the Expense Reimbursement on the terms set forth in the Stalking Horse Bid Agreement and in this Order; and (vi) all related relief as set forth herein.

I.      The Assumption and Assignment Procedures are fair, reasonable, and appropriate, and comply with the provisions of section 365 of the Bankruptcy Code.

J.      Under the circumstances, the Debtors' marketing process for the Purchased Assets has been reasonably calculated to maximize value for the benefit of all stakeholders.

K.      Under the circumstances, the Bidding Procedures are fair, reasonable and appropriate, and are designed to maximize the value to be achieved for the Purchased Assets. The Bidding Procedures were negotiated by the parties at arms' length and in good faith by the Debtors and the Stalking Horse Bidder.

L.      The Debtors have demonstrated a compelling and sound business justification for the Court to approve the payment of the Expense Reimbursement on the terms set forth in the Stalking Horse Bid Agreement. The Expense Reimbursement: (i) is payable as provided in Sections 7.1 and 9.2 of the Stalking Horse Bid Agreement; (ii) shall be granted allowed administrative expense status under sections 503(b) and 507 of the Bankruptcy Code and shall be deemed an actual and necessary cost of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code; (iii) is of substantial benefit to the Debtors' estates; (iv) is reasonable and appropriate, including in light of the size and nature of the sale and the efforts that

6

have been or will be expended by the Stalking Horse Bidder notwithstanding that the proposed sale is subject to higher or otherwise better offers for the Purchased Assets; (v) was negotiated by the parties at arm's length and in good faith; and (vi) is necessary to ensure that the Stalking Horse Bidder will continue to pursue its proposed acquisition of the Purchased Assets contemplated by the Stalking Horse Bid Agreement.  The Expense Reimbursement is a material inducement for, and a condition of, the Stalking Horse Bidder's entry into the Stalking Horse Bid Agreement.

M. The entry of this Order is in the best interests of the Debtors, their estates, creditors and other parties in interest.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The Motion is **GRANTED** to the extent set forth herein.

2. Except as explicitly provided in this Order, all objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled through language in this Order, and all reservations of rights included therein, including [TBD], are overruled and denied on the merits with prejudice.

**The Stalking Horse Bid Agreement**

3. The Debtors are authorized to enter into the Stalking Horse Bid Agreement attached as Exhibit "A" to the Sale Motion, subject to higher or otherwise better offers received from Competing Qualified Bidders at the Auction, provided, that the rights of all parties to object to the Sale contemplated by the Stalking Horse Bid Agreement are expressly preserved. Lender AcquisitionCo LLC, together with its permitted successors, assigns and designees, is approved as the Stalking Horse Bidder for the Purchased Assets, pursuant to the terms of the Stalking Horse Bid Agreement and this Order.  The Debtors are authorized to perform any obligations of the

7

Debtors set forth in the Stalking Horse Bid Agreement that are intended to be performed prior to the Sale Hearing or entry of the Sale Order, without further order of the Court.

4.     The Expense Reimbursement is approved on the terms set forth in the Stalking Horse Bid Agreement; including the amount of the Expense Reimbursement that a Preliminary Interested Investor shall use solely for the purpose of the amount of the "Expense Reimbursement" referenced in the "Amount of Bid" set forth in paragraph II.b of the Bidding Procedures is set at $375,000.00; provided further, the Stalking Horse Bidder shall provide the Debtors and U.S. Trustee with documentation supporting the payment of the Expense Reimbursement up to $500,000.00 five business days prior to the Sale Hearing; provided further, that the U.S. Trustee may only seek to challenge on the grounds of amounts sought for reimbursement over $375,000.00; provided further, that the Stalking Horse Bidder may only seek reimbursement of fees incurred in connection to the Stalking Horse Bid Agreement and the Sale Hearing. Nothing herein precludes the right of the Stalking Horse Bidder to seek reimbursement in excess of $500,000.00 in establishing the reasonableness of the Expense Reimbursement (to the extent applicable), however it shall only be entitled to actual payment and reimbursement up to $500,000.00. The Expense Reimbursement shall constitute an allowed administrative expense claim against each Debtors' bankruptcy estates under sections 503(b) and 507 of the Bankruptcy Code (without the need to file a proof of claim). The obligation of the Debtors to pay the Expense Reimbursement shall survive termination of the Stalking Horse Bid Agreement.

5.     Subject to the terms of the Stalking Horse Bid Agreement, the Debtors shall pay the Expense Reimbursement out of the proceeds of an Alternate Transaction to the Stalking Horse Bidder by wire transfer of immediately available funds to the account specified by the Stalking Horse Bidder to the Debtors in writing and shall be paid to the Stalking Horse Bidder prior to the

8

payment of the proceeds of such sale to any third party asserting a lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Expense Reimbursement). No further or additional order from this Court shall be required in order to give effect to such provisions relating to the terms of payment of the Expense Reimbursement and the Stalking Horse Bidder's professional advisors are not obligated to comply with any provisions of the Bankruptcy Code regarding Court approval of professional fees payable by the Debtors' estates and included in the Expense Reimbursement.

6. The obligation of the Debtors' estates to pay the Expense Reimbursement, as provided by the Stalking Horse Bid Agreement and this Order, is hereby approved in all respects and shall survive termination of the Stalking Horse Bid Agreement and shall be payable out on the terms set forth in the Stalking Horse Bid Agreement.

## The Bidding Procedures

7. The Bidding Procedures, attached hereto as **Exhibit "1"**, are hereby approved in their entirety, are incorporated herein by reference and shall govern the bids and proceedings related to the Sale and the Auction. The failure to recite or reference any particular provision of the Bidding Procedures in this Order shall not diminish the effectiveness of such provision, it being the intent of this Court that the Bidding Procedures be authorized and approved in their entirety.

8. The "Bidding Procedures Key Dates", attached hereto as **Exhibit "2"**, are hereby approved in their entirety.

9. The Debtors are authorized to proceed with the Sale in accordance with the Bidding Procedures and are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith, the Stalking Horse Bid Agreement, and the timeline below.

11844825-13

10.     The Bid Deadline is **March __, 2023 at 5:00 p.m. (prevailing Eastern Time)**.

11.     Subject to any applicable financing orders entered in the Debtors' bankruptcy cases, holders of claims secured by unavoidable, properly perfected liens on all or a portion of the Purchased Assets shall, pursuant to section 363(k) of the Bankruptcy Code, be permitted, but not compelled, to credit bid up to the full amount of their secured claims for any such Purchased Assets (such bid, a "Credit Bid"), including, the Prepetition Lenders and the DIP Lenders.

12.     A Credit Bid, other than the Stalking Horse Bid Agreement, must: (i) contain evidence sufficient to the Debtors, after consultation with the Consultation Parties, to demonstrate that the secured claims subject to such Credit Bid are secured by unavoidable, properly perfected liens on the Purchased Assets subject to such Credit Bid; and (ii) include a cash purchase price sufficient to pay in full the sum of the following: (a) all amounts being paid in full in cash as part of the Purchase Price under the Stalking Horse Bid Agreement (excluding, for the avoidance of doubt, any Assumed Liabilities to be assumed by the Stalking Horse Bidder pursuant to the Stalking Horse Bid Agreement), *plus* (b) all obligations under the DIP Facility, *plus* (c) all obligations secured by senior or *pari passu* liens on the Purchased Assets (e.g., the Loan Debt) to be purchased pursuant to such Credit Bid, *plus* (d) the Expense Reimbursement (in addition to the other requirements in the Bidding Procedures).

13.     The Stalking Horse Bid Agreement is, in part, a Credit Bid, notwithstanding any earlier Bids. Further, any Credit Bid, including the Stalking Horse Bid, shall be permitted to increase its Credit Bid up to the full amount of its applicable outstanding secured obligations. For purposes of valuing Competing Qualified Bids and determining the Successful Bid, the full face amount of a Credit Bid satisfying the requirements set forth in the Bidding Procedures and this Order shall be deemed to have the same value as the equivalent amount of cash. In the event the

10

Purchased Assets are acquired in an Alternate Transaction, the Successful Bidder shall be responsible for the payment of the Expense Reimbursement per the terms of the Stalking Horse Bid Agreement and this Order.

14.    For the avoidance of doubt, each Competing Qualified Bid must be for all of the Purchased Assets and must include (i) cash consideration of not less than the sum of (a) the Purchase Price (including the amount of the Assumed Debt as of the Closing Date) *plus* (b) all amounts outstanding under the DIP Facility, *plus* (c) the Expense Reimbursement in the amount of $375,000.00, *plus* (d) an initial cash overbid of $500,000.00, and (ii) assumption of the Assumed Liabilities (other than the Assumed Debt). The Debtors shall make the precise dollar amount of the cash portion of a Competing Qualified Bid available to any interested bidder upon request.

15.    If the Debtors receive more than one Competing Qualified Bid (as defined in the Bidding Procedures) by the Bid Deadline, an Auction shall take place on **March __, 2023 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Berger Singerman LLP, located at 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, or such other place and time, or by electronic means (e.g., Zoom), as the Debtors shall notify all Competing Qualified Bidders, including the Stalking Horse Bidder, counsel for the Stalking Horse Bidder and other invitees in accordance with the Bidding Procedures, and for the avoidance of any doubt, the Auction is subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Auction to a later date. The Auction shall be conducted in accordance with the Bidding Procedures. Each Competing Qualified Bidder participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (b) has reviewed, understands and accepts the Bidding Procedures, (c) has consented to the core jurisdiction of this Court, (d) intends to consummate the Sale transaction if selected as the

Successful Bidder and (e) agrees to serve as a Backup Bidder if the Competing Qualified Bidder's Competing Qualified Bid is the next highest and best bid after the Successful Bid with respect to the Purchased Assets.

16.     The Sale Hearing shall be held before this Court on **March __, 2023 at _____ (prevailing Eastern Time)**.  The Sale Hearing may be adjourned from time to time by the Debtors, and for the avoidance of any doubt, the Sale Hearing is subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Sale Hearing to a later date in consultation with the Stalking Horse Bidder, subject to the availability of the Court.  If there is no Auction, the Debtors will serve and file a notice with this Court not later than **March ___, 2023 at 3:00 p.m. (prevailing Eastern Time)** stating that there will be no Auction and the Debtors are moving forward with the Sale Hearing with the Stalking Horse Bidder, subject to the proviso in the immediately preceding sentence.

17.     Objections, if any, to the sale of the Purchased Assets and the Sale contemplated by the Stalking Horse Bid Agreement, or the relief requested in the Sale Motion must: (a) be in writing; (b) state the basis of such objection with specificity; (c) comply with the Bankruptcy Rules and the Local Rules; (d) be filed with the Court on or before **4:00 p.m. (prevailing Eastern Time) on March __, 2023** (the "Sale Objection Deadline"); and (e) be served, so as to be received the same day as the objection is filed, upon: (1) *the Debtors*, c/o (i) Interim Chief Executive Officer, c/o Getzler Henrich & Associates LLC, 295 Madison Avenue, 20th Floor, New York, New York 10017 (Attn: Edward A. Phillips, ephillips@getzlerhenrich.com) and (ii) *bankruptcy counsel for the Debtors*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com), Christopher Andrew Jarvinen, Esq.     (cjarvinen@bergersingerman.com),     and     Robin     J.     Rubens,     Esq.

(rrubens@bergersingerman.com)); (2) *counsel for (i) the Administrative Agent for the Prepetition Lenders, (ii) the Administrative Agent for the DIP Lenders, and (iii) the Stalking Horse Bidder*, King & Spalding LLP, 1185 Avenue of the Americas, 34th Floor, New York, New York 10036 (Attn: Roger Schwartz, Esq. (rschwartz@kslaw.com), Timothy M. Fesenmyer, Esq. (tfesenmyer@kslaw.com), and Robert Nussbaum, Esq. (rnussbaum@kslaw.com)); (3) *the Office of the United States Trustee*, 51 SW First Avenue, Room 1204, Miami, Florida 33130; and (4) *counsel to any statutory committee appointed in the Debtors' bankruptcy cases*.

## Sale Notice

18.     The sale notice, substantially in the form attached hereto as **Exhibit "3"** (the "Sale Notice"), is hereby approved and the Debtors are authorized to make non-substantive or immaterial changes to the Sale Notice or to fill in missing information, in each case to the extent not inconsistent with this Order, prior to service or publication of the Sale Notice.

19.     On or before three (3) business days after the entry of this Order, the Debtors will file the Sale Notice with the Bankruptcy Court and shall serve the Sale Notice by first-class mail, to the following: (a) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest, or encumbrance of record against all or any portion of the Purchased Assets; (b) the Office of the United States Trustee for the Southern District of Florida; (c) counsel to the Stalking Horse Bidder; (d) counsel for the Administrative Agent for the DIP Lenders; (e) counsel for the Administrative Agent for the Prepetition Lenders; (f) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (g) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets, known to the Debtors that may reasonably have claims, contingent or otherwise, in connection with the Debtors'

13

ownership of the Purchased Assets or have any known interest in the relief requested by the Motion, which shall include the attorneys general for the states of California, Florida, Maryland, Massachusetts, and New Jersey; (h) the Non-Debtor Counterparties; and (i) all potential bidders previously identified or otherwise known to the Debtors.[3]

<div align="center">

**Assumption & Assignment Procedures**

</div>

20.     The proposed procedures related to the assumption and assignment of the Assumed Contracts (the "Assumption and Assignment Procedures"), and the payment by the Debtors of any related Cure Amounts, as set forth in the Stalking Horse Bid Agreement and the Motion, are approved.

21.     The notice, substantially in the form attached hereto as **Exhibit "4"** (the "Assumption Notice"), of potential assumption and assignment of certain of the Debtors' executory contracts and unexpired leases to be listed in the Assumption Notice (collectively, the "Available Contracts"), is hereby approved in its entirety.  The Debtors are authorized to make non-substantive or immaterial changes to the Assumption Notice to fill in missing information, in each case to the extent not inconsistent with this Order, prior to service or publication of the Assumption Notice.  The Assumption and Assignment Procedures, including but not limited to, with respect to the Stalking Horse Bidder's rights to designate or change the Assumed Contracts

---

[3]     With respect to serving all potential bidders previously identified or otherwise known to the Debtors, these are the investors who entered into non-disclosure agreements with the Debtors, and the Debtors are authorized to file under seal that part of the service list providing the names and email addresses for all such parties which will be served *via* email with the Sale Notice and this Order at the email address(es) maintained for each such investor by, respectively, either FTI or the Debtors.

<div align="center">14</div>

by the date that is three (3) business days prior to the closing of the Sale, or such shorter period if consented to by the Non-Debtor Counterparty (the "Determination Date"), are approved.[4]

22.     On or before three (3) business days after the entry of this Order, the Debtors shall file the Assumption Notice with the Bankruptcy Court and shall serve the Assumption Notice via first class mail on each Non-Debtor Counterparty to an Available Contract listed thereon. In the event that the Debtors later identify any Non-Debtor Counterparty which was not served with the Assumption Notice, the Debtors may subsequently serve such Non-Debtor Counterparty with the Assumption Notice substantially in the form attached hereto as the Assumption Notice (each, a "Supplemental Assumption Notice"), and the Assumption and Assignment Procedures will nevertheless apply to such Non-Debtor Counterparty; provided, that the Contract Objection Deadline with respect to such Non-Debtor Counterparty listed on a Supplemental Assumption Notice shall be 4:00 p.m. (prevailing Eastern Time) on the date that is the later of the Contract Objection Deadline or fourteen (14) days following the date of service of a Supplemental Assumption Notice (each, a "Supplemental Contract Objection Deadline"). Each Supplemental Assumption Notice shall (i) identify the relevant Available Contract(s), (ii) set forth a good faith estimate of the Cure Amount(s), (iii) include a statement that assumption and assignment of each such Available Contract is not required nor guaranteed, and (iv) inform such Non-Debtor Counterparty of the requirement to file any Contract Objection(s) by the Supplemental Contract Objection Deadline.

---

[4]     The Stalking Horse Bid Agreement provides, among other things, that the Stalking Horse Bidder has the right to elect to have the Debtors assume and assign to the Stalking Horse Bidder some or all of the Available Contracts and that the Debtors shall be responsible for payment of the Cure Amounts of the Assumed Contracts.

23.     Not later than one business day following the Determination Date, the Debtors shall file with the Bankruptcy Court an amended and restated Assumption Notice, which notice shall set forth only the Assumed Contracts (and exclude all other Available Contracts).

24.     Any objection to the Cure Amount or to the assumption and assignment of an Available Contract to the Stalking Horse Bidder, including with respect to adequate assurance of future performance of the Stalking Horse Bidder (collectively, a "Contract Objection"), must: (a) be in writing; (b) state the basis of such objection with specificity; (c) comply with the Bankruptcy Rules and the Local Rules; (d) be filed with the Court on or before **4:00 p.m. (prevailing Eastern Time) on March __, 2023** (the "Contract Objection Deadline"); and (e) be served, so as to be received the same day as the objection is filed, upon: (1) *the Debtors*, c/o (i) Interim Chief Executive Officer, c/o Getzler Henrich & Associates LLC, 295 Madison Avenue, 20th Floor, New York, New York 10017 (Attn: Edward A. Phillips, ephillips@getzlerhenrich.com) and (ii) *bankruptcy counsel for the Debtors*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com), Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com), and Robin J. Rubens, Esq. (rrubens@bergersingerman.com)); (2) *counsel for (i) the Administrative Agent for the Prepetition Lenders, (ii) the Administrative Agent for the DIP Lenders, and (iii) the Stalking Horse Bidder*, King & Spalding LLP, 1185 Avenue of the Americas, 34th Floor, New York, New York 10036 (Attn: Roger Schwartz, Esq. (rschwartz@kslaw.com), Timothy M. Fesenmyer, Esq. (tfesenmyer@kslaw.com), and Robert Nussbaum, Esq. (rnussbaum@kslaw.com)); (3) *the Office of the United States Trustee*, 51 SW First Avenue, Room 1204, Miami, Florida 33130; and (4) *counsel to any statutory committee appointed in the Debtors' bankruptcy cases*.

16

25.     Any Contract Objection must state the basis for such objection and state with specificity what Cure Amount the party to the Available Contract believes is required (in all cases with appropriate documentation in support thereof).  If no Contract Objection is timely received, the Cure Amount set forth in the Assumption Notice shall be controlling, notwithstanding anything to the contrary in the Available Contract or other related documents as of the date of the Assumption Notice.  The Assumption Notice shall also provide that the Contract Objection to any Cure Amount or assumption and assignment of an Available Contract will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors and the applicable counterparty in consultation with the Stalking Horse Bidder.  If a Successful Bidder that is not the Stalking Horse Bidder prevails at the Auction, then in such case only the deadline to object to assumption and assignment (solely on the grounds of adequate assurance of future performance) of an Available Contract shall be the Sale Hearing.

26.     **Unless a Non-Debtor Counterparty to any Available Contract files an objection to the Cure Amount by the applicable objection deadline, then such counterparty shall be (a) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Available Contract, other than the Cure Amount on the Assumption Notice, in the event it is assumed and/or assigned by the Debtors, and the Debtors and the assignee of the Available Contract shall be entitled to rely solely upon the Cure Amounts scheduled on the Assumption Notice; and (b) be deemed to have consented to the assumption, assignment and/or transfer of such Available Contract (including the transfer of any related rights and benefits thereunder) to the relevant assignee and shall be forever barred and estopped from asserting or claiming against the Debtors or the assignee that any additional pre-assignment amounts are due or defaults exist, or**

17

**conditions to assumption, assignment, and/or transfer must be satisfied under such Available**

**Contract, that any related right or benefit under such Available Contract cannot or will not**

**be available to the relevant assignee, or that the assignee failed to provide such Non-Debtor**

**Counterparty with adequate assurance of future performance**.

27.     **Unless a Non-Debtor Counterparty to any Available Contract files a timely**

**Contract Objection to the assumption and assignment of the applicable Available Contract**

**by the Stalking Horse Bidder or the other Successful Bidder, then such Non-Debtor**

**Counterparty shall be deemed to have (i) consented to the assumption and assignment of the**

**applicable Available Contract to the Stalking Horse Bidder or the other Successful Bidder**

**with the Cure Amount set forth in the Assumption Notice and (ii) waived and released any**

**and all other rights to object to the Cure Amount or the assumption and assignment of the**

**Available Contract to the Stalking Horse Bidder or the other Successful Bidder**.

28.     On the date of the Closing of the Sale (the "Closing Date"), with respect to Cure

Amounts not disputed as of the Closing Date, the Debtors shall pay all Cure Amounts in

accordance with the Approved Budget to the applicable Non-Debtor Counterparty and the Stalking

Horse Bidder shall have no liability therefor.  With respect to Cure Amounts that are disputed as

of the Closing Date and that were submitted in accordance with these Assumption and Assignment

Procedures, the Debtors and the Successful Bidder shall cooperate and diligently pursue resolution

of such disputes in good faith to attempt to resolve any such objection without court intervention.

If the applicable parties determine that the objection cannot be resolved without judicial

intervention in a timely manner, then the Court shall make all necessary determinations relating to

such objection at a hearing scheduled pursuant to the following paragraph.

11844825-13

29.     Consideration of unresolved Contract Objections relating to Available Contract assignment, if any, unless otherwise ordered by the Court or with the consent of the parties that to any Available Contract that are subject to a Contract Objection relating to an Available Contract assignment, shall be adjourned to a date to be determined and shall not proceed at the Sale Hearing; provided, however, that (i) any Available Contract that is the subject of a Contract Objection with respect solely to the amount of the Cure Amount may be assumed and assigned prior to resolution of such objection, and (ii) the Debtors shall pay any undisputed Cure Amount on or before the Closing Date in accordance with the Approved Budget and shall appropriately reserve funding for the disputed portion of the Cure Amount. A timely filed and properly served Contract Objection will reserve the filing Non-Debtor Counterparty's rights relating to the Available Contract, but will not be deemed to constitute an objection to the relief generally requested in the Motion with respect to the approval of the Sale.

30.     Upon the resolution of any disputed Cure Amount (with the consent of such Successful Bidder) following the Closing, the Debtors shall pay such Cure Amount promptly, and in no event later than two business days following such resolution.

31.     Upon payment by the Debtors of a Cure Amount (through resolution of a Cure Objection or otherwise), all defaults under the Assumed Contracts (monetary or otherwise) and all actual or pecuniary losses that have or may have resulted from such defaults shall be deemed cured, including any Tax, rental obligation, common area maintenance, percentage rent, base rent or utility payments, whether or not such obligation became due, or accrued, after the effective date of the assignment of such Assumed Contracts, as the case may be.

32.     The Debtors' assumption and/or assignment of an Available Contract is subject to approval by this Court and consummation of the Sale. Absent consummation of the Sale and entry

11844825-13

of a Sale Order approving the assumption and/or assignment of the Available Contracts, the Available Contracts shall be deemed neither assumed nor assigned, and shall in all respects be subject to subsequent assumption or rejection by the Debtors.

**Other Assets Bid Deadline**

33. The Other Assets Bid Deadline (i.e., the deadline for interested parties to submit bids to purchase any of the Other Assets of the Debtors which are not Purchased Assets subject to the Stalking Horse Bid Agreement) is March ___, 2023 at 4:00 p.m. (prevailing Eastern Time).

**Other Relief**

34. Subject to the other requirements in these Bidding Procedures, and in connection with the Sale of the Purchased Assets, secured credit parties, which hold security interests in the Purchased Assets, may submit Credit Bids for such Purchased Assets. The Stalking Horse Bid Agreement is, a Credit Bid. Subject to each Bid and Competing Qualified Bid satisfying the requirements of these Bidding Procedures, the Debtors shall treat comparable Credit Bids and cash bids as equivalent and no Credit Bid shall be considered inferior to a cash bid merely because it is a Credit Bid. Notwithstanding anything to the contrary contained herein, but subject in all respects to the challenge period as set forth in any DIP Order, the Administrative Agent for the DIP Lender and/or the Administrative Agent for the Prepetition Lenders shall have the right to Credit Bid all or any portion of the aggregate amount of their applicable outstanding secured obligations, notwithstanding any earlier or lower Credit Bid of any portion of their applicable outstanding secured obligations.

35. Compliance with the foregoing notice provisions shall constitute sufficient notice of the Debtors' proposed sale of the Purchased Assets free and clear of certain liens, claims, interests and encumbrances as set forth in the Stalking Horse Bid Agreement, pursuant to

Bankruptcy Code section 363(f) and otherwise, and except as set forth in this Order, no other or further notice of the sale shall be required to be provided by the Debtors.

36. For the reasons stated in the Motion and at the Hearing or any prior hearing, the Court grants the Debtors' request for shortened notice with respect to the relief requested in the Motion.

37. The Stalking Horse Bidder is entitled to make any additional bids at the Auction in compliance with the Bidding Procedures. For purposes of any Overbid, the Stalking Horse Bidder shall be entitled to a credit in the amount of the Expense Reimbursement.

38. The Sale Hearing may be continued, from time to time in consultation with the Stalking Horse Bidder, without further notice to creditors or other parties in interest other than by announcement of said continuance before the Court on the date scheduled for such hearing or announced by the Debtors in open court.

39. Except for the Stalking Horse Bidder, no other party submitting an offer or Bid for the Purchased Assets or a Competing Qualifying Bid shall be entitled to any expense reimbursement, breakup, termination, or similar fee or payment. Moreover, all Competing Qualifying Bidders (excluding any Bid Protections approve by this Court) waive any right to seek a claim for substantial contribution pursuant to section 503 of the Bankruptcy Code, or the payment of any broker fees or costs, unless specifically agreed to by the Debtors, upon consultation with the Consultation Parties, or upon further order of the Court.

40. Except as otherwise provided in the Stalking Horse Bid Agreement or this Order, the Debtors further reserve the right as they may reasonably determine to be in the best interests of the Debtors' estates (in consultation with the Consultation Parties) to: (a) determine which Bidders are Competing Qualified Bidders; (b) determine which Bids are Competing Qualified

Bids; (c) determine which Competing Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and their estates; (e) impose additional terms and conditions with respect to all potential bidders other than the Stalking Horse Bidder; (f) extend the deadlines set forth herein; and (g) adjourn or cancel the Auction and/or Sale Hearing in open court without further notice or by filing a notice on the docket. Before extending any deadline, the Debtors shall consult with the Stalking Horse Bidder and the Consultation Parties.

41.    All persons and entities that participate in the bidding process or the Auction shall be deemed to have knowingly and voluntarily submitted to the exclusive jurisdiction of this Court with respect to all matters related to the terms and conditions of the transfer of Purchased Assets, the Auction and any transaction contemplated herein.

42.    To the extent that any order confirming any plan of reorganization or liquidation in the Debtors' cases or any other order in these cases (including any order entered after any conversion of these chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code) alters, conflicts with or derogates from the provisions of this Order, the provisions of this Order shall control.  The Debtors' obligations under this Order, the provisions of this Order and the portions of the Stalking Horse Bid Agreement pertaining to the Bidding Procedures shall survive conversion of these chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code, confirmation of any plan of reorganization or liquidation, or discharge of claims thereunder and shall be binding upon the Debtors, any Chapter 7 trustee, the reorganized or reconstituted debtors, as the case may be, after the effective date of a confirmed plan or plans in the Debtors' cases

(including any order entered after any conversion of the cases of the Debtors to cases under Chapter 7 of the Bankruptcy Code)

43.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014 or any other provisions of the Bankruptcy Rules or the Local Rules stating the contrary, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry and no automatic stay shall apply to this Order.

44.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

45.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

46.     In the event there is any inconsistency between the Stalking Horse Bid Agreement, the Motion, the Bidding Procedures, and/or this Order, the terms of this Order shall govern.

47.     The Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order. All matters arising from or related to the implementation of this Order may be brought before the Court as a contested matter, without the necessity of commencing an adversary proceeding.

<div align="center">#    #    #</div>

Submitted by:
Christopher Andrew Jarvinen, Esq.
BERGER SINGERMAN LLP
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Tel. (305) 755-9500
Fax (305) 714-4340
Email:  cjarvinen@bergersingerman.com

*(Attorney Jarvinen is directed to serve this order upon all non-registered users who have yet to appear electronically in this case and file a conforming certificate of service.)*

<div align="center">23</div>

11844825-13

## EXHIBIT "1"

## Bidding Procedures

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                                    Chapter 11 Cases

DELPHI BEHAVIORAL HEALTH                                  Case No. 23-_____
GROUP, LLC, *et al.*,[1]
                                                         (Jointly Administered)

      Debtors.

_____/

## **BIDDING PROCEDURES**[2]

      On February ____, 2023 (the "Petition Date"), each of the above-captioned, affiliated, debtors and debtors-in-possession (collectively, the "Debtors") filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").

      On February ____, 2023, the Debtors filed the *Debtors' Expedited Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry into the Stalking Horse Bid Agreement with the Stalking Horse Bidder, Subject to the Bidding Procedures and the Sale Hearing, (II) Approving Bidding Procedures, (III) Scheduling the Bid Deadlines and the Auction, (IV) Scheduling a Hearing to Consider the Transaction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Procedures, and (VII) Approving a Deadline for Interested Parties to Submit Bids to Purchase Any of the Debtors' Remaining Assets Which Are Not*

---

[1] The address of the Debtors is 1901 West Cypress Creek Road, Suite 500, Fort Lauderdale, FL 33309.  The last four digits of the Debtors' federal tax identification numbers are: (i) Delphi Behavioral Health Group, LLC (2076), (ii) 61 Brown Street Holdings, LLC (0007), (iii) Aloft Recovery, LLC (6674), (iv) Banyan Recovery Institute, LLC (6998), (v) Breakthrough Living Recovery Community, LLC (5966), (vi) California Addiction Treatment Center, LLC (7655), (vii) California Vistas Addiction Treatment, LLC (8272), (viii) DBHG Holding Company, LLC (6574), (ix) Defining Moment Recovery Community, LLC (3532), (x) Delphi Health BuyerCo, LLC (2325), (xi) Delphi Health Group, LLC (0570), (xii) Delphi Intermediate HealthCo, LLC (6378), (xiii) Delphi Management LLC (6474), (xiv) Desert View Recovery Community, LLC (7437), (xv) DR Parent, LLC (2700), (xvi) DR Sub, LLC (8183), (xvii) Las Olas Recovery, LLC (9082), (xviii) Maryland House Detox, LLC (1626), (xix) New Perspectives, LLC (0508), (xx) Next Step Housing, LLC (6975), (xxi) Ocean Breeze Detox, LLC (7019), (xxii) Ocean Breeze Recovery, LLC (9621), (xxiii) Onward Living Recovery Community, LLC (4735), (xxiv) Palm Beach Recovery, LLC (4459), (xxv) Peak Health NJ, LLC (7286), (xxvi) QBR Diagnostics, LLC (7835), (xxvii) Rogers Learning, LLC (1699), (xxviii) SBH Haverhill, LLC (0971), (xxix) SBH Undion IOP, LLC (4139), (xxx) Summit at Florham Park, LLC (8226), (xxxi) Summit Behavioral Health, LLC (3337), (xxxii) Summit Health BuyerCo, LLC (2762), (xxxiii) Summit IOP Limited (4567), and (xxxiv) Union Fresh Start, LLC (6841).

[2] Any capitalized term not explicitly defined herein shall have the meaning ascribed to it in, as applicable, the Stalking Horse Bid Agreement, the Bidding Procedures Motion or the Bidding Procedures Order (as each is defined herein).

*Purchased Assets Subject to the Stalking Horse Bid Agreement, and (VIII) Granting Related Relief* [ECF No. __] (the "Bidding Procedures Motion").

The Bidding Procedures Motion sought approval of, among other things, the procedures through which the Debtors, in the reasonable exercise of their business judgment, will determine the highest or otherwise best bid for the sale (the "Sale") of three of the Debtors' inpatient and outpatient substance use disorder treatment facilities (each, a "SUD", and collectively, the "SUDs") located in Massachusetts and New Jersey, identified on **Schedule 1** annexed hereto, and all related assets (collectively, the assets subject to the Sale are the "Purchased Assets", as such term is defined in the Stalking Horse Bid Agreement (defined herein)).

On February _____, 2023, three of the Debtors (each, a "Seller" and collectively, the "Sellers")[3] entered into that certain *Asset Purchase Agreement* (the "Stalking Horse Bid Agreement"), a copy of which is attached as Exhibit "A" to the Sale Motion (such bid, the "Stalking Horse Bid"), by and among Lender AcquisitionCo LLC, as purchaser (together with each of its permitted successors, assigns and designees, collectively, the "Stalking Horse Bidder") and Brightwood Loan Services LLC, solely for the purposes stated expressly in the Stalking Horse Bid Agreement, the "Administrative Agent").

On February ____, 2023, the Bankruptcy Court entered an order approving the Bidding Procedures Motion [ECF No. __] (the "Bidding Procedures Order" and the procedures set forth herein, the "Bidding Procedures"), which, among other things, authorizes the Debtors to determine the highest or otherwise best bid for the Purchased Assets through the process and the procedures set forth in these Bidding Procedures, and authorized the Debtors' entry into the Stalking Horse Bid Agreement, pursuant to which the Stalking Horse Bidder has committed to (a) purchase, acquire, and take assignment and delivery of the Purchased Assets, free and clear of all liens, claims, encumbrances, and other interests (except as otherwise expressly provided in the Stalking Horse Bid Agreement), and (b) assume certain liabilities associated with the Debtors' operations involving the Purchased Assets as set forth in the Stalking Horse Bid Agreement, in the form of a credit bid.

Unless expressly indicated, the following Bidding Procedures apply to all bidders regardless of the phase of the Auction in which the bidder intends to participate.

## Key Dates

| Event | Date |
|---|---|
| Hearing on the Motion for Bidding Procedures | February __, 2023 at ___ a.m./p.m. (prevailing Eastern Time) |
| Service of (i) Bidding Procedures Order, and (ii) Assumption Notice | Within three (3) business days after the Bankruptcy Court's entry of the Bidding Procedures Order. |

---

[3]  The Sellers are the following Debtors: Debtors: (i) Union Fresh Start LLC (d/b/a Serenity at Summit); (ii) Summit Behavioral Health Limited Liability Company (d/b/a Summit Behavioral Health Princeton Junction); and (iii) SBH Haverhill, LLC (d/b/a Serenity at Summit New England).

2

| Contract Objection Deadline | March __, 2023 at 4:00 p.m. (prevailing Eastern Time) |
|---|---|
| Sale Objection Deadline | March __, 2023 at 4:00 p.m. (prevailing Eastern Time) |
| Bid Deadline | March __, 2023 at 5:00 p.m. (prevailing Eastern Time) |
| Notice of No Auction to be Held (if applicable) | March __, 2023 at 3:00 p.m. (prevailing Eastern Time) |
| Notification of Auction Baseline Bid to all Competing Qualified Bidders | March __, 2023 at 5:00 p.m. (prevailing Eastern Time) |
| Auction | March __, 2023 at 10:00 a.m. (prevailing Eastern Time), subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Auction to a later date. If an Auction is to be held, it shall take place at the offices of the Debtors' counsel, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131), and/or by electronic means (e.g., Zoom). |
| Debtors File Notice Identifying the Successful Bidder and any Backup Bidders | Within one (1) business days following the conclusion of the Auction. |
| Sale Hearing | March __, 2023 at ___ a.m./p.m. (prevailing Eastern Time), subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Sale Hearing to a later date, subject to the availability of the Court. |
| Adequate Assurance Objection (in the event the Stalking Horse Bidder is not the Successful Bidder) | At or before the Sale Hearing. |
| Deadline to Close the Sale | April __, 2023, subject to the right of the Debtors, in the reasonable exercise of their business judgment and the consent of the Stalking Horse Bidder, to agree to a later date. |

### Access to Diligence Materials.

To participate in the bidding process and to receive access to due diligence information, including access to the electronic data room being maintained by Berger Singerman LLP (the Debtors' counsel), and to additional non-public information regarding the Debtors and their business (collectively, the "Diligence Materials"), a party must deliver to the Debtors: (i) an executed confidentiality agreement in the form and substance satisfactory in the sole discretion of the Debtors (the "Confidentiality Agreement"); (ii) written evidence demonstrating such party's financial capability to close a transaction involving the Purchased Assets (an "Alternate Transaction"), as determined by the Debtors, in consultation with the Consultation Parties; and (iii) any other evidence that the Debtors, in consultation with the Consultation Parties, may reasonably request (any such party that satisfies the foregoing, a "Preliminary Interested Investor").

Only a Preliminary Interested Investor may proceed to conduct due diligence. Only a Preliminary Interested Investor may submit a Bid (as defined below).

3

All due diligence requests must be directed to the Debtors to the attention of Mr. Harvey Tepner (htepner@delphihealthgroup.com). To the extent reasonably practicable, Mr. Tepner will also facilitate meetings between any interested Preliminary Interested Investor and the Debtors' management team, which meetings will proceed in a manner determined by the Debtors, in their sole discretion. The Debtors shall promptly provide the Stalking Horse Bidder with any information provided to a prospective bidder or Competing Qualified Bidder that has not already been provided to the Stalking Horse Bidder.

The due diligence period will end on the Bid Deadline (as defined below), and, subsequent to the Bid Deadline, the Debtors and their representatives, including but not limited to the Debtors' Advisors (as defined below), will have no obligation to furnish any due diligence information to any party. For the avoidance of doubt, no due diligence will continue after the Bid Deadline.

Neither the Debtors nor any of their respective representatives, including the Debtors' Advisors, will be obligated to furnish any information relating to the Purchased Assets other than to Preliminary Interested Investors. The Debtors and the Debtors' Advisors make no representations or warranty as to the information to be provided through this due diligence process or otherwise, except to the extent set forth in any definitive agreement entered into with a Successful Bidder.

The Debtors and the Debtors' Advisors will coordinate all reasonable requests from Preliminary Interested Investors for additional information and due diligence access; provided that the Debtors may decline to provide such information to Preliminary Interested Investors who, at such time and in the Debtors' reasonable exercise of their business judgment, have not established, or who have raised doubt, that such Preliminary Interested Investor intends in good faith to, or has the capacity to, consummate an Alternate Transaction.

**For any Preliminary Interested Investor or Competing Qualified Bidder who, in the Debtors' determination, is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold, or to delay providing, in their sole discretion, and subject to any requirements under applicable law, <u>any</u> Diligence Materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such Preliminary Interested Investor or Competing Qualified Bidder, at any such time.**

**<u>All parties, Preliminary Interested Investors, and Competing Qualified Bidders are prohibited from communicating with any of the Debtors' employees, directors, officers, landlords, vendors, suppliers, agents, existing lender(s), interest or equity holders, or with any other potential bidder, Preliminary Interested Investor, or Competing Qualified Bidder with respect to any Bid or Alternate Transaction absent the prior written consent (email shall suffice) of the Debtors; provided that if such consent is given a representative of the Debtors shall be present for, or party to, any such communications (unless otherwise waived in writing (email shall suffice) by the Debtors in their sole discretion).</u>**

Each Preliminary Interested Investor and Competing Qualified Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or the Debtors' Advisors regarding such Preliminary Interested Investor or Competing Qualified Bidder.

4

Notwithstanding anything to the contrary herein, the Stalking Horse Bidder shall be qualified as a Preliminary Interested Investor and a Competing Qualified Bidder.

## Bid Qualification Process

**I.      Bid Deadline**.

A Preliminary Interested Investor that desires to make a proposal, solicitation, or offer for all or substantially all of the Purchased Assets (each, a "Bid") shall transmit such proposal, solicitation, or offer via email (in pdf or similar format) so as to be actually received by the following parties on or before **March \_\_, 2023, at 5:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"):

a.   *Bankruptcy Counsel to the Debtors*:  Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com), Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com), and Robin J. Rubens (rrubens@bergersingerman.com); and

b.   *The Interim Chief Executive Officer for the Debtors:* c/o Getzler Henrich & Associates LLC, 295 Madison Avenue, 20th Floor, New York, New York 10017 (Attn: Edward A. Phillips, ephillips@getzlerhenrich.com) (and together with Berger Singerman LLP, collectively, the "Debtors' Advisors").

**II.      Bid Requirements**.

To be eligible to participate in the Auction (defined below), other than with respect to the Stalking Horse Bid, each Bid by a Preliminary Interested Investor (a "Bidder") must be submitted in writing and satisfy each of the following requirements (collectively, the "Bid Requirements"):

a.   Same or Better Terms.  The Bid must be on terms that are substantially the same or better than the terms of the Stalking Horse Bid Agreement, as determined by the Debtors in their sole discretion (in consultation with the Consultation Parties) and the Bid must identify which assets the Bidder intends to purchase and include executed transaction documents (as defined herein, an Alternate Transaction).  A Bid shall include both a clean version (in MS-Word) and a blackline against the Stalking Horse Bid Agreement marked to show all changes requested by the Bidder.  A Bid will not be considered qualified for the Auction if: (i) such Bid contains additional material representations and warranties, covenants, closing conditions (including, but not limited to, any contingency involving the need to obtain any license in any way related to the operations of the Purchased Assets), termination rights, financing, or due diligence contingencies other than as may be included in the Stalking Horse Bid Agreement (it being agreed and understood that such Bid shall modify the Stalking Horse Bid Agreement as needed to comply in all respects with the Bidding Procedures Order (including removing any termination rights in conflict with the Bidding Procedures Order) and will remove provisions that apply only to the Stalking Horse Bidder, as the stalking horse bidder, such as the Expense

Reimbursement); (ii) such Bid is not received by each of the Debtors' Advisors in writing on or prior to the Bid Deadline; (iii) such Bid does not provide for payment of the Expense Reimbursement in cash upon closing; and (iv) such Bid does not contain evidence that the Bidder(s) has/have received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby, including proof that the Earnest Money Deposit (defined below) has been made.

b.    <u>Amount of Bid</u>.  Each Bid must be for all of the Purchased Assets and shall clearly show the amount of the purchase price.  In addition, a Bid must include (i) cash consideration of not less than the sum of (a) the Purchase Price (including the Credit Bid Amount and the amount of the Assumed Debt, as each term is defined in the Stalking Horse Bid Agreement), *plus* (b) all additional amounts outstanding under the DIP Facility not included in the Assumed Debt, *plus* (c) the Expense Reimbursement in the amount of $375,000.00, *plus* (d) an initial cash overbid of $500,000.00, and (ii) assumption of the Assumed Liabilities (other than the Assumed Debt).

c.    <u>Earnest Money Deposit</u>.  Each Bid, must be accompanied by a cash deposit in the amount equal to ten (10%) percent of the aggregate value of the cash and non-cash consideration of the Bid (the "<u>Earnest Money Deposit</u>") to be deposited with an escrow agent selected by the Debtors (the "<u>Escrow Agent</u>"), *provided that, for the avoidance of doubt,* the Stalking Horse Bidder will not be required to provide an Earnest Money Deposit.

d.    <u>Proof of Financial Ability to Perform</u>.  The Bid must include written evidence that the Debtors conclude in their sole discretion demonstrates that the Bidder has the necessary financial ability to close the Alternate Transaction and to provide adequate assurance of future performance under all executory contracts and unexpired leases to be assumed and assigned in such Alternate Transaction (i.e., the Assumed Contracts).

e.    <u>Identity</u>.  Each Bid must fully disclose the identity of each person and entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder, including if such Bidder is an entity formed for the purpose of consummating the proposed Alternate Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s) and counsel whom the Debtors' Advisors should contact regarding such Bid. Nothing herein shall preclude multiple Preliminary Interested Investors from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein.  Each Bid must also fully disclose any past or present agreements with or connections to the Debtors or their non-debtor affiliates, the Stalking Horse Bidder, any other known prospective bidder or Competing

Qualified Bidder, any of the owners of the Debtors or their non-debtor affiliates, and/or any officer or director of the foregoing.

f.  Authorization. Each Bid must contain written evidence acceptable to the Debtors in their sole discretion that the Bidder has obtained appropriate authorization or approval from its board of directors (or a comparable governing body) with respect to the submission of its Bid and the consummation of the Alternate Transaction contemplated in such Bid.

g.  Contingencies. A Bid will not be considered qualified for the Auction if it (i) contains any of the contingencies set forth above in sub-paragraph "a", or (ii) is conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties set forth in any definitive agreement entered into by the Debtors with a Successful Bidder at the Closing.

h.  Irrevocable. A Bid must be irrevocable through the Auction, provided, however, that if such Bid is accepted as the Successful Bid or a Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of these Bidding Procedures.

i.  Adequate Assurance of Future Performance. To the extent applicable, each Bid must contain evidence that the Bidder has the ability to comply with the requirements of adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code (the "Adequate Assurance Information") with respect to the Assumed Contracts. Such Adequate Assurance Information may include: (i) information about the Bidder's financial condition, such as federal tax returns for two (2) years, a current financial statement, or bank account statements; (ii) information demonstrating (as determined by the Debtors in the reasonable exercise of their business judgment (in consultation with the Consultation Parties)) that the Bidder has the financial capacity to consummate the proposed Alternate Transaction; (iii) evidence that the Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid; (iv) the identity and exact name of the Bidder (including any equity holder or other financial backer if the Bidder is an entity formed for the purpose of consummating the proposed Alternate Transaction; (v) such additional information regarding the Bidder as the Bidder may elect to include; and (vi) such other documentation that the Debtors may request. By submitting a Bid, the Bidder(s) agree that the Debtors may disseminate their Adequate Assurance Information to affected landlords and contract counterparties in the event that the Debtors determine such Bid to be a Qualified Bid.

j.  As-Is, Where-Is. Each Bid must include a written acknowledgement and representation that the Bidder: (1) has had an opportunity to conduct any and all due diligence regarding the assets prior to making its Bid; (2) has relied solely upon its own independent review, investigation, and/or inspection of any documents

7

and/or the asset(s) in making its Bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's mark-up of the Stalking Horse Bid Agreement.

k.     Affirmative Statement.  Each Bid shall be accompanied by an affirmative statement in which the Bidder explicitly agrees that: (i) it has and will continue to comply with these Bidding Procedures; (ii) the Bid it submits does not entitle such Bidder (and if it becomes a Competing Qualified Bidder) to any breakup fee, expense reimbursement, termination payment, or similar type of payment or reimbursement; and (iii) it waives any substantial contribution administrative expense claims under Bankruptcy Code section 503(b) related to bidding for the Purchased Assets.

l.     Time Frame for Closing. A Bid must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors after consultation with the Consultation Parties, which time frame shall include a closing by no later than **April __, 2023**.

m.     Adherence to Bid Procedures. By submitting a Bid, each Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of these Bidding Procedures and after the conclusion of the Auction, if any, agrees not to submit a Bid, or seek to reopen the Auction.

n.     Non-License Government Approvals. Each Bid must include a description of all governmental, regulatory, or other approvals or consents that are required to close the proposed Alternate Transaction (other than any license related in any way to the operations of the Purchased Assets), together with evidence satisfactory to the Debtors, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals; provided, however, as set forth above in sub-paragraphs "a" and "g", a Bid will not be considered qualified for the Auction if, among other things, it contains any contingency described therein, including but not limited to, the need to obtain any license in any way related to the operations of the Purchased Assets.

o.     Non-License Government Approvals Timeframe. Each Bid must set forth an estimated timeframe for obtaining any required, governmental, regulatory or other approvals or consents for consummating any proposed Sale; provided, however, as set forth above in sub-paragraphs "a" and "g", a Bid will not be considered qualified for the Auction if, among other things, it contains any contingency described therein, including but not limited to, the need to obtain any license in any way related to the operations of the Purchased Assets.

p.     Consent to Jurisdiction. By submitting a Bid, each Bidder agrees and shall be deemed to have agreed, to submit to the jurisdiction of the Bankruptcy Court and waives any right to a jury trial in connection with any disputes relating to the Debtors' qualification of bids, the Auction, if any, the construction and enforcement of these Bidding Procedures, the Alternate Transaction documents, and the Closing, as applicable

q.     Credit Bid.  If a Bid, other than the Stalking Horse Bid Agreement, consists in whole or in part of a credit bid pursuant to section 363(k) of the Bankruptcy Code (a "Credit Bid"): (i) it contains evidence sufficient to the Debtors, after consultation with the Consultation Parties, to demonstrate that the secured claims subject to such Credit Bid are secured by unavoidable, properly perfected liens on the Purchased Assets subject to such Credit Bid; and (ii) it includes a cash purchase price sufficient to pay in full the sum of the following, (a) all amounts being paid in full in cash as part of the Purchase Price under the Stalking Horse Bid Agreement (excluding, for the avoidance of doubt, any Assumed Liabilities to be assumed by the Stalking Horse Bidder pursuant to the Stalking Horse Bid Agreement), *plus* (b) all obligations under the DIP Facility, *plus* (c) all obligations secured by senior or *pari passu* liens on the Purchased Assets (e.g., the Loan Debt) to be purchased pursuant to such Credit Bid, *plus* (d) the Expense Reimbursement (in addition to the requirements set forth in (b) above).  The Stalking Horse Bid Agreement is, in part, a Credit Bid, notwithstanding any earlier Bids.  Further, any Credit Bid, including the Stalking Horse Bid, shall be permitted to increase its Credit Bid up to the full amount of its applicable outstanding secured obligations.

r.     Transition Services. Each bid must state or otherwise estimate the types of transition services, if any, the prospective bidder would require of and/or provide to the Debtors, including an estimate of the time any such transition services would be required of and/or provided to the Debtors, if the prospective bidder's bid were selected as the Successful Bid for the applicable Purchased Assets.

By submitting its Bid, each Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bidding Procedures, including but not limited to, refraining from, after the conclusion of the Auction, either submitting a Bid or seeking to reopen the Auction. **The submission of a Bid shall constitute a binding and irrevocable offer to acquire the Purchased Assets (or assets) as reflected in such Bid**.

## III.    **Designation of Competing Qualified Bidders**.

The Debtors will review each Bid received from a Bidder.  A Bid will be considered a "Competing Qualified Bid," and each Bidder that submits a Competing Qualified Bid will be considered a "Competing Qualified Bidder," if the Debtors determine, in their sole discretion and in the reasonable exercise of their business judgment (in consultation with the Consultation Parties), that such Bid was received before the Bid Deadline and satisfies each of the Bid Requirements set forth above.

11843540-13

Notwithstanding anything herein to the contrary, the Stalking Horse Bid Agreement submitted by the Stalking Horse Bidder shall be deemed a Competing Qualified Bid, and the Stalking Horse Bidder is a Competing Qualified Bidder for each phase of the Auction.

No later than three (3) business days after the receipt of a Bid, the Debtors will notify the relevant Bidder whether or not its Bid has been designated as a Competing Qualified Bid.

Upon the receipt of any competing Bid(s), the Debtors shall immediately provide counsel for the Stalking Horse Bidder copies of any blackline of the Stalking Horse Bid Agreement received by the Debtors from such Bidder(s).

If any Bid is determined by the Debtors not to be a Competing Qualified Bid, the Escrow Agent will refund such Bidder's Earnest Money Deposit on the date that is three (3) business days after the Debtors inform the Bidder that its Bid is not a Competing Qualified Bid, or as soon as is reasonably practicable thereafter.

Between the date that the Debtors notify a Bidder that it is a Competing Qualified Bidder and the Auction, the Debtors may discuss, negotiate, or seek clarification of any Competing Qualified Bid from a Competing Qualified Bidder. Without the prior written consent of the Debtors, a Competing Qualified Bidder may not modify, amend, or withdraw its Competing Qualified Bid, except for proposed amendments to increase the purchase price, or otherwise improve the terms of, the Competing Qualified Bid, during the period that such Competing Qualified Bid remains binding as specified in these Bidding Procedures; provided that any Competing Qualified Bid may be improved at the Auction as set forth herein. Any improved Competing Qualified Bid must continue to comply with the requirements for Competing Qualified Bids set forth in these Bidding Procedures.

## IV. <u>Right to Credit Bid</u>.

Subject to the other requirements in these Bidding Procedures, and in connection with the Sale of the Purchased Assets, secured credit parties, which hold perfected security interests in the Purchased Assets, may seek to submit Credit Bids for such Purchased Assets. The Stalking Horse Bid Agreement is, in part, a Credit Bid. Subject to a Bid and Competing Qualified Bid satisfying the requirements of these Bidding Procedures, the Debtors shall treat comparable Credit Bids and cash bids as equivalent and no Credit Bids shall be considered inferior to a cash bid merely because it is a Credit Bid.

Notwithstanding anything to the contrary contained herein, but subject in all respects to the challenge period as set forth in any Interim DIP Order or Final DIP Order, the Administrative Agent for the Prepetition Lenders and/or the Administrative Agent for the DIP Lenders shall have the right to Credit Bid all or any portion of the aggregate amount of their respective applicable outstanding secured obligations to the maximum extent permitted by section 363(k) of the Bankruptcy Code, notwithstanding any earlier or lower Credit Bid of any portion of their respective applicable outstanding secured obligations.

10

## V.    **The Auction**.

If one or more Competing Qualified Bids (other than the Stalking Horse Bid Agreement submitted by the Stalking Horse Bidder) are received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the highest or otherwise best Competing Qualified Bid. If no Competing Qualified Bid (other than the Stalking Horse Bid Agreement) is received by the Bid Deadline, no Auction shall be conducted and the Stalking Horse Bid Agreement shall be deemed to be the Successful Bid and the Stalking Horse Bidder shall be deemed to be the Successful Bidder.  Only Competing Qualified Bidders (including, but not limited to the Stalking Horse Bid) may participate in the Auction.

No later than **March __, 2023 at 5:00 p.m. (prevailing Eastern Time)**, the Debtors will notify all Competing Qualified Bidders of the highest or otherwise best pre-Auction, Competing Qualified Bid, as determined by the Debtors in the reasonable exercise of their business judgment, in consultation with the Consultation Parties (the "Auction Baseline Bid"), and will provide copies of the documents supporting the Auction Baseline Bid to all Competing Qualified Bidders.

The determination of which Competing Qualified Bid constitutes the Auction Baseline Bid and which Competing Qualified Bid constitutes the Successful Bid (defined herein) shall take into account any factors that the Debtors deem in their sole discretion to be relevant to the value of the Competing Qualified Bid to the Debtors' estates, including, among other things: (a) the type and amount of Purchased Assets (or assets) sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Competing Qualified Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Auction Baseline Bid; (e) the tax consequences of such Competing Qualified Bid; (f) the assumption of obligations, including contracts and leases; (g) the cure amounts to be paid; (h) the impact on employees, including the number of employees proposed to be transferred and employee-related obligations to be assumed, including the assumption of collective bargaining agreements; and (i) regulatory authorizations from any relevant government agency and all other applicable governmental entities relating to the services and products provided by or on behalf of the Debtors, including approvals, authorizations, certificates, registrations, licenses, exemptions, permits, clearances, and consents (collectively, the "Bid Assessment Criteria").

The Auction (if any) shall take place on **March __, 2023 at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131, or such other date and time and/or place or by electronic means (e.g., Zoom) as selected by the Debtors (in consultation with the Consultation Parties), and the Debtors shall notify all Competing Qualified Bidders, including the Stalking Horse Bidder, counsel for the Stalking Horse Bidder, and other invitees of the time and place of the Auction in accordance with these Bidding Procedures, and for the avoidance of any doubt, the Auction is subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Auction to a later date.

The Auction shall be conducted according to the following procedures:

11843540-13

a.     The Debtors Shall Conduct the Auction.

The Debtors and their professionals, including but not limited to the Debtors' Advisors, shall direct and preside over the Auction. At the start of the Auction, the Debtors shall announce which Competing Qualified Bid is deemed to be the Auction Baseline Bid.

Only (i) the Debtors, (ii) the Stalking Horse Bidder, (iii) other Competing Qualified Bidders, (iv) the Consultation Parties, and (v) with respect to (i) through (iv), each of their respective representatives and legal and financial advisors, shall be entitled to attend the Auction, and the Competing Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives.

b.     No Collusion; Good-Faith *Bona Fide* Offer.

Each Competing Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding or sale of the Purchased Assets, and (ii) its Competing Qualified Bid is a good-faith bona fide offer and it intends to consummate the proposed transaction for the Purchased Assets if selected as the Successful Bidder.

c.     Terms of Overbids.

An "Overbid" means any bid made at the Auction by a Competing Qualified Bidder subsequent to the Debtors' announcement of the Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(i)     Minimum Overbid Increment. Any Overbid following the Auction Baseline Bid shall be no less than the value of the $500,000.00, as determined by the Debtors in the reasonable exercise of their business judgment. Additional consideration in excess of the amount set forth in an Auction Baseline Bid, including each Overbid, may include cash, credit bids and/or other noncash consideration, or any combination of the foregoing, as determined by the Debtors in the reasonable exercise of their business judgment. For purposes of the Overbid, the Stalking Horse Bidder shall be entitled to a dollar for dollar credit in the amount of the Expense Reimbursement.

(ii)     Remaining terms are the same as for Competing Qualified Bids. Except as modified herein, an Overbid must comply with the conditions for a Competing Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid must remain open and binding on the Bidder until and unless the Debtors accept a higher Overbid or have a Backup Bidder (as defined below). An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Competing Qualified Bid or Overbid, as determined by the Debtors in the reasonable exercise of their

12

business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

    d.    <u>Consideration of Overbids</u>.

The Debtors reserve the right, in the reasonable exercise of their business judgment and in consultation with the Consultation Parties, to adjourn the Auction one or more times, to, among other things, to (i) facilitate discussions between the Debtors and the Competing Qualified Bidders, (ii) allow Competing Qualified Bidders to consider how they wish to proceed, and (iii) provide Competing Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in the reasonable exercise of their business judgment, may require, that the relevant Competing Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed purchase of the Purchased Assets at the prevailing Overbid amount.

Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (as the Debtors may, in the reasonable exercise of their business judgment, extend from time to time, the "<u>Overbid Round Deadline</u>") by which time any Overbids must be submitted to the Debtors.

Subsequent to each Overbid Round Deadline, the Debtors shall announce whether the Debtors have identified, (a) in the initial Overbid round, an Overbid as being higher or otherwise better than the Auction Baseline Bid, or, (b) in subsequent rounds, an Overbid as being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "<u>Prevailing Highest Bid</u>"). The Debtors shall describe to all Competing Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

    e.    <u>Backup Bidder</u>.

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Competing Qualified Bid at the Auction, as determined by the Debtors, in the reasonable exercise of their business judgment (in consultation with the Consultation Parties), will be designated as the backup bidder (the "<u>Backup Bidder</u>"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "<u>Backup Bid</u>") open and irrevocable until the earlier of 4:00 p.m. (prevailing Eastern Time) on the date that is the earlier of sixty (60) days after the conclusion of the Auction (the "<u>Outside Backup Date</u>") or the closing of the Alternate Transaction with the Successful Bidder. For the avoidance of doubt, the Debtors may not designate the Stalking Horse Bidder as a Backup Bidder without its express written consent.

Following the Sale Hearing, if the Successful Bidder fails to consummate an approved transaction, the Debtors may designate (in consultation with the Consultation Parties) the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction, with the Backup Bidder. A hearing to authorize a sale to the Backup

Bidder will be held by the Bankruptcy Court on no less than three (3) days' notice, with supplemental objections due at least two (2) days prior to such hearing (the "Backup Sale Hearing"). For the avoidance of doubt, only parties who timely filed an objection to the Sale by the Sale Objection Deadline may supplement their original objection with respect to the Backup Bidder and all such issues shall be limited to issues relating to the identity of the Backup Bidder. In such case, the defaulting Successful Bidder's Earnest Money Deposit shall be forfeited to the Debtors. The Debtors also specifically reserve the right to seek all available damages from the defaulting Successful Bidder. The Earnest Money Deposit of the Backup Bidder shall be held by the Debtors until the earlier of one (1) business day after (i) the closing of the transaction with the Successful Bidder and (ii) the Outside Backup Date.

      f.      <u>Additional and Modified Procedures</u>.

The Debtors (in consultation with the Consultation Parties and the Stalking Horse Bidder) may announce at the Auction additional or modified rules and procedures that are reasonable under the circumstances (e.g., limitations on the amount of time to make subsequent Overbids, changes in minimum Overbid increments, etc.) for conducting the Auction so long as such rules are not inconsistent with the Bidding Procedures or the Stalking Horse Bid Agreement.

      g.      <u>Consent to Jurisdiction as Condition to Bidding</u>.

The Stalking Horse Bidder and all Competing Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection any disputes relating to these Bidding Procedures, the Auction, or the construction and enforcement of any documents relating to an Alternate Transaction.

      h.      <u>Closing the Auction</u>.

The Auction shall continue until the Debtors determine, in the reasonable exercise of their business judgment (in consultation with the Consultation Parties), that there is a highest or otherwise best Competing Qualified Bid or Competing Qualified Bids at the Auction for all or substantially all of the Purchased Assets (each a "<u>Successful Bid</u>" and each Bidder submitting such Successful Bid, a "<u>Successful Bidder</u>"). The Auction shall not close unless and until all Bidders who have submitted Competing Qualified Bids have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbids and the Successful Bidder has submitted fully executed sale and transaction documents memorializing the terms of the Successful Bid. Within one (1) business day following the conclusion of the Auction, the Debtors shall file a notice on the Bankruptcy Court's docket in the lead case for the Debtors identifying the Successful Bidder for the Purchased Assets and any applicable Backup Bidders. The Debtors shall not consider any Bids submitted after the conclusion of the Auction and any and all such Bids shall be deemed untimely and shall under no circumstances constitute a Competing Qualified Bid.

Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

<div align="center">14</div>

The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Auction Baseline Bid, all Overbids, all Prevailing Highest Bids, the Successful Bid and any Backup Bid.

## VI. **Expense Reimbursement**.

The Stalking Horse Bidder is entitled to payment of the Expense Reimbursement pursuant to the terms of the Stalking Horse Bid Agreement; provided, however that the amount of the Expense Reimbursement that a Preliminary Interested Investor shall use solely for the purpose of the amount of the "Expense Reimbursement" referenced in the "Amount of Bid" set forth in paragraph II.b of these Bidding Procedures is set at $375,000.00; provided further, the Stalking Horse Bidder shall provide the Debtors and the U.S. Trustee with documentation supporting the payment of the Expense Reimbursement up to $500,000.00 five business days prior to the Sale Hearing; provided further, that the U.S. Trustee may only seek to challenge on the grounds of amounts sought for reimbursement over $375,000.00; provided further, that the Stalking Horse Bidder may only seek reimbursement of fees incurred in connection to the Stalking Horse Bid Agreement and the Sale Hearing. Nothing herein precludes the right of the Stalking Horse Bidder to seek reimbursement in excess of $500,000.00 in establishing the reasonableness of the Expense Reimbursement (to the extent applicable), however it shall only be entitled to actual payment and reimbursement up to $500,000.00.

The Debtors recognize the value and benefits that the Stalking Horse Bidder has provided to the Debtors' estates by entering into the Stalking Horse Bid Agreement, as well as the Stalking Horse Bidder's expenditure of time, energy and resources. Therefore, subject to the terms of the Stalking Horse Bid Agreement, the Debtors shall pay the Expense Reimbursement on the terms set forth in the Stalking Horse Bid Agreement and shall be paid to the Stalking Horse Bidder prior to the payment of the proceeds of such sale to any third party asserting a lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Expense Reimbursement.)

The Expense Reimbursement shall constitute an allowed administrative expense claim against the each of the Debtors pursuant to section 503(b) and 507 of the Bankruptcy Code (without the need to file a proof of claim).

Except for the Stalking Horse Bidder, no other party submitting an offer or Bid for the Purchased Assets or a Competing Qualifying Bid shall be entitled to any expense reimbursement, breakup fee, termination or similar fee or payment.

In the event no Competing Qualified Bid, other than the Stalking Horse Bid, is received, the Debtors reserve the right to request (in consultation with the Consultation Parties) that the Bankruptcy Court advance the date of the Sale Hearing and provide notice of such new date to those parties in interest entitled to notice thereof.

The Sale Hearing may be adjourned or rescheduled from time to time.

11843540-13

## VII.   Sale Hearing.

Objections, if any, to the Sale and/or the sale of the Purchased Assets to the Successful Bidder and the transaction contemplated by the Stalking Horse Bid Agreement must be: (a) be in writing; (b) state the basis of such objection with specificity; (c) comply with the Bankruptcy Procedure and the Local Rules; (d) be filed with the Court on or before **4:00 p.m. (prevailing Eastern Time) on March __, 2023** (the "Sale Objection Deadline"); and (e) be served, so as to be received the same day as the objection is filed, upon: (1) *the Debtors*, c/o (i) Interim Chief Executive Officer, c/o Getzler Henrich & Associates LLC, 295 Madison Avenue, 20th Floor, New York, New York 10017 (Attn: Edward A. Phillips, ephillips@getzlerhenrich.com) and (ii) *bankruptcy counsel for the Debtors*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com), Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com), and Robin J. Rubens, Esq. (rrubens@bergersingerman.com)); (2) *counsel for (i) the Administrative Agent for the Prepetition Lenders, (ii) the Administrative Agent for the DIP Lenders, and (iii) the Stalking Horse Bidder*, King & Spalding LLP, 1185 Avenue of the Americas, 34th Floor, New York, New York 10036 (Attn: Roger Schwartz, Esq. (rschwartz@kslaw.com), Timothy M. Fesenmyer, Esq. (tfesenmyer@kslaw.com), and Robert Nussbaum, Esq. (rnussbaum@kslaw.com)); (3) *the Office of the United States Trustee*, 51 SW First Avenue, Room 1204, Miami, Florida 33130; and (4) *counsel to any statutory committee appointed in the Debtors' bankruptcy cases*.

If no Auction is to be held, the Debtors will file a notice **no later than 3:00 p.m. (prevailing Eastern Time) on March __, 2023** with the Court in the lead case for the Debtors stating that there will be no Auction (the notice will be posted at the Court's website https://ecf.flsb.uscourts.gov/ which requires a court-issued login and passcode to access the notice).

The Debtors will seek a hearing (the "Sale Hearing") on **March __, 2023 at _____ a.m./p.m. (prevailing Eastern Time)**, at which the Debtors will seek approval of the transactions contemplated by the Stalking Horse Bid Agreement (or Alternate Transaction) with the Successful Bidder, and for the avoidance of any doubt, the Sale Hearing is subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Sale Hearing to a later date, subject to the availability of the Court.

**The Sale Hearing may be continued to a later date by the Debtors by either filing a notice with the Bankruptcy Court prior to, or making an announcement in open court at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.**

The approved Sale shall close not later than **April __, 2023**, unless the Debtors, with the consent of the Stalking Horse Bidder, agree to a later date.

## VIII.   Return of Earnest Money Deposit.

The Earnest Money Deposit for each Competing Qualified Bidder (i) shall be held by the Escrow Agent in one or more interest-bearing escrow accounts on terms acceptable to the Debtors

11843540-13

in their sole discretion, (ii) shall not become property of the Debtors' estates absent further order of the Bankruptcy Court, and (iii) shall be returned (other than with respect to the Successful Bidder and the Backup Bidder) by the Escrow Agent on the date that is three (3) business days after the Sale Hearing, or as soon as is reasonably practicable thereafter.

The Earnest Money Deposits of any Competing Qualified Bidder shall be forfeited if any such Competing Qualified Bidder attempts to withdraw its Qualified Bid, except as may be permitted by these Bidding Procedures, during the time the Qualified Bid remains binding and irrevocable under these Bidding Procedures and the Debtors are not in violation of these Bidding Procedures. The Debtors and their estates shall be entitled to retain the Competing Qualified Bidder's Earnest Money Deposit as partial compensation for the damages caused to the Debtors and their estates as a result of the Competing Qualified Bidder's failure to adhere to the terms of these Bidding Procedures and/or the relevant Qualified Bid. In the event that a Competing Qualified Bidder's Earnest Money Deposit is deemed forfeited, such Competing Qualified Bidder's Earnest Money Deposit shall be released by the Escrow Agent by wire transfer of immediately available funds to an account designated by the Debtors within two (2) business days after receipt of written notice to the Escrow Agent by an authorized office of the Debtors stating that the applicable Competing Qualified Bidder has breached or otherwise failed to satisfy its obligations in accordance with these Bidding Procedures and the applicable Qualified Bid.

The Earnest Money Deposit of the Backup Bidder shall be returned to the Backup Bidder by the Escrow Agent on the date that is the earlier of one (1) business day after (i) the closing of the transaction with the Successful Bidder and (ii) the Outside Backup Date. If the Successful Bidder timely closes its winning transaction, its Earnest Money Deposit shall be credited towards its purchase price.

Upon the return of the Earnest Money Deposit, the applicable Competing Qualified Bidders shall receive any and all interest that will have accrued thereon.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, the Debtors and the Escrow Agent will not have any obligation to return the Earnest Money Deposit deposited by such Successful Bidder, which may be retained by the Debtors' estates as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors, and the Debtors shall be free to consummate the proposed Alternate Transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court.

## IX.    **Consultation Parties**.

Each reference in these Bidding Procedures to "consultation" (or similar phrase) with the Consultation Parties shall mean consultation in good faith. The term "Consultation Parties" as used in these Bidding Procedures shall mean (a) the Administrative Agent for the DIP Lenders (and its advisors), (b) the Administrative Agent for the Prepetition Lenders (and its advisors), and (c) any statutory committee of unsecured creditors (and its advisors). During any period in which a Consultation Party or an affiliate thereof (i) has submitted a Qualified Bid and has become a Qualified Bidder hereunder, or (ii) submits (or indicates its intent to submit) a credit bid, such

17

Consultation Party shall no longer be considered a Consultation Party for purposes of these Bidding Procedures unless and until such party unequivocally revokes its Bid and waives its right to continue in the Auction process.

**X.**     **Free and Clear Sale**.

Except as otherwise provided in the Stalking Horse Bid Agreement, the applicable purchase agreement of a different Successful Bidder, or the Sale Order, all of the Debtors' rights, title, and interests in the Purchased Assets shall be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Encumbrances") in accordance with section 363 of the Bankruptcy Code and any definitive agreement entered into by the Debtors with the Successful Bidder with respect to a Sale, with such Encumbrances to attach to the net proceeds (if any) of the sale of the Purchased Assets.

**XI.**    **Fiduciary Duties**.

Notwithstanding anything to the contrary contained herein, nothing in the Bidding Procedures will prevent the Debtors from exercising their respective fiduciary duties under applicable law.

**XII.**   **Reservation of Rights**.

Except as otherwise provided in Stalking Horse Bid Agreement, or the Bidding Procedures Order, the Debtors further reserve the right as they may reasonably determine at any time, whether before, during or after the Auction, in the exercise of the Debtors' business judgment (in consultation with the Consultation Parties) to: (a) determine which Bidders are Competing Qualified Bidders; (b) determine which Bids are Competing Qualified Bids and reject any or all Bids or Competing Qualified Bids; (c) determine which Competing Qualified Bid is the highest or otherwise best proposal and which is the next highest or otherwise best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and their estates; (e) impose additional terms and conditions with respect to all potential bidders other than the Stalking Horse Bidder; (f) modify these Bidding Procedures and/or implement additional procedural rules that the Debtors determine will better promote the goals of the bidding process, including but not limited to adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (g) extend the deadlines set forth in these Bidding Procedures; and (h) adjourn or cancel the Auction at the Auction and/or the Sale Hearing in open court without further notice or by filing a notice on the docket (in consultation with the Stalking Horse Bidder and the Consultation Parties).

11843540-13

**Schedule 1**

**SUDs in the Stalking Horse Bid**

| # | Debtor | Doing Business As (d/b/a) | Inpatient or Outpatient | Street Address | City | State | Zip Code |
|---|--------|--------------------------|-------------------------|----------------|------|-------|----------|
| 1 | Union Fresh Start, LLC | Serenity at Summit | Inpatient | 1000 Galloping Hill Road | Union | NJ | 07083 |
| 2 | Summit Behavioral Health Limited Liability Company | Summit Behavioral Health Princeton Junction | Outpatient | 4065 Quakerbridge Road Suite 102 | Princeton Junction | NJ | 08550 |
| 3 | SBH Haverhill, LLC | Serenity at Summit New England | Inpatient | 61 Brown Street | Haverhill | MA | 01830 |

19

## EXHIBIT "2"

### Bidding Procedures Key Dates

### Key Dates

| Event | Date |
|-------|------|
| Hearing on the Motion for Bidding Procedures | February __, 2023 at ___ a.m./p.m. (prevailing Eastern Time) |
| Service of (i) Bidding Procedures Order, and (ii) Assumption Notice | Within three (3) business days after the Bankruptcy Court's entry of the Bidding Procedures Order. |
| Contract Objection Deadline | March __, 2023 at 4:00 p.m. (prevailing Eastern Time) |
| Sale Objection Deadline | March __, 2023 at 4:00 p.m. (prevailing Eastern Time) |
| Bid Deadline | March __, 2023 at 5:00 p.m. (prevailing Eastern Time) |
| Notice of No Auction to be Held (if applicable) | March __, 2023 at 3:00 p.m. (prevailing Eastern Time) |
| Notification of Auction Baseline Bid to all Competing Qualified Bidders | March __, 2023 at 5:00 p.m. (prevailing Eastern Time) |
| Auction | March __, 2023 at 10:00 a.m. (prevailing Eastern Time), subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Auction to a later date. If an Auction is to be held, it shall take place at the offices of the Debtors' counsel, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131), and/or by electronic means (e.g., Zoom). |
| Debtors File Notice Identifying the Successful Bidder and any Backup Bidders | Within one (1) business days following the conclusion of the Auction. |
| Sale Hearing | March __, 2023 at ___ a.m./p.m. (prevailing Eastern Time), subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Sale Hearing to a later date, subject to the availability of the Court. |
| Adequate Assurance Objection (in the event the Stalking Horse Bidder is not the Successful Bidder) | At or before the Sale Hearing. |
| Deadline to Close the Sale | April __, 2023, subject to the right of the Debtors, in the reasonable exercise of their business judgment and the consent of the Stalking Horse Bidder, to agree to a later date. |

**EXHIBIT "3"**

**Notice of Sale of Certain Assets at Auction**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

DELPHI BEHAVIORAL HEALTH
GROUP, LLC, *et al.*,[1]

Debtors.
_____/

Chapter 11 Cases

Case No. 23-_____

(Jointly Administered)

## NOTICE OF SALE OF CERTAIN ASSETS AT AUCTION

PLEASE TAKE NOTICE THAT:

1.    Pursuant to the *Order Granting Debtors' Expedited Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry into the Stalking Horse Bid Agreement with the Stalking Horse Bidder, Subject to the Bidding Procedures and the Sale Hearing, (II) Approving Bidding Procedures, (III) Scheduling the Bid Deadlines and the Auction, (IV) Scheduling a Hearing to Consider the Transaction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Procedures, and (VII) Approving a Deadline for Interested Parties to Submit Bids to Purchase Any of the Debtors' Remaining Assets Which Are Not Purchased Assets Subject to the Stalking Horse Bid Agreement, and (VIII) Granting Related Relief* [ECF No. __] (the "Bidding Procedures Order")[2] entered by the United States Bankruptcy Court for the Southern District of Florida (the "Court") on February __, 2023, three of the above-captioned, affiliated, debtors and debtors-in-possession (each, a "Seller" and collectively, the "Sellers", and together with the remaining above-captioned, affiliated, debtors and debtors-in-possession, collectively, the "Debtors"), have entered into an *Asset Purchase Agreement* (the "Stalking Horse Bid Agreement") with Lender AcquisitionCo LLC (together with each of its permitted successors, assigns and

---

[1]    The address of the Debtors is 1901 West Cypress Creek Road, Suite 500, Fort Lauderdale, FL 33309.  The last four digits of the Debtors' federal tax identification numbers are: (i) Delphi Behavioral Health Group, LLC (2076), (ii) 61 Brown Street Holdings, LLC (0007), (iii) Aloft Recovery, LLC (6674), (iv) Banyan Recovery Institute, LLC (6998), (v) Breakthrough Living Recovery Community, LLC (5966), (vi) California Addiction Treatment Center, LLC (7655), (vii) California Vistas Addiction Treatment, LLC (8272), (viii) DBHG Holding Company, LLC (6574), (ix) Defining Moment Recovery Community, LLC (3532), (x) Delphi Health BuyerCo, LLC (2325), (xi) Delphi Health Group, LLC (0570), (xii) Delphi Intermediate HealthCo, LLC (6378), (xiii) Delphi Management LLC (6474), (xiv) Desert View Recovery Community, LLC (7437), (xv) DR Parent, LLC (2700), (xvi) DR Sub, LLC (8183), (xvii) Las Olas Recovery, LLC (9082), (xviii) Maryland House Detox, LLC (1626), (xix) New Perspectives, LLC (0508), (xx) Next Step Housing, LLC (6975), (xxi) Ocean Breeze Detox, LLC (7019), (xxii) Ocean Breeze Recovery, LLC (9621), (xxiii) Onward Living Recovery Community, LLC (4735), (xxiv) Palm Beach Recovery, LLC (4459), (xxv) Peak Health NJ, LLC (7286), (xxvi) QBR Diagnostics, LLC (7835), (xxvii) Rogers Learning, LLC (1699), (xxviii) SBH Haverhill, LLC (0971), (xxix) SBH Undion IOP, LLC (4139), (xxx) Summit at Florham Park, LLC (8226), (xxxi) Summit Behavioral Health, LLC (3337), (xxxii) Summit Health BuyerCo, LLC (2762), (xxxiii) Summit IOP Limited (4567), and (xxxiv) Union Fresh Start, LLC (6841).

[2]    All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them, as applicable, in the Bidding Procedures Order, the Motion (as defined in the Bidding Procedures Order) or the Stalking Horse Bid Agreement (as defined in the Bidding Procedures Order).

11844825-13

designees, the "Stalking Horse Bidder") and Brightwood Loan Services LLC (solely for the purposes stated expressly in the Stalking Horse Bid Agreement, the "Administrative Agent"), for the (the "Sale") of three of the Debtors' inpatient and outpatient substance use disorder treatment facilities (each, a "SUD" and collectively, the "SUDs") located in Massachusetts and New Jersey, identified on **Schedule 1** hereof, and all related assets (collectively, the "Purchased Assets"), subject to a competitive bidding process as set forth in the Bidding Procedures Order.

2.      Copies of (i) the Motion, (ii) the Stalking Horse Bid Agreement, (iii) the proposed Sale Order, (iv) the Bidding Procedures, and (v) the Bidding Procedures Order can be obtained by contacting the Debtors at either (i) the Interim Chief Executive Officer, c/o Getzler Henrich & Associates LLC, 295 Madison Avenue, 20th Floor, New York, New York 10017 (Attn: Edward A. Phillips, ephillips@getzlerhenrich.com), or (ii) *the bankruptcy counsel for the Debtors*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com), Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com), and Robin J. Rubens, Esq. (rrubens@bergersingerman.com).

3.      All interested parties are invited to make an offer to purchase the Purchased Assets in accordance with the terms and conditions approved by the Court (the "Bidding Procedures") by **5:00 p.m. (prevailing Eastern Time) on March     , 2023**.  Pursuant to the Bidding Procedures, the Debtors may conduct an Auction for the Purchased Assets (the "Auction") beginning at **10:00 a.m. (prevailing Eastern Time) on March     , 2023** at the offices of Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131 (or by other electronic means (e.g., Zoom)), or such later time or other place as the Debtors notify all Competing Qualified Bidders who have submitted Competing Qualified Bids, and for the avoidance of any doubt, the Auction is subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Auction to a later date.  Interested bidders are encouraged to read the Bidding Procedures carefully and, for further information, are invited to contact the bankruptcy counsel for the Debtors at Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com), Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com) and Robin J. Rubens, Esq. (rrubens@bergersingerman.com), or the Interim Chief Executive Officer, c/o Getzler Henrich & Associates LLC, 295 Madison Avenue, 20th Floor, New York, New York 10017 (Attn: Edward A. Phillips, ephillips@getzlerhenrich.com).

4.      Participation at the Auction is subject to the Bidding Procedures and the Bidding Procedures Order.

5.      If no Auction is held, the Debtors will file a notice **no later than 3:00 p.m. (prevailing Eastern Time) on March     , 2023** with the Court in each of the Debtors' bankruptcy cases stating that there will be no Auction (the notice will be posted at the Court's website https://ecf.flsb.uscourts.gov/ which requires a court-issued login and passcode to access the notice).  The Debtors will seek approval of the Sale of the Purchased Assets to the Stalking Horse Bidder at a hearing before the Court proposed to be held, in Courtroom ___, United States Courthouse, 299 East Broward Blvd., Ft. Lauderdale, Florida 33301, before the Honorable _____, United States Bankruptcy Judge, at **_____ (prevailing Eastern Time) on March     , 2023** (the "Sale Hearing").  The Sale Hearing may be adjourned without notice other than adjournment in open court or as identified on the agenda, and for the avoidance of any doubt,

the Sale Hearing is subject to the right of the Debtors, in the reasonable exercise of their business judgment, to adjourn the Sale Hearing to a later date, subject to the availability of the Court. Any party opposing the relief sought at the Sale Hearing must appear at the Sale Hearing or any objections or defenses may be deemed waived. You are reminded that Local Rule 5072-2 restricts the entry of cellular telephones, cameras, recording devices or other electronic devices (such as computers or MP3 players) into the Courthouse absent a specific order of authorization issued beforehand by the presiding judge, a valid Florida Bar identification card, or *pro hac vice* order. Please take notice that as an additional security measure a photo ID is required for entry into the Courthouse.

6.      **Objections, if any, to the proposed Sale and/or the sale of the Purchased Assets to the Successful Bidder and the transaction contemplated by the Stalking Horse Bid Agreement must be: (a) be in writing; (b) state the basis of such objection with specificity; (c) comply with the Bankruptcy Rules and the Local Rules; (d) be filed with the Court <u>on or before 4:00 p.m. (prevailing Eastern Time) on March    , 2023</u> (the "<u>Sale Objection Deadline</u>"); and (e) be served, so as to be received the same day as the objection is filed, upon**: (1) *the Debtors*, c/o (i) Interim Chief Executive Officer, c/o Getzler Henrich & Associates LLC, 295 Madison Avenue, 20th Floor, New York, New York 10017 (Attn: Edward A. Phillips, ephillips@getzlerhenrich.com) and (ii) *bankruptcy counsel for the Debtors*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com), Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com), and Robin J. Rubens, Esq. (rrubens@bergersingerman.com)); (2) *counsel for (i) the Administrative Agent for the Prepetition Lenders, (ii) the Administrative Agent for the DIP Lenders, and (i) the Stalking Horse Bidder*, King & Spalding LLP, 1185 Avenue of the Americas, 34th Floor, New York, New York 10036 (Attn: Roger Schwartz, Esq. (rschwartz@kslaw.com), Timothy M. Fesenmyer, Esq. (tfesenmyer@kslaw.com), and Robert Nussbaum, Esq. (rnussbaum@kslaw.com)); (3) *the Office of the United States Trustee*, 51 SW First Avenue, Room 1204, Miami, Florida 33130; and (4) *counsel to any statutory committee appointed in the Debtors' bankruptcy cases*.

7.      This notice is qualified in its entirety by the Bidding Procedures Order.

Dated: February __, 2023
Miami, Florida

**BERGER SINGERMAN LLP**
*Counsel for the Debtors and Debtors-in-Possession*
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By:      <u>Christopher Andrew Jarvinen</u>
         Paul Steven Singerman
         Florida Bar No. 0378860
         singerman@bergersingerman.com
         Christopher Andrew Jarvinen
         Florida Bar No. 021745
         cjarvinen@bergersingerman.com

11844825-13

## Schedule 1

## SUDs in the Stalking Horse Bid

| # | Debtor | Doing Business As (d/b/a) | Inpatient or Outpatient | Street Address | City | State | Zip Code |
|---|--------|--------------------------|-------------------------|----------------|------|-------|----------|
| 1 | Union Fresh Start, LLC | Serenity at Summit | Inpatient | 1000 Galloping Hill Road | Union | NJ | 07083 |
| 2 | Summit Behavioral Health Limited Liability Company | Summit Behavioral Health Princeton Junction | Outpatient | 4065 Quakerbridge Road Suite 102 | Princeton Junction | NJ | 08550 |
| 3 | SBH Haverhill, LLC | Serenity at Summit New England | Inpatient | 61 Brown Street | Haverhill | MA | 01830 |

**EXHIBIT "4"**

**Notice of Assumption and Cure Amount with Respect to Available Contracts**
**(i.e., Executory Contracts or Unexpired Lease Potentially to be Assumed and Assigned in**
**Connection with Sale of Debtors' Assets)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:

DELPHI BEHAVIORAL HEALTH
GROUP, LLC, *et al.*,[3]

    Debtors.

_____/

Chapter 11 Cases

Case No. 23-_____

(Jointly Administered)

### NOTICE OF ASSUMPTION AND CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACTS OR UNEXPIRED LEASES POTENTIALLY TO BE ASSUMED AND ASSIGNED IN CONNECTION WITH SALE OF DEBTORS' ASSETS

---

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO
AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR
MORE OF THE DEBTORS AS SET FORTH ON EXHIBIT A ATTACHED HERETO.**

---

PLEASE TAKE NOTICE THAT:

    1.    Pursuant to the *Order Granting Debtors' Expedited Motion for Entry of an Order (I) Authorizing and Approving the Debtors' Entry into the Stalking Horse Bid Agreement with the Stalking Horse Bidder, Subject to the Bidding Procedures and the Sale Hearing, (II) Approving Bidding Procedures, (III) Scheduling the Bid Deadlines and the Auction, (IV) Scheduling a Hearing to Consider the Transaction, (V) Approving the Form and Manner of Notice Thereof, (VI) Approving Contract Procedures, and (VII) Approving a Deadline for Interested Parties to Submit Bids to Purchase Any of the Debtors' Remaining Assets Which Are Not Purchased Assets Subject to the Stalking Horse Bid Agreement, and (VIII) Granting Related Relief* [ECF No. __] [ECF No.

---

[3]    The address of the Debtors is 1901 West Cypress Creek Road, Suite 500, Fort Lauderdale, FL 33309. The last four digits of the Debtors' federal tax identification numbers are: (i) Delphi Behavioral Health Group, LLC (2076), (ii) 61 Brown Street Holdings, LLC (0007), (iii) Aloft Recovery, LLC (6674), (iv) Banyan Recovery Institute, LLC (6998), (v) Breakthrough Living Recovery Community, LLC (5966), (vi) California Addiction Treatment Center, LLC (7655), (vii) California Vistas Addiction Treatment, LLC (8272), (viii) DBHG Holding Company, LLC (6574), (ix) Defining Moment Recovery Community, LLC (3532), (x) Delphi Health BuyerCo, LLC (2325), (xi) Delphi Health Group, LLC (0570), (xii) Delphi Intermediate HealthCo, LLC (6378), (xiii) Delphi Management LLC (6474), (xiv) Desert View Recovery Community, LLC (7437), (xv) DR Parent, LLC (2700), (xvi) DR Sub, LLC (8183), (xvii) Las Olas Recovery, LLC (9082), (xviii) Maryland House Detox, LLC (1626), (xix) New Perspectives, LLC (0508), (xx) Next Step Housing, LLC (6975), (xxi) Ocean Breeze Detox, LLC (7019), (xxii) Ocean Breeze Recovery, LLC (9621), (xxiii) Onward Living Recovery Community, LLC (4735), (xxiv) Palm Beach Recovery, LLC (4459), (xxv) Peak Health NJ, LLC (7286), (xxvi) QBR Diagnostics, LLC (7835), (xxvii) Rogers Learning, LLC (1699), (xxviii) SBH Haverhill, LLC (0971), (xxix) SBH Undion IOP, LLC (4139), (xxx) Summit at Florham Park, LLC (8226), (xxxi) Summit Behavioral Health, LLC (3337), (xxxii) Summit Health BuyerCo, LLC (2762), (xxxiii) Summit IOP Limited (4567), and (xxxiv) Union Fresh Start, LLC (6841).

__ ] (the "Bidding Procedures Order")[4] entered by the United States Bankruptcy Court for the Southern District of Florida (the "Court") on February __, 2023, three of the above-captioned, affiliated, debtors and debtors-in-possession (each, a "Seller" and collectively, the "Sellers", and together with the remaining affiliated, debtors and debtors-in-possession, collectively, the "Debtors"), have entered into an *Asset Purchase Agreement* (the "Stalking Horse Bid Agreement") with Lender AcquisitionCo LLC (together with each of its permitted successors, assigns and designees, the "Stalking Horse Bidder") and Brightwood Loan Services LLC (solely for the purposes stated expressly in the Stalking Horse Bid Agreement, the "Administrative Agent"), for the (the "Sale") of three of the Debtors' inpatient and outpatient substance use disorder treatment facilities (each, a "SUD" and collectively, the "SUDs") located in Massachusetts and New Jersey, identified on **Schedule 1** hereof, and all related assets (collectively, the "Purchased Assets"), subject to a competitive bidding process as set forth in the Bidding Procedures Order.

2.     Copies of (i) the Motion, (ii) the Stalking Horse Bid Agreement, (iii) the proposed Sale Order, (iv) the Bidding Procedures, and (v) the Bidding Procedures Order can be obtained by contacting the Debtors at either (i) the Interim Chief Executive Officer, c/o Getzler Henrich & Associates LLC, 295 Madison Avenue, 20th Floor, New York, New York 10017 (Attn: Edward A. Phillips, ephillips@getzlerhenrich.com), or (ii) *the bankruptcy counsel for the Debtors*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, Florida 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com), Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com), and Robin J. Rubens, Esq. (rrubens@bergersingerman.com).

3.     The Debtors hereby provide notice of their intent to potentially assume and assign the prepetition executory contracts or unexpired leases (collectively, the "Available Contracts") listed on **Exhibit "A"** hereto to the Stalking Horse Bidder or the Successful Bidder, as the case may be.  The inclusion of any executory contract or unexpired lease on **Exhibit "A"** hereto does not require or guarantee that such executory contract or unexpired lease will be assumed or assigned (i.e., be an Assumed Contract under the Stalking Horse Bid Agreement), or that said contact or lease is executory, and all rights of the Debtors with respect thereto are reserved.

4.     Pursuant to the terms of the Stalking Horse Bid Agreement (or any asset sale and purchase agreement that the Debtors may enter into with the Successful Bidder), the Debtors may seek to assume and assign one or more of the Available Contracts to the Stalking Horse Bidder or the Successful Bidder, as the case may be, subject to approval at the hearing proposed to be held at _____ **a.m./p.m. (prevailing Eastern Time) on March __, 2023** (the "Sale Hearing") before the Court.  On the date of the closing of the transactions contemplated by the Stalking Horse Bid Agreement (the "Closing Date"), or as soon thereafter as is reasonably practicable, the Debtors will pay the amount the Debtors' records reflect is owing for prepetition arrearages, if any, as set forth on **Exhibit A** hereto (the "Cure Amount").  The Debtors' records reflect that all post-petition amounts owing under the Available Contracts have been paid and will continue to be paid until the assumption and assignment of the Available Contracts (i.e., if an Available Contract becomes

---

[4]     All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them, as applicable, in the Bidding Procedures Order, the Motion (as defined in the Bidding Procedures Order) or the Stalking Horse Bid Agreement (as defined in the Bidding Procedures Order).

an Assumed Contract) and that, other than the Cure Amount, there are no other defaults under the Assumed Contracts.

5.     **Objections, if any, to the Cure Amount or to the assumption and assignment of an Available Contract to the Stalking Horse Bidder or a different Successful Bidder, including with respect to adequate assurance of future performance of the Stalking Horse Bidder or a different Successful Bidder (collectively, a "Contract Objection"), must: (a) be in writing; (b) state the basis of such objection with specificity, including, if applicable, the Cure Amount asserted to be required; (c) include appropriate documentation thereof; (d) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (e) be filed with the Court on or before 4:00 p.m. (prevailing Eastern Time) on March    , 2023 (the "Contract Objection Deadline"); and (e) be served, so as to be received the same day as the objection is filed, upon**: (1) *the Debtors*, c/o (i) Interim Chief Executive Officer, c/o Getzler Henrich & Associates LLC, 295 Madison Avenue, 20th Floor, New York, New York 10017 (Attn: Edward A. Phillips, ephillips@getzlerhenrich.com) and (ii) *bankruptcy counsel for the Debtors*, Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131 (Attn: Paul Steven Singerman, Esq. (singerman@bergersingerman.com), Christopher Andrew Jarvinen, Esq. (cjarvinen@bergersingerman.com) and Robin J. Rubens, Esq. (rrubens@bergersingerman.com)); (2) *counsel for (i) the Administrative Agent for the Prepetition Lenders, (ii) the Administrative Agent for the DIP Lenders, and (iii) the Stalking Horse Bidder*, King & Spalding LLP, 1185 Avenue of the Americas, 34th Floor, New York, New York 10036 (Attn: Roger Schwartz, Esq. (rschwartz@kslaw.com), Timothy M. Fesenmyer, Esq. (tfesenmyer@kslaw.com), and Robert Nussbaum, Esq. (rnussbaum@kslaw.com)); (3) *the Office of the United States Trustee*, 51 SW First Avenue, Room 1204, Miami, Florida 33130; and (4) *counsel to any statutory committee appointed in the Debtors' bankruptcy cases*.

6.     **Objections, if any, related solely to the adequate assurance of future performance provided by the Successful Bidder, if the Successful Bidder is not the Stalking Horse Bidder, must be made prior to or at the Sale Hearing.**

7.     If an objection to the assumption and assignment of an Available Contract is timely submitted in accordance with paragraphs 5 and 6 hereof, a hearing with respect to the objection will be held before the Court at the Sale Hearing, or as may be continued by the Debtors and noticed on the agenda filed on the docket, or such date and time as the Court may schedule.  If no objection is timely received, the Non-Debtor Counterparty to the Available Contract will be deemed to have consented to the assumption and assignment of the Available Contract with the Cure Amount set forth herein and the Non-Debtor Counterparty will forever will be barred from asserting any other claims, including but not limited to the propriety or effectiveness of the assumption and assignment of the Available Contract, against the Debtors, the Stalking Horse Bidder, the Successful Bidder or the property of any of them in respect of the Available Contract.

8.     Pursuant to Bankruptcy Code section 365, there is adequate assurance of future performance that the Cure Amount set forth in the Assumption Notice will be paid in accordance with the terms of the Stalking Horse Bid Agreement and the Sale Order.  There is adequate assurance of the Stalking Horse Bidder's future performance under the executory contract or unexpired lease to be assumed and assigned because of the significant resources of the Stalking Horse Bidder.  If necessary, the Debtors will adduce facts at the hearing on any objection

demonstrating the financial wherewithal of the Successful Bidder, and its willingness and ability to perform under the Available Contracts to be assumed and assigned to it (i.e., the Assumed Contracts).

9.      If an objection to the Cure Amount is timely filed and received and the parties are unable to consensually resolve the dispute, the amount to be paid under Bankruptcy Code section 365, if any, with respect to such objection will be determined at a hearing to be requested by the Debtors.  At the Stalking Horse Bidder's or the Successful Bidder's discretion, and provided the Debtors escrow the disputed portion of the Cure Amount, the hearing regarding the Cure Amount may be continued until after the Closing Date and the Available Contract(s) subjected to such Cure Amount shall, with the consent of the Stalking Horse Bidder or the Successful Bidder, be assumed and assigned to the Stalking Horse Bidder or the Successful Bidder at or following the closing of the Sale per the procedures set forth in Section 2.5 of the Stalking Horse Bid Agreement and the Sale Order.

10.     **If no objection is timely received, the Cure Amount set forth in Exhibit "A" hereto will be controlling, notwithstanding anything to the contrary in any Available Contract or any other related document, and the Non-Debtor Counterparty to the Available Contract will be deemed to have consented to the Cure Amount for the purposes of the Sale and will be forever barred from asserting any other claims in respect of such Available Contract or the Cure Amount against the Debtors, the Stalking Horse Bidder, or the Successful Bidder (as appropriate), or the property of any of them.  The failure of any objecting person or entity to timely file its objection will be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Sale Motion, the Sale or the Debtors' consummation of and performance under the Stalking Horse Bid Agreement (including the transfer of the Purchased Assets and the Assumed Contracts free and clear of all claims, liens, encumbrances, and interests), if authorized by the Court**.

11.     **Unless a Non-Debtor Counterparty to any Available Contract files a timely Contract Objection to the assumption and assignment of the applicable Available Contract by the Stalking Horse Bidder or the other Successful Bidder, then such Non-Debtor Counterparty shall be deemed to have (i) consented to the assumption and assignment of the applicable Available Contract to the Stalking Horse Bidder or the other Successful Bidder with the Cure Amount set forth in the Assumption Notice and (ii) waived and released any and all other rights to object to the Cure Amount or the assumption and assignment of the Available Contract to the Stalking Horse Bidder or the other Successful Bidder**.

[This section intentionally left blank]

12.     Prior to the date of the closing of the Sale, the Debtors may amend their decision with respect to the assumption and assignment of any Available Contract, including amending the Cure Amount, and provide a new notice amending the information provided in this notice, including, without limitation, a determination not to assume certain contracts.

Dated: February __, 2023
Miami, Florida

**BERGER SINGERMAN LLP**
*Counsel for the Debtors and*
*Debtors-in-Possession*
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Telephone: (305) 755-9500
Facsimile: (305) 714-4340

By:     Christopher Andrew Jarvinen
        Paul Steven Singerman
        Florida Bar No. 0378860
        singerman@bergersingerman.com
        Christopher Andrew Jarvinen
        Florida Bar No. 021745
        cjarvinen@bergersingerman.com

11844825-13

## Schedule 1

## SUDs in the Stalking Horse Bid

| # | Debtor | Doing Business As (d/b/a) | Inpatient or Outpatient | Street Address | City | State | Zip Code |
|---|--------|--------------------------|-------------------------|----------------|------|-------|----------|
| 1 | Union Fresh Start, LLC | Serenity at Summit | Inpatient | 1000 Galloping Hill Road | Union | NJ | 07083 |
| 2 | Summit Behavioral Health Limited Liability Company | Summit Behavioral Health Princeton Junction | Outpatient | 4065 Quakerbridge Road Suite 102 | Princeton Junction | NJ | 08550 |
| 3 | SBH Haverhill, LLC | Serenity at Summit New England | Inpatient | 61 Brown Street | Haverhill | MA | 01830 |

11844825-13

**Exhibit "A"**

**Available Contracts and Cure Amounts**

**EXHIBIT C**

**Form of Bill of Sale, Assignment and Assumption Agreement**

Exhibit C

**FORM OF BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

This BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into as of [●], 2023, by and among Union Fresh Start LLC d/b/a Serenity at Summit, a New Jersey limited liability company, Summit Behavioral Health Limited Liability Company d/b/a Summit Behavioral Health, a New Jersey limited liability company, SBH Haverhill, LLC d/b/a Serenity at Summit (each a "Seller," and collectively, the "Sellers"), and Delphi Lender AcquisitionCo LLC, a Delaware limited liability company ("Buyer").

WHEREAS, the Sellers and Buyer are parties to that certain Asset Purchase Agreement, dated as of February 19, 2023 (the "Purchase Agreement"), pursuant to which, among other things, (a) the Sellers have agreed to sell, convey, assign, transfer and deliver to Buyer, and Buyer has agreed to purchase, acquire and accept from the Sellers, all of the right, title and interest of each of the Sellers, free and clear of all Liens (other than Permitted Liens), in, to and under, all of the Purchased Assets and (b) Buyer has agreed to assume the Assumed Liabilities.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and on the terms and subject to the conditions in the Purchase Agreement, the parties hereto agree as follows:

Section 1.    Definitions.    Capitalized, undefined terms used herein shall have the respective meanings ascribed to them in the Purchase Agreement.

Section 2.    Assignment.    Effective as of the Closing, each Seller hereby irrevocably, absolutely and unconditionally sells, conveys, assigns, transfers and delivers to Buyer, free and clear of all Liens (other than Permitted Liens), all of such Seller's right, title and interest in, to and under the Purchased Assets (the "Assignment").

Section 3.    Assumption.    Effective as of the Closing, Buyer hereby (a) accepts the Assignment and (b) irrevocably, absolutely and unconditionally assumes and agrees to discharge and perform, as and when due, the Assumed Liabilities.

Section 4.    Successors and Assigns.    This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

Section 5.    Subject to Purchase Agreement.    The scope, nature, and extent of the Purchased Assets and Assumed Liabilities are expressly set forth in the Purchase Agreement. Nothing contained in this Agreement shall itself change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Purchase Agreement in any manner whatsoever. This Agreement does not create or establish liabilities or obligations not otherwise created or existing under or pursuant to the Purchase Agreement. In the event of any conflict between the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall govern and control. The parties hereto acknowledge and agree that the representations, warranties, covenants and agreements contained in the Purchase Agreement will not be superseded hereby but will remain in full force and effect to the full extent provided therein. Any controversy or claim arising under this Agreement shall be governed solely by, and subject to the terms of, the Purchase Agreement.

Section 6.    <u>Governing Law; Dispute Resolution; Consent to Jurisdiction</u>.  The terms and provisions of Sections 10.10 and 10.11 of the Purchase Agreement are incorporated herein by this reference and shall apply to this Agreement, *mutatis mutandis*.

Section 7.    <u>Further Assurances</u>.  During the pendency of the Cases, each party hereto shall, and shall cause its respective subsidiaries to, promptly execute, acknowledge and deliver any other assurances or documents or instruments of transfer or assumption reasonably requested by the other party and necessary for the requesting party to satisfy its obligations hereunder or to obtain the benefits of the Transactions.

Section 8.    <u>Construction</u>.  The headings of sections in this Agreement are provided for convenience only and will not affect its construction or interpretation.  The language used in this Agreement is the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

Section 9.    <u>Counterparts</u>.  This Agreement may be executed simultaneously in one or more counterparts (including by facsimile or electronic .pdf submission), and by the different parties in separate counterparts, each of which when executed shall be deemed to be an original, but all of which shall constitute one and the same agreement.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, each of the parties hereto has duly executed this Agreement as of the date first above written.

**SELLERS:**

**Union Fresh Start LLC d/b/a Serenity at Summit**

By:_____
Name:
Title:

**Summit Behavioral Health Limited Liability Company d/b/a Summit Behavioral Health**

By:_____
Name:
Title:

**SBH Haverhill, LLC d/b/a Serenity at Summit**

By:_____
Name:
Title:

*Signature Page to Bill of Sale, Assignment and Assumption Agreement*

**BUYER:**

**Delphi Lender AcquisitionCo LLC**

By: _____
Name:
Title:

**EXHIBIT "B"**

**STALKING HORSE BID AGREEMENT**
(REDLINE VERSION)

11934644-3

**ASSET PURCHASE AGREEMENT**

by and among

[DELPHI LENDER ACQUISITIONCO LLC],

as Buyer,

THE SELLERS PARTY HERETO,

solely for the purposes of Sections 3.1(b) and 6.15 hereto,

DR PARENT, LLC,

as Parent

and

solely for the purposes stated expressly herein,

BRIGHTWOOD LOAN SERVICES LLC,

as Administrative Agent

Dated as of [●]February 19, 2023

# TABLE OF CONTENTS

## ARTICLE I

## DEFINITIONS

1.1   Defined Terms ................................................................2
1.2   Other Definitional Provisions ........................................15

## ARTICLE II

2.1   Purchased Assets..............................................................16
2.2   Excluded Assets .......................................................... ~~17~~18
2.3   Assumed Liabilities.........................................................18
2.4   Excluded Liabilities ........................................................19
2.5   Assumption and Assignment of Assumed Contracts............................21

## ARTICLE III

## CLOSING AND PURCHASE PRICE

3.1   Closing; Transfer of Possession; Certain Deliveries ...............22
3.2   Purchase Price ~~and Deposit~~; Related Matters .........................24
3.3   Allocation of Purchase Price.........................................24
3.4   Withholding .........................................................24

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLERS

4.1   Organization and Good Standing .....................................25
4.2   Power and Authority ................................................25
4.3   Litigation .........................................................25
4.4   No Contravention ...................................................25
4.5   Consents and Approvals .............................................25
4.6   Title to Purchased Assets; Sufficiency .............................26
4.7   Assumed Contracts ..................................................26
4.8   Intellectual Property...............................................26
4.9   Employee Benefits ..................................................27
4.10   Labor Matters.....................................................28
4.11   Conduct of Business ..............................................29
4.12   Compliance with Laws; Permits ....................................29
4.13   ~~Financial Statements~~Reserved ...................................30
4.14   Financial Advisors ...............................................30
4.15   ~~Absence of Undisclosed Liabilities~~Reserved.....................30
4.16   Tax Matters ......................................................30
4.17   Real Property ....................................................~~31~~30

i

| | | |
|---|---|---|
| 4.18 | Tangible Personal Property | 31 |
| 4.19 | Insurance | 31 |
| 4.20 | Environmental Matters | 31 |
| 4.21 | Condition and Suitability of Purchased Assets | 32 |
| 4.22 | Anti-Corruption | 32 |
| 4.23 | Related Party Transactions | ~~33~~32 |
| 4.24 | Disclaimer of Other Representations and Warranties | 33 |

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

| | | |
|---|---|---|
| 5.1 | Organization and Good Standing | 33 |
| 5.2 | Power and Authority | 33 |
| 5.3 | No Contravention | ~~34~~33 |
| 5.4 | Consents and Approvals | ~~34~~33 |
| 5.5 | Litigation | 34 |
| 5.6 | Financial Advisors | 34 |
| 5.7 | Sufficient Funds; Adequate Assurances | 34 |
| 5.8 | Acknowledgements; "As Is" "Where Is" Transaction | 34 |

## ARTICLE VI

## COVENANTS OF THE PARTIES

| | | |
|---|---|---|
| 6.1 | Conduct of Business Pending the Closing | 35 |
| 6.2 | Negative Covenants | 35 |
| 6.3 | Access | 37 |
| 6.4 | Confidentiality | 38 |
| 6.5 | Public Announcements | 38 |
| 6.6 | Employment Matters | ~~39~~38 |
| 6.7 | Reasonable Efforts; Approvals | 40 |
| 6.8 | Corporate Name Change | ~~41~~40 |
| 6.9 | Assignment of Contracts and Rights | ~~41~~40 |
| 6.10 | Tax Matters | 41 |
| 6.11 | Available Contracts List | ~~43~~42 |
| 6.12 | Business Records | ~~43~~42 |
| 6.13 | Personally Identifiable Information | 43 |
| 6.14 | Acquired Bank Accounts | 43 |
| 6.15 | Additional Assets | 43 |
| 6.16 | Supplement to Sellers' Disclosure Schedules | 43 |

## ARTICLE VII

## BANKRUPTCY PROVISIONS

| | | |
|---|---|---|
| 7.1 | Expense Reimbursement | 44 |

ii

11875751-23

7.2    Bankruptcy Court Orders and Related Matters .................................................44
7.3    Bankruptcy Milestones .................................................................................45

## ARTICLE VIII

## CONDITIONS TO OBLIGATIONS OF THE PARTIES

8.1    Conditions Precedent to Obligations of Buyer ....................................................46
8.2    Conditions Precedent to the Obligations of the Sellers .........................................47
8.3    Conditions Precedent to Obligations of Buyer and the Sellers........................4847
8.4    Frustration of Closing Conditions .......................................................................48

## ARTICLE IX

## TERMINATION

9.1    Termination of Agreement.................................................................................48
9.2    Consequences of Termination...........................................................................49

## ARTICLE X

## MISCELLANEOUS

10.1    Expenses .......................................................................................................50
10.2    Assignment ....................................................................................................50
10.3    Parties in Interest............................................................................................50
10.4    Matters Related to the Administrative Agent ....................................................50
10.5    Risk of Loss ...................................................................................................51
10.6    Notices ..........................................................................................................51
10.7    Entire Agreement; Amendments and Waivers ..................................................52
10.8    Counterparts ..................................................................................................53
10.9    Invalidity .......................................................................................................53
10.10  Governing Law ..............................................................................................53
10.11  Dispute Resolution; Consent to Jurisdiction ....................................................53
10.12  WAIVER OF RIGHT TO TRIAL BY JURY ...................................................54
10.13  Specific Performance .....................................................................................54
10.14  Third Party Beneficiaries ...............................................................................54
10.15  Counting........................................................................................................54
10.16  Survival.........................................................................................................54
10.17  Non-Recourse ...........................................................................................5554
10.18  Preparation of this Agreement ........................................................................55
10.19  Releases.........................................................................................................55

### **Exhibits**

Exhibit A      Bidding Procedures
Exhibit B      Bidding Procedures Order
Exhibit C      Form of Bill of Sale, Assignment and Assumption Agreement

iii

# ASSET PURCHASE AGREEMENT[1]

This ASSET PURCHASE AGREEMENT (the "Agreement"), dated as of [●]February 19, 2023 (the "Agreement Date"), is made and entered into by and among [Delphi Lender AcquisitionCo LLC], a Delaware limited liability company (together with its designee, "Buyer"), Union Fresh Start LLC d/b/a Serenity at Summit, a New Jersey limited liability company, Summit Behavioral Health Limited Liability Company d/b/a Summit Behavioral Health Princeton Junction, a New Jersey limited liability company, SBH Haverhill, LLC d/b/a Serenity at Summit New England (each a "Seller," and collectively, the "Sellers"), DR Parent, LLC, a Delaware limited liability company, solely with respect to Sections 3.1(b) and 6.15 of this Agreement ("Parent") and Brightwood Loan Services LLC, a Delaware limited liability company, solely in its capacity as administrative agent for the lenders under the Prepetition Credit Agreement (defined below) and signing solely with respect to Section 3.2, Section 10.4, and Sections 10.7 to 10.19 of this Agreement (the "Administrative Agent"). The Administrative Agent, Buyer, Parent (solely with respect to Sections 3.1(b) and 6.15 of this Agreement) and Sellers collectively are referred to herein as the "Parties" and each, a "Party."[2]

## RECITALS:

A.    The Sellers are engaged in the business of owning, managing, and operating inpatient and outpatient substance use disorder ("SUD") treatment facilities in Massachusetts and New Jersey (the "Business").

B.    Reference is made to that certain Credit Agreement, dated as of April 8, 2020 (as amended by that certain First Amendment to Credit Agreement and Forbearance Agreement, dated as of August 3, 2021, that certain Second Amendment to Credit Agreement and Forbearance Agreement, dated as of January 18, 2022, that certain Third Amendment to Credit Agreement and Forbearance Agreement, dated as of April 29, 2022, that certain Fourth Amendment to Credit Agreement and Forbearance Agreement, dated as of June 14, 2022, that certain Fifth Amendment to Credit Agreement, dated as of September 16, 2022, that certain Sixth Amendment to Credit Agreement, dated as of November 7, 2022, that certain Seventh Amendment to Credit Agreement, dated as of December 6, 2022, that certain Eighth Amendment to Credit Agreement, dated as of January 10, 2023 and as further amended, restated, supplemented and/or otherwise modified from time to time, the "Prepetition Credit Agreement"), by and among Delphi Intermediate Healthco, LLC, as borrower (the "Borrower"), the other loan parties party thereto from time to time, the lenders party thereto from time to time (the "Prepetition Lenders") and the Administrative Agent. The obligations under the Prepetition Credit Agreement and the other Loan Documents (as defined below) are secured by valid and duly perfected liens, mortgages and other encumbrances in and upon all property and assets of, among other parties, the Sellers.

C.    Buyer is an entity organized for the purpose of effecting the rights and interests of the Prepetition Lenders in accordance with the terms and conditions of the Loan Documents and

---

[1] NTD: Any exhibit or schedule not attached hereto will be filed hereafter subject to notice of filing.

[2] NTD: All Delphi IP outside of NJ/MA shall also be sold to the extent not sold to other parties. The relevant entities shall join the Agreement through a joinder for the transfer of such IP only.

that certain Credit Bid Direction Letter, dated as of January 30, 2023, executed by the Prepetition Lenders.

D.      Prior to the execution of this Agreement, on February 6, 2023, each of the Sellers filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. Sections 101 et seq. (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") (such cases, the "Cases").

E.      Upon the terms and subject to the conditions set forth in this Agreement, and as authorized under sections 363 and 365 of the Bankruptcy Code as relates to the Sellers, the Sellers propose to sell, transfer and assign to Buyer, and Buyer proposes to purchase, acquire and assume from the Sellers, respectively, the Purchased Assets and Assumed Liabilities.

NOW, THEREFORE, in consideration of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and upon the terms and subject to the conditions hereof, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1      <u>Defined Terms</u>. As used herein, the terms below shall have the following respective meanings:

~~"Accrued Paid Time Off" shall mean, with respect to each Hired Employee, the amount of accrued and unused paid time off as of the Closing and that may be taken by such Hired Employee following the Closing.~~

"<u>Accrued Wages</u>" shall mean, with respect to each Hired Employee, the amount of accrued and unpaid wages payable by any of the Sellers immediately prior to the Closing Date with respect to the pay period in which the Closing occurs and that are not yet due and payable by the Sellers, and the amount of accrued and unpaid payroll and other withholding taxes in respect thereof.

[‌"<u>Acquired Bank Accounts</u>" shall ~~mean any Bank Accounts that Buyer elects to acquire by written notice to Sellers on or before the date that is ten (10) days prior to Closing.]~~have the meaning set forth in Section 6.14.

"<u>Acquired Intellectual Property</u>" shall mean, collectively, all Owned Intellectual Property ~~and~~, all Licensed Intellectual Property and, to the extent not sold to one or more Persons other than Buyer pursuant to the Sale Order, all Delphi Subsidiary Intellectual Property.

"<u>Administrative Agent</u>" shall have the meaning set forth in the Preamble.

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause

the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" shall have the meaning set forth in the Preamble.

"Agreement Date" shall have the meaning set forth in the Preamble.

"Allocation Schedule" has the meaning set forth in Section 3.3.

"Alternate Transaction" shall mean a transaction or transactions pursuant to which any of the Sellers or any of its Affiliates, in one or a series of transactions, sells, transfers, exchanges, leases or otherwise disposes of, directly or indirectly, all or any of the Purchased Assets, including any transaction pursuant to one or more Competing Qualified Bids or through any other asset sale, stock sale, share exchange, debt-for-equity swap, joint venture, credit bid, financing, merger, amalgamation, business combination, reorganization, restructuring or recapitalization, a plan of reorganization, a plan of arrangement or any similar transaction, in each case that would not involve a sale or disposition of any or all of the Purchased Assets or the Business to Buyer; provided that disposition of Purchased Assets that are expressly permitted by Section 6.2 of this Agreement shall not be deemed an Alternate Transaction.

"Anti-Corruption Laws" shall mean the FCPA and all other applicable Laws concerning or relating to bribery or corruption in any jurisdiction in which any Seller or any of its Affiliates is located or is doing business.

"Anti-Money Laundering Laws" shall mean the U.S. Patriot Act, as amended, and all other applicable Laws in any jurisdiction in which any Seller or any of its Affiliates is located or is doing business, which Laws relate to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Assumed Contracts" shall have the meaning set forth in Section 2.5(a).

"Assumed Debt" shall have the meaning set forth in Section 3.2(a).

"Assumed Environmental Liabilities" shall have the meaning set forth in Section 2.3(c).

"Assumed Liabilities" shall have the meaning set forth in Section 2.3.

"Assumption Notice" shall have the meaning set forth in Section 2.5(e).

"Auction" shall mean the auction for the Purchased Assets to be conducted on the Auction Date in the event of the submission of one or more "Competing Qualified Bids" in accordance with the terms and provisions of the Bidding Procedures Order and as expressly defined in the Bidding Procedures.

"Auction Date" shall mean the date of the Auction scheduled by the Bankruptcy Court and set forth in the Bidding Procedures Order or such later date as shall be announced by the Sellers and agreed upon by the Sellers and Buyer.

3

"Audited Financial Statements" shall have the meaning set forth in Section 4.13.

"Available Contracts" shall mean the executory Contracts to which one or more Sellers is a party.

"Avoidance Actions" shall mean those actual and/or potential claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code.

"Balance Sheets" shall have the meaning set forth in Section 4.13.

"Bank Accounts" shall have the meaning set forth in Section 6.14.

"Bankruptcy Code" shall have the meaning set forth in the Recitals.

"Bankruptcy Court" shall have the meaning set forth in the Recitals.

"Bankruptcy Milestones" shall have the meaning set forth in Section 7.3.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure originally promulgated pursuant to 28 U.S.C. § 2075.

"Benefit Plan" shall mean any "employee benefit plan" (within the meaning of Section 3(3) of ERISA, including multiemployer plans within the meaning of Section 3(37) of ERISA) that (i) provides benefits or compensation to, or which has any application to, any present or former employee, director, independent contractor or other individual service provider of any Seller, or (ii) is adopted, maintained, sponsored, contributed to, or required to be contributed to by any Seller.

"Bidding Procedures" shall mean the Bidding Procedures filed with the Bankruptcy Court in the form attached hereto as Exhibit A or otherwise in form and substance reasonably acceptable to Buyer.

"Bid" shall have the meaning ascribed to such term in the Bidding Procedures.

"Bidding Procedures Motion" shall mean the motion filed in the Cases, which motion shall be in form and substance satisfactory to Buyer (together with all exhibits thereto), (i) seeking approval of (A) this Agreement and the Transactions and (B) the Bidding Procedures and scheduling certain dates, deadlines and forms of notice in connection therewith, (ii) authorizing the payment of the Expense Reimbursement to Buyer, and (iii) granting other related relief, in each case, in form and substance acceptable to Buyer.

"Bidding Procedures Order" shall mean the order entered by the Bankruptcy Court approving the Bidding Procedures Motion, the Bidding Procedures and granting the relief requested therein in the form set forth in Exhibit B or otherwise in form and substance acceptable to Buyer.

"Bill of Sale and Assignment and Assumption Agreement" shall have the meaning set forth in Section 3.1(b)(i).

"Borrower" shall have the meaning set forth in the Recitals.

"Budget" shall have the meaning ascribed thereto in the DIP Documents.

"Business" shall have the meaning set forth in the Recitals.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in New York City, New York are authorized or obligated by Law or executive order to close.

"Buyer" shall have the meaning set forth in the Preamble.

"Carve Out" shall have the meaning set forth in the Final DIP Order.

"Cases" shall have the meaning set forth in the Recitals.

"Claims" shall have the meaning as defined in the Bankruptcy Code.

"Closing" shall mean the consummation of the Transactions.

"Closing Date" shall have the meaning set forth in Section 3.1.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder.

"Competing Qualified Bid" shall mean a Bid that, in accordance with the Bidding Procedures Order, (i) is submitted by the bid deadline established by the Bankruptcy Court, (ii) includes cash consideration of not less than the $15,000,000 Purchase Price (including the amount of the Assumed Debt as of the Closing Date) *plus* (A) all amounts outstanding under the DIP Documents in excess of $10,000,000, *plus* (B) the Expense Reimbursement and (C) an initial cash overbid of [$500,000] and (iii) assumes the Assumed Liabilities (other than the Assumed Debt).

"Confidential Information" shall mean all information in any form or medium that relates to the Business, the Purchased Assets or the Assumed Liabilities, including financial information, projections, pricing structures, technical data, trade secrets, know-how, ideas, inventions, designs, research, development plans, identities of, and arrangements with, customers and suppliers, software and databases, but shall not include any information that (i) at the time of disclosure thereof is generally available to the public (other than as a result of disclosure in violation of this Agreement), or (ii) is independently developed by the receiving party following the Closing Date without reliance on or use of any Confidential Information.

"Contract" shall mean any lease, sublease, license, sublicense, agreement, contract, contract right, obligation, trust, purchase order, sale order, instrument and other similar arrangements, whether or not in written form, that is binding upon a Person or its property (including any commitment to enter into any of the foregoing).

"Contracting Parties" shall have the meaning set forth in Section 10.17.

5

"Copyrights" shall have the meaning set forth in the definition of Intellectual Property.

"Credit Bid Amount" shall have the meaning set forth in Section 3.2(a).

"Credit Documents" shall mean, collectively, the Loan Documents and the DIP Documents.

"Cure Amounts" shall mean all amounts payable that must be paid or otherwise satisfied to cure all of the Sellers' monetary defaults under the Assumed Contracts at the time of the assumption thereof and assignment to Buyer pursuant to section 365 of the Bankruptcy Code.

"Debt" shall mean, without duplication, (i) indebtedness or other obligations for borrowed money or in respect of loans or advances or issued in substitution for or exchange of indebtedness for borrowed money or loans or advances, whether short-term or long-term, secured or unsecured, (ii) any indebtedness or other obligations evidenced by any note, bond, debenture or other debt security or instrument, (iii) all obligations to pay the deferred purchase price of property or services, contingent or otherwise (including all "earn-out" obligations), (iv) all obligations under interest rate and currency hedging agreements, including swap breakage or associated fees, (v) all obligations arising from bankers' acceptances, letters of credit (to the extent drawn) and cash/book overdrafts or similar facilities, (vi) all obligations for the payment of which a Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including guarantees of such obligations, (vii) any obligations under leases that have been or are required to be, in accordance with GAAP, recorded as capital leases, (viii) any indebtedness or other obligations secured by a Lien on any Seller's interest in any assets, and (ix) all accrued interest, premiums, penalties (including any prepayment penalties or premiums) and other obligations related to any of the foregoing.

"Debtors" shall mean the Sellers and their affiliated debtors and debtors in possession that filed the Cases.

"Delphi Subsidiaries" shall mean all direct and indirect subsidiaries of Parent other than the Sellers.

"Delphi Subsidiary Intellectual Property" shall mean all Marks and internet domain names set forth on Schedule 4.8(a) that are owned by Delphi Subsidiaries.

"Designation Notice" shall have the meaning set forth in Section 2.5(a).

"Determination Date" shall have the meaning set forth in Section 2.5(a).

"DIP Documents" shall mean that certain Superpriority Secured Debtor-in-Possession Credit Agreement between Delphi Intermediate HealthCo, LLC, the Borrower, the other loan parties party thereto, the DIP Lenders and the Administrative Agent, together with the schedules and exhibits attached thereto and all agreements, documents, orders, instruments and/or amendments executed, delivered or entered in connection therewith.

6

"DIP Facility" shall mean the debtor-in-possession term loan facility pursuant to which the DIP Lenders agreed to provide up to $11,000,000 in debtor-in-possession financing commitments on the terms set forth in the DIP Documents.

"DIP Lenders" shall mean the lenders providing the DIP Facility.

"Environmental Law" shall mean any Law concerning pollution, protection of the environment or natural resources or human health or safety, including any Law governing the labelling, use, transportation, manufacture, processing, generation, distribution, treatment, storage, discharge, release, disposal, clean-up or handling of Hazardous Material.

"Environmental Permits" shall have the meaning set forth in Section 4.20(a).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" shall mean, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" within the meaning of Sections 414(b), (c), (m) and (o) of the Code.

"Excluded Assets" shall have the meaning set forth in Section 2.2.

"Excluded Contracts" shall have the meaning set forth in Section 2.2(a).

"Excluded Liabilities" shall have the meaning set forth in Section 2.4.

"Expense Reimbursement" shall mean all reasonable and documented out-of-pocket fees and expenses which shall not exceed $375,000, subject to the right of Buyer to request approval of up to $500,000, which shall include all professional fees and expenses and travel expenses incurred by Buyer or the Administrative Agent, in each case, without duplication and to the extent not otherwise payable to, and received by, the Administrative Agent pursuant to the DIP Documents or the Loan Documents, and subject to the additional terms as set forth in the Bidding Procedures Motion and reflected in the Bidding Procedures Order.

"Express Representations" shall have the meaning set forth in Section 5.8(b).

"Extended Contract Period" shall have the meaning set forth in Section 2.5(a).

"FCPA" shall mean the Foreign Corrupt Practices Act of 1977, as amended, 15 U.S.C. §§78dd-1, et seq.

"Final DIP Order" shall mean an Order of the Bankruptcy Court acceptable to the Administrative Agent in its sole discretion, authorizing and approving on a final basis, among other things, the DIP Documents and the DIP Facility on a final basis (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of Administrative Agent, in its sole discretion) as to which no stay has been entered.

"Final Order" shall mean an Order of the Bankruptcy Court or other applicable court (a) that is not the subject of a pending appeal, petition for certiorari, motion for reconsideration or leave to appeal or other proceeding for review, rehearing or reargument, (b) that has not been reversed, vacated, modified or amended, is not stayed and remains in full force and effect, and (c) with respect to which the time to appeal, to petition for certiorari, to move for reconsideration or to seek review, rehearing or reargument shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure or other applicable Laws, as applicable.

["Financial Statements" shall have the meaning set forth in Section 4.13.]

"GAAP" shall mean United States generally accepted accounting principles.

"Government Official" shall mean any officer or employee of a Governmental Entity or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such Governmental Entity or department, agency, or instrumentality, or for or on behalf of any such public international organization, or any political party, party official, or candidate thereof, excluding officials related to the government of the United States.

"Governmental Entity" shall mean any (i) federal, state, provincial, local, municipal, foreign or other government, (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court, arbitrator or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitral tribunal.

"Haverhill Flood Claim" shall mean the claim by SBH Haverhill, LLC against the Haverhill facility landlord for reimbursement of $380,000 in flood damage paid by SBH Haverhill, LLC.

"Hazardous Material" shall mean any material, substance or waste defined, classified or otherwise characterized as "hazardous," "radioactive," "deleterious," "toxic," "caustic," "dangerous," a "contaminant," a "pollutant," a "dangerous good," a "waste," a "special waste," a "source of contamination" or a "source of a pollutant" or words of similar meaning or regulatory effect under an Environmental Law and any substances or materials the presence or concentration of which in soil, sediment, ground water or surface water regulated under any Environmental Law, including, asbestos, asbestos-containing materials, lead or lead-based paint, polychlorinated biphenyls, mold, mildew or fungi, oil, waste oil, petroleum, petroleum productions, lead-containing paint or plumbing, polychlorinated biphenyls, radioactive materials or radon, or urea formaldehyde foam insulation; and any other material or substance which may pose a threat to the environment or to human health or safety, including poly- and perfluoroalkyl substances.

"Hired Employees" shall mean, collectively, the employees of the Sellers who accept an offer of employment by Buyer at or prior to the Closing and actually commence employment with Buyer upon the Closing.

"Insider Avoidance Actions" shall mean any actual and/or potential Avoidance Actions or other Claim by the Sellers against the individuals listed on Schedule 1.1(a) as of the Petition Date.

["Interim Financial Statements" shall have the meaning set forth in Section 4.13.]

"Intellectual Property" shall mean all intellectual property and industrial property, whether protected, created or arising under the Laws of the United States or any other jurisdiction, including all: (i) patents and patent applications, all continuations, divisionals, and continuations-in-part of any of the foregoing, all patents issuing on any of the foregoing, and all reissues, renewals, substitutions, reexaminations and extensions of any of the foregoing (collectively, "Patents"); (ii) trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, corporate names, trade styles, logos and other source or business identifiers and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations, renewals and extensions of any of the foregoing (collectively, "Marks"); (iii) internet domain names; (iv) copyrights, works of authorship, and all mask work, database and design rights, whether or not registered or published, all applications, registrations, reversions, extensions and renewals of any of the foregoing, and all moral rights, however denominated (collectively, "Copyrights"); (v) trade secrets and other confidential or proprietary information (collectively, "Trade Secrets"); (vi) rights of publicity, persona rights or other rights to use indicia of any Person's personality; and (vii) Technology and other intellectual property or industrial property rights arising from or relating to any Technology.

"Interim DIP Order" shall mean an Order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof), in form and substance acceptable to the Administrative Agent in its sole discretion, authorizing on an interim basis, among other things, the DIP Documents and the DIP Facility.

"Knowledge of the Sellers" shall mean, as to a particular matter, the actual knowledge of any executive officer of a Seller.

"Labor Laws" shall mean, collectively, to the extent applicable to any Seller, any federal, national, state, and foreign Laws governing labor and/or employment and employment-related matters, including all such Laws relating to wages, employee classification, other compensation and benefits (including but not limited to any applicable federal, state or local laws concerning COVID-19 related paid sick leave or other benefits), family and medical leave and other leaves of absence, the provision of meal and rest periods/breaks, hours, vacation, severance, restrictive covenants, background checks and screening, immigration, WARN Act and any similar federal, state, provincial or local "mass layoff" or "plant closing" Law, collective bargaining, discrimination, harassment, retaliation, civil rights, safety and health (including but not limited to the federal Occupational Safety and Health Act and any applicable state or local laws concerning COVID-19-related health and safety issues), and workers' compensation.

"Law" shall mean any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, order, treaty, administrative interpretation, guideline, principle of common law or equity, judgment enacted, promulgated, issued, enforced or entered by any Governmental Entity, or other requirement or rule of law.

"Leased Real Property" shall mean each parcel of real property leased by a Seller and used in or necessary for the conduct of the Business as currently conducted, together with all rights, title and interest of each such Seller in and to leasehold improvements relating thereto.

"Leases" shall mean all leases, subleases, licenses, concessions and other agreements pursuant to which a Seller holds any Leased Real Property.

"Lenders" shall mean the Prepetition Lenders and the DIP Lenders, as appliable.

"Liabilities" shall mean, as to any Person, all debts, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct, indirect, asserted or unasserted, absolute or contingent, of such Person, whether accrued, vested or otherwise, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records, including any liability for Taxes.

"Licensed Intellectual Property" shall mean all Intellectual Property (other than Owned Intellectual Property) used, held for use or practiced in connection with the Business.

"Lien" shall mean any claim, pledge, option, charge, hypothecation, easement, security interest, license, right-of-way, encroachment, mortgage, statutory or deemed trust, and deed of trust or other encumbrance.

"Loan Debt" shall have the meaning provided in the Final DIP Order.

"Loan Documents" shall mean the Prepetition Credit Agreement, together with the Loan Documents (as defined therein) related thereto, including each Security Document and all other documents, agreements and certificates executed or delivered in connection with or contemplated by the Prepetition Credit Agreement.

"Marks" shall have the meaning set forth in the definition of Intellectual Property.

"Material Adverse Effect" shall mean any event, change, occurrence, circumstance, development, condition, fact or effect, which, when considered either individually or in the aggregate together with other events, changes, conditions or effects, is or would reasonably be expected to be materially adverse to (i) the Business or the properties, assets, condition (financial or otherwise), results or operations of the Business or the Purchased Assets, or (ii) any Seller's ability to consummate the Transactions, other than with respect to clause (i) hereof any event, change, occurrence, circumstance, development, condition or change of fact, arising out of, resulting from or attributable to (A) general economic conditions affecting the United States or those countries within which any of the Sellers operate, (B) a change in GAAP or regulatory accounting principles or interpretations thereof after the date hereof, or a change in applicable Law by any Governmental Entity after the date hereof, (C) any act of war or terrorism (or, in each case, escalation thereof) or declaration of a national emergency, (D) any pandemic or epidemic, or (E) any natural disaster, except in each case covered by clauses (A) through (E) to the extent such event, change, occurrence, circumstance, development, condition or change of fact disproportionately and adversely affects any Seller as compared to other companies in a business similarly situated to that of the Business.

"Nonparty Affiliates" shall have the meaning set forth in Section 10.17.

"Notices" shall have the meaning set forth in Section 10.6.

"Order" shall mean any judgment, order, injunction, writ, ruling, verdict, decree, stipulation, award or other binding obligation, pronouncement or determination of any Governmental Entity or arbitration tribunal.

"Ordinary Course of Business" shall mean the conduct and operation of the Business in the ordinary course, consistent with past practice, and in accordance with applicable Law.

"Outside Date" shall have the meaning set forth in Section 9.1(b)(ii).

"Owned Intellectual Property" shall mean all Intellectual Property owned or purported to be owned by any Seller.

"Parent" shall have the meaning set forth in the Preamble.

"Party" or "Parties" shall have the meaning set forth in the Preamble.

"Permits" shall mean all licenses, certificates, consents, permits, registrations, quotas, Environmental Permits, and other authorizations of any Governmental Entity relating to the Purchased Assets or used by the Sellers in connection with the Business, and all pending applications therefor.

"Permitted Liens" shall mean (i) Liens for Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and sufficiency reserved for on the appropriate balance sheet in accordance with GAAP, (ii) zoning, entitlement and other land use and environmental regulations by any Governmental Entity having jurisdiction over any Leased Real Property which are not violated by the current use, occupancy or operation of any Leased Real Property, (iii) lessor liens or other liens which arise by operation of law or in the Ordinary Course of Business, and (iv) such other defects, exceptions, restrictions, imperfections in title, charges, easements, restrictions and encumbrances (other than in connection with the Loan Debt) which would not, individually or in the aggregate, reasonably be expected to materially detract from the property and/or the use of the property for its intended purpose in the Ordinary Course of Business; provided that Liens described in the foregoing clause (v) shall only be deemed Permitted Liens if they rank junior to the Liens securing the obligations under the Credit Documents.

"Person" shall mean an individual, partnership, joint venture, corporation, business trust, limited liability company, trust, unincorporated organization, association, joint stock company, estate, Governmental Entity or other entity.

"Personal Information" shall mean, in addition to any definition for any similar term (e.g., "personal data" or "personally identifiable information" or "PII") provided by applicable Law or by the Sellers in any of their privacy policies, notices or contracts, all information that identifies, could be used to identify or is otherwise associated with an individual person or device, whether or not such information is associated with an identified individual. Personal Information may relate

to any individual, including a current, prospective, or former customer, end user or employee of any Person, and includes information in any form or media, whether paper, electronic, or otherwise.

"Personal Property Leases" shall have the meaning set forth in Section 4.18.

"Petition Date" shall mean ~~the date on which the Sellers file voluntary petitions for relief under chapter 11 of the Bankruptcy Code~~ February 6, 2023.

"Plan" shall mean a plan of reorganization or liquidation for the Debtors pursuant to sections 1125, 1126 and 1145 of the Bankruptcy Code (as applicable), to be implemented in the Cases.

"Post-Closing Tax Period" shall mean all taxable years or other taxable periods that begin after the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period beginning after the Closing Date.

"Pre-Closing Tax Period" shall mean all taxable years or other taxable periods that end on or before the Closing Date and, with respect to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of such taxable year or period ending on and including the Closing Date.

"Pre-Closing Taxes" shall have the meaning set forth in Section 6.10(b).

"Prepetition Credit Agreement" shall have the meaning set forth in the Recitals.

"Prepetition Lenders" shall have the meaning set forth in the Recitals.

"Privacy Laws" shall mean any and all applicable Laws, legal requirements and self-regulatory guidelines (including of any applicable foreign jurisdiction) relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security (technical, physical or administrative), disposal, destruction, disclosure or transfer (including cross-border) of any Personal Information, including the Federal Trade Commission Act, Health Insurance Portability and Accountability Act (HIPAA), California Consumer Privacy Act (CCPA), Payment Card Industry Data Security Standard (PCI-DSS), and any and all applicable Laws relating to breach notification or marketing in connection with any Personal Information.

"Proceeding" shall mean any action, arbitration, audit, hearing, investigation, order, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Entity or arbitrator.

"Purchase Price" shall have the meaning set forth in Section 3.2.

"Purchased Assets" shall mean all right, title and interest of each of the Sellers in, to and under all of the assets, properties, interests, rights and claims of the Sellers (whether owned, leased, licensed, used or held for use by the Sellers), wherever situated and of whatever kind and nature,

real or personal, tangible or intangible, and whether or not reflected on the books and records of the Sellers, including the assets, properties, rights and claims described in Section 2.1, other than the Excluded Assets.

"Records" shall have the meaning set forth in Section 6.12.

"Related Party" shall have the meaning set forth in Section 4.23(a).

"Related Party Transactions" shall have the meaning set forth in Section 4.23(a).

"Representative" shall mean, with respect to any Person, such Person's officers, managers, directors, employees, agents and representatives (including any investment banker, financial advisor, accountant, legal counsel or expert retained by or acting on behalf of such Person or its Affiliates).

"Retained Cash" shall mean cash drawn down under the DIP Documents immediately prior to the Closing to fund the liquidation of the Sellers pursuant to the Plan, in an amount to be agreed between the Sellers, on the one hand, and Administrative Agent, on the other hand, in accordance with and subject to the terms of the DIP Documents.

"Sale Order" shall mean, collectively, the Order or Orders which shall be in a form and substance reasonably acceptable to Buyer and Sellers and which shall, among other things: (i) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code (A) the execution, delivery and performance by the Sellers of this Agreement, including each and every term and condition hereof, and the other instruments and agreements contemplated hereby, (B) the sale of the applicable Purchased Assets of the Sellers to Buyer free and clear of all Liens and Liabilities (other than Permitted Liens), on the terms set forth herein, (C) the assumption of the Assumed Liabilities of the Sellers by Buyer on the terms set forth herein and (D) effective as of the Closing, the release of Sellers from amounts due and owing under the Loan Documents up to an amount equal to the Credit Bid Amount; (ii) authorize the Sellers to assume and assign to Buyer the Assumed Contracts; (iii) find that Buyer has provided adequate assurance of future performance with respect to the Assumed Contracts to which any Seller is a party; (iv) find that Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code entitled to all the protections of Section 363(m) and that the sale was not controlled by any agreements among potential bidders in violation of Section 363(n) of the Bankruptcy Code; (v) provide that neither Buyer nor any of its Affiliates or equityholders will have any derivative, successor, transferee or vicarious liability of any kind or character, whether fixed or contingent, for Liabilities of the Sellers (whether under federal or state Law or otherwise), including on account of any Taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Business prior to the Closing; (vi) waive in all necessary jurisdictions, (A) the so-called "bulk sales," "bulk transfer" and similar Laws, including those related to Taxes and (B) the imposition of any Taxes incurred in connection with the Transactions and the Sale Order; (vii) enjoin all Persons from commencing any proceeding or taking any action against Buyer or any of its Affiliates to recover any claim that such Person has solely against the Sellers or their Affiliates; (viii) provide that the obligations of the Sellers relating to Taxes, whether arising under Law, by this Agreement, or otherwise, shall be fulfilled by the Sellers; and (ix) approves the releases granted pursuant to Section 10.19 hereof.

"Schedule Supplement" shall have the meaning set forth in Section 6.16.

"Seller Registered Intellectual Property" shall mean all issued Patents, pending Patent applications, Mark registrations, applications for Mark registration, Copyright registrations, applications for Copyright registration and internet domain names, in each case, included in the Owned Intellectual Property.

"Sellers" shall have the meaning set forth in the Preamble.

"Sellers' Disclosure Schedules" shall have the meaning ascribed to such term in the opening paragraph of Article IV.

"Software" shall mean, collectively, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

"Tax" or "Taxes" shall mean (i) all U.S. federal, state, local, foreign and other taxes, assessments, duties or charges of any kind whatsoever, including, income, profits, gains, net worth, sales and use, *ad valorem,* gross receipts, sales, use, business and occupation, license, premium, minimum, alternative or add-on minimum, environmental, estimated, stamp, customs duties, occupation, property (real or personal), franchise, capital stock, license, excise, value added, payroll, employment, social security (or similar), escheat, unclaimed property, unemployment, transfer, severance, registration, lease, service, recording, documentary, permit or authorization, intangibles or other tax (whether payable directly or by withholding), together with any penalty, fine, addition to tax or interest on the foregoing; (ii) any liability in respect of any items described in clause (i) payable by reason of contract, assumption, transferee or successor liability, operation of Law, Treasury Regulations Section 1.1502-6(a) or any analogous or similar provision of Law (or any predecessor or successor thereof) or otherwise; and (iii) any Liability in respect of any items described in clause (i) as a result of being a "transferee" of the taxpayer or entity or a number of a related, non-arm's length, affiliated or combined group.

"Tax Return" shall mean any return, declaration, report, claim for refund, or information return or statement (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates) relating to Taxes, including any schedule or attachment thereto, and including any amendment or supplement thereof.

"Technology" shall mean all technology, formulae, algorithms, procedures, processes, methods, techniques, ideas, know-how, creations, inventions (whether patentable or unpatentable and whether or not reduced to practice), discoveries, improvements, product, servicing, business, financial and supplier information and materials, specifications, designs, models, devices, prototypes, schematics and development tools, Software, websites, recordings, graphs, drawings, reports, analyses and other writings and other tangible embodiments of any of the foregoing, in any form or media whether or not specifically listed in this definition.

14

"Third Party Consents" shall have the meaning set forth in Section 6.7(b).

"Trade Secrets" shall have the meaning set forth in the definition of Intellectual Property.

"Transaction Dispute" shall have the meaning set forth in Section 10.10.

"Transactions" shall mean the sale of the Purchased Assets pursuant to this Agreement and the other transactions contemplated by this Agreement.

"Transfer Tax" or "Transfer Taxes" shall mean any stamp, sales, use, transfer, conveyance, recording, registration, filing or other similar non-income Tax, fee, duty or charge imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto.

"Transition Services Agreement" shall mean a transition services agreement between Buyer and Sellers to be mutually agreed to by Buyer and Sellers prior to Closing.

"Treasury Regulations" shall mean the regulations promulgated under the Code, as such regulations may be amended from time to time.

"U.S. Patriot Act" shall mean Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001).

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any successor Law, and the rules and regulations thereunder and under any successor Law, and any comparable Law under the Laws of any state.

1.2    Other Definitional Provisions.

(a)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(b)    The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(c)    Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(d)    Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)    A reference to any Person shall include such Person's successors and permitted assigns.

15

(f)     Unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if".

(g)     References herein to any Law shall be deemed to refer to such Law as amended, modified, codified, reenacted, replaced, supplemented or superseded in whole or in part and in effect from time to time, including any successor legislation thereto, and also to all rules and regulations promulgated thereunder, and references to any section or other provision of a Law means that section or provision of such Law in effect from time to time and constituting the substantive amendment, modification, codification, reenactment, replacement or supplement of such section or other provision.

(h)     All references to "$" and dollars shall be deemed to refer to the currency of the United States of America.

(i)     The provision of a table of contents, the division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. References to the terms "Article," "Section," "clause," "Schedule" and "Exhibit" are references to the Articles, Sections, clauses, Schedules and Exhibits to this Agreement unless otherwise specified.

(j)     References to "days" means calendar days unless Business Days are expressly specified.

(k)     References to "written" or "in writing" include in electronic form (including by e-mail transmission or electronic communication by portable document format (.pdf)).

## ARTICLE II

## TRANSFER OF ASSETS AND LIABILITIES

2.1     <u>Purchased Assets</u>.[3] At the Closing, and upon the terms and subject to the conditions set forth herein and, with respect to the Sellers, subject to the approval of the Bankruptcy Court pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Sellers shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from the Sellers, all of the right, title and interest of each of the Sellers, free and clear of all Liens (other than Permitted Liens), in, to and under, all of the Purchased Assets. The Purchased Assets shall include each of the following of the Sellers:

(a)     other than the Retained Cash, (i) all cash, money orders, third-party checks, wire transfers and any other funds of the Sellers, commercial paper, marketable securities, demand deposits, reserves for taxes, certificates of deposit and other bank deposits, deposits of any Seller with any third-party (including any vendor, manufacturer, customer, utility or landlord or other

---

[3] NTD: Purchased Assets to be confirmed.

cash deposits for rent, electricity, telephone or otherwise), treasury bills, and other cash equivalents and liquid investments and (ii) [the Acquired Bank Accounts;]4

(b)     all deposits, credits, and prepaid charges and expenses from whatever source paid;

(c)     all accounts receivable;

(d)     all Claims with respect to the Business, including all Avoidance Actions, (other than Claims that are Excluded Assets and Insider Avoidance Actions) with respect to the Purchased Assets;

(e)     the Haverhill Flood Claim;

(f)     all royalties, advances, prepaid assets, and other current assets;

(g)     all furniture, fixtures, furnishings, equipment, and other tangible personal property owned or used or held for use by the Sellers in the conduct of the Business, including all artwork, desks, chairs, tables, copiers, telephone lines and numbers, facsimile machines and other telecommunication equipment, cubicles and miscellaneous office furnishings and supplies;

(h)     all rights of any Seller under or pursuant to all warranties, representations and guarantees, including those made by suppliers, manufacturers and contractors or any other third party to and for the benefit of any Seller;

(i)     all current and prior insurance policies, to the extent transferable, and any proceeds therefrom, other than any directors and officers insurance policies, general liability policies, malpractice policies, professional policies, or employment policies;

(i)     Reserved;

(j)     all Assumed Contracts;

(k)     copies or originals of all books, records, files or papers, whether in hard copy or electronic format, relating to the Purchased Assets or to the Business, including emails, advertising and marketing materials, sales and promotional literature, manuals and data, correspondence (including sales and purchase correspondence), vendor lists, mailing lists, other distribution lists, catalogues, research material, know-how, specifications, designs, drawings, processes and quality control data, if any, or any other intangible property and applications for the same, engineering information, test results, plans, personnel and employment records, technical information, diagrams, maintenance schedules, operating records, safety and environmental reports, data, studies and documents, fixed asset ledgers, accounting information, copies of Tax Returns, including any exemption or abatement agreements or certifications and supporting documentation for such Tax Returns;

---

4 NTD: Subject to review and confirmation.

(l)     all Acquired Intellectual Property and all of Sellers' (or, with respect to Delphi Subsidiary Intellectual Property, the applicable Delphi Subsidiary's) rights to institute and pursue Proceedings against third parties for past, present and future infringement, misappropriation or dilution of any of the foregoing, or other conflict therewith, and all of the Sellers' (or, with respect to Delphi Subsidiary Intellectual Property, the applicable Delphi Subsidiary's) rights to recover damages or lost profits in connection with any of the foregoing;

(m)     all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and agents of any Seller or with third parties (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreement entered into in connection with the Auction);

(n)     any interest in any internet websites, URLs or internet domain names, and any applications and registrations pertaining thereto;

(o)     any loans owed to any Seller by any current or former employee, officer or director of any Seller;

(p)     all other assets or rights of every kind and description of Sellers related to the Business, wherever located, whether real, personal or mixed, tangible or intangible;

(q)     all health Benefit Plans currently in effect; and

(r)     all goodwill related to the foregoing.

2.2     Excluded Assets. Notwithstanding anything herein contained to the contrary, from and after the Closing, each Seller shall retain, and Buyer shall not purchase, such Seller's right, title and interest in and to (and the Purchased Assets shall not include any of) the following assets and properties of the Sellers (collectively, the "Excluded Assets"), all of which shall remain the exclusive property of the Sellers:

(a)     any Contract other than any Assumed Contract or any Contract otherwise included as a Purchased Asset under Section 2.1(h), Section 2.1(j),  or Section 2.1(n2.1(m) (the "Excluded Contracts");

(b)     any Contract or arrangement (including any loan or similar arrangement) with or binding upon any of the Sellers and any Related Party;

(c)     any intercompany accounts receivable owed between or among the Sellers;

(d)     all Claims which the Sellers may have against any Person (other than Buyer and its Affiliates), other than Avoidance Actions with respect to the Purchased Assets provided for in Section 2.1(d) and the Haverhill Flood Claim), including Insider Avoidance Actions;

(e)     all rights of the Sellers under this Agreement and the agreements and instruments delivered to the Sellers by Buyer pursuant to this Agreement;

11875751-23

(f)     the company seal, minute books, charter documents, stock or equity record books and such other books and records solely as pertain to the organization, existence or capitalization of the Sellers;

(g)     the Sellers' directors and officers liability insurance policies and general liability policies, malpractice policies, professional policies, and employment policies, if any;

(h)     all membership interests of the Sellers, including any options, warrants or other securities exchangeable or convertible into membership interests of the Sellers;

(i)     all Permits;

(j)     custodianship of all active and inactive patient records of the Sellers, other than records after December 31, 2020;

(k)     all assets owned or used by the Sellers that are specifically identified in Schedule 2.2(k);

(l)     the Retained Cash (including the Carve Out); and

(m)     all Tax assets (including duty and Tax refunds and prepayments) of Sellers for any Pre-Closing Tax Periods, including Claims for refunds of Pre-Closing Taxes.

2.3     Assumed Liabilities. Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, and subject to the exclusions set forth in Section 2.4 (and in the event of any conflict between the exclusions set forth in Section 2.4 and the provisions of this Section 2.3, the exclusions set forth in Section 2.4 shall prevail), as partial consideration for the Purchased Assets, Buyer shall, on and after the Closing, assume and thereafter timely pay and perform only the following Liabilities of the Sellers (the "Assumed Liabilities"):

(a)     all Liabilities arising under the Assumed Contracts solely to the extent that any such Liabilities under such Assumed Contracts: (i) arise from facts, circumstances, events or obligations to be performed on or after the Closing; (ii) do not arise from a breach, violation or default of such Assumed Contract by any Seller prior to the Closing; and (iii) are not required to be performed prior to the Closing;

(b)     all Liabilities relating to Buyer's ownership or operation of the Purchased Assets to the extent arising from events, facts or circumstances that first occur on or after the Closing;

(c)     all Liabilities under Environmental Laws solely to the extent arising from events, facts or circumstances that first occur on or after the Closing (the "Assumed Environmental Liabilities");

(d)     all Accrued Wages and all Accrued Paid Time Off solely with respect to Hired Employees;

(e)    all obligations under the retention agreements listed on <u>Schedule 2.3(e)</u> solely with respect to Hired Employees; and

(f)    the Assumed Debt.

2.4    <u>Excluded Liabilities</u>. Notwithstanding anything to the contrary set forth herein, Buyer shall not assume, and shall not be deemed to have assumed, and the Sellers shall be solely and exclusively liable with respect to, all Liabilities of any Seller or any of its Affiliates or any of their respective predecessors other than the Assumed Liabilities (collectively, the "<u>Excluded Liabilities</u>"). For the avoidance of doubt, and without limiting the foregoing, Buyer shall not be obligated to assume, nor assumes, and Buyer hereby disclaims, all of the Excluded Liabilities, including all of the following Liabilities of any Seller or any of its Affiliates (or any of their respective predecessors) (each of which shall constitute an Excluded Liability hereunder):

(a)    any Liability for (i) Taxes of any Seller for any taxable period and (ii) Pre-Closing Taxes, including, for the avoidance of doubt, any employment Taxes the payment of which was deferred under the Coronavirus Aid, Relief, and Economic Security (CARES) Act;

(b)    any Claim in connection with or arising from or relating to any Excluded Asset, including any Taxes associated therewith;

(c)    any of the Debt other than the Assumed Debt;

(d)    all Cure Amounts;

(e)    any fees, costs and expenses (including legal fees and accounting fees) incurred by any Seller in connection with the Cases or the Transactions, including all fees, costs and expenses incurred in connection with or by virtue of (i) the negotiation, preparation and review of this Agreement and all agreements ancillary or related hereto, (ii) the preparation and submission of any filing or notice required to be made or given in connection with the Transactions, and the obtaining of any consent required to be obtained in connection with the Transactions, (iii) the negotiation, preparing and review of the DIP Documents and (iv) any Alternate Transaction;

(f)    any Liabilities arising under or pursuant to Environmental Laws, other than the Assumed Environmental Liabilities;

(g)    any Liabilities arising under or pursuant to Labor Laws, other than the Accrued Wages to the extent expressly assumed pursuant to <u>Section 2.3(d)</u>;

(h)    any Liabilities relating to the Hired Employees and their dependents and beneficiaries (and any alternate payees in respect thereof) arising during or in connection with periods on or prior to the Closing Date, other than those Liabilities expressly assumed pursuant to <u>Section 2.3(d)</u> and <u>Section 2.3(e)</u>, and any Liabilities relating to all other current or former employees, directors, consultants and other individual service providers of the Sellers or their Affiliates and their dependents and beneficiaries (and any alternate payees in respect thereof) arising at any time, in each case, including any severance, termination or payment in lieu of notice Liability, and any other Liability arising under or out of any Law or Contract in connection with

20

such Person's employment, service or Contract with, or the termination of such Person's employment, service or Contract with, any Seller or its Affiliates;

(i)     any Liabilities of the Sellers and their respective ERISA Affiliates with respect to any Benefit Plan or other compensation or benefit plan, program, policy, agreement or arrangement of the Sellers, including any health, welfare, retirement, pension or profit sharing Liability, deferred compensation Liability, equity or equity-based incentive compensation Liability, any Liability under any employment agreements or offer letters, or any penalties, fines or other expenses resulting from any compliance issue with any Benefit Plan or Law, other than those Liabilities expressly assumed pursuant to <u>Section 2.3(d)</u> and <u>Section 2.3(e)</u>;

(j)     other than Liabilities expressly assumed pursuant to <u>Section 2.3(e)</u>, any success, retention, stay, change of control or similar bonuses and any other payments or benefits owing to current or former employees, independent contractors or consultants of the Sellers or their Affiliates in connection with the consummation of the Transactions, including any employer portion of any payroll, social security or similar Taxes in respect thereof;

(k)     any Liability of any Seller arising out of this Agreement or any agreement ancillary or related hereto;

(l)     any Liabilities arising out of or relating to the Business, the Purchased Assets or the ownership, operation or conduct thereof prior to the Closing;

(m)     any Liabilities for accrued expenses and accounts payable of the Business, other than expressly assumed hereunder;

(n)     any Liabilities arising as a result of any Proceeding, whether initiated prior to or following the Closing, to the extent related to the Business or the Purchased Assets, including any actions for breach of contract, violations of or non-compliance with Law (including Sanctions, Anti-Corruption Laws, and Anti-Money Laundering Laws), Product Liability or any tort actions;

(o)     any Liabilities arising as a result of any Contract or arrangement (including any loan or similar arrangement) with or binding upon any of the Sellers and any Related Party (other than with respect to post-Closing liabilities under Assumed Contracts) and all intercompany payables owed from one Seller to the other Seller; and

(p)     any Liabilities (i) existing prior to the filing of the Cases that are subject to compromise under the Bankruptcy Code or other applicable Law and (ii) to the extent not otherwise expressly assumed herein, incurred subsequent to the filing of the Cases and prior to the Closing.

2.5     <u>Assumption and Assignment of Assumed Contracts</u>.

(a)     By ~~the date that is three (3) Business Days prior to the Closing~~ <u>March 3, 2023</u> (such date, the "<u>Determination Date</u>"), Buyer shall designate in writing (each such writing, a "<u>Designation Notice</u>") which Available Contracts that Buyer wishes to assume at the Closing (the "<u>Assumed Contracts</u>"). All Available Contracts which Buyer does not designate in writing for assumption shall not constitute Assumed Contracts or Purchased Assets and shall automatically

21

be deemed Excluded Assets; provided, however, that if an Available Contract is subject to a cure dispute or other dispute as to the assumption or assignment of such Available Contract that has not been resolved to the mutual satisfaction of Buyer and the Sellers prior to the Determination Date, then the Determination Date shall be extended (but only with respect to such Available Contract) to no later than the earlier of (A) the date on which such dispute has been resolved to the mutual satisfaction of Buyer and the Sellers, (B) the date on which such Available Contract is deemed rejected by operation of section 365 of the Bankruptcy Code and (C) the date upon which such dispute is finally determined by the Bankruptcy Court (the "Extended Contract Period"). If a Designation Notice with respect to such Available Contract is not delivered by Buyer in writing by the date which is three (3) Business Days following the expiration of such Extended Contract Period, such Available Contract shall be automatically deemed an Excluded Asset. For the avoidance of doubt, except as set forth in Section 2.3, Buyer shall not assume or otherwise have any Liability with respect to any Excluded Asset. At Buyer's reasonable request, the Sellers shall make reasonably available to Buyer the appropriate employees of the Sellers necessary to discuss the outstanding Available Contracts.

(b)     The Sellers shall use commercially reasonable efforts to take all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Contracts to Buyer satisfies all applicable requirements of section 365 of the Bankruptcy Code.

(c)     At the Closing, the Sellers shall, pursuant to the Sale Order and the Bill of Sale and Assignment and Assumption Agreement, assume and assign, or cause to be assigned, to Buyer, each of the Assumed Contracts that is capable of being assumed and assigned as of such date.

(d)     Buyer will cooperate with the Sellers in communicating with third parties to Available Contracts as may be reasonably necessary to assist the Sellers in establishing that Buyer has satisfied the requirement of adequate assurance of future performance contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the applicable Available Contracts.

(e)     As soon as practicable after the Agreement Date (and in no event later than three (3) Business Days after entry of the Bidding Procedures Order), the Sellers shall file a list of the Available Contracts (the "Assumption Notice") with the Bankruptcy Court and shall serve such Assumption Notice via first class mail on each counterparty to an Available Contract listed thereon. The Assumption Notice shall identify all Available Contracts and set forth a good faith estimate of the amount of the Cure Amounts applicable to each such Contract.

(f)     Not later than one (1) Business Day following the Determination Date, Seller shall file with the Bankruptcy Court an amended and restated Assumption Notice, which notice shall set forth only the Assumed Contracts (and exclude all other Available Contracts).

(g)     On the Closing Date, with respect to Cure Amounts not disputed as of the Closing Date, the Sellers shall pay all Cure Amounts in accordance with the Budget to the applicable counterparty and Buyer shall have no Liability therefor. With respect to Cure Amounts that are disputed as of the Closing Date, the Parties shall cooperate and diligently pursue resolution

22

of such disputes. Upon the resolution of any disputed Cure Amount following the Closing, the Sellers shall pay such Cure Amount promptly, and in no event later than two (2) Business Days following such resolution.

(h)     Upon payment by the Sellers of the aforesaid Cure Amounts, all defaults under the Assumed Contracts (monetary or otherwise) and all actual or pecuniary losses that have or may have resulted from such defaults shall be deemed cured, including any Tax, rental obligation, common area maintenance, percentage rent, base rent or utility payments, whether or not such obligation became due, or accrued, after the effective date of the assignment of such Assumed Contracts, as the case may be.

(i)     Except for any Contracts listed in Schedule 2.5(i), notwithstanding anything in this Agreement to the contrary, from and after the date hereof through the Closing, the Sellers will not reject or take any action (or fail to take any action that would result in rejection by operation of Law) to reject, repudiate or disclaim any Contract without the prior written consent of Buyer.

## ARTICLE III

## CLOSING AND PURCHASE PRICE

3.1     Closing; Transfer of Possession; Certain Deliveries.

(a)     Unless this Agreement shall have been terminated and the Transactions shall have been abandoned pursuant to Article IX, the Closing shall take place at 10:00 a.m. (prevailing Eastern Time) on the date (the "Closing Date") that is two (2) Business Days after all the conditions set forth in Article VIII shall have been satisfied or waived (excluding, but subject to the satisfaction or waiver of, conditions that, by their nature, are to be satisfied at the Closing), or such other time or date as agreed to in writing by the Parties. The Closing shall take place by telephone or video conference and electronic exchange of documents, unless otherwise mutually agreed to by the Parties. The Closing shall be effective as of 12:01 a.m. (prevailing Eastern Time) on the Closing Date.

(b)     At the Closing, the Sellers or Parent (as applicable) shall deliver, or shall cause to be delivered, to Buyer the following:

(i)     a counterpart to the Bill of Sale and Assignment and Assumption Agreement in substantially the form attached hereto as Exhibit C (the "Bill of Sale and Assignment and Assumption Agreement"), duly executed by each Seller and the applicable Delphi Subsidiaries;

(ii)     a counterpart to the Transition Services Agreement, duly executed by each Seller;

(iii)     one (1) or more assignments of the Owned Intellectual Property and Delphi Subsidiary Intellectual Property, in a form reasonably acceptable to Buyer and the Sellers, duly executed by the applicable Seller(s) and Delphi Subsidiaries;

23

(iv)    a certificate of a duly authorized officer of each Seller dated the Closing Date certifying as to the matters set forth in Section 8.1(b), Section 8.1(c) and Section 8.1(f);

(v)    assignments of the Leases, and/or other documents, in each case, as reasonably requested by Buyer with respect to the Leased Real Property;

(vi)    a certification of non-foreign status from each of the Sellers, duly completed and executed in compliance with Treasury Regulation Section 1.1445-2(b); and

(vii)    such other closing instruments and certificates as may be reasonably requested by Buyer, in each case in form and substance reasonably acceptable to Buyer and Sellers.

(c)    At the Closing, Buyer shall deliver, or shall cause to be delivered to the Sellers, the following:

(i)    a counterpart to the Bill of Sale and Assignment and Assumption Agreement, duly executed by Buyer;

(ii)    a counterpart to the Transition Services Agreement, duly executed by Buyer;

(iii)    a certificate of a duly authorized officer of Buyer dated the Closing Date, certifying as to the matters set forth in Section 8.2(a) and Section 8.2(b); and

(iv)    such other closing instruments and certificates as may be reasonably requested by the Sellers, in each case, in form and substance reasonably acceptable to the Sellers and Buyer.

3.2    Purchase Price and Deposit; Related Matters.

(a)    Purchase Price and Deposit. The "Purchase Price" for the Purchased Assets is: (i) a credit bid equal to the aggregate outstanding amount of the Protective Advances, in order of priority starting with the Super Priming Protective Advances, up to Five Million Dollars ($5,000,000) (the "Credit Bid Amount"); *plus* (ii) the assumption by Buyer of funded Debt obligations in an aggregate principal amount equal to Ten Million Dollars ($10,000,000), inclusive of not more than $10,000,000 of the DIP Facility (collectively, the "Assumed Debt"); *plus* (iii) the assumption by Buyer of the other Assumed Liabilities. The portion of the Purchase Price payable under clause (i) shall be paid by means of a credit against the total amounts due and owing under the Loan Documents as of the Closing Date. In no event shall the Credit Bid Amount be payable by Buyer in cash.

(b)    Bulk Sales Laws. Buyer hereby waives compliance by the Sellers with the requirements and provisions of any "bulk-transfer" Laws that may apply to the sale and transfer of the Purchased Assets to Buyer. Pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets of the Sellers shall be free and clear of all Liens, other than Permitted

Liens, in each case pursuant to the Bankruptcy Code, whether arising prior to or subsequent to the Petition Date, including any liens or claims arising out of the "bulk-transfer" Laws.

3.3     Allocation of Purchase Price. Sellers and Buyer agree to allocate the Purchase Price among the Purchased Assets for all purposes (including tax and financial accounting) in accordance with the allocation methodology set forth in Schedule 3.3 attached hereto. Within ninety (90) days following the Closing Date, Buyer will provide to Sellers an allocation schedule prepared in accordance with such allocation methodology (the "Allocation Schedule"). Buyer and Sellers shall file all applicable Tax Returns (including Form 8594, any amended Tax Returns, and any claims for refund) consistent with the Allocation Schedule and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any taxing authority or any other proceedings) absent a contrary "determination" (within the meaning of Section 1313(a) of the Code).

3.4     Withholding. Buyer or any other paying agent (as applicable) shall be entitled to deduct and withhold from the amounts payable under this Agreement such amounts as may be required to be deducted and withheld under the Code and any other applicable Tax Laws. Any such withheld amount shall be treated as though it had been paid to the Person in respect of which such withholding was required.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in the Sellers' Disclosure Schedules delivered to Buyer concurrently herewith (the "Sellers' Disclosure Schedules"), the Sellers hereby jointly and severally make the following representations and warranties to Buyer with respect to itself and each other Seller as of the Agreement Date and as of the Closing, as applicable:

4.1     Organization and Good Standing. Each Seller (a) is a limited liability company, duly formed, validly existing and in good standing under the Laws of its jurisdiction of formation, and (b) has full organizational power and authority to own, lease and operate its properties, to perform all of its obligations under the Available Contracts, and carry on the Business as it is now being conducted. The Sellers have delivered to Buyer true, complete and correct copies of each Seller's certificate of formation and limited liability company agreement or comparable organizational documents as in effect on the date hereof.

4.2     Power and Authority. Subject to entry and effectiveness of the Sale Order in respect of the Sellers, each Seller has the requisite organizational power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement by each Seller and, subject to the approval of this Agreement by the Bankruptcy Court, the consummation by each Seller of the Transactions and the performance of each Seller's obligations hereunder have been duly authorized by all requisite organizational action on the part of each Seller. This Agreement has been duly executed and delivered by each Seller and (assuming the due and valid authorization, execution and delivery thereof by Buyer), following the approval of this Agreement and the Transactions by the Bankruptcy Court pursuant to the Sale Order, will constitute the legal, valid and binding obligation of each Seller, enforceable against each Seller in

25

accordance with its terms. Each Seller has the requisite organizational power to operate its business with respect to the Purchased Assets that it owns as now conducted and is duly qualified as a foreign entity to do business, and to the extent legally applicable, is in good standing, with respect to the Business, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing has not had a Material Adverse Effect.

4.3     Litigation. To the Knowledge of the Sellers, except as set forth on Schedule 4.3, there are no outstanding Orders or Proceedings pending, or, to the Knowledge of the Sellers, threatened against any Seller relating to the ownership or use of the Purchased Assets or conduct of the Business by the Sellers or otherwise affecting the Purchased Assets or the Business.

4.4     No Contravention. Subject to the entry and effectiveness of the Sale Order by the Bankruptcy Court, and except as set forth on Schedule 4.5, neither the execution and delivery of this Agreement and compliance by the Sellers with any provisions hereof, nor the consummation of the Transactions, will (a) violate or conflict with any provision of any Seller's organizational documents, (b) with or without the giving of notice or the lapse of time or both violate, or result in a breach of, or constitute a default under, or conflict with, or accelerate the performance required by, any of the terms of any Available Contract or Lease, (c) violate or conflict with any Order, or any Law or Permit that is required to be discharged prior to Closing applicable to the Sellers, or (d) result in the creation of any Lien upon any of the Purchased Assets (other than a Permitted Lien).

4.5     Consents and Approvals. Except (a) to the extent excused or made unenforceable as a result of the filing of the Cases, (b) for the entry and effectiveness of the Sale Order in respect of the Sellers, or (c) as set forth in Schedule 4.5, to the Knowledge of the Sellers, the execution, delivery and performance by each Seller of this Agreement and the Transactions, and the legality, validity, binding effect or enforceability of this Agreement and any agreements contemplated hereby, do not require any consents, waivers, authorizations or approvals of, or filings with, any (i) Governmental Entities or (ii) other third Persons, except with respect to clause (ii) as would not reasonably be expected to have a Material Adverse Effect.

4.6     Title to Purchased Assets; Sufficiency.

(a)     Sellers have, and subject to the entry and effectiveness of the Sale Order in respect of the Purchased Assets of the Sellers,  at the Closing, Buyer will have, good and valid title to each of the Purchased Assets (except for those Purchased Assets that are leased or licensed to any Seller, as to which any Seller has, and at the Closing, Buyer will have, valid licensed or leasehold interests), free and clear of all Liens, other than (i) Permitted Liens and (ii) Liens encumbering Buyer's assets, if any, securing any loan made directly to Buyer or expressly assumed by Buyer as of the Closing Date.

(b)     To the Knowledge of the Sellers, other than the Excluded Assets, the Purchased Assets constitute all of the assets used in or held for use in the Business and are sufficient for Buyer to conduct the Business from and after the Closing Date without interruption and in the Ordinary Course of Business as it has been conducted by the Sellers prior to the Closing Date, in each case, except as would not be material to the Business taken as a whole.

4.7     Assumed Contracts. Except to the extent excused or made unenforceable as a result of the filing of the Cases, and except as set forth on Schedule 4.7, to the Knowledge of the Sellers, (i) each Assumed Contract is a legal, valid and binding obligation of the Seller that is a party to such Assumed Contract, is enforceable against such Seller in accordance with its terms, is a legal, valid and binding obligation of each other party to such Assumed Contract and is enforceable against such other party thereto in accordance with its terms, subject to bankruptcy laws and general equitable principles, (ii) no Seller that is a party to any Assumed Contract or, to the Knowledge of the Sellers, any other party to an Assumed Contract is in default or breach of an Assumed Contract, (iii) no Seller that is a party to any Assumed Contract has received any written notice of termination or cancellation with respect to any Assumed Contract and (iv) with respect to the Assumed Contracts, upon entry of the Sale Order and payment of the Cure Amounts, each Seller will not be in breach or default of its obligations thereunder.

4.8     Intellectual Property.

(a)     Schedule 4.8(a) sets forth a correct and complete list of: (i) all items of Seller Registered Intellectual Property, specifying the record owner, jurisdiction and issuance, registration or application number and date, as applicable, of each such item; and (ii) all unregistered Marks included in the  all Owned Intellectual Property and all Delphi Subsidiary Intellectual Property. To the Knowledge of the Sellers, all renewal, maintenance and other necessary filings and fees due and payable to any relevant Governmental Entity or domain name registrar to maintain all Seller Owned Registered Intellectual Property in full force and effect have been timely submitted or paid in full.

(b)     To the Knowledge of the Sellers, a Seller is the sole and exclusive owner of all right, title and interest in and to all Owned Intellectual Property, free and clear of all Liens (other than Permitted Liens) and all Licensed Intellectual Property is validly licensed to the applicable Seller, free and clear of all Liens (other than Permitted Liens). To the Knowledge of the Sellers, the Acquired Intellectual Property constitutes all of the Intellectual Property used in, and necessary and sufficient for, the conduct and operation of the Business in all material respects.

(c)     To the Knowledge of the Sellers, none of the Sellers has received any notice, and there are no claims or Proceedings pending or threatened against any Seller, (i) alleging any infringement, misappropriation, dilution or other violation of any Intellectual Property, (ii) challenging the ownership, validity or enforceability of any Owned Intellectual Property or (iii) challenging the use by any Seller of any Acquired Intellectual Property, and, in the case of clauses (i), (ii) and (iii), to the Knowledge of the Sellers, there are no facts or circumstances that would form the basis for any such claim, Proceeding or challenge.

(d)     To the Knowledge of the Sellers, the Sellers and any Person acting for or on the Sellers' behalf have at all times materially complied with (i) all applicable Privacy Laws, (ii) all of the Sellers' policies and notices regarding Personal Information, and (iii) all of the Sellers' contractual obligations with respect to Personal Information. Each Seller has implemented and maintains and, to the Knowledge of the Sellers, has at all times maintained reasonable safeguards to protect Personal Information and other confidential data in its possession or under its control against loss, theft, misuse or unauthorized access, use, modification, alteration, destruction or disclosure. Except as set forth in Schedule 4.8(d), to the Knowledge of the Sellers,

there have been no material breaches, security incidents, misuse of or unauthorized access to or disclosure of any Personal Information in the possession or control of the Sellers or collected, used or processed by or on behalf of the Sellers. To the Knowledge of the Sellers, no Seller has received any written notice of any claims (including written notice from third parties acting on its behalf) of or investigations or inquires related to, or been charged with, the violation of any Privacy Laws, applicable privacy policies, or contractual commitments with respect to Personal Information.

4.9     Employee Benefits.

(a)     Schedule 4.9(a) lists all Benefit Plans.

(b)     True, correct and complete copies of the following documents, with respect to each of the Benefit Plans, have been made available to Buyer: (i) any plan documents and all material amendments thereto, (ii) the most recent Form 5500, if applicable, and (iii) the most recent summary plan descriptions (including letters or other documents updating such descriptions).

(c)     To the Knowledge of the Sellers, each of the Benefit Plans sponsored by any Seller that is intended to qualify under Section 401 of the Code has received a favorable determination letter from the Internal Revenue Service that such plan is so qualified, and, to the Knowledge of the Sellers, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(d)     To the Knowledge of the Sellers, since December 31, 2022, each of the Benefit Plans has been maintained, in all material respects, in accordance with its terms and all provisions of applicable Law. To the Knowledge of the Sellers, none of the Sellers has incurred, and no event has occurred and no condition or circumstance exists that could result, directly or indirectly, in, any unsatisfied Liability (including, any indirect, contingent or secondary Liability) of any Seller under Title IV of ERISA or Section 412 or 430 of the Code or Section 302 or 303 of ERISA or other similar Law.

(e)     Other than as required under Section 4980B of the Code or other similar applicable Law or for which the covered person pays the full cost of coverage for such person and his or her beneficiaries and dependents, to the Knowledge of the Sellers, neither the Sellers nor any ERISA Affiliate has or could reasonably be expected to have any Liability for providing post-termination or retiree medical, life insurance or other welfare benefits.

(f)     To the Knowledge of the Sellers, neither the execution and delivery of this Agreement nor the consummation of the Transactions, either alone or in connection with any other event, will (i) give rise to any payments or benefits that would be nondeductible to the Sellers under Section 280G of the Code or that could result in an excise Tax on any recipient under Section 4999 of the Code, (ii) result in any payment or benefit becoming due to any current or former employee, independent contractor or consultant of the Sellers, (iii) increase the amount or value of any compensation or benefits payable under any Benefit Plan, result in any acceleration of the time of payment or vesting of any compensation or benefits or provide any additional compensatory rights or benefits (including funding of compensation or benefits through a trust or otherwise) to any current or former employee, independent contractor or consultant of the Sellers, or (iv) limit

28

or restrict the ability of Buyer, its Affiliates, or the Sellers to merge, amend or terminate any Benefit Plan.

4.10    Labor Matters.

(a)    To the Knowledge of the Sellers, Schedule 4.10(a) sets forth a complete list of all employees of the Sellers, and based on the Sellers' records as of the Agreement Date, correctly reflects, with respect to each individual, as applicable: (i) date of hire; (ii) job title and department; (iii) rate of pay or salary; (iv) employee versus independent contractor status; (v) exempt versus non-exempt status; (vi) accrued PTO; (vii) to the extent known, leave of absence status; and (viii) status of participation in any health or welfare Benefit Plans.

(b)    To the Knowledge of the Sellers and except as disclosed to Buyer in writing, none of the Sellers is a party to any labor or collective bargaining agreement and, to the Knowledge of the Sellers, there are no labor or collective bargaining agreements which pertain to employees of any Seller and no such agreements are being negotiated as of the date of this Agreement. To the Knowledge of the Sellers, no employees of Sellers are represented by a labor or trade union, works council, employee association or other employee representative.  Except as set forth in Schedule 4.10(b), no labor organization or group of employees of any Seller has made a pending demand for recognition, and there are no representation proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of the Sellers, threatened to be brought or filed, with the U.S. National Labor Relations Board.

(c)    To the Knowledge of the Sellers and except as disclosed to Buyer in writing, there is (i) no unfair labor practice complaint pending or threatened against any Seller before the U.S. National Labor Relations Board, and (ii) no strike, labor dispute, slowdown or stoppage pending or threatened against any Seller.

(d)    To the Knowledge of the Sellers, (i) each of the Sellers is in material compliance with all Labor Laws, (ii) other than as set forth on Schedule 4.10(d), no equal employment opportunity charges or other claims of employment discrimination are pending or, to the Knowledge of the Sellers, threatened against them, nor have there been any such charges or claims since December 31, 2022, and (iii) no wage and hour department investigation has been made or, to the Knowledge of the Sellers, threatened against any Seller since December 31, 2022, whether internally or by any Governmental Entity, in connection with the employment, engagement, compensation, or service of any current or former employee, consultant or contractor.

(e)    All Liabilities in respect of employees of each Seller, to the Knowledge of the Sellers, since December 31, 2022, have or shall have been properly and correctly paid on or prior to the Closing Date, including withholdings, premium contributions, remittance and assessments for unemployment insurance, employer health tax, Governmental Entity-required pension plans, income tax, workers' compensation and any other employment related legislation, accrued wages, Taxes, salaries, commissions and any Benefit Plan payments.

(f)    Since December 31, 2022, to the Knowledge of the Sellers, all individuals of the Sellers who have provided or are providing services of any kind to the Sellers are correctly

classified as an employee or an independent contractor and if classified as an employee are correctly classified as exempt or nonexempt from overtime under applicable Laws.

(g)    To the Knowledge of the Sellers, neither the Sellers, nor any of their respective officers or directors in their individual capacities have settled any material claims, actions, complaints, or other grievances relating to sexual harassment involving or relating to one or more current or former employees, independent contractors, or any other service providers. There are no such claims, actions, complaints or other grievances relating to sexual harassment currently pending or, to the Knowledge of the Sellers, threatened.

4.11    Conduct of Business. Except as set forth on Schedule 4.11, since January 31, 2023, (a) the Business has been conducted in the Ordinary Course of Business and the Sellers have not entered into any transaction related to the Purchased Assets (including any transfer or sale of assets) out of the Ordinary Course of Business, (b) the Sellers have owned and operated the Purchased Assets in the Ordinary Course of Business, and (c) there has been no Material Adverse Effect.

4.12    Compliance with Laws; Permits.

(a)    To the Knowledge of the Sellers, the Sellers are conducting, and have conducted since December 31, 2022, the Business and Purchased Assets in compliance, in all material respects, with all applicable Laws and Orders. Except as disclosed on Schedule 4.12, since December 31, 2022, none of the Sellers has received any written notice or other communication that alleges that the Business is not in compliance in any material respect with any Law, Order or Permit applicable to the Business or the Purchased Assets.

(b)    The Sellers have all material Permits which are required for the lawful operation of the Business as presently conducted and the ownership and operation of the Purchased Assets, and to the Knowledge of the Sellers, each such Permit is valid, binding and in full force and effect, in each case except as would not reasonably be expected to have a Material Adverse Effect. To the Knowledge of the Sellers and except as set forth in Schedule 4.12(b), none of the Sellers is in material default or violation of any term, condition or provision of any material Permit to which it is a party.

4.13    Financial Statements. [Under review.][5]

4.13    Reserved.

4.14    Financial Advisors. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for any in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

4.15    Absence of Undisclosed LiabilitiesReserved. Except as set forth on Schedule 4.15, to the Knowledge of the Sellers, there are no Liabilities of any of the Sellers, or otherwise related to the Business, of any nature, whether accrued, contingent, absolute, known or otherwise, in each case, whether or not required by GAAP to be reflected or reserved against on a balance sheet of

---

[5] NTD: Sellers to advise as to availability of financial statements.

each of the Sellers, or of the Business, prepared in accordance with GAAP or the notes thereto, other than: (a) Liabilities as and to the extent reflected or reserved against in the Financial Statements, (b) Liabilities incurred since [●] in the Ordinary Course of Business, or (c) Liabilities that would not reasonably be expected to be material to the Business taken as a whole.

4.16     Tax Matters.

(a)     To the Knowledge of the Sellers, the Sellers have timely filed (taking into account any valid extensions of time to file) all Tax Returns which are required to be filed by the Sellers, all such Tax Returns are true, correct and complete in all material respects, and all Taxes due and payable by the Sellers prior to the date hereof have been timely and fully paid.

(b)     To the Knowledge of the Sellers, there are no Liens for Taxes upon the Purchased Assets other than for Permitted Liens.

(c)     To the Knowledge of the Sellers, the Sellers (i) have complied in all material respects with all applicable Laws relating to the withholding, collection and payment of Taxes and (ii) have duly and timely withheld, collected and paid over to the appropriate Governmental Entity all amounts required to be so withheld, collected and paid under all applicable Laws.

(c)     Reserved.

(d)     The Sellers have not received any written notice from any taxing authority or Governmental Entity asserting that any Seller may be subject to Tax in any jurisdiction in which any Seller does not file Tax Returns.

(e)     To the Knowledge of the Sellers, no action, suit, proceeding or audit is pending against or with respect to the Sellers regarding Taxes of any Seller.

(f)     To the Knowledge of the Sellers, the Sellers have not waived any statute of limitations in respect of the collection or assessment of any Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency of any Seller, other than any waiver or extension which has expired.

(g)     None of the Purchased Assets is an interest (other than indebtedness within the meaning of Section 163 of the Code) in an entity taxable as a corporation, partnership, trust or real estate mortgage investment conduit for U.S. federal income tax purposes.

4.17     Real Property.

(a)     To the Knowledge of the Sellers, no Seller owns any real property. Schedule 4.17(a) sets forth a complete list of the Leased Real Property. Except for Leased Real Property contained in Schedule 4.17(a), the Sellers do not lease or otherwise occupy any other real property or have any other place of business.

(b)     To the Knowledge of the Sellers, each Seller has good and valid leasehold title to the Leased Real Property, in each case free and clear of all Liens except for Permitted Liens.

31

(c)     To the Knowledge of the Sellers, the Sellers have not leased any portion of the Leased Real Property to any Person other than pursuant to the Leases.

(d)     To the Knowledge of the Sellers, (i) the Leases are in full force and effect, (ii) no Seller has delivered or received notice from the other party to any Lease of the termination or surrender thereof, (iii) the Sellers have delivered to Buyer true and complete copies of the Leases referenced in underline Schedule 4.17(a), including all amendments notices or memoranda of lease thereto, and all estoppel certificates, or subordination, non-disturbance and attornment agreements, if any, relating to the Leased Real Property, and (iv) no Person that is not a Seller has any right to possess, use or occupy the Leased Real Property.

4.18     _Tangible Personal Property_. All leases relating to personal property used, or held for use, by the Sellers in the conduct of the Business ("Personal Property Leases") are set forth in Schedule 4.18. To the Knowledge of the Sellers, no Seller has received any written notice of any default or event that with notice or lapse of time or both would constitute a default by any Seller under any of the Personal Property Leases.

4.19     _Insurance_. The Sellers have insurance policies in full force and effect for such amounts as are, to the Knowledge of the Sellers, sufficient for all requirements of Law applicable to the Business and the Purchased Assets. Set forth in Schedule 4.19 is a list of all insurance policies and all fidelity bonds held by or applicable to any Seller setting forth, in respect of each such policy, the policy name, policy number, carrier, term, type of coverage and annual premium. Excluding insurance policies that have expired and been replaced in the Ordinary Course of Business, to the Knowledge of the Sellers, no insurance policy has been cancelled within the last year and, to the Knowledge of the Sellers, no threat has been made to cancel any insurance policy of any Seller during such period. Except as noted in each insurance policy or on Schedule 4.19, all such insurance will remain in full force and effect, all premiums due to date thereunder have been paid in full, and neither Sellers nor any of Sellers' Affiliates is in material default with respect to any obligations thereunder.

4.20     _Environmental Matters_.

(a)     To the Knowledge of the Sellers, and except as set forth on Schedule 4.20(a), (i) the Sellers are and have been in material compliance with Environmental Laws with respect to the Business and Purchased Assets, which compliance includes obtaining, maintaining and complying with all Permits required under Environmental Laws ("Environmental Permits"), (ii) no Proceeding is pending or, to the Knowledge of the Sellers, threatened, to revoke, modify or terminate any such Environmental Permit, and to the Knowledge of the Sellers, no facts, circumstances or conditions currently exist that could adversely affect such continued compliance with Environmental Laws and Environmental Permits or require currently unbudgeted capital expenditures to achieve or maintain such continued compliance with Environmental Laws and Environmental Permits.

(b)     There are no Proceedings or Orders pending or, to the Knowledge of the Sellers, threatened, alleging non-compliance with or Liabilities under Environmental Law with respect to the Business or the Purchased Assets.

(c) To the Knowledge of the Sellers, no facts, circumstances or conditions exist with respect to the Business or the Purchased Assets or real property to which the Sellers with respect to the Business or Purchased Assets arranged for the disposal or treatment of Hazardous Materials that could result in any Seller, with respect to the Business or the Purchased Assets, incurring material Liability or obligations under Environmental Laws.

4.21     Condition and Suitability of Purchased Assets. To the Knowledge of the Sellers, (a) there has been no condemnation, seizure, damage, destruction or other casualty loss (whether or not covered by insurance) affecting any of the Purchased Assets or the Business in any material respect which has not subsequently been completely repaired, replaced, or restored, and (b) there are no pending or, to the Knowledge of the Sellers, threatened or contemplated condemnation proceedings affecting the Business, any of the Purchased Assets (or any portion thereof), or of any sale or other disposition of the Business or any of the Purchased Assets (or any portion thereof) in lieu of condemnation except as would not reasonably be expected to have a Material Adverse Effect.

4.22     Anti-Corruption.

(a) None of the Sellers, or any of their respective officers, directors, employees, agents, representatives, consultants, members, equityholders, or any other Person associated with or acting for or on behalf of the Sellers, since December 31, 2022, has, to the Knowledge of the Sellers, directly or indirectly, in connection with the Business:

(i) made, offered or promised to make or offer any payment, loan or transfer of anything of value, including any reward, advantage or benefit of any kind, to or for the benefit of any Government Official, candidate for public office, political party or political campaign, for the purpose of (A) influencing any act or decision of such Government Official, candidate, party or campaign, (B) inducing such Government Official, candidate, party or campaign to do or omit to do any act in violation of a lawful duty, (C) obtaining or retaining business for or with any Person, (D) expediting or securing the performance of official acts of a routine nature, or (E) otherwise securing any improper advantage;

(ii) paid, offered or promised to make or offer any bribe, payoff, influence payment, kickback, unlawful rebate, or other similar unlawful payment of any nature;

(iii) made, offered or promised to make or offer any unlawful contributions, gifts, entertainment or other unlawful expenditures;

(iv) established or maintained any unlawful fund of corporate monies or other properties;

(v) created or caused the creation of any false or inaccurate books and records of the Sellers related to any of the foregoing; or

(vi) otherwise violated any provision of any Anti-Corruption Laws.

4.23     Related Party Transactions.

33

(a)      To the Knowledge of the Sellers, no Seller, executive officer, director, member, manager, equityholder or Affiliate of a Seller nor any individual who is a lineal descendant, sibling, parent or spouse of any such Person (each, a "Related Party") is a party to any Contract or arrangement (including any loan or similar arrangement) with or binding upon any of the Sellers or the Purchased Assets or has any interest in any asset (each, a "Related Party Transaction") other than as set forth on Schedule 4.23(a). Except as set forth on Schedule 4.23(a), no Seller has made any payments to or on behalf of any Related Party (including by exercise of set-off rights, cancellation of intercompany indebtedness, or otherwise).

(b)      Except as disclosed on Schedule 4.23(b), to To the Knowledge of the Sellers, no Related Party will, immediately following the Closing, hold any asset (tangible or intangible), property, right, claim, cause of action (including any counterclaim) or defense used in or related to the Business.

4.24    Disclaimer of Other Representations and Warranties. Except as expressly set forth in this Article IV, no Seller makes any representation and warranty, express or implied, in respect of such Seller, the Purchased Assets, the Business or the Assumed Liabilities, and any such other representations or warranties, express or implied, are hereby expressly disclaimed.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Sellers as follows:

5.1    Organization and Good Standing. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation, and has full power and authority to own, lease and operate its properties and carry on its business as it is now being conducted.

5.2    Power and Authority. Buyer has the requisite power and authority to enter into this Agreement and to perform its obligations hereunder, and the execution and delivery of this Agreement and the consummation of the Transactions and the performance of Buyer's obligations hereunder have been duly authorized by all requisite company action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and constitutes (assuming the due and valid authorization, execution and delivery thereof by the other parties thereto and the entry of approval of this Agreement and the Transactions by the Bankruptcy Court pursuant to the Sale Order) the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

5.3    No Contravention. Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) violate or conflict with any provision of Buyer's organizational documents, or (b) violate or conflict with any Order, Governmental Entity or arbitrator, or any Law applicable to Buyer.

5.4    Consents and Approvals. Except for (a) entry of the Sale Order, and (b) any consents or approvals as are reflected on Schedule 5.4, the execution, delivery and performance by Buyer of this Agreement and the Transactions, and the legality, validity, binding effect or

enforceability of this Agreement and any agreements contemplated hereby, do not require any consents, waivers, authorizations or approvals of, or filings with, any third Persons or Governmental Entities.

5.5    Litigation. There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would reasonably be expected to adversely affect the ability of Buyer to consummate the Transactions in any material respect.

5.6    Financial Advisors. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the Transactions and no Person is entitled to any fee or commission or like payment in respect thereof.

5.7    Sufficient Funds; Adequate Assurances. Buyer has or will have as of the Closing, immediately available funds sufficient for the satisfaction of all of Buyer's obligations under this Agreement, including all fees, expenses of, and other amounts required to be paid by, Buyer in connection with the transactions contemplated hereby. As of the Closing, Buyer shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assumed Contracts and the related Assumed Liabilities.

5.8    Acknowledgements; "As Is" "Where Is" Transaction.

(a)    BUYER ACKNOWLEDGES THAT IT HAS RECEIVED FROM SELLERS CERTAIN PROJECTIONS, FORECASTS, AND PROSPECTIVE OR THIRD-PARTY INFORMATION RELATING TO SELLERS, THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES. BUYER ACKNOWLEDGES THAT (I) THERE ARE UNCERTAINTIES INHERENT IN ATTEMPTING TO MAKE SUCH PROJECTIONS AND FORECASTS AND IN SUCH INFORMATION; (II) BUYER IS FAMILIAR WITH SUCH UNCERTAINTIES AND IS TAKING RESPONSIBILITY FOR MAKING ITS OWN EVALUATION OF THE ADEQUACY AND ACCURACY OF SUCH PROJECTIONS, FORECASTS, AND INFORMATION SO FURNISHED; AND (III) NONE OF THE SELLERS NOR ANY OTHER PERSON MAKES ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO SUCH PROJECTIONS AND FORECASTS.

(b)    BUYER FURTHER ACKNOWLEDGES AND AGREES THAT THE REPRESENTATIONS AND WARRANTIES MADE BY SELLERS TO BUYER IN ARTICLE IV (AS QUALIFIED BY THE DISCLOSURE SCHEDULES) OR IN THE DOCUMENTS DELIVERED BY SELLERS TO BUYER IN ACCORDANCE WITH SECTION 3.1(b) AT THE CLOSING (COLLECTIVELY, THE "EXPRESS REPRESENTATIONS") ARE THE SOLE AND EXCLUSIVE REPRESENTATIONS, WARRANTIES AND STATEMENTS OF ANY KIND MADE TO BUYER IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND THAT ALL OTHER REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE EXPRESSED OR IMPLIED, WHETHER IN WRITTEN, ELECTRONIC OR ORAL FORM, ARE EXPRESSLY DISCLAIMED, INCLUDING WITH RESPECT TO (I) ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS, AND (II) WITH RESPECT TO THE BUSINESS, FINANCIAL CONDITION, RESULTS OF OPERATIONS, ASSETS, LIABILITIES, AND

11875751-23

PROSPECTS OF SELLERS OR THE BUSINESS OF THE SELLERS, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF.

(c)     UPON THE CLOSING DATE, SUBJECT TO THE EXPRESS REPRESENTATIONS AND THE PROVISIONS OF <u>SECTION 10.5</u>, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

## ARTICLE VI

## COVENANTS OF THE PARTIES

6.1     <u>Conduct of Business Pending the Closing</u>. During the period from the Agreement Date and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing, the Sellers shall carry on the Business in the Ordinary Course of Business subject to the requirements of the Bankruptcy Code and Bankruptcy Court and use commercially reasonable efforts to (a) preserve in all material respects the operations, organization and goodwill of the Business intact (including by maintaining and renewing its Permits) and (b), preserve in all material respects relationships with Governmental Entities, suppliers, partners, lessors, licensors, licensees, vendors, contractors, distributors, agents, officers and employees and others having business dealings with the Business. The Sellers shall notify Buyer in writing of any event, occurrence, fact, condition or change in the Business, assets, operations or prospects of the Sellers that results in, or could reasonably be expected to result in, a Material Adverse Effect, promptly upon the occurrence of any such event, occurrence, fact, condition or change.

6.2     <u>Negative Covenants</u>. Except as otherwise expressly provided by this Agreement or consented to in writing by Buyer, or as may be required by order of the Bankruptcy Court, the Sellers shall not take any of the following actions:

(a)     incur or commit to incur any capital expenditures other than as expressly contemplated under the Budget;

(b)     acquire or agree to acquire (by merging or consolidating with, or by purchasing any portion of the stock of, or other ownership interests in, or substantial portion of assets of, or by any other manner), any business or division or any corporation, partnership, limited liability company or other entity;

(c)     sublease, pledge, transfer, license, or terminate or surrender any Leased Real Property or grant any Lien on or otherwise encumber or dispose of (or consent to the disposition of) any of the Purchased Assets (including any Available Contract), including the capital stock or equity interests of any of the Sellers, other than a Permitted Lien in the Ordinary Course of Business;

(d)      sell, assign, transfer, license, sublicense, covenant not to sue with respect to, abandon, cancel, terminate, permit to lapse or expire, or otherwise dispose of any Acquired Intellectual Property;

(e)      adjust, split, combine, redeem, repurchase or reclassify any capital stock or equity interests or issue or propose or authorize the issuance of any other securities (including Debt securities, options, profits interests, warrants or any similar security exercisable for, or convertible into, such other security);

(f)      incur or assume any Debt (other than in connection with the DIP Documents);

(g)      guarantee any Debt of any Person or enter into any "keep well" or other agreement to maintain any financial condition of another Person or enter into any arrangement having the economic effect of any of the foregoing (other than pursuant to the DIP Documents);

(h)      enter into, amend, restate, supplement, modify, waive or terminate any Available Contract;

(i)      adopt or propose any amendments to the certificate of incorporation, bylaws or other organizational documents of any Seller;

(j)      initiate, compromise, settle or agree to settle any Claim, complaint, or Proceeding, other than compromises or settlements in the Ordinary Course of Business that (i) involve only the payment of money damages not in excess of Ten Thousand Dollars ($10,000) individually or Twenty Five Thousand Dollars ($25,000) in the aggregate, (ii) do not impose ongoing limits on the conduct of the Business, and (iii) result in a full release of all Sellers with regard to the Claims or complaint giving rise to such Proceeding;

(k)      make, change or revoke any material Tax election (including entity classification elections), change any financial or Tax accounting method, except insofar as may have been required by applicable Law or a change in GAAP, consent to an extension or waiver of the limitation period applicable to any Tax claim or assessment, or surrender any right to claim a refund of a material amount of Taxes;

(l)      enter into, amend, negotiate or terminate any collective bargaining agreement or similar agreement with any labor union or labor organization representing any employees;

(m)      (i) increase the compensation payable to or to become payable to, or the benefits provided to, pay any bonus to, or grant any equity or equity-based award to, any current or former employee, director, independent contractor or other individual service provider of the Sellers; (ii) grant, increase, pay, provide or modify any severance, retention, change in control or termination payment or benefit to, or loan or advance or accelerate any amount to, any current or former employee, director, independent contractor or other individual service provider of the Sellers; (iii) accelerate the vesting or payment, or fund or in any other way secure the payment, of any compensation or benefit for any current or former employee, director, independent contractor or other individual service provider of the Sellers; (iv) approve, establish, adopt, enter into, amend

or terminate any Benefit Plan, except as required by Law; (v) grant or forgive any loans to any current or former employee, director, independent contractor or other individual service provider of the Sellers; or (vi) hire or promote, or terminate or demote (other than for cause) any current or former employee, independent contractor or other individual service provider of the Sellers with annual target cash compensation greater than One Hundred Thousand Dollars ($100,000);

(n)     implement any employee layoffs that would result in an obligation to give notice at or before Closing Date under the WARN Act or other similar Law;

(o)     (i) enter into any Contract or arrangement (including any loan or similar arrangement) with a Related Party or that would be a Related Party Transaction if it existed on the Agreement Date, or (ii) make payments to or on behalf of any Related Party (including by exercise of set-off rights or otherwise), other than in accordance with the terms of an existing, disclosed Related Party Transaction;

(p)     take any action inconsistent with, or omit to take any action required by, this Agreement;

(q)     receive, collect, compile, use, store, process, share, safeguard, secure (technically, physically and administratively), dispose of, destroy, disclose, or transfer (including cross-border) Personal Information (or fail to do any of the foregoing, as applicable) in violation of any (i) applicable Privacy Laws, (ii) privacy policies or notices of the Sellers, or (iii) the Sellers' contractual obligations with respect to Personal Information; or

(r)     authorize, commit or agree to take any of the foregoing actions or any other action which would reasonably be expected to prevent, or materially delay or impede, the satisfaction of any of the conditions set forth in Article VIII.

6.3     Access.

(a)     Subject to applicable Law, until the Closing Date, the Sellers (i) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, assets, contracts, properties, officers, employees, accountants, auditors, financial advisors, counsel (other than counsel to the Sellers in connection with the Cases) and other representatives, books and records, of the Sellers and their Affiliates, (ii) shall furnish to Buyer and its Representatives such financial, operating and property related data and other information as such Persons reasonably request, (iii) shall instruct the employees, accountants, counsel and financial advisors of the Sellers and their Affiliates to cooperate reasonably with Buyer in its investigation of the Business; and (iv) shall, upon reasonable request of Buyer, use commercially reasonable efforts to provide Buyer with access to their customers, suppliers, vendors, distributors, manufacturers and other Persons with whom the Business has had material dealings. No investigation by Buyer prior to or after the date of this Agreement shall diminish or obviate any of the representations, warranties, covenants or agreements of the Sellers contained in this Agreement. For the avoidance of doubt, nothing in this Section 6.3(a) shall require Sellers to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege or (ii) such action could reasonably be expected to result in violation of applicable Law or Order.

(b)     From and after the Closing Date until the conclusion of the Cases, Buyer shall give the Sellers and the Sellers' Representatives reasonable access during normal business hours to the books and records pertaining to the Purchased Assets and Assumed Liabilities, and shall make available to the Sellers and the Sellers' Representatives the employees of Buyer or its Affiliates whose assistance Buyer reasonably determines is necessary to assist the Sellers or the Sellers' Representatives in connection with the Sellers' or such Representatives' inquiries for the purposes referred to in this Section 6.3(b), for the purposes of (i) the preparation or amendment of Tax Returns, (ii) the determination of any matter relating to the rights or obligations of the Sellers under this Agreement, or (iii) as is necessary to administer, or satisfy their obligations in connection with, the Cases. Buyer shall, and shall cause each of its controlled Affiliates to, cooperate with the Sellers as may reasonably be requested by the Sellers for such purposes. For the avoidance of doubt, nothing in this Section 6.3(b) shall require Buyer to take any such action if (i) such action may result in a waiver or breach of any attorney/client privilege, (ii) such action could reasonably be expected to result in violation of applicable Law or Order, or (iii) providing such access or information would be reasonably expected to be disruptive to its normal business operations.

6.4     Confidentiality. From and after the Closing Date:

(a)     the Sellers will treat and hold as confidential all of the Confidential Information, and will not, directly or indirectly, without the prior written consent of Buyer, disclose or use any Confidential Information. The Sellers' obligation not to disclose Confidential Information shall not apply to Confidential Information that it shall be required to disclose by Law; provided, however, that, prior to making such disclosure, the Sellers shall notify Buyer promptly to the extent not prohibited by Law so that Buyer may seek confidential treatment or protection of such Confidential Information at Buyer's sole cost and expense.

(b)     in the event that the Sellers are required in any Proceeding to disclose any Confidential Information, the Sellers will notify Buyer promptly of the requirement to the extent not prohibited by Law so that Buyer may seek an appropriate protective order at Buyer's sole cost and expense or waive compliance with the provisions of this Section 6.4.

6.5     Public Announcements. From the Agreement Date, Buyer and the Sellers will consult with each other before issuing, and provide each other the reasonable opportunity to review and comment upon, any press release, any court filing or pleading filed with the Bankruptcy Court relating primarily to this Agreement or the Transactions, or other public statements with respect to the Transactions, and neither Buyer nor the Sellers shall issue any such press release or make any such public statement without the prior written approval of the other Party, in each case except as may be required by Law, or by obligations pursuant to any listing agreement with any national securities exchange. Sellers shall use their respective commercially reasonable efforts to cause their respective Affiliates, employees, officers and directors to comply with this Section 6.5.

6.6     Employment Matters.[6] Prior to Closing, Buyer may in its sole discretion (following consultation with the executive management of the Sellers) provide offers of employment to individuals employed by the Sellers as of the Closing Date, which offer shall provide at least the

---

[6] NTD: Subject to further discussion.

same base salary or hourly wage rate and target incentive cash bonus opportunities and such other terms and conditions determined by Buyer in its sole discretion.

(b)     Buyer shall provide credit to Hired Employees under Buyer's paid time off plans for all accrued but unused paid time off days as of the Closing, except to the extent that Hired Employees receive payment for such vacation days in connection with the Closing.

(c)     Following the Closing, Buyer shall give each Hired Employee full credit for prior service with the Sellers for purposes of (i) eligibility and vesting under any health or welfare plans of Buyer (for the avoidance of doubt, excluding defined benefit pension accruals, deferred compensation, or equity or equity-based incentive plans, or any plan under which such crediting would be prohibited), and (ii) determination of benefit levels under any employee benefit plans of Buyer relating to paid time off, in each case, for which the Hired Employee is otherwise eligible and in which the Hired Employee is offered participation, except where such credit would result in a duplication of benefits. Buyer shall use commercially reasonable efforts to waive, or cause to be waived, any limitations on benefits relating to pre-existing conditions to the same extent such limitations are waived under any comparable plan of the Sellers and use commercially reasonable efforts to recognize for purposes of annual deductible and out-of-pocket limits under its medical and dental plans, deductible and out-of-pocket expenses paid by Hired Employees in the calendar year in which the Closing Date occurs.

(d)     Without limiting the generality of Section 2.4, each Seller shall retain responsibility for, and satisfy all Liabilities with respect to, all payments and benefits of the employees (and their spouses, dependents and beneficiaries, and all former employees, agents and representatives) under Benefit Plans accrued up to the Closing Date or which relate to events prior to the Closing Date in accordance with the terms thereof and applicable Laws.

(e)     Without limiting the generality of Article II, each Seller shall be responsible for the following claims or benefit payments of all employees (and their spouses, dependents and beneficiaries, and all former employees, agents and representatives) accrued up to the Closing Date or which relate to events prior to the Closing Date regardless of whether such claims are filed before or after the Closing Date:

(i)     with respect to death or dismemberment claims, those in respect of which the event occurred prior to the Closing Date;

(ii)     with respect to health claims, those in respect of which the services were provided or the supplies were purchased prior to the Closing Date; and

(iii)     with respect to short term and/or long term disability claims and workers' compensation claims, for those claims resulting from events that occurred prior to the Closing Date, including, to the extent covered under the Benefit Plans, for recurring illnesses which first originated with events occurring prior to the Closing Date, whether or not such claims continue after the Closing Date.

(f)     This Section 6.6 shall operate exclusively for the benefit of the Sellers and Buyer and not for the benefit of any other Person, including any current or former employees of the Sellers or the Hired Employees, which Persons shall have no rights to enforce this Section 6.6.

40

Nothing in this Section 6.6 shall: (i) entitle any Hired Employee to employment with Buyer; (ii) change such Hired Employee's status as an employee-at-will or restrict the ability of Buyer to terminate the service of any Hired Employee at any time or for any reason; (iii) create any third party rights in any current or former service provider of the Sellers (including any beneficiary or dependent thereof); or (iv) be treated as an amendment of any Benefit Plan or other employee benefit plan or arrangement or restrict the ability of Buyer, the Sellers or any of their respective Affiliates to amend, modify, discontinue or terminate any Benefit Plan or other employee benefit plan or arrangement.

6.7    Reasonable Efforts; Approvals.

(a)    Buyer and the Sellers will use reasonable best efforts to take, or cause to be taken, all actions and use reasonable best efforts to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things which are necessary, proper or advisable to consummate and make effective the Transactions including: (i) the obtaining or taking of all other necessary actions, non-actions or waivers from Governmental Entities and the making of all other necessary registrations and filings with Governmental Entities, and (ii) the execution and delivery of any additional certificates, agreements, instruments, reports, schedules, statements, consents, documents and information necessary to consummate the Transactions. For greater certainty, nothing in this Section 6.7(a) shall diminish, reduce or impact the closing condition set forth in Section 8.1(d).

(b)    In furtherance of the foregoing, Buyer and each Seller shall use its commercially reasonable efforts to obtain any consents and approvals from any third party other than a Governmental Entity that may be required in connection with the Transactions (the "Third Party Consents"). Without limiting the generality of the foregoing sentence, the Sellers shall not be required to compensate any applicable third party, commence or participate in any Proceeding or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to indemnify, remain primarily, secondarily or contingently liable for any Assumed Liability) to any applicable third party in connection with the Sellers' obligations under this Section 6.7(b); provided, that the Sellers shall obtain the written consent of Buyer prior to any Seller paying any such compensation, commencing or participating in any Proceeding, or offering or granting any such accommodation. The covenants in this Section shall survive the Closing.

6.8    Corporate Name Change. Upon termination of the ~~Transaction~~ Transition Services Agreement, (a) each Seller shall deliver to Buyer a duly executed and acknowledged certificate of amendment to such Seller's certificate of formation or other organizational document which is required to change such Seller's entity name to a new name that is, in Buyer's reasonable judgment, sufficiently dissimilar to such Seller's present name and, in all cases, does not include the name "Delphi" so as to avoid confusion and to make each Seller's present name available to Buyer, and (b) each Seller shall deliver to Buyer appropriate documents, duly executed and acknowledged, which is required to change such Seller's name to such new name in any jurisdiction in which such Seller is qualified to do business, in forms reasonably satisfactory to Buyer. Buyer and any Affiliate of Buyer are hereby authorized (but not obligated) to file such certificates or other documents (at Buyer's expense) with the applicable Governmental Entities in order to effectuate such change of name at or after the termination of the Transition Services Agreement as Buyer may elect.

41

6.9    Assignment of Contracts and Rights. To the maximum extent permitted by the Bankruptcy Code, the Purchased Assets of the Sellers shall be assumed and assigned to Buyer pursuant to section 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if, after giving effect to the Sale Order, an attempted assignment without the consent of a third party (including any Governmental Entity) would constitute a breach or in any way adversely affect the rights of Buyer following the Closing. If, as of the Closing Date, such consent is not obtained or such assignment is not attainable pursuant to sections 105, 363 or 365 of the Bankruptcy Code other than as a result of the failure by the Sellers to pay or otherwise satisfy all Cure Amounts, then the Sellers and Buyer will cooperate pursuant to the Transition Services Agreement, to the extent feasible, under which Buyer would obtain the benefits and assume the obligations (to the extent otherwise constituting Assumed Liabilities hereunder) thereunder in accordance with this Agreement, including subcontracting, sublicensing or subleasing to Buyer, or under which the Sellers would enforce for the benefit of, and at the direction of, Buyer, with Buyer assuming all of the Sellers' obligations (to the extent constituting Assumed Liabilities hereunder), and any and all rights of the Sellers thereunder.

6.10    Tax Matters.

(a)    All Transfer Taxes arising out of the transfer of the Purchased Assets and any Transfer Taxes required to effect any recording or filing with respect thereto shall be borne by the Sellers. The Transfer Taxes shall be calculated assuming that no exemption from Transfer Taxes is available, unless otherwise indicated in the Sale Order or, at Closing, the Sellers or Buyer, as appropriate, provide an appropriate resale exemption certificate or other evidence acceptable to Buyer or the Sellers, as appropriate, of exemption from such Transfer Taxes. The Sellers and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. The Sellers shall file all necessary documentation and returns with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to Buyer. Each Party shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Business as is reasonably necessary for filing of all Tax Returns, including any claim for exemption or exclusion from the application or imposition of any Taxes or making of any election related to Taxes, the preparation for any audit by any taxing authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return.

(b)    Other than Transfer Taxes, all liability for Taxes with respect to the Purchased Assets attributable to the Pre-Closing Tax Period (the "Pre-Closing Taxes") shall be borne by the Sellers, and all liability for Taxes with respect to the Purchased Assets attributable to the Post-Closing Tax Period shall be borne by Buyer. For purposes of this Agreement, with respect to Taxes attributable to any taxable year or other taxable period beginning on or before and ending after the Closing Date, the portion of any such Taxes that are treated as Pre-Closing Taxes shall be: (i) in the case of Taxes based upon, or related to income, receipts, profits, or wages or imposed in connection with the sale, transfer or assignment of property, or required to be withheld, deemed equal to the amount which would be payable if such taxable year or other taxable period ended on

42

the Closing Date, and (ii) in the case of other Taxes deemed to be the amount of such Taxes for the entire period multiplied by a fraction the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period.

(c)     The Parties agree that the transfer of the Purchased Assets to the Buyer is intended to be treated as a taxable acquisition of assets and the Parties shall prepare and file all relevant U.S. federal income Tax Returns consistent with such intended treatment and <u>Section 3.3</u>, respectively, absent a contrary "determination" (within the meaning of Section 1313(a) of the Code).

(d)     The obligations set forth in this <u>Section 6.10</u> with respect to Taxes shall survive the Closing until the date that is thirty (30) days following the expiration of the applicable statute of limitations.

(e)     In order to prepare Tax Returns and defend any Tax audit or examination, Buyer shall, for a period of seven (7) years after the Closing:

(i)     Retain the books and records (including personnel files) of the Business included in the Purchased Assets, as applicable, relating to the periods prior to Closing in a manner reasonably consistent with the prior practices of the Sellers; and

(ii)     upon reasonable notice, afford the Representatives of any requesting Party or the Representatives of any Affiliate of a Party reasonable access (including the right to make photocopies), during normal business hours, to such books and records.

(iii)     Buyer shall not be obligated to provide any Person with access to any books or records (including personnel files) pursuant to this <u>Section 6.10(e)</u> where such access would violate any Law.

6.11     <u>Available Contracts List</u>. Sellers shall use commercially reasonable efforts to provide Buyer with a true and correct list of all Available Contracts (and copies thereof) promptly following the date hereof and in no event later ~~thirty (30) days from the Agreement Date~~<u>than February 28, 2023</u>.

6.12     <u>Business Records</u>. In partial consideration for turning over the medical/treatment records of patients treated by Sellers in the Business ("<u>Records</u>"), as of the Closing Date, Buyer agrees to assume control, custody and possession of the Records for patients seen and/or treated after December 31, 2020.  Buyer shall retain such Records in accordance with applicable New Jersey or Massachusetts Law, as well as federal Law.  Buyer recognizes that the Records are confidential under applicable New Jersey, Massachusetts and/or federal Law and may not be released to any third party except as provided by Law. Buyer agrees to honor lawful requests for release of medical records or information contained in the Records in accordance with applicable New Jersey or Massachusetts Law, and may, at Buyer's discretion, charge a reasonable fee in accordance with the current rules of the applicable state licensing board to cover the costs of reproduction, unless such fees are deemed waived by other applicable Law. Buyer shall permit

43

Sellers, during normal business hours, to have reasonable access to, and examine and make copies of, medical records of patients treated by the Sellers which relate to events occurring prior to the Closing or events required to audit or maintain or defend positions in connection with any Medicare claims (or other claims related to any other governmental insurance program), in connection with any investigation or proceeding, in connection with an audit by a third party payor, or to conduct the defense of any potential professional liability claim, or to conduct the defense of any potential complaint or proceeding before the applicable state licensing board. The covenants in this Section shall survive the Closing.

6.13    Personally Identifiable Information. Notwithstanding the definition of and provisions related to Personal Information in this Agreement, Buyer agrees that with respect to Personally Identifiable Information, as that term is defined in Section 101(41A) of the Bankruptcy Code (11 U.S.C. §101(41A)) to do the following: (a) adhere to the applicable Seller's relevant privacy policy or a policy at least as comprehensive and inclusive, and (b) use such Personally Identifiable Information only in accordance with the applicable Seller's relevant privacy policy or a policy at least as comprehensive and inclusive.

6.14    Acquired Bank Accounts. To facilitate the transition of the Business, the Sellers agree that Buyer shall be and hereby is authorized and entitled to utilize, for the benefit of Buyer (as opposed to any Seller) the bank accounts identified on Schedule 6.14 (the "Acquired Bank Accounts") in connection with the operation of the Business and/or the provision of business, administrative and other services to or for the benefit of the Business, including (a) to deposit cash and checks and receive direct payments, and (b) administer and pay payroll and other expenses, in each case as determined by Buyer in its sole discretion.  Buyer shall be and hereby is authorized to sign checks, drafts, bank notes or other instruments in the name of the applicable Seller from such Acquired Bank Accounts and to deposit such into the Acquired Bank Accounts.  The Sellers agree that amounts deposited in the Acquired Bank Accounts after the Closing in respect of goods or services rendered as of or after the Closing shall be the sole property of Buyer and not any Seller.  The Sellers (i) hereby appoint Buyer as their true and lawful agent and attorney-in-fact to enable Buyer to take the actions described in this Section 6.14, (ii) shall grant Buyer signature card authority with respect to the Acquired Bank Accounts, (iii) shall not deposit or withdraw any funds from the Acquired Bank Accounts until the end of the term of the Transition Services Agreement and (iv) shall cooperate with all reasonable requests of Buyer to effectuate the purposes of this Section 6.14.

6.15    Additional Assets. During the pendency of the Cases and no longer than a period of ninety (90) days following the Closing Date, if Buyer identifies any asset (including any Intellectual Property) that is necessary for the Business as conducted by the Sellers prior to Closing or that Buyer otherwise desires to use in the Business that was not sold, assigned, transferred, conveyed and delivered to Buyer pursuant to this Agreement, then Parent shall, or shall cause its applicable subsidiary(ies) to, at no cost to Buyer, promptly transfer such asset to Buyer.

6.16    Supplement to Sellers' Disclosure Schedules. From time to time prior to the Closing, the Sellers shall have the right (but not the obligation) to supplement or amend the Sellers' Disclosure Schedules with respect to any matter hereafter arising or of which Sellers become aware after the date hereof, which, if existing, occurring or known at the date of this Agreement, would have been required to be set forth or described in the Sellers' Disclosure Schedules (each a

44

"Schedule Supplement"). Any disclosure in any such Schedule Supplement shall not be deemed to have cured any inaccuracy in or breach of any representation or warranty contained in this Agreement, including for purposes of the termination rights contained in this Agreement or of determining whether or not the conditions set forth in Section 8.1(b) have been satisfied.

## ARTICLE VII

## BANKRUPTCY PROVISIONS

7.1     Expense Reimbursement. In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of the Sellers, if this Agreement is terminated for any reason other than Section 9.1(c)(i), the Sellers shall pay Buyer, in accordance with the terms of this Agreement (including Section 9.2) and the Bidding Procedures Order an aggregate amount equal to the Expense Reimbursement; provided however, if the Agreement is terminated pursuant to Section 9.1(b)(vi), Section 9.1(b)(vii) or Section 9.1(c)(ii), any such Expense Reimbursement shall only be due and payable upon consummation of an Alternate Transaction from the proceeds of such Alternate Transaction. Each of the Parties acknowledges and agrees that the agreements contained in this Section 7.1 are an integral part of the Transactions and this Agreement and that the Expense Reimbursement is not a penalty, but rather is liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Expense Reimbursement is payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing the Transactions and this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision. In accordance with Section 7.3, Sellers shall file with and seek the entry by the Bankruptcy Court of the Bidding Procedures Order approving the payment of the Expense Reimbursement. The claim of Buyer in respect of the Expense Reimbursement shall become and constitute an allowed administrative expense claim against each of the Sellers under sections 503(b) and 507(a)(2) of the Bankruptcy Code in the Cases (without the need to file a proof of claim). The Expense Reimbursement shall be payable on a joint and several basis by the Sellers.

7.2     Bankruptcy Court Orders and Related Matters.

(a)     The Sellers and Buyer acknowledge that this Agreement and the Transactions are subject to entry of, as applicable, the Bidding Procedures Order and the Sale Order. In the event of any discrepancy between this Agreement and the Bidding Procedures Order and the Sale Order, the Bidding Procedures Order and the Sale Order shall govern.

(b)     The Sellers shall give notice under the Bankruptcy Code of the request for the relief specified in the Bidding Procedures Motion to all creditors and parties in interest entitled to notice thereof pursuant to the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the local rules of the Bankruptcy Court, and any other applicable orders of the Bankruptcy Court, including all Persons that have asserted Liens on any Seller's assets, and all non-debtor parties to the Available Contracts of the Sellers and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders,

45

hearings, or other Proceedings in the Bankruptcy Court relating to this Agreement, the Transactions and the Bidding Procedures Motion.

(c)     The Sellers shall provide draft copies of all orders, motions, pleading, applications and other material documents they intend to file with the Bankruptcy Court in connection with the sale of the Purchased Assets or the Transactions not less than three (3) Business Days prior to the date when the Sellers plan to file such document (provided, that if the delivery of such drafts at least three (3) Business Days is not reasonably practicable, such drafts shall be delivered to Buyer as soon as reasonable practicable prior to filing). The form and substance of any such document hereunder shall be acceptable to Buyer.

(d)     Subject to the Sellers exercising their rights pursuant to this <u>Section 7.2</u>, the Sellers shall not, and shall cause their Affiliates not to, take any action that is intended to result in, or fail to take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Bidding Procedures Order or, if applicable, if Buyer is the prevailing bidder at the Auction, the Sale Order. The Sellers shall, and shall cause their Affiliates to, comply with the Bidding Procedures Order and the Sale Order.

7.3     <u>Bankruptcy Milestones</u>. The Sellers shall achieve the following milestones by the dates set forth below (or such later date as may be agreed by Buyer) (collectively, the "<u>Bankruptcy Milestones</u>"):

(a)     On the Petition Date, the Debtors shall file a motion with the Bankruptcy Court seeking approval of the DIP Facility.

(b)     On or before the date that is one (1) day after the Petition Date, the Debtors shall have filed the Bidding Procedures Motion in the Bankruptcy Court.

(c)     On or before the date that is  five (5) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.

(d)     On or before ten (10) Business Days after the Petition Date, the Debtors have filed a Plan in the Cases, in form and substance acceptable to the Buyer.

(e)     On or before the date that is no later than fourteen (14) days after the Petition Date, each of the Debtors shall have filed schedules and statements of financial affairs pursuant to rule 1007 of the Federal Rule of Bankruptcy Procedure.

(f)     On or before the date that is twenty-five (25) days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order and the Final DIP Order.

(g)     On or before the date that is forty-five (45) days after the Petition Date, the Bid Deadline (as defined in the Bidding Procedures Order) shall have occurred.

(h)     On or before the date that is fifty (50) days after the Petition Date, the Debtors shall have commenced the Auction, if necessary.

(i)      On or before the date that is fifty-seven (57) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order.

(j)      On or before the date that is seventy-two (72) days after the Petition Date, the Closing shall have occurred.

## ARTICLE VIII

## CONDITIONS TO OBLIGATIONS OF THE PARTIES

8.1      <u>Conditions Precedent to Obligations of Buyer</u>. The obligation of Buyer to consummate the Transactions is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) on or prior to the Closing Date of each of the following conditions:

(a)      <u>Debt Purchase</u>. Concurrently with the Closing, the Administrative Agent shall have assigned or otherwise transferred, or caused the assignment or transfer of, the Lenders' interest in an amount outstanding under the DIP Facility and, if applicable, the Loan Debt equal to, in the aggregate, the Credit Bid Amount and related security documents to Buyer pursuant to agreements, in form and substance satisfactory to Buyer and the Administrative Agent.

(b)      <u>Accuracy of Representations and Warranties</u>. The representations and warranties of the Sellers contained in <u>Section 4.1</u> (Organization and Good Standing), <u>Section 4.2</u> (Power and Authority), <u>Section 4.4</u> (No Contravention), <u>Section 4.14</u> (Financial Advisors), <u>Section 4.16</u> (Tax Matters), <u>Section 4.22</u> (Anti-Corruption), and <u>Section 4.23</u> (Related Party Transactions) shall be true and correct on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date). The representations and warranties of the Sellers contained in <u>Section 4.6</u> (Title to Purchased Assets) shall be true and correct in all material respects on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date). All other representations and warranties of the Sellers contained in <u>Article IV</u> shall be true and correct on the date hereof and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date), except where the failure of any such representations or warranties to be true and correct, either individually or in the aggregate, has resulted in or would reasonably be expected to result in a Material Adverse Effect.

(c)      <u>Performance of Obligations</u>. Each of the Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(d)      ~~[Intentionally Omitted].~~

(d)      <u>Reserved.</u>

(e) <u>DIP Financing</u>. The DIP Documents shall have each been approved by the Bankruptcy Court pursuant to the Final DIP Order, which shall be in form and substance acceptable to Buyer.

(f) <u>No Material Adverse Effect</u>. There shall have been no Material Adverse Effect from the Agreement Date through the Closing Date.

(g) <u>No Challenges to Credit Bid</u>. There shall be no pending challenge or contest to the validity, amount, perfection or priority of the DIP Documents, the Loan Documents or other Claims of Buyer or Administrative Agent (as applicable) thereunder that would prevent or otherwise limit Buyer's ability to credit bid the Credit Bid Amount or assume the Assumed Debt, unless any such challenge or contest shall have been resolved to the reasonable satisfaction of Buyer in its sole discretion;

(h) <u>Deliverables</u>. The Sellers shall have delivered, or caused to be delivered, to Buyer each deliverable required pursuant to <u>Section 3.1(b)</u>.

(i) <u>Bidding Procedures Order</u>. The Bankruptcy Court shall have entered the Bidding Procedures Order, which Order shall have become a Final Order.

(j) <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order, which Order shall have become a Final Order.

8.2 <u>Conditions Precedent to the Obligations of the Sellers</u>. The obligation of the Sellers to consummate the Transactions is subject to the satisfaction (or waiver by the Sellers) at or prior to the Closing Date of each of the following conditions:

(a) <u>Accuracy of Representations and Warranties</u>. The representations of Buyer contained in <u>Section 5.1</u> (Organization and Good Standing), <u>Section 5.2</u> (Power and Authority), <u>Section 5.3</u> (No Contravention) and <u>Section 5.6</u> (Financial Advisors) shall be true and correct on the date hereof and on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date). All other representations and warranties contained in <u>Article V</u> shall be true and correct on the date hereof and as of the Closing Date (except to the extent that any such representation or warranty is expressly made as of a specified date), except where the failure of any such representations or warranties to be true and correct (without giving effect to any limitations to "material" or similar qualifier), either individually or in the aggregate, has resulted in or would reasonably be expected to have an adverse effect on Buyer's ability to perform its obligations under this Agreement in any material respect.

(b) <u>Performance of Obligations</u>. Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or on the Closing Date.

(c) <u>Deliverables</u>. Buyer shall have delivered to the Sellers each deliverable required pursuant to <u>Section 3.1(c)</u>.

(d)    <u>Bidding Procedures Order</u>. The Bankruptcy Court shall have entered the Bidding Procedures Order, which Order shall not be subject to a stay or otherwise been vacated.

(e)    <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order, which Order shall not be subject to a stay or otherwise been vacated.

8.3    <u>Conditions Precedent to Obligations of Buyer and the Sellers</u>. The respective obligations of Buyer and the Sellers to consummate the Transactions are subject to the fulfillment, on or prior to the Closing Date, of the condition (which may be waived by the Parties in whole or in part to the extent permitted by applicable Law) that no provision of any applicable Law or Order enacted, entered, promulgated, enforced or issued by any Governmental Entity shall be in effect that prevents, renders illegal or otherwise prohibits the sale and purchase of the Purchased Assets or any of the other Transactions.

8.4    <u>Frustration of Closing Conditions</u>. Neither the Sellers nor Buyer may rely on the failure of any condition to their respective obligations to consummate the Transactions set forth in <u>Section 8.1</u>, <u>Section 8.2</u> or <u>Section 8.3</u>, as the case may be, to be satisfied if such failure was caused by such Party's failure to comply with or breach of any provision of this Agreement.

# ARTICLE IX

# TERMINATION

9.1    <u>Termination of Agreement</u>. This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(a)    by written agreement of the Sellers and Buyer.

(b)    by Buyer, if:

(i)    any Bankruptcy Milestone is not timely satisfied in accordance with <u>Section 7.3</u>;

(ii)    there shall have been a breach by the Sellers of any of their representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in <u>Section 8.1</u>, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured by the earlier of (A) [●] <u>May 1, 2023</u> (or such later date as the Parties may agree upon in writing, the "<u>Outside Date</u>") or (B) five (5) Business Days after written notice thereof shall have been received by the Sellers;

(iii)    the Cases are (A) converted to cases under chapter 7 of the Bankruptcy Code or (B) dismissed prior to the Closing;

(iv)    a trustee or examiner is appointed under section 1104 of the Bankruptcy Code;

(v)    there is a breach or event of default under the DIP Documents;

(vi)     Buyer is not the winning bidder at the Auction; or

(vii)    any Seller enters into a definitive agreement with respect to an Alternate Transaction or an Order of the Bankruptcy Court or other court of competent jurisdiction is entered approving an Alternate Transaction;

(c)     by the Sellers, if:

(i)     there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 8.2, and such breach shall be incapable of being cured or, if capable of being cured, shall not have been cured within the earlier of (A) Outside Date or (B) five (5) Business Days after written notice thereof shall have been received by Buyer; or

(ii)    any Seller enters into a definitive agreement with respect to an Alternate Transaction that is a Competing Qualified Bid, or an Order of the Bankruptcy Court or other court of competent jurisdiction is entered approving an Alternate Transaction that is a Competing Qualified Bid.

(d)     by either Buyer or the Sellers:

(i)     if any Governmental Entity shall have enacted or issued a Law or Order or taken other action permanently restraining, prohibiting or enjoining any of the Parties from consummating the Transactions; or

(ii)    if the Closing shall not have occurred by the Outside Date (except that a Party seeking to terminate this Agreement pursuant to this Section 9.1(d)(ii) shall not have the right to do so if such Party is then in material breach of its obligations under this Agreement).

9.2     Consequences of Termination.

(a)     If either Buyer, on the one hand, or Sellers, on the other hand, desire to terminate this Agreement pursuant to Section 9.1, such Party (or Parties, as applicable) shall give written notice of such termination to the other Parties. Upon delivery of such notice of termination, this Agreement will become void and have no further force and effect and all further obligations of the Parties to each other under this Agreement will terminate without further obligation or liability of the Parties.

(b)     Notwithstanding anything to the contrary in this Agreement, if the Agreement is terminated pursuant to Section 9.1(b)(vi), Section 9.1(b)(vii) or Section 9.1(c)(ii), then Buyer shall be entitled to payment of the Expense Reimbursement, if approved by the Bankruptcy Court, upon consummation of an Alternate Transaction from the proceeds of such Alternate Transaction.

(c)     Notwithstanding anything to the contrary in this Agreement, if this Agreement is terminated for any reason other than pursuant to Section 9.1(b)(vi),

50

Section 9.1(b)(vii) or Section 9.1(c), then Buyer shall be entitled to payment of the Expense Reimbursement no later than two (2) Business Days following such termination.

(d)     Notwithstanding the foregoing set forth in this Section 9.2, Section 1.1 (Defined Terms), Section 6.5 (Public Announcements), Section 7.1 (Expense Reimbursement), this Section 9.2 (Consequences of Termination) and Article X (Miscellaneous) shall survive any termination of this Agreement.

(e)     Nothing in this Section 9.2 shall relieve Buyer or the Sellers of any liability for a breach of this Agreement prior to the date of termination.

## ARTICLE X

## MISCELLANEOUS

10.1     Expenses. Except as set forth in this Agreement or the Credit Documents and whether or not the Transactions are consummated, each Party shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the Transactions.

10.2     Assignment. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers without the prior written consent of Buyer, or by Buyer without the prior written consent of Sellers; provided, however, that Buyer may assign any or all of its rights and/or liabilities hereunder (or any document delivered by Buyer pursuant hereto) to one or more Affiliates of Buyer, or to any party which has received a contribution of the outstanding balance of Loan Debt equal to the Credit Bid Amount, in the aggregate, which assignment shall not relieve Buyer of its obligations hereunder. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

10.3     Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of the Sellers and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein. Without limiting the foregoing, no direct or indirect holder of any equity interests or securities of either the Sellers or Buyer (whether such holder is a limited or general partner, member, stockholder or otherwise), nor any Affiliate of either the Sellers or Buyer, nor any Representative, or controlling Person of each of the Parties and their respective Affiliates, shall have any liability or obligation arising under this Agreement or the Transactions.

10.4     Matters Related to the Administrative Agent.

(a)     The Administrative Agent shall use commercial reasonable efforts to assign or transfer or otherwise deliver to Buyer an amount outstanding under the Loan Debt equal in the aggregate to the Credit Bid Amount and corresponding security documents, pursuant to agreements, in form and substance satisfactory to Buyer and Administrative Agent.

(b)     Each of the Parties acknowledges and agrees that none of the Sellers' title to, control of or possession of any of the Purchased Assets, or any of the Sellers' obligations in

respect of any of the Assumed Liabilities, shall be transferred to or assumed by the Administrative Agent. Each Seller and Buyer, on behalf of itself and its respective Affiliates, acknowledges and agrees that neither the Administrative Agent nor any of its Affiliates (other than Buyer) shall have any Liability in the event of any breach by Buyer or any Seller of any of its representations, warranties, covenants, obligations or other agreements under this Agreement, including its obligations to consummate the Transactions in accordance with the terms of any document contemplated by this Agreement, other than as a result of or arising out of the Administrative Agent's intentional fraud or willful misconduct. Each Seller and Buyer, on behalf of itself and its respective Affiliates, further acknowledges and agrees that neither the Administrative Agent nor any of its Affiliates (other than Buyer) shall in any way be deemed to be attributed or otherwise responsible for any of the representations, warranties, covenants, obligations or other agreements of Buyer or the Sellers under any document contemplated by this Agreement, including any obligation of Buyer or the Sellers hereunder to make payments of any kind, provide written approvals or make deliveries. Each Seller and Buyer, on behalf of itself and its respective Affiliates, further acknowledges and agrees that neither the Administrative Agent nor any of its Affiliates shall have any Liability or other obligation in respect of any action taken or not taken by the Administrative Agent in connection with any document contemplated by this Agreement, other than as a result of or arising out of the Administrative Agent's intentional fraud or willful misconduct. Each Seller and Buyer, on behalf of itself and its respective Affiliates, further acknowledges and agrees that Buyer, and not the Administrative Agent, has negotiated the terms of the purchase set forth herein, including the assets being purchased, the Liabilities being assumed, the Purchase Price and all the terms of this Agreement relating to the purchase by Buyer, and the Administrative Agent shall bear no responsibility and incur no Liability whatsoever to any Person solely by virtue of being a Party.

10.5     <u>Risk of Loss</u>. The Sellers will bear all risk of loss occurring to or upon any portion of the Purchased Assets prior to the Closing Date. In the event that any material portion of any Purchased Assets is damaged or destroyed prior to Closing Date, then, with respect to such Purchased Assets, Buyer may, at Buyer's option, either (i) proceed to close notwithstanding the damage or destruction of such Purchased Assets or (ii) exclude such Purchased Assets, in which event Buyer shall have no obligation to close if as a consequence of the exclusion of such Purchased Assets any condition to Closing in <u>Section 8.1</u> would not be satisfied. If Buyer closes notwithstanding an unrepaired or unrestored loss to a Purchased Asset, the Sellers will deliver and/or assign to Buyer any insurance proceeds with respect to such damage or destruction, and all claims against third parties relating thereto, and the adjustment to the Purchase Price shall be limited to the amount of any deductible or self-insured retention under the applicable policies of insurance.

10.6     <u>Notices</u>. All notices, demands, requests, waivers, consents, approvals or other communications (collectively, "<u>Notices</u>") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery or electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice. Notice shall be deemed given on the date of service or transmission if personally served or transmitted by electronic mail with confirmation of receipt (excluding "out of office" or similar automated replies); <u>provided</u>, <u>however</u>, that, if delivered or transmitted on a day other than a Business Day, notice shall be deemed given on the

next Business Day. Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

| | |
|---|---|
| If to the Sellers or Parent: | [Summit Health BuyerCo, LLC][●] [●][●]1901 W. Cypress Creek Road<br>Suite 500<br>Fort Lauderdale, FL 33309<br><u>Attention</u>: [●][●]Harvey L. Tepner<br><u>Email</u>: [●][●]htepner@delphihealthgroup.com |
| With a copy to: | Berger Singerman LLP<br>1450 Brickell Avenue<br>Suite 1900<br>Miami, Florida 33131<br><u>Attention</u>: Paul Steven Singerman, Esq.<br>Christopher Andrew Jarvinen, Esq.<br><u>Email</u>: singerman@bergersingerman.com<br>cjarvinen@bergersingerman.com |
| If to Buyer or Administrative Agent: | Brightwood Loan Administrative Services LLC<br>810 Seventh Avenue, 26th Floor<br>New York, NY 10019<br><u>Attention</u>: Mia Ellis<br><u>Email</u>: ellis@brightwoodlp.com |
| With a copy to: | King & Spalding LLP<br>1185 Avenue of the Americas, 34th Floor<br>New York, NY 10036<br><u>Attention</u>: Roger Schwartz<br>Timothy M. Fesenmyer<br>Robert Nussbaum<br><u>Email</u>: rschwartz@kslaw.com<br>tfesenmyer@kslaw.com<br>rnussbaum@kslaw.com |

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

10.7    <u>Entire Agreement; Amendments and Waivers</u>. This Agreement and all agreements entered into pursuant hereto and thereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement between the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties; provided, that nothing herein shall modify or alter the terms, rights or obligations of the Administrative Agent, the Lenders or Sellers under the Loan Documents or the DIP Documents prior to Closing. This Agreement may be amended,

53

supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the Party waiving compliance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.8    Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Counterparts to this Agreement may be delivered via electronic delivery, "pdf" or facsimile. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

10.9    Invalidity. If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, the Parties shall negotiate in good faith to modify this Agreement, to ensure that this Agreement shall reflect as closely as practicable the intent of the Parties on the date hereof. If the final judgment of a court of competent jurisdiction or other Governmental Entity declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

10.10    Governing Law. This Agreement, and any Proceeding that may be based upon, arise out of or relate or be incidental to the Transactions, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "Transaction Dispute"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of Florida, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of Florida to be applied, except to the extent that such Laws are superseded by the Bankruptcy Code.

10.11    Dispute Resolution; Consent to Jurisdiction.

(a)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10.6; provided, however, upon the closing of the Cases (except for any matter(s) with respect to the Sellers and/or the Cases in which the Bankruptcy Court retains jurisdiction with respect to such matter with respect to Sellers and/or the

Cases), then, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S. District Court for the Southern District of New York sitting in New York County or the Commercial Division of the Courts of the State of New York sitting in the County of New York and any appellate court from any thereof, for the resolution of any such Transaction Dispute. In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally: (i) submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts; (ii) agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and (iii) agrees that Notice demand in accordance with Section 10.6, will be effective service of process; provided, however, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of New York.

(b)     The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of New York for any purpose except with respect to any Transaction Dispute.

10.12   WAIVER OF RIGHT TO TRIAL BY JURY. EACH PARTY HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING IN CONNECTION WITH A TRANSACTION DISPUTE.

10.13   Specific Performance. Each Party acknowledges and agrees that the other Party would be damaged irreparably in the event that a Party does not perform its obligations under this Agreement in accordance with its specific terms or otherwise breaches this Agreement, so that, in addition to any other remedy that Buyer or the Sellers may have under law or equity, each Party shall be entitled to injunctive relief to prevent any breaches of the provisions of this Agreement by the other Parties and to enforce specifically this Agreement and the terms and provisions hereof.

10.14   Third Party Beneficiaries. Nothing in this Agreement, express or implied, is intended to confer upon any other Person any rights or remedies of any nature under or by reason of this Agreement, except as expressly provided herein, including Section 10.17.

10.15   Counting. If the due date for any action to be taken under this Agreement (including the delivery of Notices) is not a Business Day, then such action shall be considered timely taken if performed on or prior to the next Business Day following such due date.

10.16   Survival. Except as expressly set forth in this Agreement to the contrary, all representations and warranties and covenants of Buyer and the Sellers, respectively, contained in this Agreement or in any document delivered pursuant hereto shall not survive the Closing Date and thereafter shall be of no further force and effect, and in no event whatsoever shall any of the Sellers be liable or responsible for damages, indemnity, or other monetary remedy after Closing. Notwithstanding the foregoing, all covenants and agreements set forth in this Agreement, which by their terms would require performance after the Closing Date, shall survive until fully

performed or until such covenant or agreement expires by its terms; provided that no Seller shall be liable in monetary damages thereunder.

10.17   <u>Non-Recourse</u>. All claims, Liabilities, Proceedings, or causes of action (whether in contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to a Transaction Dispute, may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their permitted assignees (collectively, the "<u>Contracting Parties</u>"). No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, equityholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any Contracting Party (other than the Persons listed on <u>Schedule 10.17(a))</u>, or any director, officer, employee, incorporator, member, partner, manager, equityholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any of the foregoing, ~~including each of the Persons listed on Schedule 10.17(b)~~ (collectively, the "<u>Nonparty Affiliates</u>"), shall have any Liability (whether in contract or in tort, in law or in equity, or granted by statute) for any claims, Liabilities, or causes of action, arising under, out of, in connection with, or related in any manner to a Transaction Dispute; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such claims, Liabilities, and causes of action, against any such Nonparty Affiliates.

10.18   <u>Preparation of this Agreement</u>. Buyer and the Sellers hereby acknowledge that (a) Buyer and the Sellers jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (b) Buyer and the Sellers have been adequately represented and advised by legal counsel with respect to this Agreement and the Transactions, and (c) no presumption shall be made that any provision of this Agreement shall be construed against either Party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

10.19   <u>Releases</u>. Effective as of the Closing, each of the Sellers on their own behalf and on behalf of their past, present, and future predecessors, successors and assigns hereby unconditionally, irrevocably, and fully forever release, remise, acquit, relinquish, irrevocably waive, and discharge the Buyer, Administrative Agent and the Lenders, and each of their respective affiliates, former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, assigns, and predecessors in interest, each in their capacity as such, of and from any and all Claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened, including all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description that exist on the date hereof with respect to or relating to this Agreement, the Sellers, the Debtors, the Cases, the Transaction, the DIP Documents, and the Loan Documents in each case, in connection with any event, conduct or circumstance occurring on or prior to the Closing.

[*Remainder of Page Intentionally Left Blank*]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the Sellers, Buyer and the Administrative Agent as of the date first above written.

**BUYER:**

**[Delphi Lender AcquisitionCo, LLC]**

By:_____
Name:
Title:

**SELLERS:**

**Union Fresh Start LLC d/b/a Serenity at Summit**

By:_____
Name:
Title:

**Summit Behavioral Health Limited Liability Company d/b/a Summit Behavioral Health ~~Princeton Junction~~**

By:_____
Name:
Title:

**SBH Haverhill, LLC d/b/a Serenity at Summit~~New England~~**

By:_____
Name:
Title:

**PARENT:**

**DR Parent, LLC**, solely for purposes of Section 3.1(b) and Section 6.15

By: _____
Name:
Title:

**ADMINISTRATIVE AGENT:**

**Brightwood Loan Services LLC**, solely for purposes of <u>Section 3.2</u>, <u>Section 10.4</u>, and <u>Section 10.7</u> to <u>10.19</u>

By:_____
Name:
Title:

**EXHIBIT A**

**Bidding Procedures**

**EXHIBIT B**

**Bidding Procedures Order**

**EXHIBIT C**

**Form of Bill of Sale, Assignment and Assumption Agreement**

**EXHIBIT "C"**

**SELLERS' DISCLOSURE STATEMENTS**
(REDACTED)

11934644-3

*Privileged & Confidential*

DISCLOSURE SCHEDULES

to that certain

ASSET PURCHASE AGREEMENT

by and among

DELPHI LENDER ACQUISITIONCO LLC,

as Buyer,

THE SELLERS PARTY THERETO,

solely for the purposes of Sections 3.1(b) and 6.15 thereto,

DR PARENT, LLC,

as Parent

and

solely for the purposes stated expressly therein,

BRIGHTWOOD LOAN SERVICES LLC,

as Administrative Agent

Dated as of February 19, 2023

11888521-15

These disclosure schedules (these "Schedules") constitute the Schedules referred to in the Asset Purchase Agreement (the "Agreement"), dated February 19, 2023, by and among Delphi Lender AcquisitionCo LLC, a Delaware limited liability company (together with its designee, "Buyer"), Union Fresh Start LLC d/b/a Serenity at Summit, a New Jersey limited liability company, Summit Behavioral Health Limited Liability Company d/b/a Summit Behavioral Health, a New Jersey limited liability company, SBH Haverhill, LLC d/b/a Serenity at Summit, a Massachusetts limited liability company (each a "Seller," and collectively, the "Sellers"),  DR Parent, LLC, a Delaware limited liability company, solely with respect to Sections 3.1(b) and 6.15 of the Agreement ("Parent") and Brightwood Loan Services LLC, a Delaware limited liability company, solely in its capacity as administrative agent for the lenders under the Prepetition Credit Agreement (defined below) and signing solely with respect to Section 3.2, Section 10.4, and Sections 10.7 to 10.19 of the Agreement (the "Administrative Agent"). Capitalized terms used but not otherwise defined herein have the meanings given to them in the Agreement.

Sellers may, at their option, include in these Schedules items that are not material, and any such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgment or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of these Schedules.  Information disclosed in any Schedule shall constitute a disclosure for all purposes under the Agreement notwithstanding any reference to a specific section, and all such information shall be deemed to qualify the Agreement with respect to any matter that could reasonably be expected to be pertinent.

In no event shall disclosure of any matter, fact, occurrence, information or circumstance in these Schedules be deemed or interpreted to broaden the scope of, or alter or otherwise change, the representations and warranties, obligations, covenants, conditions, indemnities or agreements contained in the Agreement or any other document or agreement required to be executed or delivered in connection therewith, or to create any representation, warranty, obligation, covenant, condition, indemnity or agreement that is not contained in the Agreement or any other document or agreement required to be executed or delivered in connection therewith.  The inclusion of any matter, fact, occurrence, information or circumstance in these Schedules shall not be construed as an admission or acknowledgement or otherwise imply that such matter, fact, occurrence, information or circumstance is required to be listed in these Schedules in order for any representation or warranty in the Agreement to be true and correct, or that any such matter, fact, occurrence, information or circumstance constitutes a Material Adverse Effect or is material (or not material) to or outside (or in) the Ordinary Course of Seller or the Business (or that such matter, fact, occurrence, information or circumstance is above or below any specified threshold).

Matters reflected in these Schedules are not necessarily limited to matters required by the Agreement to be reflected in these Schedules.  In particular, although these Schedules may contain supplementary information not specifically required under the Agreement to be included in these Schedules, such additional matters are set forth for informational purposes, are not represented or warranted in the Agreement and do not necessarily include other matters of a similar nature.

The disclosure of any matter in these Schedules is not to be deemed an admission against any Party that such matter actually constitutes noncompliance with or a violation of Contract or Law or other topic to which such disclosure is applicable.

11888521-15

In disclosing any matter, fact, occurrence, information or circumstance in these Schedules, the disclosing party is not waiving any attorney-client privilege associated with any such matter, fact, occurrence, information or circumstance, or any protection afforded by the "work product doctrine" with respect to any of the same.

**Schedule 1.1(a)**
**Insider Avoidance Actions**

*[To be provided]*

**Schedule 2.2(k)**
**Excluded Assets**

*[To be provided]*

**Schedule 2.3(e)**
**Retention Agreements**

- ████████████████████████████████████████████████████.
- ████████████████████████████████████████████████████.
- ████████████████████████████████████████████████████.
- ████████████████████████████████████████████████████
- ████████████████████████████████████████████████████
- ████████████████████████████████████████████████████

**Schedule 2.5(i)**
**Rejected Contracts**



**Schedule 3.3**
**Allocation Methodology**



.

**Schedule 4.3**
**Litigation**

- See attached.

- Schedule 4.10(b) is incorporated herein by reference.

| Cases | Counsel | Notes |
|---|---|---|
| Joseph Dello Russo v. SBH Haverhill, LLC d/b/a Serenity At Summit Case No. 2177CV1256-B Commonwealth of Massachusetts | **Scott J. Tucker (Counsel for Plaintiff)** Matthew S. Prunk Tucker, Dyer & O'Connell, LLP 199 Wells Avenue Newton, MA 02459 O: (617) 986-4219 tucker@tdolaw.com prunk@tdolaw.com <br><br> **Matthew J. Holmes (Counsel for Defendant)** Noel B. Dumas MORRISON MAHONEY LLP | Negligence claim pending in MA Claim is that SBH Haverhill, LLC d/b/a Serenity At Summit cost employee his job |

11905636-2



250 Summer Street
Boston, MA 02210-1181
O: (617) 439-7500
mholmes@morrisonmahoney.com
ndunas@morrisonmahoney.com

11905636-2

**Schedule 4.5**
**Sellers' Consents and Approvals**





---

3 SBHH must require, as a condition to the sale, that Buyer assume this agreement.

11888521-15

**Schedule 4.7**
**Assumed Contracts**

*[To be provided following receipt of Available Contracts]*

**Schedule 4.8(a)**
**Intellectual Property**

**Trademarks**:

| Grantor | Trademark Number | Trademark Application Number | Trademark Registration Number | Date of Application | Date of Registration |
|---|---|---|---|---|---|
| Delphi Behavioral Health Group, LLC | 87366914 | N/A | 5676785 | 3/10/2017 | 2/12/2019 |
| Delphi Behavioral Health Group, LLC | 87366407 | N/A | 5628551 | 8/15/2017 | 12/11/2018 |
| Delphi Behavioral Health Group, LLC | 87366451 | N/A | 5628551 | 8/15/2017 | 12/11/2018 |
| Delphi Behavioral Health Group, LLC | 87366451 | N/A | 5493256 | 3/10/2017 | 6/12/2018 |
| Delphi Behavioral Health Group, LLC | 87366845 | N/A | 5322373 | 3/10/2017 | 10/31/2017 |
| Delphi Behavioral Health Group, LLC | 87366744 | N/A | 5322361 | 8/15/2017 | 10/31/2017 |
| Delphi Behavioral Health Group, LLC | 87366442 | N/A | 5322339 | 3/10/2017 | 8/15/2017 |
| Delphi Behavioral | 87366819 | N/A | 5278570 | 6/11/2017 | 8/29/2017 |

| | | | | | |
|---|---|---|---|---|---|
| Health Group, LLC | | | | | |
| Delphi Behavioral Health Group, LLC | 87366783 | N/A | 5278569 | 3/10/2017 | 6/9/2017 |
| Delphi Health Group, LLC | 88391954 | N/A | N/A | 4/18/2019 | N/A |
| Delphi Health Group, LLC | 87716129 | N/A | 5814320 | 12/11/2017 | 7/23/2019 |
| Delphi Health Group, LLC | 87687366 | N/A | 5704387 | 11/16/2017 | 3/19/2019 |
| Delphi Health Group, LLC | 87687308 | N/A | 5704385 | 11/16/2017 | 3/19/2019 |
| Delphi Health Group, LLC | 87687290 | N/A | 5698557 | 11/16/2017 | 3/12/2019 |
| Ocean Breeze Recovery, LLC | 86288218 | N/A | 4670728 | 5/21/2014 | 10/28/2014 |
| Ocean Breeze Recovery, LLC | 86287797 | N/A | 4670709 | 5/21/2014 | 10/28/2014 |
| Palm Beach Recovery, LLC | 86461024 | N/A | 4907130 | 11/21/2014 | 3/1/2016 |
| Palm Beach Recovery, LLC | 85936694 | N/A | 4591207 | 5/20/2013 | 8/26/2014 |
| Palm Beach Recovery, LLC | 85936614 | N/A | 4680522 | 5/20/2013 | 2/3/2015 |
| Palm Beach Recovery, LLC | 77357111 | N/A | 3476197 | 12/20/2007 | 7/29/2008 |
| Peak Health | 86532642 | N/A | 4826172 | 2/12/2015 | 10/6/2015 |

| | | | | | |
|---|---|---|---|---|---|
| NJ, LLC | | | | | |
| Peak Health NJ, LLC | 86532640 | N/A | 4812454 | 2/12/2015 | 9/15/2015 |
| Peak Health NJ, LLC | 86532637 | N/A | 4812453 | 2/12/2015 | 9/15/2015 |
| Peak Health NJ, LLC | 86532633 | N/A | 4826171 | 2/12/2015 | 10/6/2015 |

**Domain Names**:

- addictioncounselinginstitute.com

- addictioncounselinginstitute.net

- addictioncounselinginstitute.org

- alcoholabuse.org

- aretedetox.com

- aretedetox.net

- aretedetox.org

- areterecovery.com

- areterecovery.net

- areterecovery.org

- aretetreatment.com

- aretetreatment.net

- aretetreatment.org

- breakthroughlivingrc.com

- californiahighlands.com

- californiahighlandsdesertcanyon.com

- californiahighlandsvistas.com

- definingmomentrc.com

- delphibehavioral.com

- delphibehavioral.net

- delphibehavioral.org

- delphihealthgroup.com

- delphihelpdesk.com

- delphitreatment.com

- delphitreatment.info

- delphitreatment.net

- delphitreatment.org

- desertviewrc.com

- desertviewrecovery.com

- desertviewrecovery.info

- desertviewrecovery.net

- desertviewrecovery.org

- DRUGTREATMENTCENTERFINDER.COM

- familyrecoveryspecialists.com

- marylandhousedetox.com

- mddetox.com

- mhdetox.com

- newperspectivesfl.com

- newperspectivesrecovery.org

- obr.mobi

- obr.rehab

- obrdetox.com

- oceanbr.com

- oceanbr.info

- oceanbr.net

- oceanbr.org

- oceanbreezerecovery.com

- oceanbreezerecovery.org

- onwardlivingrc.com

- pathwaytohope.net

- pbinstitute.com

- RECOVERYHUB.CO

- RECOVERYHUB.COM

- sbhflorhampark.com

- sbhprincetonjunction.com

- sbhunion.com

- serenityatne.com

- serenityatnj.com

- serenityatsummit.com

- summitbehavioralhealth.com

- summitdetoxtreatment.com

- summiteatingdisordertreatment.com

- summithelps.com

- summitiop.com

- summitresidentialtreatment.com

- summittreatmentdynamics.com

- treatment4grownups.com

- vistapineshealth.com

**Schedule 4.8(d)**
**Security Breaches**

**Schedule 4.9(a)**
**Benefit Plans**

See attached.

# BENEFIT OVERVIEW

Delphi is committed to providing employees with a benefits program that is both comprehensive and competitive. Our benefits program offers health coverage and a degree of financial security to our employees and their families. This guide provides a general overview of the benefits available to you and how to contact the carriers.



**Schedule 4.10(a)**
**Labor Matters (Employee Census)**

See attached.

45-page attachment to Schedule 4.10(a) removed

**Schedule 4.10(b)**
**Labor Matters; Collective Bargaining**



**Schedule 4.10(d)**
**Labor Matters; Compliance with Labor Laws**

- <!-- redacted -->

- Schedule 4.3 is incorporated herein by reference.

**Schedule 4.11**
**Conduct of Business**

On February 6, 2023, the Sellers and certain of their affiliates each commenced a chapter 11 case, which are being jointly administered under Case No. 23-10945-PDR, by filing separate voluntary petitions for reorganization under Chapter 11 of Title 11 of the U.S. Code, 11 U.S.C. 101 *et seq.*, with the United States Bankruptcy Court for the Southern District of Florida. The Sellers continue to operate their businesses and manage their properties as debtors in possession.

**Schedule 4.12**
**Compliance with Laws; Permits**

- 

- Schedule 4.3 is incorporated herein by reference.

## Schedule 4.17(a)
## Real Property

| Address of Premises | Title | Tenant | Landlord | Term | Effective Date | Expiration Date |
|---|---|---|---|---|---|---|
| 4065 Quakerbridge Road, Suite 102 & Suite 103, West Windsor Township, NJ 08550 | Lease Agreement, as amended by (i) Lease Amendment #1, (ii) Second Amendment to Lease, (iii) Third Amendment to Lease, and (iv) Fourth Amendment to Lease Expansion | Summit Behavioral Health, LLC | Quakerbridge Investment Group, LLC | Originally 5 years; Extended to expire 9/30/27 per Fourth Amendment | Original Lease dated 6/5/12; Amendment # 1 dated 2018 (no exact date filled in); Second Amendment dated 5/23/17, Third Amendment dated 6/15/22, and Fourth Amendment dated 2/2/23 | 9/30/27 |
| 1000 Galloping Hill Road, Union Township, NJ 07083 | OFFICE LEASE AGREEMENT, as amended by (i) First Amendment to Lease and (ii) Second Amendment to Lease | UNION FRESH START, LLC | UNION MEDICAL PARK LLC | 10 years | 8/24/2013; renewed 11/15/2017 | 8/31/2032 |
| 61 Brown Street, Haverhill, Massachusetts 01830 | Lease Agreement as amended by (i) the First Amendment to Lease, (ii) the Second Amendment to Lease and (iii) the Third Amendment to Lease | SBH Haverhill, LLC | NWI Serenity Behavioral Hospital LP [4] | 180 months | Lease Agreement dated January 22, 2019<br><br>Rent Commencement Date February 1, 2021 (per Second Amendment) | 2/31/36 |

---

[4] Building sold to TST Haverhill Mob, LLC 1/22/2019. Lease assigned to NWI Serenity Behavioral Hospital LLP 2022.

**Schedule 4.18**
**Personal Property Leases**

Equipment Rental Contract for Water Cooler Rentals, dated October 25, 2019, by and between Pure Beverage Systems of Florida, Inc. and Delphi Health Group, LLC.

**Schedule 4.19**
**Sellers' Insurance**

| Coverage | Carrier/Paper | Policy Number | Policy Term |
|---|---|---|---|
| **Property**<br>Premium: $298,617.70<br>($5M of $10M Primary) | CHUBB<br>Westchester Surplus Lines Insurance Company | D38064277006 | 10/3/2022<br>to<br>10/3/2023 |
| **Property**<br>Premium: $336,582.55<br>($5M of $10M Primary) | SOMPO<br>Endurance American Specialty Insurance Co | ESP30002050002 | 10/3/2022<br>to<br>10/3/2023 |
| **Excess Property**<br>Premium: $26,254 | One Beacon<br>Homeland Insurance Company of New York | 79501995300000 | 10/3/2022<br>to<br>10/3/2023 |
| **Property Deductible Buyback**<br>Premium: $23,633 | Certain Underwriters at Lloyds of London<br>National Fire & Marine Insurance Co | AOP-220690<br>42 ADB 220690-01 | 10/3/2022<br>to<br>10/3/2023 |
| **General & Professional Liability**<br>Premium: $449,400 | Allied World<br>Allied World Surplus Lines Insurance Company | 0310-9685 | 10/3/2022<br>to<br>10/3/2023 |

| Coverage | Insurer | Policy Number | Policy Period |
|---|---|---|---|
| **Automobile Liability (States: FL, CA, MD)**<br>Premium: $312,885<br>•includes endorsement adding FL Physical Damage | National Liability & Fire Insurance Co. | 73 APB 005805 | 10/3/2022<br>to<br>10/3/2023 |
| **Automobile Liability (State: MA)**<br>Premium: $1,558<br>Issued to: Enterprise FM Trust | Progressive Casualty Insurance Co. | 01022176-0 | 10/3/2022<br>to<br>10/3/2023 |
| **Automobile Liability (MA)**<br>Premium: $2,953<br>Issued to: SBH Haverhill LLC | Progressive Casualty Insurance Co. | 01023060-0 | 10/3/2022<br>to<br>10/3/2023 |
| **Automobile Liability (State: NJ)**<br>Premium: $5,999<br>Issued to: Enterprise FM Trust | Drive New Jersey Insurance Co (Progressive) | 962123333 | 10/3/2022<br>to<br>10/3/2023 |
| **Automobile Liability (NJ)**<br>Premium: $4,470<br>Issued to: Union Fresh Start LLC | Drive New Jersey Insurance Co (Progressive) | 962122640 | 10/3/2022<br>to<br>10/3/2023 |
| **Umbrella Liability**<br>Premium: $262,500.00<br>($5M) | Allied World<br>Allied World Assurance Company (U.S.) Inc. | 0310-9686 | 10/3/2022<br>to<br>10/3/2023 |

11888521-15

| Coverage | Carrier | Policy Number | Policy Period |
|---|---|---|---|
| **Excess Liability**<br>Premium: $110,250.00<br>($5M xs $5M) | Sompo<br>Endurance American Specialty Insurance Co. | HLC1001506202 | 10/3/2022 to 10/3/2023 |
| **Excess Liability**<br>Premium: $119,253.76<br>($7M xs $10M) | Coverys<br>Coverys Specialty Insurance Company | 005FL000027910 | 10/3/2022 to 10/3/2023 |
| **Cyber Liability**<br>Premium: $52,500.00 | AXA XL<br>Indian Harbor Insurance Company | MTP9039691 03 | 10/1/2022 to 10/1/2023 |
| **D&O / EPL / FID**<br>Premium: $70,000 | Markel American Insurance Company | MKLM1MML000850 | 4/8/2022 to 4/8/2023 |
| **Excess D&O**<br>Premium: $43,000 | Argonaut Insurance Company | MLX4262481-1 | 4/8/2022 to 4/8/2023 |
| **Excess D&O**<br>Premium: $13,594.50 | Hudson Insurance Company | HN-0303-8417 | 4/8/2022 to 4/8/2023 |

11888521-15

**Crime**

Premium: $4,964.00 (Annual Installments)

| | | | |
|---|---|---|---|
| Travelers | 107325955 | Travelers Casualty & Surety Company | 10/3/2020 to 10/3/2023 |

**Workers' Compensation and Employment Practices Liability**

Premium: $274,654.00 — Service American Indemnity Company — SAACWC0007602 — 7/1/2022 to 7/1/2023

**Terrorism**

Premium: $819.00 — Certain Underwriters at Lloyds of London — PRPNA2102693/1080 — 6/25/2022 to 6/25/2023

11888521-15

**Schedule 4.23(a)**
**Related Party Transactions; Contracts and Arrangements**

1. Delphi Behavioral Health Group, LLC runs all administrative functions for Sellers.

2. *[To be provided]*

**Schedule 5.4**
**Buyer Consents and Approvals**

None.

**Schedule 6.14**
**Acquired Bank Accounts**

| Seller | Name of Bank | Type of Account | Account Number |
|---|---|---|---|
| Summit Behavioral Health Limited Liability Company | Key Bank<br>PO Box 93885<br>Cleveland, OH 44101-5885 | Operating | ███████7050 |
| SBH Haverhill, LLC | Key Bank<br>PO Box 93885<br>Cleveland, OH 44101-5885 | Operating | ███████7035 |
| Union Fresh Start, LLC | Key Bank<br>PO Box 93885<br>Cleveland, OH 44101-5885 | Operating | ███████7019 |

**Schedule 10.17(a)**
**Non-Recourse; Party Affiliates**

*[To be provided]*